**United States District Court**
**District of Columbia**

| | |
|---|---|
| **The Christian Civic League of Maine, Inc.** | |
| 70 Sewall Street | |
| Augusta, ME 04330, | |
| *Plaintiff,* | **Cause No. _____** |
| *v.* | |
| **Federal Election Commission,** | |
| 999 E Street, NW | |
| Washington, DC 20463, | |
| *Defendant.* | |

## Verified Complaint for Declaratory and Injunctive Relief

The Christian Civic League of Maine, Inc. (CCL) complains as follows:

### Introduction

1. This is a First Amendment as-applied constitutional challenge to the prohibition on the use of corporate funds for "electioneering communications" (hereinafter "the prohibition") contained in § 203 of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, 116 Stat. 81, 91-92, and codified at 2 U.S.C. § 441b(b)(2).

2. As presently applicable, "'electioneering communication' means any broadcast, cable, or satellite communication which . . . refers to a clearly identified candidate for Federal office [and] is made within . . . 60 days before a general . . . election for the office sought by the candidate; or . . . 30 days before a primary . . . election . . . for the office sought by the

**Complaint**                                      1

candidate; and . . . is targeted to the relevant electorate." 2 U.S.C. § 434(f)(3)(A)(i). *See also* 11 C.F.R. § 100.29 (definition of "electioneering communication").

3. The prohibition provides that "[i]t is unlawful . . . for any corporation whatever . . . to make a contribution or expenditure in connection with any [Federal] election. . . . For purposes of this section . . . , the term 'contribution or expenditure' includes . . . any applicable electioneering communication . . . ." 2 U.S.C. § 441b(a)-(b); *see also* 11 C.F.R. §§ 114.2 and 114.14 (regulatory ban on corporate funding of electioneering communications).

4. The United States Supreme Court has held that corporations may use corporate funds to engage in lobbying. *First National Bank of Boston v. Bellotti*, 435 U.S.765 (1978).

5. In *McConnell v. FEC*, the United States Supreme Court upheld the prohibition against a *facial* constitutional challenge. 540 U.S. 93, 202-207 (2003). In *Wisconsin Right to Life, Inc. v. FEC*, 126 S.Ct. 1016 (2006), the Court explained that as-applied challenges to the electioneering communication prohibition were not resolved or precluded by its holding in *McConnell*. 126 S.Ct. at 1018.

6. This case challenges the prohibition as applied to grass-roots lobbying on the facts of this case, which involves a broadcast advertisement (a true and accurate transcript of the current version of which is attached as Exhibit A that are paid for by CCL and that encourage Maine listeners to contact their U.S. Senators (Sen. Susan Collins and Sen. Olympia Snowe) and to ask them to vote for the Marriage Protection Amendment (S.J. Res. 1). The broadcast of this advertisement will occur during electioneering communication prohibition periods this summer. More specific as-applied facts are provided *infra*.

7. The Federal Election Commission considered creating an exception to this

**Complaint**                    2

prohibition in its regulations implementing BCRA for grass-roots lobbying broadcasts but decided it was beyond the exception-making authority granted it by Congress to do so. 67 Fed. Reg. 65190, 65200-02.

8. In January, 2005, Senator Wayne Allard introduced the Marriage Protection Amendment (S.J. Res. 1). On November 9, 2005, the Subcommittee on Constitution, Civil Rights and Property Rights of the Committee on the Judiciary approved the Marriage Protection Amendment for full committee consideration without amendment favorably. 150 Cong. Rec. S8459-60.

9. On information and belief, a vote for cloture in the Senate on S.J. Res. 1 is likely to occur in early June, 2006.

10. Previous versions of a federal constitutional amendment to protect traditional marriage have failed to garner sufficient support in Congress. Therefore, the progress of S.J. Res. 1 in the Senate this summer is critical. CCL would support any future House or Senate bills that would offer protection to traditional marriage materially similar to that of S.J. Res. 1 or previous permutations of a federal bill to protect traditional marriage.

11. CCL intends to air the advertisement (Exhibit A) beginning on May 10 for the purpose of influencing the votes of Senators Snow and Collins regarding S.J. Res. 1, the Marriage Protection Amendment.

