**United States District Court**
**District of Columbia**

| | |
|---|---|
| **The Christian Civic League of Maine, Inc.** | |
| 70 Sewall Street | |
| Augusta, ME 04330, | |
| *Plaintiff,* | |
| | |
| *v.* | Cause No. _____ |
| | |
| **Federal Election Commission,** | |
| 999 E Street, NW | |
| Washington, DC 20463, | |
| *Defendant.* | |

## Preliminary Injunction Motion

Plaintiff the Christian Civic League of Maine, Inc. ("CCL") moves for a preliminary injunction. Fed. R. Civ. P. 65. CCL files concurrently its *Verified Complaint for Declaratory and Injunctive Relief* and *Memorandum in Support of Preliminary Injunction Motion.*

As set out fully in the *Complaint* and *Memorandum*, CCL complains against the prohibition (codified at 2 U.S.C. § 441b(b)(2)) on corporate disbursements for "electioneering communications" (defined at 2 U.S.C. § 434(f)(3)(A)(i)) as applied to (a) electioneering communications by CCL that constitute grassroots lobbying and (b) the electioneering communications by CCL contained in Exhibit A of the *Complaint.*

CCL submits that it has established probable success on the merits, it will be irreparably harmed, a preliminary injunction will not substantially harm Defendant Federal Election

**Motion for Prel. Inj.**

Commission ("FEC"), a preliminary injunction is in the public interest, and there is no adequate remedy at law.

Pursuant to Local Rule of Civil Procedure 7(m), CCL has conferred with legal counsel for the FEC regarding whether the electioneering communication prohibition should be preliminarily enjoined as so applied. The response of the FEC has been separately submitted to the Court in the *Notice of Consultation on Motions With Opposing Counsel*, which conveniently consolidates opposing counsel's positions on all motions being filed contemporaneously with this one.

Because a preliminary injunction presents no monetary risks to the FEC, CCL requests that bond be set at $1. Fed. R. Civ. P. 65(c).

For the reasons stated in the accompanying *Memorandum*, CCL requests that the Court grant its preliminary injunction motion and preliminarily enjoin the FEC from enforcing the prohibition on corporate expenditures for electioneering communications at Section 203 of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), codified at 2 U.S.C. § 441b(b)(2) of the Federal Election Campaign Act ("FECA"), as applied to (a) electioneering communications by CCL that constitute grassroots lobbying and (b) the electioneering communications by CCL contained in Exhibit A of the *Complaint*, until a final hearing on the merits.

Dated April 3, 2006

Respectfully submitted,

_____
M. Miller Baker, D.C. Bar # 444736
Michael S. Nadel, D.C. Bar # 470144
MCDERMOTT WILL & EMERY LLP
600 Thirteenth Street, NW
Washington, D.C. 20005-3096
202/756-8000 telephone
202/756-8087 facsimile
*Local Counsel for Plaintiff*

_____
James Bopp, Jr.*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN  47807
812/232-2434 telephone
812/234-3685 facsimile
*Lead Counsel for Plaintiff*
*\*Pro Hac Vice Motion filed April 3, 2006*

**Motion for Prel. Inj.**                    3

**United States District Court**
**District of Columbia**

| | |
|---|---|
| **The Christian Civic League of Maine, Inc.**<br>70 Sewall Street<br>Augusta, ME 04330,<br><br>*Plaintiff,*<br><br>*v.*<br><br>**Federal Election Commission,**<br>999 E Street, NW<br>Washington, DC 20463,<br><br>*Defendant.* | Cause No. _____ |

# Memorandum In Support of Preliminary Injunction Motion

---

M. Miller Baker, D.C. Bar # 444736
MCDERMOTT WILL & EMERY LLP
600 Thirteenth Street, NW
Washington, D.C. 20005-3096
202/756-8000 telephone
202/756-8087 facsimile
*Local Counsel for Plaintiff*

James Bopp, Jr.*
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/234-3685 facsimile
*Lead Counsel for Plaintiff*
*\*Pro Hac Vice Motion filed March 31, 2006*

**Table of Contents**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   I.   CCL Has a Substantial Likelihood of Success on the Merits. . . . . . . . . . . . . . . . . . . . . 8

      A.  An Exception for Genuine Grassroots Lobbying Is Constitutionally Re-
         quired.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         1.   The Constitution Specifically Protects Grassroots Lobbying.  . . . . . . . . . . . . 9

         2.   Grassroots Lobbying Differs From Electioneering.  . . . . . . . . . . . . . . . . . . 13

             a.   There Is a Distinction Between Grassroots Lobbying and
                 Electioneering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

             b.   Genuine Grassroots Lobbying Is Not Sham Issue Advertising. . . . . . . . 17

             c.   Grassroots Lobbying Does Not Implicate *McConnell*'s Concerns. . . . . . 19

             d.   If There Are Residual Concerns about Using Corporate General Treasury
                 Funds for Grassroots Lobbying, a Segregated Bank Account Could Be
                 Used. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         3.   CCL's Ad Is Not Electioneering.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

             a.   CCL's Ad Is Not the "Functional Equivalent of Express Advocacy."  . . 23

   II.   CCL Will Suffer Irreparable Injury Without the Injunction. . . . . . . . . . . . . . . . . . . 25

   III.  The Injunction Will Not Substantially Injure Others. . . . . . . . . . . . . . . . . . . . . . . . 26

   IV.  The Injunction Furthers the Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# Introduction

This case is about drawing a careful line to protect both the American system of participatory democracy – guaranteed in large part by the First Amendment protections of speech, association, and petitioning government – and the integrity of our federal election campaigns.

*McConnell v. FEC*, 540 U.S. 93 (2003), involved a *facial* challenge to the Bipartisan Campaign Reform Act of 2002 ("BCRA"). In *McConnell*, the Supreme Court expressly employed a facial overbreadth analysis to uphold BCRA's prohibition on using corporate funds for "electioneering communications." Subsequently, the Supreme Court in *Wisconsin Right to Life, Inc. v. FEC*, 126 S.Ct. 1016 (2006), explained that as-applied challenges to the electioneering communication prohibition were not resolved or precluded by its holding in *McConnell*. 126 S.Ct. at 1018.

This is such an as-applied challenge. It challenges as unconstitutional the prohibition on using corporate funds for "electioneering communications" (hereinafter "the prohibition") contained in § 203 of the BCRA, Pub. L. No. 107-155, 116 Stat. 81, 91-92, and codified at 2 U.S.C. § 441b(b)(2), as applied to grass roots lobbying and specifically as applied to the broadcast advertisement attached to the *Complaint* as Exhibit A.

