**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:06CV00614 |
| | ) | OPPOSITION |
| v. | ) ) | |
| FEDERAL ELECTION COMMISSION | ) ) | |
| Defendant. | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CONSOLIDATION OF THE RULING ON THE MERITS WITH THE HEARING ON
THE PRELIMINARY INJUNCTION**

**Introduction**

On April 10, 2006, the plaintiff Christian Civic League of Maine ("CCL") filed a motion to consolidate the hearing on the motion for preliminary injunction with a hearing on the merits in this case under Federal Rule of Civil Procedure 65(a)(2).  CCL has brought an as-applied constitutional challenge to a provision of the Federal Election Campaign Act ("FECA" or the "Act"), 2 U.S.C. 431 et seq., which prohibits corporations and labor organizations from using their general treasury funds to pay for certain "electioneering communications," 2 U.S.C. 441b(b)(2), narrowly defined to include only broadcast advertisements targeted to the electorate in an imminent election that refer to a clearly identified federal candidate running in that election, 2 U.S.C. 434(f)(3).  CCL alleges (Complaint ¶¶ 11, 12) that it intends to use its corporate funds to finance a broadcast ad that will qualify as an electioneering communication. The Federal Election Commission ("Commission" or "FEC") is amenable to an expedited

schedule for discovery and briefing of the merits.  However, it opposes CCL's motion to

combine the hearing on the merits with the hearing on the preliminary injunction because the two

weeks the Commission has had to respond to this motion is inadequate to prepare a proper

defense of the constitutionality of this important federal statute.[1]

At issue in this litigation is the constitutionality of provisions of the Federal Election

Campaign Act, 2 U.S.C. 441b(b)(2), 434(f)(3), that regulate what the Act refers to as

"electioneering communications."  Enacted as Section 203 of the Bipartisan Campaign Reform

Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, 91-92, these provisions prohibit

corporations and labor organizations from using their general treasury funds to pay for any

broadcast, cable, or satellite communication that refers to a candidate for federal office and is

broadcast within 30 days of a federal primary election or 60 days of a federal general election in

the jurisdiction in which that candidate is running.  2 U.S.C. 441b(b)(2), 434(f)(3).  In

McConnell v. FEC, 540 U.S. 203-11 (2003), the Supreme Court upheld against facial

constitutional challenge BCRA § 203's bright-line definition of "electioneering communication"

and the ban on the use of corporate or union treasury funds to pay for communications that fall

within that definition.  Noting that its campaign finance jurisprudence reflects "respect for the

legislative judgment that the special characteristics of the corporate structure require particularly

careful regulation," the Court concluded that compelling governmental interests supported

prohibiting corporations and labor organizations from financing electioneering communications

out of their general treasury funds.  Id. at 205 (citations and internal quotation marks omitted).

---

[1]     The Commission recently proposed such an abbreviated schedule to the three-judge court
in Wisconsin Right to Life ("WRTL") v. FEC, No. 04-1260, which involves a similar as-applied
challenge to the electioneering communication provision.  See attachment 1.

As-applied challenges are by their nature fact-specific.  The Court should adopt an expedited schedule that will permit the parties to develop a full factual record and to submit thorough briefing of the law as applied to that record.  The Commission seeks to supplement the sparse discovery it has had so far with the kind of evidence that the Supreme Court relied upon in McConnell v. FEC, 540 U.S. 93 (2003), but on a much more limited scale involving only one organization and a single ad campaign.  Another three-judge district court also found this kind of evidence relevant when it examined the purpose and effect of the advertisements before it in denying a preliminary injunction in WRTL, another case challenging the constitutionality of applying this provision of BCRA to ads alleged to be "grassroots lobbying."  See attachment 2.  As we show below, CCL has failed to present any compelling reason for reducing the times for both briefing and discovery on an issue this important to the two weeks the Commission has had to respond to the motion for a preliminary injunction.

