UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )        No.  1:06CV00614 (LFO)
          Plaintiff,               )
                                   )        OPPOSITION
          v.                       )        TO MOTION FOR
                                   )        PRELIMINARY INJUNCTION
FEDERAL ELECTION COMMISSION,       )
                                   )
          Defendant.               )
                                   )


**DEFENDANT FEDERAL ELECTION COMMISSION'S
OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**


Lawrence H. Norton
General Counsel

Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

David Kolker
Assistant General Counsel
(D.C. Bar # 394558)

Harry J. Summers
Kevin Deeley
Steve N. Hajjar
Attorneys

FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

April 17, 2006

# TABLE OF CONTENTS

BACKGROUND ..........................................................................................2

    A.    The Federal Election Commission ...............................................2

    B.    Statutory and Regulatory Background ........................................2

        1.    Regulation of Corporate-Financed Electoral Activities
                Prior to the Passage of BCRA ...........................................2

        2.    Regulation of Corporate-Financed Electoral Activities After
                the Enactment of BCRA in 2002 ......................................4

    C.    The Christian Civic League of Maine, Inc. ..................................7

        1.    How This Lawsuit Arose ....................................................7

        2.    CCL's Finances and Related Organizations ....................10

        3.    CCL's History of Public Advocacy ................................11

        4.    Marriage Protection Amendment......................................13

ARGUMENT ...........................................................................................14

I.    CCL HAS NOT SHOWN THAT IT HAS ARTICLE III STANDING
    TO SEEK A PRELIMINARY INJUNCTION .......................................14

II.    CCL CANNOT CARRY ITS HEAVY BURDEN OF SHOWING THAT
    IT IS ENTITLED TO A PRELIMINARY INJUNCTION...................16

    A.    The Requirements for a Preliminary Injunction .......................16

    B.    CCL Has Failed to Show That It Is Substantially Likely to
        Succeed on the Merits................................................................17

        1.    McConnell Clearly Envisioned That BCRA's Electioneering
                Communication Restrictions Could Be Applied Constitutionally
                to Political Ads That CCL Calls "Grass Roots Lobbying"............17

        2.    CCL Is Not Entitled To Any Constitutional Exemption for Its
                "Grass Roots Lobbying" that Meets the Definition of
                "Electioneering Communication"..................................20

a.     The Constitution Does Not Require A General "Grass Roots Lobbying" Exemption From BCRA § 203..............20

b.     CCL Has Not Shown That the Communication Options Identified in <u>McConnell</u> and Other Alternatives Available to It Are Constitutionally Burdensome.............................23

c.     CCL's Proposed Advertisement Is Materially Similar To Ads That <u>McConnell</u> Found Functionally Equivalent to Express Advocacy...........................................................26

3.     BCRA's Bright-Line Rule Furthers First Amendment Interests and Would Be Subverted by CCL's As-Applied Challenge..........30

4.     CCL's Offer to Finance The Advertisement At Issue Here From A Segregated Bank Account Does Not Alter The Constitutional Analysis ...............................................................36

III.    CCL FAILS TO DEMONSTRATE IRREPARABLE INJURY ...........................38

IV.    A PRELIMINARY INJUNCTION WOULD CAUSE THE COMMISSION AND THE PUBLIC SUBSTANTIAL HARM......................................................43

CONCLUSION..............................................................................................................45

# TABLE OF AUTHORITIES

## Cases

**Page(s)**

Alexander v. United States, 509 U.S. 544 (1993)..............................................40

Anderson v. FEC, 634 F.2d 3  (1st Cir. 1980) ...................................................16

Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990) ..................5, 18, 22, 25

Bowen v. Kendrick, 483 U.S. 1304 (1987)..............................................17, 44

*Buckley v. Valeo, 424 U.S. 1 (1976)..................................................4, 21, 25, 28, 32, 34

California Medical Ass'n v. FEC, 453 U.S. 182 (1981)....................................34

Christian Knights of the Ku Klux Klan Invisible Empire v. District of Columbia,
    919 F.2d 148 (D.C. Cir. 1990) ...................................................................42

Clinton v. Jones, 520 U.S. 681, 690 n.11 (1997)..............................................16

Circuit City Stores, Inc. v. Adams, 532 U.S. 105 (2001) ..................................33

*CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738 (D.C. Cir. 1995).........16

Crow Creek Sioux Tribe v. Brownlee, 331 F.3d 912 (D.C. Cir. 2003)............................14

Dombrowski v. Pfister, 380 U.S. 479 (1965) ....................................................31

Eastern R.R. Presidents Conference v. Noerr, 365 U.S. 127 (1961) .............................21

Elrod v. Burns, 427 U.S. 347 (1976) ...............................................................42

EMILY'S List v. FEC, 362 F. Supp. 2d 43 (D.D.C. 2005) ...............................................42

Faucher v. FEC, 708 F. Supp. 9, 14 (D. Me. 1989) ...........................................16

*FEC v. Beaumont, 539 U.S. 146 (2003) .......................................................... 2, 5, 18, 25

*FEC v. Massachusetts Citizens for Life, Inc. ("MCFL"), 479 U.S. 238
    (1986)................................................................................. 3, 4, 15, 29, 32, 33, 37

FEC v. National Right to Work Committee, 459 U.S. 197 (1982)....................................3

First National Bank of Boston v. Bellotti, 435 U.S. 765 (1978) ......................................22

*Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995).......................................35

FTC v. Standard Oil Co.,  449 U.S. 232 (1980) .................................................42

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) ........................................15

Goland v. United States, 903 F.2d 1247 (9th Cir. 1990) ...................................34

Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 654 (1981)........................35

*Hill v. Colorado, 530 U.S. 703 (2000)................................................................31, 34, 35

Hohe v. Casey, 868 F.2d 69 (3d Cir.), cert. denied 493 U.S. 848 (1989)........................43

KOS Pharmaceuticals v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004) ...............................39

Martin Tractor Co. v. FEC, 627 F.2d 375 (D.C. Cir. 1980) .............................................16

McConnell v. FEC, 02A989, 02A990, slip op. (May 23, 2003)............................17, 44, 45

*McConnell v. FEC, 540 U.S. 93 (2003) ................................................................ passim

McConnell v. FEC, 251 F. Supp.2d 176 (D.D.C. 2003)............................17, 27, 28, 29, 30

McIntyre v. Ohio Elections Commission, 514 U.S. 334 (1995)......................................22

New Motor Vehicle Bd. of California v. Orrin W. Fox Co., 434 U.S. 1345
   (Rehnquist, Circuit Justice, 1977)...............................................................44

NTEU v. United States, 927 F.2d 1253 (D.C. Cir. 1991)..........................................39, 42

Pipefitters v. United States, 407 U.S. 385 (1972)...........................................................3

Piscottano v. Murphy, 317 F.Supp.2d 97 (D.Conn. 2004) .................................................43

Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781 (1988) ...................................................31

Taylor v. Resolution Trust Corp. 56 F.3d 1497 (D.C. Cir.), amended on other
   grounds on reh'g, 66 F. 3d. 1226 (D.C. Cir. 1995).........................................15

Time Warner Cable of New York City v. Bloomberg L.P., 118 F.3d 917
   (2d Cir. 1997)...................................................................................39

Turner Broad. Sys., Inc. v. FCC, 507 U.S. 1301 (1993)...................................................39

*University of Texas v. Camenisch, 451 U.S. 390 (1981) ........................................16, 39

Veitch v. Danzig, 135 F.Supp.2d 32 (D.D.C. 2001)........................................................39

Wagner v. Taylor, 836 F.2d 566 (D.C. Cir. 1987)......................................................39, 42

Walters v. National Ass'n of Radiation Survivors, 468 U.S. 1323 (1984)......................17

Western Assoc. Ltd. P'ship v. Market Square Ass'n., 235 F.3d 629
   (D.C. Cir. 2001)..............................................................................15

Wisconsin Gas Co. v. FERC, 758 F.2d 669 (D.C. Cir. 1985) .........................................39

*Wisconsin Right to Life, Inc. v. FEC, 546 U.S. ___, No. 04-1581, 2006 WL 152676
   (Jan. 23, 2006)  ...................................................................6, 7, 22

Wisconsin Right to Life, Inc. v. FEC, 542 U.S. 1305, 1306 (2004)............................17, 44

Wisconsin Right to Life, Inc. v. FEC, No. 04-1260, slip op. (D.D.C. May 9, 2005) ..........6

Wisconsin Right to Life, Inc. v. FEC, No. 04-1260, slip op.
   (D.D.C. Aug. 17, 2004)..................................................................6, 26, 43

**Statutes and Regulations**

Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155,

116 Stat. 81, 91-92 (2002) ...................................................................... passim

BCRA §201(a) ...................................................................................... 5, 18, 33

*BCRA §203 ................................................................................................ passim

BCRA §204 ...................................................................................................... 37

BCRA §403(a) .................................................................................................. 33

BCRA §403(d) .................................................................................................. 33


Federal Election Campaign Act of 1971, as amended ............................. passim

2 U.S.C. 431(17) ................................................................................................ 4

2 U.S.C. 434(b)(3) ........................................................................................... 38

2 U.S.C. 434(b)(6) ........................................................................................... 38

2 U.S.C. 434(f)(1) ............................................................................................ 38

2 U.S.C. 434(f)(2)(E) ................................................................................. 36, 38

2 U.S.C. 434(f)(2)(F) ....................................................................................... 38

2 U.S.C. 434(f)(3) ............................................................................................ 41

2 U.S.C. 434(f)(3)(A)(i) .................................................................................. 5, 8

2 U.S.C. 434(f)(3)(B)(i)-(iv) ............................................................................. 5

2 U.S.C. 434(f)(3)(B)(iv) ................................................................................. 22

2 U.S.C. 437c(b)(1) ........................................................................................... 2

2 U.S.C. 437d(a)(7) ........................................................................................... 2

2 U.S.C. 437d(a)(8) ........................................................................................... 2

2 U.S.C. 437f ................................................................................................. 2, 15

2 U.S.C. 438(a)(8) ............................................................................................. 2

2 U.S.C. 438(d) ................................................................................................. 2

2 U.S.C. 441a(a)(1)(c) ......................................................................... 24, 37, 38

2 U.S.C. 441b ................................................................................................. passim

2 U.S.C. 441b(a) ................................................................................................ 3

2 U.S.C. 441b(b) ................................................................................................ 4

2 U.S.C. 441b(b)(2) ........................................................................................... 4

2 U.S.C. 441b(b)(2)(C) ........................................................................................3, 4

2 U.S.C. 441b(b)(4) .................................................................................3, 24, 37, 38

2 U.S.C. 441b(b)(4)(A) ..............................................................................................3

2 U.S.C. 441b(b)(4)(B) ..............................................................................................3

2 U.S.C. 441b(b)(4)(C) ..............................................................................................3

2 U.S.C. 441b(b)(c)(2) .............................................................................................37

2 U.S.C. 441b(b)(c)(6) .............................................................................................37

11 C.F.R. 114.2(b)(2) ...............................................................................................11

11 C.F.R. 114.10 ................................................................................................3, 11

## Federal Register

71 Fed. Reg. 13,557 (Mar. 16, 2006) .......................................................................23

## Miscellaneous

148 Cong. Rec. S2117 (daily ed. Mar. 20, 2002) ...................................................31

151 Cong. Rec. S365 ...............................................................................................13

Edward B. Foley, "'Narrow Tailoring' Is Not the Opposite of "Overbreadth" Defending
    BCRA's Definition of 'Electioneering Communications,'" 2 Election L.J. 457
    (2003)....................................................................................................................31

Plaintiff Christian Civic League of Maine, Inc. ("CCL"), intends to use money from its general corporate treasury to finance the pre-election radio broadcast of an advertisement that identifies by name Maine's two United States Senators and criticizes their position on a proposed constitutional amendment. This communication would be disseminated in Maine during the 30-day period before the upcoming June primary election in which one of the named Senators, Olympia Snowe, is seeking her party's nomination, and CCL alleges that it plans to broadcast "materially similar" advertisements during the 60-day period before the November general election and prior to later elections. A provision of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, 91-92 (2002), prohibits corporations from using general treasury funds to pay for such broadcast communications — called "electioneering communications" — that refer to a candidate for federal office during those periods prior to a federal election. BCRA § 203, codified at 2 U.S.C. 441b(b)(2). On March 31, 2006, CCL filed both a complaint challenging the constitutionality of the provision as applied to its proposed ad and a motion for a preliminary injunction to prevent the Federal Election Commission ("Commission" or "FEC") from enforcing BCRA § 203 against it.