12. On May 10, the advertisements are not electioneering communications because they were not being run 30 days before the primary or 60 days before the general election. They will become electioneering communications as to U.S. Senator Olympia Snowe on May 14, 30 days before the June 13 Maine primary. *See*

**Complaint**                                  3

http://www.fec.gov/Fec_calendar/viewevent.cfm?EventID=788. Senator Snowe is an

unopposed candidate and Senator Susan Collins is not a candidate this year. CCL intends to

run the ad after May 14.

13. Because of the timing of anticipated Senate vote on S.J. Res. 1, CCL intends to

run the ad and/or materially similar ads between May 10 and early June, including within the

blackout periods, if CCL obtains the relief sought herein. The timing of these events is

beyond the control of CCL.

14. From May 14 to June 13 (30 days before the primary) and from September 8 to

November 7 (60 days before the general election), the current ad (Exhibit A) and materially

similar ads will become electioneering communications as to Maine Senatorial candidate

Olympia Snowe, and CCL will be prohibited from running these ads.

15. This case seeks declaratory and injunctive relief permitting CCL to run both the

current grass-roots lobbying advertisement (Exhibit A) and materially similar ads in the

future.

16. Regardless of the outcome of the expected Senate cloture vote on S.J. Res. 1 in

early June, CCL intends to run materially similar grass-roots lobbying ads falling within the

electioneering communication prohibition period before the general election and within the

electioneering communication prohibition periods before future primary and general elections

in Maine when there are pending matters in the legislative or executive branch that similarly

require referencing a clearly identified candidate for federal office in broadcast communica-

tions to the citizens of Maine. CCL is concerned about a range of issues in addition to laws

protecting traditional marriage – such as partial birth abortion, permissive abortion, abortion

**Complaint**                                    4

clinic regulations, parental control of their children's education, regulation of sexual predators, legislation normalizing same sex relations, gambling, limiting the government's power to raise taxes and the freedom to advance its issues in the public forum – that regularly have and will become issues in the legislative and executive branch. Because the legislative and executive branches often deal with important legislative and executive branch issues in the periods before elections, there is a strong likelihood that CCL's need to broadcast grass-roots lobbying ads will again coincide with the electioneering communications blackout periods. CCL does not have a federal political committee (PAC), and would instead pay for such ads with funds that do not comply with the source and amount limitations that govern PACs.

17. Recognizing the serious constitutional questions the BCRA raises, the law provides for immediate expedited judicial review by a three-judge panel of this Court of any constitutional action for declaratory or injunctive relief, with expedited appellate review by the Supreme Court of the United States of final decisions. BCRA § 403, 116 Stat. at 113-14.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and BCRA § 403, 116 Stat. at 113-14.

## PARTIES

20. Plaintiff the Christian Civic League of Maine, Inc., is a nonprofit, nonstock, Maine, ideological corporation recognized by the Internal Revenue Service as tax exempt under § 501(c)(4) of the Internal Revenue Code.

**Complaint**                    5

21. Defendant Federal Election Commission (FEC) is the government agency charged with enforcing the relevant provision of the Federal Election Campaign Act, as amended by the BCRA.

## ADDITIONAL AS-APPLIED FACTS

22. CCL does not qualify for any exception permitting it to pay for electioneering communications from corporate funds because (a) it is not a "qualified nonprofit corporation" (QNC) within the definition of 11 C.F.R. § 114.10 so as to qualify for the exception found at 11 C.F.R. § 114.2(b)(2) to the electioneering communication prohibition and (b) its advertisement is "targeted" so that it does not fit the exception for § 501(c)(4) organizations as described in 2 U.S.C. § 441b(c)(2). 2 U.S.C. § 441b(c)(6)(A).

23. CCL's advertisement will become an electioneering communication from May 14 to June 13 and from September 8 until November 7, because it meets the statutory and regulatory definitions found at 2 U.S.C. § 434(f)(3) and 11 C.F.R. § 110.29.

24. Specifically, the advertisement at Exhibit A and planned future advertisements would be broadcast for a fee on radio. 2 U.S.C. § 434(f)(3)(A)(i); 2 C.F.R. § 100.29(b).

25. The advertisement at Exhibit A and planned future advertisements would be broadcast within 30 days before the Maine primary and/or within 60 days before the general election. 2 U.S.C. § 434(f)(3)(A)(i)(II); 2 C.F.R. § 100.29(a)(2).

26. The advertisement at Exhibit A and planned future advertisements "refer to," and will continue to refer to, "a clearly identified candidate for Federal office." 2 U.S.C. § 434(f)(3)(A)(i)(I); 2 C.F.R. § 100.29(a)(1).