Grassroots lobbying is one of the most important and effective ways citizens petition the government. It is essential to any government "of the people, by the people, and for the people." Abraham Lincoln, *Gettysburg Address*. As shown below, ordinarily (a) incorporated groups are free to use corporate funds for grassroots lobbying and (b) limits on contributions in the grassroots lobbying context are not constitutionally warranted. The need for, and importance of, participatory democracy does not diminish in importance in the days before elections. Rather,

**Memorandum in Support of**
**Preliminary Injunction Motion**                    1

this case demonstrates that the people's interest may increase at such times as legislators hurry to finish important work before recessing at the fall election time.

In considering the electioneering communications prohibition, Congress and the Supreme Court, in *McConnell*, wrestled with the need to distinguish what the Supreme Court called "true" or "genuine" issue ads from what it called "bogus," "sham," or "so-called" issue ads. The Court focused on "sham" ads in upholding the broad-brush prohibition against facial attack. This case demonstrates that a more discerning line can, and should, be drawn in this as-applied challenge. The facts of this case demonstrate that the ad at issue in this case are not the sort of campaign-speech ads that Congress and the Court in *McConnell* considered "sham." Consequently, as applied to bona fide grassroots lobbying and the ad at issue herein, the prohibition is not narrowly tailored to a compelling governmental interest.

## Facts

The facts of this case are set out in the *Verified Complaint for Declaratory and Injunctive Relief* and verified there by the long-time executive director of the Christian Civic League of Maine, Inc. ("CCL"). They are restated here for the Court's convenience.

As presently applicable, "'electioneering communication' means any broadcast, cable, or satellite communication which . . . refers to a clearly identified candidate for Federal office [and] is made within . . . 60 days before a general . . . election for the office sought by the candidate; or . . . 30 days before a primary . . . election . . . for the office sought by the candidate; and . . . is targeted to the relevant electorate." 2 U.S.C. § 434(f)(3)(A)(i). *See also* 11 C.F.R. § 100.29 (definition of "electioneering communication").

The prohibition provides that "[i]t is unlawful . . . for any corporation whatever . . . to make

**Memorandum in Support of**
**Preliminary Injunction Motion**                2

a contribution or expenditure in connection with any [Federal] election. . . . For purposes of this section . . . , the term 'contribution or expenditure' includes . . . any applicable electioneering communication . . . ." 2 U.S.C. § 441b(a)-(b); *see also* 11 C.F.R. §§ 114.2 and 114.14 (regulatory ban on corporate funding of electioneering communications).

CCL is a nonprofit, nonstock, Maine ideological corporation recognized by the Internal Revenue Service as tax exempt under § 501(c)(4) of the Internal Revenue Code. *Complaint* ¶ 20.

CCL does not qualify for any exception permitting it to pay for electioneering communications from corporate funds because (a) it is not a "qualified nonprofit corporation" (QNC) within the definition of 11 C.F.R. § 114.10 so as to qualify for the exception found at 11 C.F.R. § 114.2(b)(2) to the electioneering communication prohibition and (b) its advertisement is "targeted" so that it does not fit the exception for § 501(c)(4) organizations as described in 2 U.S.C. § 441b(c)(2). 2 U.S.C. § 441b(c)(6)(A). *Complaint* ¶ 22.

Defendant FEC is the government agency charged with enforcing the relevant provision of the Federal Election Campaign Act ("FECA"), as amended by the BCRA. *Complaint* ¶ 21. The FEC considered creating an exception to this prohibition in its regulations implementing BCRA for grassroots lobbying broadcasts but decided it was beyond the exception-making authority granted it by Congress to do so. *Complaint* ¶ 7 (citing  67 Fed. Reg. 65190, 65200-02).

This case challenges the prohibition *as applied* to grassroots lobbying on the facts of this case, which involves a broadcast advertisement (a true and accurate transcript of the current version of the ad is attached to the *Complaint* as Exhibit A) that is paid for by CCL and that encourages Maine listeners to contact their U.S. Senators (Sen. Olympia Snowe and Sen. Susan Collins) and to ask them to support the federal Marriage Protection Amendment (S.J. Res. 1),

**Memorandum in Support of**
**Preliminary Injunction Motion**                    3

including a vote for cloture on debate for the Amendment and/or other legislative action which

will occur during the electioneering communication blackout periods this summer and fall.

*Complaint* ¶ 9.

In January, 2005, Senator Wayne Allard introduced the Marriage Protection Amendment

(S.J. Res. 1). On November 9, 2005, the Subcommittee on Constitution, Civil Rights and

Property Rights of the Committee on the Judiciary approved the Marriage Protection Amendment

for full committee consideration without amendment favorably. 150 Cong. Rec. S8459-60. On

information and belief, a vote for cloture in the Senate on S.J. Res. 1 is likely to occur in early

June, 2006. Previous versions of a federal constitutional amendment to protect traditional

marriage have failed to garner sufficient support in Congress. Therefore, the progress of S.J. Res.

1 in the Senate this summer is critical. CCL would support any future House or Senate bills that

would offer protection to traditional marriage materially similar to that of S.J. Res. 1 or previous

permutations of a federal bill to protect traditional marriage. CCL intends to air the advertisement

(Exhibit A) beginning on May 10  for the purpose of influencing the votes of Senators Snow and

Collins regarding S.J. Res. 1, the Marriage Protection Amendment.

CCL intends to begin broadcasting a radio advertisement (*Complaint* Exhibit A) on May 10

and intends to run the ad throughout May, for the purpose of influencing the votes of Senators

Snowe and Collins regarding the federal Marriage Protection Amendment expected this summer.

Because the ad mentions Sen. Snowe, who is a candidate in the upcoming primary and general

elections, they will be electioneering communications because they are within the electioneering

communication blackout periods before the Maine primary, to be held on June 13, or the general

election, to be held on November 7. *Complaint* ¶ 14.

**Memorandum in Support of**
**Preliminary Injunction Motion**          4

Because of the timing of the vote for cloture and/or other resulting actions by the Senate with regard to the Marriage Protection Amendment CCL intends to run the ad (*Complaint* Exhibit A) and materially similar ads during the blackout periods if CCL obtains the relief sought herein. The timing of these events is beyond the control of CCL. *Complaint* ¶ 13.

From May 14 to June 13 (30 days before the primary) and from September 8 to November 7 (60 days before the general election), the current ad (*Complaint* Exhibit A) and materially similar ads will become electioneering communications as to Maine Senatorial candidate Olympia Snowe and CCL will be prohibited from running the ad. *Complaint* ¶ 14. CCL's advertisement will become electioneering communications from May 14 to June 13, and from September 8 to November 7, because it meets the statutory and regulatory definitions found at 2 U.S.C. § 434(f)(3) and 11 C.F.R. § 110.29. *Complaint* ¶ 23.