 Although Congress required that cases like this be expedited, that statutory provision was not intended to require courts to ignore the need to act with care in evaluating constitutional challenges to the statute that Congress enacted after years of legislative effort.  On the contrary, as one of BCRA's principal Senate sponsors stated during floor debate:

> Finally, and most importantly, although [BCRA § 403] provides for the expedition of these cases to the greatest possible extent, we do not intend to suggest that the courts should not take the time necessary to develop the factual record and hear relevant testimony if necessary. …  By expediting the case, we in no way want to rush the Court into making its decision without the benefit of a full and adequate record…

147 Cong. Rec. S3189 (Mar. 30, 2001) (remarks of Sen. Feingold).  See also id. at S3189-90 (remarks of Sen. Dodd).  This case implicates exactly these concerns, and it is critical that the courts have such a "full and adequate" record to support their decisions.  Accordingly, while this case can certainly be resolved under an expedited schedule providing a reasonable opportunity to

develop the case for defending the constitutionality of the statute as applied, the Court should deny CCL's motion to consolidate.

> **I.     Consolidation As Proposed By CCL Will Deprive The FEC Of A Full Opportunity To Present Its Case And Defend The Act.**

Because a party is "not required to prove his case in full at a preliminary injunction hearing … and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding in a trial on the merits … [i]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). See also West Virginia Ass'n of Cmty. Health Ctrs., Inc. v. Heckler, 734 F.2d 1570, 1578 (D.C. Cir. 1984). Although Rule 65(a)(2) permits a court to "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application," the Supreme Court has cautioned that "the parties should normally receive clear and unambiguous notice of the court's intent to consolidate the trial and the hearing either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." Camenisch, 451 U.S. at 395 (emphasis added, internal citations and quotations marks omitted). Consolidation should not be granted, therefore, if it would "deprive the parties of a full opportunity to discover and present all of their evidence." CFTC v. Board of Trade of City of Chicago, 657 F.2d 124, 126 (7th Cir. 1981). This caution is fully applicable to constitutional challenges to the federal campaign finance laws. See, e.g., Colorado Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 626 (1996) ("[G]iven the important competing interests involved in campaign finance issues, we should proceed cautiously . . ."); FEC v. Colorado Republican Fed. Campaign Comm., 96 F.3d 471, 473 (10th Cir. 1996) ("[T]he issues are too important to be resolved in haste").

The resolution of this case does not turn on purely legal issues.  Because this is an as-applied challenge, its resolution necessarily depends on facts specific to this plaintiff and this advertising campaign.[2]  CCL bears the burden of demonstrating why the regulation of electioneering communications in BCRA is unconstitutional as applied to the specific advertisements it says it wants to run before the upcoming primary election.  Federal courts have long recognized the need for a "concrete factual setting that sharpens the deliberative process especially demanded for constitutional decision."  United States v. UAW, 352 U.S. 567, 591 (1957) (declining to resolve constitutional challenge to statutory restriction on political spending by unions before development of a factual record).  The D.C. Circuit has found it "undesirable to decide a constitutional issue abstracted from its factual context."  International Ass'n of Machinists v. FEC, 678 F.2d 1092, 1097 (D.C. Cir. 1982) (en banc).  In fact, courts have repeatedly emphasized the importance of creating a full factual record before resolving constitutional challenges, like the one here, to the federal campaign finance statutes.  See, e.g., Bread Political Action Comm. v. FEC, 455 U.S. 577, 580 (1982) (district court is required to make findings of fact before certifying constitutional question to the en banc court of appeals under section 437h of FECA); California Med. Ass'n v. FEC, 453 U.S. 182, 192 n.14 (1981) ("immediate adjudication of constitutional claims through a section 437h proceeding would be improper in cases where the resolution of such questions required a fully developed factual

---

[2]     See e.g., Ada v. Guam Soc. of Obstetricians & Gynecologists, 506 U.S. 1011 (1992) (Scalia, J. dissenting) (in an as-applied challenge "the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional") (emphasis added); Patlex Corp., v. Mossinghoff, 771 F.2d 480, 488 (Fed. Cir. 1985) (in an-as applied challenge "the litigant contests the application of the provision to his situation").  The record reviewed by the McConnell Court in 2003 contains not a single fact about CCL or the ad it proposes running in the future.  Thus, contrary to CCL's claim (Mot. at 2 n.2), taking judicial notice of facts in that record would clearly be insufficient to evaluate CCL's as applied challenge.

record"); Khachaturian v. FEC, 980 F.2d 330, 331-32 (5th Cir. 1992) (en banc); FEC v. Central

Long Island Tax Reform Immediately Comm., 616 F.2d 45, 49 (2nd Cir. 1980) (en banc);

Buckley v. Valeo, 519 F.2d 817, 818 (D.C. Cir. 1975) (en banc).  And in Colorado Republican

Federal Campaign Committee, 518 U.S. at 618, Justice Breyer pointed out the importance of

record evidence in reviewing the constitutionality of the Act's limit on coordinated party

committee expenditures to the candidate, 2 U.S.C. 441(a)(d).