As we explain in detail below, CCL has not shown that it is entitled to the extraordinary relief it seeks, failing in particular to demonstrate a key element of irreparable harm. In fact, preliminary discovery has revealed that CCL decided to run the advertisement to enable this lawsuit to proceed, rather than the lawsuit being filed to protect any pre-existing plans to finance broadcast advertisements.

In 2003 the Supreme Court upheld the constitutionality of BCRA § 203 against the claim that the electioneering communication provision on its face is either overbroad or underinclusive, and concluded that it survives strict scrutiny. McConnell v. FEC, 540 U.S. 93, 204-209 (2003). McConnell rejected many of the arguments CCL makes here. CCL has failed to offer any

evidence to show that the lawful options for corporations upon which <u>McConnell</u> relied in

holding that BCRA was not overbroad — simply re-wording an ad to omit references to a federal

candidate or using a separate segregated fund — would be unconstitutionally burdensome.

Indeed, CCL already maintains two active state political action committees.  Moreover, creating

an amorphous exemption for the so-called "grass roots lobbying" communications that CCL

seeks to finance with corporate funds would undermine the bright-line prophylactic standard that

Congress crafted in BCRA, and the Court upheld in <u>McConnell</u>.  Its request for a preliminary

injunction should be denied.

## BACKGROUND

### A.    The Federal Election Commission

The Commission is the independent agency of the United States government with

exclusive jurisdiction over the administration, interpretation, and civil enforcement of the

Federal Election Campaign Act of 1971, as amended ("the Act" or "FECA"), codified at

2 U.S.C. 431-455.  The Commission is empowered to "formulate policy" with respect to the Act,

2 U.S.C. 437c(b)(1); "to make, amend, and repeal such rules … as are necessary to carry out the

provisions of [the] Act," 2 U.S.C. 437d(a)(8), 438(a)(8) and 438(d); and to issue written advisory

opinions concerning the application of the Act and Commission regulations to any specific

proposed transaction or activity, 2 U.S.C. 437d(a)(7) and 437f.

### B.    Statutory and Regulatory Background

#### 1.    Regulation of Corporate-Financed Electoral Activities Prior to the Passage of BCRA

Federal law has long prohibited corporations, whether large or small, for-profit or not-

for-profit, from using their general treasury funds to finance contributions and expenditures in

connection with federal elections.  <u>See</u> <u>FEC v. Beaumont</u>, 539 U.S. 146, 152-54 (2003).  The

FECA makes it "unlawful … for any corporation whatever … to make a contribution or

expenditure in connection with any election" for federal office.  2 U.S.C. 441b(a).  The FECA does not, however, ban any corporation from speaking.  Rather, it permits a corporation to establish a "separate segregated fund," commonly called a political action committee or PAC, to finance those disbursements.  2 U.S.C. 441b(b)(2)(C).  A separate segregated fund "may be completely controlled" by the corporation, and is "separate" from it "'only in the sense that there must be a strict segregation of its monies' from the corporation's other assets."  FEC v. National Right to Work Comm., 459 U.S. 197, 200 n.4 (1982) (quoting Pipefitters v. United States, 407 U.S. 385, 414-17 (1972)).  The fund comprises donations voluntarily made for political purposes by the corporation's stockholders or members and its employees, and the families of those individuals.  2 U.S.C. 441b(b)(4)(A)-(C).  The money in this fund can, for example, be contributed directly to federal candidates or used to pay for independent expenditures to communicate to the general public the corporation's views on candidates for federal office.

In FEC v. Massachusetts Citizens for Life, Inc. ("MCFL"), 479 U.S. 238 (1986), the Supreme Court held that section 441b could not constitutionally be applied to independent expenditures by a class of corporations having three features in common with the corporation in that case:  (1) the organization was "formed for the express purpose of promoting political ideas, and cannot engage in business activities"; (2) it has "no shareholders or other persons affiliated so as to have a claim on its assets or earnings"; and (3) it "was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities."  Id. at 264.  See also McConnell, 540 U.S. at 210 ("Our decision in MCFL related to a carefully defined category of entities"); 11 C.F.R. 114.10 (implementing the MCFL exception).

To avoid problems of vagueness and overbreadth, the Supreme Court in MCFL also construed the provision's prohibition of independent expenditures from corporate treasuries to reach only the financing of communications that expressly advocate the election or defeat of a

clearly identified candidate.  479 U.S. at 248-49.  <u>See</u> 2 U.S.C. 431(17) (pre-BCRA version).

The Court had introduced the concept of express advocacy in <u>Buckley v. Valeo</u>, 424 U.S. 1,

43-44, 77-80 (1976), in narrowly construing other provisions of the FECA regulating

independent campaign expenditures to avoid the same kinds of constitutional concerns.  <u>Buckley</u>

provided examples of words of express advocacy, such as "vote for," "elect," "support,"

"defeat," and "reject."  <u>Id.</u> at 44 n.52.

**2.  Regulation of Corporate-Financed Electoral Activities After the Enactment of BCRA in 2002**

Congress concluded that, "[w]hile the distinction between 'issue' and express advocacy

seemed neat in theory, the two categories of advertisements proved functionally identical in

important respects."  <u>McConnell</u>, 540 U.S. at 126.  Corporations and labor unions crafted

political communications that avoided explicit words of electoral advocacy and financed those

communications with "hundreds of millions of dollars" from their general treasuries.  <u>Id.</u> at 127.

"[A]lthough the resulting advertisements do not urge the viewer to vote for or against a candidate

in so many words, they are no less clearly intended to influence the election."  <u>Id.</u> at 193

(footnote omitted).  "Moreover, the conclusion that such ads were specifically intended to affect

election results was confirmed by the fact that almost all of them aired in the 60 days

immediately preceding a federal election."  <u>Id.</u> at 127 (footnote omitted).

"Congress enacted BCRA to correct the flaws it found in the existing system,"

<u>McConnell</u>, 540 U.S. at 194, and section 203 of BCRA amended 2 U.S.C. 441b(b) by barring

corporations and unions from paying for an "electioneering communication" with money from

their general treasuries.  2 U.S.C. 441b(b)(2).  However, as with contributions and expenditures,

a corporation or union may establish a separate segregated fund and pay for electioneering

communications from that fund.  2 U.S.C. 441b(b)(2)(C).

BCRA defines "electioneering communication" in pertinent part as a "broadcast, cable, or satellite communication" that (1) refers to a clearly identified candidate for federal office; (2) is made within 60 days before a general election, or within 30 days before a primary election for the office sought by that candidate; and (3) is "targeted to the relevant electorate." BCRA § 201(a), codified at 2 U.S.C. 434(f)(3)(A)(i).[1] Because the definition specifies communications distributed by "broadcast, cable, or satellite," the expanded regulation does not apply to print communications such as signs, newspaper and magazine advertisements, brochures, and handbills, or to telephone or Internet communications. McConnell, 540 U.S. at 207.

In McConnell, the Supreme Court upheld these provisions against constitutional challenge. "Because corporations can still fund electioneering communications with PAC money, it is 'simply wrong' to view … [BCRA § 203] as a 'complete ban' on expression rather than a regulation." McConnell, 540 U.S. at 204 (quoting Beaumont, 539 U.S. at 162, and Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 658 (1990)). "'The PAC option allows corporate political participation without the temptation to use corporate funds for political influence, quite possibly at odds with the sentiments of some shareholders or members.'" Id. (quoting Beaumont, 539 U.S. at 163). The Court also noted that its campaign finance jurisprudence reflects "respect for the legislative judgment that the special characteristics of the corporate structure require particularly careful regulation." Id. at 205 (citations and internal quotation marks omitted). The Court concluded that the compelling governmental interests that support requiring corporations to finance express advocacy communications from a PAC apply equally to their financing of electioneering communications. Id. at 206.

---

[1]    BCRA excludes from this definition (i) a news story, commentary, or editorial by a broadcasting station; (ii) a communication that is an expenditure or independent expenditure under the Federal Election Campaign Act; (iii) a candidate debate or forum; and (iv) any other communications the Commission exempts by regulation, consistent with certain requirements. BCRA § 201(a), codified at 2 U.S.C. 434(f)(3)(B)(i)-(iv).

The Court held that the constitutional inquiry did not turn on the "precise percentage of [past] issue ads that clearly identified a candidate and were aired during those relatively brief preelection time spans but had no electioneering purpose." <u>McConnell</u>, 540 U.S. at 206.  The Court stated that "the vast majority of ads" run during the 30- and 60-day intervals before federal primary and general elections "clearly had such a purpose." <u>Id.</u>  The Court found it decisive, however, that, "whatever the precise percentage may have been in the past, in the future corporations and unions may finance genuine issue ads during those time frames by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated fund." <u>Id.</u>

Earlier this year, the Supreme Court addressed whether its holding in <u>McConnell</u> precludes all as-applied challenges to BCRA's "electioneering communication" financing restrictions.  In <u>Wisconsin Right to Life, Inc. v. FEC</u>, 546 U.S. ___, No. 04-1581, 2006 WL 152676, at *1 (Jan. 23, 2006) (per curiam) ("<u>WRTL</u>"), the Court considered a challenge originally filed in this court in which (as here) a nonprofit corporation alleged that BCRA's prohibition on the use of its corporate treasury funds for "electioneering communications" is unconstitutional as applied to its so-called "grass roots lobbying" advertisements.  <u>See</u> <u>WRTL</u>, District Court Memorandum Opinion, No. 04-1260 (D.D.C.), Aug. 17, 2004 (Exh. K hereto). A three-judge panel of this court denied a preliminary injunction in August 2004.  The court concluded that there was little likelihood of success because <u>McConnell</u> precluded as-applied challenges like the one before it, and because the "facts suggest[ed] that WRTL's advertisements may fit the very type of activity <u>McConnell</u> found Congress had a compelling interest in regulating." <u>Id.</u>, slip op. at 4, 6.  The court later dismissed the case, holding that <u>McConnell</u> foreclosed the suit for the reasons set forth in its preliminary injunction opinion.  <u>WRTL</u>, District Court Mem. Op., May 9, 2005.

On appeal, the Supreme Court held that <u>McConnell</u> did not purport to foreclose courts from considering all future as-applied challenges to BCRA's primary definition of "electioneering communication." <u>WRTL</u>, 2006 WL 152676, at *1.  The Supreme Court found it unclear whether the district court's statement that WRTL's advertisements were the type of activity that was properly regulated under <u>McConnell</u> was intended to be an alternative ground for the dismissal of the case, so it vacated the judgment and remanded for the district court "to consider the merits of WRTL's as-applied challenge in the first instance." <u>WRTL</u>, 2006 WL 152676, at *1.  The question of whether, under the rationale of <u>McConnell</u>, the "electioneering communication" provisions of BCRA are constitutional as applied to the advertisements WRTL wanted to run in 2004, is now pending on remand before the district court.

### C.     The Christian Civic League of Maine, Inc.

In its complaint, CCL describes itself as a nonprofit, nonstock Maine corporation interested in "laws protecting traditional marriage" and other public issues.  Complaint ¶¶ 16, 20.  Michael Heath has served as executive director of CCL since 1994.  <u>See</u> Deposition of Michael Heath ("Heath Depo."), Exh. A at 8-9.  Mr. Heath testified that one of CCL's main purposes is "to elect honest and competent public officials," and that CCL is "becoming more active in [its] efforts related to candidates." <u>Id.</u> at 14-15.  <u>See</u> Exh. A-1 at 1 (CCL By-Laws).