27. The advertisement entitled "Crossroads" (Exhibit A) is a radio broadcast ad to be

**Complaint**                                    6

broadcast for a fee paid by CCL that clearly references federal candidate Sen. Snowe by mentioning her name and asking listeners to contact her (and Sen. Collins) to support the federal Marriage Protection Amendment.

28. The advertisement at Exhibit A and planned future advertisements would be "targeted to the relevant electorate," 2 U.S.C. § 434(f)(3)(A)(i)(III); 2 C.F.R. § 100.29(a)(3), meaning that the broadcast ads "can be received by 50,000 or more persons . . . in the State [Sen. Snowe] seeks to represent." 2 C.F.R. § 100.29(a)(3).

29. The advertisement at Exhibit A and planned future advertisements would be "publicly distributed," i.e., "aired, broadcast, cablecast or otherwise disseminated for a fee through the facilities of a television station, radio station, cable television system or satellite system." 2 C.F.R. § 100.29(a)(3).

30. On May 14, when the electioneering communication prohibition period begins, CCL will be broadcasting a radio ad, Exhibit A, so that it will be "publicly distributed" on that date. 11 C.F.R. § 100.29(b)(3)(i).

31. If and when CCL has spent or contracted to spend more than $10,000 "for the direct costs of producing or airing one or more electioneering communications," 11 C.F.R. § 104.20(a)(1)(i), the public distribution and disbursement will trigger a "disclosure date" requiring it to file a report of its electioneering communication activity on FEC Form 9.

32. CCL intends to comply with all record keeping and reporting requirements for its electioneering communications as set out in the Federal Election Campaign Act ("FECA") and FEC regulations, 2 U.S.C. § 434(f); 11 C.F.R. § 104.20, providing accurate disclosure information as to the source and disbursement of funds at the levels at which Congress

**Complaint**                                   7

asserted a disclosure interest.

33. CCL is also complying with, and will continue to comply with, the applicable disclaimer requirements for electioneering communications. 2 U.S.C. § 441d; 11 C.F.R. § 110.11. This may be seen on the advertisement's scripts at Exhibit A, providing disclosure of the fact that CCL is paying for the ads, that they are not authorized by any candidate or candidate's committee, and providing a phone number where a person hearing the ads may find contact information for the Senators.

34. CCL does not challenge the reporting and disclaimer requirements for electioneering communications, only the prohibition on using its corporate funds for its grass-roots lobbying advertisements.

35. The ad at Exhibit A expresses an opinion on pending Senate legislative activity, which is imminently up for a vote, and urges listeners to contact their Senators and to urge them to vote a certain way in this upcoming vote, so that this ad constitutes bona fide grass-roots lobbying.

36. The ad deals with concrete, imminent, legislative issues, beyond the timing and control of CCL, with which the two incumbent Senators are dealing and must shortly deal with further.

37. The ad refers to both a candidate and a non-candidate and deal with them equally.

38. The ad deals exclusively with the legislative issue.

39. The ad focuses on the legislative issue in question, not on any candidate.

40. The ad does not refer to any political party.

41. The ad deals with an issue with which CCL has a clear and long-held interest.

**Complaint**                                      8

42. The ad does not expressly advocate the election or defeat of a clearly identified candidate for federal office.

43. The ad does not comment on a candidate's character, qualifications, or fitness for office.

44. The ad does not mention any upcoming election.

45. The ad is broadcast independent of any candidate or political party in that it is not "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents." 11 C.F.R. § 109.20(a).

46. Broadcast advertisements are the most effective form of communication for the present grass-roots lobbying campaign, and non-broadcast communications would not provide CCL with sufficient ability to reach the people of Maine with CCL's message.

47. If CCL does not obtain the requested injunctive relief, CCL will not broadcast the ad at Exhibit A after May 14, because it is prohibited from doing so and because of its fear of enforcement by the FEC. As a result, CCL will be deprived of its constitutional rights under the First Amendment to the United State Constitution and will suffer irreparable harm. There is no adequate remedy at law.

## COUNT 1

48. Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

49. Section 203(a) of BCRA amended section 316(b)(2) of FECA to prohibit corporations and labor unions from engaging in "electioneering communications." This

**Complaint**                    9

prohibition is codified at 2 U.S.C. § 441b.

50. The United States Supreme Court has decided that corporations may use corporate funds to engage in lobbying. *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).