Specifically, the advertisement at *Complaint* Exhibit A and any future advertisements will be broadcast for a fee on radio. 2 U.S.C. § 434(f)(3)(A)(i); 2 C.F.R. § 100.29(b). *Complaint* ¶ 24. The advertisements will be broadcast within 30 days before the Maine primary and/or within 60 days before the general election. 2 U.S.C. § 434(f)(3)(A)(i)(II); 2 C.F.R. § 100.29(a)(2). *Complaint* ¶ 25. Like the present ad, these advertisements will "refer to" "a clearly identified candidate for Federal office." 2 U.S.C. § 434(f)(3)(A)(i)(I); 2 C.F.R. § 100.29(a)(1). *Complaint* ¶ 26.

The advertisement entitled "Crossroads" (Exhibit A) is a radio broadcast ad to be broadcast for a fee paid by CCL that clearly references federal candidate Sen. Snowe by mentioning her name and asking listeners to contact her (and Sen. Collins) and to urge them to support the federal Marriage Protection Amendment. *Complaint* ¶ 27.

**Memorandum in Support of**
**Preliminary Injunction Motion**          5

The advertisement at Exhibit A is, and planned future advertisements will continue to be, "targeted to the relevant electorate," 2 U.S.C. § 434(f)(3)(A)(i)(III); 2 C.F.R. § 100.29(a)(3), meaning that the broadcast ads "can be received by 50,000 or more persons . . . in the State [Sen. Snowe] seeks to represent." 2 C.F.R. § 100.29(a)(3). *Complaint* ¶ 28. The advertisement at Exhibit A will be, and planned future advertisements would be, "publicly distributed," i.e., "aired, broadcast, cablecast or otherwise disseminated for a fee through the facilities of a television station, radio station, cable television system or satellite system." 2 C.F.R. § 100.29(a)(3). *Complaint* ¶ 29. On May 14, when the electioneering communication blackout period begins, CCL will be broadcasting a radio ad, Exhibit A, so that it will be "publicly distributed" on that date. 11 C.F.R. § 100.29(b)(3)(i). *Complaint* ¶ 30.

If and when CCL has spent or contracted to spend more than $10,000 "for the direct costs of producing or airing one or more electioneering communications," 11 C.F.R. § 104.20(a)(1)(i), the public distribution and disbursement amount will trigger a "disclosure date" requiring it to file a report of its electioneering communication activity on FEC Form 9. *Complaint* ¶ 31.

CCL intends to comply with all record keeping and reporting requirements for its election-eering communications as set out in the Federal Election Campaign Act ("FECA") and FEC regulations, 2 U.S.C. § 434(f); 11 C.F.R. § 104.20, providing accurate disclosure information as to the source and disbursement of funds at the levels at which Congress asserted a disclosure interest. *Complaint* ¶ 32. CCL is also complying with, and will continue to comply with, the applicable disclaimer requirements for electioneering communications. 2 U.S.C. § 441d; 11 C.F.R. § 110.11.  This may be seen on the advertisement script at Exhibit A, providing disclosure of the fact that CCL is paying for the ad, that they are not authorized by any candidate or

candidate's committee, and providing a phone number where a person hearing or viewing the ad may find contact information for the Senators. *Complaint* ¶ 33. CCL does not challenge the reporting and disclaimer requirements for electioneering communications, only the prohibition on using its corporate funds for its grassroots lobbying advertisements. *Complaint* ¶ 34.

The ad at Exhibit A expresses an opinion on pending Senate legislative activity, which is imminently up for a vote, and urges listeners to contact their Senators and to urge them to vote a certain way in this upcoming vote, so that this ad constitutes bona fide grassroots lobbying. *Complaint* ¶ 35. The ad deals with concrete, imminent, legislative issues, beyond the timing and control of CCL, with which the two incumbent Senators are dealing and must shortly deal with further. *Complaint* ¶ 36.

The ad refers to both a candidate and a non-candidate and deals with them equally. *Complaint* ¶ 37. The ad deals exclusively with the legislative issue. *Complaint* ¶ 38. It focuses on the legislative issue in question, not on any candidate. *Complaint* ¶ 39. It does not refer to any political party. *Complaint* ¶ 40. It deals with an issue with which CCL has a clear and long-held interest. *Complaint* ¶ 41. It does not expressly advocate the election or defeat of a clearly identified candidate for federal office. *Complaint* ¶ 42. It does not comment on a candidate's character, qualifications, or fitness for office. *Complaint* ¶ 43. It does not mention any upcoming election. *Complaint* ¶ 44. The ad is broadcast independent of any candidate or political party in that it is not "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents." 11 C.F.R. § 109.20(a). *Complaint* ¶ 45.

Broadcast advertisements are the most effective form of communication for the present

grassroots lobbying campaign, and non-broadcast communications would not provide CCL with

sufficient ability to reach the people of Maine with CCL's message. *Complaint* ¶ 46. If CCL does

not obtain the requested injunctive relief, CCL will not continue broadcasting the ad at *Com-*

*plaint* Exhibit A beginning May 14, because it is prohibited from doing so and because of its fear

of enforcement by the FEC. As a result, CCL will be deprived of its constitutional rights under

the First Amendment to the United State Constitution and will suffer irreparable harm. There is

no adequate remedy at law. *Complaint* ¶ 47.

## Argument

Four factors govern preliminary injunctions:

> in considering a plaintiff's request for a preliminary injunction a court must weigh
> four factors:  (1) whether the plaintiff has a substantial likelihood of success on
> the merits; (2) whether the plaintiff would suffer irreparable injury were an
> injunction not granted; (3) whether an injunction would substantially injure other
> interested parties; and (4) whether the grant of an injunction would further the
> public interest. *See, e.g., Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18
> (D.C. Cir.1998).

*Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001). As seen next, CCL meets these require-

ments, so preliminary injunctive relief should be granted.

## I.    CCL Has a Substantial Likelihood of Success on the Merits.

CCL has a substantial likelihood of success on the merits of this as-applied challenge. In

*McConnell v. FEC*, 540 U.S. 93, the Supreme Court upheld the electioneering communication

prohibition against a facial challenge. In *Wisconsin Right to Life*, 126 S.Ct. 1016 (2006), the

Supreme Court explained that as-applied challenges to the electioneering communication

prohibition were not resolved or precluded by its holding in *McConnell*. 126 S.Ct. at 1018. This

is an as-applied challenge and the constitution requires an exception to the electioneering

**Memorandum in Support of**
**Preliminary Injunction Motion**           8

communication prohibition. Any constitutionally sound exception will include grassroots

lobbying generally or the grassroots lobbying advertisement CCL wishes to broadcast here.

**A.  An Exception for Genuine Grassroots Lobbying Is Constitutionally Required.**

Should incumbent politicians be able to insulate themselves from lobbying about upcoming

votes in Congress through campaign finance regulations? CCL believes not and seeks relief as to

(1) its broadcast ad specifically *and/or* (2) grassroots lobbying generally.