When reviewing the constitutionality of the electioneering communication provision,

both the Supreme Court and the three judge district court in McConnell relied upon evidence that

went beyond the text of the communications at issue.  The Supreme Court examined the purpose

and effect of advertisements by relying upon contextual factors such as the timing of the ads

broadcast: "the conclusion that such ads were specifically intended to affect election results was

confirmed by the fact that almost all of them aired in the 60 days immediately preceding a

federal election."  McConnell, 540 U.S. at 127.[3]  The electoral nature of such activity cannot be

analyzed in a vacuum; the public views pre-election communications as part of a larger mix of

campaign related information, and the purpose and effect of a pre-election ad cannot be

determined without knowledge of the context in which it was run.  See, e.g., McConnell v. FEC,

251 F.Supp.2d 176, 875, 882 (D.D.C. 2003) (Leon, J.);  id. at 567-68 (Kollar-Kotelly, J.) (expert

evidence shows that the real purpose of an ad cannot be determined without looking at the

context; for example, an ad run in the 1998 North Carolina Senate campaign about fighting trial

lawyers' efforts to expand health care liability may have seemed like an "issue ad" to an outside

---

[3]    See also, e.g., id. at 193 ("And although the resulting advertisements do not urge the
viewer to vote for or against a candidate in so many words, they are no less clearly intended to
influence the election"); at 193 n.78 ("The notion that this advertisement was designed purely to
discuss the issue of family values strains credulity"); at 206 ("The justifications for the regulation
of express advocacy apply equally to ads aired during those periods if the ads are intended to
influence the voters' decisions and have that effect").

observer who did not know that one candidate's status as a trial lawyer was an important campaign issue).[4]

The Commission seeks to compile a record addressing a narrow range of topics concerning the purpose and likely effect of CCL's planned advertisement, such as its decision about where, when, and how to run its ad, CCL's historic use of broadcast and other media for its public communications, the relationship between matters raised in CCL's contemplated ad and Senator Snowe's candidacy for reelection, and CCL's historic support of or opposition to Senator Snowe.  In addition, the Commission may seek expert testimony as to the likely effect of CCL's advertisement in Maine's electoral climate, CCL's alleged need to identify office holders in its grassroots lobbying advertisements, and the effect that a grassroots lobbying exemption like the one CCL now seeks would likely have in future electoral contests, including whether it would enable political consultants to craft electioneering ads that would circumvent regulation during the "electioneering communication" periods of the Act.[5]

---

[4]     See also, 251 F. Supp. 2d at 539-52, 610-13 (Kollar-Kotelly, J.) (evidence shows that "issue ad" campaigns of the AFL-CIO, the Coalition, Citizens for Better Medicare, the National Rifle Association, and Club for Growth were intended to affect federal elections); id. at 878-79 (Leon, J.) (quoting the statement of a former chair of a major advocacy organization who explained that her organization "really hoped people would vote for" a Congressman, not just "thank him," even though its ads only expressly asked viewers to do the latter); at 885-87 (Leon, J.) (evidence shows that influencing federal elections was a "consideration" in "issue ad" campaigns by both the AFL-CIO and the Chamber of Commerce).

[5]     In upholding BCRA § 203, the Supreme Court found that the definition of "electioneering communication" is not substantially overbroad.  Although the Court recognized that some "genuine issue ads" would be covered by the definition, it found that in the past the "vast majority of ads" that clearly identified a candidate and aired during the "brief preelection time spans" "clearly had" an "electioneering purpose." 540 U.S. at 206.  This finding necessarily means that, even if some exemption for grassroots lobbying were constitutionally required, it cannot be so broad as to deregulate a substantial amount of the communications that fall within the definition; otherwise, such an exemption would swallow up the definition and be inconsistent with McConnell's holding that the definition is facially valid precisely because it is not substantially overbroad.  Expert testimony may be useful in explaining whether certain

Finally, in <u>McConnell</u> the Supreme Court upheld the electioneering communication provision in part because it leaves corporations and unions free to "finance genuine issue ads during those time frames by simply avoiding any specific reference to federal candidates, or … by paying for the ad from a segregated fund" 540 U.S. at 206.[6] CCL's as-applied challenge cannot succeed without demonstrating that these options are constitutionally inadequate as applied to its own proposed advertising, so the Commission seeks to develop evidence about any burden on CCL of using alternative advertising media, or alternative text that would fall outside the definition of "electioneering communication," and about its ability to establish a separate segregated fund to pay for its ad.