### 1.     How This Lawsuit Arose

CCL filed this lawsuit on March 31, 2006, one week after John Paulton, an official of the Colorado group Focus on the Family, sent an email to leaders of a number of organizations, including CCL's Michael Heath.  <u>See</u> Exh. B; Heath Depo., Exh. A at 45-49, 55.  There is no evidence that, before receiving this email, CCL had any plans to run broadcast advertising this year.  <u>See</u> Health Depo., Exh. A at 45-46.

7

The subject line in Paulton's email on March 24, 2006, was: "Possible legal action needed." Exh. B. The email explained that it was sent to these recipients "because [they were] in [states] that could be affected by McCain-Feingold restrictions on Marriage Amendment lobbying ads that target U.S. senators who are on the ballot." Id. Mr. Paulton referred to and attached a longer message from "our attorney, Jim Bopp," and asked that any interested persons respond to Mr. Bopp, copying Focus on the Family. Mr. Bopp's message first explained that WRTL would probably not be resolved before the fall, but that the Senate had scheduled a vote on the marriage amendment in June. Id. Mr. Bopp offered to seek a federal court injunction at no charge on behalf of "any group" that planned a "grass roots lobbying" ad during the electioneering communication periods, adding that "[t]his may even involve an appeal to the U.S. Supreme Court (which would result in a landmark ruling)." Id. He concluded that "[i]t would be very helpful … for some group to step up and do this," and asked "[a]nyone interested in this possibility" to "contact me or Rich Coleson at my law firm." Id.

One hour later, Heath responded by email with a subject line entitled, "Interested"; the full text of the message stated, "I will run an ad in that period of time mentioning Olympia Snowe." See Exh. C; Heath Depo., Exh. A. at 56.[2] Soon after this email was sent, interactions occurred among CCL staff, counsel, and Focus on the Family. See Heath Depo., Exh. A at 56-60. Focus on the Family then sent CCL "hypothetical" information on advertising rates in Maine radio markets, and also provided CCL with the text of the "Crossroads" ad that was attached to plaintiff's complaint filed a few days later. See Heath Depo., Exh. A at 46, 51, 59; Exh. D. Prior

---

[2]    Senator Snowe is running for re-election in 2006. The 2006 primary election in Maine is scheduled to occur on June 13, and the general election is scheduled for November 7, 2006. See http://www.maine.gov/sos/cec/elec/2006elec.html. Thus, the "electioneering communication" restrictions are in effect in Maine during the period May 14 to June 13, and during the period September 8 to November 7. See 2 U.S.C. 434(f)(3)(A)(i).

to this, CCL ads had been created by CCL's own personnel and consultants, including a Florida marketing firm.  See Heath Depo., Exh. A at 32-33.

CCL has spent no money on the "Crossroads" ad, it currently lacks the $5,000 to $10,000 Focus on the Family estimates will be required to broadcast the ad, and CCL has no firm commitments from donors to pay for the campaign.  See Heath Depo., Exh. A at 52, 54, 65-68, 121.  On April 13, 2006 — 13 days after this lawsuit commenced and hours before Heath's deposition began — Heath and his counsel met with a potential funder who Heath testified "may" finance the ad.  See id. at 54, 65-66.  Heath testified that CCL has been experiencing a shortage of funds serious enough to force it to "cut the hours of some staff members and make changes in benefit plans."  See id. at 73-74.  Heath also testified that nothing had been done to record or produce the radio spot, that he did not know how much that would cost, that CCL has not contacted any radio stations, and that he could not say where or how often the ads would run. See id. at 51-52, 70.

The complaint alleges that CCL plans to run the radio ad attached as Exhibit A "and/or materially similar ads between May 10 and early June."  Complaint ¶¶ 11, 13.  The ad stresses the importance of "safeguard[ing] the traditional definition of marriage" through a federal constitutional amendment, and states in part:

> Unfortunately, your senators voted against the Marriage Protection Amendment two years ago.  Please call Sens. Snowe and Collins immediately and urge them to support the Marriage Protection Amendment when it comes to a vote in early June.  Call the Capitol switchboard at 202-224-3121 and ask for your senators. Again, that's 202-224-3121.

The complaint also alleges that CCL "intends" to run "materially similar grass-roots lobbying ads" falling within the electioneering communications definition "on a range of issues in addition to laws protecting traditional marriage" in the electioneering communication periods prior to the November 7 general election and prior to later elections.  Complaint ¶16.  However, CCL's

executive director testified that CCL currently has no specific plans to run any other broadcast ads about the marriage amendment or any other issue.  See Heath Depo., Exh. A at 74-75, 82-83. CCL does plan to communicate about the marriage amendment through the non-broadcast media it has used in the past.  See id. at 75-76; infra pp. 11-13.

### 2.    CCL's Finances and Related Organizations

CCL asserts in its Complaint that it is tax-exempt under Section 501(c)(4) of the Internal Revenue Code.  Complaint at ¶ 20.  CCL alleges no other facts about its finances, including the sources of its funds, and includes no affidavits or evidence of any kind to support its factual allegations.  The Internal Revenue Service Form 990 that CCL filed in July 2005 for the 2004 fiscal year lists total revenue of $238,464, and indicates that CCL is affiliated with a Section 501(c)(3) organization called the Christian Education League, Inc. ("CEL").  See Heath Depo., Exh. A-14 at 1, 5-6.

Although CCL alleges (Complaint ¶ 16) that it has no federal separate segregated fund (i.e., no federal political action committee, or "PAC"), CCL administers two state level PACs: the Christian Action League ("CAL") and the Coalition for Marriage ("CFM"), which operate from CCL's offices and whose activities are directed by Heath.  See Heath Depo., Exh. A at 6-7, 86, 91-92, 95-96; Exh. A-9, A-11.  CFM was formed on April 6, 2005, with the purpose to oppose same sex marriage.  See Exh. A-11.  CFM was created to support a 2005 Maine state ballot initiative to overturn Maine's gay rights law.  See Heath Depo., Exh. A at 86, 96-97. Although state records indicate that CAL's PAC registration was filed on March 28, 2006 — three days before this lawsuit was filed — CAL was apparently founded in 1999 and has been politically active for some time.  See Heath Depo., Exh. A at 90-95; Exh. A-9.  CAL's stated purpose is to support "[c]andidates who support principles of the Christian Civic League of Maine."  See Exh. A-9.  The CFM website (www.coalitionformarriage.net) informs potential

donors that CFM is "the Christian Civic League of Maine's political action committee," and that state law requires it to disclose information about those who contribute more than $50.  See Exh. E.  Heath testified that maintaining these Maine PACs requires registration and regular reporting as to the PACs' contributions and expenditures.  See Heath Depo., Exh. A at 86-87.[3]

CCL alleges (Complaint ¶ 22) that it does not qualify as an MCFL organization under the Commission's regulations, 11 CFR 114.10, a status that would enable it to finance electioneering communications with treasury funds, 11 CFR 114.2(b)(2).  CCL has stated that it does not believe it has received any donations directly from business corporations, but that it does not know whether non-profit organizations that have contributed to it may have received donations from business corporations.  CCL has also stated that it "shares and allocates expenses" with CEL (which receives donations from business corporations), and that CCL has engaged in "business activity" by offering goods and services in exchange for donations, and by receiving some advertising revenue during 2006 for its newspaper, The Record.  See Heath Depo., Ex. A-10 (CCL Interrogatory Responses) at 4-5; Exh. A at 105-09.

### 3.    CCL's History of Public Advocacy

In recent years, CCL has communicated with the public using various non-broadcast media concerning gay rights and other issues, as well as federal candidates, including Senator Snowe.  In 2004, for example, CCL made public statements on the issue of gay marriage in its own print publications, its website, at least one newspaper column, many quotes supplied to the news media, CCL print ads, phone calls, mailings to supporters, and church bulletin inserts, many of these urging supporters to contact federal and state officials.  See Heath Depo., Ex. A at 34-41; see also id. at 26-32; http://www.cclmaine.org.

---

[3]    Mr. Heath testified that CCL is also working with a third Maine PAC, No Slots for Maine, on a petition effort related to gambling.  See Heath Depo., Exh. A at 7.

CCL's website includes "voter guides" for the 2002 and 2004 elections. See Exh. F.[4] It also includes a newspaper column by its executive director headed "Coalition for Marriage" that was assertedly published on March 1, 2004, in the Portland Press Herald, and a copy of a print advertisement called the "Statesman Ad," apparently published in a Maine daily newspaper in 2004, urging unnamed office holders to support a federal constitutional amendment that would bar gay marriage. See Heath Depo., Exh. A at 36, 39-40; Exh. A-4, A-6. The latter ad states, "Before you vote on November 2 review our on-line voter's guide," below which CCL's web address (www.cclmaine.org) is listed. Exh. A-6. Mr. Heath testified that the ad directed readers to the CCL voter's guide because the "ad was political" and CCL wanted voters to keep CCL's position in mind while voting. See Heath Depo., Exh. A at 40. He also testified that the communication methods CCL used in 2004 were effective ways to communicate its views on gay marriage. See id. at 36, 38, 41.

The Commission has found no evidence, however, that CCL itself has previously run any broadcast advertisements about the federal marriage amendment or any other policy issue, and it appears that CCL's only broadcast ads in recent years have been radio ads on Christian stations for what its executive director described as "events, banquets that we have annually." Heath Depo., Exh. A at 28-29, 44.[5] Heath could recall no broadcast ads financed by CCL that had identified a federal candidate during his tenure. See id. at 81-82.

---

[4]    In daily CCL emails, "probably" in a printed version of a CCL publication (The Record), and possibly in a press release, CCL encouraged its supporters to distribute these voter guides. See Heath Depo., Exh. A at 20-23. The 2002 and 2004 guides were based on federal and state candidate responses to questions posed by CCL. See id. at 17-19; Exh. A-3.

[5]    CFM (not CCL) apparently ran radio and television ads in connection with the 2005 state ballot initiative. See Heath Depo., Exh. A at 97. These ads did not mention any candidate. See id. at 98-99.

In 2005, CCL criticized Senator Snowe on gay rights and other issues. On February 25, 2005, CCL's online publication of The Record included an email interview with Maine state Representative Brian Duprey, whom the piece's introductory material described as "the courageous third term legislator who is the State House's most faithful defender of traditional marriage." Heath Depo., Exh. A-8. See Exh. A at 84-85. The introduction continued:

> Here, Representative Duprey announces for the first time that he is willing to run against Senator Olympia Snowe in next year's Republican primary. The RECORD is proud to be the first publication in Maine to provide you with this information.

In accord with this statement, CCL's executive director testified that CCL would rather see a Republican Senate candidate whose policy views are closer to its own views than Senator Snowe's are. See Heath Depo., Exh. A at 84-85.[6]

### 4.    Marriage Protection Amendment

A resolution called the Marriage Protection Amendment was introduced in the United States Senate in January 2005. See 151 Cong. Rec. S365. Senate Majority Leader Bill Frist reportedly told the Family Research Council in March 2005 that "[w]e will, once again, bring [a marriage] amendment to the floor when the time is right. I and others will be discussing with you when the appropriate time is. Last year we had to be sure it was an issue on which Americans could express their minds at the polls." Exh. I at 2. In February 2006, Senator Frist reportedly told another group that "he would push for a vote June 5 on 'the marriage protection

---

[6]    The April 15, 2005 issue of The Record included an item stating that it seemed Senator Snowe would be "once again acting more like a stalwart Democrat than a Republican" by opposing changes to Senate rules that would have ended Democratic filibusters of judicial nominees. See Exh. G at 3. The piece asserted that the "goal of the Democrats, and Senator Snowe, is to exclude from the Federal Judiciary all judges who do not share the Left's views on abortion, euthanasia, homosexual rights, and other radical attempts to re-engineer American society." The May 25, 2005, issue included an item criticizing the compromise reached by 14 Senators, including Senators Snowe and Collins, to "ward off a vote to end the filibustering of judicial nominees." Exh. H at 5-6. The item stated that the positions of Senators Snowe and Collins "on a number of issues are virtually interchangeable with those of the Democrats," and wondered "how much the people of Maine will have to suffer … before they finally get the picture."

amendment' that seeks to amend the Constitution to define marriage as a union between a man and a woman." <u>Republican chief outlines strategy to portray Democrats as weak, bypass mainstream media</u>, The Associated Press, Feb. 11, 2006, Exh. J.