51. The United States Supreme Court has held that contribution limits on organizations engaged in lobbying to support or oppose ballot measures violate the First Amendment rights of association and expression. *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981).

52. As applied to CCL's disbursements for the advertisement at Exhibit A and for materially similar future advertisements, the broadcast ads are bona fide grass-roots lobbying and are not the "functional equivalent of express advocacy." *McConnell*, 540 U.S. at 206.

53. Because CCL's grass-roots lobbying advertisement is not the functional equivalent of express advocacy, there is no constitutional justification for the corporate prohibition at 2 U.S.C. § 441b on this particular electioneering communication, requiring that such activities be done through a political action committee (PAC).

54. PAC compliance burdens have been held as only justified in the election campaign context, which has nothing to do with the sort of bona fide grass-roots legislative lobbying at issue here, so that the prohibition on electioneering communications should be held unconstitutional as applied to grass-roots lobbying broadcasts.

55. Because corporations are permitted to lobby with corporate funds, there is no justification for imposing the PAC requirement on corporations making grass-roots lobbying broadcasts.

56. Because contribution limits on organizations engaged in lobbying are unconstitu-

**Complaint**                                      10

tional, there is no justification for imposing the PAC requirement of a $5,000 annual

contribution limit on contributors to a corporation making grass-roots lobbying broadcasts. 2

U.S.C. § 441a(a)(1)(C).

57. As applied to grass-roots lobbying broadcasts and to the broadcast advertisement

contained in Exhibit A, BCRA § 203 is not narrowly tailored to a compelling governmental

interest.

58. As applied to grass-roots lobbying broadcasts and to the broadcast advertisement

contained in Exhibit A, BCRA § 203 unconstitutionally burdens the rights of free speech,

free association, and petitioning the government, all in violation of the First Amendment.

## COUNT 2

59. Plaintiff realleges and incorporates by reference all of the allegations contained in

all of the preceding paragraphs.

60. In the alternative to Count 1, which focuses on the use of general corporate funds

for electioneering communications that constitute bona fide grass-roots lobbying communica-

tions, CCL also asserts that BCRA § 203 is not narrowly tailored to a compelling state

interest where the electioneering communications are made "out of a segregated bank account

which consists of funds contributed solely by individuals who are United States citizens or

nationals or law-fully admitted for permanent residence (as defined in section 101(a)(20) of

the Immigration and Nationality Act (8 U.S.C. 1101(a)(20))) directly to this account for

electioneering communications." 2 U.S.C. § 434(f); 11 C.F.R. § 104.20(c)(7).

61. If disbursements for grass-roots lobbying communications that constitute

electioneering communications are made from such a segregated bank account, there will still

**Complaint**                                    11

be full disclosure at the level at which Congress asserted a disclosure interest, but all
concerns about the use of corporate funds for electioneering communications will be absent.

62. The only remaining restrictions on PACs that would not apply to disbursements
for grass-roots lobbying electioneering communications made from a segregated bank
account are (a) the annual PAC contribution limit and (b) the requirement that a corporation
first acquire "members" and then solicit funds only from these members. 2 U.S.C.
§ 441b(b)(4)(C). But as noted above, contribution limits are unconstitutional in the context of
grass-roots lobbying because there is no potential for corruption, *Citizens Against Rent
Control v. Berkeley*, 454 U.S. 290 (1981), and any donors contributing in excess of $1,000 to
the account would be disclosed to the public.

63. CCL believes it is constitutionally entitled to make the grass-roots lobbying
disbursements at issue from general corporate funds, but if necessary to gain the requested
relief to make the disbursements, CCL will make such disbursements from a segregated bank
account.

64. As applied to disbursements from a segregated bank account under 2 U.S.C.
§ 434(f) for grass-roots lobbying broadcasts and for the broadcast advertisement contained in
Exhibit A, BCRA § 203 is not narrowly tailored to a compelling state interest and so it
unconstitutionally burdens the rights of free speech, free association, and petitioning the
government, all in violation of the First Amendment.

**Complaint**                                  12

## PRAYER FOR RELIEF

Wherefore, CCL prays for the following relief:

1. a declaratory judgment declaring 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 unconstitutional as applied to electioneering communications by CCL that constitute grass-roots lobbying;

2. a declaratory judgment declaring 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 unconstitutional as applied to the electioneering communications by CCL contained in Exhibit A;

3. a preliminary and permanent injunction enjoining defendant FEC from enforcing 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 against CCL for any electioneering communications by CCL that constitute grass-roots lobbying;

4. a preliminary and permanent injunction enjoining defendant FEC from enforcing 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 against CCL for broadcasting the election-eering communications contained in Exhibit A;

5. costs and attorneys' fees pursuant to any applicable statute or authority; and

6. any other relief this Court in its discretion deems just and appropriate.