**1.  The Constitution Specifically Protects Grassroots Lobbying.**

The people are sovereign. U.S. Const. preamble; *Buckley*, 424 U.S. at 14 ("In a republic

. . . the people are sovereign . . . ."). In a constitutional republic, government is restricted to the

powers expressly granted by the people. U.S. Const. amend. X. The people created legislators to

represent them, U.S. Const. art. I, § 1; art. IV, § 4, and amended the Constitution to require that

Senators be "elected by the people." U.S. Const. amend. XVII. The people mandated Congress

not to restrict their rights to speak, associate,[1] and petition in the exercise of the people's

sovereign right to participate in representative self-government. U.S. Const. amend. I.

The First Amendment is designed "'to assure [the] unfettered interchange of ideas for the

bringing about of political and social changes desired by the people.'" *Buckley,* 424 U.S. at 14

(quoting *Roth v. United States,* 354 U.S. 476, 484 (1957)). "'[S]peech concerning public affairs

is more than self-expression; it is the essence of self-government.'" *First National Bank of*

*Boston v. Bellotti*, 435 U.S. 765, 777 n.12 (1978) (citation omitted). "It is the type of speech

indispensable to decisionmaking in a democracy, and this is no less true because the speech

---

[1]"[T]he First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas . . . ." *Buckley*, 424 U.S. at 16 (citations and quotation indicators omitted).

**Memorandum in Support of**
**Preliminary Injunction Motion**            9

comes from a corporation rather than an individual." *Id.* at 777.

While the individuals who make up CCL could engage in electioneering communication, 2 U.S.C. § 434(f) (requiring only disclosure if spending exceeds $10,000 in a calendar year), when they form themselves into an effective advocacy group for lobbying, their lobbying through broadcast ads is prohibited for up to 90 days during an election year. Citizen groups formed under the right of association are an essential component of democracy in action. In *Buckley*, the Supreme Court reaffirmed the constitutional protection for association: "[E]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association. [Consequently,] the First and Fourteenth Amendments guarantee freedom to associate with others for the common advancement of political beliefs and ideas." *Buckley*, 424 U.S. at 15. "[A]ction which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* at 25.[2] This highest level of constitutional protection flows from the essential function of associations in allowing effective participation in our democratic republic by permitting amplified individual speech. *Id.* at 22.

Grassroots lobbying is also protected by rights not considered in *McConnell*, i.e., the inherent right of the people to participate in self-government and the express First Amendment right to petition, along with a line of cases protecting corporations' right to contact both

_____

[2]When only an associational interest is involved, as with limits on cash contributions to candidates, the government need only demonstrate that the "contribution regulation was 'closely drawn' to match a 'sufficiently important interest.'" *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387-88 (2000). But when speech is limited, as here, the statute is subject to strict scrutiny, requiring the government to demonstrate that the regulation is narrowly tailored to advance a compelling governmental interest, *Buckley*, 424 U.S. at 64-65, the standard employed for expressive association. *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984); *Boy Scouts of America v. Dale*, 530 U.S. 640, 657-59 (2001).

**Memorandum in Support of**
**Preliminary Injunction Motion**          10

legislators and the public about pending legislative and executive matters.

The right of corporations to petition both the legislative and executive branches was recognized in *Eastern Railroad Presidents Conference v. Noerr*, 365 U.S. 127, 135 (1961). The Supreme Court held that attempts to influence the passage or enforcement of laws were constitutionally protected, essential to representative government, and could not constitute a violation of the Act:

> In a representative democracy such as this, these [legislative and executive] branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. . . . The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

*Id.* at 137-38. *See also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("the right to petition extends to all departments of the government").

In *Bellotti*, 435 U.S. 765, the Supreme Court applied the right of petition to corporations which sought "to publicize their views on a proposed constitutional amendment . . . to be submitted . . . as a ballot question," *id.* at 769, and held that this was constitutionally protected. *Id.* at 776-78, 790-96. *Bellotti* noted that "the First Amendment protects the right of corporations to petition legislative and administrative bodies," and concluded that "there hardly can be less reason for allowing corporate views to be presented openly to the people when they are to take action in their sovereign capacity." *Id.* at 791 n.31.

The overarching principle of these cases is the right of the people to lobby incumbent politicians about their conduct in office.[3] Where the express right of petition and the inherent

---

[3]It should be noted that the only reason that the present issue about grassroots lobbying arises is because an incumbent politician chooses to run again. Choosing to run for reelection

necessity of the people's participation in self-government are added to the rights of free expres-

sion and association, the electioneering communication prohibition must yield to the weight of

constitutional necessity and allow an exception for grassroots lobbying.

Recently there was a great debate on reforming Social Security. President Bush made

speeches across the nation to generate support so that people would pressure their representatives

to support his plan. This was grassroots lobbying. Senators, Representatives, and political party

leaders similarly tried to sway public opinion for or against the President's viewpoint. The

people, through nonprofit corporate citizen groups, also lobbied.[4] This is the work of a vibrant

republic, with active involvement of the people. But what if an election were pending within 60

days as this debate occurred?[5] All but the people could continue using the most effective means

––––––––––––––––––––––––––

is a benefit to the incumbent, now candidate, because he or she has the possibility (perhaps
even the likelihood, given the benefits of incumbency) of being reelected and exercising
government power in the future. However, if the electioneering communication provision
bans grassroots lobbying, the incumbent's interests are served, but not the people's. In the
present case, Sen. Collins could be lobbied, but not Sen. Snowe. So incumbents who choose
to run again gain a special exemption from the attempt by the people to influence them
through grassroots lobbying. This goes a step beyond anything considered in *McConnell*. And
the problem is compounded because members of Congress often push important legislative
matters to the end of the session, which will often be in the blackout period.

[4]For example, AARP was grassroots lobbying against the President's plan. *See*
http://www.aarp.org/ (visited March 7, 2005). The 60 Plus Association was grassroots
lobbying for the President's plan. *See* http://www.60plus.org/ (visited March 7, 2005).

[5]In *McConnell*, the ACLU provided a summary Chart of "Bills of Interest to the ACLU
in the 106th Congress During the 60 Days Prior to the November General Election." Joint
Appendix at 622-26, *ACLU v. FEC* (No. 02-1734) (consolidated with *McConnell*) and made
the following observations about pre-election legislative activity:
  [E]lection years are often periods of intense legislative activity, as the district court
  recognized. During the 2002 election cycle, for instance, legislation creating a new
  federal Department of Homeland Security was under consideration in the midst of
  the pre-election period. . . . During the fall 2000 elections, dozens of critical legisla-
  tive issues were pending in Congress during the 60 day general election blackout

**Memorandum in Support of**
**Preliminary Injunction Motion**          12

to do grassroots lobbying—broadcast media.