A full record on these important factual issues could not be compiled based on the limited discovery the Commission was able to obtain in the few days it had to respond to CCL's motion for preliminary injunction.  For example, CCL has not so far provided the Commission with a single document in response to the discovery request for documents relating to the planning, creation or arrangements for distribution of the broadcast ad at issue, claiming in conclusory fashion that every such document is subject to attorney-client privilege without even providing a privilege log.  Surely a reasonable opportunity for discovery would not limit the Commission to

---

criteria for exempting grassroots lobbying proposed by CCL would likely have that kind of impermissible effect and thus be contrary to the holding in <u>McConnell</u>.

[6]    A separate segregated fund "may be completely controlled" by the corporation, and is "separate" from it "'only in the sense that there must be a strict segregation of its monies' from the corporation's other assets."  <u>FEC v. National Right to Work Comm.</u>, 459 U.S. 197, 200 n.4 (1982) (quoting <u>Pipefitters v. United States</u>, 407 U.S. 385, 414-17 (1972)).  The fund comprises donations voluntarily made for political purposes by the corporation's stockholders or members and employees, and the families of such individuals.  2 U.S.C. 441b(b)(4)(A)-(C).  The money in this fund, can for example, be contributed directly to federal candidates or used to pay for independent expenditures to communicate to the general public the corporation's views on candidates for federal office.

discovering only those things CCL unilaterally chooses to provide during the few days allotted for briefing on the preliminary injunction.

Because the FEC has not yet had a reasonable opportunity to complete this discovery, consolidation will not save the parties or the Court from wasteful duplication of effort.[7] Rather, consolidation would deprive the Commission of a full opportunity to develop critical evidence and present its best case defending the constitutionality of the statute, and deprive the Court – and the Supreme Court in the likely event of an appeal – of a full and adequate record for constitutional adjudication. Such an outcome would only further delay final resolution of this case by postponing the building of a record until after remand from the Supreme Court. See, e.g., Colorado Republican Fed. Campaign Comm., 518 U.S. 604 (1996) (remanding for further consideration of constitutional issues). Providing the Commission with a full opportunity for discovery at this stage would, therefore, expedite final resolution of the case by ensuring that such a remand by the Supreme Court would not be necessary.

II.     **The Commission Is Not Precluded From Conducting Discovery By The Noerr-Pennington Doctrine Or By Considerations Of The Ease With Which A Grassroots Lobbying Exemption, If Any, Could Be Administered.**

A. **The Noerr-Pennington Doctrine Is Inapplicable**

CCL argues at length (Mot. at 6-10) that discovery in this case is irrelevant, and perhaps impermissible, because the Noerr-Pennington doctrine establishes "that unless CCL's grassroots lobbying ads themselves are objectively without merit as exercising the right to petition, then any finding of a subjective intent to influence elections would not be enough to deny the ads

---

[7]     In NOW v. Operation Rescue, 747 F. Supp. 760 (D.D.C. 1990), this Court held that Rule 65(a)(2) consolidation in a case pending in federal court in Virginia involving identical parties did not deprive the defendant of a full and fair opportunity to litigate issues for collateral estoppel purposes. Critical to the court's holding, however, was that the "defendants neither objected to the accelerated trial nor requested any continuance to prepare rebuttal evidence." Id. at 768. That is not the case here.

immunity from the electioneering communication prohibition," (Mot. at 9).  This argument is wholly without merit, for a number of reasons.

First, the Noerr-Pennington doctrine has no application to a constitutional challenge to a statute.  The Noerr line of cases involve only a principle of statutory construction, and CCL has not cited a single case in which that doctrine has ever been found relevant to determining the constitutionality of a statute, facially or as applied.  In the Noerr cases, the Supreme Court construed the antitrust statutes, and later the National Labor Relations Act, as not intended to regulate political speech.  While the Court's narrow statutory construction was certainly motivated in part by a desire to avoid constitutional issues, "[t]his doctrine . . . rests ultimately upon a recognition that the antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'"  City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991) (quoting Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 141 (1961).  Accord, Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 817 (D.C. Cir. 2001).