## ARGUMENT

## I.    CCL HAS NOT SHOWN THAT IT HAS ARTICLE III STANDING TO SEEK A PRELIMINARY INJUNCTION

An applicant for preliminary injunctive relief, like all litigants who invoke federal jurisdiction, must first show that it has standing pursue its claims in federal court. <u>See, e.g., Crow Creek Sioux Tribe v. Brownlee</u>, 331 F.3d 912, 915-18 (D.C. Cir. 2003) (remand to dismiss case for lack of standing on appeal of denial of preliminary injunction). CCL has failed to allege facts to demonstrate that it is injured by the statutory provision it challenges. It appears, for example, that CCL lacks funds to finance the radio advertisement, that it has not contacted any radio station about the availability of advertising time, and that it has neither recorded the advertisement nor made any plans or arrangements for doing so. <u>See supra</u> p. 9. Indeed, CCL had no interest in running this ad at all before it was solicited by a national advocacy group, a few days before suit was filed, to volunteer to become the plaintiff here.[7] Accordingly, CCL has failed to provide facts demonstrating either that its <u>own</u> interest in public expression would be injured if it is unable to broadcast the ads provided to it by others, or that its alleged inability to broadcast the ads is caused by the statute rather than by its own lack of funds or its failure to reserve advertising time with any radio station.

In addition, as we have explained, the Supreme Court in <u>McConnell</u> interpreted BCRA to exempt "<u>MCFL</u> organizations" from the requirement that corporations not use their general

---

[7]    Contrary to its allegation in the Complaint (¶ 16), CCL has admitted it actually has no plans to run any broadcast advertising referring to federal candidates before the general election in November. <u>See supra</u> pp. 9-10; Heath Depo., Exh. A at 74-75, 82-83.

treasuries to finance electioneering communications.  Therefore, if CCL is an MCFL

organization, the statutory provision it seeks to challenge would not apply to its proposed radio

advertisements.  CCL asserts in its Complaint (¶ 22) that it does not qualify for any exception

from the statute, but it offers no facts to support that legal conclusion.[8]  The preliminary

discovery indicates that CCL does not claim it fails to qualify for the MCFL exemption because

it has accepted contributions from business corporations, but only because it has received money

from certain activities it anticipates the Commission would find to be disqualifying business

activities.  See supra p. 11.  But CCL has so far cited no precedent to establish that the

Commission would necessarily consider income from a fundraising banquet, or the provision of

materials supporting an organization's policy goals in return for a donation, as business activities

rather than incidental fundraising activities.  See, e.g., MCFL, 479 U.S. at 255 (donations might

well be sought "by means of garage sales, bake sales, and raffles").

     In such circumstances, it is appropriate for this Court to require CCL to establish its

standing by seeking an advisory opinion from the Commission as to whether it qualifies under

MCFL before the Court proceeds to consider CCL's constitutional challenges.  See 2 U.S.C.

437f (requiring FEC to issue advisory opinion within 60 days); McConnell, 540 U.S. at 170 n.64

(advisory opinion process adequate method to clear up uncertainty about application of the Act).

"If the FEC should issue an advisory opinion that [CCL] is exempt from regulation under section

441b, plaintiffs would have no standing to challenge section 441b or any companion regulation.

And if FEC opines that [CCL] is subject to section 441b, the advisory opinion process should

produce a better foundation for judicial evaluation of the constitutional claims."  Faucher v. FEC,

---

[8]    This Court "is not bound by the complaint's legal conclusions," Western Assoc. Ltd. Partnership v. Market Square Ass'n, 235 F.3d 629, 633 (D.C. Cir. 2001), and CCL must "adequately ple[a]d facts supporting its standing."  Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1508 (D.C. Cir.), amended on other grounds, 66 F.3d 1226 (D.C. Cir. 1995).  "[T]he necessary factual predicate may not be gleaned from the briefs and arguments."  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 235 (1990) (citation omitted).

708 F.Supp. 9, 14 (D. Me. 1989). See also Martin Tractor Co. v. FEC, 627 F.2d 375, 388 (D.C. Cir. 1980); Anderson v. FEC, 634 F.2d 3, 5 (1st Cir. 1980) (en banc).

"'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.'... It has long been the Court's 'considered practice not to decide abstract, hypothetical or contingent questions ... or to decide any constitutional question in advance of the necessity for its decision....'" Clinton v. Jones, 520 U.S. 681, 690 n.11 (1997) (citations omitted, second ellipsis added). The Court ought not to permit CCL to circumvent this fundamental principle simply by waiting until the last minute to file suit and then arguing that it had insufficient time to seek a clarifying advisory opinion.

## II.    CCL CANNOT CARRY ITS HEAVY BURDEN OF SHOWING THAT IT IS ENTITLED TO A PRELIMINARY INJUNCTION

### A.    The Requirements for a Preliminary Injunction

The party seeking a preliminary injunction bears a heavy burden to establish that it is entitled to that relief. To prevail, it must demonstrate (1) a "substantial likelihood of success on the merits"; (2) that it would suffer irreparable harm if an injunction is not granted; (3) that an injunction would not cause substantial injury to other parties; and (4) that the public interest would be furthered by the injunction. CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

In this case, CCL must shoulder a particularly heavy burden. First, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). However, CCL is attempting to change the status quo by seeking an exemption from BCRA's requirement that corporations either finance an electioneering communication through a separate segregated fund or avoid clearly identifying a candidate in the communication.

16

Second, as we explained supra pp. 4-6, the Supreme Court recently upheld the constitutionality of BCRA § 203 on its face.  Although CCL is challenging the constitutionality of the provision as applied, the McConnell decision greatly strengthens "[t]he presumption of constitutionality which attaches to every Act of Congress."  Walters v. National Ass'n of Radiation Survivors, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).  That presumption "'is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of … [the government] in balancing hardships.'"  Bowen v. Kendrick, 483 U.S. 1304 (1987) (Rehnquist, C.J., in chambers) (quoting Walters, 468 U.S. at 1324; bracketed words added).  In McConnell, Chief Justice Rehnquist relied on that very presumption in denying an application to vacate the stay of judgment entered by the three-judge court that had held portions of BCRA unconstitutional.  McConnell, 02A989, 02A990, Slip Op. at 1 (May 23, 2003) (Exh. L).  More recently, Chief Justice Rehnquist denied a request similar to CCL's for an injunction pending appeal barring enforcement of the Act against a particular set of political advertisements, explaining, "An injunction pending appeal barring the enforcement of an Act of Congress would be an extraordinary remedy, particularly when this Court recently held that Act facially constitutional."  WRTL, 542 U.S. 1305, 1306 (2004) (citing McConnell, 540 U.S. at 189-210).

**B.    CCL Has Failed to Show That It Is Substantially Likely to Succeed on the Merits**

**1.    McConnell Clearly Envisioned That BCRA's Electioneering Communication Restrictions Could Be Applied Constitutionally to Political Ads That CCL Calls "Grass Roots Lobbying"**

The record in McConnell was replete with advertisements that purportedly sought merely to lobby about an issue rather than advocate a particular electoral result.  See, e.g., McConnell v. FEC, 251 F.Supp.2d 176, 574-79 (D.D.C. 2003) (Kollar-Kotelly, J.).  The Court was thus directly confronted with the contention that BCRA § 203 is unconstitutional because of its

17

potential to burden lobbying or other issue advertisements that are not intended to influence federal elections.  While acknowledging that BCRA § 203 might reach some such advertisements, the Court squarely held the provision constitutional, even as applied to "genuine issue ads" that fall within the definition of "electioneering communication."  McConnell, 540 U.S. at 206.  In reaching that conclusion, the Court recognized that BCRA § 203 imposes only a modest burden on speakers who wish to discuss issues of public concern but do not intend to influence federal elections, and that the establishment of an objective bright-line rule was essential to the achievement of Congress's objectives.  That holding addressed precisely the kind of advertisements with mixed messages that CCL describes as "grass-roots lobbying":  issue ads that discuss legislative concerns but also influence federal elections.

The Supreme Court found that whether a "compelling governmental interest" justified BCRA's burden on First Amendment expression was "easily" resolved by its prior decisions, McConnell, 540 U.S. at 205; the Court noted that it had "repeatedly sustained legislation aimed at 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.'"  Id. (quoting Austin, 494 U.S. at 660).  It also pointed out that recent cases had "recognized that certain restrictions on corporate electoral involvement permissibly hedge against 'circumvention of [valid] contribution limits.'"  Id. (quoting Beaumont, 539 U.S. at 155).

The Court did note that at least some prior advertisements falling within BCRA § 201(a)'s definition of "electioneering communication" were not actually intended to influence federal elections.  Far from suggesting that BCRA's financing restrictions were unconstitutional as applied to such advertisements, however, the Court held that the statute's minimal impact on issue advertising was constitutionally acceptable because corporations and unions could comply

18

with the law and "finance genuine issue ads during those time frames by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated fund." McConnell, 540 U.S. at 206.

This holding necessarily means that, even if some exemption to the electioneering communication definition were constitutionally required, it could not be so broad as to deregulate a substantial amount of the communications that fall within the definition; otherwise, such an exemption would swallow up the definition itself and be inconsistent with McConnell's holding that the definition is facially valid precisely because it is not substantially overbroad.  As discussed infra pp. 23-26 regarding the particular facts of this case, this holding also means that a successful plaintiff in an as-applied challenge must be able to demonstrate why it would be an unconstitutional burden for it to "avoid[] any specific reference to federal candidates" in its ads or to "pay[] for the ad from a segregated fund."

Indeed, the kind of "grass-roots lobbying" that CCL describes was squarely before the Court in McConnell, and the majority did not suggest that the electioneering communication provision was unconstitutional as applied to such ads.  See 540 U.S. at 126-27 (finding "[l]ittle difference" between "an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'"  In dissent, Justice Kennedy gave a hypothetical example of a few Senators who, eager to impress logging industry constituents just before an election, proposed a law that would "harm the environment by allowing logging in national forests."  540 U.S. at 334.  Justice Kennedy objected strongly that under BCRA an "environmental group" would find it difficult to "form and fund a PAC in the short time required" and would be "unable to run an ad referring to these Senators" in the relevant jurisdictions, and he argued that BCRA forces such groups to "contend with faceless and nameless opponents."  Id. at 334-35.  The Court did not

19

dispute Justice Kennedy's conclusion that its decision upholding BCRA would have this effect, but instead found adequate the options just discussed (use of a separate segregated fund or slight rewording of the ad script).  See 540 U.S. at 206.  If the majority opinion had embraced Justice Kennedy's view that such "grass-roots lobbying" ads must be exempt from the statutory requirements — as CCL essentially argues it did — there would have been no need for Justice Kennedy to have dissented on this ground.  See also McConnell, 540 U.S. at 239 (emphases in original) ("upholding stringent restrictions on all election-time advertising that refers to a candidate because such advertising will often convey [a] message of support or opposition").

>      **2.    CCL Is Not Entitled To Any Constitutional Exemption for Its "Grass Roots Lobbying" that Meets the Definition of "Electioneering Communication"**

>           **a.    The Constitution Does Not Require A General "Grass Roots Lobbying" Exemption From BCRA § 203**

The Court in McConnell reaffirmed the previously recognized proposition that "unusually important interests underlie the regulation of corporations' campaign-related speech." 540 U.S. at 206 n.88.  CCL is therefore correct that any federal interest in regulating corporate issue advocacy as such is of considerably less magnitude than is the interest in regulating corporate campaign-related spending.  But any restrictions that BCRA imposes on the financing of advertisements addressing issues are simply the unavoidable, incidental byproduct of Congress's efforts to prevent corporate treasury funds from being used to influence federal elections.