**[Insert VERIFICATION here]**

I, Michael Heath, declare as follows:

1. I am the long-time Executive Director of the Christian Civic League

2. I have personal knowledge of the facts about the Christian Civic League and its activities that are set forth in the Statement of Facts in the foregoing *Complaint* and affirm their truth.

3. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 28, 2006.

/s/ Michael S. Heath
Michael S. Heath, Executive Director
The Christian Civic League of Maine

**Complaint**                                    14

Respectfully submitted,


_____        _____
M. Miller Baker, D.C. Bar # 444736      James Bopp, Jr.*
Michael S. Nadel, D.C. Bar # 470144     BOPP, COLESON & BOSTROM
MCDERMOTT WILL & EMERY LLP              1 South Sixth Street
600 Thirteenth Street, NW               Terre Haute, IN  47807
Washington, D.C. 20005-3096             812/232-2434 telephone
202/756-8000 telephone                  812/234-3685 facsimile
202/756-8087 facsimile                  *Lead Counsel for Plaintiff*
*Local Counsel for Plaintiff*           *Pro Hac Vice Motion filed April 3, 2006*

**Complaint**                    15

## VERIFICATION

I, Michael Heath, declare as follows:

1. I am the long-time Executive Director of the Christian Civic League

2. I have personal knowledge of the facts about the Christian Civic League and its

activities that are set forth in the Statement of Facts in the foregoing *Complaint* and affirm their

truth.

3. I verify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on March 28, 2006.

Michael S. Heath, Executive Director
The Christian Civic League of Maine

Plaintiff's
Exhibit


A

*Radio Script*
"Crossroads"
The Christian Civic League of Maine
:60

Our country stands at the crossroads - at the

intersection of how marriage will be defined for future generations.

Marriage between a man and a woman

has been challenged across this country and could be declared unconstitutional

at any time by rogue judges.  We must safeguard the

traditional definition of marriage by putting it beyond the reach of all judges -

by writing it into the U.S. Constitution.  Unfortunately, your senators voted against

the Marriage Protection Amendment two years ago.  Please call Sens. Snowe and Collins

immediately and urge them to

support the Marriage Protection Amendment when it comes to a vote in

early June.  Call the Capitol switchboard at

202-224-3121 and ask for your senators.  Again, that's 202-224-3121.

Thank you for making your voice heard.


Paid for by the Christian Civic League of Maine, which is responsible for the content of this advertising and
not authorized by any candidate or candidate's committee.

Plaintiff's
Exhibit

B

Certificate of Organization under Chapter 57 of the Revised
Statutes of Maine.

The undersigned, officers of a moral and educational corpor-
ation organized at a meeting duly called and held therefor at
28 Winter Street, in the City of Waterville, on the ninth day of
May, 1905, hereby certify as follows:

The name of said corporation is CHRISTIAN CIVIC LEAGUE of
MAINE, and it is located at said Waterville.

The purposes of said corporation are inculcating the princi-
ples of good citizenship in this State.

Its officers are, President, *Geo. C. Purington* of *Farmington*
Treasurer, *Horace Purinton* of *Waterville*,
Clerk, *H. W. Pringle* of *Waterville*, and

*Geo. C. Purington*          *W. F. Berry*
*Horace Purinton*
*Samuel Vose*
*Alfred W. Anthony*
*E. T. Burrowes*
*C. A. Milliken*
*M. S. Holway*

Directors.

Witness our hands at said Waterville this ninth day of
May, 1905.

*Geo. C. Purington*, President.
*Horace Purinton*, Treasurer.
*Samuel Vose*
*Wilbur F. Berry*
*Edward T. Burrowes,*

County of Kennebec, ss.

May 9,1905.

Then personally appeared the above named

and severally made oath to the foregoing certificate, that
the same is true.

Before Me,

*Horace J Knowlton*

Justice of the Peace.

Christian Civic League
of Maine —

STATE OF MAINE

OFFICE OF SECRETARY OF STATE,

Augusta, May 12, 1905

Received and filed this day

ATTEST:

Secretary of State