### 2. Grassroots Lobbying Differs From Electioneering.

#### a. There Is a Distinction Between Grassroots Lobbying and Electioneering.

The Internal Revenue Code makes a distinction between grassroots lobbying and election-

eering. The Internal Revenue Code provides that:

> [A] "Grass roots lobbying communication" is "any attempt to influence any legislation
> through an attempt to affect the opinions of the general public or any segment thereof"
> and has three "required elements:" (1) "refers to specific legislation," (2) "reflects a
> view on such legislation," and (3) "encourages the recipient of the communication to
> take some action with respect to such legislation."

26 U.S.C. § 56.4911-2(b)(2)(i)-(ii). Advocacy groups such as CCL that are exempt under 26

U.S.C. § 501(c)(4), may spend an unlimited amount of their general treasury funds on lobbying,

either "grass roots lobbying" or legislative lobbying.[6] Charities exempt under 26 U.S.C. §

501(c)(3), however, may spend only an insubstantial amount on lobbying of any kind.

Under the IRC, electioneering is referred to as "political intervention" and is more severely

restricted. Nonprofit corporations under § 501(c)(3) may not "participate in, or intervene in

---

period. *See* [Chart]. Thus, it is not unusual for the ACLU's legislative and issue
advocacy to be most intense during an election year, especially in the days leading
up to the election.

Brief of Appellant at 12-13, *ACLU v. FEC* (No. 02-1734) (consolidated with *McConnell*). A
longstanding practice in Congress is to attach riders to appropriation bills, which are
considered in the fall prohibition periods. Movement of controversial legislation to prohibi-
tion periods may reasonably be expected because less opposition can be generated at such
times.

[6]"Grass roots lobbying" includes "(A) any attempt to influence any legislation through an
attempt to affect the opinions of the general public or any segment thereof," while "legisla-
tive lobbying" refers to "(B) any attempt to influence any legislation through communication
with any member or employee of a legislative body or with any government official or
employee who may participate in the formulation of the legislation." 11 C.F.R. § 4911(d)(1).

**Memorandum in Support of**
**Preliminary Injunction Motion**          13

(including the publishing or distributing of statements), any political campaign on behalf of (or in

opposition to) any candidate for public office," *id.*, while advocacy groups under § 501(c)(4) may

do so, but may spend only an insubstantial amount on political intervention. Political intervention

is dealt with under the term of "exempt function," in 26 U.S.C. § 527(e)(2), and:

> means the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed.

So the IRC distinguishes between lobbying, which is seeking to influence legislation, and

political intervention, which is seeking to influence elections.[7]

---

[7]A diverse group of interested parties has recently offered another useful proposal for limning a grassroots lobbying exception to the electioneering communications prohibition. The FEC has published Notice 2006-4, entitled "Rulemaking Petition: Exception for Certain 'Grassroots Lobbying' Communications From the Definition of 'Electioneering Communication.'" 71 Fed. Reg. 13557. The petition was from a broad-spectrum coalition of groups asking for an expedited rulemaking

> to revise 11 C.F.R. 100.29(c) to exempt from the definition of "electioneering communication" certain "grassroots lobbying" communications that reflect all of the following principles: 1. The "clearly identified federal candidate" is an incumbent public officeholder; 2. The communication exclusively discusses a particular current legislative or executive branch matter; 3. The communication either (a) calls upon the candidate to take a particular position or action with respect to the matter in his or her incumbent capacity, or (b) calls upon the general public to contact the candidate and urge the candidate to do so; 4. If the communication discusses the candidate's position or record on the matter, it does so only by quoting the candidate's own public statements or reciting the candidate's official action, such as a vote, on the matter; 5. The communication does not refer to an election, the candidate's candidacy, or a political party; and 6. The communication does not refer to the candidate's character, qualifications or fitness for office.

> While CCL does not believe that this rule goes as far as the U.S. Constitution would extend protection to grassroots lobbying, it provides a useful definition that balances the concerns of all sides and provides a workable test.

**Memorandum in Support of**
**Preliminary Injunction Motion**          14

While the term "influencing" has not been construed in the IRC context, FECA contains a similar definition of electioneering by defining political "contributions" and "expenditures" as ones made "for the purpose of influencing any election for Federal office." 2 U.S.C.§§ 431(8)(A)(i) and 431(9)(A)(i). Because of the vagueness and potential overbreadth of this phrase, the Supreme Court has construed "influence" to require express advocacy of the election or defeat of a clearly identified candidate. *Buckley*, 424 U.S. at 79-80 (construing "purpose of influencing," in §§ 431(8) and (9), to require express advocacy), and *McConnell*, 540 U.S. at 190-92. *See also Buckley*, 424 U.S. at 42-44 (construing "relative to" to require express advocacy) and *MCFL*, 479 U.S. at 248-49 (construing "in connection with an election," in the prohibition at § 441b, to require express advocacy). As a result of these constructions, FECA clearly applied only to electioneering and not grassroots lobbying prior to enactment of BCRA.

Central to these "express advocacy" holdings, and to the speech protections of the First Amendment generally, was the idea that the *speaker* must be able to know, based on the meaning of the words he is speaking, which side of the line the speaker is on. Requiring "explicit words" of advocacy of the election or defeat of a candidate does this. *Buckley*, 424 U.S. at 43. Thus, the speaker is not left to "hedge and trim," wondering how the hearer might interpret the message based on factors external to the communication itself. *Id. McConnell* endorsed the express advocacy construction of the language at issue in *Buckley* and *MCFL* to avoid vagueness and overbreadth. 540 U.S. at 192.

BCRA added the electioneering communication provision, which applies to certain communications that "refer[] to a clearly identified candidate for Federal office," without any further content requirements. 2 U.S.C. § 434(f)(3)(A)(i)(1). *McConnell* upheld this provision on

**Memorandum in Support of**
**Preliminary Injunction Motion**        15

its face because it was not vague or overbroad. 540 U.S. at 194. It was not vague because "clearly identifying a candidate" is not vague. *Id.* (quoting definition). And it was not overbroad because electioneering communications generally were found to be the "functional equivalent of express advocacy." *Id.* at 206. However, since effective grassroots lobbying requires reference to an incumbent, who may be a candidate, this provision, on its face, encompasses grassroots lobbying, and this case presents the need to distinguish, for purposes of campaign finance laws, between grassroots lobbying and electioneering.