Unlike the antitrust and labor statutes, BCRA was written to regulate the financing of campaign speech, not business activities, and the Court has explicitly contracted its narrow construction of statutes regulating business activities from statutes designed to regulate politics. Omni, 499 U.S. at 378-379 ("Congress has passed other laws aimed at combating corruption in state and local governments," citing Hobbs Act, 18 U.S.C. 1951, but "[i]nsofar as [the Sherman Act] sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity" (quoting Noerr, 365 U.S. at 140)).  CCL concedes (Mot. at 1), moreover, that BCRA unambiguously applies to the broadcast ads it seeks to run, so there is plainly no room in this case to construe the statute not to apply to CCL's activities, as the courts did in the Noerr line of

cases.  See, e.g., NOW, Inc. v. Scheidler, 510 U.S. 249, 263 (1994) (Souter & Kennedy, JJ,

concurring) ("The argument is meritless in this case, though, for this principle of statutory

construction applies only when the meaning of a statute is in doubt, see Noerr, supra, and here

'the statutory language is unambiguous'").

        Accordingly, the Noerr-Pennington doctrine, and the tests for identifying exempt activity

developed in application of that doctrine, simply has no application to the constitutional issues

before this Court.  Indeed, in McConnell the Supreme Court unequivocally rejected a similar

attempt to convert a statutory construction adopted to avoid First Amendment questions into an

overriding substantive constitutional restriction on congressional power to regulate.  540 U.S. at

190 ("the express advocacy restriction was an endpoint of statutory interpretation, not a first

principle of constitutional law"); id. at 103 ("Buckley and MCFL were specific to the statutory

language before the Court and in no way drew a constitutional boundary that forever fixed the

permissible scope of provisions regulating campaign-related speech").

        Second, the statutory provisions at issue in the Noerr line of cases would have had a

much more onerous impact on First Amendment activities, since application of those statutes

would have entirely prohibited the petitioning activities at issue.  See Noerr, 365 U.S. at 143-

144) (Since attempts to influence legislation always carry the prospect of injury to the interests

of some, "[t]o hold that the knowing infliction of such injury renders the campaign itself illegal

would thus be tantamount to outlawing all such campaigns"); Bill Johnson's Restaurants, Inc. v.

NLRB, 461 U.S. 731, 733 (1983) ("We must decide whether the Board may issue a cease-and-

desist order to halt the prosecution of a state court civil suit brought by an employer to retaliate

against employees").  In contrast, BCRA does not prohibit CCL from engaging in public "grass

roots lobbying" to urge people to ask Senator Snowe to support the proposed marriage

amendment.  The statute has no application to such advocacy in newspapers, mailings, on the

Internet or on signs; only the financing of broadcast advertisements is affected.  Even for

broadcast advertising, the statute applies only during the 30 days before the upcoming primary

election here, and only if a candidate in that election is clearly identified in the advertisement

itself (thus permitting, for example, an advertisement that urges contacting "your Senators" and

refers listeners to the organization's website to obtain the names and phone numbers to use).

Finally, the statute only restricts financing such an advertisement with corporate treasury money;

CCL could freely establish a separate segregated fund to accept individual contributions that it

could use to finance such broadcast advertisements during the 30 days before the primary

election.  "The ability to form and administer separate segregated funds authorized by FECA . . .

has provided corporations and unions with a constitutionally sufficient opportunity to engage in

express advocacy," so that "it is 'simply wrong' to view the provision as a 'complete ban' on

expression rather than a regulation.'"  McConnell, 540 U.S. at 203-04 (quoting FEC v.

Beaumont, 539 U.S. 146, 162 (2003)).[8]  Accordingly, BCRA's impact on First Amendment

activities is far less burdensome than the First Amendment impact the Court sought to avoid by a

narrow construction in the Noerr cases.