Lobbying has no higher First Amendment status than electoral advocacy.  McConnell emphasized that it was upholding the electioneering communication provisions, not because "'[a]dvocacy of the election or defeat candidates … is … less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation,'" but because of the compelling interest in fighting corruption and

preserving the integrity of the electoral process.  540 U.S. at 205 (quoting Buckley, 424 U.S. at 48).  Moreover, the ability of individuals or corporations to petition elected government officials — either in person, by mail, phone, facsimile, or email — is not directly implicated by BCRA § 203, which limits only how certain broadcast communications that can be received by 50,000 or more persons are financed.[9]

Recognizing the strength of the federal interest in protecting the integrity of federal elections, the need for clarity as to the range of communications subject to the financing restrictions, the futility of prior efforts to identify all relevant election-related communications through the "express advocacy" test, and the minor burden that BCRA § 203 places upon any corporate and union speakers that may wish to engage in issue advocacy but not to influence electoral outcomes, the Court in McConnell sustained that provision against constitutional attack. See supra pp. 4-6, 17-20.  Thus, even if Congress lacks a substantial independent interest in regulating corporate issue advocacy itself, the marginal and incidental impact of BCRA § 203 on such communications does not require the Court to find that an exemption for CCL's advertisements is constitutionally required.

CCL relies (Br. 16) upon a footnote in McConnell (540 U.S. at 206 n.88), in which the Court "assume[d] that the interests that justify the regulation of campaign speech might not apply to the regulation of genuine issue ads."  That assumption, however, does not suggest that the right to engage in issue advocacy overrides every incidental impact on lobbying that results from

---

[9]    CCL's reliance upon (Br. 11) Eastern Railroad Presidents Conference v. Noerr, 365 U.S. 127 (1961), is misplaced, for Noerr concerned only the "proper construction," id. at 132 n.6, of the Sherman Anti-Trust Act.  Its "proscriptions…, tailored as they are for the business world, are not at all appropriate for application in the political arena," including lobbying the legislature by means of a public publicity campaign.  Id. at 141.  BCRA, by contrast, was designed to regulate political expenditures, not business interests.  We have addressed this issue at greater length at pages 9-13 of the Commission's Opposition to CCL's Motion to Consolidate, which we filed on April 14, 2006.

Congress's legitimate regulation of corporate and union financing of election advocacy.  Rather, the Court was merely emphasizing that its jurisprudence has recognized two general categories of speech, and that the interests that justify a statute regulating one type might not apply to a statute regulating the other.[10]  In that context, the Court distinguished two decisions that found unconstitutional statutory restrictions on advocacy regarding ballot measures, not candidate elections.  The McConnell decision reiterated the Court's longstanding view that the imperatives of preserving the integrity of candidate elections, preventing corruption of elected officials, and sustaining citizens' active participation and confidence in government are interests of the highest importance.  540 U.S. at 206 n.88 (quoting First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 788-89 (1978)).  Thus, far from suggesting that BCRA's effective support for those imperatives must be eroded by an exemption for all "grass-roots lobbying," the Court was explaining why BCRA § 203 is constitutional even as-applied to "genuine issue ads," id. at 206 — i.e., because "BCRA's fidelity to those imperatives sets it apart from the statute[s] in Bellotti" and McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995), 540 U.S. at 206 n.88, and it leaves corporations and unions ample opportunity to speak publicly by using PAC funds, by omitting explicit references to federal candidates, or by disseminating messages through non-broadcast media.

Congress's delegation of limited legislative authority to the Commission to create certain regulatory exemptions to the definition of "electioneering communication," see 2 U.S.C. 434(f)(3)(B)(iv), also does not require that the courts establish a general grass roots lobbying exemption as a matter of constitutional law.  CCL's reliance (Br. 16-17 n.8) on the post-enactment proposal of BCRA's principal congressional sponsors for a regulatory exemption is

---

[10]    CCL's reliance (Br. 16) on Justice Stevens' concurrence in Austin to support its own expansive view of this footnote is misplaced.  The majority opinion regarding Title II of BCRA in McConnell, co-authored by Justices Stevens and O'Connor, does not refer to Justice Stevens' general comments on lobbying in his concurrence in Austin.

thus irrelevant to the <u>constitutional</u> question before this Court.[11]  In any event, when <u>McConnell</u> was decided, the Supreme Court had already been informed that the Commission had decided not to promulgate an exemption for grass-roots lobbying in October 2002.  <u>See</u>, <u>e.g.</u>, Brief in <u>McConnell</u> of AFL-CIO, 2003 WL 22002431, at 30.  Yet, the Court did not suggest that the lack of any such exemption made BCRA § 203 constitutionally suspect.[12]

> **b.    CCL Has Not Shown That the Communication Options Identified in <u>McConnell</u> and Other Alternatives Available to It Are Constitutionally Burdensome**

In holding that the electioneering communication provision was constitutional, <u>McConnell</u> relied on the fact that corporations like plaintiff have the option under BCRA of "avoiding any specific reference to federal candidates" in publicizing their views on issues, or "paying for the ad from a segregated fund."  540 U.S. at 206.  Thus, plaintiff's as-applied challenge cannot succeed without demonstrating that these statutory options are unconstitutional as applied to its advertisements, specifically by offering evidence as to the particular burdens, if any, that these options would place on CCL.  Plaintiff has not done so.

First, plaintiff has failed to show that it could not adequately express its position on the proposed marriage amendment to the public through the first method suggested by the Court in <u>McConnell</u>, 540 U.S. at 206, "simply avoiding any specific reference to" Senator Snowe during the brief electioneering communication periods.  In fact, there are many ways for CCL to ask the people of Maine to lobby their Senators in a broadcast ad without identifying the Senators.

---

[11]    Even if it were relevant, the sponsors' proposal was markedly different from CCL's, since the former included two fundamental criteria that would exclude CCL's proposed advertisements:  First, the sponsors' proposal would not have permitted the explicit naming of a candidate, an element that is particularly likely to have an electoral effect in a pre-election context.  Second, the proposal would not allow the communication to include any reference to a candidate's record or position on any issue.

[12]    The Commission recently published a Notice of Availability seeking comment on a new proposal to promulgate a regulatory exception for a class of "grass roots lobbying" advertisements.  <u>See</u> 71 Fed. Reg. 13,557 (Mar. 16, 2006).

These include directing listeners to the Senate's own extensive website (www.senate.gov), at which contact information is readily available, or simply urging listeners to "[c]all the Capitol switchboard at 202-224-3121 and ask for your senator" — as plaintiff's "Crossroads" ad actually does, see Complaint, Exh. A — to ask them to support the proposed amendment.  Plaintiff itself did not find it necessary to identify any federal office holder in the "Statesman Ad" it apparently ran in 2004.  See supra p. 12.  That ad urged legislators to support the federal marriage amendment, and also asked readers to go to plaintiff's website to review its voter guide before voting.  In fact, it appears that CCL decided to refer to Senator Snowe in broadcast ads this year in order to set up this lawsuit, not because of a decision that its views on the Marriage Amendment could not otherwise be publicized as effectively.  See supra pp. 7-9.

Moreover, the Supreme Court has already concluded that separate segregated funds provide corporations like CCL with a "constitutionally sufficient" means of engaging in express advocacy, and likewise found that option adequate under BCRA's electioneering communication restrictions.  See McConnell, 540 U.S. at 203-04, 206.  CCL fails to provide any evidence that it is unconstitutionally burdened by BCRA's requirement that it finance its ads during the short pre-election time with contributions from its members, as defined in 2 U.S.C. 441b(b)(4), in amounts up to the existing $5,000 PAC contribution limit in 2 U.S.C. 441a(a)(1)(C).

CCL stresses that it currently has no federal PAC (Complaint ¶ 16), but it has administered two active state PACs (CAL and CFM) for some time, and it has not even tried to show why it could not have formed a comparable federal committee, particularly since BCRA has now been in effect for years and the McConnell decision was issued in late 2003.  On the contrary, available evidence indicates that CFM engaged in significant state PAC fundraising and reporting in connection with the 2005 Maine state gay rights ballot initiative.  See supra pp. 10-11.  Moreover, CAL apparently exists in order to support candidates whose views reflect

those of CCL. See supra p. 10. CCL's ability to engage in this extensive political and electoral

activity, even while apparently complying with state campaign finance restrictions, undermines

any claim that forming a separate segregated fund under the Act would be too burdensome.

CCL's executive director testified that has not even considered forming a federal PAC because

he does not have enough information about it and because he has a general sense that it would be

complicated, not because he could specify any particular burden associated with establishing

one. Heath Depo., Exh. A at 104-05.

      Of course, if CCL cannot convince its individual members to contribute up to the $5,000

federal PAC limit, or if it cannot attract new members to give to a PAC, that is a direct reflection

of the limits of its success in the marketplace of ideas, not an unconstitutional burden created by

BCRA § 203. See Austin, 494 U.S. at 660 (corporate PAC requirement "ensures that

expenditures reflect actual public support for the political ideas espoused by corporations");

McConnell, 540 U.S. at 204 ("'The PAC option allows corporate political participation without

the temptation to use corporate funds for political influence, quite possibly at odds with the

sentiments of some shareholders or members'") (quoting Beaumont, 539 U.S. at 163). See also

Buckley, 424 U.S. at 21-22 (effect of any contribution limit "is merely to require candidates and

political committees to raise funds from a greater number of persons…").

      Finally, CCL also has numerous means of publicly expressing its views on issues without

using broadcast media, including the various print media, the Internet, signs, direct mail, and

telephone calls. Indeed, available evidence indicates that CCL has made liberal use of such

options for years in pursuing the gay marriage issue, and apparently has not directly paid for

broadcast ads addressing legislative issues with its corporate funds. However, CCL has made

extensive communications through other media including press columns and speeches, print

advertisements and publications including The Record, email communications, and its massive

website, www.cclmaine.org.  See supra pp. 11-13.  In fact, the evidence indicates that CCL did

not decide to run broadcast ads this year because these alternative methods were less effective,

but because only broadcast ads are subject to BCRA's electioneering communication provisions,

and therefore would provide a basis for filing this lawsuit.  See supra pp. 7-9.

> c.    **CCL's Proposed Advertisement Is Materially Similar
>        To Ads That McConnell Found Functionally Equivalent
>        to Express Advocacy**

In McConnell, the Supreme Court explained that the "justifications for the regulation of

express advocacy apply equally to ads aired during those periods if the ads are intended to

influence the voters' decisions and have that effect."  540 U.S. at 206.  The "Crossroads" radio

advertisement CCL intends to run just prior to this year's federal elections is such an ad.  It

explicitly continues CCL's strong public criticism of Senator Snowe for her position on what is

apparently one of the most divisive social issues in Maine in recent years, in part because of

plaintiff's own aggressive publicity efforts.  Moreover, it is difficult to believe that electoral

influence was not at least one of the goals of a group that has spent years excoriating Senator

Snowe on this and a range of other social and economic issues; CCL has even publicized a

potential Republican primary challenger on its website last year, and its executive director

admitted that CCL would prefer a different Republican candidate.  See supra pp. 11-13.  Indeed,

the facts of this case present a good example of how so-called "grass roots lobbying" can have

multiple purposes and communicate more than one message, including one that is clearly

election-related.[13]

---

[13]    The fact that Senator Snowe has no opponent on the ballot in the upcoming primary is
irrelevant to the constitutional analysis.  Nothing in McConnell suggests that an ad's intention to
"influence the voters' decisions," 540 U.S. at 206, or the "conclusion that [certain] ads were
specifically intended to affect election results," id. at 127, turns on whether such intentions or
influence are outcome-determinative.  In fact, it is often difficult to determine whether a
candidate is entirely unopposed before an election is held, since a write-in campaign can be
mounted at any time.  See Exh. K (WRTL opinion denying preliminary injunction) at 3 (noting,
fewer than 30 days before primary election, that "Sen. Russell Feingold [is] currently the sole

"Crossroads" does not simply urge listeners to ask Senator Snowe to support the Marriage Protection Amendment. Instead, it frames the issue as one of epochal importance, stressing that the nation stands at "the intersection of how marriage will be defined for future generations." It then criticizes the senators for their official acts in office: "Unfortunately, your senators voted against the Marriage Protection Amendment two years ago." In the next line, the ad then urges listeners to "call Sens. Snowe and Collins immediately and urge them to support" the Amendment "when it comes to a vote" in early June.