The distinction between grassroots lobbying and electioneering has been discussed in campaign finance cases, but has not yet been definitively decided. Justice Stevens raised the distinction in *Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990), where he said that "there is a vast difference between *lobbying* and debating public issues on the one hand, and political campaigns for election to public office on the other." *Id* . at 678 (Stevens, J., concurring) (emphasis added). Justice Stevens' view seems to have been carried over to his opinion for the Court in *McConnell* where, in footnote 88, the Court reiterated that, while government may regulate electioneering, it may not regulate "genuine issue ads" and distinguished *McConnell* from *Bellotti*, 435 U.S. 765, and *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995). *McConnell*, 540 U.S. at 206 n.88. Justice Kennedy, moreover, argued in *McConnell* that corporations ought to be able to do both electioneering and lobbying. 540 U.S. at 764 (Kennedy, J., dissenting).[8]

---

[8]The BCRA prime sponsors saw the difference between electioneering and grassroots lobbying, proposing to the FEC the following exception to the prohibition on electioneering communications:

The term "electioneering communication" does not include any communication that:

**Memorandum in Support of**
**Preliminary Injunction Motion**          16

     **b.   Genuine Grassroots Lobbying Is Not Sham Issue Advertising.**

*McConnell* said that the "constitutionally adequate justification" for upholding the election-

eering communication prohibition was that the "sham issue ads" considered there were the

"functional equivalent of express advocacy." 540 U.S. at 206. So the issue here is whether

grassroots lobbying ads equate to "communications that in express terms advocate the election or

defeat of a clearly identified candidate for federal office." *Buckley*, 424 U.S. at 44. Or is

grassroots lobbying a "genuine issue ad" which may not be prohibited.

---

\*\*\*\*

    (x)(A) Meets all of the following criteria: (i) the communication concerns only a legislative or executive branch matter; (ii) the communication's only reference to the clearly identified federal candidate is a statement urging the public to contact the candidate and ask that he or she take a particular position on the legislative or executive branch matter; and (iii) the communication refers to the candidate only by use of the term "Your Congressman," "Your Senator," "Your Member of Congress" or a similar reference and does not include the name or likeness of the candidate in any form, including as part of an Internet address; and (iv) the communication contains no reference to any political party.

    (B) The criteria in Paragraph (A) are not met if the communication includes any reference to: (i) the candidate's record or position on any issue; (ii) the candidate's character, qualifications or fitness for office; or (iii) the candidate's election or candidacy.

*Detailed Comments of BCRA Sponsors Senator John McCain, Senator Russ Feingold, Representative Christopher Shays, Representative Marty Meehan, Senator Olympia Snowe, and Senator James Jeffords* at 10 (copy on file with authors) ( attached to Letter from Sen. John McCain, Sen. Russell D. Feingold, et al. to Ms. Mai T. Dinh of the FEC (Aug. 23, 2002) (copy on file with authors). Both documents are available at the FEC's website, http://www.fec.gov/law/Rulemaking Archive.shtml (select "Electioneering Communications" then "Comments on This Rulemaking").

    This proposal by the prime sponsors brings the issue to a very fine point: Assuming a grassroots exception that clearly identifies a candidate, e.g., "Your Senator," is there a constitutional justification for forbidding a citizen group to simply name its Senator? Is the incremental burden on the citizen group narrowly tailored to a compelling interest? Naming the candidate is necessary, as Judge Leon noted from the *McConnell* record, and is easily justifiable on the basis of the people's exercise of their sovereignty in a republican form of government and their express right to petition, which includes grassroots lobbying.

**Memorandum in Support of**
**Preliminary Injunction Motion**　　　　　17

Grassroots lobbying ads are not "sham issue ads" and have nothing to do with elections. They are about legislative action and effective participation by the people in self-government. Lobbying seeks to influence the exercise of government power by incumbent officeholders today, while electioneering seeks to influence who will exercise governmental power in the future. The people's right to influence their representatives on pending legislative matters today is more pressing and potentially more important than who might be their representative next year.

Further, if this Court were to accept the proposition that the people may be silenced now on upcoming votes in Congress because it might affect future elections, where would it end? Based on such a proposition, grassroots lobbying could be banned at all times because it might always have a remote effect on elections. There would be no constitutional way to limit such a ban to 30 plus 60 days in a year, or the 80 unbroken days in this case.

Throughout the *McConnell* litigation, grassroots lobbying was perceived as different in kind from electioneering. Judge Leon, the controlling vote in the district court, clearly thought that grassroots lobbying must be excluded from the "sham issue ad" category. He found that grassroots lobbying did not support or oppose candidates, declaring that his approach to the electioneering communication definition

> assures that there will be no real, let alone substantial, deterrent effect on political discourse *unrelated* to federal elections. Genuine issue advocacy thereby remains exempt from both the backup definition and its attendant disclosure requirements and source restrictions. Similarly, *genuine issue advocacy, specifically of the legislation-centered type, that mentions a federal candidate's name in the context of urging viewers to inform their representatives or senators how to vote on an upcoming bill will not be regulated by the backup definition because it does not promote, support, attack, or oppose the election of that candidate. See* Findings 368-73 (providing examples of legislation-centered advertisements that do not promote, support, attack, or oppose the election of a federal candidate).

**Memorandum in Support of**
**Preliminary Injunction Motion**              18

*McConnell*, 251 F. Supp. 2d at 802-03 (Opinion of Judge Leon) (emphasis added except as to "*unrelated*"). Up to 17% of the ads for which the *McConnell* district court did fact finding were "genuine issue ads" (in which Judge Leon included grassroots lobbying), with possibly more genuine ads in years with more hot-button legislative issues. *Id.* at 798-99.

### c.    Grassroots Lobbying Does Not Implicate *McConnell*'s Concerns.

Grassroots lobbying does not implicate *McConnell*'s expressed concerns about "sham issue advocacy." 540 U.S. at 132. *McConnell* clearly identified what the Court meant by that term, beginning with a section entitled "Issue Advertising." *Id.* at 126.

First, the Court noted that such ads "could be aired without disclosing the identity of, or any other information about, their sponsors." *Id.* In fact, the Court noted, "sponsors of such ads often used misleading names to conceal their identity." *Id.* at 128 (providing examples), 196-97 ("concealing their identities," "dubious and misleading names").

Second, the Court noted that "sham issue ads" closely resembled express advocacy ads. Both such ads and express advocacy ads "were used to advocate the election or defeat of clearly identified federal candidates," *id.* at 126, and *McConnell* provided an immediate example of what the Court meant by that: "Little difference existed, for example, between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'" *Id.* at 126-27. In its discussion of BCRA Title II, the Court returned to this aspect of "sham issue ads" with this example:

> One striking example is an ad that a group called "Citizens for Reform" sponsored during the 1996 Montana congressional race, in which Bill Yellowtail was a candidate. The ad stated:

**Memorandum in Support of**
**Preliminary Injunction Motion**                19

> "Who is Bill Yellowtail? He preaches family values but took a swing at his
> wife. And Yellowtail's response? He only slapped her. But 'her nose was not
> broken.' He talks law and order . . . but is himself a convicted felon. And
> though he talks about protecting children, Yellowtail failed to make his own
> child support payments—then voted against child support enforcement. Call
> Bill Yellowtail. Tell him to support family values." 5 1998 Senate Report 6305
> (minority views).
>
> The notion that this advertisement was designed purely to discuss the issue of family
> values strains credulity.