Finally, the Supreme Court in McConnell has already concluded that BCRA's regulation

of the financing of "electioneering communications" is constitutional on its face and as applied,

at least, to "the vast majority of ads" it regulates.  540 U.S. at 206; see also id. at 126-27 (finding

"[l]ittle difference" between "an ad that urged viewers to 'vote against Jane Doe' and one that

---

[8]  Since "'[a]dvocacy of the election or defeat of candidates for federal office is no less entitled
to protection under the First Amendment than . . . advocacy of the passage or defeat of
legislation,'" McConnell, 540 U.S. at 205 (quoting Buckley v. Valeo, 424 U.S. 1, 48 (1976)),
CCL cannot claim that its "grass roots lobbying" ads have greater constitutional protection that
the express advocacy for which the Court stated that the separate segregated fund option is
constitutionally adequate.

condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think'"). CCL claims that <u>Noerr</u> requires that its advertisement – which criticizes Senator Snowe's record opposing the proposed marriage amendment and exhorts listeners to call and let her know they think she should support it – be considered presumptively immune from application of the statute unless the "ads themselves are objectively without merit as exercising the right to petition" (Mot. at 9).[9] Such a conclusion would turn <u>McConnell</u> on its head by excluding <u>most</u> ads discussing candidates from the statute's coverage despite the Supreme Court's conclusion that there is "little difference" between ads like this and express advocacy of a candidate's election or defeat. Accordingly, CCL's attempt to invoke the <u>Noerr-Pennington</u> doctrine to foreclose discovery in this case, which is governed instead by <u>McConnell,</u> fails for this reason as well.[10]

---

[9]  It is not clear what CCL means by an ad that is "objectively without merit as exercising the right to petition" (Mot. at 9). This appears to be adapted from antitrust and labor cases concluding that the <u>Noerr-Pennington</u> doctrine does not exclude from those statutes sham lobbying campaigns or lawsuits mounted merely to harass opponents rather than to obtain legislative or judicial results. But how can public advocacy of a position on an issue, as opposed to a lawsuit, be "objectively without merit"? After all, the Constitution protects advocacy of positions with little chance of acceptance by Congress just as much as advocacy of positions that Congress is likely adopt. Most "electioneering communications" of the "call and tell" type described in <u>McConnell</u> are undoubtedly motivated by a sincere desire to prevail on the issue addressed as well as a hope that the named candidate will be defeated, but they may still be regulated even though their issue advocacy is not "objectively without merit."

[10]  Although the <u>Noerr-Pennington</u> doctrine was nowhere mentioned in <u>McConnell</u>, CCL invokes the discussion of "sham" lawsuits in the <u>Noerr</u> cases as if this were a definition of the "sham" issue advertisements referred to in <u>McConnell</u>. Of course, <u>McConnell</u> did not indicate in any way that the statute could not be applied to "electioneering communications" unless they were "sham"; it only used that word as part of its analysis of why the "express advocacy" test had proven inadequate to serve Congress' compelling interests in regulating electoral communications. But even where <u>Noerr</u> is applicable, its application and the definition of what is "sham" varies with circumstances and the consequences of regulation, <u>See</u> <u>Petrochem Insulation, Inc. v. NLRB</u>, 240 F.3d 26, 32 (D.C. Cir. 2001) ("Perhaps the Supreme Court will one day create a uniform standard for sham litigation governing both NLRA and non-NLRA cases"). <u>See also</u>, <u>Allied Tube & Conduit Corp. v. Indian Head, Inc</u>., 486 U.S. 492, 504 (1988) ("[T]he <u>Noerr</u>  immunity of anti competitive activity intended to influence the government

**B.**          **The Commission's Discovery Is Relevant To Determining Whether BCRA Can Constitutionally Be Applied To CCL's Proposed Conduct**

As explained above, the Commission is seeking to gather the facts that it believes are relevant to support its legal theories for why BCRA is not unconstitutional as applied to CCL's proposed activity.  By seeking access to such facts, the Commission is not arguing that an exemption for grassroots lobbying — if the Court should ultimately find that any such exemption is constitutionally required — should be framed in terms of a corporation's subjective intent.  While the parties may agree that if a constitutional grassroots lobbying exemption is adopted it should be easily administrable, there is no reason why the <u>evidence</u> relevant to whether such an exemption is warranted at all, or what it would comprise, should be limited to CCL's own view of the factors any such a test should include or exclude.