In McConnell, the Supreme Court found this type of "call and tell" ad to be an archetypical formulation that was constitutionally regulable under BCRA. The Court explained that "[l]ittle difference existed … between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'" 540 U.S. at 126-27. CCL itself quotes this language in its brief (Br. 19) in an effort to show that "sham issue ads" are unlike its ad, but in fact "Crossroads" does exactly what the Court in McConnell described: It condemns Senator Snowe's record on a particular issue as "unfortunate[]" before exhorting listeners to call her immediately and tell her what they think. In support of its "Jane Doe" finding, the Supreme Court cited factual findings made by all three district court judges as to the centrality of the "call and tell" statements in recent election-related ads. See McConnell, 540 U.S. at 127 n.17, citing, inter alia, 251 F.Supp.2d at 304 (Henderson, J.) (Chamber of Commerce and AFL-CIO agreed that the ultimate way to "tell" an elected official to do something is by voting; Senator Feingold

---

Democrat contender for the Senate seat" (emphasis added)). Given CCL's history of opposition to Senator Snowe, moreover, it appears that one of the ad's purposes could be a hope to depress support for her candidacy, perhaps with the ultimate goal of encouraging a primary challenger to come forward or an independent candidate to run in November. In any event, CCL does not rely upon the Senator's unopposed status as a necessary criterion for the exemption it seeks; rather, CCL is clearly seeking an exemption for this ad, and all others like it, for all future elections, regardless of how hotly contested they may be.

testified that the plea to "call" someone is at the heart of the "phony issue ad"); at 534 (Kollar-Kotelly, J.) (political consultant Raymond Strother testified that the public does not differentiate between ads whose only difference is whether they end with a request to "vote" against a candidate or one to "tell" the candidate to do something); at 876-79 (Leon, J.) (pre-election broadcast ads asking people to call and tell candidates something are generally designed to, and do, influence elections).  CCL argues (Br. 24) that its ad differs from some vague "sham issue ads" in that it discusses a specific pending "legislative activity," but there is no reason to think this reference would diminish the electoral message in such an ad.

In the context of this case, the likely electoral purpose and effect of ads like "Crossroads" is even more pronounced.  The issue of gay rights has reportedly been one of the most important and controversial issues in Maine politics since at least 2004, when the prior proposed federal constitutional marriage amendment appeared.  CCL and one of its state PACs — Coalition for Marriage — have themselves done a great deal to raise and maintain the political profile of the issue, and plaintiff has repeatedly singled out Senator Snowe for public criticism for her positions on gay rights issues.  CCL has also repeatedly denounced Senator Snowe on a wide range of other issues and enthusiastically publicized a potential Republican primary challenger. See supra pp. 11-13.

CCL stresses (Br. 23-25) that its ad deals with specific pending legislative activity in which it has an established interest, but it cannot immunize its electioneering communications from regulation simply because a lobbying message accompanies them.  Most electoral advertisements discuss issues of public importance, and "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application.  Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions."  Buckley, 424 U.S. at 42.  In MCFL,

the newsletter's most explicit exhortation was to "VOTE PRO-LIFE," 479 U.S. at 243, yet

because this issue advocacy was in a brochure that separately identified the positions of

particular candidates on this issue, the Court easily found that the newsletter went "beyond issue

discussion to express electoral advocacy" that "falls squarely within § 441b," id. at 249-50. The

Court thus confirmed that the presence of "issue discussion" does not immunize an election-

influencing communication from regulation. Cf. McConnell, 540 U.S. at 123, 166 (FECA

definition of "contribution" properly includes activities that simultaneously influence both

federal and nonfederal elections because the influence on federal elections is not negated by such

a dual purpose).

   The Supreme Court has recognized that, contrary to plaintiff's claims (Br. 23-24), the

overall electoral context in which such communications are made can be critical in evaluating the

validity of applicable financing restrictions. The record in McConnell amply supports the

finding that pre-election advertisements can have a significant electoral effect even if, unlike

CCL's advertisement, they do not expressly discuss a candidate's record. The district court

found, in a portion of its opinion relied on by the Supreme Court in concluding that the vast

majority of past ads that would have been covered by BCRA had an electioneering purpose, that

it was "unrebutted that advertisements naming federal candidates, targeted to their electorate, and

aired in the period before the election, influence voters." McConnell, 251 F.Supp.2d 176, 573

(D.D.C. 2003) (Kollar-Kotelly, J.). See 540 U.S. at 206. This finding was based in part on

testimony by a prominent political consultant that he did "not believe there are issue ads run

immediately before an election that mention[] the candidate that aren't important in the decision-

making process of the voter." 251 F.Supp.2d at 573 (Kollar-Kotelly, J.).

> Without even mentioning an upcoming election, the media consultant
> can count on the electoral context and voters' awareness that the
> election is coming. Voters will themselves link your ad to the
> upcoming election. When viewed months or years after the election a

> particular ad might look like pure issue advocacy unrelated to a federal
> election.  However, during the election, political ads — whether
> candidate ads, sham issue ads, true issue ads, positive ads, negative ads
> or whatever — are each seen by voters as just one more ingredient
> thrown into a big cajun stew.

McConnell, 251 F.Supp.2d at 875 (Leon, J.) (quoting Raymond Strother).  See also McConnell,

540 U.S. at 193 n.77 (relying on this consultant and others for the proposition that "magic

words" of express advocacy are not required for an electoral ad); id. at 206, citing Krasno &

Sorauf Rep., McConnell, S. Ct. Joint App. Vol. III, at 1330-48 (at pages 1345-47, experts explain

pattern of pure issue ads before September asking viewers to "call Congress," while ads naming

candidates aired after Labor Day).

CCL argues (Br. 24, 25) that its ad concerns a Senate vote on a legislative proposal

whose timing was beyond its control.  But available evidence suggests that the timing of the

scheduled Senate vote on the proposed marriage amendment is itself deeply election-related,

with the Majority Leader assuring supporters that the vote this year would be (like the one in

2004) scheduled for maximum electoral impact.  See supra pp. 13-14.  The matter thus serves to

illustrate how deeply entwined electoral and legislative issues are, particularly in election years.

In this context, where even the legislative action discussed in an ad may be staged largely for its

electoral effect, "[t]he notion that [CCL's] advertisement[s] were designed purely to discuss the

issue of [the marriage amendment] strains credulity."  McConnell, 540 U.S. at 193 n.78.

### 3.    BCRA's Bright-Line Rule Furthers First Amendment Interests and Would Be Subverted by CCL's As-Applied Challenge

Recognition of a constitutional exception along the lines suggested by CCL would

substantially undermine Congress's effort to develop an objective bright-line rule for identifying

the election-related advertisements that may not be financed with corporate and union treasury

funds.  One of BCRA's compelling purposes is the avoidance of any constitutional chill that

could arise from uncertainty about whether a particular communication is an "electioneering

communication." Thus, in addition to advancing the compelling government interest in protecting the integrity of federal elections, BCRA §§ 201 & 203 further First Amendment interests that would be seriously eroded by creating an exemption for advertisements like CCL's.

"A bright-line prophylactic rule may be the best way…, by offering clear guidance and avoiding subjectivity, to protect speech itself." Hill v. Colorado, 530 U.S. 703, 729 (2000). "[A] … prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms." Dombrowski v. Pfister, 380 U.S. 479, 486 (1965). See also Riley v. National Fed'n of the Blind, 487 U.S. 781, 793-94 (1988). BCRA §§ 201 & 203 were designed to give speakers clear guidance and thus avoid the uncertainty that could cause potentially unconstitutional chilling. See Edward B. Foley, 'Narrow Tailoring' Is Not the Opposite of 'Overbreadth': Defending BCRA's Definition of 'Electioneering Communications,' 2 Election L.J. 457, 465-66 (2003). The definition's "bright line" quality itself thus serves compelling governmental interests and was critical to the Court's upholding of the restriction against the First Amendment challenge. See 540 U.S. at 194. It was also a key concern of Congress when it enacted this definition. See 148 Cong. Rec. S2117 (daily ed. Mar. 20, 2002) (statement of Sen. Jeffords) ("the care we took in crafting these clear and narrow requirements").

CCL's approach would reintroduce the indeterminacy and the potential chill to political speech that Congress and the Supreme Court have sought to dispel. CCL argues (Br. 23) that its ad is "not express advocacy or its functional equivalent" by pointing (Br. 24-25) to several fact-specific aspects of its ads; it argues for no other legal standard to be applied to determine whether its ad is entitled to a constitutional exemption from the Act.[14] Although CCL discusses

---

[14]    Earlier, CCL quotes (Br. 13-14 & n.6) provisions of the Internal Revenue Code that define grass roots lobbying for tax purposes, and a rulemaking petition recently filed with the Commission (Br. 14 n.7). It is unclear whether CCL is arguing that this Court should adopt any of these actual or proposed regulatory definitions as tests required by the Constitution.

several facts about itself and its ad, it does not explain whether it views all of these factors as necessary to establish entitlement to a constitutional exemption or how or whether the factors should be weighed against each other.  Plainly, many of these factors are matters of judgment on which reasonable minds might differ depending upon the circumstances:  For example, how would a court determine whether an issue is (CCL Br. 24) a "long-time, natural concern" of a corporation or whether an ad (id. at 25) "deals with an unprecedented issue of vital importance that is just now coming to a head"? [15]

Under CCL's approach, the permissibility of corporate and union disbursements would turn on the same sort of unstructured, ad hoc inquiry that the Court in Buckley found constitutionally problematic, and that Congress in enacting BCRA carefully sought to avoid.  Without offering any specific bright-line test of its own, CCL asserts (Br. 21 n.9) that "this Court could adopt a bright-line test for grass roots lobbying that is every bit as bright as the exception for MCFL-type corporations created in MCFL."  In two distinct respects, however, CCL's approach would create difficulties far greater than those entailed by the existing constitutional exemption for MCFL organizations.  First, because CCL's as-applied challenge rests largely on the content of specific advertisements, CCL's approach necessarily focuses on the particular speech at issue, rather than on the general characteristics of an entity, and thus every advertisement would provide a new opportunity for litigation.  Moreover, even the same

---

[15]    If CCL is suggesting (Br. 23-25) that McConnell itself erected a "functional equivalent of express advocacy" test, it is mistaken.  Although the Court used that phrase when it explained why BCRA's regulation of "electioneering communications" is not overbroad, 540 U.S. at 206, it never suggested that it was replacing Congress's definition of electioneering communication, which the Court explicitly upheld, with a different test.  Rather, the Court merely explained that, because the vast majority of ads in the past that would have met the definition of electioneering communication were in fact functionally equivalent to express advocacy, the bright-line rule is not substantially overbroad and does not unduly burden "genuine issue ads."  Moreover, in WRTL, when the Court explained that McConnell had not decided one way or the other whether as-applied challenges to this provision would succeed, it never suggested that McConnell had established a "functional equivalence" test.

advertisements might be subject to differing constitutional treatment if, for example, one speaker alleges that has a "long-time, natural concern" (CCL Br. 24) for an issue or that it "will run the same ad outside the blackout periods" (id. at 25), but another speaker does not.  The exemption recognized in MCFL, on the other hand, turns on an objective assessment of the organization's structure and overall activities, see supra pp. 3-4, and can be understood as a means of identifying a class of corporations for which a separate segregated fund for campaign-related expenditures is unnecessary to achieve Congress's ends.