540 U.S. at 193 n.78. The Supreme Court approved BCRA's solution of requiring disclosure and

eliminating the use of corporate or labor union money for such ads, except as applied to *MCFL*-

type corporations, which could not be prohibited from using corporate money for "electioneering

communications" because such corporations do not pose the corruption risks represented by

business corporations. *Id.* at 209-11 (creating the first as-applied exception to the prohibition).

Grassroots lobbying ads implicate none of these concerns. Because CCL does not challenge

the disclaimer and disclosure requirements, there will be no ads done under misleading names.

There will continue to be full disclosure of all electioneering communications, both as to

disclaimers and public reports. The whole system would be transparent. With all this informa-

tion, it will then be up to the people to decide how to respond to the call for grassroots lobbying

on a particular governmental issue. And to the extent there is a scintilla of perceived support or

opposition to a candidate, a remote possibility necessitated by the people's sovereign right to

participate in representative government, the people, with full disclosure as to the messenger, can

make the ultimate judgment. "Government is forbidden to assume the task of ultimate judgment,

lest the people lose their ability to govern themselves." *Bellotti*, 435 U.S. at 792 n.31 ("The First

Amendment rejects the 'highly 'paternalistic' approach . . . .").

**Memorandum in Support of**
**Preliminary Injunction Motion**                20

And there will be no ads resembling express advocacy or the "sham ads" that the Court found to be "functional equivalents." *Id.* at 206. As may be seen in the sample offered by CCL, grassroots lobbying ads focus on passing or defeating pending legislation, not electioneering, and are of no (or only de minimis) value for the purposes of opposing or supporting candidates. But they are essential to self-government.

Further, the desirability of a "bright-line rule" does not defeat this as-applied challenge. The Supreme Court has already decided that where constitutional justification is absent, the "desire for a bright-line rule. . . . hardly constitutes the *compelling* state interest necessary to justify any infringement on First Amendment freedom." *MCFL* , 479 U.S. at 263 (emphasis in original).[9]

### d.  If There Are Residual Concerns about Using Corporate General Treasury Funds for Grassroots Lobbying, a Segregated Bank Account Could Be Used.

The one possibly perceived residual advantage of requiring CCL to do its grassroots lobbying through a PAC is that the use of donated corporate money would be eliminated.[10] In its strict scrutiny analysis, the Court in *McConnell* relied on the interest in regulating corporations with respect to candidate elections for the compelling interest prong. 540 U.S. at 205 (both

---

[9]In any event, this Court could adopt a bright-line test for grassroots lobbying that is every bit as bright as the exception for *MCFL*-type corporations created in *MCFL*. *Id.* at 263-64. The sort of "genuine issue ads" that constitute grassroots lobbying can be neatly cabined without placing any burden on the courts or the FEC.

[10]CCL does not have a PAC. *VC* ¶ 16. And in any event, the PAC option would also impose a $5,000 annual contribution limit on donations to the PAC, but contribution limits on organizations engaged in lobbying to support or oppose ballot measures (i.e., legislation) violates First Amendment rights of expression and association. *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981). Given the extremely low likelihood that genuine grassroots lobbying would have a cognizable effect on an election, and given the offsetting self-governance interest of the people, there is no constitutional justification for contribution limits in this context.

**Memorandum in Support of**
**Preliminary Injunction Motion**          21

"corporate form" advantage and "circumvention" are mentioned, but only as to "electoral involvement," which is absent here).

There is no "corporate form" compelling interest with respect to petitioning government (and consequently no "circumvention" interest), because corporate money may constitutionally be used for petitioning legislative and executive branches and the public about legislation. Strict scrutiny requires a sufficient nexus between the sort of grassroots lobbying herein and candidate elections for the compelling interest in regulating corporations applicable to candidate elections to even apply. There is, however, an insufficient nexus here.[11] So there is no compelling interest to justify applying the prohibition on use of corporate funds to grassroots lobbying.

There is also no compelling interest in regulating corporations even as to candidate elections with respect to *MCFL*-type corporations. Although CCL does not qualify for the exception to the prohibition (11 C.F.R. § 114.2(b)(2)) as a "qualified nonprofit corporation,"under the strict wording of 11 C.F.R. § 114.10,[12] CCL is in fact quite like an *MCFL*-type corporation because it is an ideological, nonstock, nonprofit (§ 501(c)(4)) corporation.

The fact that a corporation does not meet "qualified nonprofit corporation" status, because of

---

[11]*See, e.g., Riley v. National Federation of the Blind*, 487 U.S. 781, 793 & n.7 (1988) ("there is no nexus between the percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent" and "[e]ven if percentages are not completely irrelevant to the question of fraud, their relationship to the question is at best tenuous").

[12]11 C.F.R. § 114.10(c) follows, in a somewhat wooden way, the requirements for the *MCFL*-type corporation created by the Supreme Court in *MCFL*, 479 U.S. at 263-64, by creating an exception for ideological, nonstock, nonprofit (§ 501(c)(4)) corporations that have no business income and receive no corporate contributions. The regulation makes no provision for de minimis business income (especially of the sort related to the organization's mission, e.g., book sales related to its issues) or de minimis corporate contributions, as have other federal courts. *See* note 34 (listing cases recognizing corporations as *MCFL*-type despite such de minimis activity).

**Memorandum in Support of**
**Preliminary Injunction Motion**              22

some minimal business activity or receipts from corporations, should not matter for present purposes, however, because corporate money may be used for grassroots lobbying anyway. So the lack of corruption threat attributed to *MCFL*-type corporations should be attributed to CCL, even if it has receipts from business corporations.

Alternatively, CCL would be willing to make disbursements for electioneering communications only "out of a segregated bank account which consists of funds contributed solely by individuals who are United States citizens, nationals, or lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20))) directly to this account for electioneering communications." 2 U.S.C. § 434(f)(2)(E); 11 C.F.R. § 104.20(c)(7). This would eliminate all concerns about the use of business corporation funds for electioneering communications because the only remaining restrictions on PACs that would not apply to disbursements for grassroots lobbying electioneering communications made from a segregated bank account are (a) the annual PAC contribution limit and (b) the requirement that a corporation first acquire "members" and then solicit funds only from these members. 2 U.S.C. § 441b(b)(4)(C). But as noted above, contribution limits are unconstitutional in the context of grassroots lobbying because there is no potential for corruption, *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981), and any donors contributing in excess of $1,000 to the account would be disclosed to the public.

### 3.   CCL's Ad Is Not Electioneering.

#### a.   CCL's Ad Is Not the "Functional Equivalent of Express Advocacy."

Furthermore, CCL's grassroots lobbying ad is not express advocacy or its functional equivalent. In making this determination, the text of the ad itself must be examined, not external

**Memorandum in Support of**
**Preliminary Injunction Motion**          23

factors. *Buckley*, 423 U.S. at 43 (express advocacy is "limited to *communications* that include *explicit words* of advocacy . . ." (emphasis added)). The ad does not, of course, contain explicit words expressly advocating the election or defeat of a clearly identified candidate, nor is it the functional equivalent.