The fundamental flaw in CCL's argument that the only facts that are relevant to this Court concern the content of CCL's proposed ad is that it conflates the <u>evidence</u> relevant to the fundamental constitutional question presented in this case with what might be an appropriate <u>test</u>, if any, for defining "grassroots lobbying."  This assumes, however, what CCL still has to prove: that the Constitution requires that some category of "grassroots lobbying" be exempt from BCRA.  <u>See</u> Mot. at 4.  To this point, neither the Supreme Court nor any lower court has reached that threshold conclusion, and the Commission is entitled to build a factual record to convince this Court that such a threshold conclusion is unwarranted.[11]

---

depends not only on its impact, but also on the context and nature of the activity ") <u>Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l</u>, 256 F.3d 799, 818 (D.C. Cir. 2001) ("Whether conduct falls with '[t]he scope of this [Noerr] protection depends, however, on the source, context, and nature of the anticompetitive restraint at issue") (second brackets added).

[11]    There is a fundamental difference between applying a <u>test or standard</u> for defining grassroots lobbying (or other speech) and the <u>evidence or rationale</u> relevant to determining whether an exemption for such activity is required by the Constitution.  For example, in <u>McConnell</u>, both the Supreme Court and the district court reviewed BCRA's objective, bright-

In sum, the issue before this Court is not merely to formulate a general, quasi-legislative exemption for "grassroots lobbying" as CCL claims (Mot. at 2). Rather, the task is, <u>inter alia</u>, to use all relevant evidence to evaluate whether application of the "electioneering communication" provision to CCL's specific conduct is beyond the constitutional power of Congress, despite the ample opportunity the Supreme Court found the provision gives corporations to publicize their positions on issues without violating the statute. <u>See</u> supra p. 8. The Commission has a right to gather evidence that supports the government's theory of the case, without being circumscribed by plaintiff's narrow vision of what would be relevant under its own legal theories.

### III.    Plaintiff Has Provided No Other Justification For Short Circuiting This Important Case

None of the other arguments presented by CCL is remotely adequate to justify restricting the Commission's entire opportunity to defend the constitutionality of a federal statute to the brief two-week period between the filing of the complaint and the filing of an opposition to the preliminary injunction motion.

CCL notes (Mot. at 10) that the Commission agreed to an expedited schedule on the preliminary injunction motion, but the Commission would <u>not</u> have agreed if CCL had revealed at that time that it wanted this to be the Commission's <u>only</u> opportunity to address the merits of the case, as this motion requests. While CCL asserts (Mot. at 11) that after the few days of discovery on the preliminary injunction the Commission "will have ostensibly discovered all that [it] consider[s] relevant," this memorandum demonstrates that the minimal discovery the

---

line definition of "electioneering communication" by relying upon evidence that was multi-faceted and complex. That evidence went far beyond the text of the ads and included evidence about their context, purpose, and effect. As in <u>McConnell</u>, when both courts reviewed a wide array of external evidence to evaluate the constitutionality of a bright-line definition, this Court cannot properly review whether the Constitution requires it to promulgate the bright-line exemption demanded by CCL without a fully developed record.

Commission was able to conduct during the few days before filing its accelerated response to the preliminary injunction motion only skims the surface of the factual record that would be relevant to the important issues presented in this case.  The Commission certainly has <u>not</u> been able to discover "all that [it] consider[s] relevant."

Finally, CCL asserts (Mot. at 10) that it wants quick relief if it is to run its ads during the 30 days before the primary election that begins on May 14.  Of course, CCL itself created this timing problem by waiting until the last minute to file this lawsuit, even though it has known for months when the primary election would be held.  Putting that aside, however, providing prompt relief for alleged irreparable harm before a case can be fully litigated is the very purpose of the preliminary injunction procedure.  If CCL sustains its burden of demonstrating an entitlement to a preliminary injunctive it will receive the relief it seeks before May 14; if it fails to sustain that burden it will not.  Either way, the availability of quick preliminary injunctive relief does not in any way depend upon whether final briefing on the merits is consolidated with the preliminary injunction hearing.  Accordingly, this argument is nothing more than a red herring.

## <u>Conclusion</u>

For all the reasons stated above, the Court should deny plaintiff's motion for consolidation of the hearing on the merits with the hearing for preliminary injunction.

Respectfully submitted,

_____/s/_____
Lawrence H. Norton
General Counsel

_____/s/_____
Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

_____/s/_____
David Kolker
Assistant General Counsel
(D.C. Bar # 394558)


_____/s/_____
Harry J. Summers
Attorney


_____/s/_____
Kevin A. Deeley
Attorney


_____/s/_____
Vivien Clair
Attorney


_____/s/_____
Steve N. Hajjar
Attorney


FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
April 14, 2006                (202) 694-1650