Second, because CCL has made no effort to articulate an objective and determinate standard for identifying those corporate advertisements to which the BCRA financing restrictions cannot constitutionally be applied, the resolution of each such challenge would involve a complex and fact-bound inquiry rather than the application of a clear, easily followed rule. CCL's approach would thus multiply litigation, blur the bright lines drawn by Congress, and markedly subvert Congress's compelling interest in avoiding "the vagueness concerns that drove [the Court's] analysis in Buckley."  McConnell, 540 U.S. at 194.  Cf. Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001) (rejecting construction of statute that would introduce "complexity and uncertainty" and thereby "undermin[e] ... the [statute's] ... purposes and 'breed[] litigation from a statute that seeks to avoid it'").[16]

In addressing constitutional challenges to other FECA provisions, the Supreme Court has recognized the value of bright-line rules in preventing evasion of the statute's purposes and in

---

[16]    Moreover, most of this factbound litigation would occur in the context of preliminary injunction hearings on the eve of elections and would enmesh the federal courts in political debate, since BCRA § 201(a)'s definition of "electioneering communication" is limited to advertisements that, inter alia, are aired in the 30- or 60-day window before a federal election and clearly identify a federal candidate.  The fact that as-applied challenges would likely arise shortly before federal elections would also require the courts to attempt to expedite the suits, multiplying the complexity and costs of the litigation for all involved.  And under BCRA § 403(a) and (d), 116 Stat. 113-114, each plaintiff would be entitled to have the action heard by a three-judge district court, with a right of appeal directly to the Supreme Court.

furnishing clear guidance to regulated entities.  In <u>Buckley</u>, for example, the Court "assumed" that "most large contributors do not seek improper influence over a candidate's position or an officeholder's action."  424 U.S. at 29.  The Court held, however, that the difficulty of isolating suspect contributions and Congress's interest in guarding against the inherent appearance of abuse justified universal application of the $1,000 individual contribution limit.  <u>Id.</u> at 29-30. The Court's analysis clearly portends the likely failure of as-applied challenges to the contribution limits by well-intentioned contributors who might seek to prove that their own contributions, though in excess of the statutory caps, would be made without any intent to obtain special influence.[17]  <u>See also</u> <u>California Medical Ass'n v. FEC</u>, 453 U.S. 182, 198-99 (1981) (contributions to a political committee are subject to FECA restrictions even if earmarked for administrative support, rather than for influencing elections); <u>Goland v. United States</u>, 903 F.2d 1247, 1258-59 (9th Cir. 1990) (contributions are subject to FECA restrictions even if a contributor keeps his identity a secret by using straw donors, supposedly precluding the opportunity to exert undue influence).

More generally, such clarity is critical to the operation of prophylactic statutory rules, whose efficacy cannot depend upon an in-depth analysis of the extent to which the interests underlying them are served in each particular situation.  In <u>Hill v. Colorado</u>, for example, the Court explained that the rule at issue would simply cease to function if it were made susceptible to certain kinds of case-by-case challenges.  That statute banned "unwelcome demonstrators" from coming closer than eight feet to people entering health care facilities.  The Court recognized that the statute's "prophylactic approach … will sometimes inhibit a demonstrator whose approach in fact would have proved harmless," 530 U.S. at 729 — just as the Court in

---

[17]     The Court rejected an exception for contributions from "immediate family members," even though the Court accepted the proposition that the "risk of improper influence is somewhat diminished" in that circumstance.  <u>Buckley</u>, 424 U.S. at 53 n.59.

McConnell recognized that some "genuine issue ads" would have to be reworded or financed

with PAC funds under BCRA, 540 U.S. at 206.  The Court in Hill nonetheless upheld the statute,

explaining that the very exercise of engaging in a case-by-case factual analysis would thwart the

rule's effectiveness and limit free expression (530 U.S. at 729):

> But the statute's prophylactic aspect is justified by the great difficulty of
> protecting, say, a pregnant woman from physical harassment with legal rules
> that focus exclusively on the individual impact of each instance of behavior,
> demanding in each case an accurate characterization (as harassing or not
> harassing) of each individual movement within the 8-foot boundary.  Such
> individual characterization of each individual movement is often difficult to
> make accurately.  A bright-line prophylactic rule may be the best way to
> provide protection, and, at the same time, by offering clear guidance and
> avoiding subjectivity, to protect speech itself.

Similarly, in Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995), the Court upheld

Florida Bar rules prohibiting lawyers from sending targeted mail solicitations to victims and their

relatives for 30 days following an accident or disaster.  Id. at 620.  The Court did not question the

claims of the challengers that the injuries or grief of some victims are "relatively minor," but

stressed instead that making case-specific judgments would entail "drawing difficult lines" as to

the severity of different kinds of "grief, anger, or emotion."  Id.  The Court thus found the bright-

line, 30-day rule was "reasonably well tailored to its stated objective of eliminating targeted

mailings" that had caused many Floridians "to lose respect for the legal profession."  Id.[18]  See

also Heffron v. International Society for Krishna Consciousness, 452 U.S. 640, 654 (1981) ("any

such exemption [from a rule fixing the physical location of First Amendment activity] cannot be

meaningfully limited to [the plaintiff], and as applied to similarly situated groups would prevent

the State from furthering its important concern").  In these cases, the Supreme Court has upheld

---

[18]     BCRA's 30- and 60-day rule, concerning broadcasts targeted to specific portions of the
electorate, bears a striking resemblance to the restriction in Florida Bar.  Further, both regulatory
schemes allow "many other ways" for the respective speakers to make their messages heard.
Florida Bar, 515 U.S. at 633-34; see McConnell, 540 U.S. at 207-08 (rejecting underinclusive
attack based on the inapplicability of BCRA § 203 to print media and the Internet).

objective, prophylactic rules that it acknowledged would regulate speech that might not implicate

the government interests involved in order to pretermit the practical difficulty and chilling effect

of case-by-case analysis.  The Court thus has recognized that when as-applied challenges to

bright-line, prophylactic rules would undermine Congress's interest in clarity and predictability,

the First Amendment is often better served by adhering to the bright-line rule.

At a minimum, in light of these precedents, the Court should not accept an as-applied

constitutional challenge to BCRA's bright-line prophylactic rule in the absence of an objective,

readily discernible standard that could both identify an allegedly unconstitutional application and

prevent continual case-by-case adjudication.  CCL has plainly failed to identify such a basis for

invalidating BCRA § 203 as applied to the advertisement at issue here.

>  **4.    CCL's Offer To Finance The Advertisement At Issue Here
>          From A Segregated Bank Account Does Not Alter The
>          Constitutional Analysis**

CCL asserts (Br. 6) that it "intends to comply with all record keeping and reporting

requirements for its electioneering communications," and in support of its alternative Count 2,

see Complaint ¶¶ 59-64, states (Br. 23) that if necessary it is "willing" to finance electioneering

communications from a "segregated bank account" containing only funds raised from

individuals, as provided in 2 U.S.C. 434(f)(2)(E).[19]  After careful deliberation, however,

Congress chose to require corporations to finance "electioneering communications" through a

PAC, and it specifically rejected the segregated-bank-account alternative that appellant proposes.

Because the Supreme Court in McConnell sustained the PAC requirement as applied to nonprofit

corporations, CCL has no constitutional right to use a "segregated bank account" instead.

---

[19]    Of course, to date, there is no evidence that CCL has such a separate bank account.
Moreover, it has no funds to run the advertisement and has no donors who have committed to
provide such funds.  See supra p. 9.

As the Court explained in <u>McConnell</u>, BCRA § 203 (in what were known as the "Snowe-Jeffords" provisions) appeared to grant a limited exemption for Section 501(c)(4) and Section 527 organizations to finance electioneering communications with funds collected only from individuals, but BCRA § 204 (known as the "Wellstone Amendment") then effectively withdrew the exemption. <u>See</u> 540 U.S. at 209 n.90; 2 U.S.C. 441b(c)(2), (6). Snowe-Jeffords would have permitted a nonprofit corporation like CCL to finance "electioneering communications" from a segregated account that — unlike a corporation's PAC — could contain funds donated by individuals who are not its members (see 2 U.S.C. 441b(b)(4)) in amounts that could exceed the $5,000 annual contribution limit of 2 U.S.C. 441a(a)(1)(C). The Wellstone Amendment thus reflects an explicit and considered congressional determination, sustained by <u>McConnell</u>, that CCL's proposed "segregated bank account" alternative affords insufficient protection against corporate electoral activity.

CCL has itself chosen to organize as a corporation and to engage in other activities that may disqualify it for the <u>MCFL</u> exemption.[20] If so, its own choices require it to accept the limits of the constitutional exemption first recognized in <u>MCFL</u> and later extended to electioneering communications in <u>McConnell</u>. The Court in <u>McConnell</u> held that application of the "electioneering communication" financing restrictions to nonprofit corporations other than <u>MCFL</u> corporations was "plainly valid," and that "a segregated-fund requirement … could apply to a nonprofit corporation that did not qualify for <u>MCFL</u> status." <u>McConnell</u>, 540 U.S. at 211. The Court has thus made clear that, unless CCL can qualify as an <u>MCFL</u> corporation, it is not entitled to a constitutional exemption from BCRA's financing requirements for its broadcast advertising.

---

[20]    As noted above, CCL has not provided facts that clearly support its allegations that it is not a "qualified nonprofit corporation" under 11 C.F.R. 114.10, the regulation that describes the "carefully defined category of entities," <u>McConnell</u>, 540 U.S. at 210, that the Court found exempt from restriction in <u>MCFL</u>. <u>See</u> Complaint ¶ 22.

The segregated account CCL says it is "willing" to use would include funds raised outside the member class restrictions of 2 U.S.C. 441b(b)(4) and contribution limits of 2 U.S.C. 441a(a)(1)(C). CCL admits (Br. 23) that its alternative would have this effect, but claims (Br. 21 n.10) that the "self-governance interest" of its "genuine grass roots lobbying" outweighs the "extremely low likelihood" that such communications would have any "cognizable effect" on an election — an argument that not only assumes its own conclusion but also contradicts McConnell. In addition, CCL's assurances that it will disclose its donations and disbursements for the ads "at the level at which Congress asserted a disclosure interest" (Complaint ¶ 61) and that "any donors contributing in excess of $1,000 to the [segregated] account would be disclosed to the public" (Complaint ¶ 62) do not actually comport with Congress's intent in enacting BCRA, even as to disclosure. Under BCRA, an advertiser that is <u>not</u> a political committee must disclose "electioneering communications" for which it spends $10,000 or more, and it must disclose the identity of donors who contribute $1,000 or more. <u>See</u> 2 U.S.C. 434(f)(1), 434(f)(2)(E) and (F). But political committees are required to disclose all receipts and disbursements of $200 or more, 2 U.S.C. 434(b)(3), (6). Thus, by requiring financing from a separate segregated fund that must report as a political committee, Congress required much more extensive disclosure of the financing of electioneering communications by corporations and unions than those made by individuals or unincorporated groups, which is all that is offered by CCL.

In sum, CCL asks this Court to fashion a legislative carve-out for nonprofit corporations that both Congress and <u>McConnell</u> have considered and rejected, and that ignores the carefully balanced set of benefits and burdens that the Act applies to corporate political committees.

## III.    CCL FAILS TO DEMONSTRATE IRREPARABLE INJURY

CCL fails to meet its burden of demonstrating that it will suffer irreparable harm in the absence of a preliminary injunction: (1) It rests its claim of irreparable harm on its mistaken

legal assumption that any allegation of First Amendment harm is sufficient to show irreparable harm, and (2) ample alternative avenues exist for CCL to communicate to the public.

To show irreparable injury, "[a] litigant must do more than merely allege the violation of First Amendment rights." Wagner v. Taylor, 836 F.2d 566, 576 n.76 (D.C. Cir. 1987). See also NTEU v. United States, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991). It must also "show that [t]he injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal citation and quotation marks omitted). This harm "must be both certain and great," and "actual and not theoretical." Id.