The sole focus of the ad is imminently pending, specific legislative activity while Congress is in session, the timing of which was beyond the control of CCL. The ad asks for calls to *incumbent* Senators who clearly have power to immediately affect the Amendment. These are unlike the "sham issue ads" that ask hearers to call candidates, even non-incumbents, about something vague, abstract, unfocused, and/or possibly in the past.

The main reference to Sen. Snowe is in the closing call to her constituents to contact her and ask her to support the Amendment. As Judge Leon noted, even the *McConnell* defendants' own expert concluded that an ad mentioning a candidate's name is a genuine issue ad, if "the body of the ad has no referent to [a candidate] whatsoever [and] the only referent to [the candidate] is the call line." 251 F. Supp. at 795.

CCL's ad asks constituents to call *both* Sen. Collins and Sen. Snowe, lessening the focus on Sen. Snowe even more and indicating that the issue was the Amendment, not Sen. Snowe. The ad mentions no election, candidacy, or political party, and says nothing about the Senators' character, actions, or fitness for office. The ad does say that the Senators had both opposed the Amendment in an earlier permutation, but this is a reference to their position on an issue, not their suitability for office.

The ad deals with non-candidate Collins and candidate Snowe equally, not singling Sen. Snowe out in any way. The ad deals with a long-time, natural concern for CCL, which would like

**Memorandum in Support of**
**Preliminary Injunction Motion**          24

a federal marriage-protecting amendment passed, so there is no question of a made-up issue. CCL will run the same ad outside the blackout periods during which time there is no congressional or court finding that there is any equivalence with express advocacy. And the ad deals with an unprecedented issue of vital national importance that is just now coming to a head at a scheduled vote for cloture in early June, which facts were a matter of public record and beyond CCL's control.

In sum, CCL's ad is not of the "functional equivalent of express advocacy." Prohibiting CCL from running it with its general treasury funds would therefore be unconstitutional.[13]

## II.  CCL Will Suffer Irreparable Injury Without the Injunction.

CCL is currently barred by BCRA from engaging in grassroots lobbying communications that refer to Senator Snowe from May 14, until June 13 2006 and again from September 8 until November 7, 2006, which is precisely the time when CCL needs to run an ad encouraging support of the federal Marriage Protection Amendment. Without injunctive and declaratory relief, CCL's ability to make these communications will be irreparably lost. Loss of First Amendment rights is automatically irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Therefore, this required element for temporary and preliminary injunctive relief is met.

---

[13]One unique detail of CCL's ad reaches further than those at issue in *WRTL*, but does not reach the outer limits of what the Constitution requires. CCL believes that there is no constitutional justification for prohibiting a citizen group from stating a legislator's position (for, against, or undecided) on a pending legislative matter in a grassroots lobbying communication.

**Memorandum in Support of**
**Preliminary Injunction Motion**          25

**III. The Injunction Will Not Substantially Injure Others.**

CCL would be  freely able to run its ad, and may continue to freely do so up until May 14,

without any constitutionally cognizable harm to anyone. On May 14, CCL may continue to run

its ad calling on Sen. Collins to support the Amendment without any cognizable harm to anyone.

No harm to Sen. Snowe will magically arise at the stroke of midnight when May 13 becomes

May 14. This is so because CCL's ads are about Sen. Snowe's job as a Senator, accountable to

the people of Maine year-round, and not about her position as a candidate. It is so because

rallying constituents on an urgent, important legislative issue is not a harm to a legislator – it is

part of her job to be petitioned by the people. It is so because it is part of the American system of

participatory democracy. It is so because gagging the people right before vital legislative action is

not narrowly tailored to any compelling governmental interest. Moreover, it is so because Sen.

Snowe is unopposed in the Maine Republican primary: what interest does the government have

in curtailing calls to lobby a Senator during a period when she is not even challenged?  There-

fore, there will be no constitutionally cognizable harm to others if the requested injunctive relief

issues.

**IV. The Injunction Furthers the Public Interest.**

It is clearly in the public interest for Americans to be able to associate in citizen groups, such

as CCL, to more effectively involve themselves in the American system of participatory

government by expressing themselves on imminently pending legislative matters and calling on

other citizens to petition government officials. It is in the public interest for citizens to know

about the issue of the federal Marriage Protection Amendment and the ongoing conflict over it an

similar initiatives that is now coming to a head in ways not seen before. Therefore, the requested

**Memorandum in Support of**
**Preliminary Injunction Motion**          26

injunctive relief serves the public interest.

## Conclusion

The electioneering communication prohibition is unconstitutional as-applied to CCL's grassroots lobbying activities and as-applied to CCL's broadcast ad found in Exhibits A. All the required elements for preliminary injunctive relief are met. This Court should expeditiously grant the requested injunctive relief, assuring it is in place prior to May 14.

Dated April 3, 2006                                    Respectfully submitted,

_____                          _____
M. Miller Baker, D.C. Bar # 444736               James Bopp, Jr.*
Michael S. Nadel, D.C. Bar # 470144              BOPP, COLESON & BOSTROM
MCDERMOTT WILL & EMERY LLP                       1 South Sixth Street
600 Thirteenth Street, NW                        Terre Haute, IN  47807
Washington, D.C. 20005-3096                      812/232-2434 telephone
202/756-8000 telephone                           812/234-3685 facsimile
202/756-8087 facsimile                           *Lead Counsel for Plaintiff*
*Local Counsel for Plaintiff*                    *Pro Hac Vice Motion filed April 3, 2006*

**United States District Court**
**District of Columbia**

---

**The Christian Civic League of Maine, Inc.**
    70 Sewall Street
    Augusta, ME 04330,

                         *Plaintiff,*

    *v.*

**Federal Election Commission,**
    999 E Street, NW
    Washington, DC 20463,

                        *Defendant.*

Cause No. _____

---

## Preliminary Injunction Order

This action is before the Court on Plaintiff the Christian Civic League of Maine's ("CCL") motion for preliminary injunction. The Court GRANTS the motion. The Defendant FEC is preliminarily enjoined from enforcing the prohibition on corporate expenditures for electioneering communications at § 203 of the Bipartisan Campaign Reform Act of 2002, codified at 2 U.S.C. § 441b(b)(2) as applied to (a) electioneering communications by CCL that constitute grass-roots lobbying and (b) the electioneering communications by CCL contained in Exhibit A of the Plaintiff's Complaint, until a final hearing on the merits.

    SO ORDERED this _____ day of _____ 2006.

                                    _____

                                    United States District Judge

**Order**

_____

United States District Judge


_____

United States District Judge

**Order**                    2