Moreover, if the requested relief "would alter, not preserve, the status quo … [a plaintiff] must meet a higher standard than [if] the injunction [plaintiff] sought were merely prohibitory." Veitch v. Danzig, 135 F.Supp.2d 32, 35 (D.D.C. 2001). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Camenisch, 451 U.S. at 395; accord KOS Pharm. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). CCL, however, seeks to alter the relative position of the parties while its request for permanent relief is pending by preventing the Commission from enforcing a statutory provision that the Supreme Court has upheld. See McConnell, 02A989, 02A990, Slip Op. at 1 (May 23, 2003) (Exh. L); Turner Broad. Sys., Inc. v. FCC, 507 U.S. 1301 (1993) (Rehnquist, J., in chambers) (refusing to enjoin enforcement of the Cable Television Consumer Protection and Competition Act of 1992, despite First Amendment claim: "By seeking an injunction, applicants request that I issue an order altering the legal status quo") (emphasis in original).

CCL has not demonstrated imminent and irreparable harm. When CCL states (Br. 25) that it is "barred by BCRA" from running its advertisements, CCL is "'simply wrong,'" because the "provision [is not] a 'complete ban' on expression…" McConnell, 540 U.S. at 204. As

explained supra pp. 4-6, BCRA allows such corporate political speech to be financed through a separate segregated fund.  In addition, CCL has other ways to communicate its message.  See supra pp. 11-13.  Accordingly, if CCL suffers any harm at all, it will be self-inflicted.[21]

First, as explained supra pp. 4-6, the Supreme Court in McConnell explained CCL could broadcast its advertisement by paying for it with a separate segregated fund.  CCL thus bears the extraordinary burden of showing that it would suffer irreparable harm by employing an option identified by the Supreme Court for this very situation.  Nowhere, however, does CCL allege any facts which demonstrate that creating a PAC and running the proposed ad through it would be onerous, or would otherwise pose an unconstitutional burden on CCL.  Instead, CCL's only allegation regarding the PAC option (Complaint ¶ 54) is a conclusory reference to "PAC compliance burdens."  In fact, since CCL itself currently lacks funds to pay for its ads, it appears that, at least at this time, the Act's separate segregated fund requirement is not what is preventing CCL from broadcasting its ads.

More than two years have passed since the decision in McConnell put corporations like CCL — i.e., those that do not qualify as MCFL organizations — on notice about the availability of the PAC option in these circumstances.  Yet, CCL has chosen not to establish a federal PAC, even though it has established two state PAC's:  the Christian Action League and the Coalition for Marriage.  See supra pp. 10-11.  Even though the Coalition for Marriage was only active for the latter part of last year, it raised more than $200,000 in 2005.  See PAC Reports for Coalition

---

[21]    This case raises no question involving a prior restraint, since that term describes "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur."  Alexander v. United States, 509 U.S. 544, 550 (1993) (internal citation and quotation marks omitted).  CCL does not allege that the Commission has taken any action against it, let alone one that would constitute an attempt to prevent it from broadcasting its planned advertisements.

for Marriage, http://www.mainecampaignfinance.com/public/report_list.asp?TYPE=
PAC&ID=2385&LIMIT=&YEAR=2006.

Second, as discussed supra pp. 23-24, CCL could use its corporate treasury to finance its proposed broadcast ad with only a minor alteration to its script:  omitting mentioning Senator Snowe's name.  CCL argues (Br. 17 n.8) that naming the candidate is "necessary," but does not provide any proof or cite any evidence to support its apparent claim that it would be irreparably harmed by making such a minor change in its ad.  To the contrary, CCL gave no thought to publicizing its views in compliance with the Act, because its decision to run the ad was actually motivated by a desire to file this lawsuit, which itself depends upon referring to Senator Snowe in a broadcast ad.  See supra pp. 7-9.

Third, the electioneering communication provision applies only to television and radio advertising, 2 U.S.C. 434(f)(3), which leaves open numerous other avenues of public expression for CCL to use.  CCL complains (Br. 7-8) that broadcast ads are the "most effective form of communication," and that "non-broadcast communications would not provide CCL with the sufficient ability to reach the people of Maine," but again does not present any evidence to support this claim.  Instead, the record is clear that CCL decided to run broadcast ads only to provide a basis for filing this lawsuit and that, in the past, CCL has only run broadcast ads concerning events such as its own banquets, not to affect public policy.  See supra pp. 7-9, 12. In short, what CCL wrongly characterizes as a "ban" leaves open numerous avenues for CCL to disseminate its views to the public, which CCL had used extensively in the past.  See supra pp. 11-13.[22]

---

[22]    CCL also has the option of structuring itself to qualify as an MCFL organization so that it could finance its proposed ad with its corporate treasury funds.  See supra pp. 3-4.  CCL asserts (Br. 22) that it "is in fact quite like an MCFL-type corporation" even though it also alleges (Complaint ¶ 22) that it does not qualify for the exemption as defined in 11 C.F.R. 114.10.  CCL presents no evidence suggesting how it would be irreparably harmed if it were to take whatever steps are necessary to so qualify.

Finally, the "Crossroads" ad at issue here was not even created by CCL, but by another group who solicited it to enable this legal challenge, so any harm to <u>CCL</u> if no injunction is entered is highly doubtful. Especially since CCL has taken no steps to arrange for the ad to be aired, and has no funds committed to pay for a broadcast, CCL has failed to demonstrate that any inability to run the ads is attributable to BCRA.

CCL "devotes a mere one page of its Motion [Br. at 25] to this central question of irreparable harm, apparently relying on the persuasive power of invoking the First Amendment," <u>EMILY's List v. FEC</u>, 362 F. Supp. 2d 43, 58 (D.D.C. 2005) (bracketed words added), and one case, <u>Elrod v. Burns</u>, 427 U.S. 347 (1976). This case is, however, entirely different from <u>Elrod</u>. In that case the Supreme Court held that employee dismissal based on political party patronage was an unconstitutional infringement on employees' First Amendment Rights. <u>Id.</u> at 372. But the Court specifically found that government employees had already been "threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge," and it was "clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought." <u>Id.</u> at 373. Here, however, CCL has not alleged any governmental action against it of any kind, let alone the kind of imminent or actual threats that were present in <u>Elrod</u>.[23] Indeed, CCL had not even given any thought to engaging in activity inconsistent with the Act until it was solicited to become the plaintiff in this case a few days before the preliminary injunction motion was filed.

The D.C. Circuit has clearly explained that <u>Elrod</u> did not eliminate a First Amendment plaintiff's burden to show that its interests are actually threatened or in fact being impaired.

---

[23]     Any speculation about the possibility of a later FEC administrative investigation cannot be used to show irreparable harm. <u>FTC v. Standard Oil Co.</u>, 449 U.S. 232, 244 (1980) (internal citations omitted) ("'the expense and annoyance'" of agency proceedings do "not constitute irreparable injury," but are merely "'part of the social burden of living under government'").

NTEU, 927 F.2d at 1254-55; Wagner, 836 F.2d at 576-77 n.76.  See also Christian Knights of the Ku Klux Klan Invisible Empire v. District of Columbia ("KKK"), 919 F.2d 148, 149-150 (D.C. Cir. 1990) (rejecting preliminary injunction sought by Ku Klux Klan to require local government to issue a parade permit for a planned march longer than the one for which it had received a permit, finding Elrod not controlling on irreparable harm because the shorter parade allowed in the permit was not a total denial of First Amendment rights).[24]  Moreover, since CCL decided to run these ads only at the request of a third party, and primarily for the purpose of conducting litigation challenging the Act, it is doubtful that CCL's own interest in public communication is even seriously at risk in this case.  In sum, since CCL, unlike the plaintiff in Elrod, remains free to communicate publicly by paying for its advertisements through a PAC, by modifying slightly the text of its ad, and by using a variety of non-broadcast media to spread its message, CCL has failed to meet its burden of demonstrating irreparable harm.  See Exh. K at 7 (WRTL decision denying preliminary injunction, finding no irreparable harm because the "actual limit on plaintiff's freedom of expression, as protected by the First Amendment, is not nearly so great as plaintiff argues").

## IV.  A PRELIMINARY INJUNCTION WOULD CAUSE THE COMMISSION AND THE PUBLIC SUBSTANTIAL HARM

In denying a preliminary injunction against enforcement of this same statutory provision in 2004, the three-judge court in WRTL explained why such an injunction would significantly harm both the Commission and the public interest (Exh. K at 8-9):

---

[24]    See also, e.g., Hohe v. Casey, 868 F.2d 69, 72-73 (3d Cir.), cert. denied 493 U.S. 848 (1989) ("assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits"); Time Warner Cable of New York City v. Bloomberg L.P., 118 F.3d 917, 924 (2d Cir. 1997) ("[It is often] more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights"); Piscottano v. Murphy, 317 F.Supp.2d 97, 102 (D. Conn. 2004).

> The harm to the opposing party, the Federal Election Commission, is evident. Everyone agrees that it is the statutory duty of the defendant to enforce the BCRA…. We hold that an injunction against the performance of its statutory duty constitutes a substantial injury to the Commission ….
>
> … [W]e do hold that plaintiff has not established that the public interest would be furthered by the injunction. The Supreme Court has already determined that the provisions of the BCRA serve compelling government interests. See McConnell, 125 S.Ct. at 695-96. To the extent that the injunction of the proposed application of those provisions interferes with the execution of the statute upheld by the Supreme Court in McConnell, the public interest is already established by the Court's holding and by Congress's enactment, and the interference therewith is inherent in the injunction.

These conclusions are fully applicable here. As Justice Rehnquist explained in staying a federal court decision enjoining the enforcement of a state statute, "It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." New Motor Vehicle Bd. of California v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (Rehnquist, Circuit Justice, 1977). The same kind of irreparable injury is suffered nationally when a federal statute cannot be enforced.

> "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of applicants in balancing hardships." Walters v. National Ass'n of Radiation Survivors, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). "Given the presumption of constitutionality granted to all Acts of Congress," it is … appropriate that the statute remain in effect pending such review. Schweiker v. McClure, 452 U.S. 1301, 1303 (1981) (Rehnquist, J., in chambers).

Bowen v. Kendrick, 483 U.S. 1304, 1304-05 (Rehnquist, Circuit Justice, 1987) (staying a district court injunction against enforcement of the Adolescent Family Life Act, 42 U.S.C. 300z et seq.). Chief Justice Rehnquist applied these same principles to the provisions of BCRA at issue here when he denied a motion to enjoin enforcement of these provisions pending decision by the Supreme Court in McConnell, and when he denied an injunction pending appeal in WRTL. See WRTL, 542 U.S. 1305 (2004). Even though the three-judge district court in McConnell had

already entered judgment finding these provisions unconstitutional in part, Chief Justice

Rehnquist concluded:

> Applicants have filed an application to vacate the stay entered by the
> District Court.  After consulting with other members of the Court, I shall
> deny the application to vacate the stay entered by the District Court.  An
> act of Congress is presumed to be constitutional, see Bowen v. Kendrick,
> 483 U.S. 1304 (1987), and the Bipartisan Campaign Reform Act should
> remain in effect until the disposition of this case by the Supreme Court.

McConnell v. FEC, 02A989, 02A990, Slip Op. at 1 (May 23, 2003) (Ex. L).  Accordingly, both

the public and the Commission have an overriding interest in having the statute enforced as it

was written by Congress, and CCL cannot justify a preliminary injunction that would harm that

interest.

## CONCLUSION

For the foregoing reasons, CCL's motion for a preliminary injunction should be denied.

Respectfully submitted,

_____/s/_____
Lawrence H. Norton
General Counsel

Richard B. Bader
Associate General Counsel
(D.C. Bar # 911073)

David Kolker
Assistant General Counsel
(D.C. Bar # 394558)

Harry J. Summers
Kevin Deeley
Steve N. Hajjar
Attorneys

FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
April 17, 2006                                    (202) 694-1650