UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )     No.  1:06CV00614
          Plaintiff,               )
                                   )     OPPOSITION
          v.                       )     TO MOTION FOR
                                   )     PRELIMINARY INJUNCTION
FEDERAL ELECTION COMMISSION,       )     EXHIBITS
                                   )
          Defendant.               )
                                   )


**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBITS SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Exhibit
Letter:                Document:

A                Transcript of Deposition of Michael Heath (April 13, 2006).

A-1              By-Laws of the Christian Civic League (adopted October 17, 1998)
                 (Heath Depo. Exh. 1).

A-2              Notice of Fed. R. Civ. P. 30(b)(6) Deposition (filed April 6, 2006) (Heath
                 Depo. Exh. 2).

A-3              Christian Civic League of Maine Voter's Guide Page (visited April 11,
                 2006) (Heath Depo. Exh. 3).

A-4              Coalition for Marriage – Newspaper Column by Michael S. Heath (March
                 1, 2004) (Heath Depo. Exh. 4).

A-5              Joshua L. Weinstein, Senators Balk on Gay-Marriage Amendment,
                 Portland Press Herald (July 13, 2004) (Heath Depo. Exh. 5).

A-6              Christian Civic League, Advertisement (2004) (Heath Depo. Exh. 6).

A-7              Verified Complaint for Declaratory and Injunctive Relief (March 28,
                 2006) (Heath Depo. Exh. 7).

A-8              Man on a Mission, The Record (Christian Civic League) (February 23,
                 2005) (Heath Depo. Exh. 8).

A-9              Christian Action League, Registration for Political Action Committee
                 (February 27, 2006) (Heath Depo. Exh. 9).

A-10             Responses of the Christian Civic League of Maine, Inc. to Defendant's
                 First Set of Interrogatories (April 12, 2006) (Heath Depo. Exh. 10).

A-11             Coalition for Marriage, Registration for Political Action Committee
                 (February 27, 2006) (Heath Depo. Exh. 11).

A-12             Betty Adams, Civic League Head Expects Large Turnout for Anti-Gay-
                 Rights Rally, Morning Sentinel Online (April 27, 2005) (Heath Depo.
                 Exh. 12).

A-13     Christian Civic League, Advertising Invoices for the Record (Heath Depo. Exh. 13).

A-14     Christian Civic League of Maine, Form 990, Fiscal Year 2004 (August 1, 2005) (Heath Depo. Exh. 14).

B        Email from John Paulton (Focus on the Family) to Michael Heath (Christian Civic League), et al. (March 24, 2006).

C        Email from Michael Heath (Christian Civic League) to James Bopp, Jr. (March 24, 2006).

D        Hypothetical Maine Advertising Spreadsheet (Fall 2005, Spring 2005, Fall 2004).

E        Coalition for Marriage, Website Donation Page (visited April 5, 2005).

F        Christian Civic League of Maine Website, Voter Guides Page (visited April 11, 2006).

G        The Record (Christian Civic League), Online Newspaper (April 15, 2005).

H        The Record (Christian Civic League), Online Newspaper (May 25, 2005).

I        Transcript and Links to Audio of Remarks of Senator Bill Frist (March 17, 2005).

J        Associated Press, Republican Chief Outlines Strategy to Portray Democrats as Weak, Bypass Mainstream Media (February 11, 2006).

K        <u>Wisconsin Right to Life v. FEC</u>, District Court Memorandum Opinion, No. 04-1260 (D.D.C. 2004).

L        <u>McConnell v. FEC</u>, 02A989, 02A990, (May 23, 2003).

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) | |
| | ) | No. 1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT A |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

ORIGINAL

1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF COLUMBIA

3

4  CHRISTIAN CIVIC LEAGUE     )
    OF MAINE, INC.,          )  Docket No. 1:06CV00614

5                     )

6        Plaintiff,     )

7            v.          )

   FEDERAL ELECTION COMMISSION,)

8                   )

        Defendant.     )

9

10

11

12        DEPOSITION of MICHAEL HEATH, taken pursuant to

13  notice dated April 5, 2006, at the Sheraton Hotel, 363 Maine

14  Mall Road, South Portland, Maine, on April 13, 2006,

15  commencing at 9:55 a.m., before Cindy Packard, Registered

16  Merit Reporter, a Notary Public in and for the State of

17  Maine.

18

19  APPEARANCES:

20  For the Plaintiff:        James Bopp, Jr., Esq.

21  For the Defendant:        Harry J. Summers, Esq.
                          Colleen T. Sealander, Esq.

22

23

24

25

1                                INDEX

2     Deponent:  MICHAEL HEATH

3          Examination by:                          Page

4              Mr. Summers                            3
               Mr. Bopp                             121
5

6

7

8                              EXHIBITS

9                     (Retained by Counsel.)

10    Exhibit 1              bylaws                   9
      Exhibit 2         notice of deposition          9
11    Exhibit 3           voter's guide              17
      Exhibit 4              article                 36
12    Exhibit 5              article                 37
      Exhibit 6           advertisement             39
13    Exhibit 7             complaint                44
      Exhibit 8              article                 84
14    Exhibit 9           registration               90
      Exhibit 10     interrogatory responses         92
15    Exhibit 11          registration               95
      Exhibit 12             article                 97
16    Exhibit 13            invoices                109
      Exhibit 14            form 990                119
17

18

19

20

21

22

23

24

25

```
 1                      - - - - - - -

 2          MICHAEL HEATH, having been duly sworn by the Notary

 3          Public, was examined and deposed as follows:

 4                    MR. SUMMERS:  My name is Harry Summers, I'm

 5          an attorney with the Federal Election Commission.  With

 6          me today is Colleen Sealander, also an attorney with

 7          the Commission.

 8                    Would other counsel please identify himself?

 9                    MR. BOPP:  James Bopp, Jr.

10                    MR. SUMMERS:  This deposition is being taken

11          in connection with Christian Civic League of Maine v.

12          Federal Election Commission, Civil Action Number

13          06-0614 in the District -- U.S. District Court for the

14          District of Columbia.

15                             EXAMINATION

16          BY MR. SUMMERS:

17     Q    Please state your name, sir?

18     A    Michael Heath.

19     Q    And what is your home address?

20     A    28 Mayflower Lane, South China, Maine.

21     Q    And your professional address or your work address?

22     A    70 Sewall Street, Augusta, Maine.

23     Q    And that's the -- also the address of the Christian

24          Civic League of Maine?

25     A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | Are you represented by a lawyer today, by counsel |
| 2 | | today? |
| 3 | A | I am. |
| 4 | Q | And who is that counsel? |
| 5 | A | James Bopp. |
| 6 | Q | Okay.  Have you been deposed before, sir? |
| 7 | A | No, sir. |
| 8 | Q | Do you understand that if I ask questions, the court |
| 9 | | reporter takes down the questions and the answers, so |
| 10 | | it's important to answer orally? |
| 11 | A | Yes. |
| 12 | Q | Do you understand you're under oath today and required |
| 13 | | to testify truthfully to the best of your ability? |
| 14 | A | I do. |
| 15 | Q | If you don't understand a question, will you let me |
| 16 | | know? |
| 17 | A | Yes. |
| 18 | Q | We'll take breaks, but if you need one at any |
| 19 | | particular time, just let me know.  Is there anything |
| 20 | | such as medication that could affect your ability to |
| 21 | | testify accurately today? |
| 22 | A | No. |
| 23 | Q | Okay.  Did you do anything to prepare for this |
| 24 | | deposition? |
| 25 | A | Yes. |

1    Q    What did you do?

2    A    I spoke with counsel.  I instructed my staff to

3         cooperate with counsel in the preparation of documents

4         related to this deposition.  I reviewed those

5         documents.  And that's about it.

6    Q    Did you discuss the deposition itself with anyone other

7         than counsel?

8    A    My wife.

9    Q    Anyone else?

10   A    Besides staff?

11   Q    Including staff?

12   A    I discussed it with the president of our board of

13        directors.

14   Q    And what is his name?

15   A    Dallas Henry.

16   Q    Anyone else?

17   A    No.

18   Q    Okay.  Did your counsel give you anything to review in

19        preparing for today's deposition?

20   A    He gave me the documents that you have.

21   Q    The documents that were produced to the Commission

22        earlier this week?

23   A    Correct.

24   Q    By Christian -- I'm sorry, Christian Civic League, I'm

25        sorry, those documents?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Just to save time, in the papers that counsel has |
| 3 | | filed, he's used the abbreviation CCL for your |
| 4 | | employer.  Is that okay with you if I use that as well, |
| 5 | | or is there one you prefer, just to make it shorter? |
| 6 | A | That's fine. |
| 7 | Q | That's fine, okay.  Any other materials that -- |
| 8 | A | Related to -- any other materials related to -- |
| 9 | Q | To the deposition that you were given by counsel before |
| 10 | | the deposition? |
| 11 | A | Okay.  Related to this meeting? |
| 12 | Q | Yes. |
| 13 | A | To the deposition? |
| 14 | | (Mr. Bopp confers with the witness.) |
| 15 | | THE WITNESS:  Can you repeat the question? |
| 16 | Q | (By Mr. Summers)  Did counsel give you any other |
| 17 | | materials other than what you've described in |
| 18 | | preparation for this meeting, this deposition? |
| 19 | A | I'm pausing to reflect on what I described in the |
| 20 | | previous questions.  No. |
| 21 | Q | Okay.  Could you state your job, please? |
| 22 | A | I'm the executive director of the Christian Civic |
| 23 | | League of Maine. |
| 24 | Q | Do you hold any other work positions? |
| 25 | A | I'm the executive director of the Christian Education |

```
 1        League.  And I also have responsibilities related to

 2        our political action committees.

 3   Q    And what are those?  What are your positions with those

 4        committees?

 5   A    Executive director.

 6   Q    Of?

 7   A    Christian Action League.  The Coalition for Marriage,

 8        which is a -- doing business as PAC, related to the

 9        Coalition -- I mean, to the Christian Action League.

10        And the -- recently -- we're in process of working with

11        a PAC called the No Slots for Maine.

12   Q    And what's your position with No Slots for Maine?

13   A    Still being determined because the board of No Slots

14        for Maine is transitioning, and we are working with

15        them to --

16   Q    I see.

17   A    -- develop a petition effort related to gambling.

18   Q    So that's an existing PAC?

19   A    It is.  State.

20   Q    State PAC, yes.  Is it okay if for -- if I use these

21        abbreviations as well, for the Christian Action League,

22        CAL, and for the Coalition for Marriage, CFM?

23   A    Yes.

24   Q    Okay.  Thank you.  How long have you held a position

25        with CCL?
```

8

```
 1    A    As executive --

 2    Q    Let's start when you first started and maybe work your

 3         way through the different job titles until now, if you

 4         would?

 5    A    I started in 1988, I believe, around there, as the

 6         administrative assistant.  And sometime in the early

 7         1990s, became associate director.  And in 1994, became

 8         executive director of CCL.  I've held that post since

 9         that time.

10    Q    Can you describe your duties as executive director of

11         CCL, please?

12    A    My duties.  I am responsible for the day to day

13         operations of CCL.  And my duty is to the board.  I'm

14         responsible to the board of directors.

15    Q    What do you actually do as executive director in a more

16         concrete way?

17    A    I manage the staff.  I sign the checks.  I speak for

18         the organization publicly, am responsive to the media.

19             I implement the broad policy directives of the

20         board with respect to our operations, our day to day

21         operations, which sometimes include petitioning

22         campaigns, and other times include lobbying efforts in

23         the State House.

24    Q    Would you say that you direct the policy and activities

25         of CCL on a day to day basis?
```

```
 1    A    Yes.

 2    Q    Okay.

 3              MR. SUMMERS:  I'd like to have the court

 4         reporter mark an exhibit.

 5         (Heath Deposition Exhibit Number 1 was marked for

 6         identification.)

 7              MR. BOPP:  Before we do 1, I was expecting

 8         you to go to the notice of deposition, and of course --

 9         do you have a copy of the notice of deposition?

10              MR. SUMMERS:  I do.  I have no objection to

11         having that marked, if you --

12              MR. BOPP:  Could we mark that now?  Do you

13         have a copy?

14              MR. SUMMERS:  I do.  Is it okay if that's

15         marked as Exhibit 2?

16              MR. BOPP:  Yes, sure.

17         (Heath Deposition Exhibit Number 2 was marked for

18         identification.)

19              MR. BOPP:  Mr. Heath of course has been

20         produced pursuant to the notice of deposition, which is

21         Exhibit Number 2, pursuant to Rule 30(b)(6), as the

22         representative of CCL.  And in that regard, the notice

23         of deposition has subject matters as required that he

24         is to familiarize himself with and be prepared to

25         testify about in this deposition.
```

1    Now we have to both the interrogatories and to the

2    document request, we have interposed objections and

3    have answered subject to those objections.  And that

4    would be our intention here.

5    We have the same substantive objections to the

6    subject matters that you are asking this witness to be

7    prepared to answer on as we do to the interrogatories

8    and to the depositions -- or the document request.

9    Specifically, it is our -- we object to any

10   questions that go beyond the facts verified in the

11   complaint, that go beyond the content of the ad or

12   relevant contextual factors that go to whether or not

13   the particular ad in question is an electioneering

14   communication.

15   And specifically, we object to questions about

16   other lobbying efforts that have been engaged in by the

17   organization, by -- with respect to their subjective

18   intent in conducting this broadcast advertising

19   campaign, to their projected belief on whether or not

20   there will be any effect on any election by their

21   advertising campaign.

22   We object to any questions about practical

23   difficulties that they would encounter in creating a

24   PAC.

25   And so as a result, we object to subject matters

11

1    listed in the notice of deposition, Numbers 1, 3, 4, 5,

2    7, and 9.

3        We do not object to questions specifically related

4    to the ad in question in Number 2, which we believe is

5    encompassed in Number 2.

6        We do not object to the extent to which Number 6

7    is involved in -- in questions related to contributions

8    or expenditures for the ad in question.

9        We do object to questions beyond that, including

10   the identity of any donors.

11       And we do not object to questions related to 8, as

12   long as they're not asking for legal conclusions of the

13   witness, they're asking for factual matters that would

14   relate to that criteria, we do not object to that.

15       And I would ask -- and we of course had this

16   discussion prior to the deposition that we stipulate

17   that these objections are, you know, ongoing so we do

18   not have to interpose them to each question.

19       And we intend to have the witness to answer those

20   questions even though we believe they're objectionable.

21   And if we have any specific question -- objections go

22   beyond this, of course, we would make those at that

23   time.

24       So if that is agreeable to you, then that's the

25   way we'd proceed.

```
 1              MR. SUMMERS:  That is agreeable.  We'll

 2         stipulate to that, and we appreciate that.

 3    Q    (By Mr. Summers)  Mr. Heath, if I could direct your

 4         attention to what's been marked as Exhibit 1.  And if

 5         you could turn to Section 9 of that exhibit.  Is this

 6         exhibit the current bylaws of CCL?

 7    A    Yes.

 8    Q    And is Paragraph 9 an accurate description of your

 9         duties as executive director today?

10    A    Yes.

11    Q    Mr. Heath, you were a Republican nominee for the Maine

12         House of Representatives in 1992; is that correct?

13    A    Yes.

14    Q    Have you made any other bids for government office?

15    A    No.

16    Q    Okay.  Have you worked on any other electoral campaigns

17         since then, either paid or volunteer?

18    A    No.

19    Q    Have you held any position in a political party since

20         then?

21    A    No.

22    Q    Okay.  You made reference earlier to the documents

23         produced to the Commission earlier this week.  Is it

24         part of your job to maintain the documents that CCL

25         produced to the Commission earlier this week?
```

1    A    I have a staff member who I delegate that

2         responsibility to.

3    Q    I see.  Were those documents true and correct copies of

4         documents kept in the course of CCL's regular business?

5    A    Yes.

6    Q    Were they made by persons with knowledge of the matters

7         they discuss?

8    A    Yes.

9    Q    And was it the regular practice of CCL to make those

10        documents?

11             MR. BOPP:  I'll be glad to stipulate, they're

12        business records that are admissible.

13             MR. SUMMERS:  Thank you.

14   Q    (By Mr. Summers)  Please answer, anyway, if you would?

15   A    Could you repeat the question?

16   Q    Yes.  Was it the regular practice of CCL to make those

17        documents?

18   A    No.

19   Q    In what way was it not?

20   A    Well, to make those specific documents, we maintain

21        some of those electronically, we produced those in that

22        sequence for this purpose.

23   Q    Maybe I should explain.  To -- was it the regular

24        practice of CCL to create documents like those in

25        whatever medium they were -- they are normally created

14

```
 1              or maintained, whether in a digital version or in a

 2              printed version?

 3      A       Yes, but not in the -- not in the sequence or --

 4      Q       I understand.

 5      A       -- organization that was given -- that was provided.

 6      Q       I understand.  But in some organization that you may

 7              have in the organization itself?

 8      A       Yes.

 9      Q       Thank you.  Okay.

10              (Mr. Bopp and the witness confer.)

11      Q       (By Mr. Summers)  What is CCL?

12      A       The Christian Civic League is a ministry that was

13              formed in 1897 and which has been active in the state

14              of Maine since that time bringing Christian individuals

15              and churches together to accomplish three purposes.

16                   One, to elect honest and competent public

17              officials.

18                   Second, to encourage all the people of Maine in

19              good citizenship.

20                   And third, to enact good laws and provide for

21              their impartial enforcement.

22      Q       Let me direct your attention once again to what's been

23              marked as Exhibit 1, Section 2.  Section 2 describes

24              the purpose of CCL; correct?

25      A       Uh-huh.
```

1  Q  And I see four purposes there, are those four purposes

2  all still the current purposes of CCL?

3  A  Yes.

4  Q  How does CCL work to elect honest and competent

5  officials?

6  A  The -- that has been a subject of discussion among

7  staff and board for years as a result of the, in part,

8  IRS designations and rules.  Also rules related to

9  electioneering, some of which -- some of which are

10  beyond my -- I don't know them all.  I don't work hard

11  to try to understand what presents itself as an issue.

12  So in recent decades, the Christian Civic League

13  of Maine, which is the name of the founding -- which

14  was the founding name in 1897, has seen that purpose of

15  electing honest and competent public officials become

16  less active in its actions, in its daily actions.

17  That's changing, and we are becoming more active

18  in our efforts related to candidates.  In doing so, we

19  are familiarizing ourselves with contemporary rules and

20  regulations related to that sort of activity.

21  Some of the, from what I've been able to determine

22  in travelling around the state and speaking with our

23  supporters, reason for the election of honest and

24  competent public officials fading into the background

25  is the 501(c)(3) rules that churches operate

1          under related to the Internal Revenue Service.

2                And because the Civic League was founded to work

3          with churches, in part, that is a reality within our

4          organization, their concerns related to candidate --

5          related to any statements they might make or actions

6          they might take related to candidate politics.

7                So we are in process regarding that purpose,

8          discussing it.

9    Q    CCL --

10                     MR. BOPP:   Just a second.

11         (Mr. Bopp and the witness confer.)

12   Q    (By Mr. Summers)   CCL is a 501(c)(4) organization under

13         the IRS rules; correct?

14   A    Repeat the question.

15   Q    CCL is a 501(c)(4) organization under the IRS law; is

16         that correct?

17   A    Yes.

18   Q    What does CCL -- I understand your prior answer about

19         the CCL's activities with regard to electing officials,

20         my question was directed at what CCL has actually done

21         in the past to -- and say in the last few years, to

22         pursue that goal?

23   A    What goal?

24   Q    The goal of electing honest and competent officials?

25   A    Nothing.

1   Q   Nothing.  You've --

2   A   Let me clarify, if what you mean by that is endorsement

3       of candidates or direct organized opposition of a

4       candidate, it hasn't done anything.

5   Q   What has it done?

6   A   It produces a voter guide, which can be viewed online,

7       which involves a questionnaire and a ranking of

8       candidates.

9   Q   And what years has it produced voter guides?

10  A   We began producing them in 2000 -- I don't remember

11      exactly when, but I --

12  Q   If it would help --

13  A   We've been producing them since the date that you

14      requested documents, January 1, 2004.

15  Q   Did you produce one in 2002?

16  A   We may have.

17              MR. SUMMERS:  I'd like to mark another

18          exhibit.

19          (Heath Deposition Exhibit Number 3 was marked for

20          identification.)

21  Q   (By Mr. Summers)  I'll show you what's been marked as

22      Exhibit 3, a document dated 2002 and entitled voter's

23      guide.  Do you recognize this?

24  A   Yes.

25  Q   As the CCL's 2002 voter's guide?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What's the purpose of the voter's guide? |
| 3 | A | To inform our -- well, to inform the public. |
| 4 | Q | I'll direct your attention to Page Number 5 of the |
| 5 | | voter's guide. At the top of Page 5, there is a |
| 6 | | listing of several federal candidates; correct? |
| 7 | A | Uh-huh. |
| 8 | Q | And then over -- and that includes Senator Susan |
| 9 | | Collins; correct? |
| 10 | A | Yes. |
| 11 | Q | Then over on the right side of the page, there are |
| 12 | | what's described as CCL ratings; correct? |
| 13 | A | Yes. |
| 14 | Q | Can you explain those? |
| 15 | A | Page 4, halfway down the page, how we rated the |
| 16 | | candidates. Christian Civic League board of directors |
| 17 | | rated candidates according to their comments and |
| 18 | | answers to the questionnaire. Our policy statement was |
| 19 | | used as a standard to grade the stands of each |
| 20 | | candidate. Each candidate running in the November |
| 21 | | election was sent a questionnaire, and every effort was |
| 22 | | made to assure the candidates received questionnaires |
| 23 | | and had ample opportunity to respond. Followup |
| 24 | | telephone calls were made when possible. And the |
| 25 | | rating of A through F is shown here. |

| | | |
|---|---|---|
| 1 | Q | So what's on Page 4 is an accurate description of how |
| 2 | | the rating process works in the voter guides for CCL? |
| 3 | A | Uh-huh. |
| 4 | Q | And is that also how it worked in -- for the -- well, |
| 5 | | strike that. Did you also create a voter guide in |
| 6 | | 2004? |
| 7 | A | Yes. |
| 8 | Q | Was the same rating system used in 2004? |
| 9 | A | Yes. |
| 10 | Q | Did you also create a voter guide in 2000? |
| 11 | A | 2000, I don't remember. |
| 12 | Q | Do you remember any prior years, whether a guide was |
| 13 | | created in years prior to 2000? |
| 14 | A | None were -- none were created. |
| 15 | Q | You're sure that none were created prior to 2000? |
| 16 | A | Not during my -- not while I was executive director. |
| 17 | Q | Was there a printed version of the 2004 voter's guide? |
| 18 | A | I don't remember. |
| 19 | Q | Is the 2004 voter's guide available on your web site? |
| 20 | A | Yes. |
| 21 | Q | Were any federal candidates rated in the 2004 voter's |
| 22 | | guide? |
| 23 | A | I don't remember. |
| 24 | Q | Okay. |
| 25 | | MR. SUMMERS:  We would request a copy of the |

1       2004 voter's guide if one can be created in hard copy.

2               MR. BOPP:  If you -- the way we need to

3       handle this is not to ask it during the deposition, but

4       if you just make a list, give us a list in writing, and

5       we will do -- we will produce those as promptly as we

6       can, assuming they're not objectionable.

7               MS. SEALANDER:  Is it all right if we make a

8       list on a piece of paper here today and hand it to you

9       on your way out the door?

10              MR. BOPP:  Anything that's in writing, I'll

11      be happy to respond to.

12              MS. SEALANDER:  Handwriting, however -- all

13      right.

14              MR. BOPP:  I trust I can read your writing, I

15      don't know about Harry's, but --

16              MS. SEALANDER:  I will make the list.

17              MR. SUMMERS:  Maybe you've been able to see

18      some of my writing here.

19   Q  (By Mr. Summers)  Was the 2002 voter -- strike that.

20      Where was the 2002 voter's guide distributed?

21   A  Online.  And beyond that, I don't remember.

22   Q  Was there a hard copy version of the 2004 voter's

23      guide?

24   A  I don't remember.

25   Q  Did CCL do anything beyond putting the 2002 voter's

21

```
 1         guide on its web site to transmit the 2002 voter's

 2         guide to persons outside of CCL?

 3    A    No.

 4    Q    Did CCL do anything beyond what you've described to

 5         make persons outside of CCL aware that 2002 voter's

 6         guide was available on the web site?

 7    A    We mentioned it in publications.

 8    Q    Which publications?

 9    A    The email which was then called the issues summary

10         would have mentioned it.

11    Q    How often does that -- how often did that email -- how

12         often was that email sent?

13    A    Daily.

14    Q    So roughly how many emails mentioned the 2002 voter's

15         guide?

16    A    I don't know.

17    Q    Were the emails mentioning it sent prior to the --

18         prior to the November, 2002, elections?

19    A    Yes.

20    Q    Is there any other way in which the availability of the

21         2002 voter's guide was made known to those outside CCL,

22         other than the emails you've described?

23    A    We may have sent a press release to the media

24         indicating that we produced a voter's guide.

25    Q    Did you -- did CCL mention that the 2002 voter's guide
```

1          existed in any print publications?

2    A     We probably mentioned it in a item -- in a printed

3          publication called The Record.

4    Q     Please describe The Record?

5    A     It's a four page newsletter that is sent to our

6          supporters.

7    Q     How often was that sent in 2002?

8    A     It was -- it changed over the years in frequency, it

9          was either monthly at that time or every other month.

10   Q     Can you think of any other ways in which CCL made those

11         outside of CCL aware of the 2002 voter's guide?

12   A     No.

13   Q     Did CCL use the same methods you've described for the

14         2002 voter's guide in making people aware of the 2004

15         voter's guide being available on CCL's web site?

16   A     Yes.

17   Q     In 2002, did CCL encourage people outside of CCL to

18         print and distribute the voter's guide from the web

19         site?

20   A     Yes.

21   Q     And did that occur in 2004 also?

22   A     Yes.

23   Q     Did CCL encourage people to print and distribute the

24         voter guides through the same methods that it made

25         persons outside CCL aware that they existed through the

1          same media?

2     A    Repeat the question.

3     Q    Did CCL encourage people to print and distribute the

4          2002 and 2004 voter's guides through the same media

5          that you've said it used to make people aware that the

6          voter's guides existed on its web site?

7     A    Yes.

8     Q    Can you think of any other ways in which CCL made

9          people outside of CCL aware of the existence of the

10         voter's guides in 2002 and 2004?

11    A    No.

12    Q    Okay.  You've mentioned -- you've described how CCL is

13         considering becoming more active in working to elect

14         good candidates; correct?

15    A    Yes.

16    Q    Does it plan to endorse candidates in the future?

17    A    No.

18    Q    How does it plan to become more active in working to

19         elect good candidates?

20    A    The CCL?

21    Q    Yes.

22    A    It doesn't, if what you mean by the question is

23         endorsement.

24    Q    How does CCL plan to become more active in working to

25         elect good candidates other than endorsement?

1    A    Repeat the question.

2    Q    How does CCL plan to become more active in pursuing its

3         purpose of working to elect good candidates other than

4         endorsement?

5    A    It doesn't have any other plans.

6    Q    What is it considering doing in order to become more

7         active in that area?

8    A    Nothing beyond what I've indicated with respect to the

9         voter's guide.

10   Q    You described earlier that CCL was, and correct me if

11        I'm not getting it right, CCL was reviewing the current

12        requirements for organizations engaged in political

13        activity.  Can you explain a little more what the

14        purpose of that -- of that review is if you are not

15        considering becoming more active in pursuing the goal

16        of electing good candidates?

17   A    Can you repeat or rephrase the question?  I'm not sure

18        I understand it.

19   Q    What is the purpose of CCL's review of current

20        requirements about political activity that you've

21        described?

22   A    To practice good citizenship and maintain its

23        operations within the parameters of the law and

24        regulations related to our activities.

25   Q    Has CCL ever stated that it is considering endorsing

```
 1        state and local candidates in the future?
 2    A   We may have indicated such a thing in relationship to
 3        the formation of the political action committee of the
 4        Christian Civic League, which is the Christian Action
 5        League.
 6    Q   Has CCL ever stated that it is considering endorsing
 7        federal candidates including in connection with the
 8        political action committee that you mentioned?
 9    A   No.
10    Q   And I take it there are no plans to endorse federal
11        candidates by CCL?
12    A   None, no.
13    Q   CCL has a worldwide web site; correct?
14    A   Yes.
15    Q   And is the address www.cclmaine.org?
16    A   It is.
17    Q   And the statements on that site are statements of CCL;
18        right?
19    A   Yes.
20    Q   Please describe generally what activities CCL does to
21        achieve its purposes?
22    A   Repeat the question.
23    Q   Please describe generally what activities CCL does to
24        achieve its purposes?
25        (Mr. Bopp and the witness confer.)
```

```
 1              THE WITNESS:  Repeat it.

 2   Q    (By Mr. Summers)  What does CCL do, day to day, what

 3        does CCL do?

 4   A    CCL exists to enact good laws and provide for their

 5        impartial enforcement.

 6   Q    I understand the purposes of CCL, you've described, but

 7        what does it actually do, what does the staff of CCL do

 8        day to day in order to pursue those purposes?

 9   A    They come to work.  They review daily newspapers.  They

10        receive and track contributions.  They write opinion

11        and commentary.  The staff is responsive to my leading

12        which is responsive to the board's direction.

13   Q    Anything else?

14   A    No.

15   Q    How does CCL communicate with the public?

16   A    Through its web site.  Through its newspaper.  Through

17        media interviews.

18   Q    Does it also communicate through email?

19   A    Yes.

20   Q    How often does it -- please describe how it does that?

21   A    It has an online email -- it has an email that it

22        produces three times a week called The Record.

23   Q    Is that the same Record as is also created as a print

24        publication?

25   A    Different -- same name, different publication.
```

| | | |
|---|---|---|
| 1 | Q | Is there any content in common? |
| 2 | A | Yes. |
| 3 | Q | How much is in common? |
| 4 | A | We started the newspaper three months ago.  What was |
| 5 | | the -- percentage, is that what you said? |
| 6 | Q | Yes. |
| 7 | A | Less than 20 percent. |
| 8 | Q | How often is the print version distributed? |
| 9 | A | Monthly. |
| 10 | Q | How many people is it currently distributed to, the |
| 11 | | print version? |
| 12 | A | 5,000. |
| 13 | Q | And how many -- how many recipients are there of the |
| 14 | | email version of The Record? |
| 15 | A | 3,000. |
| 16 | Q | Does CCL have a radio program? |
| 17 | A | No. |
| 18 | Q | Does CCL prepare any audio commentary for distribution? |
| 19 | A | No. |
| 20 | Q | Do you prepare any audio commentary for distribution? |
| 21 | A | Yes. |
| 22 | Q | Please describe that? |
| 23 | A | I produce a daily two minute commentary program called |
| 24 | | Faith Matters in Maine for the CEL, Christian Education |
| 25 | | League. |

| | | |
|---|---|---|
| 1 | Q | And what -- what is the basic content of that |
| 2 | | commentary? |
| 3 | A | It addresses political, cultural, moral issues and |
| 4 | | occasionally discusses candidates or politicians, |
| 5 | | elected officials and their positions on issues. |
| 6 | Q | I believe you mentioned that CCL speaks with media; |
| 7 | | correct? |
| 8 | A | Yes. |
| 9 | Q | Does CCL appear in press articles? |
| 10 | A | Yes. |
| 11 | Q | Are you quoted in press articles? |
| 12 | A | Yes. |
| 13 | Q | Does that happen often? |
| 14 | A | Yes. |
| 15 | Q | Have you published columns in newspapers? |
| 16 | A | Yes. |
| 17 | Q | How many columns have you published in newspapers since |
| 18 | | the beginning of 2004? |
| 19 | A | A dozen. |
| 20 | Q | Has CCL run radio or TV ads? |
| 21 | A | Has -- I can't speak for all the way back to the |
| 22 | | beginning of radio and television, but in my tenure, |
| 23 | | yes. |
| 24 | Q | Please describe those in your tenure? |
| 25 | A | We've advertised on Christian radio stations for |

1    events, banquets that we have annually.

2        We've not done any television advertising.

3   Q   Have there been any other radio ads other than the ones

4       you've described by CCL?

5   A   Right.  Not that I remember.

6   Q   Has the Christian Education League placed any radio or

7       TV ads during your tenure?

8   A   No.

9   Q   Okay.  Has CCL published advertisements in newspapers

10      other than its own newspaper?

11  A   I -- print advertisements.

12  Q   When I say advertisement, I include things that discuss

13      policy or political matters -- same question.

14  A   Oh, so --

15  Q   So the question is has CCL placed any advertisements in

16      newspapers other than its own newspaper?

17  A   No.

18  Q   Has it placed any advertisements on web sites other

19      than its own web site?

20  A   I don't -- I don't think so.

21  Q   Who would know?

22  A   The question again was has it placed -- repeat the

23      question.

24  Q   Has it placed any advertisements on web sites other

25      than its own web site?

1    A    No.

2    Q    Has it distributed written materials other than The

3         Record that you've described?

4    A    Yes.

5    Q    Please describe those?

6    A    Books on various subjects related to the mission of the

7         League.  Fliers.  Publications related to various

8         events and issues.

9    Q    In what physical form -- what physical form have those

10        materials taken, brochures?

11   A    Brochures, books, magazines.

12   Q    Any others?

13   A    Well, electronic -- electronic media, emails, pdf

14        documents that people can download off the web site.

15   Q    Anything else?

16   A    No.

17   Q    Has CCL used phone banks in your tenure?

18   A    No.

19   Q    Has it used billboards in your tenure?

20   A    Well, that would get me in jail since they're illegal

21        in Maine.  No.

22   Q    Have CCL representatives appeared on television or

23        radio shows?

24   A    Who?

25   Q    Have representatives of CCL appeared on television or

```
 1        radio shows?

 2    A   Yes.

 3    Q   Please describe those appearances?

 4    A   We have a lobbyist who is interviewed regularly.   I'm

 5        interviewed regularly by radio and television stations

 6        on issues.

 7    Q   What is the lobbyist's name?

 8    A   Tim Russell.

 9    Q   How often do you appear on television or radio shows?

10    A   How often, I've done hundreds of media interviews of

11        various kinds.

12    Q   And Mr. Russell?

13    A   He's been with us two years, he has done -- probably

14        he's done hundreds, I've done thousands by this time.

15    Q   Is that -- have you appeared on national television and

16        radio shows?

17    A   Yes.

18    Q   And also on local television radio shows?

19    A   Yes.

20    Q   Has Mr. Russell appeared on national television or

21        radio shows?

22    A   Yes.

23    Q   And he's appeared on local television radio shows I

24        take it?

25    A   Yes.
```

| 1 | Q | Has any other representative of CCL appeared on |
| 2 | | television or radio shows in your tenure? |
| 3 | A | Yes. |
| 4 | Q | Who is that? |
| 5 | A | The president of our board, Dallas Henry. |
| 6 | Q | Anyone else? |
| 7 | A | No. |
| 8 | Q | CCL does create advertisements as I've described to |
| 9 | | communicate its policy views to the public; correct? |
| 10 | A | Clarify what you mean by advertisements. |
| 11 | Q | CCL creates public communications to tell the public |
| 12 | | what it thinks about policy issues; correct? |
| 13 | A | Yes. |
| 14 | Q | Who creates those advertisements? |
| 15 | A | I do.  And I have staff who work on those -- |
| 16 | Q | Which staff? |
| 17 | A | -- items. |
| 18 | Q | Sorry. |
| 19 | A | That's it. |
| 20 | Q | Which staff work on those now? |
| 21 | A | I have a gentleman named Fritz Spencer on my staff who |
| 22 | | does writing.  I have a young lady named Leslie Gower |
| 23 | | who works on graphics.  And occasionally, we work with |
| 24 | | a firm outside of the Christian Civic League on various |
| 25 | | things. |

| 1 | Q | What's the name of that firm? |
| 2 | A | Design 4 Marketing. |
| 3 | Q | Where are they located? |
| 4 | A | Florida. |
| 5 | Q | Which city in Florida? |
| 6 | A | Tampa. |
| 7 | Q | And could you spell the surnames of the two people |
| 8 | | you've named for the court reporter? |
| 9 | A | The surname, you mean -- |
| 10 | Q | The last name?  Fritz and -- |
| 11 | A | Fritz Spencer and Leslie Gower, G-O-W-E-R. |
| 12 | Q | And is that Spencer with a C or an S? |
| 13 | A | C. |
| 14 | Q | Does anyone else work on CCL's ads? |
| 15 | A | No. |
| 16 | Q | When did CCL become aware that a federal constitutional |
| 17 | | amendment about marriage was under consideration in |
| 18 | | Congress? |
| 19 | A | Years ago. |
| 20 | Q | Do you recall which year? |
| 21 | A | No. |
| 22 | Q | Could it have been in 2004? |
| 23 | A | Congress, yes. |
| 24 | Q | Could it have been later than 2004? |
| 25 | A | No. |

| 1 | Q | Could it have been earlier than 2004? |
| 2 | A | I don't know. |
| 3 | Q | CCL has spoken publicly about such a proposed |
| 4 | | amendment; correct? |
| 5 | A | Yes. |
| 6 | Q | Did it do so in 2004? |
| 7 | A | Yes. |
| 8 | Q | Okay.  In those public communications -- strike that. |
| 9 | | Would you describe those public communications in 2004 |
| 10 | | as grass roots lobbying? |
| 11 | A | Yes. |
| 12 | Q | Who at CCL made the decision to do that activity in |
| 13 | | 2004? |
| 14 | A | Me. |
| 15 | Q | All right.  I'd like to explore some of the ways in |
| 16 | | which CCL has communicated on that issue since 2004. |
| 17 | | Has CCL used the internet to communicate about that |
| 18 | | issue since 2004? |
| 19 | A | Yes. |
| 20 | Q | Can you briefly describe those efforts using the |
| 21 | | internet? |
| 22 | A | We've written about the federal marriage amendment in |
| 23 | | The Record that I mentioned before.  And I believe -- |
| 24 | | and in 2004, there was an effort to influence our |
| 25 | | senators on this -- on the federal marriage amendment. |

| 1 | Q | Can you describe that effort in more detail? |
| 2 | A | We designed a church bulletin insert, and we had a |
| 3 | | young lady make phone calls and encourage citizens to |
| 4 | | contact our senators and urge them to support the |
| 5 | | federal marriage amendment. |
| 6 | Q | The -- how was the church insert distributed? |
| 7 | A | We mailed copies if they were requested, and we made |
| 8 | | them available as printouts off of our web site. |
| 9 | Q | How many were distributed by CCL? |
| 10 | A | Yeah, I -- I have no idea.  I don't know. |
| 11 | Q | How many calls did the young lady you've described make |
| 12 | | in 2004? |
| 13 | A | I don't know. |
| 14 | Q | Can you think of any other ways in which CCL |
| 15 | | communicated its view in 2004 on that issue? |
| 16 | A | No. |
| 17 | Q | Did CCL organize public protests about the issue, by |
| 18 | | which I mean encouraging people to gather together |
| 19 | | physically to express a view about the federal marriage |
| 20 | | amendment? |
| 21 | A | I don't remember. |
| 22 | Q | Did CCL distribute brochures other than the church |
| 23 | | inserts that you've mentioned in 2004 about the issue? |
| 24 | A | Not that I recall. |
| 25 | Q | Okay. |

```
 1                      MR. SUMMERS:  I'd like to mark another
 2          exhibit.  Off the record.
 3          (Recess at 10:56 a.m., to 11:03 a.m., after which the
 4          following proceedings transpired.)
 5                      MR. SUMMERS:  I'd like to have another
 6          exhibit marked.
 7          (Heath Deposition Exhibit Number 4 was marked for
 8          identification.)
 9    Q     (By Mr. Summers)  Show you what's been marked as
10          Exhibit 4, which appears to be a copy of a March 1,
11          2004, column called Coalition for Marriage, which says
12          it was published in the Portland Press Herald on that
13          date.  Do you recognize this column?
14    A     Yes.
15    Q     Is that a column that you wrote?
16    A     Yes.
17    Q     Was it published in that newspaper on that date?
18    A     Yes.
19    Q     Do you think that this column was effective in
20          conveying CCL's message about the issue of gay
21          marriage?
22    A     Yes.
23    Q     Can you recall any other columns that you -- that CCL
24          published in the print press in 2004 about the gay
25          marriage issue?
```

1    A    No.

2    Q    Were any CCL personnel quoted in news pieces in 2004 on

3         the gay marriage issue?

4    A    Yes.

5    Q    Can you describe that?

6    A    I'm sure that I was quoted and probably Tim Russell was

7         quoted.

8    Q    How many press pieces would you say you and Tim Russell

9         were quoted in in 2004 on that issue?

10   A    I have -- I don't know.

11   Q    Was it more than 10?

12   A    Yes.

13   Q    More than 50?

14   A    I don't know.

15   Q    Okay.

16             MR. SUMMERS:   I'd like to mark another

17        exhibit.

18        (Heath Deposition Exhibit Number 5 was marked for

19        identification.)

20   Q    (By Mr. Summers)   Please review what's been marked as

21        Exhibit Number 5, which is a reprint of an article

22        dated July 13, 2004, from the Portland Press Herald.

23             Please turn to the second page and find the

24        paragraph which begins executive director Michael

25        Heath, which is in the bottom half.  And please review

```
 1          that paragraph and the following two paragraphs.

 2              Are those three paragraphs an accurate account of

 3          what CCL and its members were doing at that time with

 4          regard to the federal marriage -- excuse me, federal

 5          marriage amendment?

 6   A      Yes.

 7   Q      Did you speak with the reporter of -- who wrote this

 8          article --

 9   A      Yes.

10   Q      -- on this issue?  In the article, you're quoted as

11          saying that your members have been calling and emailing

12          their senators; correct?

13   A      Yes.

14   Q      How did CCL get its members to do that?

15   A      We assigned a full-time staffer to make phone calls and

16          provide bulletin -- church bulletin inserts to churches

17          that were responsive.

18   Q      So it used the methods that you described earlier?

19   A      Yes.

20   Q      Did it use any other methods to encourage supporters to

21          contact the senators?

22   A      No.

23   Q      Were those effective ways of achieving your goals?

24   A      Yes.

25   Q      The article also says that you wrote a column that
```

1      appeared in this same paper the preceding week which

2      would have still been in July; correct?

3  A   Yeah.  Yes.

4  Q   Is it correct that that column was published the

5      preceding week before this article, or is it the one

6      from March that I believe we've marked as Exhibit 4?

7  A   I don't remember.

8  Q   It's possible there was more than one column?

9  A   It's possible.

10  Q   Okay.  Did any CCL representative appear on any radio

11      or TV shows in 2004 on this issue?

12  A   I don't remember.

13  Q   Did CCL place any print advertisements or

14      communications on this issue in 2004?

15  A   No.

16               MR. SUMMERS:  I'd like to mark another

17      exhibit.

18      (Heath Deposition Exhibit Number 6 was marked for

19      identification.)

20  Q   (By Mr. Summers)  Please review what's been marked as

21      Exhibit 6, which is an undated one page document with

22      the heading, A Politician Fears Man?

23  A   Yes.  We published this, and I had forgotten about it.

24  Q   Where was this published?

25  A   I believe it was published in the Kennebec Journal,

```
 1        which is a daily newspaper in Augusta.

 2   Q    Anywhere else that you can recall?

 3   A    No.

 4   Q    When was it published?

 5   A    I don't remember.

 6   Q    Do you think it was in 2004?

 7   A    I do.

 8   Q    What was the purpose of the advertisement?

 9   A    To support marriage and to point people to our online

10        voter's guide.

11   Q    And what's the link between supporting marriage and

12        pointing them to the online voter's guide?

13   A    In general, it's -- it was political.  The ad was

14        political, and the ad must -- I don't know exactly when

15        it ran, but it must have run prior to the election, and

16        so we decided to include mention of our voter's guide.

17   Q    In 2004?  The election in 2004?

18   A    As I said, I think so, but I can't remember.

19   Q    Okay.  Is it that you wanted voters to bear in mind

20        your position on this issue when they were voting?

21   A    Yes.

22   Q    And part of that would have been the information listed

23        in the voter's guide about different candidates and

24        their positions on this issue?

25   A    Yes.
```

1  Q  Who created this ad?

2  A  This ad was created by Design 4.

3  Q  And that's the firm in Florida that you mentioned

4     earlier?

5  A  Yes.

6  Q  Do you think this ad was effective in conveying CCL's

7     position on this issue?

8  A  Yes.

9  Q  Did CCL use direct mail in 2004 other than the church

10    inserts that you've described on this issue?

11 A  We may have mailed our membership -- mailed our

12    supporters and our membership.

13 Q  Roughly what was the size of your membership in 2004?

14 A  2,500.

15 Q  And what roughly is the size of your membership today?

16 A  Same.

17 Q  And was it the same in 2005?

18 A  And I'm -- we -- membership -- we define membership so

19    that actual membership is 300.  Around 300,

20    approximately, 300 members of CCL.

21 Q  You say you've designed it, can you explain what that

22    means?

23 A  Well, a member.  We have approximately 300 members.

24 Q  And the other people --

25 A  Are supporters.

```
 1   Q   Supporters.  How do you define a member for CCL?

 2   A   A member pays annual dues and signs a form that we

 3       provide to them.  We maintain the form in our files.

 4       They only have to sign it once.  And then they have to

 5       pay their dues annually.

 6   Q   Just generally, what does the form involve?

 7   A   It's a doctrinal statement, a religious doctrinal

 8       statement.

 9   Q   And how are the supporters -- the supporters don't sign

10       that form?

11   A   That is correct.

12   Q   That is, the people who are not members?  But they are

13       people who have given money to the organization?

14   A   Maybe.  Some have, some haven't.

15   Q   Okay.  Are some of the members -- strike that.  What

16       types of entities are your members, individuals,

17       churches?

18   A   Individuals and churches.

19   Q   Any other types?

20   A   Not that we identify, not that we keep track of.

21   Q   So it's possible there's another type?

22   A   Well, it's not possible there's another type that we

23       keep track of.

24   Q   But if you're not sure -- if you're not sure that it's

25       only individuals and churches, isn't it possible
```

```
 1          there's some other type of member such as another

 2          501(c)(4) organization?

 3   A      Yes, but we wouldn't recognize them in membership as

 4          another (c)(4) organization, we would recognize -- they

 5          would come in as an individual member or a family

 6          member or a church member.  There's no business member.

 7          There's no 501(c)(4) member.

 8   Q      How does someone get on your list of supporters, the

 9          larger list?

10   A      Variety of ways.  They have involved themselves in a

11          campaign perhaps.  They have indicated to me personally

12          that they would like to be on our mailing list.

13                 They have indicated such to a board member.  They

14          have been on the list for -- two -- I think it's two

15          years.

16                 Actually, let me correct that.  The number I gave

17          you, which is 2,500, references only those who have

18          given any money in the last two years and have made a

19          donation in the last two years.  We have a much larger

20          list that we don't use that we never mail to, but we

21          maintain those names and addresses.

22   Q      What do you do with the larger list?

23   A      Nothing.  It sits there.

24   Q      Do you have a sense of how large that list is?

25   A      8,000, approximately.
```

1   Q   And to get on that list, what are the likely ways other

2       than the ones you've described?

3   A   Well, they indicated some interest in our mission or

4       were entered for the reasons I've mentioned.  And then

5       they become part of the group, the inactive group above

6       2,500 by not contributing, by not making a contribution

7       for two years.

8   Q   But it's only the medium size list of roughly 2,500

9       that receives the mailings; correct?

10  A   Yes.

11  Q   So why do you maintain the larger list?

12  A   We may decide to use it at some point.  We may decide

13      to communicate with that list.

14  Q   Has CCL run any radio or TV ads about the federal

15      marriage amendment from 2004 until today?

16  A   Not that I recall.

17  Q   Okay.  Can you think of any other ways that CCL has

18      spoken publicly about the federal marriage amendment

19      from 2004 until today other than what we've discussed?

20  A   No.

21  Q   Okay.

22              MR. SUMMERS:  I'd like to mark another

23      exhibit.

24      (Heath Deposition Exhibit Number 7 was marked for

25      identification.)

| 1 | Q | (By Mr. Summers)  I'll show you what's been marked as |
| 2 | | Exhibit 7, which is the complaint in this lawsuit, |
| 3 | | which it says was verified by you on March 28, 2006. |
| 4 | | And you -- if you'd turn to Paragraph 11, please, |
| 5 | | which I believe is on Page 3.  That paragraph says that |
| 6 | | CCL plans to run the radio ad that's attached as |
| 7 | | Exhibit A to the complaint; is that correct? |
| 8 | A | Yes. |
| 9 | Q | And that ad is called Crossroads; correct? |
| 10 | A | Yes. |
| 11 | Q | Is it still CCL's plan today to run that radio ad? |
| 12 | A | Yes. |
| 13 | Q | When did CCL decide to run a broadcast ad about the |
| 14 | | federal marriage amendment this year? |
| 15 | A | We decided to run the ad a couple of weeks ago. |
| 16 | Q | Who first had the idea for CCL to run such an ad? |
| 17 | A | We were contacted by the organization that we associate |
| 18 | | with called Focus on the Family, Colorado Springs, |
| 19 | | Colorado. |
| 20 | | And the -- it was suggested that this would be an |
| 21 | | appropriate grass roots lobbying, appropriate and |
| 22 | | effective grass roots lobbying effort.  I agreed.  And |
| 23 | | I communicated my agreement with them. |
| 24 | Q | Who at Focus on the Family did you communicate with |
| 25 | | about it? |

1    A    I believe it was John Paulton.

2    Q    Could you spell that last name?

3    A    P-A-U-L-T-O-N.

4    Q    Did you talk to anybody else at Focus on the Family

5         about it?

6    A    No.

7    Q    So Focus on the Family sent the text of the ad to CCL a

8         couple weeks ago?

9    A    No.  The Focus on the Family developed the text of the

10        ad after learning of my agreement or learning of my --

11        after I responded to them.

12   Q    So when they first contacted you, what did they

13        communicate?

14   A    They communicated that this would be an appropriate

15        grass roots lobbying activity.

16   Q    And then you indicated your agreement, and then at some

17        later point, they sent back the ad text, proposed ad

18        text?

19   A    Yes.

20   Q    I see.  Do you know who drafted that text?

21   A    I don't.

22   Q    Okay.  Do you know who was involved in drafting it?

23   A    I don't.

24   Q    Can you explain what you mean by appropriate grass

25        roots lobbying effort?

1  A  Well, the federal marriage amendment is due to be voted

2     in July, and -- in Congress.  And it is appropriate to,

3     given the stand of Senators Snowe and Collins, for

4     citizens to be advised of that fact, and to be urged to

5     contact Senators Snowe and Collins, and urge them to

6     vote in the affirmative for the federal marriage

7     amendment.  And that should happen -- that should start

8     happening soon and continue into July or toward July or

9     toward the vote.

10 Q  Why does it have to start soon?

11 A  Well, because these things take -- campaigns take time

12    to work their way through the grass roots networks, and

13    so it's good to get people thinking about, talking

14    about, and contacting political figures like Senators

15    Snowe and Collins as they're moving toward the vote.

16 Q  So when you say appropriate, what does that -- what

17    does that include?

18 A  Can you --

19 Q  What is the ad trying to do?

20 A  It is encouraging the listener to contact their

21    senator.

22 Q  Does it have any other purpose?

23 A  No.

24 Q  Do you know where Focus on the Family got the idea for

25    these ads?

```
 1    A    No.

 2    Q    Do you know if they're sending them to other states for

 3         use in other states?

 4    A    I don't know.

 5    Q    Do you know if they've sent them for use by other

 6         groups in Maine?

 7    A    I don't know.

 8    Q    In your discussion with Focus on the Family about this

 9         ad, did you discuss the -- did you discuss campaign

10         finance regulation?

11    A    Can you rephrase the question?

12    Q    In your discussion with Focus on the Family about this

13         ad, was there any discussion of campaign finance

14         regulation?

15    A    Can you be more specific about campaign finance

16         regulation?

17    Q    Yes.  Was there any discussion of the electioneering

18         communication regulation and federal law?

19    A    Yes.

20    Q    Can you describe that?

21    A    That it's -- that this is prohibited speech or prior --

22         within a certain window before an election, and Maine's

23         primary is in June, early June.  And so our desire to

24         run the ad consistent -- in -- to run the ad at a time

25         that makes sense in order to influence Senators Snowe
```

```
 1            and Collins with respect to a pending vote scheduled

 2            for July is interfered with by the -- by the blockout

 3            period 30 days prior to June.  So that was -- that was

 4            presented by Focus in good faith indicating that this

 5            is the way it is.

 6    Q       So Focus brought you the idea, and in bringing you the

 7            idea, they also mentioned there was this legal issue as

 8            well?

 9    A       Yes.

10    Q       So that's something that came from them?

11    A       Yes.

12    Q       So they suggested that you run the ad even though there

13            was this legal issue?

14    A       Yes.  No.  I mean they didn't encourage us to do

15            something illegal, they advised -- they advised us of

16            the law.  And they said that the -- and they suggested

17            that the grass roots advertising would be helpful in

18            influencing senators.

19    Q       Did they suggest any way that you could run the ad

20            during the period you've described and not face a legal

21            problem?

22    A       They -- they said that we should contact them if we

23            want to run the ad.  And then we were -- we were put in

24            touch with counsel who is counsel for Focus on the

25            Family and for us.  And here we are.
```

```
 1   Q   Can you think of anything else that Focus on the Family
 2       told you during those discussions about running the ad?
 3   A   No.
 4   Q   Just to finish up this topic, did they -- did Focus on
 5       the Family offer you any funding to assist with running
 6       the ad?
 7   A   No.
 8   Q   Did they offer you any other kind of assistance other
 9       than supplying a text for the ad?
10   A   No.
11   Q   You mentioned that they offered to put you in touch
12       with counsel?
13   A   Uh-huh.
14   Q   Correct?
15   A   Uh-huh.
16   Q   Can you think of any other -- were there any other
17       names they gave you of persons who might be of
18       assistance in connection with running the ad?
19   A   Can you rephrase the question?
20   Q   Did they offer to put you in touch with anyone else
21       other than counsel with regard to the ad?
22   A   No.
23   Q   Did they offer you a list of potential funders of the
24       ad?
25   A   No.
```

51

```
 1   Q   Did they offer you any assistance in producing the ad?

 2   A   They researched the buy, the schedule.

 3   Q   The buy here in Maine?

 4   A   Yes.

 5   Q   And what -- can you describe more about that research?

 6   A   I have not seen the detail.  The buy is planned for

 7       radio stations in Portland and Augusta.  And we

 8       don't -- we haven't decided on a final cost for the

 9       buy, but they have produced some -- they've produced

10       some information related to overall costs, but I have

11       not had an opportunity to review it.

12   Q   But you have that information?

13   A   I don't have it here.

14   Q   I understand.  But CCL has that information?

15   A   I don't know if we have it in our offices yet.  I don't

16       know.

17   Q   But Focus on the Family has indicated that they will

18       provide it?

19   A   Yes.

20   Q   But the money to run the ad is planned to come solely

21       from CCL?

22   A   Yes.

23   Q   Has the actual recording of the ad been created?

24   A   No.

25   Q   Do you have specific plans to create it?
```

| | | |
|---|---|---|
| 1 | A | We have not gotten to the point of making those plans. |
| 2 | Q | How much money has CCL spent so far on the ad? |
| 3 | A | Nothing. |
| 4 | Q | Nothing.  The complaint in Paragraph 11 describes a |
| 5 | | specific period that CCL plans to run the Crossroads |
| 6 | | ad, and I believe it indicates that CCL plans to start |
| 7 | | running the ad on May 10; is that correct? |
| 8 | A | Uh-huh. |
| 9 | Q | Why start running the ad on May 10, if the vote may not |
| 10 | | be until you said July? |
| 11 | A | Uh-huh. |
| 12 | Q | Why start running the ad on May 10? |
| 13 | A | Well, it's an appropriate time to start introducing the |
| 14 | | upcoming vote and to encourage our members and the |
| 15 | | public to contact Senators Snowe and Collins and take a |
| 16 | | position. |
| 17 | Q | Do you know how often the ad is planned to run on the |
| 18 | | two -- in the two markets that you described? |
| 19 | A | I don't. |
| 20 | Q | Do you know how many stations the ad is planned to run |
| 21 | | on in those two markets? |
| 22 | A | I don't. |
| 23 | Q | Are those decisions that you will make at a later time? |
| 24 | A | Yes. |
| 25 | Q | Will anyone else be involved in making those decisions? |

| | | |
|---|---|---|
| 1 | A | I'll be responsible for the decision, but I will |
| 2 | | consult with the board president perhaps.  Well, |
| 3 | | definitely, and -- at least him. |
| 4 | Q | Will you consult Focus on the Family? |
| 5 | A | I don't know. |
| 6 | Q | Will you consult anyone else? |
| 7 | A | No. |
| 8 | Q | So you haven't spoken -- CCL has not spoken with any |
| 9 | | radio stations yet about running the ad? |
| 10 | A | No. |
| 11 | Q | But the information about where the ad will run is |
| 12 | | coming from Focus on the Family? |
| 13 | A | The proposal is coming -- is coming from them. |
| 14 | Q | I understand.  Will CCL stop running the ad once the |
| 15 | | vote that is -- that may occur in Congress on the |
| 16 | | marriage amendment happens? |
| 17 | A | Yes.  But Congress does all kinds of things.  So you |
| 18 | | say the vote, the vote on what, so -- |
| 19 | Q | The vote referenced in the Crossroads ad? |
| 20 | A | Yes. |
| 21 | Q | If the vote is postponed, will CCL postpone running the |
| 22 | | ad? |
| 23 | A | I don't know. |
| 24 | Q | We're almost ready to break for lunch, so just one or |
| 25 | | two things. |

1        Do you know how much CCL plans to spend to

2    broadcast Crossroads?

3  A  No.

4  Q  Does CCL currently have the funds to do it?

5  A  No.  But we have -- I have one donor who has committed

6    the funds if -- they've committed the funds, but I

7    haven't decided whether I will go to that donor to

8    fulfill that commitment or not.

9  Q  The donor has pledged to cover whatever the cost is, or

10   is there a specific number?

11  A  Donor was unclear, but my interpretation of it is that

12   they would cover the entire buy, if necessary.

13  Q  Okay.

14  A  They may.

15  Q  Okay.

16        MR. SUMMERS:  I think that's all I have for

17    now, we can go to lunch.  Thank you.

18    (Recess at 11:40 a.m., to 1:30 p.m., after which the

19    following proceedings transpired.)

20  Q  (By Mr. Summers)  Mr. Heath, when we broke for lunch,

21    we were talking about the interactions that CCL has had

22    with Focus on the Family about the Crossroads ad.

23        Before we leave that topic, I want to make sure

24    I've heard everything about those interactions.  Maybe

25    the best way to do that is to start with the first

1      contact that you had with Mr. Paulton?

2  A   Uh-huh.

3  Q   And ask you to describe everything that was said in

4      that contact?

5  A   Uh-huh.  First let me say that I got something wrong in

6      the morning, and that was the expected time when the

7      Congress will take up the -- will vote on the -- I said

8      July.  And it's June.  And that was just a -- I just --

9      I wasn't thinking right.

10         So it's John -- it was -- came to me in the form

11      of an email that was a broadcast email to myself and

12      all my colleagues in the country who work at the state

13      level in organizations called Family Policy Councils.

14      And I was -- I responded to that email with an email

15      and said that I was -- said that I was interested.

16  Q   What did the initial email say?

17  A   Nothing different from what I indicated in the morning.

18      It discussed the upcoming vote and the suggestion that

19      advertising would be appropriate to encourage grass

20      roots activism, appropriate and helpful, but

21      nevertheless, barred during this window.  It mentioned

22      that as well.  And sought a response from Family Policy

23      Councils that were interested in doing such

24      advertising.

25  Q   How many recipients were there for that email?

```
 1   A   I don't know exactly, but in excess of 30.

 2   Q   And in various states?

 3   A   Yes.

 4   Q   Do you know if there are any others in Maine?

 5   A   There are not.

 6   Q   There are not.  And can you think of anything else that

 7       that email said?

 8   A   I can't.

 9   Q   And in your response, you said your response indicated

10       an interest, what else did you say in your response?

11   A   It was very short, I said I'm interested.

12   Q   What happened next?

13   A   We were -- we were in contact with John, and then

14       counsel became involved because of the aspect of the

15       email having to do with the blackout period.  And then

16       we proceeded toward the development of script and

17       research regarding the buy and began our plan, began

18       our planning.

19   Q   Did you then have a number of interactions with

20       Mr. Paulton?

21   A   No.

22   Q   How many would you say?

23   A   Just that original email, a response to that email, and

24       then I have a staff, and my -- they were involved.  And

25       we consulted with counsel, and we consulted with Focus,
```

```
 1        and leading up to.

 2   Q    Who else on your staff was involved in any dealing with

 3        Mr. Paulton?

 4   A    Nobody.

 5   Q    How were they involved in the process then?

 6   A    They got involved later as it -- as it became clear

 7        that we were going to have to -- as this process began

 8        related to the blackout period, producing documents,

 9        preparing documents, getting that material together.

10   Q    What else did Mr. Paulton tell you about the

11        electioneering communications period that you've

12        described?

13   A    Nothing.

14   Q    All he said was this is a problem?

15   A    I never spoke with him orally.  I -- just email.

16   Q    Right.  What did he tell you in any form about --

17   A    Just the email, just that original email.

18   Q    Did he mention that there might be a court case about

19        it?

20   A    I don't remember if that was contained in the email or

21        not.

22   Q    Did he say that at any point?  Did he tell you that at

23        any point?

24   A    No.

25   Q    By email or otherwise?
```

| 1 | A | I don't know. |
| 2 | Q | So you only had communications with Mr. Paulton on this |
| 3 | | issue by email? |
| 4 | A | In the initial phase, yes. |
| 5 | Q | Well, when did the initial phase end and a later phase |
| 6 | | begin? |
| 7 | A | We received the email.  I responded to the email in the |
| 8 | | affirmative.  I don't remember how many days lapsed, |
| 9 | | but then I spoke with counsel in reference to the |
| 10 | | blackout aspect of the original email. |
| 11 | | And then script development was ongoing at Focus. |
| 12 | | This of course happened in the last two weeks, I |
| 13 | | believe.  And that -- and shortly after that staff |
| 14 | | became involved. |
| 15 | Q | So in that later phase, did you speak orally with |
| 16 | | Mr. Paulton? |
| 17 | A | No. |
| 18 | Q | Still only by email? |
| 19 | A | I had no further need for correspondence with |
| 20 | | Mr. Paulton. |
| 21 | Q | So after -- after you replied by email expressing |
| 22 | | interest? |
| 23 | A | Uh-huh. |
| 24 | Q | You're saying you had no further correspondence with |
| 25 | | Mr. Paulton? |

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Did Mr. Paulton communicate with anyone else at CCL? |
| 3 | A | I don't know. |
| 4 | Q | But at some point a text of the Crossroads ad arrived |
| 5 | | at CCL? |
| 6 | A | Uh-huh. |
| 7 | Q | Do you remember when that was? |
| 8 | A | I don't remember exactly. |
| 9 | Q | Do you remember from whom that text came? |
| 10 | A | I don't know. |
| 11 | Q | But it was someone at Focus on the Family? |
| 12 | A | Yes. |
| 13 | Q | And someone at CCL received it? |
| 14 | A | My operations director, Natalie Torgeson, was involved |
| 15 | | at that point. |
| 16 | Q | Did anything come with the text of the ad at that |
| 17 | | point? |
| 18 | A | I don't know. |
| 19 | Q | Were there any other communications from Focus on the |
| 20 | | Family about the ad after that? |
| 21 | A | I don't know because those communications may or may |
| 22 | | not have happened between my operations director and |
| 23 | | Focus. |
| 24 | Q | And what is her full name? |
| 25 | A | Natalie Torgeson. |

| | | |
|---|---|---|
| 1 | Q | Torgeson, can you spell the last name? |
| 2 | A | T-O-R-G-E-S-O-N. |
| 3 | Q | Thank you.  Has -- have there been any communications |
| 4 | | with Focus on the Family between the time the ad was -- |
| 5 | | arrived at CCL and today? |
| 6 | A | No. |
| 7 | Q | Is it possible there were communications between |
| 8 | | someone else at CCL and Focus on the Family during that |
| 9 | | time? |
| 10 | A | No. |
| 11 | Q | Are you aware of any other versions of the Crossroads |
| 12 | | ad that CCL has received? |
| 13 | A | No. |
| 14 | Q | Did anyone at CCL express a view about the text of the |
| 15 | | Crossroads ad after it was received to Focus on the |
| 16 | | Family? |
| 17 | A | No. |
| 18 | Q | Did anyone at CCL express a view on the ad to anyone |
| 19 | | else other than counsel? |
| 20 | A | Repeat the question. |
| 21 | Q | Did anyone at CCL say anything else about the ad to |
| 22 | | someone other than Focus on the Family or counsel? |
| 23 | A | I don't know. |
| 24 | Q | Did you discuss the text of the ad with anyone else |
| 25 | | outside CCL or counsel? |

 1    A    No.

 2    Q    Did Focus on the Family offer to help with the

 3         recording of the ad?

 4    A    No.

 5    Q    I want to talk briefly about the timing to make sure I

 6         have that correct.

 7              I believe you've -- you've said that CCL believes

 8         May 10 is an appropriate time to begin running the ad;

 9         correct?

10    A    Yes.

11    Q    Would April 10th also be an appropriate time to begin

12         running the ad?

13    A    No.

14    Q    Why not?

15    A    It's too soon.

16    Q    Too soon for what?

17    A    Well, given the fact that the vote is coming in June,

18         it's most appropriate to run it beginning in May.

19    Q    And so I believe you've indicated that Focus on the

20         Family told you that May 10 would be an appropriate

21         date?  Did I have that correct?

22    A    I don't recall saying that.  They may have recommended

23         that.  I'm not certain.

24    Q    You're not sure who came up with the May 10th date?

25    A    People discussed the email that was sent by Focus on

1    the Family, made a suggestion in reference to the

2    June -- the upcoming June vote on the FMA, and

3    discussions ensued about what would be an appropriate

4    date to begin.  And May 10 was settled on.

5  Q  So would June 15th be an appropriate date?

6  A  June 15th?

7  Q  15th to run the ad?

8  A  Not if the vote is June 1st.

9  Q  But if the vote were to be postponed until July,

10    when -- let's say the vote was postponed until

11    July 15th, when do you think would be an appropriate

12    day to start running the ad?

13  A  I would have to consider the circumstances.

14  Q  And if the vote is postponed until July 15th, do you

15    have any plan to run the ad on a different start date,

16    different than May 10th?

17  A  No.

18  Q  If the vote were to be held on the last day of July,

19    would you -- do you have any plan to start the ad on a

20    different date?

21  A  No, I don't -- I don't have such a plan at this time.

22  Q  Would that be appropriate to make later the start date

23    if the vote -- if you knew the vote were to occur on

24    the last day in July?

25  A  Maybe.

1  Q   What factors would go into that decision?

2  A   Not -- realities in Washington, D.C., decisions that

3      may or may not be made that I can't predict at this

4      time.  Or we're basing our time table now on a decision

5      to hold a vote that was made by a high ranking official

6      who has authority in the matter of setting the date.

7          And what that individual may choose to do or not

8      do, I can't predict.  And for what reasons he would

9      choose to do those things, I can't predict.  And so

10     what we might choose to do with respect to grass roots

11     lobbying related to Senators Snowe and Collins and

12     timing, I can't predict.

13 Q   The current plan is to start running the ad less than a

14     month before the scheduled vote; correct?

15 A   Uh-huh.

16 Q   You've indicated that starting in advance of that --

17 A   Uh-huh.

18 Q   -- would not be effective in your view?

19 A   Uh-huh.

20 Q   Correct?  So if the vote were to be moved to the end of

21     July, wouldn't it be appropriate to start running the

22     ad at the beginning of July?

23 A   Repeat the question.

24 Q   If the vote were to be moved until the end of July,

25     wouldn't it be appropriate to start running the ad at

1    the beginning of July?

2  A  Maybe.

3  Q  Is there any reason the analysis would be different if

4     that one month period were the month of July versus the

5     current one month period of May 10 through June 5?

6  A  Sure.

7  Q  What's different?

8  A  I don't know what could develop related to the timing.

9  Q  So you can't think of any reason why it would be

10    different today?

11  A  Rephrase the question.

12  Q  You can't think of any reason why the analysis about

13    when to run the ad would be different; correct?

14  A  I still don't --

15  Q  We've put -- we've proposed two periods, right, one is

16    the current period in let's say the month before the

17    scheduled vote in June; correct?

18  A  Uh-huh.

19  Q  I'm proposing another period, if the vote were to be

20    postponed until the end of July?

21  A  Uh-huh.

22  Q  And my question is, why wouldn't it be appropriate,

23    just as appropriate for you to start running the

24    Crossroads ad at the beginning of July because that

25    would be about the same distance before the

|     |   |                                                          |
|-----|---|----------------------------------------------------------|
| 1   |   | beginning -- before the vote?                            |
| 2   | A | Well, it may or may not be appropriate to do that.       |
| 3   | Q | So you have no plans to change the start date for the    |
| 4   |   | ad running based on a postponement of the vote if that   |
| 5   |   | were to occur?                                           |
| 6   | A | None.  I have no plans to change the date.               |
| 7   | Q | Is it possible that you would change the date?           |
| 8   | A | Yes.                                                     |
| 9   | Q | Okay.  Can you think -- strike that.  Did anyone at      |
| 10  |   | Focus on the Family give you any other information that  |
| 11  |   | we haven't discussed about the Crossroads ad from the    |
| 12  |   | initial contact until today?                             |
| 13  | A | No.                                                      |
| 14  | Q | Did they give you any other information about the        |
| 15  |   | timing of the Crossroads ad, the timing that it would    |
| 16  |   | be run that we haven't discussed?                        |
| 17  | A | No.                                                      |
| 18  | Q | Did they give you any other information about how the    |
| 19  |   | ad would be created that we haven't discussed?           |
| 20  | A | No.                                                      |
| 21  | Q | You've mentioned a potential donor to get CCL the funds  |
| 22  |   | to run the ad, how did that donor learn about the ad?    |
| 23  | A | I told him about it.                                     |
| 24  | Q | When were those discussions?                             |
| 25  | A | I told him about it this morning.                        |

| 1 | Q | Did you discuss it with this potential donor before |
| 2 | | today? |
| 3 | A | No. |
| 4 | Q | Please describe those discussions? |
| 5 | A | It was over breakfast, and we were discussing the case. |
| 6 | | And the donor offered to -- made a not a detailed |
| 7 | | commitment with respect to an amount, but made a |
| 8 | | commitment to be helpful. |
| 9 | Q | Did the donor say anything else about being helpful? |
| 10 | A | I -- |
| 11 | Q | Did the donor say any specific way in which the donor |
| 12 | | might be helpful in running the ad? |
| 13 | A | No. |
| 14 | Q | Did you ask the donor to do anything specifically? |
| 15 | A | No, I didn't even ask for a donation. |
| 16 | Q | You didn't mention a specific amount? |
| 17 | A | We discussed -- we discussed what such a campaign might |
| 18 | | cost because I don't have -- I haven't -- I don't have |
| 19 | | detailed information regarding that information.  But |
| 20 | | that was -- that was what we discussed. |
| 21 | Q | Did you discuss the purpose of running the ad? |
| 22 | A | Yes. |
| 23 | Q | What did you tell the donor the purpose of running the |
| 24 | | ad was? |
| 25 | A | To influence Senator Snowe and Senator Collins to vote |

67

```
 1          yes for the -- to support the federal marriage

 2          amendment.

 3    Q     Did you mention any other reasons for running the ad?

 4    A     We discussed this case, and the fact that it's

 5          happening and shared with them what this case is about.

 6    Q     Did you -- what was the donor's reaction to that?

 7    A     They were interested.

 8    Q     Interested in what way?

 9    A     Interested in the case, interested in the grass roots

10          lobbying, interested in the federal marriage amendment,

11          interested in the Christian Civic League.

12    Q     So if I understand, you did discuss a specific amount

13          of money that might be needed to run the ad?

14    A     No.

15    Q     Did you discuss a range of figures?

16    A     Yes.

17    Q     What was that range of figures?

18    A     We've since learned because we have more detailed

19          information that we were inaccurate maybe, but five to

20          $10,000.

21    Q     You've referred to earlier information, where did that

22          information come from?

23    A     Focus on the Family research regarding the buy.

24    Q     Okay.

25    A     Which --
```

1    Q    And how much did that research indicate that the buy

2         would cost?

3    A    $3,500.

4    Q    I see.  And did the new research come from Focus on the

5         Family also?

6    A    Yes.

7    Q    And when did that new research come?

8    A    I found out about it this morning.

9    Q    Okay.

10   A    I got that particular detail this morning, of $3,500.

11   Q    Okay.  Who was at the -- this meeting this morning with

12        you and the donor?

13   A    Counsel.

14   Q    Counsel.  Anyone else?

15   A    No.

16   Q    Has this donor ever given money to CCL in the past?

17   A    Yes.

18   Q    Please describe those donations in terms of time and

19        amount?

20   A    I -- they've donated to the League a number of times.

21        And I don't know the exact times or amounts.  They're

22        in writing, but I don't have them committed to memory.

23   Q    Did it start more than five years ago, their donations?

24   A    Yes.

25   Q    Okay.  Did you and the donor discuss a time frame for

1     determining whether the donor will support the running

2     of the ad?

3 A   No.

4 Q   Do you plan to be in touch about the ad in the future?

5 A   I haven't decided.

6 Q   Do you have other potential donors --

7 A   Yes.

8 Q   -- to support the ad?

9 A   Yes.

10 Q   How many?

11 A   Probably possibilities, 1,500.

12 Q   1,500 donors?

13 A   Possibilities, if I decide to direct mail and tell them

14     about the possibility, invite them to donate.

15 Q   Would that be direct mail to people on your supporters

16     list that you've described?

17 A   Yes.

18 Q   Is there any other -- do you have any other donor in

19     mind who would be a large donor similar to the donor

20     you met with today?

21 A   Yes.

22 Q   And how many -- how many other large donors do you have

23     in mind who might support the ad?

24 A   At least a half dozen.

25 Q   Have you had any discussions with any of those --

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | -- persons?  Just a few more on this area.  In order to |
| 3 | | start running the ad on May 10, when would CCL need to |
| 4 | | have the funding? |
| 5 | A | The -- a few days before the start date. |
| 6 | Q | Would that include the funding for recording the ad? |
| 7 | A | No. |
| 8 | Q | Is the recording of the ad included within the figure |
| 9 | | you gave earlier of the range? |
| 10 | A | No.  No, it isn't. |
| 11 | Q | Do you have an estimate for how much it would cost to |
| 12 | | record the ad, to create the recording of the ad? |
| 13 | A | No. |
| 14 | Q | Did you discuss with your potential donor this morning |
| 15 | | assisting with that production of the ad cost? |
| 16 | A | No. |
| 17 | Q | Have you discussed the funding of the recording and |
| 18 | | production of the ad with anyone? |
| 19 | A | No. |
| 20 | Q | How do you plan to run the ad -- strike that.  What |
| 21 | | plans do you have to have the ad recorded? |
| 22 | A | At this point, none. |
| 23 | Q | Do you know when the ad would have to be recorded in |
| 24 | | order to be run on May 10? |
| 25 | A | No. |

1    Q    Who was the donor from this morning?

2              MR. BOPP:  I object and instruct the witness

3         not to answer the identity of the donor, potential

4         donor -- well, both a donor and a potential donor in

5         this case.

6    Q    (By Mr. Summers)  Was the -- is that potential donor

7         from this morning an individual or not an individual?

8         An individual person or -- sorry, strike that.  I was

9         caught between two forces.  Let me --

10             MR. BOPP:  Your mind and her mind.

11             MR. SUMMERS:  Let me rephrase that.

12   Q    (By Mr. Summers)  Would the potential donation that you

13        have described from your meeting, your meeting this

14        morning, be a donation of individual funds or funds

15        from an organization?

16   A    I don't know.

17   Q    Was the individual you met with this morning

18        representing an organization in that meeting?

19   A    No.

20   Q    Okay.  Have that individual's donations in the past

21        been donations of personal funds or donations of funds

22        from an organization?

23   A    I don't know.

24   Q    Is an organization's name listed in your records along

25        with the donations that have been given in the past?

```
 1    A    I don't know.

 2    Q    So it may be that only the individual's name is listed

 3         in your records of donations from the past by -- from

 4         that donor?

 5    A    It may be.

 6    Q    Okay.  Is that donor -- is that potential donor a

 7         resident of Maine?

 8    A    Yes.

 9    Q    What are the names of the other I believe you said six

10         potential major donors?

11              MR. BOPP:  And we object to identification of

12         any donors and instruct the witness not to answer.

13    Q    (By Mr. Summers)  Are those other six potential major

14         donors persons who have donated funds to CCL in the

15         past?

16    A    Yes.

17    Q    And were their donations in the past donations of

18         personal funds or organizational funds?

19    A    Both.

20    Q    For the donors who gave organizational funds, were they

21         corporate funds?

22    A    I don't know.

23    Q    Who would know?

24    A    They would.

25    Q    Anyone else?
```

```
 1   A   I don't know.

 2   Q   Are you saying no one at CCL knows?

 3   A   Right.

 4   Q   Okay.  You've mentioned that CCL doesn't have right now

 5       the funds to run this ad, has CCL had a shortage of

 6       operating funds in 2006?

 7   A   Yes.

 8   Q   Has CCL curtailed any of its normal activities in 2006?

 9   A   Yes.

10   Q   Generally speaking, what has it done to curtail

11       activities?

12   A   I've been forced to cut the hours of some staff members

13       and make changes in benefit plans.

14   Q   Anything else?

15   A   No.

16   Q   Can you describe in some more detail the shortage of

17       funds in 2006?

18   A   Donations are not being made at the level that we

19       anticipated.  I do not know the reason.

20   Q   Have you made other efforts to make up for the

21       shortfall?

22   A   Can you rephrase the question?

23   Q   Have you tried to raise more funds to compensate for

24       the lack of funds in 2006?

25   A   Yes.
```

```
 1   Q   What have you done to do that?

 2   A   Notified our supporters in writing of our challenge

 3       through both email and written, printed letters.

 4   Q   And when did you do that?

 5   A   A couple of months ago.  Ongoing.

 6   Q   Do you think running the Crossroads ad on the radio

 7       will affect the election of Senator Snowe, primary

 8       election?

 9   A   No.  She doesn't have an opponent that I know of.

10   Q   Do you think it might affect her election in a way

11       other than the ultimate outcome?

12   A   I have no idea.  I don't know.

13   Q   Is it a concern of yours that it might affect the

14       election in some way other than the ultimate outcome?

15   A   Rephrase the question.

16   Q   Do you have a view about whether it will affect the

17       election of Senator Snowe in some way other than what

18       if she loses?

19   A   No.

20   Q   All right.  Do you have any current plans to run ads on

21       radio or TV about the federal marriage amendment other

22       than the Crossroads ad?

23   A   No.

24   Q   Do you have any plans to run ads on radio or TV about

25       anything other than the Crossroads ad?
```

1    A    No.

2    Q    Do you have any plans to communicate about the federal

3         marriage amendment through nonbroadcast media during

4         the same period that you plan to run the Crossroads ad?

5    A    Maybe.  Strike that.  Yes.  We will write about it in

6         our house organs, the email and the print newspaper.

7    Q    The Record newspaper?

8    A    The Record newspaper, yes.

9    Q    Will you communicate in any other way about it during

10        that period?

11   A    We will do interviews with reporters.

12   Q    Do you have plans to place any print ads about the

13        issue during that period?

14   A    No.

15   Q    Do you have plans to send communications to your

16        supporters about it during that period?

17   A    Yes.

18   Q    Please describe those plans?

19   A    The email and the monthly Record which goes to our

20        supporters.

21   Q    Okay.  Can you think of any other plans to communicate

22        about the marriage amendment during that period other

23        than what you've discussed?

24   A    No.

25   Q    All right.  Do you have plans to communicate about the

76

 1        issue through nonbroadcast media after the period you

 2        plan to run the Crossroads ad?

 3    A   No.

 4    Q   No plans?

 5    A   Oh, you said nonbroadcast?

 6    Q   Right, nonbroadcast?

 7    A   Yes.

 8    Q   Please describe those plans?

 9    A   Information for our supporters following the progress

10        of the federal marriage amendment.

11    Q   And would it be the same types of media that you just

12        described?

13    A   Yes.

14    Q   Other than broadcast?

15    A   Yes.

16    Q   Has CCL run any ads in the past in any media that have

17        identified a federal candidate other than the ones

18        we've discussed today?

19    A   Repeat the first part of the question.

20    Q   Has CCL run any ads in the past in any media that have

21        identified a federal candidate other than what we've

22        discussed today?

23    A   I don't know.

24    Q   Well, maybe it will help to break it down by media.

25        Has CCL in the past ever run any radio or TV ads that

```
 1          have identified a federal candidate?

 2    A     I don't know.  I don't know.

 3    Q     Has it ever placed a print ad that has identified a

 4          federal candidate before now?

 5    A     Well, we have already seen one.

 6    Q     Anything else beside the one we've seen?

 7    A     Not that I recall.

 8                  MS. SEALANDER:  Let's go off the record.

 9          (Discussion had off the record, after which the

10          following proceedings transpired.)

11                  MR. BOPP:  Back on the record.  That is not

12          proper for you to challenge the witness on the record

13          or off the record.  So we're back on the record, let's

14          just -- and Harry is the deponent -- or he's doing the

15          deposition.

16                  MS. SEALANDER:  Jim, we're getting an awful

17          lot of I don't know to questions that were outlined in

18          30(b(6), and you designated this man.  He's been

19          designated as the person to answer.

20                  MR. BOPP:  There isn't corporate records that

21          go back to 1886.

22                  MS. SEALANDER:  This morning he had no

23          trouble saying during my tenure, the answer is such and

24          such, that's a reasonable qualifier to put on.  What's

25          happening right now is we're getting a whole bunch of I
```

1     don't knows because I think he's interpreting the

2     question in a way that Harry doesn't intend it, and

3     we're not going to get through this any time --

4           MR. BOPP:   Then Harry is to ask the question.

5     And when -- and it's a perfectly appropriate answer for

6     him to say that he doesn't know.  And there are no

7     records that would ever indicate that since 1886, they

8     have run radio ads.  So that is a perfectly appropriate

9     answer.

10          And you are not to challenge this witness on -- go

11    off the record and raise your voice and challenge this

12    witness.  That's improper.  Honestly.  So we're back on

13    the record --

14          MS. SEALANDER:   I wanted to make sure that he

15    was testifying truthfully because I know --

16          MR. BOPP:   He is testifying truthfully.

17          MS. SEALANDER:   I know he's trying to, and I

18    wanted to make sure that we -- that he was

19    understanding the questions that Harry was asking and

20    that everybody was understanding everybody because it

21    sounded to me as if we were getting awfully

22    inconsistent answers.  So that is why I raised this

23    point.

24          MR. BOPP:   Okay.  Colleen --

25          MS. SEALANDER:   I have no problem doing it on

1    the record.

2           MR. BOPP:   Colleen, that is simply improper

3    for you to challenge the witness on whether or not he

4    is answering truthfully or not.  So let's resume.

5  Q  (By Mr. Summers)  Let me direct your attention to

6    what's been marked as Exhibit 7, which is the

7    complaint, if you have a copy.  Do you see it?  I think

8    it's that one.

9  A  Yes.

10 Q  And Paragraph 16.  Please review Paragraph 16 just

11   briefly.

12          MR. BOPP:   By the way, in light of that

13   colloquy, let me make clear that the time period of

14   this deposition is since January 1, 2004.  It is not

15   for the history of the world.

16          And that all questions -- I object to any question

17   that is directed at time period prior to January 1,

18   2004, because it's not part of the notice for the

19   period of time in which he is to be prepared to answer

20   questions.

21          If we can make that a continuing objection, then I

22   won't object to whenever he says, has CCL ever run a

23   radio ad.  Can we stipulate to that, or do you want me

24   to object?

25          MS. SEALANDER:   I think that's an excellent

1        example about why I -- I just wanted to make sure that

2        the witness understood the questions that I thought

3        Harry was asking and was understanding them in the way

4        that Harry meant them.

5                MR. BOPP:  Do we agree to the time period,

6        January 1, 2004, or do I have to object?

7                MR. SUMMERS:  You're asking do we agree that

8        you can have a standing objection?

9                MS. SEALANDER:  I think you're right the

10       deposition notice specifies 2004.  Nobody has any

11       problem with that.  There are occasions when

12       understand -- the answers to questions regarding the

13       time period from then forward is helpful to go back a

14       few years.  I don't think that in the course of this

15       deposition, Harry has pushed that envelope too much.

16           If I -- I think you should -- I mean, I think he

17       can endeavor to continue to try, to the extent that you

18       think that he's not done that, he can try harder.

19           I think you ought to say something if you have a

20       problem, say something about it, but I think there's

21       times when going beyond before 2004 is entirely

22       appropriate in a contextual manner.  I think you would

23       think so if you were sitting in Harry's chair, too.

24               MR. SUMMERS:  In general, I'm not, or maybe

25       never, I'm not talking about 1900, I'm talking about

1        during the witness's tenure at CCL.  Obviously, if you

2        have --

3                    THE WITNESS:  That was not clear to me.  And

4        that's why I said I don't know because what I heard you

5        asking was has the CCL Maine ever, that's what I heard.

6        And so in my mind, I was thinking I don't know.

7    Q   (By Mr. Summers)  I understand.  But would your answer

8        change if it had been specified during your tenure,

9        because --

10   A   Yes.

11   Q   It would?

12   A   Yes.

13                   MS. SEALANDER:  Perhaps we ought to go back

14       and do some questions, I wouldn't want to go back to

15       the beginning.

16   Q   (By Mr. Summers)  I would interpret ever to include

17       your tenure plus more.  So if you didn't recall

18       anything ever, that would mean you didn't recall

19       anything during your tenure because your tenure is a

20       small --

21                   MR. BOPP:  We're not going to argue about

22       these questions.  Let's just go back in the proper

23       order here and with that clarification.

24   Q   (By Mr. Summers)  Okay.  During your tenure at CCL, has

25       CCL run any radio or TV ads that identified federal

1          candidates?

2    A     None that I recall in addition to the print

3          advertisement that has already been discussed.

4    Q     And that's my next question is whether CCL during your

5          tenure has run any other print advertisements

6          identifying federal candidates?

7    A     None that I recall.

8    Q     Okay.  Now directing your attention to what's been

9          marked as Exhibit 7, a complaint, Paragraph 16.  Have

10         you had a chance to look at Paragraph 16?

11   A     Yes.

12   Q     Paragraph 16 says that CCL plans to run materially

13         similar ads after mid June on a range of other issues;

14         correct?

15   A     Uh-huh.  Uh-huh.

16   Q     Is that a correct statement of CCL's plans today?

17   A     Yes.

18   Q     Can you describe those plans?

19   A     No.

20   Q     Why not?

21   A     Because it's not beyond a simple plan or intention to

22         do that.

23   Q     Does -- is Paragraph 16 a complete statement of CCL's

24         current plans to do that, in other words, is there

25         anything more than what's in Paragraph 16?

1    A    Can you rephrase the question?

2    Q    Is there any specific issue you can tell me that CCL

3         plans to run a radio or TV ad on in the future other

4         than the Crossroads ad?

5    A    No.  We have no other script written.  We have no other

6         issues selected for future campaigns.

7    Q    Does CCL have plans to run such ads in any other media

8         other than radio or TV in the future?

9    A    Such as?

10   Q    Such as what media?

11   A    Yes.

12   Q    Newspapers?

13   A    No.

14   Q    Okay.  CCL has spoken publicly about Senator Snowe in

15        the past; correct?

16   A    Yes.

17   Q    Please describe generally what CCL has discussed about

18        Senator Snowe?

19   A    We've been critical of the senator's position on

20        marriage.  We've been critical of the senator's

21        position on partial birth abortion.  That's all that I

22        can recall.

23   Q    I'm talking about during your tenure of course?

24   A    Right.

25   Q    You can't recall any other issues that you've discussed

1          Senator Snowe?

2    A     I can't.

3    Q     You can't.  During your tenure, has CCL ever expressed

4          a view about Senator Snowe's candidacy for any office?

5    A     No.

6    Q     Okay.

7                    MR. SUMMERS:  I'm going to mark another

8          document.

9          (Heath Deposition Exhibit Number 8 was marked for

10         identification.)

11   Q     (By Mr. Summers)  I'll show you what's been marked as

12         Exhibit 8, a document headed The Record, and dated

13         February 23, 2005.  Do you recognize this document?

14   A     I do.

15   Q     What is it?

16   A     It's an article that appeared in our -- on our web

17         site.  And I think it's still there.

18   Q     Did it appear on or about the date that's listed,

19         February 23, 2005?

20   A     Uh-huh.

21   Q     I'd like to direct you to the -- really the first

22         paragraph which is the introductory material on the

23         first page.  And if you would, I'd like to ask you to

24         read aloud the last three sentences of that paragraph,

25         the sentence starting Representative Duprey is?

1  A    Representative Duprey is the courageous third term

2       legislator who is the State House's most faithful

3       defender of traditional marriage.  Here, Representative

4       Duprey announces for the first time that he is willing

5       to run against Senator Olympia Snowe in next year's

6       Republican primary.  The Record is proud to be the

7       first publication in Maine to provide you with this

8       information.

9  Q    This basically says CCL's proud to tell the public that

10      Representative Duprey was quote, willing, unquote, to

11      run against Senator Snowe in the 2006 Republican

12      primary; right?

13 A    Uh-huh.

14 Q    Okay.  So I take it from this that CCL would rather see

15      a Republican senate candidate whose positions were

16      closer to its own than Senator Snowe's are; is that

17      correct?

18 A    Yes.

19 Q    Has CCL spoken publicly on any other occasions about

20      potential primary challengers to Senator Snowe, other

21      than this?

22 A    Not that I recall.

23 Q    CCL has no federal separate segregated fund or PAC;

24      correct?

25 A    Yes.

```
 1    Q    And CCL has currently two Maine state political action
 2         committees; correct?
 3    A    Technically, one, depending on how you define that
 4         because we register two PACs with the Ethics
 5         Commission, but they're incorporated under one
 6         incorporation.
 7    Q    And what are the names of those for the record?
 8    A    Christian Action League and Coalition for Marriage.
 9    Q    And you say they're incorporated as one, can you
10         explain what that means?
11    A    Well, the way my lawyer explained it is that Coalition
12         for Marriage is a d/b/a for the Christian Action
13         League.
14    Q    And why is there a separate registered PAC entity?
15    A    To comply with state ethics rules regarding a petition
16         drive that we ran last year.
17    Q    And so I take it CFM was created in order to pursue
18         that project?
19    A    Correct.  Yes.
20    Q    All right.  What's involved in setting up and running a
21         state PAC in Maine?
22    A    Registration with the State Ethics Commission which
23         includes the filing of a form, which requires certain
24         information, all of which I can't -- I would have to
25         see the form to familiarize myself with the detail that
```

1  they request.

2   And then the filing of reports on a regular basis

3  with the Ethics Commission indicating what the PAC's

4  activities have been, expenditures and income.

5 Q Are there requirements about maintaining records?

6 A I'm not sure.  I know that there's a requirement about

7  presenting information.  I do not know about

8  requirements regarding the maintenance of records.

9 Q And by presenting information, you mean reporting the

10  financial information to the state?

11 A Yes.

12 Q And is that information about contributions received

13  and expenditures made?

14 A Yes.

15 Q Any other information?

16 A No.

17 Q Is there anything else that from your perspective is

18  involved in running these PACs?

19 A Can you rephrase the question?

20 Q I'm looking for your sense of what work is required to

21  run and maintain the state PACs, what does CCL have to

22  do?

23 A A lot in the case of the Coalition for Marriage.

24 Q How so?

25 A People's veto drive.

1   Q   Right.

2   A   Well, I mean, the PAC is the entity that does the work,

3        so let me rephrase my answer. The PAC does -- did the

4        work on the petition drive last year, the Coalition for

5        Marriage work. The Christian Civic League of Maine did

6        not do that work.

7   Q   Okay. And in general, what work was that that was done

8        that CFM did?

9   A   It was the gathering of signatures, the fund raising

10       related to supporting the field team that made that

11       happen. The coordination of 2,000 volunteers --

12   Q   Okay.

13   A   -- statewide. All of the operational matters related

14       to fielding and leading and managing such a campaign.

15   Q   Okay. In running -- in running the PACs, one thing you

16       have to do is to disclose the identities of your

17       donors; correct?

18   A   Yes.

19   Q   And you've done that at least in the case of CFM;

20       correct?

21   A   Yes.

22   Q   Have you also done that with CAL?

23   A   Yes.

24   Q   All right. And those disclosures are public records in

25       Maine; correct?

1    A    Yes.

2    Q    Have you or any of your donors ever faced any kind of

3         harassment as a result of those disclosures to the

4         state?

5    A    I don't know.

6    Q    You're not aware of any harassment that you or the

7         donors have faced as a result of those disclosures?

8    A    I cannot prove that harassment or vandalism has taken

9         place as a result of those disclosures.  However,

10        harassment and destruction of property has taken

11        place --

12   Q    Has taken place?

13   A    -- at times related to our work on these issues.

14   Q    Okay.  Is CAL a corporation?

15   A    Yes.

16   Q    It's a Maine corporation?

17   A    Yes.

18   Q    And CFM is not a separate --

19   A    I'm sorry, you said CAL?

20   Q    Yes.

21   A    I was thinking -- yes, CAL, Christian Action League,

22        yes.

23   Q    Yes.  It's a corporation?

24   A    Yes.

25   Q    And it's distinct from CCL?

1    A    Yes.

2    Q    Is CAL a Maine corporation?

3    A    Yes.

4    Q    Is it tax exempt?

5    A    I don't know.

6    Q    Do you know what kind of corporation is it?

7    A    I don't know.

8    Q    Okay.  When was it founded?

9    A    I'm not sure of the exact year, but I believe just a

10        few years ago.  Since 2000.

11   Q    All right.

12            MR. SUMMERS:  I'm going to mark an exhibit.

13        (Heath Deposition Exhibit Number 9 was marked for

14        identification.)

15   Q    (By Mr. Summers)  I'll show you what's been marked as

16        Exhibit 9, which says that it's a registration for

17        political action committees for Christian Action

18        League, do you recognize this?

19   A    Yes.  I recognize the form.

20   Q    And what is it?

21   A    It's the registration for the Christian Action League

22        with the Ethics Commission of the state of Maine.

23   Q    Directing your attention to the second page, Section 5,

24        Part B, it lists a date of origin/incorporation of

25        April, 1999.  Is that correct for the beginning of CAL

```
 1            as far as you know?

 2     A      Yes.

 3     Q      Okay.  You were executive director at the time CAL was

 4            set up; correct?

 5     A      Yes.

 6     Q      Why did CCL decide to set up CAL?

 7     A      To get involved with in a -- politics, potentially

 8            endorsements or direct opposition of candidates during

 9            elections.

10     Q      So the statement in Section 6 of this document, which

11            is entitled statement of support or opposition, is that

12            a correct statement of the purpose of CAL?

13     A      It's incomplete, should be amended.

14     Q      What else does CAL do?

15     A      Well, right now, it is -- it is not doing much, but we

16            are discussing supporting or opposing candidates for

17            state.

18     Q      State candidates, also --

19     A      Legislature.

20     Q      -- federal candidates?

21     A      No.

22     Q      There's no plan to endorse or oppose federal candidates

23            by CAL?

24     A      No.

25     Q      Do you direct CAL's activities?
```

1    A   Yes.

2    Q   What have CAL's activities been between 1999 and today

3        generally speaking?

4    A   The most activity came last year -- strike that.  The

5        Christian Action League was very active in 2000 on a

6        state matter related to gay rights.  And then again in

7        2004 on a state matter involving the same issue.

8            In 2004, the Christian Action League was involved

9        through its d/b/a, the Coalition for Marriage.  Same

10       corporation both times, same issue both times.

11   Q   Okay.

12   A   D/b/a in 2004.

13   Q   Is there anything else that CAL has done since 1999

14       other than what you've described?

15   A   No.

16           MR. SUMMERS:  I want to mark another exhibit.

17       (Heath Deposition Exhibit Number 10 was marked for

18       identification.)

19   Q   (By Mr. Summers)  I'll show you what's been marked as

20       Exhibit 10, which is the responses of CCL to the FEC's

21       interrogatories served earlier this week, and I direct

22       your attention to the second page, Interrogatory 1, the

23       answer at the bottom.

24           I take it -- let me ask, is this a correct

25       statement of the activities of CCL -- CAL?

1    A    Yes.

2    Q    Did CAL do anything prior to 2004?

3    A    Did CAL?

4    Q    Yes.

5    A    In 2000 --

6    Q    Prior, between 1999 and the end of 2003?

7    A    Yeah.  We worked in 2000 on a state ballot issue

8         related to gay rights through the PAC.

9    Q    Briefly, what was that issue?

10   A    The legislature put gay rights on the ballot, and we

11        led the opposition.

12   Q    Has CCL -- PAC -- strike that.  Has CAL done anything

13        other than what you've described?

14   A    Not that I recall.

15   Q    Has it ever supported or opposed candidates from 1999

16        until today?

17   A    No.

18              MR. BOPP:  By the way, now that we're on the

19        interrogatories, I want to advise you all that with

20        respect to Interrogatory Number 9, which has an Exhibit

21        B attached, that Exhibit B is attached in error.

22        Exhibit B is not responsive to Interrogatory Number 9.

23        And that was a mistake made in our office.

24              MR. SUMMERS:  Okay.  While we're on that,

25        there's no other answer listed for Interrogatory 9, so

 1        obviously we're interested in an answer of

 2        Interrogatory 9.

 3               MR. BOPP:   There's the guy that can answer it

 4        right here.

 5               MR. SUMMERS:   We'd still like an answer to

 6        the interrogatory itself.

 7               MR. BOPP:   But given the expedition, I

 8        thought rather than amend, you know, the interrogatory

 9        answers, I would tell you right now, and you can ask

10        whatever you want to ask.

11               MR. SUMMERS:   We will get to that.

12   Q    (By Mr. Summers)   Generally speaking, how has CAL

13        communicated with the public?

14   A    Can you be more specific?

15   Q    What media has CAL used to --

16   A    The internet, in the form of a web site.   Email.   I'm

17        assuming in answering your question since you mentioned

18        CAL and since CFM is a d/b/a, you're referring to both?

19   Q    We'll actually get to CFM in a minute.

20   A    You're referring only to CAL?

21   Q    Yes, just CAL?

22   A    Ask the question again.

23   Q    What methods has CAL used to communicate with the

24        public?

25   A    I can't think of any except -- except for 2000, when

1          we -- when we were engaged in leading the opposition to

2          that particular ballot initiative.  In that case, we

3          employed internet, print media.  Since I wasn't charged

4          with preparing for 2000 in the --

5     Q    I understand.

6     A    I don't remember the specific ways that the CAL

7          communicated.

8     Q    CAL has a presence on the web site of CCL; correct?

9     A    Limited, I believe.  It's mentioned, I'm sure.

10    Q    Can you think of any other ways that CAL has

11         communicated?

12    A    No.

13    Q    It hasn't sent its own emails except for --

14    A    No.

15    Q    It hasn't placed -- has it placed ads in newspapers?

16    A    No.

17    Q    Has it run broadcast ads during your tenure?

18    A    It may have in 2000 related to that specific ballot

19         measure.

20    Q    All right.  Let's talk about CFM.

21              MR. SUMMERS:  Let me mark another exhibit,

22         actually.

23         (Heath Deposition Exhibit Number 11 was marked for

24         identification.)

25    Q    (By Mr. Summers)  Show you what's been marked as

```
 1              Exhibit 11, do you recognize -- I should say, it's a

 2              registration for a political action committees for

 3              Coalition for Marriage, dated February 27, 2006, as

 4              received by the Commission on Governmental and Election

 5              Practices.  Do you recognize this document?

 6     A        Uh-huh.  Yes.

 7     Q        What is this?

 8     A        It's a registration for a political action committee

 9              with the Commission on Governmental Ethics and Election

10              Practices.

11     Q        And this is for the Coalition for Marriage that we've

12              discussed; correct?

13     A        Yes.

14     Q        Do you direct CFM's activities?

15     A        Yes.

16     Q        What have those activities been?

17     A        The Coalition for Marriage was formed in the spring of

18              2005 in response to the decision of our legislature to

19              add sexual orientation to the Human Rights Act.  And

20              the Coalition for Marriage led a people's veto of that

21              law, which -- the result of which was an election in

22              November of 2005, and that we lost -- that we lost.

23     Q        You say an election, do you mean a measure that was on

24              the ballot for people to vote on?

25     A        Yes.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  I take it CFM communicated with the public quite |
| 2 | | a bit during 2005? |
| 3 | A | Yes. |
| 4 | Q | Did it have a web site? |
| 5 | A | Yes. |
| 6 | Q | Was that www.coalitionformarriage.net? |
| 7 | A | Yes. |
| 8 | Q | Did CFM send emails during 2005 about the ballot |
| 9 | | measure and the petition drive? |
| 10 | A | Yes. |
| 11 | Q | Was the internet an important method of building |
| 12 | | support for that campaign in 2005? |
| 13 | A | Yes. |
| 14 | Q | Did CFM run radio and TV ads during 2005 for that |
| 15 | | campaign? |
| 16 | A | Yes. |
| 17 | Q | Okay. |
| 18 | | MR. SUMMERS:  I'll mark another exhibit. |
| 19 | | (Heath Deposition Exhibit Number 12 was marked for |
| 20 | | identification.) |
| 21 | Q | (By Mr. Summers)  I'll show you what's been marked as |
| 22 | | Exhibit 12, which is a reprint of an article from the |
| 23 | | Morning Sentinel dated April 27, 2005, with the |
| 24 | | headline, Civic League Head Expects Large Turnout for |
| 25 | | Anti Gay Rights Rally. |

```
 1              Please look at the second page at the top, the
 2        first paragraph?
 3    A   Uh-huh.
 4    Q   Is that paragraph a correct statement of some of --
 5        well, strike that.  That paragraph says that CCL was
 6        running radio ads; correct?
 7    A   Uh-huh.
 8    Q   Were those -- were those ads actually being run by CFM
 9        in April, 2005?
10    A   I think they were.
11    Q   It's correct that those radio ads were being run?
12    A   I believe -- I believe they were.
13    Q   Can you describe those ads?
14    A   A lobsterman named Dan Riley recorded a spot, and they
15        were aired as -- I believe the story is accurate with
16        regard to the number of times they were aired, seven to
17        800 times.
18              And they -- I don't recall the script, exactly
19        what the -- what it asked for.  I remember the general
20        subject matter being as described here.
21    Q   Did it name -- did the script name any candidates?
22    A   No.
23    Q   And you ran TV ads as well; correct?
24    A   Later, I believe.
25    Q   Do you know when those ran?
```

1  A  In the fall of 2005.

2  Q  Just prior to the November ballot vote?

3  A  Yes.

4  Q  What did those ads say?

5  A  They were an appeal to the public to vote yes on that

6     ballot measure.

7  Q  Did those ads name any candidates?

8  A  No.  No.

9  Q  What other ways has CFM communicated with the public

10    other than what we've discussed?

11 A  None that I can think of.

12 Q  Has CFM placed any newspaper ads?

13 A  Yes.

14 Q  Can you describe those?

15 A  We ran many large ads at about the same time this radio

16    advertising campaign was running in the spring of 2005

17    mentioning the rally and encouraging people to commit

18    to gather signatures for the petition drive.

19 Q  Can you think of any other -- anything else about the

20    newspaper ads that you ran, what -- sorry.  Strike

21    that.  What newspapers did they run in?

22 A  I don't know all the papers they ran in, but I know

23    they ran in the Portland Press Herald, the Kennebec

24    Journal, I think in the Bangor Daily News.  And they

25    may have run in the Waterville Sentinel also.

| | | |
|---|---|---|
| 1 | Q | Did -- |
| 2 | A | No, go ahead. |
| 3 | Q | Did you speak often with the press about the ballot |
| 4 | | initiative? |
| 5 | A | Yes. |
| 6 | Q | And were your comments published in the press? |
| 7 | A | Yes. |
| 8 | Q | And did you speak with the broadcast media about the |
| 9 | | ballot issue? |
| 10 | A | Yes. |
| 11 | Q | And were those comments broadcast? |
| 12 | A | Yes. |
| 13 | Q | Did that include the national media? |
| 14 | A | Yes. |
| 15 | Q | The CFM web site even today contains a number of |
| 16 | | documents that appear to be newspaper ads? |
| 17 | A | Uh-huh. |
| 18 | Q | Were those in fact newspaper ads? |
| 19 | A | Yes. |
| 20 | Q | That were -- and those were placed in the newspapers as |
| 21 | | you've described? |
| 22 | A | Yes.  I was describing a different set of -- a |
| 23 | | different print advertising campaign that ran in the |
| 24 | | spring.  The ads that you're referencing were developed |
| 25 | | for the fall campaign.  And those were placed on the |

```
 1          web site as pdf -- as downloadable files that people
 2          were encouraged to place in their own local weekly and
 3          daily newspapers.  I have no way of knowing how many of
 4          those were run, could have been none, could have
 5          been -- I have no way of knowing.
 6   Q      What other methods did -- strike that.  You mentioned a
 7          rally?
 8   A      Uh-huh.
 9   Q      Can you describe the rallies that CFM put together for
10          this effort in 2005?
11   A      We organized a rally for the State House steps in I
12          think it was -- it's mentioned there, March, I guess,
13          that attracted over 500 people and addressed the recent
14          passage of the gay rights law and responded to that by
15          encouraging citizens to sign up to become petition
16          circulators.  And 2,000 of them did that.
17   Q      What other rallies did you hold as part of the CFM
18          effort in 2005?
19   A      Well, rallies.
20   Q      Or any public gathering of that nature?
21   A      None.
22   Q      What methods did CFM use to persuade people to come to
23          the rally?
24   A      The full page ads.  The radio advertisements mentioned
25          the rally, I think.  Email mention on the web site.
```

```
 1            Direct mail.  Phoning, but not phone banking, just
 2            informal grass roots voluntary phoning.
 3   Q   Was that by the woman you mentioned earlier or --
 4   A   No.
 5   Q   Who was -- please describe the phoning?
 6   A   We worked with a group called the Maine Grass Roots
 7       Coalition, and they did phoning.  And they made direct
 8       contact, personal appeals to people.
 9   Q   Was it a shared effort between CFM and Maine Grass
10       Roots Coalition to do that phoning?
11   A   They did most of the work.  We provided funding to them
12       to do that and to coordinate and organize the signature
13       gathering.
14   Q   And you mentioned direct mail, can you describe what
15       you did in direct mail with CFM?
16   A   There were a number of mailings that went out to donors
17       and potential donors inviting them to participate.  I
18       cannot remember -- I cannot remember any of them
19       specifically.
20            We had a group of people numbering around 20 to 30
21       who were in my orbit, and beyond them, there were many
22       more as you can imagine with 2,000 people active.  And
23       there was a number of -- there was mailing and phoning
24       and solicitation ongoing at a number of levels in a
25       number of different ways.
```

1    Q    Are there any other ways in which CFM communicated its

2         views on the ballot initiative in 2005?

3    A    None that I can think of.

4    Q    CFM reported the contributions it received in 2005 to

5         the state of Maine; correct?

6    A    Uh-huh.

7    Q    And I take it those reports are accurate as far as you

8         know?

9    A    Yes.

10   Q    Did CFM receive any money from business corporations in

11        2005?

12   A    I don't know.

13   Q    Okay.

14              MR. SUMMERS:   This might be a good place for

15        a break.   Does that sound good?

16        (Recess at 2:56 p.m., to 3:06 p.m., after which the

17        following proceedings transpired.)

18   Q    (By Mr. Summers)   Mr. Heath, has CCL considered during

19        your tenure setting up a federal PAC?

20   A    No.

21   Q    Why not?

22   A    We're -- I'm taking it slow.

23   Q    Can you explain?

24   A    Getting involved with candidate politics in the form of

25        express endorsements or in the form of endorsements or

```
 1          direct opposition is -- has appeared to me to be

 2          complicated, not just with respect to regulations, but

 3          with respect to the theological perspectives of our

 4          supporters.  So I'm taking my time.

 5     Q    Do you have concerns about the -- those issues with the

 6          state PACs that you have?

 7     A    Yes.  Some -- some of the same issues on the

 8          theological side, yes.  But with respect to regulations

 9          and rules and funding on the federal side with federal

10          candidates and PACs and activity, I don't have enough

11          information yet.

12     Q    Have you talked about possibly setting up a federal PAC

13          during your tenure with anyone else?

14     A    No.

15     Q    What are the sources of CCL's funding?

16     A    CCL.  Churches and individual contributors.

17     Q    Anything else?

18     A    The -- we just started accepting advertising for our

19          print Record so we do have advertising income now.

20     Q    Is that -- strike that.  The complaint in this case

21          that you verified says that CCL does not qualify for

22          the exception for qualified nonprofit corporations

23          under the federal law.  Do you recall verifying that as

24          a factual --

25                    MR. BOPP:  That is not a fact.  That is a
```

1    legal -- I object to the question.

2                MR. SUMMERS:  We'll bring him to the

3    complaint then.

4    Q    (By Mr. Summers)  I'll ask you to take a look at the

5    complaint which is Exhibit 7, and please turn to

6    Paragraph 22?

7    A    Okay.

8    Q    Okay.  Please read Paragraph 22.  I'm asking for the

9    factual basis for the statements in Paragraph 22 as to

10    why CCL does not qualify for the exception for

11    qualified nonprofit corporations?

12                MR. BOPP:  Well, I'd object because that

13    would be based upon the legal requirements.  So he

14    cannot be expected to know the legal requirements that,

15    you know, are encompassed within that determination.

16    Q    (By Mr. Summers)  Let me direct you to the

17    interrogatory responses, which are Exhibit 10.  Exhibit

18    10 which are the interrogatory responses CCL served

19    earlier this week, and Interrogatory 4, response is on

20    Page 5.  Okay.  The first full paragraph on Page 5, do

21    you see that?

22    A    Uh-huh.

23    Q    Is it correct that CCL has offered books and materials

24    in exchange for a suggested donation?

25    A    Yes.

```
 1    Q    Please describe how that -- how that works?

 2    A    Well, we were in receipt of over 400 books entitled How

 3         Now Shall We Live some years ago, I don't know if it's

 4         been since 2004, but it may have been.  And --

 5    Q    Who wrote that?

 6    A    Charles Colson.

 7    Q    Go on.

 8    A    And those books -- I'm hesitating because that

 9         particular campaign may have been a Christian Education

10         League activity, CEL, instead of CCLM.  The CCLM has a

11         literature table when I speak, and we provide books to

12         people who sign up to become members or supporters, we

13         provide them for the donation or for the -- for their

14         first donation or their dues, whatever, depends.  It

15         may be dues or it may be just a donation for support,

16         and we would provide books.

17    Q    So does CCL or possibly the Education League say if you

18         make a donation of a certain amount, we will give you a

19         copy of this book or this material?

20    A    Yes.

21    Q    Is there any other -- any other materials that are

22         offered in exchange for donations by CCL?

23    A    Occasionally.

24    Q    What are those?

25    A    We're working on a project now that would involve a DVD
```

1      for -- we will probably make those available not for

2      donation, but for sale.  People would give us a certain

3      amount, and we would provide the product.

4   Q  When you -- what you've described, offering the books

5      and other materials at your meetings, is that a CCL

6      activity?

7   A  Yes.

8   Q  And so what CEL activity might involve this kind of

9      transaction?

10  A  I mentioned one, that book project that we provided to

11     churches.

12  Q  All right.  Anything else?

13  A  Nothing that I can think of.

14  Q  All right.  Now coming back to CCL activities, other

15     than the books and materials offered in exchange for

16     the suggested donations at the meetings, are there any

17     other ways in which CCL provides books and materials to

18     supporters that generates income to or that generates

19     funds for CCL?

20  A  No.

21  Q  In the same paragraph on Page 5 of the interrogatory

22     responses, there's a reference to events such as

23     banquets which are likewise providing goods and

24     services or are advertising or promotional activity.

25         Can you describe -- is that any different from

1    what we just talked about, or is that the same thing by

2    CCL?

3  A   The banquets are different from my speaking

4    engagements.  We hold an annual banquet, and we invite

5    people to sponsor tables.  Occasionally we will provide

6    a book or CD or some goods related to their

7    contribution.

8  Q   Is that sentence describing anything other than that?

9  A   No.

10 Q   At the end of the paragraph, there's a reference to

11    advertising revenue from The Record; correct?

12 A   Yes.

13 Q   Is that the revenue that you mentioned earlier that you

14    had just recently started to --

15 A   Yes.

16 Q   -- create?  When did The Record begin receiving

17    advertising revenue?

18 A   Three months ago.

19 Q   Before that period, before 2006, had The Record ever

20    received such advertising revenue?

21 A   Yes.

22 Q   Please describe that during your tenure?

23 A   None during my tenure.

24 Q   So during your tenure, The Record has not received?

25    Have you -- has CCL during your tenure received any

```
 1            other advertising revenue aside from what The Record
 2            decided to do three months ago?
 3     A      No.
 4                      MR. SUMMERS:  I'm going to mark another
 5            exhibit.
 6            (Heath Deposition Exhibit Number 13 was marked for
 7            identification.)
 8     Q      (By Mr. Summers)  Please review what's been marked as
 9            Exhibit 13 which is a series of invoices produced by
10            CCL to the Commission earlier this week with dates
11            ranging from late January, 2006, to March, 2006?
12     A      Uh-huh.
13     Q      Do you recognize these?
14     A      Yes.
15     Q      Are those invoices for The Record's advertising?
16     A      Uh-huh.
17     Q      And this is the advertising that you just discussed?
18     A      Uh-huh.
19     Q      Correct?  Can you tell me which of these invoices
20            reflect money from business corporations?
21     A      I don't know which are business corporations and which
22            aren't.
23     Q      I take it that zero invoices do not generate any income
24            for CCL?
25     A      Zero invoices may or may not be related to donations.
```

| 1 | Q | So please explain what that means? |
| 2 | A | Some ads that have zero invoices are thank yous that we |
| 3 | | just might give to a potential -- an advertiser, a |
| 4 | | church, an individual or a business.  Some are zeros |
| 5 | | that are part -- that are part of an advertising series |
| 6 | | where we don't invoice this month, but we're going to |
| 7 | | invoice next month or the month after because they've |
| 8 | | made a commitment over a period of months. |
| 9 | Q | So the thank yous you've described to an individual, |
| 10 | | what would that look like as far as the ad text? |
| 11 | A | Whatever they want it to look like. |
| 12 | Q | Can you give me an example of what people typically -- |
| 13 | A | Look through here. |
| 14 | Q | -- create? |
| 15 | A | Well, there's one ad here which is listed as a zero, |
| 16 | | it's invoice number 171, which would be invoice number |
| 17 | | 171, top right, which has a zero value.  The newspaper |
| 18 | | ad itself has a retail value of $56, but we didn't |
| 19 | | charge anything as a thank you to this particular |
| 20 | | individual for donation. |
| 21 | Q | And what did that ad text actually say? |
| 22 | A | Well, this individual chose to advertise a particular |
| 23 | | ministry of which he was fond -- that he was fond of. |
| 24 | | And so we put an ad in for him advertising that |
| 25 | | particular -- it happened to be a retreat center. |

```
 1   Q   Is it really whatever the donor would like to put in
 2       there?
 3   A   As long as it's consistent with our mission values.
 4   Q   Do donors sometimes create ads that thanks CCL for its
 5       work?
 6   A   Well, not yet, but I hope so.
 7   Q   Do donors sometimes create ads that are in the nature
 8       of tributes to people they admire?
 9   A   That's another good idea.
10   Q   Can you describe any other -- any other -- please
11       describe other types of things that people put in their
12       ads?
13   A   Well, one -- this top one here, he advertises his car
14       dealership.
15   Q   What does that ad say?
16   A   Buy a car from me, his company, full page, basically.
17       I mean that's not exactly what it says, but that's what
18       it -- that's what it tries to get people to do.
19   Q   Is it possible that none of the -- that none of these
20       ads are for business corporations?
21   A   Is it possible, yes.  Is it likely, no, because this
22       particular ad for the car company, I'm not a lawyer, so
23       when you say business corporation, I can't -- I don't
24       know whether he has a business corporation.  I know
25       it's a business.  But I don't know what his corporate
```

```
 1            status is or anything like that.

 2    Q    I mean a for profit corporation?

 3    A    I would assume, but it's an assumption on my part, that

 4         this particular ad for the Linnehan family business is

 5         such an ad, but it's an assumption on my part because

 6         we don't keep track of that.

 7    Q    Does The Record have any policy about offering the

 8         courtesy advertisements?

 9    A    Can you elaborate on the question?

10    Q    Who is entitled to a courtesy advertisement?

11    A    We developed some broad guidelines, but I have

12         authorized my advertising director to use her

13         discretion in those decisions.

14    Q    How much revenue has advertising in The Record created

15         for CCL in 2006?

16    A    It would be an estimate, but pretty close, I would say,

17         not in excess of $3,000.

18    Q    How much of that came from individual human beings?

19    A    Probably at least two-thirds of it, I'm guessing.  But

20         I don't know because I'd have to review the -- all the

21         ads and the income that came in from those ads.

22    Q    Did some of it come from churches?

23    A    Yes.

24    Q    How much came from churches?

25    A    I don't know.  I don't know.
```

| | | |
|---|---|---|
| 1 | Q | Did some come from other nonprofit groups that are not |
| 2 | | churches like CCL itself? |
| 3 | A | Not that I -- not that I recall. |
| 4 | Q | Does CCL do anything else other than what we've |
| 5 | | discussed that you regard as business activity? |
| 6 | A | No. |
| 7 | Q | Okay.  I'd like to direct your attention back to the |
| 8 | | interrogatory responses, which I believe were marked as |
| 9 | | Exhibit 10.  And that same Page 5, now the last |
| 10 | | paragraph on Page 5, a statement about halfway down in |
| 11 | | that paragraph, the sentence beginning, however, 11 |
| 12 | | CFR, and the statement, the second half of that |
| 13 | | sentence which states, CCL may have received |
| 14 | | contributions from nonprofit corporations who may have |
| 15 | | received contributions from business corporations. |
| 16 | | Do you see that? |
| 17 | A | Yes. |
| 18 | Q | Can you please explain the factual basis for that? |
| 19 | A | Well, we don't keep track of the corporate status of |
| 20 | | donors.  So it's accurate for us to say we may have |
| 21 | | received contributions.  We receive somewhere between |
| 22 | | 10 and 20,000 contributions a year. |
| 23 | | And so we may have received contributions for |
| 24 | | business corporations, may have received -- so that's |
| 25 | | the factual basis. |

 1  Q   Can you think of any examples of a donation from a

 2      nonprofit that you suspect may have received money from

 3      a business corporation?

 4  A   There's -- in the Exhibit B, which has been mentioned

 5      as not responsive to interrogatory whatever, I don't

 6      remember the question, there's the International Reform

 7      Federation is listed there.

 8          And I -- they may be a nonprofit corporation, says

 9      they are in our notation here.  And they may have

10      received contributions from a business corporation.  I

11      can't say they did or didn't.

12  Q   In the next sentence of the same paragraph of the

13      interrogatories, there's a statement that the Christian

14      Education League does receive donations from business

15      corporations.  Is that correct?

16  A   Yes.

17  Q   How much in donations from business corporations has

18      the Education League received in 2006?

19  A   I don't know.

20  Q   How would you find out?

21  A   I would have to review each individual contribution,

22      and if I saw a name that looked like a business, I

23      would then have to confirm or deny that it is -- was

24      actually a business by I assume contacting the

25      business.  And that would be how it would have to be

```
 1            done.

 2    Q      Is that the same answer for 2005?

 3    A      Are you referencing something here?

 4    Q      Has the Education League -- did the Education League

 5            receive donations from business corporations in 2005?

 6    A      Yes.

 7    Q      And how much did it receive in 2005?

 8    A      I don't know.

 9    Q      Would you have to go through the same process you've

10            just described for 2005?

11    A      Yes.

12    Q      And in 2004, did the Education League receive donations

13            from business corporations?

14    A      Yes.

15    Q      How much?

16    A      I don't know.

17    Q      And would you have to go through the same process to

18            find out?

19    A      Yes.

20    Q      Okay.  Is it possible because you've said that you --

21            if I understand -- if I understand you, that you aren't

22            sure exactly what the Education League has received in

23            2006 from business corporations, is it possible that it

24            has not actually received any money from business

25            corporations in 2006?
```

| 1 | A | Business corporations. Is it possible, I don't know. |
| 2 | | I would have to review the contributor list for 2006 to |
| 3 | | give an answer. |
| 4 | Q | So if you -- then if you don't know as you sit here |
| 5 | | right now, then it's possible; correct? |
| 6 | A | It's possible that we did not, possible, yes. |
| 7 | Q | The same sentence in the response to Interrogatory |
| 8 | | Number 4 that talks about the Education League also |
| 9 | | mentions the sharing and allocating of expenses between |
| 10 | | CCL and the Education League? |
| 11 | A | Uh-huh. |
| 12 | Q | Please explain generally how that works? |
| 13 | A | The CEL is bound by (c)(3), 501(c)(3) rules to only |
| 14 | | fund certain activity. And that activity, some of its |
| 15 | | funds are provided to the Christian Civic League of |
| 16 | | Maine in the form of grants that fund appropriate |
| 17 | | (c)(3) activity. That's -- and then some of the funds |
| 18 | | in the CEL are directly expended by the CEL by that |
| 19 | | corporation. |
| 20 | Q | Okay. The CEL and the CCL share staff; correct? |
| 21 | A | The CCL is the only entity that has staff. And the |
| 22 | | staff of the CCL is -- keeps track of hours and related |
| 23 | | to projects that the grants from the CEL are funding. |
| 24 | | And that's how -- that's one way that that relationship |
| 25 | | works. |

```
 1              The CCL also provides the staff for CEL activities

 2        directly, and the CEL pays for that.

 3   Q    So does the -- I'm trying to understand.  Does the CEL

 4        finance activities of the CCL?

 5   A    It funds only activities that it -- that its board,

 6        which is a separate entity, determines are appropriate

 7        (c)(3) activities.  And the CCL submits paperwork

 8        consistent that indicate that detail -- that detail

 9        that activity.

10   Q    And that's sometimes activity of CCL that is funded

11        that way?

12   A    Yes.

13   Q    All right.  Okay.  I'd like to direct your attention to

14        the response to Interrogatory Number 7, same exhibit,

15        and Exhibit A to the responses.  The Exhibit A lists

16        donations over $1,000 to CCL in the time period 2004

17        through March of 2006; correct?

18   A    Yes.

19   Q    And are these donations by individual human beings?

20   A    Some are, some aren't.

21   Q    What else -- what other kinds of entities are they

22        from?

23   A    Churches.  Perhaps some nonprofit corporations, perhaps

24        some -- what you're calling -- perhaps some businesses.

25   Q    Do you know for certain that any are businesses?
```

1    A    I don't.

2    Q    Do you know for certain that any are individual human

3         beings?

4    A    Yes.

5    Q    How many are individual human beings?

6    A    I don't know.

7    Q    The third column is headed fund code; correct?

8    A    Uh-huh.

9    Q    Can you explain the meaning of the entries under fund

10        code?

11   A    Well, this is a code that's produced by our operations

12        director and is used I assume by her in her work with

13        our accounting firm that does the -- that does the --

14        not audit, but the review of our finances every year.

15   Q    Can you explain what the entries mean, though?   For

16        instance, what does SPLG mean?

17   A    I believe that means special gift.   I think wills,

18        probably self-explanatory.   Miscellaneous.   CHBD would

19        be I assume again church budget.   I would need to

20        confirm that.   AP204, I don't know.   EOYG, I don't

21        know.

22   Q    RCPT?

23   A    I don't know.

24   Q    SPDS?

25   A    Don't know.

| 1 | Q | All right.  Since January 1, 2004, CCL has received |
| 2 |   | donations from other nonprofit corporations; correct? |
| 3 | A | Yes. |
| 4 | Q | And since that time, it's received donations from |
| 5 |   | churches; correct? |
| 6 | A | Yes. |
| 7 | Q | Has it received donations from other 501(c)(4) |
| 8 |   | organizations since that time? |
| 9 | A | I don't know. |
| 10 | Q | What other types of organizations do you know that CCL |
| 11 |   | has gotten donations from during that time? |
| 12 | A | Rephrase the question. |
| 13 | Q | Do you know that CCL has received donations from any |
| 14 |   | other type of organization since January, 2004? |
| 15 | A | I don't know. |
| 16 |   | MR. SUMMERS:  I'm going to mark one exhibit. |
| 17 |   | I believe it may be the last exhibit.  Is that |
| 18 |   | encouraging? |
| 19 |   | (Heath Deposition Exhibit Number 14 was marked for |
| 20 |   | identification.) |
| 21 | Q | (By Mr. Summers)  I'll show you what's been marked as |
| 22 |   | Exhibit 14, which is a Form 990 of the Internal Revenue |
| 23 |   | Service which states that it's for fiscal year 2004 for |
| 24 |   | Christian Civic League of Maine, Inc.  Do you recognize |
| 25 |   | this? |

1    A    Uh-huh.

2    Q    Please turn to Page 6.  What is this document?

3    A    Form 990.

4    Q    Is it a Form 990 that CCL filed for fiscal year 2004?

5    A    Yes.

6    Q    On Page 6, there are entries for Line 93A and 103A, do

7         you see those?

8    A    Uh-huh.

9    Q    The entry for 93A on Page 6 says program service

10        revenue along with other income; correct?

11   A    Uh-huh.

12   Q    What is that?

13   A    I believe that that would be income that came from a

14        convention we had that year, our banquet.  It's

15        referenced as a banquet in other documents.

16   Q    And what income related to the banquet, what was that?

17   A    Could have been donations.  It could have been what

18        people paid us to get in.

19   Q    Ticket prices?

20   A    Ticket type of thing.  But I don't recall exactly what

21        it was that year.

22   Q    Is there anything else it could have been?

23   A    Not that I can think of.

24   Q    For 103A, the description is, provide the League with

25        the capital necessary to fund its operations.  What was

| | | |
|---|---|---|
| 1 | | that? |
| 2 | A | I don't know. |
| 3 | Q | You were the person who signed this form on behalf of |
| 4 | | CCL; correct? |
| 5 | A | Yes. |
| 6 | Q | All right.  Turning back once again to the |
| 7 | | interrogatories, which you should have in front of you, |
| 8 | | which are Exhibit 10.  And please look at Exhibit 9 -- |
| 9 | | I'm sorry, Interrogatory 9, and Exhibit B, which has |
| 10 | | been deleted from the response to Interrogatory 9.  Do |
| 11 | | you see Interrogatory 9? |
| 12 | A | Uh-huh. |
| 13 | Q | What is the answer to Interrogatory 9? |
| 14 | A | Zero. |
| 15 | Q | Please explain. |
| 16 | A | No individual has pledged to contribute in excess of |
| 17 | | $1,000 to CCL to pay for CCL's campaign for passage of |
| 18 | | the federal Marriage Protection Amendment Act, not one. |
| 19 | Q | I understand. |
| 20 | | MR. SUMMERS:  I think that's all I have. |
| 21 | | Jim, do you have any questions you'd like to ask? |
| 22 | | MR. BOPP:  Yes. |
| 23 | | EXAMINATION |
| 24 | | BY MR. BOPP: |
| 25 | Q | Turn to Page 5, please, again. |

| | | |
|---|---|---|
| 1 | | MR. SUMMERS:  Page 5 of? |
| 2 | Q | (By Mr. Bopp)  The interrogatory answers.  You were |
| 3 | | asked about banquets? |
| 4 | A | Uh-huh. |
| 5 | Q | And with respect to people buying tables, you mentioned |
| 6 | | that they might be provided goods and services like |
| 7 | | books or other premiums? |
| 8 | A | Uh-huh. |
| 9 | Q | Okay.  Aren't they also provided meals? |
| 10 | A | Yes. |
| 11 | Q | Okay.  And meals would be a good or service that |
| 12 | | resulted in income to the corporation? |
| 13 | A | Yes. |
| 14 | Q | Okay. |
| 15 | | MR. BOPP:  No further questions. |
| 16 | | MS. SEALANDER:  We had talked earlier about a |
| 17 | | list. |
| 18 | | MR. BOPP:  Are we done? |
| 19 | | MS. SEALANDER:  But I want to do this on the |
| 20 | | record because I'm giving you the only copy of this.  I |
| 21 | | want to just read to you the things that we've listed. |
| 22 | | MR. BOPP:  Okay, sure. |
| 23 | | MS. SEALANDER:  So the first thing is the |
| 24 | | 2004 voter's guide. |
| 25 | | And second thing is the radio buy information that |

1    Focus on the Family produced which I believe he

2    indicated that he may have, but in any event, I believe

3    they have, and at this point they're sort of acting as

4    the agent.

5        Number three, email from Focus on the Family, the

6    initial email that was sent to you from Focus on the

7    Family asking whether you wanted to do an advertising

8    campaign on the amendment.  You described it as being

9    sent to the Family Policy Councils.

10       Number four, you indicated that you responded by

11   email.  So we would like that email response.

12       Number 5, you indicated there have been

13   communications between Natalie Torgeson and Focus on

14   the Family regarding the script.  We'd like any

15   documents related to that.

16       Number 6.  There's only two more.  Number 6 is

17   copies of the print version of The Record for the last

18   three months that contain paid advertising.

19       And Number 7 is all invoices that weren't produced

20   earlier that relate to paid advertising in The Record.

21   You indicated at deposition that you thought there were

22   about $3,000 worth.  My quick math said we didn't have

23   that much here.  If there's others, we'd like those.

24   If there's not, there's not.

25           MR. BOPP:  All right.  We'll do this as

 1          quickly as possible subject to --

 2                    MS. SEALANDER:  Maybe we can get this

 3          tomorrow?

 4                    MR. BOPP:  We'll try, subject to any

 5          objections, if we have any.  I don't know that we do,

 6          but we will --

 7                    MS. SEALANDER:  Can you read all of that?

 8                    MR. BOPP:  Yes, thank you.  Yes.  I think I

 9          know what you're saying.  And we'll do that as quickly

10          as possible, hopefully tomorrow, but we will see.

11                    MS. SEALANDER:  We're all done.

12          (At 3:52 p.m., the foregoing proceedings were

13          concluded.)

14                                - - - - -

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2                I, Cindy Packard, a Notary Public in and for

 3        the State of Maine, hereby certify that the

 4        within-named deponent was sworn to testify the truth,

 5        the whole truth, and nothing but the truth in the

 6        aforementioned cause of action.

 7                I further certify that this deposition was

 8        stenographically reported by me and later reduced to

 9        print through Computer-Aided Transcription, and the

10        foregoing is a full and true record of the testimony

11        given by the deponent.

12                I further certify that I am a disinterested

13        person in the event or outcome of the above-named cause

14        of action.

15                IN WITNESS WHEREOF I subscribe my hand

16        this  14th of   April        , 2006.

17        Dated at Falmouth, Maine.

18

19

20

21

22                                   Cindy Packard

23                                   Notary Public

24        My Commission Expires
          November 9, 2008
25
```

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )        No.  1:06CV00614
            Plaintiff,             )
                                   )        EXHIBIT A-1
            v.                     )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
            Defendant.             )
                                   )


**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-1 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# By-Laws of The Christian Civic League of Maine

## - Adopted October 17, 1998 -

The Constitution and By-laws of The Christian Civic League of Maine are hereby revoked and replaced with the following new By-laws.

## 1. **Mission Statement**

The Christian Civic League of Maine exists for the purpose of bringing a Christian influence to the public square through effectively working with public policy makers and members by providing accurate, timely and persuasive information from a biblical perspective.

## 2. **Purpose**

The purpose of The Christian Civic League of Maine shall be to present and maintain an effective, positive and faithful witness in the public life of our state; to have an impact on the development of public policy in Maine; to uphold a biblical standard of justice and righteousness; and to reflect a genuine Christina compassion and respect for all people. The League shall endeavor to: (1) promote good citizenship; (2) elect honest and competent officials; (3) secure good laws and their impartial execution; and (4) cooperate and assist the home, church and schools in these efforts.

## 3. **Statement of Faith**

- We believe the Bible to be the only infallible authoritative Word of God.
- We believe that there is only one God, eternally existent in three persons: Father, Son and Holy Spirit
- We believe in the deity of our Lord Jesus Christ, in His virgin birth, in His sinless life, in His miracles in His vicarious and atoning death through His shed blood, in His bodily resurrection, in His ascension to the right hand of the Father, and in His personal return to power and glory.
- We believe that for the salvation of lost and sinful man a person must repent of his/her sins, ask Jesus Christ to be Lord of his/her life and be regenerated by the Holy Spirit.
- We believe in the present ministry of the Holy Spirit, by Who's indwelling the Christian is enabled to live a godly life.
- We believe in the resurrection of both the saved and the lost; that they are saved unto the resurrection of life and they that are lost unto the resurrection of damnation.
- We believe in the spiritual unity of believers in our Lord Jesus Christ.

## 4. **Members**



DEPOSITION EXHIBIT
PENGAD 800-631-6989
Heath 1
Cp 4-13-06

2

### a. Membership

Any person who signs a statement that they agree with the League's mission, Statement, Purpose and Statement of Faith, set forth above, and who pays the annual membership fee (to be determined annually by the Board of Directors) shall be a member of The Christian Civic League of Maine.

The Board of Directors may revoke the membership of any person at any time.

All Board Members, officers, committee members and employees of The League must be members of The League.

### b. Meetings of the Members

An annual meeting of the members will be held each year on the first Friday of the month of December and place to be specified by the Board of Directors. Notice of the time and place of the annual meeting will be given by the Secretary by inserting such a notice in The Civic League RECORD at least thirty (30) days prior to such a meeting. At the annual meeting the members shall elect a Board of Directors (consisting of eleven [11] directors), and shall set general policies and goals for The League.

The Board of Directors may call additional meetings of the members at any time. Notice of any such additional meetings shall be given in the same manner that notice is to be given for the annual meeting of the members.

### c. Votes taken by the Members

*Members of Record:* The secretary shall prepare a list of members of record at least ten (10) days prior to any meeting of the members. Only those members who are listed as members of record may vote at the meeting of the members.

*Quorum of Members:* A quorum of members will be present if fifteen (15) or more members of record are present at the meeting. No business can be conducted at a meeting of the members unless a quorum of the members is present.

*Majority Vote:* No action of the members will be of any legal force or effect unless a majority of the members of record present at a valid meeting of the members vote in favor of the action.

### 5. **Board of Directors**

#### a. Board Membership

The Board of Directors shall consist of eleven (11) persons elected at large by the members at the annual meeting of the members.

A board member may be expelled from the Board of Directors for any reason if:

1. A special meeting of members in called expressly for that purpose.
2. Notice of the time, place and purpose of that special meeting is printed in the RECORD at least thirty (30) days prior to the meeting.
3. At least fifteen (15) members are present at the meeting; and
4. A majority of members present at that meeting votes in favor of expelling the director.

3

The responsibilities of members of the Board of Directors shall include regular attendance at board meetings, ongoing involvement in raising resources and the encouragement and prayerful support of the executive director.

Vacancies on the Board of Directors may be filled by the board at any time.

### b. Powers

The Board of Directors shall be the governing body of The League. The board shall carry out the resolutions of the members, made at a meeting of the members. In addition, the Board of Directors is empowered to take any actions not expressly reserved to the members under the laws of the state of Maine. The powers of the Board of Directors shall include, but shall not be limited to, establishing goals and policies for The League.

### c. Meetings of the Board of Directors

Meetings of the Board of Directors may be called at any time by the executive director, by the president, or by three (3) or more of the directors. Notice stating the time and place of the meeting of the Board of Directors must be mailed by the person or persons calling the meeting (first class, postage prepaid) to each director at least five (5) days in advance of the meeting. Notice may be waived by a director at any time, either before or after a meeting of the Board of Directors.

The president shall act as the chairman of the board, and preside over all meetings of the Board of Directors. The president may establish whatever procedure and rules of order he deems appropriate for the meeting.

Generally, any member of The League may attend meetings of the Board of Directors, but may not participate in discussions by the board unless called upon by the president. However, if the president deems a particular issue to be highly sensitive, the president may order the board into "executive session", and exclude all non-board members from the meeting during the discussion of that issue.

### d. Votes of the Board of Directors

*Quorum of Directors:* Seven (7) directors shall constitute a quorum. No business shall be conducted at a meeting of the Board of Directors unless a quorum of the directors is present.

*Majority Vote:* No action of the Board of Directors shall be of any legal force or effect unless a majority of the directors present at a valid meeting of the Board of Directors votes in favor of the action.

## 6. Officers

The Board of Directors shall appoint a president, first vice-president, secretary and treasurer from among the members of the Board of Directors at the first meeting of the board following the annual meting of the members. These officers shall hold office for one year or until successors are appointed. Officers may be removed from their office and replaced by the Board of Directors at any valid meeting of the board.

4

### a. Powers of the Officers

The officers shall have any and all powers, which the Board of Directors delegates to them. In addition to the powers expressly delegated toe the officers by the Board of Directors; the officers shall have the following powers and duties:

*President:* The president shall serve as the chairman of the Board of Directors and shall preside over all board meetings. In addition, he shall sign any documents approved by the Board on behalf of The League.

*Vice President:* The vice president shall exercise any and all powers of the president when the president is unavailable. He shall appoint a chair of nominations, and is responsible for the oversight of Board policy.

*Secretary:* The secretary shall keep a correct record of each meeting of the members and of the Board of Directors. He shall count all votes at the meetings of the members and of the Board of Directors. He shall see that timely notice is placed in the RECORD prior to all meetings of the members.

*Treasurer:* The treasurer shall maintain the security of all funds of the corporation and disburse the same only as directed by the Board of Directors. He shall be responsible for keeping accurate records of all financial matters of the corporation. He shall present an annual report to the membership at the annual meeting of The League; and shall present financial reports to the Board of Directors upon request by the board. He shall present a proposed budget, approved by the Board to the annual membership at the annual meeting.

### 7. **Advisory Board**

In addition, those church denominations that agree with The League's Mission Statement, Purpose, and Statement of Faith may send a representative to serve on the advisory board of The League. All such representatives must become members of The League and must be approved to sit on the advisory board by vote of the board at a valid board meeting.

The Board of Directors may also appoint former board members to an advisory board to consult with and advise the Board of Directors. Such advisory board members shall be called "emeritus" board members.

Advisory board members may attend all meetings of the Board of Directors – including executive sessions, and may participate in all board discussions in an advisory capacity. Advisory board members have no vote.

### 8. **Committees**

The Board of Directors may establish committees to advise the board and/or the executive director, as the board deems necessary and appropriate.

### 9. **Executive Director**

The Board of Directors shall hire an executive director, who shall be in charge of carrying out the on-going, day-to-day administrative duties of the corporation. He shall serve in that capacity until he resigns, or until his employment is terminated by vote of at least eight (8) members of the Board of Directors.

The executive director shall serve as an ex-officio member of the Board of Directors and of all committees. However, he shall only be entitled to vote on an issue at a board meeting:

(1) in the event of a tie vote by the other board members present at the meeting; or

5

(2) if there are only six (6) other board members present at the meeting.

He shall establish employment positions and fill those positions, within the budget constraints established by the Board of Directors. He shall supervise the staff, both employees and volunteer persons, and shall manage The League's office.

He shall be responsible for leading funding and resource development efforts.

The executive director is authorized and empowered to represent The League in all matters; i.e. – in church and community relations, in dealing with the legislature or the governor's office, and in dealing with the media. Whenever it becomes necessary, between meetings of the Board of Directors, the executive director shall exercise full authority in acting and speaking on behalf of The League; and he shall act and speak in a manner consistent with The League's Mission Statement, Purpose, Statement of Faith, and with the policies, resolutions and directives of the members and of the Board of Directors.

The Executive director shall also be the "Registered Agent" of the corporation. He shall be responsible for filing the annual report of the corporation with the Secretary of State, pursuant to Title 13-B M.R.S.A §1301, on or before June 1. He shall also be the corporation's designated representative for receipt of any service of legal process upon the corporation.

The executive director shall be accountable to the Board of Directors. However, the board shall, at all times, encourage and support the executive director, and pray for him and The League's staff.

## 10. Indemnification of Board Members, Officers and Employees

The Corporation shall indemnify and hold all board members, officers and employees harmless form all liability for anything done in good faith within the scope of their duties on behalf of the corporation.

## 11. Disposition of Assets on Dissolution

Upon the dissolution of the corporation or the termination of its activities, the assets of the corporation remaining after the payment of all its liabilities shall be distributed exclusively to one or more organizations organized and operated exclusively for such purposes as then qualifying as an exempt organization or organizations under section 501(c)(3) of the Internal Revenue Code of 1986 as amended, and as a charitable, religious eleemosynary, benevolent or educational corporation within the meaning of Title 13-B of the Maine Revised Statutes as amended.

No part of the net earnings of the corporation shall inure to the benefit of any member, director, or officer of the corporation, or any private individual (except that reasonable compensation may be paid for services rendered to or for the corporation in carrying out one or more of its purposes), and no member, director or officer of the corporation or any private individual shall be entitled to share in the distribution of any of the corporate assets on dissolution of the corporation.

## 12. Amendments

These By-laws may be amended at any time by vote of the members at the annual meeting of the members or at a special meeting of the members called for the purpose of amending the By-laws. However, the proposed

amendment must be published in the RECORD at least thirty (30) days prior to the meeting.

### 13. Effective Date

These By-laws shall take effect immediately upon their adoption –and all other constitutions and By-laws of the corporation shall be null and void – except for the provision of Article 4 of these by-laws, concerning who qualifies to be a member of The League.  That provision shall go into effect immediately following the meeting at which these By-Laws are adopted, and those persons who qualify as members of The League at the outset of that meeting, before these by-laws are adopted, shall continue to conduct business at that meeting.

*(NOTE:  These By-laws were adopted by vote of at least two-thirds of the members present at the annual meeting of the members, held on October 17, 1998.)*

7

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )    No.  1:06CV00614
            Plaintiff,             )
                                   )    EXHIBIT A-2
            v.                     )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
            Defendant.             )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-2 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) ) ) | |
| Plaintiff, | ) | No. 1:06CV00614 |
| | ) ) | |
| v. | ) ) | |
| FEDERAL ELECTION COMMISSION | ) ) | |
| Defendant. | ) | |

### NOTICE OF DEPOSITION

To:    James Bopp, Jr., Esq.
Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, IN  47807
Fax:  (812) 232-2434

M. Miller Baker, Esq.
McDermott Will &Emery LLP
600 Thirteenth Street, NW
Washington, DC 20005-3096
Fax: (202) 756-8087

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure plaintiff will take the

deposition upon oral examination, before a Notary Public or other person authorized to

administer oaths, of the corporate designee(s) of the Christian Civic League of Maine, Inc.

regarding each matter set forth in Schedule A.  The deposition will be recorded by stenographic

means and will continue from day to day until completed.



DEPOSITION
EXHIBIT
Heath 2
CP 4-13-06

Decley Decl. Exh. 1

The deposition will take place at the United States Attorney's Office, 100 Middle Street,

Portland, ME, 04101 at 9:00 a.m. on April 13, 2006.

Dated: April 5, 2006

 

 

Lawrence H. Norton
Richard B. Bader
David Kolker
Harry Summers
Kevin Deeley
Steve N. Hajjar
Federal Election Commission
999 E Street, N.W.
Washington, D.C.  20463
(202) 694-1650
Facsimile (202) 219-0260

2

## Schedule A

### Definitions

1.    "Christian Civic League, Inc." ("CCL") shall mean the Christian Civic League, Inc.,

including all officers; employees, whether paid or unpaid; supervisors; volunteers; agents,

consultants, or persons otherwise working on behalf of or at the request of the Christian Civic

League, Inc.; co-workers; subordinates; and staff or in-house attorneys thereof.

### Subject Matters of Testimony

1.    CCL's campaign for passage of the federal Marriage Protection Amendment.

2.    "Crossroads," CCL's proposed broadcast advertisement.

3.    CCL's grassroots and legislative lobbying campaigns from January 1, 2004

through the present.

4.    CCL's advocacy for or against candidates from January 1, 2004 through the

present.

5.    CCL's broadcast advertisements from January 1, 2004 through the present.

6.    CCL's current budget and financial resources from January 1, 2004 through the

present, including any donations to CCL from corporations or unions and the number of

donations to CCL from individuals that were in excess of $1000.

7.    CCL's relationship to the Christian Education League, Inc., the Christian Action

League, and the Coalition for Marriage.

8.    Application of the criteria listed for qualified nonprofit corporations in 11 C.F.R.

114.10 to CCL.

9.    CCL's efforts, if any, to create and raise funds for a federal, state or local political

action committee.

3

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF              )
MAINE, INC.,                          )
                                      )        No.  1:06CV00614
            Plaintiff,                )
                                      )        EXHIBIT A-3
            v.                        )
                                      )
FEDERAL ELECTION COMMISSION           )
                                      )
            Defendant.                )
                                      )


**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-3 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# The Christian Civic League Of Maine



Bringing a Biblical perspective to the dialogue over public policy.

## 2002

## Voter's Guide

*A reference guide to help you cast an informed vote*

## Maine's General Election is:

# Tuesday, November 5, 2002



DEPOSITION
EXHIBIT

Keahr 3

CP 4-13-06

**REMEMBER TO VOTE**

For information on where to vote, contact your Town Registrar of Voters or the Town Clerk.

---

The Christian Civic League of Maine is a 104-year-old organization that exists to bring a biblical perspective to the dialogue over public policy. Our executive director, Michael S. Heath, regularly lobbies in the legislature, speaks in churches and other public forums around the State of Maine and keeps abreast of events in the Legislature at the state and national level.

The League is a non-profit 501c4 corporation that is funded entirely by voluntary contributions. **Your gift ensures that pro-family advocates will continue to have a strong voice in Maine public policy and culture.**

---

**For further information on candidates, we have comments on file available for viewing at our 70 Sewall Street office. Please call 207.622.7634 to arrange for a time to review these documents.**

---

## The Christian Civic League of Maine

Dear Maine Citizen:

The League is pleased to bring you the Maine Voter's Guide for the upcoming November Election.

Your copy of the Voter's Guide represents many hours of writing, editing, printing, phone calls, interviews and set up work. I want to thank all those who have helped to put this publication together, the volunteers and staff of the League and also the candidates who took the time to respond to our questionnaire.

This resource is designed to provide you with vital information you can use to make an informed vote on Election Day. If you would like any more information, please call our office at 207.622.7634.

We sincerely hope this guide will be a help to you. Remember, your vote counts.

Michael S. Heath
Executive Director

---

**To locate your district for the State Senate or State Representative Race go to the Secretary of State web site:**

**www.state.me.us/sos/cec/elec/elec.html**



3

## Questionnaires containing the following questions sent to all candidates who are running for office in the November election.

Please answer each question with a **YES, NO or UNDECIDED**, except as specified. Feel free to expand on your answers on the back or on additional sheets of paper.

**Abortion:**
1.     Do you believe that the current abortion law is acceptable?
2.     Do you believe partial birth abortion should be banned?
3.     Do you favor providing "confidential" contraceptive services to schoolchildren?
4.     Are you in favor of a minor obtaining an abortion without parental consent?

**Alcohol**
1.     Do you favor strong and aggressive enforcement of alcohol laws?
2.     Do you believe that OUI offenders should be strongly punished for their offense?

**Education**
1.     Should parents have a school choice option (i.e. school vouchers or tax credits)?
2.     Do you support a parent's right to home school their children?
3.     Should children be exposed to homosexuality as an acceptable alternative lifestyle?

**Gambling**
1.     Do you support the expansion of legalized gambling?
2.     Do you support a casino in Maine?
3.     Do you think Maine should have a state lottery?

**Homosexual Issues**
1.     Do you favor expanded laws establishing sexual orientation as a protected class?
2.     Do you favor homosexual adoption?
3.     Do you support homosexual marriage?
4.     Do you support repeal of laws that attach greater rights to certain victims, such as "hate crimes"?
5.     Should public funding of faith-based organizations be denied because they do not support the homosexual agenda?

**Marriage and Family Values**
1.     Do you believe that marriage is an institution between one man and one woman and should last a lifetime?
2.     Do you favor health insurance benefits for non-married heterosexual couples and for homosexual couples ("domestic partners")?
3.     Do you agree with the status quo of "no fault" divorce?
4.     Would you support a voluntary "Marriage Covenant" option whereby couples would have to meet more requirements before they are granted a divorce?

4

**Pornography**
1.     Do you support the sale of so-called "soft porn" in public stores?
2.     Do you believe that pornography is a destructive force in society today?
3.     Do you support enforcement of existing obscenity laws against pornography?

**Spiritual Life**
1.     My religious affiliation is: _____ _____ _____
2.     Do you attend religious services on a regular basis?
3.     Do you believe religious ethics and reasoning should be part of the decision making process in law, politics and nation building?

**Taxes**
1.     Are you in favor decreasing the income tax burden for working families?
2.     Do you feel that there should be property tax relief for retired persons and those on a fixed income?
3.     Do you think the size of government should be reduced in order to stimulate economic development and job creation?

**Comments:**  (These will be kept on file and available for review by request)

# How We Rated the Candidates:

**The Christian Civic League Board of Directors** rated candidates according to their comments and answers to the questionairre.  Our policy statement was used as a standard to grade the stance of each candidate.  Each candidate running in the November election was sent a questionnaire and every effort was made to assure that candidates received questionnaires and had ample opportunity to respond.  Follow up telephone calls were made when possible.

A **rating of A to F** was used as follows:

        A. **Strongly supports** the League's values
        B. **Generally supports** the League's values
        C. **Neither supports nor opposes** the League's values
        D. **Generally opposes** the League's values
        E. **Strongly opposes** the League's values

**Candidates that "failed" to respond were graded with an "F".**

5

# The Candidates

## United States Senate Race:

| Party | Name | Town | CCL Rating |
|---|---|---|---|
| (D) | Ms. Chellie Pingree | Portland | F |
| (R) | Senator Susan Collins | Bangor | F |

## Governor's Race:

| Party | Name | Town | CCL Rating |
|---|---|---|---|
| (D) | Rep. John Baldacci | Bangor | Sent letter |
| (G) | Mr. Jonathan Carter | Lexington Twp | F |
| (R) | Mr. Peter Cianchette | Portland | F |
| (U) | David T. Flannagan | Augusta | F |
| (U) | John M. Michael | Auburn | B+ |

## United States Representative Races:

| Party | Name | Town | District | CCL Rating |
|---|---|---|---|---|
| (D) | Rep. Thomas Allen | Portland | District 1 | F |
| (R) | Mr. Steven  Joyce | Saco | District 1 | B+ |
| (D) | Senator Michael Michaud | E. Millinocket | District 2 | F |
| (R) | Mr. Kevin Raye | Perry | District 2 | F |

## Maine Senate Races:

| Party | Name | Town | District | CCL Rating |
|---|---|---|---|---|
| R | Shirlee Carlson | Ft. Kent Mills | #1 | F |
| D | John L. Martin | Eagle Lake | #1 | F |
| D | James P. Dunleavy | Presque Isle | #2 | F |
| R | Richard Kneeland | Easton | #2 | A |
| R | Dean F. Clukey | Houlton | #3 | A |
| D | Stephen Stanley | Medway | #3 | F |
| D | Ralph E Barnett | Brookton Twp | #4 | F |
| R | Kevin L. Shorey | Calais | #4 | F |
| D | Dennis S. Damon | Trenton | #5 | F |
| U | Richard Davis Hart | Surry | #5 | D |
| R | William D. Pinkham | Lamoine | #5 | A- |

6

*Maine Senate Races Con't:*

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| D | Charles D. Fisher | Brewer | #6 | F |
| R | Edward M Youngblood | Brewer | #6 | B+ |
| D | MaryR. Cathcart | Orono | #7 | F |
| R | Steven Veit | Old Town | #7 | F |
| R | Paul T. Davis | Sangerville | #8 | F |
| D | Thomas E. Mooney | Veazie | #9 | F |
| R | W. Tom Sawyer | Bangor | #9 | B+ |
| R | Betty Lou Mitchell | Etna | #10 | F |
| D | Joseph E. Brooks | Winterport | #11 | F |
| G | Oliver Outerbridge | Belfast | #11 | F |
| R | Carol Weston | Montville | #11 | F |
| D | Stefan Mathew Pakulski | Rockland | #12 | F |
| R | Christine R. Savage | Union | #12 | F |
| D | Pamela H. Hatch | Skowhegan | #13 | F |
| R | Lynda N. Quinn | Skowhegan | #13 | F |
| D | Kenneth T. Gagnon | Waterville | #14 | F |
| R | Robert E. Wing | Albion | #14 | F |
| D | Beverly C. Dagget | Augusta | #15 | F |
| R | David R. Madore | Augusta | #15 | F |
| R | Leslie T. Fossel | Alna | #16 | C+ |
| D | Christopher G. L. Hall | Briston | #16 | F |
| D | Gary T. McGrane | Jay | #17 | F |
| R | Chandler E. Woodcock | Farmington | #17 | F |
| R | R. Douglas Newman | Hallowell | #18 | F |
| D | Sharon Treat | Gardiner | #18 | F |
| D | Roger A. Baffer | Woolwich | #19 | F |
| R | Arthur F. Mayo III | Bath | #19 | F |
| R | Kenneth Blais | Litchfield | #20 | F |
| D | Paul Chizmar | Lisbon | #20 | F |
| D | Margaret R. Rotundo | Lewiston | #21 | F |
| R | Robert D. Stone | Lewiston | #21 | F |
| D | Neria R. Douglas | Auburn | #22 | F |
| R | Ronald W. Potvin | Auburn | #22 | A- |
| D | Betheda Edmonds | Freeport | #23 | F |
| R | Reginald G. Pinkham | Brunswick | #23 | F |
| D | Bruce Bryant | Dixfield | #24 | C+ |
| R | Robert A. Cameron | Rumford | #24 | F |
| R | Richard A. Bennett | Norway | #25 | B+ |
| R | Karl W. Turner | Cumberland | #26 | B |
| D | Kathryn N. Turner | Raymond | #26 | F |

7

## *Maine Senate Races Con't:*

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| D | Michael Brennan | Portland | #27 | F |
| G | Kelly Thompson Fernald | Falmouth | #27 | F |
| R | Sally G. Vamvakias | Falmouth | #27 | F |
| R | Robin D. Lambert | Portland | #28 | C- |
| D | Ethan Strimling | Portland | #28 | F |
| R | Carolyn M. Gilman | Westbrook | #29 | A |
| D | William B. O'Gara | Westbrook | #29 | F |
| R | Linda R. Boudreau | South Portland | #30 | F |
| D | Lynn Bromley | South Portland | #30 | F |
| R | Michael J. Dell'olio | Scarborough | #31 | F |
| G | Frederick Dolgon | Old Orchard Beach | #31 | F |
| D | Peggy A. Pendleton | Scarborough | #31 | F |
| R | Robert D. Haggett | Biddeford | #32 | B+ |
| G | Dorothy Lafortune | Biddeford | #32 | F |
| D | Lloyd P. LaFountain III | Biddeford | #32 | F |
| R | David L. Carpenter | Sanford | #33 | F |
| D | Elizabeth C. Dupre | Sanford | #33 | F |
| D | George A. Carroll | Limerick | #34 | F |
| R | Richard A. Nass | Acton | #34 | A |
| R | Kenneth F. Lemont | Kittery | #35 | F |
| D | Page A. Mead | Kittery | #35 | F |

## Maine State Representative Races:

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| R | Christopher R. Dewolf | Kittery | #1 | F |
| D | Stephen C. Estes | Kittery | #1 | F |
| R | Mary A. Andrews | York | #2 | F |
| D | Sarah Redfield | York | #2 | F |
| G | Peter Fernald | Eliot | #3 | C |
| R | Sarah O. Lewin | Eliot | #3 | F |
| D | Gary J. Wheeler | Eliot | #3 | F |
| D | Barry Abbott | North Berwick | #4 | F |
| R | Richard B. Brown | South Berwick | #4 | F |
| R | Oscar C. Stone | Berwick | #5 | F |
| D | Thomas J. Wright | Berwick | #5 | F |
| R | Jonathan T. E. Courtney | Springvale | #6 | B+ |
| D | Linda Boucher Strohecker | Lebanon | #6 | F |
| R | Ronald F. Collins | Wells | #7 | F |
| D | Harry Tomah | Wells | #7 | F |
| R | Thomas W. Murphy, Jr. | Kennebunk | #8 | F |
| D | Lynda J. Wilson-Dinino | W. Kennebunk | #8 | F |
| R | David E. Bowles | Sanford | #9 | B+ |
| D | Matthew S. Whittier | Sanford | #9 | F |

8

## *Maine State Representative Races con't:*

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| D | Roger A. Landry | Sanford | #10 | |
| R | Michael A. Lewis | Sanford | #10 | A- |
| R | James J. Campbel, Sr. | Newfield | #11 | A- |
| D | David McKechnie | Shapleigh | #11 | F |
| R | Lawrence E. Jaconsen | Waterboro | #12 | sent letter |
| D | Frank J. Tarazewich | Waterboro | #12 | F |
| R | Robert A. Diagle | Arundel | #13 | F |
| D | Randa L. Thomas | Hollis | #13 | F |
| R | Robert W. Brandenstein | Buxton | #14 | B |
| D | Bonita J. Breault | Buxton | #14 | F |
| R | Matthew Campbell | Saco | #15 | F |
| D | Christopher P. O'Neil | Saco | #15 | B |
| D | Thomas J. Kane | Saco | #16 | F |
| D | Nancy B. Sullivan | Biddeford | #17 | F |
| D | Marie Laverriere-Boucher | Biddeford | #18 | F |
| R | Raymond B. Tillson | Biddeford | #19 | A- |
| D | JoAnne T. Twomey | Biddeford | #19 | F |
| D | David LeMoine | Old Orchard | #20 | F |
| R | Darlene J. Curley | Scarborough | #21 | F |
| D | John E. Leighton, Jr. | Scarborough | #21 | F |
| R | Harold A. Clough | Scarborough | #22 | B+ |
| D | Arlene B. Vaillancourt | Scarborough | #22 | F |
| D | Christopher R. Barstow | Gorham | #23 | F |
| R | Calvin H. Hamblen | Gorham | #23 | F |
| D | Lawrence Bliss | South Portland | #24 | F |
| R | Wayne H. Ross | South Portland | #24 | F |
| R | John W. McGinty | Cape Elizabeth | #25 | F |
| D | Janet L. McLaughlin | Cape Elizabeth | #25 | F |
| R | Arlene A. Baker | South Portland | #26 | F |
| D | Christopher T. Muse | South Portland | #26 | F |
| D | William C. Collins | South Portland | #27 | F |
| R | Kevin J. Glynn | South Portland | #27 | F |
| R | Edward W. Symbol | Westbrook | #28 | F |
| D | Ronald E. Usher | Westbrook | #28 | F |
| R | Anthony J. Bessey | Westbrook | #29 | F |
| D | Robert W. Duplessie | Westbrook | #29 | F |
| D | Benjamin F. Dudley | Portland | #30 | F |
| R | James K. Spinney | Portland | #30 | F |
| G | John Edere | Portland | #31 | F |
| R | Robert Fisk, Jr. | Portland | #31 | F |
| D | David J. Garrity | Portland | #31 | F |
| G | Johsua Dolby | Portland | #32 | D |
| R | Jason A. Fortin | Portland | #32 | F |
| D | Edward J. Suslovic | Portland | #32 | C- |
| D | Herbert C. Andrews | Portland | #33 | C+ |
| R | Ann B. Yates | Portland | #33 | F |

9

## *Maine State Representative Races con't:*

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| R | David M. Delcamp | Portland | #34 | F |
| D | William S. Norbert | Portland | #34 | F |
| D | Joseph C. Brannigan | Portland | #35 | F |
| R | Steven L. Caminiti | Portland | #35 | F |
| D | Boyd P. Marley | Portland | #36 | F |
| R | Alan Parks | Portland | #36 | F |
| D | Glenn A. Cummings | Portland | #37 | F |
| R | Thomas B. Wheatley | Portland | #37 | A- |
| R | Joseph Bruno | Raymond | #38 | F |
| D | Francis McDermott | Raymond | #38 | F |
| R | David L. Tobin | Windham | #39 | F |
| D | Sandra B. Tolman | Windham | #39 | F |
| R | Gerald M. Davis | Falmouth | #40 | B |
| D | Jeanne A. Hulit | Falmouth | #40 | F |
| R | Susan M. Austin | Gray | #41 | F |
| D | Richard F. Barter | Gray | #41 | C |
| D | Benjamin P. Campo, Jr. | Cumberland | #42 | F |
| R | Terrence P. McKenney | Cumberland | #42 | F |
| D | Susan M. Hawes | Standish | #43 | F |
| R | Gary W. Moore | Standish | #43 | F |
| R | Paul Roberts | Yarmouth | #44 | F |
| U | Richard G. Woodbury | Yarmouth | #44 | F |
| R | Kevin Muse | Fryeburg | #45 | F |
| D | Marlee Turner | Brownfield | #45 | F |
| U | Johnathan B. Chappell | Bridgton | #46 | F |
| G | Robert K. Dunning | Bridgton | #46 | F |
| D | Margaret R. Reimer | Bridgton | #46 | F |
| R | Richard M. Sykes | Harrison | #46 | C+ |
| R | Philip A. Cressey, Jr. | Baldwin | #47 | A- |
| D | Tony Montanaro | Casco | #47 | F |
| D | Thomas D. Bull | Freeport | #48 | F |
| R | Millard W. Pray | Freeport | #48 | F |
| R | Carroll E. Pennell II | Brunswick | #49 | F |
| D | John G. Richardson | Brunswick | #49 | F |
| R | Gerald E. Favreau | Brunswick | #50 | F |
| D | Stanley J. Gerzofsky | Brunswick | #50 | F |
| D | Leila Jane Percy | Phippsburg | #51 | F |
| R | C. Matthew Rich | Harpswell | #51 | F |
| R | Dwayne F. Bickford | Topsham | #52 | F |
| D | Paul J. Lessard | Topsham | #52 | F |
| R | William T. Berry | Bowdoinham | #53 | F |
| D | Deborah J. Hutton | Bowdoinham | #53 | F |
| D | Jennifer Dechant | Bath | #54 | F |
| R | Michael E. Kiernam | Bath | #54 | F |
| U | John F. Albis, Sr. | Woolwich | #55 | B+ |
| D | Carol A. Grose | Woolwich | #55 | F |
| R | Frederick J. Kahrl | Woolwich | #55 | F |

10

## Maine State Representative Races con't:

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| R | Gene W. Boothby | Bremen | #56 | F |
| D | William M. Earle | Damariscotta | #56 | F |
| U | David M. Brown | Wiscasset | #57 | F |
| D | Peter L. Rines | Wiscasset | #57 | F |
| R | Karl F. Tarbox | Wiscasset | #57 | B+ |
| D | Morrison Bonpasse | Newcastle | #58 | D- |
| R | Kenneth A. Honey | Boothbay | #58 | A |
| R | A. David Trahan | Waldoboro | #59 | F |
| R | William I. Jones | Hope | #60 | F |
| D | James H. O'Haverty | Hope | #60 | F |
| U | Gary E. Sukeforth | Union | #60 | F |
| R | Christopher Rector | Thomaston | #61 | F |
| D | James G. Skoglund | St. George | #61 | F |
| D | Kim H. Fletcher | Rockland | #62 | F |
| R | Deborah K. McNeil | Rockland | #62 | F |
| R | Stephen Bowen | Rockport | #63 | C- |
| D | Susan Dorr | Camden | #63 | F |
| R | Theodore H. Heidrick | Oxford | #64 | B+ |
| D | David C. Miner | Mechanic Falls | #64 | F |
| R | Arlan R. Jodrey | Bethel | #65 | F |
| D | Shirley M. Powell | Hanover | #65 | F |
| R | John Bertl | New Portland | #66 | F |
| D | Monica McGlocklin | Embden | #66 | F |
| D | Ronald D. Hemmingway | Dixfield | #67 | F |
| R | Randy E. Hotham | Dixfield | #67 | F |
| D | Marilyn Baker | Waterford | #68 | F |
| R | H. Sawin Millett, Jr. | Waterford | #68 | F |
| D | Rosita Gagne | Buckfield | #69 | B- |
| R | Dana S. Knightly | Paris | #69 | F |
| R | Diane R. Mitchell | Rumford | #70 | F |
| D | John L. Patrick | Rumford | #70 | F |
| D | Laurie Lee W. Levine | Poland | #71 | F |
| R | Lois A. Snowe-Mello | Poland | #71 | A |
| D | Idella M. Harter | Auburn | #72 | F |
| R | Thomas F. Sheilds | Auburn | #72 | A- |
| U | Belinda A. Gerry | Auburn | #73 | F |
| D | Deborah L. Simpson | Auburn | #73 | F |
| U | Chandler W. White | Auburn | #73 | B+ |
| U | Jessica J. Larlee | Auburn | #74 | F |
| D | Sonya G. Sampson | Auburn | #74 | F |
| R | Joan Bryant-Deschenes | Turner | #75 | F |
| D | Vivian S. Onge | Greene | #75 | F |
| R | Jesse J. Crandall | Mercer | #76 | F |
| D | Raymond Pineau | Jay | #76 | F |
| U | Willaim L. Reid III | New Sharon | #76 | F |
| D | Charles C. Laverdiere | Wilton | #77 | F |

11

## *Maine State Representative Races con't:*

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| R | Lance E. Harvell | Farmington | #78 | B |
| D | Janet T. Mills | Farmington | #78 | F |
| R | Anna C. H. Lyon | Wayne | #79 | F |
| D | Linda R. McKee | Wayne | #79 | F |
| D | Elaine Fuller | Manchester | #80 | F |
| R | Stanley A. Moody | Manchester | #80 | F |
| R | Maitland E. Richardson | Skowhegan | #81 | B+ |
| D | Richard H. C. Tracy | Rome | #81 | F |
| U | James Bilodeau | Farmington | #82 | F |
| G | Ruth Z. Gabey | W. Gardiner | #82 | F |
| R | Earle L. McCormick | W. Gardiner | #82 | F |
| D | Frederick E. Merrill | W. Gardiner | #82 | F |
| U | Christopher D. Ranslow | Farmingdale | #82 | F |
| R | Ralph W. Bickford Jr. | Monmouth | #83 | F |
| D | Nancy E. Smith | Monmoutn | #83 | F |
| R | Robert A. Berube | Lisbon | #84 | B+ |
| D | Deborah L. Danuski | Lisbon | #84 | F |
| D | Terrence W. Kirk | Durham | #85 | F |
| R | William J. Schneider | Durham | #85 | F |
| D | Richard H. Mailhot | Lewiston | #86 | F |
| R | Larry P. Caron | Lewiston | #87 | F |
| D | Paul A. Samson | Lewiston | #87 | F |
| R | Claudette Caron | Lewiston | #88 | F |
| D | Margaret M. Craven | Lewiston | #88 | F |
| R | Michael J. Mosher-Collins | Lewiston | #89 | F |
| D | Lillian LaFontaine O'Brien | Lewiston | #89 | F |
| R | Robert E. MacDonald | Lewiston | #90 | F |
| D | Elaine Makas | Lewiston | #90 | F |
| D | Patrick Colwell | Gardiner | #91 | F |
| R | Kevin Pyle | Gardiner | #91 | F |
| D | Scott W. Cowger | Hallowell | #92 | F |
| R | Eric J. Perry | Hallowell | #92 | F |
| R | Clinton A. Conant | Canton | #93 | F |
| D | Rodney C. Jennings | Leeds | #94 | F |
| D | Charles E. Mitchell | Vassalboro | #94 | F |
| R | Linda A. Hadley Rood | Augusta | #95 | F |
| D | Arthur L. Lerman | Augusta | #95 | F |
| D | Mary D. Mayo-Wescott | Augusta | #96 | F |
| R | Julie Ann O'Brien | Augusta | #96 | F |
| D | Susanne P. Ketterer | Madison | #97 | F |
| R | Luciann T. Merrill | Solon | #97 | F |
| D | Paul R. Hatch | Skowhegan | #98 | F |
| R | Elton D. Powers | Skowhegan | #98 | B+ |
| U | Joanne M. Woodard | Skowhegan | #98 | F |
| D | Marilyn E. Canavan | Waterville | #99 | F |
| R | Duane E. Wheeler | Waterville | #99 | F |
| D | Lisa T. Marrache | Waterville | #100 | F |
| R | Virginia Sturies | Waterville | #100 | C- |

12

## *Maine State Representative Races con't:*

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| D | Edward D. Fitch | Fairfield | #101 | F |
| R | William J. Hagerty | Fairfield | #101 | F |
| R | Kenneth C. Fletcher | Winslow | #102 | F |
| D | Zachery E. Matthews | Winslow | #102 | F |
| D | Dennis J. McLellan | Oakland | #103 | F |
| R | Robert Nutting | Oakland | #103 | F |
| R | Stacey Allen Fitts | Pittsfield | #104 | F |
| D | Bernard E. McGowan | Pittsfield | #104 | F |
| D | Walter E. Ash, Jr. | Belfast | #105 | F |
| R | Thomas D. Crandall | Belfast | #105 | F |
| R | Neil R. Farrington | China | #106 | F |
| D | Judd D. Thompson | China | #106 | F |
| R | Jeffrey H. Kaelin | Winterport | #107 | F |
| D | Julie A. Logan | Winterport | #107 | F |
| D | Michael P. Cray | Palmyra | #108 | F |
| R | S. Peter Mills | Cornville | #108 | F |
| R | Donald P. Berry, Sr. | Belmont | #109 | A- |
| D | John S. Merrithew | Searsport | #109 | F |
| G | Heather E. Garrold | Knox | #110 | F |
| R | Galen D. Larrabee | Knox | #110 | A- |
| D | John F. Piotti | Unity | #110 | F |
| D | Sharon Libby Jones | Greenville | #111 | B+ |
| R | Earl E. Richardson | Greenville | #111 | Incomplete |
| R | James D. Annis | Dover-Foxcroft | #112 | B+ |
| D | John Henderson | Dover-Foxcroft | #112 | F |
| D | Kendal S. Dunbar | Bucksport | #113 | F |
| R | Richard W. Rosen | Bucksport | #113 | F |
| R | Brian M. Duprey | Hampden | #114 | A- |
| D | Mary D. Poulin | Hampden | #114 | F |
| R | William T. Rogers, Jr. | Brewer | #115 | F |
| D | Earl G. Sherwood | Brewer | #115 | F |
| R | Mary Ellen Ledwin | Holden | #116 | F |
| D | Stanley N. Marshall, Jr. | Veazie | #116 | F |
| D | Christina L. Baker | Bangor | #117 | F |
| R | Jerry M. Evans | Bangor | #117 | F |
| R | Duane E. Carter | Bangor | #118 | F |
| D | Joseph C. Perry | Bangor | #118 | F |
| R | James T. Bair | Bangor | #119 | F |
| D | Patricia A. Blanchette | Bangor | #119 | F |
| R | Ronald F. Jack | Bangor | #120 | B |
| D | Jacqueline R. Norton | Bangor | #120 | F |
| D | Matthew Dunlap | Old Town | #121 | D+ |
| R | Albert J. Duplessis | Old Town | #121 | F |
| U | Donald Isaac Curtis | Levant | #122 | F |
| R | Christian David Greeley | Levant | #122 | F |
| D | James F. Thiel | Kenduskeag | #122 | C |
| D | Jonathan Thomas | Orono | #123 | F |
| D | Richard Thomas | Hermon | #124 | F |

13

## Maine State Representative Races con't:

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| R | Russell P. Treadwell | Carmel | #124 | A |
| D | Joyce M. Packard | Newport | #125 | F |
| R | Joshua A. Tardy | Newport | #125 | F |
| D | Michele Nickerson | Corinna | #126 | F |
| R | James H. Tobin | Dexter | #126 | F |
| R | Robert H. Crosthwaite | Ellsworth | #127 | A |
| D | John Fink | Ellsworth | #127 | F |
| R | Eugene L. Churchill | Orland | #128 | B+ |
| D | James M. Schatz | Blue Hill | #128 | F |
| G | Christine A. West | Penobscot | #128 | F |
| R | Leslie R. Johnson | Stonington | #129 | F |
| D | Hannah Pingree | North Haven | #129 | F |
| D | Theodore Koffman | Bar Harbor | #130 | F |
| R | Robert E. Stanwood | Southwest Hbr | #130 | F |
| D | Edward R. Dugay | Cherryfield | #131 | F |
| R | Ruith Moore | Milbridge | #131 | F |
| R | Leonard E. Brierman | Sorrento | #132 | F |
| D | William F. Stone | Gouldsboro | #132 | F |
| D | Martha A. Bagley | Machias | #133 | C- |
| R | Christopher Paul Cambron | Jonesport | #133 | A |
| D | Albion D. Goodwin | Pembroke | #134 | F |
| R | John Morrison | Baileyville | #135 | F |
| D | Anne C. Perry | Calais | #135 | F |
| D | George H. Bunker, Jr. | Kossuth Twp | #136 | F |
| R | Shawn MacDonald | Lee | #136 | F |
| R | Anita Peavey Haskell | Milford | #137 | F |
| D | Laura Sanborn | Alton | #137 | F |
| R | Roderick W. Carr | Lincoln | #138 | A |
| D | David F. Kirkpatrick | Lincoln | #138 | C+ |
| D | Guy J. Duprey, Jr. | Medway | #139 | B+ |
| R | Murrel Harris | Milo | #139 | F |
| D | Joseph E. Clark | Millinocket | #140 | B- |
| R | Stuart F. Kallgren | Indian Purchase | #140 | F |
| R | Henry L. Joy | Crystal | #141 | F |
| D | Sally Landry | Patten | #141 | F |
| D | Maren McGillicuddy | Houlton | #142 | F |
| R | Roger L. Sherman | Hodgdon | #142 | B+ |
| R | Gordon L. Hagerman | Littleton | #143 | F |
| D | Patricia B. Sutherland | Chapman | #143 | F |
| R | Christopher J. Cronkhite | Blaine | #144 | F |
| D | Jacqueline A. Lundeen | Mars Hill | #144 | F |
| U | David R. Deschesne | Presque Isle | #145 | A |
| R | Richard H. Duncan | Presque Isle | #145 | A- |
| D | Jeremy Fischer | Presque Isle | #145 | F |
| R | John W. Churchill | Washburn | #146 | F |
| D | Theodore L. St. Pierre | Woodland | #146 | A- |
| R | Arthur W. Benner | Caribou | #147 | F |
| D | Philip R. Bennett, Jr. | Caribou | #147 | B+ |

14

## *Maine State Representative Races con't:*

| Party | Name | Town | District | CCL Rating |
|-------|------|------|----------|------------|
| D | Jimmy Pelletier | Limestone | #148 | F |
| R | Florence T. Young | Limestone | #148 | F |
| U | Peter Edgecomb | Caribou | #149 | B+ |
| D | William J. Smith | Van Buren | #149 | F |
| D | Rosaire Paradis, Jr. | Frenchville | #150 | F |
| U | Rudolph T. St. Peter | Guerette | #150 | F |
| U | Troy Jackson | Fort Kent | #151 | F |
| D | Marc E. Michaud | Fort Kent | #151 | F |

The returned questionnaires are kept on file in our office. Should you wish to view the questionnaire, or comments made by candidates, please call our office at 207.622.7634 to schedule a time.

To find your voting district, you can access the Secretary of State Web Site at: **www.state.me.us/sos/cec/elec/elec.html** If you do not have web access, you can go to your local library and use a computer there, or call your local town offices.

The 2002 voters guide is also available on line for reference at www.cclmaine.org

The staff of the Christian Civic League of Maine has been diligent to insure the accuracy of the information in this voter's guide. We apologize if there is any inadvertent error, misprint or omission.

This publication is made available free of charge to friends of the League, churches and the public. If you would like to make a donation to the Christian Civic League of Maine to help defray the cost of production, you may send your contribution to:

**The Christian Civic League of Maine**
**PO Box 5459**
**Augusta, ME 04332**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF       )
MAINE, INC.,                    )
                                )       No.  1:06CV00614
                Plaintiff,      )
                                )       EXHIBIT A-4
        v.                      )
                                )
FEDERAL ELECTION COMMISSION     )
                                )
                Defendant.      )
                                )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-4 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# Coalition for Marriage

Policy on use of information on League website

*Newspaper column for the Portland Press Herald March 1, 2004 by Michael S. Heath, Executive Director of the Christian Civic League of Maine.*

Some politicians, and the leadership of the Catholic Church here in Maine, are saying that we must wait to fight the homosexual marriage battle. They argue that we must wait so that the battle can be waged more professionally -- allowing more time for lobbying, fund raising etc. I understand and respect this perspective. It is however small thinking, in a war that requires big thinking.

The war transcends politics. It is spilling out all over the place. And the result of this conflict will affect basic freedoms and it is certainly threatening our national identity -- our very civilization.

Some will view this as overheated rhetoric. It isn't. What I am saying is as plain as the nose on your face. And if we all would lift our heads above the low hanging mind-numbing moral haze that Satan's smoke machine is pumping out we could take in a breath of fresh air. And when we did, we'd think "Hey, marriage IS between a man and woman." The war would be over, and we wouldn't have to amend our constitution to etch obvious truth in stone.

Even John Kerry is saying that homosexual "marriage" is a bad idea. While he doesn't support the Federal Marriage Amendment, he does say that the states need to take care of this problem. So both the sitting President of the United States, and the man who will likely face him in November, agree that homosexual marriage is a horrible idea. Just the fact that we are having this discussion at that level should horrify us. We are seriously debating the approval of homosexuality. Does that make sense to you? It does not make sense to me.

Alas, we are all liberals when anyone mouths the words of our modern orthodoxy. All a person needs to say these days is "civil" anything and we all raise our hands and shout "Hallelujah." You know what I mean...civil rights, civil unions, civility. These are buzzwords of our ever changing (I should say evolving, sorry), essentially pagan public dogmas. And we respond to them, especially when delivered by a sincere and intelligent lesbian, with thoughtless



DEPOSITION
EXHIBIT
Heath 4
cp 4-13-06
PENGAD 800-631-6989

fawning adoration.

Maine cannot wait to define marriage. And it is probably going to take a constitutional amendment to resolve it. Elite and media culture in Maine is all for homosexual marriage, or some look alike program like domestic partnerships or civil unions. The politicians in Augusta (not all of them, thank God) think this stuff is part of the "evolution of marriage." If we don't act in March we will be entrusting the fate of our families to activist judges who are simply robed lawyers trained in modern temples of secularism (law schools). They have become pretend theologians. It isn't good to appoint pretenders for life and not have the spine to hold them accountable.

The future of our country is in the hands of our pastors and priests. Unfortunately the tendrils of sexual corruption have slithered -- noticed -- into their ranks. The battle for the soul of our civilization is going to be fought by forgiven sinners. That is always the way of it. It isn't the soldier who lays wounded to die who wins the day. The soldier who transforms his wounds into the mettle of leadership (and uses his heel to crush the head of the serpent) causes change.

Are there any soldiers out there willing to stand with me at 9:30 a.m. March 2nd -- tomorrow -- on the third floor of the State House? Now is the time. As my friend Paul Madore reminded me the other day, "You fight where you stand." Now is the time. Join me.

The Christian Civic League of Maine, 70 Sewall Street, Augusta, ME  04330 * 207-622-7634

HOME

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF            )
MAINE, INC.,                         )
                                     )        No.  1:06CV00614
                Plaintiff,           )
                                     )        EXHIBIT A-5
                v.                   )
                                     )
FEDERAL ELECTION COMMISSION          )
                                     )
                Defendant.           )
                                     )


**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-5 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**



DEPOSITION
EXHIBIT

Heaton 5

cp 4-13-06

NewsRoom

Page    1

Citation                    Search Result        Rank(R) 3 of 7            Database
7/13/04 PTLD-PH A1                                                          ALLNEWSPLUS

7/13/04 Portland Press Herald A1
2004 WLNR 17016953

Portland Press Herald
Copyright 2004 Blethen Maine Newspapers Inc.

July 13, 2004

Section: FRONT

## Senators balk on gay-marriage amendment
### Snowe and Collins signal they will join the majority in defeating the proposal.

By JOSHUA L. WEINSTEIN Staff Writer

Maine's two U.S. senators are likely to join most of their colleagues Wednesday and vote against the proposed Federal Marriage Amendment, which would change the Constitution to prohibit same-sex couples from marrying.

Despite strong support from the White House - President Bush used his weekly radio address Saturday to encourage Congress to pass the amendment - the measure is unlikely to get even simple-majority support in the Senate, much less the 67 votes it needs to be sent to the 50 states for ratification.

Only one New England senator, Republican John Sununu of New Hampshire, has not expressed opposition to the proposed amendment, unlike Republicans Olympia Snowe and Susan Collins of Maine, Judd Gregg of New Hampshire and Lincoln Chafee of Rhode Island.

Democratic opponents include Joe Lieberman and Christopher Dodd of Connecticut, John Kerry and Edward Kennedy of Massachusetts, Jack Reed of Rhode Island and Patrick Leahy of Vermont. Independent Jim Jeffords of Vermont is also opposed.

Over the weekend, Snowe told CNN that "I believe that marriage should be defined as a marriage between man and woman, but I don't think that a constitutional amendment is necessary."

In a written statement, Collins said she supports an existing federal law that "protects the traditional right of states to determine for themselves what constitutes marriage, and defines for federal purposes that marriage will consist of a union between a man and a woman." She said that "as long as this law is on the books, I see no need for a constitutional amendment."

Bucking their president, even during an election year, is unlikely to hurt Maine's two centrist Republicans, experts said. Snowe and Collins are in their second terms in the Senate, both won re-election by substantial majorities and

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

'/13/04 PTLD-PH A1

ieither is up for re-election this year.

Richard Maiman, who chairs the Political Science Department at the University of Southern Maine, noted that both have defied their party on much tougher issues.

"Going against their party is part of what's keeping them in Washington," he said. "We don't send our senators to Washington, particularly our Republican senators, to toe the party line."

He noted that both voted to acquit former President Bill Clinton of high crimes and misdemeanors, yet they remain popular in Maine.

Douglas Hodgkin, a Bates College political science professor emeritus, said that because this issue isn't close, even among Republican senators, Snowe and Collins are not swing votes and likely aren't getting much pressure from the White House.

Most Mainers are with Snowe and Collins on the issue, said Patrick Murphy, a pollster who runs Strategic Marketing Services in Portland.

A March poll showed that 30.3 percent of Mainers back full marriage rights for gay and lesbian couples, and 35.5 percent support civil unions but not marriage. About 31.8 percent of Mainers oppose any legal recognition of same-sex relationships, and 2.5 percent did not know.

Murphy said Mainers are more concerned about the economy, taxes, health care and homeland security than they are about marriage rights for same-sex couples. "This whole debate about whether to allow gay people to marry, I don't think that's going to be a decisive factor for most folks in this country," he said.

Opponents and supporters of the proposed amendment agree.

Executive Director Michael Heath of the Christian Civic League of Maine, whose organization supports the proposed amendment and assigned a full-time staffer to the issue three weeks ago, acknowledged the amendment will fail.

He said members have been calling and e-mailing senators, and he wrote a column that appeared in the Portland Press Herald/Maine Sunday Telegram last week. But he said he gets the feeling ordinary Mainers haven't thought much about the issue.

"I'm concerned that it's not getting the attention that it should get from folks who lead busy lives," he said.

On the other side of the issue, the executive director of Equality Maine, a gay and lesbian rights organization, offered similar thoughts. "For the vast number of Mainers, it is not on their screen," Betsy Smith said.

Maine Gov. John Baldacci, a Democrat, opposes the amendment, as do both of Maine's U.S. representatives, Democrats Tom Allen and Michael Michaud of the 1st

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

'/13/04 PTLD-PH A1

ınd 2nd congressional districts, respectively.

  For the amendment to pass, two-thirds of the Senate and two-thirds of the
łouse of Representatives must approve it. It then must be ratified by three-
fourths of the states.

 MARRIAGE AMENDMENT "Marriage In the United States shall consist only of the
ınion of a man and a woman. Neither this Constitution, nor the constitution of
any State, shall be construed to require that marriage or the legal incidents
:hereof be conferred upon any union other than the union of a man and a woman."

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Social Issues (1SO05); Legislation (1LE97); Gay & Lesbian Issues
(1GA65); Health & Family (1HE30); Government (1GO80); Human Sexuality (1HU27))

REGION:  (District Of Columbia (1DI60); USA (1US73); Americas (1AM92); New
Hampshire (1NE86); Maine (1MA44); New England (1NE37); North America (1NO39);
Rhode Island (1RH18); Vermont (1VE77))

Language:  EN

OTHER INDEXING:  (BATES COLLEGE; CHRISTIAN CIVIC LEAGUE; CNN; EQUALITY MAINE;
FEDERAL MARRIAGE AMENDMENT; HOUSE OF REPRESENTATIVES; MAINERS; MARRIAGE;
POLITICAL SCIENCE DEPARTMENT; REPUBLICANS; REPUBLICANS OLYMPIA SNOWE; SENATE;
SNOWE; STRATEGIC MARKETING SERVICES; UNIVERSITY OF SOUTHERN; WHITE HOUSE)
(Betsy Smith; Bill Clinton; Bucking; Bush; Christopher Dodd; Collins;
Democratic; Democrats Tom Allen; Douglas Hodgkin; Edward Kennedy; Independent
Jim Jeffords; Jack Reed; Joe Lieberman; John Baldacci; John Kerry; John Sununu;
Judd Gregg; Lincoln Chafee; Michael Heath; Michael Michaud; Murphy; Patrick
Leahy; Patrick Murphy; Richard Maiman; Susan Collins)

EDITION: Final

Word Count: 967
7/13/04 PTLD-PH A1

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF           )
MAINE, INC.,                        )
                                    )          No.  1:06CV00614
            Plaintiff,              )
                                    )          EXHIBIT A-6
            v.                      )
                                    )
FEDERAL ELECTION COMMISSION         )
                                    )
            Defendant.              )
                                    )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-6 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

*In the exercise of governance, President John Adams keenly observed the profound difference*
*between a politician and one who understands and serves the Common Good:*

# A POLITICIAN FEARS MAN.
# A STATESMAN FEARS GOD.



To every public servant, elected or appointed, who will debate and decide before God and country
the critical issue of marriage in the United States, we ask *this* critical question:

# WHOM DO YOU FEAR?

When the roll is called for a vote on whether to codify marriage in the United States Constitution as between one man and one woman, *what will your position say about you?*

Will it say your concern is for poll results, and fundraising, and re-election campaigns? Or will it say you recognize that holding public office is more about the common *good* than it is about common politics?

Will it say you're too attuned to interest groups and talking heads? Or will it say that you decide issues of national importance with an internal compass pointing to what's right rather than a finger in the wind that finds political cover? *It all depends on whom you fear.*

Ultimately, your vote will say whether you fear the wrath of voters. Or not. Whether you fear negative letters to hometown editors. Or not. Or whether you fear the unvarnished truth of a righteous God. Or not.

The truth is that God is more concerned with your vote than any constituent will ever be. Choose wisely, then. Politician or Statesman? The good citizens of Maine pray you know the difference.

# MARRIAGE IS GOD'S DESIGN.
## DO YOU HAVE THE COURAGE TO DEFEND IT?

| | | |
|---|---|---|
| **Christian Civic League** *Augusta* | **Church Hill Baptist Church** *Augusta* | **Mr. Paul Niehaus** *Sebago Lake* |
| **Pastor Sandy Williams** First Baptist Church *Freeport* | **David & Elaine Bridge** *Manchester* | **Gail Card** *Bowdoin* |
| **Family Bible Church** *Ellsworth* | **Dale & Suzie Tellefsen** *Eliot* | **Campaign to Elect Michael Hein** *Augusta* |



**BEFORE YOU VOTE NOVEMBER 2 REVIEW OUR ON-LINE VOTER'S GUIDE**

WWW.CCLMAINE.ORG

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )       No.  1:06CV00614
                Plaintiff,         )
                                   )       EXHIBIT A-7
                v.                 )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
                Defendant.         )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-7 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

RECEIVED
FEDERAL ELECTION
COMMISSION
OFFICE OF GENERAL
COUNSEL

2006 APR -3 P 4: 45

**United States District Court**
**District of Columbia**

**The Christian Civic League of Maine, Inc.**
    70 Sewall Street
    Augusta, ME 04330,
                    *Plaintiff,*

    *v.*

**Federal Election Commission,**
    999 E Street, NW
    Washington, DC 20463,
                   *Defendant.*

Cause No. _____

## Verified Complaint for Declaratory and Injunctive Relief

The Christian Civic League of Maine, Inc. (CCL) complains as follows:

### Introduction

1. This is a First Amendment as-applied constitutional challenge to the prohibition on the use of corporate funds for "electioneering communications" (hereinafter "the prohibition") contained in § 203 of the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, 116 Stat. 81, 91-92, and codified at 2 U.S.C. § 441b(b)(2).

2. As presently applicable, "'electioneering communication' means any broadcast, cable, or satellite communication which . . . refers to a clearly identified candidate for Federal office [and] is made within . . . 60 days before a general . . . election for the office sought by the candidate; or . . . 30 days before a primary . . . election . . . for the office sought by the

**Complaint**                                 1



DEPOSITION
EXHIBIT
Heath 7
CP 4-13-06

PENGAD 800-631-6989

candidate; and . . . is targeted to the relevant electorate." 2 U.S.C. § 434(f)(3)(A)(i). *See also* 11 C.F.R. § 100.29 (definition of "electioneering communication").

3. The prohibition provides that "[i]t is unlawful . . . for any corporation whatever . . . to make a contribution or expenditure in connection with any [Federal] election. . . . For purposes of this section . . . , the term 'contribution or expenditure' includes . . . any applicable electioneering communication . . . ." 2 U.S.C. § 441b(a)-(b); *see also* 11 C.F.R. §§ 114.2 and 114.14 (regulatory ban on corporate funding of electioneering communications).

4. The United States Supreme Court has held that corporations may use corporate funds to engage in lobbying. *First National Bank of Boston v. Bellotti*, 435 U.S.765 (1978).

5. In *McConnell v. FEC*, the United States Supreme Court upheld the prohibition against a *facial* constitutional challenge. 540 U.S. 93, 202-207 (2003). In *Wisconsin Right to Life, Inc. v. FEC*, 126 S.Ct. 1016 (2006), the Court explained that as-applied challenges to the electioneering communication prohibition were not resolved or precluded by its holding in *McConnell*. 126 S.Ct. at 1018.

6. This case challenges the prohibition as applied to grass-roots lobbying on the facts of this case, which involves a broadcast advertisement (a true and accurate transcript of the current version of which is attached as Exhibit A that are paid for by CCL and that encourage Maine listeners to contact their U.S. Senators (Sen. Susan Collins and Sen. Olympia Snowe) and to ask them to vote for the Marriage Protection Amendment (S.J. Res. 1). The broadcast of this advertisement will occur during electioneering communication prohibition periods this summer. More specific as-applied facts are provided *infra*.

7. The Federal Election Commission considered creating an exception to this

**Complaint**                                    2

prohibition in its regulations implementing BCRA for grass-roots lobbying broadcasts but decided it was beyond the exception-making authority granted it by Congress to do so. 67 Fed. Reg. 65190, 65200-02.

8. In January, 2005, Senator Wayne Allard introduced the Marriage Protection Amendment (S.J. Res. 1). On November 9, 2005, the Subcommittee on Constitution, Civil Rights and Property Rights of the Committee on the Judiciary approved the Marriage Protection Amendment for full committee consideration without amendment favorably. 150 Cong. Rec. S8459-60.

9. On information and belief, a vote for cloture in the Senate on S.J. Res. 1 is likely to occur in early June, 2006.

10. Previous versions of a federal constitutional amendment to protect traditional marriage have failed to garner sufficient support in Congress. Therefore, the progress of S.J. Res. 1 in the Senate this summer is critical. CCL would support any future House or Senate bills that would offer protection to traditional marriage materially similar to that of S.J. Res. 1 or previous permutations of a federal bill to protect traditional marriage.

11. CCL intends to air the advertisement (Exhibit A) beginning on May 10 for the purpose of influencing the votes of Senators Snow and Collins regarding S.J. Res. 1, the Marriage Protection Amendment.

12. On May 10, the advertisments are not electioneering communications because they were not being run 30 days before the primary or 60 days before the general election. They will become electioneering communications as to U.S. Senator Olympia Snowe on May 14, 30 days before the June 13 Maine primary. *See*

**Complaint**                                              3

http://www.fec.gov/Fec_calendar/viewevent.cfm?EventID=788. Senator Snowe is an unopposed candidate and Senator Susan Collins is not a candidate this year. CCL intends to run the ad after May 14.

13. Because of the timing of anticipated Senate vote on S.J. Res. 1, CCL intends to run the ad and/or materially similar ads between May 10 and early June, including within the blackout periods, if CCL obtains the relief sought herein. The timing of these events is beyond the control of CCL.

14. From May 14 to June 13 (30 days before the primary) and from September 8 to November 7 (60 days before the general election), the current ad (Exhibit A) and materially similar ads will become electioneering communications as to Maine Senatorial candidate Olympia Snowe, and CCL will be prohibited from running these ads.

15. This case seeks declaratory and injunctive relief permitting CCL to run both the current grass-roots lobbying advertisement (Exhibit A) and materially similar ads in the future.

16. Regardless of the outcome of the expected Senate cloture vote on S.J. Res. 1 in early June, CCL intends to run materially similar grass-roots lobbying ads falling within the electioneering communication prohibition period before the general election and within the electioneering communication prohibition periods before future primary and general elections in Maine when there are pending matters in the legislative or executive branch that similarly require referencing a clearly identified candidate for federal office in broadcast communications to the citizens of Maine. CCL is concerned about a range of issues in addition to laws protecting traditional marriage -- such as partial birth abortion, permissive abortion, abortion

**Complaint**                              4

clinic regulations, parental control of their children's education, regulation of sexual predators, legislation normalizing same sex relations, gambling, limiting the government's power to raise taxes and the freedom to advance its issues in the public forum – that regularly have and will become issues in the legislative and executive branch. Because the legislative and executive branches often deal with important legislative and executive branch issues in the periods before elections, there is a strong likelihood that CCL's need to broadcast grass-roots lobbying ads will again coincide with the electioneering communications blackout periods. CCL does not have a federal political committee (PAC), and would instead pay for such ads with funds that do not comply with the source and amount limitations that govern PACs.

17. Recognizing the serious constitutional questions the BCRA raises, the law provides for immediate expedited judicial review by a three-judge panel of this Court of any constitutional action for declaratory or injunctive relief, with expedited appellate review by the Supreme Court of the United States of final decisions. BCRA § 403, 116 Stat. at 113-14.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and BCRA § 403, 116 Stat. at 113-14.

## PARTIES

20. Plaintiff the Christian Civic League of Maine, Inc., is a nonprofit, nonstock, Maine, ideological corporation recognized by the Internal Revenue Service as tax exempt under § 501(c)(4) of the Internal Revenue Code.

**Complaint**                              5

21. Defendant Federal Election Commission (FEC) is the government agency charged with enforcing the relevant provision of the Federal Election Campaign Act, as amended by the BCRA.

### ADDITIONAL AS-APPLIED FACTS

22. CCL does not qualify for any exception permitting it to pay for electioneering communications from corporate funds because (a) it is not a "qualified nonprofit corporation" (QNC) within the definition of 11 C.F.R. § 114.10 so as to qualify for the exception found at 11 C.F.R. § 114.2(b)(2) to the electioneering communication prohibition and (b) its advertisement is "targeted" so that it does not fit the exception for § 501(c)(4) organizations as described in 2 U.S.C. § 441b(c)(2). 2 U.S.C. § 441b(c)(6)(A).

23. CCL's advertisement will become an electioneering communication from May 14 to June 13 and from September 8 until November 7, because it meets the statutory and regulatory definitions found at 2 U.S.C. § 434(f)(3) and 11 C.F.R. § 110.29.

24. Specifically, the advertisement at Exhibit A and planned future advertisements would be broadcast for a fee on radio. 2 U.S.C. § 434(f)(3)(A)(i); 2 C.F.R. § 100.29(b).

25. The advertisement at Exhibit A and planned future advertisements would be broadcast within 30 days before the Maine primary and/or within 60 days before the general election. 2 U.S.C. § 434(f)(3)(A)(i)(II); 2 C.F.R. § 100.29(a)(2).

26. The advertisement at Exhibit A and planned future advertisements "refer to," and will continue to refer to, "a clearly identified candidate for Federal office." 2 U.S.C. § 434(f)(3)(A)(i)(I); 2 C.F.R. § 100.29(a)(1).

27. The advertisement entitled "Crossroads" (Exhibit A) is a radio broadcast ad to be

broadcast for a fee paid by CCL that clearly references federal candidate Sen. Snowe by mentioning her name and asking listeners to contact her (and Sen. Collins) to support the federal Marriage Protection Amendment.

28. The advertisement at Exhibit A and planned future advertisements would be "targeted to the relevant electorate," 2 U.S.C. § 434(f)(3)(A)(i)(III); 2 C.F.R. § 100.29(a)(3), meaning that the broadcast ads "can be received by 50,000 or more persons . . . in the State [Sen. Snowe] seeks to represent." 2 C.F.R. § 100.29(a)(3).

29. The advertisement at Exhibit A and planned future advertisements would be "publicly distributed," i.e., "aired, broadcast, cablecast or otherwise disseminated for a fee through the facilities of a television station, radio station, cable television system or satellite system." 2 C.F.R. § 100.29(a)(3).

30. On May 14, when the electioneering communication prohibition period begins, CCL will be broadcasting a radio ad, Exhibit A, so that it will be "publicly distributed" on that date. 11 C.F.R. § 100.29(b)(3)(i).

31. If and when CCL has spent or contracted to spend more than $10,000 "for the direct costs of producing or airing one or more electioneering communications," 11 C.F.R. § 104.20(a)(1)(i), the public distribution and disbursement will trigger a "disclosure date" requiring it to file a report of its electioneering communication activity on FEC Form 9.

32. CCL intends to comply with all record keeping and reporting requirements for its electioneering communications as set out in the Federal Election Campaign Act ("FECA") and FEC regulations, 2 U.S.C. § 434(f); 11 C.F.R. § 104.20, providing accurate disclosure information as to the source and disbursement of funds at the levels at which Congress

**Complaint**                                    7

asserted a disclosure interest.

33. CCL is also complying with, and will continue to comply with, the applicable disclaimer requirements for electioneering communications. 2 U.S.C. § 441d; 11 C.F.R. § 110.11. This may be seen on the advertisement's scripts at Exhibit A, providing disclosure of the fact that CCL is paying for the ads, that they are not authorized by any candidate or candidate's committee, and providing a phone number where a person hearing the ads may find contact information for the Senators.

34. CCL does not challenge the reporting and disclaimer requirements for electioneering communications, only the prohibition on using its corporate funds for its grass-roots lobbying advertisements.

35. The ad at Exhibit A expresses an opinion on pending Senate legislative activity, which is imminently up for a vote, and urges listeners to contact their Senators and to urge them to vote a certain way in this upcoming vote, so that this ad constitutes bona fide grass-roots lobbying.

36. The ad deals with concrete, imminent, legislative issues, beyond the timing and control of CCL, with which the two incumbent Senators are dealing and must shortly deal with further.

37. The ad refers to both a candidate and a non-candidate and deal with them equally.

38. The ad deals exclusively with the legislative issue.

39. The ad focuses on the legislative issue in question, not on any candidate.

40. The ad does not refer to any political party.

41. The ad deals with an issue with which CCL has a clear and long-held interest.

**Complaint**                                    8

42. The ad does not expressly advocate the election or defeat of a clearly identified candidate for federal office.

43. The ad does not comment on a candidate's character, qualifications, or fitness for office.

44. The ad does not mention any upcoming election.

45. The ad is broadcast independent of any candidate or political party in that it is not "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents." 11 C.F.R. § 109.20(a).

46. Broadcast advertisements are the most effective form of communication for the present grass-roots lobbying campaign, and non-broadcast communications would not provide CCL with sufficient ability to reach the people of Maine with CCL's message.

47. If CCL does not obtain the requested injunctive relief, CCL will not broadcast the ad at Exhibit A after May 14, because it is prohibited from doing so and because of its fear of enforcement by the FEC. As a result, CCL will be deprived of its constitutional rights under the First Amendment to the United State Constitution and will suffer irreparable harm. There is no adequate remedy at law.

## COUNT 1

48. Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

49. Section 203(a) of BCRA amended section 316(b)(2) of FECA to prohibit corporations and labor unions from engaging in "electioneering communications." This

**Complaint**                                    9

prohibition is codified at 2 U.S.C. § 441b.

50. The United States Supreme Court has decided that corporations may use corporate funds to engage in lobbying. *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).

51. The United States Supreme Court has held that contribution limits on organizations engaged in lobbying to support or oppose ballot measures violate the First Amendment rights of association and expression. *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981).

52. As applied to CCL's disbursements for the advertisement at Exhibit A and for materially similar future advertisements, the broadcast ads are bona fide grass-roots lobbying and are not the "functional equivalent of express advocacy." *McConnell*, 540 U.S. at 206.

53. Because CCL's grass-roots lobbying advertisement is not the functional equivalent of express advocacy, there is no constitutional justification for the corporate prohibition at 2 U.S.C. § 441b on this particular electioneering communication, requiring that such activities be done through a political action committee (PAC).

54. PAC compliance burdens have been held as only justified in the election campaign context, which has nothing to do with the sort of bona fide grass-roots legislative lobbying at issue here, so that the prohibition on electioneering communications should be held unconstitutional as applied to grass-roots lobbying broadcasts.

55. Because corporations are permitted to lobby with corporate funds, there is no justification for imposing the PAC requirement on corporations making grass-roots lobbying broadcasts.

56. Because contribution limits on organizations engaged in lobbying are unconstitu-

**Complaint**                                        10

tional, there is no justification for imposing the PAC requirement of a $5,000 annual

contribution limit on contributors to a corporation making grass-roots lobbying broadcasts. 2

U.S.C. § 441a(a)(1)(C).

57. As applied to grass-roots lobbying broadcasts and to the broadcast advertisement

contained in Exhibit A, BCRA § 203 is not narrowly tailored to a compelling governmental

interest.

58. As applied to grass-roots lobbying broadcasts and to the broadcast advertisement

contained in Exhibit A, BCRA § 203 unconstitutionally burdens the rights of free speech,

free association, and petitioning the government, all in violation of the First Amendment.

### COUNT 2

59. Plaintiff realleges and incorporates by reference all of the allegations contained in

all of the preceding paragraphs.

60. In the alternative to Count 1, which focuses on the use of general corporate funds

for electioneering communications that constitute bona fide grass-roots lobbying communica-

tions, CCL also asserts that BCRA § 203 is not narrowly tailored to a compelling state

interest where the electioneering communications are made "out of a segregated bank account

which consists of funds contributed solely by individuals who are United States citizens or

nationals or law-fully admitted for permanent residence (as defined in section 101(a)(20) of

the Immigration and Nationality Act (8 U.S.C. 1101(a)(20))) directly to this account for

electioneering communications." 2 U.S.C. § 434(f); 11 C.F.R. § 104.20(c)(7).

61. If disbursements for grass-roots lobbying communications that constitute

electioneering communications are made from such a segregated bank account, there will still

be full disclosure at the level at which Congress asserted a disclosure interest, but all concerns about the use of corporate funds for electioneering communications will be absent.

62. The only remaining restrictions on PACs that would not apply to disbursements for grass-roots lobbying electioneering communications made from a segregated bank account are (a) the annual PAC contribution limit and (b) the requirement that a corporation first acquire "members" and then solicit funds only from these members. 2 U.S.C. § 441b(b)(4)(C). But as noted above, contribution limits are unconstitutional in the context of grass-roots lobbying because there is no potential for corruption, *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290 (1981), and any donors contributing in excess of $1,000 to the account would be disclosed to the public.

63. CCL believes it is constitutionally entitled to make the grass-roots lobbying disbursements at issue from general corporate funds, but if necessary to gain the requested relief to make the disbursements, CCL will make such disbursements from a segregated bank account.

64. As applied to disbursements from a segregated bank account under 2 U.S.C. § 434(f) for grass-roots lobbying broadcasts and for the broadcast advertisement contained in Exhibit A, BCRA § 203 is not narrowly tailored to a compelling state interest and so it unconstitutionally burdens the rights of free speech, free association, and petitioning the government, all in violation of the First Amendment.

## PRAYER FOR RELIEF

Wherefore, CCL prays for the following relief:

1. a declaratory judgment declaring 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 unconstitutional as applied to electioneering communications by CCL that constitute grass-roots lobbying;

2. a declaratory judgment declaring 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 unconstitutional as applied to the electioneering communications by CCL contained in Exhibit A;

3. a preliminary and permanent injunction enjoining defendant FEC from enforcing 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 against CCL for any electioneering communications by CCL that constitute grass-roots lobbying;

4. a preliminary and permanent injunction enjoining defendant FEC from enforcing 2 U.S.C. § 441b and 11 C.F.R. §§ 114.2 and 114.14 against CCL for broadcasting the election-eering communications contained in Exhibit A;

5. costs and attorneys' fees pursuant to any applicable statute or authority; and

6. any other relief this Court in its discretion deems just and appropriate.

**[Insert VERIFICATION here]**

I, Michael Heath, declare as follows:

1. I am the long-time Executive Director of the Christian Civic League

2. I have personal knowledge of the facts about the Christian Civic League and its activities that are set forth in the Statement of Facts in the foregoing *Complaint* and affirm their truth.

3. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on <u>March 28</u>, 2006.

<u>/s/ Michael S. Heath</u>
Michael S. Heath, Executive Director
The Christian Civic League of Maine

**Complaint**                         14

Respectfully submitted,

_____
M. Miller Baker, D.C. Bar # 444736
Michael S. Nadel, D.C. Bar # 470144
McDermott Will & Emery LLP
600 Thirteenth Street, NW
Washington, D.C. 20005-3096
202/756-8000 telephone
202/756-8087 facsimile
*Local Counsel for Plaintiff*

_____
James Bopp, Jr.
Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, IN  47807
812/232-2434 telephone
812/234-3685 facsimile
*Lead Counsel for Plaintiff*
*Pro Hac Vice Motion filed April 3, 2006*

**Complaint**                    15

## VERIFICATION

I, Michael Heath, declare as follows:

1. I am the long-time Executive Director of the Christian Civic League

2. I have personal knowledge of the facts about the Christian Civic League and its

activities that are set forth in the Statement of Facts in the foregoing *Complaint* and affirm their

truth.

3. I verify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on March 28, 2006.


Michael S. Heath, Executive Director
The Christian Civic League of Maine

Exhibit

**A**

*Radio Script*
"Crossroads"
The Christian Civic League of Maine
:60

Our country stands at the crossroads - at the

intersection of how marriage will be defined for future generations.

Marriage between a man and a woman

has been challenged across this country and could be declared unconstitutional

at any time by rogue judges.  We must safeguard the

traditional definition of marriage by putting it beyond the reach of all judges -

by writing it into the U.S. Constitution.  Unfortunately, your senators voted against

the Marriage Protection Amendment two years ago.  Please call Sens. Snowe and Collins

immediately and urge them to

support the Marriage Protection Amendment when it comes to a vote in

early June.  Call the Capitol switchboard at

202-224-3121 and ask for your senators.  Again, that's 202-224-3121.

Thank you for making your voice heard.


Paid for by the Christian Civic League of Maine, which is responsible for the content of this advertising and
not authorized by any candidate or candidate's committee.

Plaintiff's
Exhibit

B

Certificate of Organization under Chapter 57 of the Revised Statutes of Maine.

The undersigned, officers of a moral and educational corporation organized at a meeting duly called and held therefor at 28 Winter Street, in the City of Waterville, on the ninth day of May, 1905, hereby certify as follows:

The name of said corporation is CHRISTIAN CIVIC LEAGUE of MAINE, and it is located at said Waterville.

The purposes of said corporation are inculcating the principles of good citizenship in this State.

Its officers are, President, *Geo. C. Pennington* of *Farmington* Treasurer, *Horace Purinton* of *Waterville*,

Clerk, *H. N. Pringle* of *Waterville*    , and

*Geo. C. Purinton        W. F. Berry*
*Horace Purinton*
*Samuel Vose*
*Alfred W. Anthony*
*E. T. Burrowes*
*C. A. Milliken*
*M. S. Holway*


Directors.

Witness our hands at said Waterville this ninth day of May, 1905.

*Geo. C. Purinton* President.
*Horace Purinton* Treasurer.
*Samuel Vose*
*Wilbur F. Berry*
*Edward T. Burrowes,*

County of Kennebec, ss.

May 9,1905.

Then personally appeared the above named

and severally made oath to the foregoing certificate, that the same is true.

Before Me,

*Hiram Knowlton*

Justice of the Peace.

American Civil League
of Maine

STATE OF MAINE

OFFICE OF SECRETARY OF STATE,

Augusta, _____ March _____ 19__

Received and filed this day.

ATTEST:

_____
Secretary of State

chain in Maine, with over forty employees. I'm a member of Bangor Baptist Church. I am a Junior Church Director, and a professionally trained counselor who teaches an eight-week marriage enrichment course called "Dynamic Marriage," a twelve-week Bible study course for couples called "Dynamic Love" and a twelve-week Bible study course for the entire family called "Dynamic Families." I am also President of the Board of Directors of the First Step Pregnancy Resource Center, a crisis pregnancy center in Bangor. I have been on the board for over four years.

Q. How did your Christian faith influence your decision to become a member of Maine's House of Representatives?

A. I ran for the Legislature because I was concerned about the direction in which the state of Maine was headed. I want to make Maine a better place for my children and grandchildren. My Christian faith gives me the strength to carry on day after day.

Q. How do you integrate prayer into your political service?

A. I ask God for guidance daily. He helps me get through trying times, and there are plenty of them.

Q. What does the phrase "One Nation under God" mean to you?

A. It means that a citizen is free to worship or not to worship. While we are truly a Christian nation, we are very tolerant to people of other faiths.

Q. Is one political party more Christian than the other?

A. There are many good Christian Democrats. What confuses me are the Catholic Democrats or anyone of the Christian faith who is "pro-choice" The Bible is clear on the  sanctity of human life. Yet this seems to have no meaning to many legislators.

Q. Should we amend the Constitution to protect marriage? If so, why?

A. Marriage is under attack by extremist judges who want to legalize homosexual marriage on the basis of equal rights. Marriage has been the bedrock of our society for thousands of years. And the Bible is clear on the issue of homosexuality.

Q. Are you going to seek higher office in the next few years?

A. I am considering running for the Senate against Olympia Snowe. If I can raise enough seed money to kick off a credible campaign, I will take the initiative and run. I will be watching her voting record very carefully. If she votes against President Bush's judicial nominees, or tries to block the President's agenda, it will speed up my decision to run.

Q. How can Maine restore sanity to how it treats babies in the womb? Right now about 2500 are killed each year in Maine.

A. The "pro-choice" forces in Augusta are a powerful lobby. At any given time, there are three or four full-time lobbyists walking the hallways to convince legislators not to restrict a "woman's right to choose." At most, you will see one or two part-time lobbyists fighting for life issues.

Q. Can you persuade the Governor to drop his homosexual rights bill? What do you think of that bill? Is it right for the Legislature to put the League in the position of having to do another people's veto?

A. I am not exactly on speaking terms with the Governor, so I am sure I cannot persuade him to drop this issue. He is pretty set on pushing this idea this session. What I have a problem with is passing this bill without sending it out to the people for ratification. I think the Governor will do whatever he wants. He has had a history of ignoring the will of the people to pass his agenda through. The

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF    )
MAINE, INC.,    )
    )   No.  1:06CV00614
    Plaintiff,    )
    )   EXHIBIT A-8
    v.    )
    )
FEDERAL ELECTION COMMISSION    )
    )
    Defendant.    )
    )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-8 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# the RECORD

online newspaper published since 1900

in various formats -- now online

Wednesday, February 23, 2005



Representative Brian Duprey

## Man on a Mission

*by League writers*

*The RECORD recently emailed Republican Representative Brian Duprey a few questions on politics and religion, and on the matter of same-sex marriage in particular.   You can read Representative Duprey's responses below.  Representative Duprey is the courageous third-term legislator who is the State House's most faithful defender of traditional marriage.   Here, Representative Duprey announces for the first time that he is willing to run against Senator Olympia Snowe in next year's Republican primary. The RECORD is proud to be the first publication in Maine to provide you with this information.*

Q. Representative Duprey, could you give us a brief biography?

A. I'm the State Representative for District 39, Hampden, Newburgh, and Dixmont. This is my third term, and I'm the Lead Republican on the Labor Committee. I'm married to Carol, and we have five children - four girls and a son, ages twenty, seventeen, nine, four, and three. I'm the owner of Little Angels Daycare and Preschool, the largest child care center



DEPOSITION EXHIBIT

Heath 8

GP 4-13-06

PENGAD 800-631-6969

Legislature has the right to do what it wants, but the Governor and all Legislators are accountable to the people for their actions.

Click here to go to the RECORD forum

# The Christian Civic League of Maine

70 Sewall Street
Augusta, Maine 04330
v- 207-622-7634
f- 207-621-0035
email@cclmaine.org

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )      No.  1:06CV00614
          Plaintiff,               )
                                   )      EXHIBIT A-9
          v.                       )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
          Defendant.               )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-9 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**STATE OF MAINE**
**Commission on Governmental Ethics and Election Practices**
**135 State House Station**
**Augusta, Maine 04333**
Tel: (207) 287-6221    Fax: (207) 287-6775
Website: **www.maine.gov/ethics**

☐ This is an update.

R E C E I V E D

FEB 2 7 2006

COMMISSION ON GOVERNMENTAL E'
& ELECTION PRACTICES-AUGUSTA

## REGISTRATION FOR POLITICAL ACTION COMMITTEES

A political action committee must register with the Commission within 7 days of accepting contributions, incurring obligations or making expenditures in the aggregate in excess of $1,500 in any single calendar year to initiate, support, defeat or influence in any way a campaign, referendum, initiated petition, candidate, political committee or another political action committee (21-A M.R.S.A. §1053).

**Within 10 days of a change in PAC information an amended registration form must be submitted to the Commission. The committee must file an updated registration every election year between January 1st and March 1st.**

## I. COMMITTEE INFORMATION

Name of committee _CHRISTIAN ACTION LEAGUE_    Acronym _N/A_

Mailing address _70 SEWALL STREET_    Telephone # _622-7634_

City, State, Zip Code _AUGUSTA, ME 04330_    Fax # _621-0035_

Website _WWW.CCLMAINE.ORG_

## II. IDENTIFICATION OF TREASURER AND PRINCIPAL OFFICERS OF COMMITTEE

**A. Committee Treasurer:** _MICHAEL HEIN_

Mailing address _28 FRANKLIN STREET_    Telephone # _622-2599_

City, State, Zip Code _AUGUSTA, ME 04330_    E-Mail _mhein1@gwi.net_

**B. Principal Officers:**

Name _MICHAEL S. HEATH_    Title _EXECUTIVE DIRECTOR_

Mailing address _70 SEWALL STREET_

City, State, Zip code _AUGUSTA, ME 04330_    Telephone # _622-7634_

Name _MICHAEL HEIN_    Title _CHAIRMAN_

Mailing address _28 FRANKLIN STREET_

City, State, Zip Code _AUGUSTA, ME 04330_    Telephone # _622-2599_

**C. Identify any candidates, Legislators or other individuals who are the primary fundraisers and decision makers for the committee.**

_MICHAEL S. HEATH - DECISION MAKER_
_MICHAEL HEIN - CANDIDATE AND DECISION MAKER_

## III. MAILING ADDRESS (Filing notices and correspondence will be mailed to this address.)

_70 SEWALL STREET, AUGUSTA, ME 04330_

DEPOSITION
EXHIBIT
Heath 9
CP 4-13-06

PENGAD 800-631-6989

CGEEP Form PAC (Rev. 7/05)    (Continued on reverse side)

## IV. STATUS OF COMMITTEE

Is this a continuing committee?    Yes _____    No **X**

## V. FORM OF ORGANIZATION

A.  Name the form or structure of organization; i.e., cooperative, corporation, voluntary association, partnership, etc.

ADVOCACY MINISTRY, FOR-PROFIT CORPORATION
     (non)

B.  Date of origin/incorporation ~~13 KNOTPORT~~ 4/14/1999

## VI. STATEMENT OF SUPPORT OR OPPOSITION

Indicate whether the committee supports or opposes a candidate, political committee, referendum, initiated petition or campaign.  If unknown at the time of registration, the committee must inform the Commission as soon as the committee knows this information.

**X** Support CANDIDATES WHO SUPPORT PRINCIPLES OF CHRISTIAN CIVIC LEAGUE OF MAINE.

_____ Oppose _____

## VII. ASSETS OF COMMITTEE

List total assets at time of registration.  Include deposits, real and personal property, investments, cash, and all other available assets.

1.  NONE                              2. _____

## VIII. DEPOSITORY OF FUNDS  N/A

Name of depository _____    Account # _____

Address _____

Name of depository _____    Account # _____

Address _____

## IX. CONTRIBUTIONS TO THE COMMITTEE

List the names and mailing addresses of contributors who donate in excess of $50 each year to the committee and the amount or value of each contribution at the time of registration.  Any person who makes contributions on an installment basis, the total of which exceeds $50 in the calendar year, is considered a contributor to be identified here.  N/A

1. _____    2. _____

_____       _____

_____       _____

3. _____    4. _____

_____       _____

_____       _____

Signature of Principal PAC Officer _____

Title CHAIR, CHRISTIAN ACTION LEAGUE    Date 2/27/2006

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF | ) | |
| MAINE, INC., | ) | |
| | ) | No.  1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT A-10 |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-10 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**United States District Court**
**District of Columbia**

The Christian Civic League of Maine, Inc.
  70 Sewall Street
  Augusta, ME 04330,
                    *Plaintiff,*

*v.*                                   **Cause No. 1:06CV00614 (LFO)**

**Federal Election Commission,**              THREE-JUDGE COURT
  999 E Street, NW
  Washington, DC 20463,
                    *Defendant.*

RECEIVED
FEDERAL ELECTION
COMMISSION
OFFICE OF GENERAL
COUNSEL
2006 APR 12   PM 1: 43

# Responses of the Christian Civic League of Maine, Inc. to Defendants' First Set of Interrogatories

## General Objections

The Christian Civic League ("CCL") objects to each Interrogatory to the extent that it

seeks information that is neither relevant to the parties' claims or defenses in the pending action

nor reasonably calculated to lead to the discovery of admissible evidence. By responding, the

CCL does not concede that any of the information requested is relevant to this action or

admissible at the trial thereof or that any person identified in the responses has information

relevant to this action. The CCL reserves any and all objections as to competency, relevance,

materiality, privilege, admissibility, or any other grounds on which an objection may be made.

The CCL expressly reserves the right to object to further discovery into the subject matter of

## Interrogatory Responses

PENGAD 800-631-6989

DEPOSITION
EXHIBIT
Heater 10
4-13-06

these Interrogatories or relating to any person identified in the responses. Any response that

inadvertently discloses privileged information is not intended to and shall not be deemed or

construed to constitute a waiver of any privilege or right of the CCL. Insofar as a response to an

Interrogatory may be deemed to be a waiver of any privilege or right, such waiver shall be

deemed to be a waiver limited to that particular response only.

Subject to and without waiving any of the foregoing General Objections, which are

hereby incorporated into each response given below, the CCL responds to the individual

interrogatories as follows:

**Interrogatory 1.** List each grassroots lobbying campaign by CCL since January 1, 2004 and the

communication methods employed for each campaign, such as radio advertising, television

advertising, print advertisements, phone banks, direct mail, mass email, public demonstrations,

or any other method of grassroots lobbying.

**Specific Objection:** CCL objects as to relevance. Whether CCL's advertisement fits the type of

activity Congress has a compelling interest in regulating depends entirely on the content of the

advertisement and not with any previous grassroots lobbying campaign. Without waiving any

specific or general objection, CCL responds as follows:

**Answer:** CCL has a state registered political action committee, the Christian Action League

(CCL-PAC). Since January, 2004, CCL-PAC worked to defeat passage of state discrimination

law that would expand the definition of discrimination. It circulated a petition, asking voters to

sign to send the message to the Governor to veto the bill. The issue was mentioned on CCL's

radio program. CCL distributed flyers and handouts. The executive director spoke at colleges.

**Interrogatory Responses**                    2

**Interrogatory 2.** Identify and explain each reason why CCL considers other means of communication less effective than radio advertising in advocating for the passage of the federal Marriage Protection Amendment Act.

**Specific Objections**: CCL objects as to relevance. It is not the role of government to tell citizens how best to communicate. "The First Amendment protects [CCL's] right not only to advocate [its] cause but also to select what [it] believes to the most effective means for doing so." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

CCL also objects as to relevance because the burden a regulation of speech places on the exercise of First Amendment rights is a matter of law and is not dependent on facts. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

CCL also objects as to relevance because the mode of communication at issue here is not relevant to the issue this case presents. By remanding *Wisconsin Right to Life v. FEC*, 126 S.Ct.1016 (2006) ("*WRTL*"), to the district court, the Supreme Court necessarily implied that there may be "genuine issue ads," *McConnell v. FEC*, 540 U.S. 93, 206 n.88 (2003), that are broadcast by radio within prohibition periods. Accordingly, why CCL chose this mode of broadcast is irrelevant. Without waiving any specific or general objection, CCL responds as follows:

**Answer**: CCL considers radio advertising to be the most effective means of communication because it consistently reaches more persons per dollar spent.

**Interrogatory 3.** Identify and explain each reason why other means of communication that CCL has previously employed for grassroots lobbying are expected to be less effective than radio

**Interrogatory Responses**                    3

advertising if utilized in CCL's campaign for the federal Marriage Protection Amendment Act.

**Specific Objections:** CCL objects as to relevance. It is not the role of government to tell citizens how best to communicate. "The First Amendment protects [CCL's] right not only to advocate [its] cause but also to select what [it] believes to the most effective means for doing so." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

CCL also objects as to relevance because the burden a regulation of speech places on the exercise of First Amendment rights is a matter of law and is not dependent on facts. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

CCL objects as to relevance because the mode of communication at issue here is not relevant to the issue this case presents. By remanding *Wisconsin Right to Life v. FEC*, 126 S.Ct.1016 (2006) ("*WRTL*"), to the district court, the Supreme Court necessarily implied that there may be "genuine issue ads," *McConnell v. FEC*, 540 U.S. 93, 206 n.88 (2003), that are broadcast by radio within prohibition periods. Accordingly, why CCL chose this mode of broadcast is irrelevant. Without waiving any specific or general objection, CCL responds as follows:

**Answer:** Radio broadcasts reach the most hearers for each dollar spent. CCL has, in fact, employed radio broadcasts as part of its state grassroots lobbying efforts.

**Interrogatory 4.** Identify each reason why CCL is not a "qualified nonprofit corporation" within the meaning of 11 C.F.R. § 114.10.

**Answer:** CCL is not a "qualified nonprofit corporation" within the meaning of 11 C.F.R. § 114.10 because it does not have characteristic 11 C.F.R. § 114.10(c)(2). CCL *can* engage in

**Interrogatory Responses**                    4

business activities, and it does. No written or unwritten bylaw, rule, or policy to which CCL is subject provides that it cannot engage in business activity.

Accordingly, it has "provided goods and services that results in income to the corporation,"11 C.F.R. § 114.10(b)(3)(i)(A) when it has offered books and materials in exchange for a suggested donation. It holds events such as banquets which are likewise providing goods and services or are "[a]dvertising or promotional activity which results in income to the corporation, other than in the form of membership dues or donations." 11 C.F.R. § 114.10(b)(3)(i)(B). CCL also receives advertising revenue from its newspaper, the Record.

CCL does not record income in a such a way that easily discloses whether it has, in fact, "directly or indirectly accept[ed] donations of anything of value from business corporations, or labor organizations," 11 CFR 114.10 (c)(4)(ii). Accordingly, to the best of CCL's knowledge and belief, it has not directly accepted any donations of anything of value from business corporations or if it has, such donations have been small. However, 11 CFR 114.10 (c)(4)(ii) also excludes from qualified nonprofit corporation status a corporation that *indirectly* accepts donations of anything of value from business corporations, and CCL may have received contributions from non-profit corporations who may have received contributions from business corporations. CCL also shares and allocates expenses with an associated entity, the Christian Education League, that does receive donations from business corporations. Because such sharing and allocation may be construed to result in the conclusion that CCL "indirectly accept[s] donations . . . from business corporations," CCL is also not able to certify, in accordance with 11 C.F.R. § 114.10(e)(1)(ii)(B), that it has the characteristic 11 C.F.R. § 114.10(c)(4)(ii).

**Interrogatory Responses**          5

**Interrogatory 5.** Explain what steps, if any, CCL has taken to determine whether it would be harmed if it could not name Senator Snowe in its planned advertisements.

**Specific Objections:** CCL objects to this interrogatory as vague. The term "steps" could mean studies, focus groups, or internal workings and thought processes of the CCL. Insofar as it seeks information from CCL's inner workings and use of proprietary information, the request is overbroad because it seeks information specifically protected by the First Amendment.

CCL objects as to relevance. It is not the role of government to tell citizens how best to communicate. "The First Amendment protects [CCL's] right not only to advocate [its] cause but also to select what [it] believes to the most effective means for doing so." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

CCL objects as to relevance because the mode of communication at issue here is not relevant to the issue this case presents. By remanding *Wisconsin Right to Life v. FEC*, 126 S.Ct.1016 (2006) ("*WRTL*"), to the district court, the Supreme Court necessarily implied that there may be "genuine issue ads," *McConnell v. FEC*, 540 U.S. 93, 206 n.88 (2003), that name a federal candidate. Accordingly, why CCL chose to name Senator Snowe is irrelevant.

Limiting the meaning of "steps" to processes not subject to the above objections, and without waiving any specific or general objection, CCL responds as follows:

**Answer:** CCL took no surveys or conducted no focus groups and took no other steps to determine whether it would be harmed if it could not name Senator Snowe in its planned advertisements.

**Interrogatory 6.** For each donation of anything of value that CCL has received from a business

**Interrogatory Responses**                     6

corporation or labor organization since January 1, 2004, list the date, amount, and name and address of the source of the donation.

**Specific Objection**: CCL objects to this request as requiring disclosure of information that the government has no compelling interest in knowing. It specifically requests that such information be subject to a protective order. Without waiving any specific or general objection,, CCL responds as follows:

**Answer:** CCL does not record income in a such a way that easily discloses whether it has, in fact, directly or indirectly accepted donations from business corporations or labor organizations. CCL believes any such direct donations to have been small but cannot specify them. CCL may have received contributions from non-profit corporations who may have received contributions from business corporations. CCL also shares and allocates expenses with an associated entity, the Christian Education League, that does receive donations from business corporations. CCL cannot specify any indirect donations from business corporations or labor organizations.


**Interrogatory 7** For each time an individual has donated in excess of $1000 to CCL over the course of a calendar year in 2004, 2005, or to date in 2006, list the amount the individual donated in that calendar year.

**Specific Objection:** Disclosing such records is an infringement on the rights of speech and association without being adequately tailored to a commensurately compelling government interest. Without waiving any specific or general objection, CCL responds as follows:

**Answer:** *See attached* **Exhibit A** (nominated as "#7")


**Interrogatory Responses**            7

**Interrogatory 8**. List the amount and the name and address of the source of each contribution from a corporation that has been pledged to pay for CCL's campaign for the passage of the federal Marriage Protection Amendment Act.

**Specific Objection:**

**Answer:** No corporation has pledged to pay for CCL's efforts for the passage of the federal Marriage Protection Amendment.

**Interrogatory 9**. For each individual who has pledged to contribute in excess of $1000 to CCL to pay for CCL's campaign for the passage of the federal Marriage Protection Amendment Act, list the amount that each individual has pledged.

**Specific Objection:**

**Answer:** *See attached* **Exhibit B** (nominated as "# 9")

**Interrogatory 10**. List the amount and percentage of CCL's receipts that came from business corporations or labor organizations in 2004, 2005, and to date in 2006.

**Specific Objection:**

**Answer:** CCL does not record income in a such a way that easily discloses whether it has, in fact, "directly or indirectly accept[ed] donations of anything of value from business corporations, or labor organizations," 11 CFR 114.10 (c)(4)(ii). Accordingly, to the best of CCL's knowledge and belief, it has not directly accepted any donations of anything of value from business corporations or if it has, such donations have been small.

**Interrogatory Responses**                    8

**Interrogatory 11**. List each federal candidate that CCL has endorsed since January 1, 2004.

**Specific Objection:** CCL objects to this interrogatory as vague. The term "endorse" could mean support that is not encompassed with the government's compelling interest in disclosure. As limited to the constitutionally required construction for disclosure of expressly advocating the election or defeat of a clearly identified candidate, and without waiving this specific or general objection, CCL responds as follows:

**Answer:** CCL has endorsed no federal candidate since January 1, 2004.

**Interrogatory 12.** State whether CCL has ever opposed Senator Olympia Snowe or endorsed an opponent of hers in an election for federal office. If CCL has opposed Senator Snowe or endorsed an opponent of hers, identify each election campaign that CCL opposed Senator Snowe and each election campaign in which CCL endorsed Senator Snowe's opponent.

**Specific Objections:** CCL objects as to relevance. Only the content of CCL's advertisement as provided in its Verified Complaint is relevant to this action.

CCL objects to as vague the terms "opposed" and "endorsed." If not limited to communications that expressly advocate the election or defeat of a clearly identified candidate, such terms ask for information that the government has no compelling interest in gathering. If limited in meaning to expressly advocate the election or defeat of a clearly identified candidate, and without waiving this specific or general objection, CCL responds as follows:

**Answer:** CCL has not "opposed" Senator Olympia Snowe or "endorsed" an opponent of hers in an election for federal office.

**Interrogatory 13.** Separately list the amount that CCL disbursed in 2004 and 2005 in order to advocate for against a) candidates for state or local office; and b) candidates for federal office.

**Specific Objections:** CCL objects as to relevance. Only the content of CCL's advertisement as provided in its Verified Complaint is relevant to this action.

CCL objects as to relevance as to candidates for state or local office. The FECA provisions at issue in this matter operate completely separately from state regulations which would apply to such elections.

CCL objects to as vague the phrase "advocate for or against." If not limited to communications that expressly advocate the election or defeat of a clearly identified candidate, such terms ask for information that the government has no compelling interest in gathering. If limited in meaning to expressly advocate the election or defeat of a clearly identified candidate, and without waiving these specific or general objections, CCL responds as follows:

**Answer:** a) CCL has spent no amount in order to expressly advocate the election or defeat of a clearly identified candidate for state or local office.

b) CCL has spent no amount in order to expressly advocate the election or defeat of a clearly identified candidate for federal office.

**Interrogatory Responses**            10

Plaintiff's
Exhibit

A

# 7

| Contribution Date | Amount | Fund Code | Organization |
|---|---|---|---|
| 1/2/2004 | $ 2,723.4 | Wills | 1 |
| 1/27/2004 | $ 1,565.56 | MISC | 1 |
| 2/4/2004 | $ 1,080. | CHBD | 1 |
| 2/24/2004 | $ 3,000. | AP204 | 1 |
| 3/1/2004 | $ 6,500. | Wills | 1 |
| 3/2/2004 | $ 4,000. | SPLG | 1 |
| 6/17/2004 | $ 5,000. | SPLG | 1 |
| 8/16/2004 | $ 2,000. | SPLG | 1 |
| 9/20/2004 | $ 3,246.89 | MISC | 1 |
| 12/30/2004 | $ 10,000. | EOYG | 1 |
| 1/19/2005 | $ 1,080. | CHBD | 1 |
| 4/1/2005 | $ 5,000. | SPLG | 1 |
| 4/19/2005 | $ 25,000. | SPLG | 1 |
| 4/20/2005 | $ 1,200. | CHBD | 1 |
| 4/26/2005 | $ 10,000. | SPDS | 1 |
| 6/9/2005 | $ 1,300. | SPLG | 1 |
| 8/4/2005 | $ 2,000. | SPLG | 1 |
| 8/22/2005 | $ 20,000. | SPLG | 1 |
| 8/22/2005 | $ 20,000. | SPLG | 1 |
| 8/23/2005 | $ 5,000. | SPLG | 1 |
| 10/12/2005 | $ 25,000. | SPLG | 1 |
| 10/12/2005 | $ 25,000. | SPLG | 1 |
| 10/31/2005 | $ 1,200. | CHBD | 1 |
| 11/23/2005 | $ 2,000. | RCPT | 1 |
| 11/28/2005 | $ 1,404. | SPLG | 1 |
| 11/29/2005 | $ 10,000. | EOYG | 1 |
| 1/12/2006 | $ 8,977. | DAY | 1 |
| 1/12/2006 | $ 8,977. | DAY | 1 |
| 2/15/2006 | $ 1,200. | CHBD | 1 |
| 3/14/2006 | $ 2,000. | SPLG | 1 |
| 3/16/2006 | $ 10,000. | SPDS | 1 |

Plaintiff's
Exhibit

B

| ContributionDat | Amount | Fund Code | Contribution Organization | Contact Type | Organization Name | |
|---|---|---|---|---|---|---|
| 3/1/2004 | $ 6,500. | Wills | | 1 Org | Putnam Investment Group | Income from Mutual funds |
| 8/16/2004 | $ 2,000. | SPLG | | 1 Org | International Reform Federation | Non Profit Donation |
| 8/4/2005 | $ 2,000. | SPLG | | 1 Org | International Reform Federation | Non Profit Donation |
| 11/28/2005 | $ 1,404. | SPLG | | 1 Org | United Mid-Coast Charities, Inc | Non Profit Donation |
| 1/12/2006 | $ 8,977. | DAY | | 1 Org | Cecil B. Day Foundation | Non Profit Donation as matching funds |

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) ) | |
| | ) | No.  1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT A-11 |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-11 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**STATE OF MAINE**
**Commission on Governmental Ethics and Election Practices**
**135 State House Station**
**Augusta, Maine 04333**
Tel: (207) 287-6221   Fax: (207) 287-6775
Website: **www.maine.gov/ethics**

☐ This is an update.



RECEIVED
FEB 2 7 2006
COMMISSION ON GOVERNMENTAL
& ELECTION PRACTICES AUGUST.

## REGISTRATION FOR POLITICAL ACTION COMMITTEES

A political action committee must register with the Commission within 7 days of accepting contributions, incurring obligations or making expenditures in the aggregate in excess of $1,500 in any single calendar year to initiate, support, defeat or influence in any way a campaign, referendum, initiated petition, candidate, political committee or another political action committee (21-A M.R.S.A. §1053).

**Within 10 days of a change in PAC information an amended registration form must be submitted to the Commission.**
**The committee must file an updated registration every election year between January 1st and March 1st.**

### I. COMMITTEE INFORMATION

Name of committee **COALITION FOR MARRIAGE**   Acronym **N/A**

Mailing address **70 SEWALL STREET**   Telephone # **622-7634**

City, State, Zip Code **AUGUSTA, ME 04330**   Fax # **621-0035**

Website **WWW.CRLMAINE.ORG**

### II. IDENTIFICATION OF TREASURER AND PRINCIPAL OFFICERS OF COMMITTEE

**A. Committee Treasurer:** **GREGG TABBUTT**

Mailing address **555 GRANDVIEW AVENUE**   Telephone # **945-5995**

City, State, Zip Code **BANGOR, ME 04401**   E-Mail **GLT@GWI.NET**

**B. Principal Officers:**

Name **REV. SANDY WILLIAMS**   Title **CHAIRMAN**

Mailing address

City, State, Zip code   Telephone #

Name **MICHAEL HEIN**   Title **ASST. TREASURER**

Mailing address **28 FRANKLIN STREET**   **mhein1@gwi.net**

City, State, Zip Code **AUGUSTA, ME 04330**   Telephone # **622-2599**

**C.** Identify any candidates, Legislators or other individuals who are the primary fundraisers and decision makers for the committee.

**REV. SANDY WILLIAMS - DECISION MAKER**

**MICHAEL S. HEATH - DECISION MAKER**

### III. MAILING ADDRESS (Filing notices and correspondence will be mailed to this address.)

**70 SEWALL STREET, AUGUSTA, ME 04330**

DEPOSITION
EXHIBIT
_Heath 11_
CP 4-13-06

PENGAD 800-631-6989

CGEEP Form PAC (Rev. 7/05)   (Continued on reverse side)

## IV. STATUS OF COMMITTEE

Is this a continuing committee?    Yes ___X___    No _____

## V. FORM OF ORGANIZATION

A.   Name the form or structure of organization; i.e., cooperative, corporation, voluntary association, partnership, etc.

_ADVOCACY MINISTRY, FOR-PROFIT (Non) CORPORATION_

B.   Date of origin/incorporation    _4/6/2005_

## VI. STATEMENT OF SUPPORT OR OPPOSITION

Indicate whether the committee supports or opposes a candidate, political committee, referendum, initiated petition or campaign. If unknown at the time of registration, the committee must inform the Commission as soon as the committee knows this information.

_____ Support _____

_X_ Oppose _SAME-SEX MARRIAGE_

## VII. ASSETS OF COMMITTEE

List total assets at time of registration. Include deposits, real and personal property, investments, cash, and all other available assets.

_UNKNOWN_

1. _____    2. _____

## VIII. DEPOSITORY OF FUNDS

Name of depository  _KENNEBEC SAVINGS BANK_    Account # _____

Address  _AUGUSTA, ME 04330_

Name of depository _____    Account # _____

Address _____

## IX. CONTRIBUTIONS TO THE COMMITTEE

List the names and mailing addresses of contributors who donate in excess of $50 each year to the committee and the amount or value of each contribution at the time of registration. Any person who makes contributions on an installment basis, the total of which exceeds $50 in the calendar year, is considered a contributor to be identified here.

_NONE ON AN INSTALLMENT BASIS_

1. _____    2. _____

_____

3. _____    4. _____

_____

Signature of Principal PAC Officer  _Michael M. Hein_

Title _ASST. TREASURER, COALITION FOR MARRIAGE_  Date _2/27/2006_

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) | |
| | ) | |
| | ) | No.  1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT A-12 |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-12 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Civic league head expects large turnout for anti-gay-rights rally                    Page 1 of 2





MaineToday.com    Portland Press Herald / Maine Sunday Telegram   KENNEBEC JOURNAL   Morning Sentinel

Log In | Register | Lost Password?

HOME

MAINEJOBS
HOMES
WHEELS
MARKETPLACE

## Morning Sentinel
### online

NEWS   SPORTS   OBITUARIES   VIEWPOINTS   WHAT'S HAPPENING   CLASSIFIEDS

NEWS
Local and State
Midday/4PM Reports
AP Wire
InDepth
Week in Photos

WEATHER
5-day Forecast
On the Ocean

SPORTS
High Schools
Red Sox
Pirates

BUSINESS
News
Blogs
Maine News Direct
Classifieds

ENTERTAINMENT
Calendar
Movies
Dining
Music
Theater
Art

TRAVEL
Maine Regions
From Away
Vacation Rentals
Lodging Guide

OUTDOORS
Hiking
Fishing
Trail Head
Campground Guide

BLOGS
Christina's World
Kid Tracks
A Dog's Life
More blogs

20 BELOW
Teen Blogs
One-Minute Wonders
Reindeer Rock-off

MAINEJOBS
Search Jobs
Post a Job
News and Resources
Employer Profiles

HOMES
Classifieds
Advice and Info
Featured Agents
Moving to Maine
Retiring in Maine

WHEELS
Classifieds
Resources and Info
Featured Dealers

MILESTONES
Celebrations
Obituaries

MARKETPLACE
Classifieds
Special Sections

ADVERTISING
5 Reasons
Advertising Products

MEMBER CENTER
Press Herald
Sunday Telegram

Wednesday, April 27, 2005                    E-mail this story to a friend

## Civic league head expects large turnout for anti-gay-rights rally

By BETTY ADAMS
Staff Writer

Copyright © 2005 Blethen Maine Newspapers Inc.

AUGUSTA -- The executive director of the Christian Civic League of Maine said he expects at least 1,000 people for Thursday's rally in support of a petition drive to repeal a law protecting gays and lesbians from discrimination.

Michael Heath guessed he would need three to six buses to shuttle people from a remote parking site at the Kennebec Ice Arena in Hallowell to the Statehouse steps, where the first of four speakers is set to begin addressing the crowd at 10:25 a.m. Thursday.

But Heath had little solid information on the number of attendees. There could be as many as 2,000 at the "Marriage: One Man, One Woman" rally.

"We're going on sketchy information," he said. "There are no tickets. We're having to make decisions on hints."

He's got a "good contingent coming from Millinocket," he said, and a large turnout from the Portland area, where one pastor told him, "You will need more buses for shuttles." Calvary Chapel School in Brewer is sending down the entire 100-unit student body.

"I know there's at least one lobsterman from Beals Island, Dan Riley," Heath said. "He's in radio ads right now."

ADVERTISEMENT



Saint Joseph's College of Maine
MBA-QUALITY LEADERSHIP

Thai Yoga Bodywork Workshop
to be offered at CMMC on April 21
read more >>

CMMC Receives Grant
The Maine Comprehensive Cancer Consortium's Skin Cancer Task Force has awarded Central Maine Medical Center a grant to support the "No Sun for Babies" program
read more >>

CMMC Health and Wellness Services
Central maine Medical Center Health and Wellness Services announce programs beginning on February 27.
read more >>

---

**Today's Top Headlines
from the Kennebec Journal**

- Compromised Katahdin plan approved by House
- 152nd to return on Thursday

DEPOSITION
EXHIBIT
Heath 12
CP 4-13-06
PENGAD 800-631-6989



ennebec Journal
Morning Sentinel
1aineToday.com

REAL Cities
twork Affiliate

The Christian Civic League is running radio ads up to 700 or 800 times, trying to drum up support for their cause, which includes urging legislators to amend the state Constitution to define marriage as a union between a man and a woman. The league and its partners also are running full-page ads in Maine newspapers about the rally.

Shuttle buses will run from the Kennebec Ice Arena beginning at 9 a.m. and continue until the rally starts. They'll run again beginning at 11:30 a.m. to take people back to their vehicles.

Heath said attendees will be asked to go to Capital Park and get petitions so they can collect signatures urging the repeal of the gay-rights law.

Some 1,000 T-shirts carrying a marriage logo will be distributed to petition circulators.

Rally sponsors, including the Coalition for Marriage, the Maine Grassroots Coalition and the Christian Civic League, obtained a permit from Capitol Security to hold the rally, and the Augusta Police Department has agreed to help when crowds want to cross State Street between the Statehouse and Capitol Park.

No road closures or other extraordinary traffic control is expected in the area of the Statehouse on Thursday.

Betty Adams-- 621-5631

badams@centralmaine.com

**Home Delivery**
Subscribe to the Kennebec Journal or Morning Sentinel for just $2.49 a week for 12 weeks



- Bringing back Bastille fete
- Larger cluster developments urged
- Statehouse OKs new checks on oil dealers
- Gas prices going higher
- Mules kick up offense
- Spring peepers deserve a brake

All of today's: **News** | **Sports**
from the Kennebec Journal

**Today's Top Headlines from the Morning Sentinel**

- Federal funding for parks reduced
- House approves Katahdin land deal
- 152nd will return on Thursday
- Colby speaker details crisis in boyhood
- Mayor proposes tax rate decrease
- Motorists dig deeper to fill up these days
- Mules kick up offense
- Muniz making noise for Monks

All of today's: **News** | **Sports**
from the Morning Sentinel



**Competition. Free Markets. Innovation.**
**Keep the Internet Free of Government Regulation**

Questions/Comments?
Copyright © 2006, Blethen Maine Newspapers, Inc.





UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )          No.  1:06CV00614
          Plaintiff,               )
                                   )          EXHIBIT A-13
          v.                       )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
          Defendant.               )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-13 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**Christian Civic League**

# Invoice

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | 157 |

| Bill To |
|---------|
| Linnehan Family Business<br>Ryan Linnehan<br>PO Box 553<br>Ellsworth, ME 04605 |

| Description | Amount |
|-------------|--------|
| Newspaper ad; Full Page Ad Credit Now. Com | 350.00 |

| If paid before March 1, 2006 a 5% discount will apply, Please reduce your payment accordingly. | **Total** | $350.00 |

DEPOSITION
EXHIBIT
Heath 13
40  4-13-06
PENGAD 800-631-6989

# Invoice

Christian Civic League

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | 159 |

**Bill To**

Mr. & Mrs. Douglas Sukeforth
982 Lakeview Drive
China, Maine 04358

| Description | Amount |
|-------------|--------|
| Newspaper ad 5 inch x 2 colmn February Issue Total Value: $56.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |
|-----------|-------|

**Christian Civic League**

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 165 |

| Bill To |
|---------|
| Heritage Of Maine<br>Dick Traynor<br>1321 Washington Ave. Suite 205<br>Portland, Maine 04103 |

| Description | Amount |
|-------------|--------|
| Newspaper ads March Issue Full Page Ad Total Value $600.00 | 0.00 |
| | |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |
|-----------|-------|

# Christian Civic League

**Invoice**

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 166 |

**Bill To**

Jeremiah Project
Robert Emrich
P.O. Box 62
Plymouth, Me 04696

| Description | Amount |
|-------------|--------|
| Newspaper ad 3x2 March Issue Total Value $60.00 | 0.00 |

No balance due
Courtesy Advertisement

**Total** $0.00

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 167 |

**Bill To**

Hosanna New Testament Church
Dallas Henry
109 Schoolhouse Road
Oxford, ME 04270

| Description | Amount |
|-------------|--------|
| Newspaper ad 2x2 March Issue Total Value: $28.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |

# Invoice

**Christian Civic League**

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 168 |

**Bill To**

Mr. & Mrs. Richard Kurtz
One Windward Way
Cape Elizabeth, Maine 04107

| Description | Amount |
|-------------|--------|
| Newspaper ad 5x2 March Issue Total Value $56.00 | 0.00 |

No balance due
Courtesy Advertisement

| | |
|---|---|
| **Total** | $0.00 |

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 169 |

Bill To

Homeschoolers of Maine
P.O. Box 159
Camden, Me 04843-0159

| Description | Amount |
|-------------|--------|
| Newspaper ad Full Page March Issue Total Value $600.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |

4-12-06;10:48AM;BOPP COLESON
.8122353685
# 10/ 44

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 170 |

| Bill To |
|---------|
| Cape Neddick Baptist Church<br>P.O. Box 220<br>34 River Road<br>Cape Neddick, Me 03902 |

| Description | Amount |
|-------------|--------|
| Newspaper ad 1x4 March Issue Total Value $40.00 | 0.00 |

| No balance due<br>Courtesy Advertisement | **Total** | $0.00 |

4-12-06;10:48AM;BOPP COLESON

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 171 |

**Bill To**

Mr. & Mrs. Douglas Sukeforth
982 Lakeview Drive
China, Maine 04358

| Description | Amount |
|-------------|--------|
| Newspaper ads 2x5 March Issue Total Value $56.00 | 0.00 |

| No balance due Courtesy Advertisement | **Total** | $0.00 |
|---|---|---|

# Invoice

Christian Civic League

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 172 |

**Bill To**

Free Indeed Ministries
Aaron Shorey
PO Box 2836
Waterville, ME 04903

| Description | Amount |
|-------------|--------|
| Newspaper ad 2x2 March Issue Total Value $40.00 | 0.00 |

No balance due
Courtesy Advertisement

**Total** $0.00

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/17/2006 | 173 |

| Bill To |
|---------|
| TecnPact<br>Attn: Nathanael Yellis<br>P.O. Box 9<br>Jefferson, GA 30549 |

| Description | Amount |
|-------------|--------|
| Newspaper ad Full Page March Issue Total Value $600.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | **$0.00** |

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 175 |

| Bill To |
|---------|
| Heritage Of Maine
Dick Traynor
1321 Washington Ave. Suite 205
Portland, Maine 04103 |

| Description | Amount |
|-------------|--------|
| Newspaper ad Half Page April Issue | 300.00 |

| If paid before April 1, 2006 a 5% discount will apply, Please reduce your payment accordingly. | **Total** | $300.00 |

# Invoice

**Christian Civic League**

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 176 |

**Bill To**

Viddles & Griddles
901 Main Street
Oxford, Me 04270

| Description | Amount |
|-------------|--------|
| Newspaper ad Half Page April Issue | 105.00 |

If paid before April 1, 2006 a 5% discount will apply, Please reduce your payment accordingly.

| **Total** | $105.00 |

Christian Civic League

# Invoice

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 177 |

**Bill To**

Mayflower Productions
28 Mayflower Lane
South China, ME 04358

| Description | Amount |
|-------------|--------|
| Newspaper ad 2x2 April Issue Total Value $28.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 178 |

**Bill To**

Hosanna New Testament Church
Dallas Henry
109 Schoolhouse Road
Oxford, ME 04270

| Description | Amount |
|-------------|--------|
| Newspaper ad 2x2 April Issue Total Value $28.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |

# Invoice

Christian Civic League

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 179 |

**Bill To**

Mr. & Mrs. Douglas Sukeforth
982 Lakeview Drive
China, Maine 04358

| Description | Amount |
|-------------|--------|
| Newspaper ad 5x5 April Issue Total Value $56.00 | 0.00 |

No balance due
Courtesy Advertisement

**Total** $0.00

# Invoice

Christian Civic League

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 180 |

**Bill To**

Hope Haven Gospel Mission
209 Lincoln Street
Lewiston, Maine 04240

| Description | Amount |
|-------------|--------|
| Newspaper ad April Issue 4x2 Total Value $56.00 | 0.00 |

| | |
|---|---|
| No balance due<br>Courtesy Advertisement | **Total**     $0.00 |

# Invoice

**Christian Civic League**

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | J81 |

**Bill To**

Free Indeed Ministries
Aaron Shorey
PO Box 2836
Waterville, ME 04903

| Description | Amount |
|-------------|--------|
| Newspaper ad 2x2 April Issue Total Value $40.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |
|-----------|-------|

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 182 |

| Bill To |
|---------|
| Linnehan Family Business |
| Ryan Linnehan |
| PO Box 553 |
| Ellsworth, ME 04605 |

| Description | Amount |
|-------------|--------|
| Newspaper ad Full Page April Issue | 350.00 |

| If paid before April 1, 2006 a 5% discount will apply, Please reduce your payment accordingly. | **Total** | $350.00 |

# Invoice

Christian Civic League

70 Sewall St.
Augusta Me. 04330

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 183 |

**Bill To**

Mr. & Mrs. Richard Kurtz
One Windward Way
Cape Elizabeth, Maine 04107

| Description | Amount |
|-------------|--------|
| Newspaper ad 5x5 April Issue "WORLD Magazine" Total Value $56.00 | 0.00 |

No balance due
Courtesy Advertisement

**Total**     $0.00

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 184 |

| Bill To |
|---------|
| Edward Sepciale<br>570 Middle Road<br>Sabattus, Maine 04280 |

| Description | Amount |
|-------------|--------|
| Newspaper ad Business Card Ad April Issue | 10.00 |

| | **Total** | $10.00 |

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 185 |

**Bill To**

Michelle Truman
P O. Box 296
Hallowell. Maine 04347

| Description | Amount |
|-------------|--------|
| Newspaper ad 2x2 April Issue Total Value $ 28.00 | 0.00 |

No balance due
Courtesy Advertisement

| **Total** | $0.00 |

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/15/2006 | 186 |

| Bill To |
|---------|
| Allen's Auto Sales<br>Peter Allen<br>24 Main Street<br>Norway, Maine 04268 |

| Description | Amount |
|-------------|--------|
| Newspaper ad April Issue Business Card Ad | 10.00 |
| | |
| **Total** | $10.00 |

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/21/2006 | 187 |

**Bill To**

New Life Christian Academy
Jim Warnock
8 Drift Road
Fryeburg, Maine 04037

| Description | Amount |
|-------------|--------|
| Newspaper ad April Issue 2x2 space Total Value $28.00 COMMITTED FOR 3 Months 5% discount $1.40 | 26.60 |

| | |
|---|---|
| If paid before April 1, 2006 a 5% discount will apply. Please reduce your payment accordingly. | **Total** $26.60 |

Christian Civic League

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/21/2006 | 188 |

**Bill To**

Market America
Phil Clayton
42 Masonic Street
Rockland, Maine 04841

| Description | Amount |
|-------------|--------|
| Newspaper ad April Issue Business Card $10.00 per month<br>COMMITTED FOR 3 MONTHS April,May,June Total Value $30.00<br>Paid in full 3/21/06 no payment needed | 0.00 |

No balance due

| **Total** | $0.00 |

**Christian Civic League**

70 Sewall St.
Augusta Me. 04330

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/31/2006 | 159 |

| Bill To |
|---------|
| Mr. & Mrs. Richard Kurtz |
| One Windward Way |
| Cape Elizabeth, Maine 04107 |

| Description | Amount |
|-------------|--------|
| Newspaper ad 5 inch x 2 Column February Issue Total Value: $56.00 | 0.00 |

No balance due
Courtesy Advertisement

**Total**    $0.00

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )      No.  1:06CV00614
                Plaintiff,         )
                                   )      EXHIBIT A-14
                v.                 )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
                Defendant.         )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT A-14 SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Form **990**

OMB No. 1545-0047

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except black lung benefit trust or private foundation)

**2004**

Department of the Treasury
Internal Revenue Service

▶ The organization may have to use a copy of this return to satisfy state reporting requirements.

Open to Public Inspection

**A** For the 2004 calendar year, or tax year beginning _____, and ending _____

| **B** Check if applicable: | **C** | | **D** Employer identification no. |
|---|---|---|---|
| ☐ Address change | Please use IRS label or print or type. See Specific Instructions. | Name of organization **Christian Civic League of Maine Inc.** | **01-0044660** |
| ☐ Name change | | Number and street (or P.O. box if mail is not delivered to street address)   Room/suite   **70 Sewall Street** | **E** Telephone number   **207-622-7634** |
| ☐ Initial return | | | **F** Accounting method:  ☐ Cash |
| ☐ Final return | | City or town, state or country, and ZIP + 4 | ☒ Accrual  ☐ Other (specify) ▶ |
| ☐ Amended return | | **Augusta          ME 04330-6333** | |
| ☐ Application pending | | | |

● **Section 501(c)(3) organizations and 4947(a)(1) nonexempt charitable trusts must attach a completed Schedule A (Form 990 or 990-EZ).**

**H** and **I** are not applicable to section 527 organizations.

**G** Website: ▶ **www.cclmaine.org**

H(a) Is this a group return for affiliates?  ☐ Yes  ☒ No

H(b) If "Yes," enter number of affiliates ▶ _____

**J** Organization type (check only one) ▶ ☒ 501(c) ( **4** ) ◀ (insert no.)  ☐ 4947(a)(1) or  ☐ 527

H(c) Are all affiliates included?  ☐ Yes  ☐ No
(If "No," att. a list. See instr.)

**K** Check here ▶ ☐ if the organization's gross receipts are normally not more than $25,000. The organization need not file a return with the IRS; but if the organization received a Form 990 Package in the mail, it should file a return without financial data. Some states require a complete return.

H(d) Is this a separate return filed by an organization covered by a group ruling?  ☐ Yes  ☒ No

**I** Group Exemption Number ▶

**M** Check ▶ ☐ if the organization is not required to attach Sch. B (Form 990, 990-EZ, or 990-PF).

**L** Gross receipts: Add lines 6b, 8b, 9b, and 10b to line 12 ▶     **250,599**

## Part I   Revenue, Expenses, and Changes in Net Assets or Fund Balances (See page 18 of the instructions.)

| | | | | |
|---|---|---|---|---|
| 1 | Contributions, gifts, grants, and similar amounts received: | | | |
| a | Direct public support | **1a** | 181,492 | |
| b | Indirect public support | **1b** | 50,513 | |
| c | Government contributions (grants) | **1c** | | |
| d | Total (add lines 1a through 1c) (cash $ 232,005 noncash $ _____) | | **1d** | 232,005 |
| 2 | Program service revenue including government fees and contracts (from Part VII, line 93) | | **2** | 595 |
| 3 | Membership dues and assessments | | **3** | |
| 4 | Interest on savings and temporary cash investments | | **4** | |
| 5 | Dividends and interest from securities | | **5** | 645 |
| 6a | Gross rents | **6a** | | |
| b | Less: rental expenses | **6b** | | |
| c | Net rental income or (loss) (subtract line 6b from line 6a) | | **6c** | |
| 7 | Other investment income (describe ▶ _____) | | **7** | |
| 8a | Gross amount from sales of assets other than inventory | (A) Securities  **16,500** **8a** | (B) Other | |
| b | Less: cost or other basis and sales expenses | **12,135** **8b** | | |
| c | Gain or (loss) (attach schedule) | **4,365** **8c** | | |
| d | Net gain or (loss) (combine line 8c, columns (A) and (B))    See Stmt 1 | | **8d** | 4,365 |
| 9 | Special events and activities (attach schedule). If any amount is from gaming, check here ▶ ☐ | | | |
| a | Gross revenue (not including $ _____ of contributions reported on line 1a) | **9a** | | |
| b | Less: direct expenses other than fundraising expenses | **9b** | | |
| c | Net income or (loss) from special events (subtract line 9b from line 9a) | | **9c** | |
| 10a | Gross sales of inventory, less returns and allowances | **10a** | | |
| b | Less: cost of goods sold | **10b** | | |
| c | Gross profit or (loss) from sales of inventory (attach schedule) (subtract line 10b from line 10a) | | **10c** | |
| 11 | Other revenue (from Part VII, line 103) | | **11** | 854 |
| 12 | Total revenue (add lines 1d, 2, 3, 4, 5, 6c, 7, 8d, 9c, 10c, and 11) | | **12** | 238,464 |

| | | | |
|---|---|---|---|
| **E x p e n s e s** | 13 | Program services (from line 44, column (B)) | **13** | 166,015 |
| | 14 | Management and general (from line 44, column (C)) | **14** | 38,023 |
| | 15 | Fundraising (from line 44, column (D)) | **15** | 29,947 |
| | 16 | Payments to affiliates (attach schedule) | **16** | |
| | 17 | Total expenses (add lines 16 and 44, column (A)) | **17** | 233,985 |

| | | | |
|---|---|---|---|
| **A s s e t s / N e t** | 18 | Excess or (deficit) for the year (subtract line 17 from line 12) | **18** | 4,479 |
| | 19 | Net assets or fund balances at beginning of year (from line 73, column (A)) | **19** | 60,296 |
| | 20 | Other changes in net assets or fund balances (attach explanation)   See Statement 2 | **20** | -2,035 |
| | 21 | Net assets or fund balances at end of year (combine lines 18, 19, and 20) | **21** | 62,740 |

For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.
DAA

Form **990** (2004)

SCANNED AUG 2 9 2005

RECEIVED AUG 0 5 2005 OGC

REGISTER

DEPOSITION EXHIBIT
Heater 14
CP 4-13-06

PENGAD 800-631-6989

G78

## Advisors

Mr. Robert Bruns,      14 Harbor Ridge Road, Freeport, ME  04032                865-6194 H
                                                                                                             Fax  774-4917W
                                                                           bbruns@headlightaudiovisual.com
Rev. Whitfield Curtis, 1516 Highway 1, Littleton, ME  04730                 538-9386 H
Mr. James Duran, 105 Harris Avenue, Portland, ME  04103                       797-4915 W/H
                                                                                                          JimD15904@aol.com
Dr. Eugene Glad, 11 Middle Street, Augusta, ME  04330                       622-1430W

Mr. Irving Lash, 41 Jefferson Street, Augusta, ME  04330                      622-6784W
                                                                                                          ejgins@powerlink.net

Mrs. Evelyn Maxfield, 170 Naples Road, Harrison, ME  04040              583-2388 H
                                                                                                          dodevy1@juno.com

Mr. Arnold Sturtevant, P.O. Box 2350, Kents Hill, ME  04349            897-4125H
                                            Summer Camp in Weld                 585-2139

## Denominational Advisors

### ASSEMBLIES OF GOD --

Rev. Brad Puckett, Kennebec Valley Assembly of God, 44 Hallowell Road       622-1572 C
                            Chelsea,  ME  04330-9644                                          445-5853 H
                                                                                                          kvaog@juno.com


                                                                                                July 21, 2005

Form 990 (2004)   **Christian Civic League of Maine**   **01-0044660**   Page 2

**Part II** | Statement of Functional Expenses

All organizations must complete column (A). Columns (B), (C), and (D) are required for section 501(c)(3) and (4) organizations and section 4947(a)(1) nonexempt charitable trusts but optional for others. (See page 22 of the instructions.)

| Do not include amounts reported on line 6b, 8b, 9b, 10b, or 16 of Part I. | | (A) Total | (B) Program services | (C) Management and general | (D) Fundraising |
|---|---|---|---|---|---|
| 22 Grants and allocations (attach schedule) (cash $ ___ non-cash $ ___ ) | 22 | | | | |
| 23 Specific assistance to individuals | 23 | | | | |
| 24 Benefits paid to or for members | 24 | | | | |
| 25 Compensation of officers, directors, etc. | 25 | 60,200 | 42,140 | 9,030 | 9,030 |
| 26 Other salaries and wages | 26 | 61,214 | 42,850 | 9,182 | 9,182 |
| 27 Pension plan contributions | 27 | | | | |
| 28 Other employee benefits | 28 | 9,113 | 6,379 | 1,367 | 1,367 |
| 29 Payroll taxes | 29 | 10,686 | 7,480 | 1,603 | 1,603 |
| 30 Professional fundraising fees | 30 | | | | |
| 31 Accounting fees | 31 | 2,773 | | 2,773 | |
| 32 Legal fees | 32 | 16,146 | 10,470 | 2,838 | 2,838 |
| 33 Supplies | 33 | 3,300 | | 3,300 | |
| 34 Telephone | 34 | 5,339 | 3,737 | 801 | 801 |
| 35 Postage and shipping | 35 | 7,006 | 4,904 | 1,051 | 1,051 |
| 36 Occupancy | 36 | 15,444 | 10,376 | 2,844 | 2,224 |
| 37 Equipment rental and maintenance | 37 | 4,736 | 2,972 | 1,764 | |
| 38 Printing and publications | 38 | 394 | 276 | 59 | 59 |
| 39 Travel | 39 | 6,248 | 3,124 | 1,562 | 1,562 |
| 40 Conferences, conventions, and meetings | 40 | | | | |
| 41 Interest | 41 | 82 | | 82 | |
| 42 Depreciation, depletion, etc. (attach schedule) | 42 | 1,535 | 1,075 | 230 | 230 |
| 43 Other expenses not covered above (itemize):a | 43a | | | | |
| b **See Statement 3** | 43b | 29,769 | 27,459 | 2,310 | |
| c | 43c | | | | |
| d | 43d | | | | |
| e | 43e | | | | |
| 44 Total functional expenses (add lines 22 - 43). Organizations completing columns (B)-(D), carry these totals to lines 13-15 | 44 | 233,985 | 166,015 | 38,023 | 29,947 |

Joint Costs. Check ▶ ☐ if you are following SOP 98-2.

Are any joint costs from a combined educational campaign and fundraising solicitation reported in (B) Program services? ............ ▶ ☐ Yes ☒ No

If "Yes," enter (i) the aggregate amount of these joint costs $ ___ ; (ii) the amount allocated to Program services $ ___ ;

(iii) the amount allocated to Management and general $ ___ ; and (iv) the amount allocated to Fundraising $ ___

**Part III** | Statement of Program Service Accomplishments (See page 25 of the instructions.)

What is the organization's primary exempt purpose?   ▶ **To make the publics aware of ethical issues.**

All organizations must describe their exempt purpose achievements in a clear and concise manner. State the number of clients served, publications issued, etc. Discuss achievements that are not measurable. (Section 501(c)(3) and (4) organizations and 4947(a)(1) nonexempt charitable trusts must also enter the amount of grants and allocations to others.)

Program Service Expenses (Required for 501(c)(3) & (4) orgs., & 4947(a)(1) trusts; but optional for others.)

a **The organization mails periodic publications that serve to make interested persons and the general public aware of various ethical issues.**

(Grants and allocations   $ ___ )   166,015

b ___

(Grants and allocations   $ ___ )

c ___

(Grants and allocations   $ ___ )

d ___

(Grants and allocations   $ ___ )

e Other program services (attach schedule)   (Grants and allocations   $ ___ )

f Total of Program Service Expenses (should equal line 44, column (B), Program services) ............... ▶ 166,015

DAA   Form **990** (2004)

Form 990 (2004)     **Christian Civic League of Maine**     01-0044660     Page **3**

| **Part IV** | **Balance Sheets** (See page 25 of the instructions.) | | | | |
|---|---|---|---|---|---|

| | Note: Where required, attached schedules and amounts within the description column should be for end-of-year amounts only. | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---|---|---|
| | **45** Cash-non-interest-bearing | | 2,913 | **45** | 13,151 |
| | **46** Savings and temporary cash investments | | | **46** | |
| | **47a** Accounts receivable | **47a** | | | |
| | **b** Less: allowance for doubtful accounts | **47b** | | **47c** | |
| | **48a** Pledges receivable | **48a** | | | |
| | **b** Less: allowance for doubtful accounts | **48b** | | **48c** | |
| | **49** Grants receivable | | | **49** | |
| **A** | **50** Receivables from officers, directors, trustees, and key employees | | | | |
| **s** | (attach schedule) | | | **50** | |
| **s** | **51a** Other notes and loans receivable (attach | | | | |
| **e** | schedule) | **51a** | | | |
| **t** | **b** Less: allowance for doubtful accounts | **51b** | | **51c** | |
| **s** | **52** Inventories for sale or use | | | **52** | |
| | **53** Prepaid expenses and deferred charges | | | **53** | |
| | **54** Investments-securities **See Statement 4** ▶ ☐ Cost ☒ FMV | | 63,906 | **54** | 50,330 |
| | **55a** Investments-land, buildings, and equipment: basis | **55a** | | | |
| | **b** Less: accumulated depreciation (attach schedule) | **55b** | | **55c** | |
| | **56** Investments-other (attach schedule) | | | **56** | |
| | **57a** Land, buildings, and equipment: basis | **57a** | 43,079 | | |
| | **b** Less: accumulated depreciation (attach schedule) **See Statement 5** | **57b** | 36,064 | 6,015 **57c** | 7,015 |
| | **58** Other assets (describe ▶ _____ ) | | | **58** | |
| | **59** Total assets (add lines 45 through 58) (must equal line 74) | | 72,834 | **59** | 70,496 |
| **L** | **60** Accounts payable and accrued expenses | | 12,538 | **60** | 7,756 |
| **i** | **61** Grants payable | | | **61** | |
| **a** | **62** Deferred revenue | | | **62** | |
| **b** | **63** Loans from officers, directors, trustees, and key employees (attach | | | | |
| **i** | schedule) | | | **63** | |
| **l** | **64a** Tax-exempt bond liabilities (attach schedule) | | | **64a** | |
| **i** | **b** Mortgages and other notes payable (attach schedule) | | | **64b** | |
| **t** | **65** Other liabilities (describe ▶ _____ ) | | | **65** | |
| **e** | | | | | |
| **s** | **66** Total liabilities (add lines 60 through 65) | | 12,538 | **66** | 7,756 |
| | Organizations that follow SFAS 117, check here ▶ ☒ and complete lines 67 through 69 and lines 73 and 74. | | | | |
| **N F** | **67** Unrestricted | | 56,531 | **67** | 58,975 |
| **e u** | **68** Temporarily restricted | | | **68** | |
| **t n** | **69** Permanently restricted | | 3,765 | **69** | 3,765 |
| **d** | Organizations that do not follow SFAS 117, check here ▶ ☐ and complete lines 70 through 74. | | | | |
| **A** | **70** Capital stock, trust principal, or current funds | | | **70** | |
| **s B** | **71** Paid-in or capital surplus, or land, building, and equipment fund | | | **71** | |
| **s a** | **72** Retained earnings, endowment, accumulated income, or other funds | | | **72** | |
| **c l** | **73** Total net assets or fund balances (add lines 67 through 69 or lines | | | | |
| **t a** | 70 through 72; | | | | |
| **s n** | column (A) must equal line 19; column (B) must equal line 21) | | 60,296 | **73** | 62,740 |
| **c** | **74** Total liabilities and net assets / fund balances (add lines 66 and 73) | | 72,834 | **74** | 70,496 |

Form 990 is available for public inspection and, for some people, serves as the primary or sole source of information about a particular organization. How the public perceives an organization in such cases may be determined by the information presented on its return. Therefore, please make sure the return is complete and accurate and fully describes, in Part III, the organization's programs and accomplishments.

DAA

Form 990 (2004)    **Christian Civic League of Maine**    01-0044660    Page 4

| Part IV-A | Reconciliation of Revenue per Audited Financial Statements with Revenue per Return (See page 27 of the instructions.) | | Part IV-B | Reconciliation of Expenses per Audited Financial Statements with Expenses per Return | |
|---|---|---|---|---|---|
| **N/A** | | | **N/A** | | |
| a | Total revenue, gains, and other support per audited financial statements ▶ | a | a | Total expenses and losses per audited financial statements ▶ | a |
| b | Amounts included on line a but not on line 12, Form 990: | | b | Amounts included on line a but not on line 17, Form 990: | |
| (1) | Net unrealized gains on investments $ | | (1) | Donated services and use of facilities $ | |
| (2) | Donated services and use of facilities $ | | (2) | Prior year adjustments reported on line 20, Form 990 $ | |
| (3) | Recoveries of prior year grants $ | | (3) | Losses reported on line 20, Form 990 $ | |
| (4) | Other (specify): .......... .......... $ | | (4) | Other (specify): .......... .......... $ | |
| | Add amounts on lines (1) through (4) ▶ | b | | Add amounts on lines (1) through (4) ▶ | b |
| c | Line a minus line b ▶ | c | c | Line a minus line b ▶ | c |
| d | Amounts included on line 12, Form 990 but not on line a: | | d | Amounts included on line 17, Form 990 but not on line a: | |
| (1) | Investment expenses not included on line 6b, Form 990 $ | | (1) | Investment expenses not included on line 6b, Form 990 $ | |
| (2) | Other (specify): .......... .......... $ | | (2) | Other (specify): .......... .......... $ | |
| | Add amounts on lines (1) and (2) ▶ | d | | Add amounts on lines (1) and (2) ▶ | d |
| e | Total revenue per line 12, Form 990 (line c plus line d) ▶ | e | e | Total expenses per line 17, Form 990 (line c plus line d) ▶ | e |

| Part V | List of Officers, Directors, Trustees, and Key Employees (List each one even if not compensated; see page 27 of the instructions.) |
|---|---|

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contrib. to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
|---|---|---|---|---|
| Michael Heath 70 Sewall Street Augusta ME | Executive Di 40 | 60,200 | 8,116 | 0 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

75  Did any officer, director, trustee, or key employee receive aggregate compensation of more than $100,000 from your organization and all related organizations, of which more than $10,000 was provided by the related organizations? ............ ▶ ☐ Yes ☒ No

If "Yes," attach schedule-see page 28 of the instructions.

Form 990 (2004)

DAA

Form 990 (2004)   **Christian Civic League of Maine**   01-0044660   Page 5

| | | | Yes | No |
|---|---|---|---|---|
| 76 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," attach a detailed description of each activity | **76** | | X |
| 77 | Were any changes made in the organizing or governing documents but not reported to the IRS? | **77** | | X |
| | If "Yes," attach a conformed copy of the changes. | | | |
| 78a | Did the organization have unrelated business gross income of $1,000 or more during the year covered by this return? | **78a** | | X |
| b | If "Yes," has it filed a tax return on Form 990-T for this year? | **78b** | | |
| 79 | Was there a liquidation, dissolution, termination, or substantial contraction during the year? If "Yes," attach a statement | **79** | | X |
| 80a | Is the organization related (other than by association with a statewide or nationwide organization) through common membership, governing bodies, trustees, officers, etc., to any other exempt or nonexempt organization? | **80a** | X | |
| b | If "Yes," enter the name of the organization ▶ **Christian Education League, Inc.** and check whether it is [X] exempt or [ ] nonexempt. | | | |

| 81a | Enter direct and indirect political expenditures. See line 81 instructions | **81a** | | | |
|---|---|---|---|---|---|
| b | Did the organization file Form 1120-POL for this year? | | **81b** | | X |
| 82a | Did the organization receive donated services or the use of materials, equipment, or facilities at no charge or at substantially less than fair rental value? | | **82a** | | X |
| b | If "Yes," you may indicate the value of these items here. Do not include this amount as revenue in Part I or as an expense in Part II. (See instructions in Part III.) | **82b** | | | |
| 83a | Did the organization comply with the public inspection requirements for returns and exemption applications? | | **83a** | X | |
| b | Did the organization comply with the disclosure requirements relating to quid pro quo contributions? **N/A** | | **83b** | | |
| 84a | Did the organization solicit any contributions or gifts that were not tax deductible? | | **84a** | X | |
| b | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | **84b** | X | |
| 85 | 501(c)(4), (5), or (6) organizations. a Were substantially all dues nondeductible by members? | | **85a** | | X |
| b | Did the organization make only in-house lobbying expenditures of $2,000 or less? | | **85b** | | X |
| | If "Yes" was answered to either 85a or 85b, do not complete 85c through 85h below unless the organization received a waiver for proxy tax owed for the prior year. | | | | |
| c | Dues, assessments, and similar amounts from members | **85c** | 0 | | |
| d | Section 162(e) lobbying and political expenditures | **85d** | 0 | | |
| e | Aggregate nondeductible amount of section 6033(e)(1)(A) dues notices | **85e** | 0 | | |
| f | Taxable amount of lobbying and political expenditures (line 85d less 85e) | **85f** | 0 | | |
| g | Does the organization elect to pay the section 6033(e) tax on the amount on line 85f? **N/A** | | **85g** | | |
| h | If section 6033(e)(1)(A) dues notices were sent, does the organization agree to add the amount on line 85f to its reasonable estimate of dues allocable to nondeductible lobbying and political expenditures for the following tax year? **N/A** | | **85h** | | |
| 86 | 501(c)(7) orgs. Enter: a Initiation fees and capital contributions included on line 12 | **86a** | | | |
| b | Gross receipts, included on line 12, for public use of club facilities | **86b** | | | |
| 87 | 501(c)(12) orgs. Enter: a Gross income from members or shareholders | **87a** | | | |
| b | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) | **87b** | | | |
| 88 | At any time during the year, did the organization own a 50% or greater interest in a taxable corporation or partnership, or an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? If "Yes," complete Part IX | | **88** | | X |
| 89a | 501(c)(3) organizations. Enter: Amount of tax imposed on the organization during the year under: section 4911 ▶ _____ ; section 4912 ▶ _____ ; section 4955 ▶ _____ | | | | |
| b | 501(c)(3) and 501(c)(4) orgs. Did the organization engage in any section 4958 excess benefit transaction during the year or did it become aware of an excess benefit transaction from a prior year? If "Yes," attach a statement explaining each transaction | | **89b** | | X |
| c | Enter: Amount of tax imposed on the organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 | | ▶ | | 0 |
| d | Enter: Amount of tax on line 89c, above, reimbursed by the organization | | ▶ | | 0 |
| 90a | List the states with which a copy of this return is filed ▶ **None** | | | | |
| b | Number of employees employed in the pay period that includes March 12, 2004 (See instructions.) | | **90b** | | 2 |
| 91 | The books are in care of ▶ **Michael Heath**       Telephone no. ▶ **207-622-7634** | | | | |
| | Located at ▶ **Augusta, ME**       ZIP + 4 ▶ **04330** | | | | |
| 92 | Section 4947(a)(1) nonexempt charitable trusts filing Form 990 in lieu of Form 1041- Check here ▶ [ ] and enter the amount of tax-exempt interest received or accrued during the tax year ▶ | **92** | | | |

Form **990** (2004)

DAA

## Part VII   Analysis of Income-Producing Activities (See page 33 of the instructions.)

| Note: Enter gross amounts unless otherwise indicated. | Unrelated business income | | Excluded by sec. 512, 513, or 514 | | (E) Related or exempt function income |
|---|---|---|---|---|---|
| | (A) Business code | (B) Amount | (C) Exclusion code | (D) Amount | |
| 93  Program service revenue: | | | | | |
| a  **Convention Revenue** | | | | | 595 |
| b | | | | | |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| f  Medicare/Medicaid payments | | | | | |
| g  Fees and contracts from government agencies | | | | | |
| 94  Membership dues and assessments | | | | | |
| 95  Interest on savings and temporary cash investments | | | | | |
| 96  Dividends and interest from securities | | | 14 | 645 | |
| 97  Net rental income or (loss) from real estate: | | | | | |
| a  debt-financed property | | | | | |
| b  not debt-financed property | | | | | |
| 98  Net rental income or (loss) from personal property | | | | | |
| 99  Other investment income | | | | | |
| 100  Gain or (loss) from sales of assets other than inventory | | | | | 4,365 |
| 101  Net income or (loss) from special events | | | | | |
| 102  Gross profit or (loss) from sales of inventory | | | | | |
| 103  Other revenue: a | | | | | |
| b  **Other revenue – Excluded** | | | | | 854 |
| c | | | | | |
| d | | | | | |
| e | | | | | |
| 104  Subtotal (add columns (B), (D), and (E)) | | 0 | | 645 | 5,814 |
| 105  Total (add line 104, columns (B), (D), and (E)) | | | | ▶ | 6,459 |

Note: Line 105 plus line 1d, Part I, should equal the amount on line 12, Part I.

## Part VIII   Relationship of Activities to the Accomplishment of Exempt Purposes (See page 34 of the instructions.)

| Line No. ▼ | Explain how each activity for which income is reported in column (E) of Part VII contributed importantly to the accomplishment of the organization's exempt purposes (other than by providing funds for such purposes). |
|---|---|
| 93a | Program service revenue, along with other income |
| 103a | provide the League with the capital necessary to fund its operations. |

## Part IX   Information Regarding Taxable Subsidiaries and Disregarded Entities (See page 34 of the instructions.)

| (A) Name, address, and EIN of corporation, partnership, or disregarded entity | (B) Percentage of ownership interest | (C) Nature of activities | (D) Total income | (E) End-of-year assets |
|---|---|---|---|---|
| N/A | % | | | |
| | % | | | |
| | % | | | |
| | % | | | |

## Part X   Information Regarding Transfers Associated with Personal Benefit Contracts (See page 34 of the instructions.)

(a)  Did the organization, during the year, receive any funds, directly or indirectly, to pay premiums on a personal benefit contract?  ☐ Yes  ☒ No

(b)  Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract?  ☐ Yes  ☒ No

Note: If "Yes" to (b), file Form 8870 and Form 4720 (see instructions).

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Please Sign Here**
▶ Signature of officer    Exec. Dir    Date  8-01-05

| | Date | Check if self-employed ▶ ☐ | Preparer's SSN or PTIN (See Gen. Instr. W) |
|---|---|---|---|

CCL4660  Christian Civic League of Maine
01-0044660
FYE: 12/31/2004

**Federal Statements**

7/25/2005  8:43 AM

**Statement 1 - Form 990, Part I, Line 8c - Sale of Assets Other Than Inventory - Securities**

|  | Desc | | | | | | |
|---|---|---|---|---|---|---|---|
|  | How Rec'd | Whom Sold | Date Acquired | Date Sold | Sale Price | Cost & Expense | Deprec | Gain/-Loss |
| Sales of Stocks | Purchase |  | Various | Various | $ 16,500 | $ 12,135 |  | $ 4,365 |
| Total |  |  |  |  | $ 16,500 | $ 12,135 | $ 0 | $ 4,365 |

1

CCL4660 Christian Civic League of Maine
01-0044660
FYE: 12/31/2004

# Federal Statements

### Statement 2 - Form 990, Line 20 - Other Changes in Net Assets or Fund Balances

| Description | Amount |
|---|---|
| Unrealized losses on investments | $ -2,035 |
| Total | $ -2,035 |

CCL4660  Christian Civic League of Maine                                    7/25/2005  8:43 AM
01-0044660                            **Federal Statements**
FYE: 12/31/2004

### Statement 3 - Form 990, Part II, Line 43 - Other Functional Expenses

| Description | Total Expenses | Program Service | Mgt & General | Fund-Raising |
|---|---|---|---|---|
| | $ | $ | $ | $ |
| **Expenses** | | | | |
| Miscellaneous Office Expense | 1,218 | | 1,218 | |
| Insurance | 1,092 | | 1,092 | |
| Members/constituency expenses | 10,163 | 10,163 | | |
| Weekly Issues Summary | 255 | 255 | | |
| The Record Expense | 5,443 | 5,443 | | |
| Annual Convention | 1,309 | 1,309 | | |
| Public Relations/Advertising | 7,563 | 7,563 | | |
| Books & Periodicals | 2,345 | 2,345 | | |
| Coalition on Marriage | 381 | 381 | | |
| Total | $ 29,769 | $ 27,459 | $ 2,310 | $ 0 |

3

CCL4660  Christian Civic League of Maine

01-0044660

FYE: 12/31/2004

# Federal Statements

7/25/2005  8:43 AM

## Statement 4 - Form 990, Part IV, Line 54 - Investments in Securities

| Description | Beginning of Year | End of Year | Basis of Valuation |
|---|---|---|---|
| US and State Government Investments in securities | 63,906 | 50,330 | Market |
| | 63,906 | 50,330 | |

## Statement 5 - Form 990, Part IV, Line 57 - Land, Buildings, and Equipment

| Description | Beginning of Year | Accum Deprec | End of Year | Accum Deprec |
|---|---|---|---|---|
| Furniture & fixtures | $    40,542 | $    34,527 | $ | $ |
| Land, buildings & equipment | | | 43,079 | |
| Accumulated depreciation | | | | 36,064 |
| Total | $    40,542 | $    34,527 | $    43,079 | $    36,064 |

CCL4660  Christian Civic League of Maine
01-0044660                 **Federal Statements**
FYE: 12/31/2004

7/25/2005 8:43 AM

## Form 990, Part I, Line 1a - Direct Public Support

| Description | Cash | Noncash | Total |
|---|---|---|---|
| Direct contrib etc rcvd-not f | $ 181,492 | $ | $ 181,492 |
| Less amount on Sch B | -15,000 | | -15,000 |
| Other Contributions | 15,000 | | 15,000 |
| Total | $ 181,492 | $ 0 | $ 181,492 |

## Form 990, Part I, Line 1b - Indirect Public Support

| Description | Cash | Noncash | Total |
|---|---|---|---|
| Indirect contr etc rcvd-not f | $ 50,513 | $ | $ 50,513 |
| Total | $ 50,513 | $ 0 | $ 50,513 |

### The Christian Civic League of Maine
### 2005 Officers and Directors

**Officers**

**President: Dallas E. Henry**
**Vice President: Dr. Jerry Mick**
**Secretary: Christiana Poole**
**Treasurer: Mr. Gregg Tabbutt**

**Directors**

**Mrs. Elaine C. Bridge,** PO Box 245, Manchester, ME 04736                   623-3794H
   [winter]   21 Hall Away Villa # 10                                                   522-4267Cell
              Hilton Head, S.C.
              (843) 842-7921                                   ecbridge8@aol.com

**Rev. John Eckhardt,** P.O. Box 426, Brunswick, ME. 04011                   353-6426 home
**Stauron Ministries**   Cell phone 841-5832 (most reliable communication)   729-4688 office
                                    725-1318 fax
                        john@stauron.org

**Rev. Dallas Henry,** 109 Schoolhouse Road, Oxford 04270-3113            539-2295 office & fax
      890-5228 cell                                                 dhenry40@verizon.net office
      233 Ashton Rd., Norway, ME  04268                 743-7750 H
                        henrymd@localnet.com home

**Dr. Jerry Mick,** 1597 Broadway, Bangor 04401          947-6576 C
**Bangor Baptist Church,**       1476 Broadway, Bangor, 04401              947-8106H
                                  Fax:  990-8955
                    pastor@bangorbaptist.org

**Mrs. Christiana Poole,** 544 River Road, PO Box 12, Newcastle, ME 04553
                                  563-1232
                                  633-2313 fax
                                592-6408 cell
                    jep@lincoln.midcoast.com

**Mr. Al Roberts,** 12 Roberts Circle, Boothbay Hbr. 04538                   633-0757H
                                  633-2822O
                    aroberts@gwi.net

**Mr. Gordon Benn Sither,** 16 Maple Avenue, Scarborough, ME 04074            883-4758H
                                854-2551H X3234
                    matawamkeg@aol.com

**Mr. Douglas Sukeforth,** 982 Lakeview Drive, China, ME 04358               968-2100 H
                                649-6160 Cell
                    ritaanddoug@pivot.net         872-2017 Fax

**Mr. Gregg Tabbutt,** 555 Grandview Ave., Bangor, ME 04401                   945-5995 H
                    glt@gwi.net

**Rev. Matthew M. Ward,** PO Box 179, Charleston, ME 04422                   285-3504W
                    pastorward@charlestonchurch.net

**Mr. Stephen Whiting,**  39 Horseshoe Dr.; Scarborough, ME  04074            883-3403 H
                                Pwhiting@rcn.com
**The Whiting Law Firm, P.A.,**                                              780-0681W
75 Pearl Street, Suite 207, Portland, ME  04101                      Fax    780-0682W
                    mail@whitinglawfirm.com

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) | |
| | ) | No. 1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT B |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT B SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## Michael Heath

**From:** Paulton, John [john.paulton@fotf.org]

**Sent:** Friday, March 24, 2006 1:26 PM

**To:** Gary Palmer; Jerry Cox; Ron Prentice; Curt Smith; Iowa Family Policy Center; Kentucky - The Family Foundation; Michael Heath; fthigpen@msfamily.org; repjeff@hotmail.com; Dave Bydalek; Len Deo; Bill Brooks; Phil Burress; Michael Howden; Michael Geer; kelly@freemarket.org; Victoria Cobb

**Cc:** Brandt, Peter; Miller, Brad; Pfaff, Jim; Hupke, Chris; Blad, Erin; JBoppjr@aol.com

**Subject:** Possible legal action needed

Dear Executive Directors:

You are receiving this because you are in a state that could be affected by McCain-Feingold restrictions on Marriage Amendment lobbying ads that target U.S. senators who are on the ballot.

See the note below from our attorney, Jim Bopp, and respond to him (copying us) if you are willing to assist in this matter.

Thank you.

John Paulton

FROM JIM BOPP:

In the federal McCain-Feingold law passed in 2002 and reviewed by the U.S. Supreme Court in 2003, Congress prohibited corporations from running "electioneering communications," that is broadcast ads naming federal candidates within 30 days of a primary and 60 days of a general election in which the named candidate is on the ballot. This January in *Wisconsin Right to Life v. FEC*, the U.S. Supreme Court held that certain broadcast ads might be exempt from this prohibition, such as grass roots lobbying about upcoming votes in Congress, and directed the lower court to consider such exemption. I represent Wisconsin Right to Life and we are attempting to establish this exemption before the District Court in DC.

It is very unlikely that the *Wisconsin Right to Life* case, however, will be resolved before next fall and the Senate has scheduled a vote on the federal Marriage Amendment in June. Thus, any FPC or other group, which is planning to run broadcast ads within 30 days of a scheduled primary naming a federal candidate on the ballot, will likely be prohibited from doing so by this law. The states where broadcast ads would be effected are: AL, Ark, Calif, Idaho, Ind, Iowa, Ky, Maine, Miss, Mont, Neb, NJ, NM, NC, ND, Ohio, Ore, PA, Texas, Utah, WV, VA. The blackout periods are set out, by the FEC, at Click here: FEC Electioneering Communications Periods .

We are willing to represent, at no charge to the group, any group whose planned broadcast ad falls within the blackout period. We would bring federal suit prior to the blackout period and seek an injunction to allow the ads to go forward. This may even involve an appeal to the U.S. Supreme Court (which would result in a landmark ruling). It would be very helpful to all groups which want to run such ads for some group to step up and do this. It could potentially clear the way for everyone to do such grass roots lobbying.

Anyone interested in this possibility should contact me or Richard Coleson at my law firm.

4/14/2006

James Bopp, Jr.
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, IN 47807
voice: 812-232-2434
fax: 812-235-3685
cell: 812-243-0825
e-mail: jboppjr@aol.com

--------------------------------------------------

John Paulton
Director, Family Policy Councils
Focus on the Family Action
8605 Explorer Dr.
Colorado Springs, CO 80920
(719) 531-3471
FAX: (719) 531-3385
john.paulton@fotf.org

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF      )
MAINE, INC.,                    )
                                )      No.  1:06CV00614
            Plaintiff,          )
                                )      EXHIBIT C
        v.                      )
                                )
FEDERAL ELECTION COMMISSION     )
                                )
            Defendant.          )
                                )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT C SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## Michael Heath

**From:** Michael Heath [msheath@pivot.net]

**Sent:** Friday, March 24, 2006 2:27 PM

**To:** 'jboppjr@aol.com'

**Subject:** Interested

I will run an ad in that period of time mentioning Olympia Snowe.

*Michael S. Heath, Executive Director*
Christian Civic League of Maine
70 Sewall Street
Augusta, ME  04330
v - 207-622-7634 X4
f - 207-621-0035
mike@cclmaine.org
www.cclmaine.org

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )      No.  1:06CV00614
                Plaintiff,         )
                                   )      EXHIBIT D
                v.                 )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
                Defendant.         )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S**
**EXHIBIT D SUBMITTED IN SUPPORT OF ITS OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Exported repr ME: HYPOTHETICAL
Market: NATIONAL REGIONAL DATABASE
Survey: Fall 2005, Spring 2005, Fall 2004
Demo: P 18+
Geo Area: ME COUNTIES - Cnty Grp
Population: 1,041,900
Intab: 9,420
Qualitative: none

| Station | Format | Market | Daypart | Rate | Spots | Total $ | Potential | Reach(00) | CPM |
|---|---|---|---|---|---|---|---|---|---|
| WGAN-AM | News/Talk | Portland & Lewiston | M-F 9:00AM - 12:00N | 75 | 0 | 0 | 0 | 0 | 18.75 |
| WGAN-AM | | | M-F 12:00N - 3:00PM | 70 | 3 | 210 | 51.8 | 146 | 8.14 |
| WGAN-AM | | | M-F 3:00PM - 6:00PM | 75 | 2 | 150 | 31.5 | 88 | 13.89 |
| WGAN-AM | | | M-F 6:00PM - 8:00PM | 10 | 2 | 20 | 27.1 | 32 | 5 |
| WGAN-AM | | | M-F 10:00AM - 12:00N | 60 | 2 | 120 | 36.8 | 60 | 14.63 |
| WGAN-AM | | | M-F 3:00PM - 5:00PM | 60 | 2 | 120 | 39.7 | 94 | 10 |
| | | | Subtotal: | | 11 | 620 | 58.5 | 245 | 10.2 |
| WVOM-FM | News/Talk | Bangor | M-F 9:00AM - 12:00N | 44 | 1 | 44 | 16.4 | 27 | 16.3 |
| WVOM-FM | | | M-F 12:00N - 3:00PM | 44 | 3 | 132 | 52.4 | 129 | 5.87 |
| WVOM-FM | | | M-F 3:00PM - 7:00PM | 44 | 3 | 132 | 40.7 | 116 | 8.15 |
| WVOM-FM | | | M-F 7:00PM - 10:00PM | 44 | 0 | 0 | 0 | 0 | 88 |
| | | | Subtotal: | | 7 | 308 | 51.3 | 208 | 7.44 |
| WLOB-FM | News/Talk | Lewiston & Augusta | M-F 9:00AM - 6:00PM | 35 | 2 | 70 | 23.4 | 56 | 10.29 |
| | | | Subtotal: | | 2 | 70 | 23.4 | 56 | 10.29 |
| WLOB-AM | News/Talk | Portland & Lewiston | M-F 9:00AM - 6:00PM | 0 | 2 | 0 | 23.7 | 9 | 0 |
| | | | Subtotal: | | 2 | 0 | 23.7 | 9 | 0 |
| | | | Station Subtotals: | | | | | | |
| | | | WGAN-AM | | 11 | 620 | 58.5 | 245 | 10.2 |
| | | | WVOM-FM | | 7 | 308 | 51.3 | 208 | 7.44 |
| | | | WLOB-FM | | 2 | 70 | 23.4 | 56 | 10.29 |
| | | | WLOB-AM | | 2 | 0 | 23.7 | 9 | 0 |
| | | | Schedule Summary: | | 22 | 998 | 49.5 | 503 | 9.06 |

ME COUNTIES - Cnty Grp: ANDROSCOGGIN, ME; AROOSTOOK, ME; CUMBERLAND, ME; FRANKLIN, ME; HANCOCK, ME; KENNEBEC, ME

Stations qualify to be reported if they have received five or more minutes of listening in a single quarter-hour in at least 1 in-tab diary in the market,

Estimates are derived from the diaries that provided the audience data for the Market Report and are subject to the limitations stated in that Report

© 1996-2006 Arbitron Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF | ) | |
| MAINE, INC., | ) | |
| | ) | No. 1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT E |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT E SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## Welcome to the first donation screen for the Maine Coalition for Marriage

Thank you for your donation to the Coalition for Marriage (CFM) which is non tax deductible.  The CFM depends solely on your donation to educate the people of Maine with the truth about Question 1.  The CFM is the only statewide organization that can counter the lies coming from the other side.  The CFM is the Christian Civic League of Maine's political action committee and by law is required by the Maine Ethics Commission to submit the names and occupation of all contributors who donate more than $50.  Please fill out the Contact Information Form below and then click the "Submit Form" button.  You can indicate the amount you are donating after the next screen.  When you click submit you will be taken to the Paypal website to make your secure online donation.

### *Contact Information Form:*

| | |
|---|---|
| *Name* | |
| *Title* | |
| *Organization* | |
| *Work Phone* | |
| *Home Phone* | |
| *E-mail* | |

Submit Form    Reset Form

**Subscribe**                    **FAQ**

Michael Hein, Treasurer, P.O. Box 817 * Augusta * Maine * 04332 * 207-622-7634

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )        No.  1:06CV00614
          Plaintiff,               )
                                   )        EXHIBIT F
          v.                       )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
          Defendant.               )
                                   )


**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT F SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**2004 Voter Guide Project**

"A general dissolution of principles and manners will more surely overthrow the liberties of America than the whole force of the common enemy. While the people are virtuous they cannot be subdued; but when once they lose their virtue then will be ready to surrender their liberties to the first external or internal invader." --Samuel Adams

# 2004 League Interactive Voter Guide

## Click here to view 2002 general election voter guide
*(PDF)*

The Importance of Morality and Religion in Government
*Click here to go to Wallbuilders website. You will leave the League's website.*

The Christian Civic League of Maine, 70 Sewall Street, Augusta, ME  04330 * 207-622-7634

HOME

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) | |
| | ) | |
| | ) | No.  1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT G |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT G SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# the RECORD

online newspaper published since 1900

in various formats -- now online



Church in Western Maine

Click here to subscribe to the free daily RECORD newspaper email
Click here to go to the RECORD daily email archive
Click here to read timeless RECORD articles
Click here to read more of today's news

"Fearful lest it be relegated to the position of an isolated sect, Christianity seems to be making frenzied efforts at mimicry in order to escape being devoured by its enemies--a reaction that seems defensive, but is in fact self-destructive. In the hope of saving itself, it seems to be assuming the colors of its environment, but the result is that it loses its identity. . . ."
--Leszek Kolakowski, from *Modernity on Endless Trial*



## THE RECORD Online Newspaper

**In This Issue:**                                    **Friday, April 15, 2005**

- You Cannot Serve God and Mammon

- A Victory for Common Sense

- Senator Snowe to Vote with Democrats Again
- We The People Tour: Final Travel Schedule for Madore and Heath

- Connecticut Elitism Behind Pro-Gay Vote
- Report from the road -- We the People!

## You Cannot Serve God and Mammon

" For where your treasure is, there will your heart be also. The light of the body is the eye: if therefore thine eye be single, thy whole body shall be full of light. But if thine eye be evil, thy whole body shall be full of darkness. If therefore the light that is in thee be darkness, how great is that darkness! No man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other. Ye cannot serve God and mammon. "

(Mt 6:21-24)



Obtain free Bible study software online by clicking here

## A Victory for Common Sense

Pro-family forces won a major victory yesterday, when the Oregon Supreme Court handed down a decision invalidating the marriage licenses of over two-thousand same-sex couples. A number of these couples had joined forces with the gay rights activist group Basic Rights Oregon, and the ACLU, to bring a lawsuit against the state of Oregon after the State Registrar had refused to record the marriage licenses. In its decision, the Court took the common sense approach that existing Oregon law provides for marriage only between individuals of the same sex. Furthermore, the court rejected any interpretation of the words "husband" and "wife" other than a person of the male or female sex respectively. It is interesting to note that the Court relied on a copy of Webster's Dictionary for the proper interpretation of the words "husband" and "wife." Following this line of reasoning, the Court found that the same-sex marriage licenses were void on issue.

Click here for more of today's RECORD

### Connecticut Elitism Behind Pro-Gay Vote

Even as common sense was prevailing in Oregon, Connecticut took a major step backwards by passing the nation's first law permitting civil unions. The 85-63 vote in the Connecticut House yesterday provoked great jubilation on the part of the law's supporters. Unlike Oregon, where the driving force behind the defense of marriage was the will of the people expressed in a popular referendum, the force behind the victory of the homosexual rights lobby in Connecticut was once again, a Liberal elite working on behalf of special interests. A case can be made that no state is as Liberal as Connecticut, which is home to the wealthy bedroom communities of Litchfield, Greenwich, and Stamford, where many dedicated ACLU members and other Liberal functionaries commute to and from their posh offices in New York City. Many active in the Pro-family movement in Connecticut had long warned that the first step towards achieving same-sex marriage or civil unions in Connecticut, was the enactment of exactly the same type of gay rights legislation recently signed into law by Governor Baldacci.

Click here for more of our online newspaper the RECORD

### Senator Snowe to Vote with Democrats Again

It seems that Senator Olympia Snowe is once again acting more like a stalwart Democrat than a Republican. This time her vote will be on a matter which will affect the welfare of the nation for generations, and that is the filibustering of conservative judicial nominees by the Democrats. Current Senate rules make it virtually impossible for a social conservative to be appointed to the Federal Judiciary, by requiring a so-called "super majority" to end a Democratic filibuster. Republicans are urging a change in procedure which would reduce the number of votes needed to a simple majority. But the issue is larger than a matter of Senate procedure. The goal of the Democrats, and Senator Snowe, is to exclude from the Federal Judiciary all judges who do not share the Left's views on abortion, euthanasia, homosexual rights, and other radical attempts to re-engineer American society.

Click here for more of today's news from the RECORD

**We The People Tour: Final Travel Schedule for Madore and Heath**

Paul Madore and Mike Heath are on a "We the People" swing through northern and downeast Maine starting this afternoon. They will hold one hour training sessions for volunteers interested in making sure that the Governor's "same sex marriage" agenda is stopped dead in its tracks.

This second People's Veto of "gay rights" is unprecedented and should never have become necessary. Heath and Madore will speak with members of the media during the tour, as their schedule permits. Journalists should call 1-207-592-4137. Supporters are urged to contact local newspapers, radio and television stations. Urge them to report on the "We the People" tour.

The duo have engaged in this sort of campaigning successfully in previous campaigns on this issue. Both men are reaching out to good Mainers who want to protect their families and Maine from the ideology of evil that is strengthening its death grip on all things decent.

Heath spoke to dozens of pentecostal ministers in Charleston Wednesday. He told them that this isn't about bringing politics into the church. He said, "This is about taking common sense into the world."

Here is the travel schedule. Please urge friends and family to attend the meeting nearest them:

CONFIRMED
Thursday, April 14
4:30-5:30 PM
Kennebec Valley Baptist Church
Marston Rd.
Waterville, ME 04901
Pastor Kevin Grant
Call M. Heath 592-4137

CONFIRMED
Thursday, April 14
7:00-8:00 PM
Cornerstone Baptist Church
Exeter, ME
Assoc. Pastor Mark Arnold 1-800-696-4734 Work

CONFIRMED
Friday, April 15
7:30-8:30 AM
Bangor Baptist Church, Pastor Mick's office
Broadway,
Bangor, ME 04401

9947-6576 Becky Snell, Pastor's Secretary
Pastor Jerry Mick

CONFIRMED
Friday, April, 15,
NOON - 1:00 PM
Tri-town Baptist Church
E. Millinockett, ME
746-2211
Pastor Dave Chicoine

CONFIRMED
Friday, April 15,
7:00-8:00 PM
Military St. Baptist Church
Military St.
Houlton, ME
532-2783
Debbie Nickerson, Secretary
Rev. Randall Burns

CONFIRMED
Saturday, April 16,
8:30-9:30 AM
State St. Baptist Church
State St.
Presque Isle, ME
768-3041church; 760-8178 home
Robin Thurston, Secretary

CONFIRMED
Saturday, April 16
NOON-1:00 PM
Location: Knights of Columbus Hall
Ft. Kent, ME
834-5730church; 834-6610home
Rev. Duane Stiles

CONFIRMED
Sunday, April 17
1:00-2:00 PM
E. Machias Baptist Church
Machias, ME
Bob Simpson, layman
259-3473

CONFIRMED
Sunday, April 17
4:30 - 5:30 PM
Maine Coast Baptist Church

Bangor Road
Ellsworth, ME

April 18-20, 2005

CONFIRMED
Monday, April 18
5:00-6:00 PM Augusta
Christian Civic League
70 Sewall St.
Augusta, ME
622-7634
Mike Heath

Tuesday, April 19
UNCONFIRMED, waiting for a confirmation call back from the pastor
5:00-6:00 PM Belfast,
Little River Baptist Church
259 Northwood Ave., Route 1
Rev. Scott Baker
338-1006

CONFIRMED
Tuesday, April 19
7:00-8:00 PM
First Baptist Church
215 Limerock St.
Rockland, ME
594-8363 church
Matt Parker 594-8139
Email: mparker@midcoast.com

CONFIRMED
Wednesday, April 20
5:00-6:00 PM
First Baptist Church
851 Washington St.
Bath, ME
Pastor Frank Rolfe
443-4032
Email: fsrolfe@suscom_maine.net

CONFIRMED
Wednesday, April 20
5:30-6:30 PM
S. Portland First Baptist Church
879 Sawyer St.
S. Portland
799-4565

Carol Taylor, secretary
Pastor Phil Andrukaitis

CONFIRMED
Wednesday, April 20
7:30-8:30 PM
Freeport Baptist Church
185 Main St.
Pastor Sandy Williams
865-4404

Click here for more of today's online RECORD

**Report from the road -- We the People!**

League director Mike Heath and Maine Grassroots Coalition Director
Paul Madore kicked off their "We the People" Tour through northern and
downeast Maine last night. They spoke to a combined total of more than
50 coordinators and circulators in two meetings, one in Oakland and one
in Exeter.

The Waterville Sentinel Newspaper covered the Oakland session.
Channel 7 joined the men and nearly thirty volunteers in Pastor Jerry
Mick's office this morning. Madore and Heath were delayed by the towing
of their vehicle during the night. The hotel made an error and had the
truck removed from the hotel lot while the leaders slept. They awoke to a
missing vehicle.

They proceeded from the very successful training session at Bangor
Baptist Church to a session in East Millinockett where they fired up a
group of 15 coordinators and circulators. Petitions are being distributed
so rapidly at the training sessions that they were forced to drive back to
Bangor to meet a courier from Lewiston bearing enough petitions to
serve Aroostook County.

They will hold a training session at the Military Street Baptist Church
tonight at 7 p.m.

Encourage friends and family to attend the session. Heath urged all
Christians to pray that God would continue to give them strength and
protection during this tour.

The "We the People" Tour was organized in 24 hours by Paulie Heath
and other volunteers statewide.

Click here for more of today's RECORD

The Christian Civic League of Maine
70 Sewall Street
Augusta, ME 04330
V-207-622-7634
F-207-621-0035
www.cclmaine.org
The RECORD is published every weekday at 6 a.m. and archived at www.cclmaine.org/forum
Forward this email to your Christian friends and family. Encourage them to sign up and stay
informed and praying about current issues. Please email your suggestions for segments to
mike@cclmaine.org.  Click here for a map to our headquarters building

Close Window

Home

# The Christian Civic League of Maine

70 Sewall Street
Augusta, Maine 04330
v- 207-622-7634
f- 207-621-0035
email@cclmaine.org

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                      )
                                  )          No.  1:06CV00614
            Plaintiff,            )
                                  )          EXHIBIT H
            v.                    )
                                  )
FEDERAL ELECTION COMMISSION       )
                                  )
            Defendant.            )
                                  )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT H SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# the RECORD

online newspaper published since 1900

in various formats -- now online



Church in Western Maine

Click here to subscribe to the free daily RECORD newspaper email
Click here to go to the RECORD daily email archive
Click here to read timeless RECORD articles
Click here to read more of today's news

"Fearful lest it be relegated to the position of an isolated sect, Christianity seems to be making frenzied efforts at mimicry in order to escape being devoured by its enemies--a reaction that seems defensive, but is in fact self-destructive. In the hope of saving itself, it seems to be assuming the colors of its environment, but the result is that it loses its identity. . . ."
--Leszek Kolakowski, from *Modernity on Endless Trial*



## THE RECORD Online Newspaper

**In This Issue:**

**Wednesday, May 25, 2005**

- Exchanging the Truth for a Lie
- Living as One's Nature Requires
- Crucial Public Hearing on Bill to

- House Tells Parents 'You're Not Supposed to Know'
- Susan, How Could You?
- The Original Band of Brothers

Defend Marriage

### Exchanging the Truth for a Lie

"For although they knew God, they neither glorified Him as God nor gave thanks to Him, but their thinking became futile and their foolish hearts were darkened. Although they claimed to be wise, they became fools and exchanged the glory of the immortal God for images made to look like mortal man and birds and animals and reptiles. Therefore God gave them over in the sinful desires of their hearts to sexual impurity for the degrading of their bodies with one another. They exchanged the truth of God for a lie, and worshipped and served created things rather than the Creator – who is forever praised. Amen. Because of this, God gave them over to shameful lusts. Even their women exchanged natural relations for unnatural ones. In the same way the men also abandoned natural relations with women and were inflamed with lust for one another. Men committed indecent acts with other men, and received in themselves the dire penalty for their perversion."



(Romans 1:21-27)

Obtain free Bible study software online by clicking here

### Living as One's Nature Requires

"But neither life nor happiness can be achieved by the pursuit of irrational whims. Just as man is free to attempt to survive in any random manner, but will perish unless he lives as his nature requires, so he is free to seek his happiness in any mindless fraud, but the torture of frustration is all he will find, unless he seeks the happiness proper to man. The purpose of morality is to teach you, not to suffer and die, but to enjoy yourself and live."



(Ayn Rand)

### Crucial Public Hearing on Bill to Defend Marriage

The public hearing on LD 1294, "Proposing an Amendment to the Constitution of Maine to Define Marriage" will be held today at 1:00 p.m. in Room 438 of the Capitol Building (State House).



Despite the assurances of homosexual rights activists, the Governor, and the Legislature to the contrary, the ultimate goal of the homosexual rights movement is gay marriage. Using a strategy called "incrementalism" gay rights activists plan to win "civil rights" a bit at a time, until the public is ready to accept the notion that homosexuals should not be denied what they claim is the ultimate civil right, the right to marry. The hearing today will be your opportunity to let the Legislature know that the families of Maine are deeply opposed to such an absurd and dangerous idea

The League urges you to come testify, or just be there to lend your support to those who will testify. This will be your chance to help shut down the militant homosexual rights movement, the same movement that was handing out condoms to seventh graders in the State House last week, with the tacit approval of Liberal members of your State Legislature.

Please wear a Marriage Button or Marriage T-shirt. We need as many people as possible to show the legislature that marriage between one man and one woman needs to be protected in the Constitution. Please pass along this information to your family, friends, and neighbors.

Tim Russell, the Legislative Liaison of the League, points out that the existing Defense of Marriage Act (DOMA) in Maine prevents the state from recognizing same-sex unions, but does not protect us from activist judges who can impose same-sex marriage on the state whenever they see fit. The only way to prevent this, Tim says, is to amend the constitution of Maine to define marriage as

between a man and a woman. You can help
support this effort by clicking on the link below,
where you will be taken to our Citizen Action
Center which will enable you to send the Judiciary
Committee an e-mail expressing your thoughts on
this crucial matter.

Click Here for Our Citizen Action Center

**House Tells Parents 'You're Not Supposed to Know'**

Many were shocked by the result of Monday's vote
in the House which rejected Brian Duprey's
proposed bill LD 1488 "An Act to Give Parents
Control over the Sex Education of their Children."
The act would have required teachers to notify
parents of the content of so-called "family life"
classes, specifically whether or not they deal with
the subjects of abstinence or homosexuality. The
bill is still alive, however, and can be returned to
the House for another vote if approved by the
Senate.



Despite the fact that the bill was narrowly rejected
by a margin of ten votes, the actions of the
Legislature are a cause for alarm. In a detailed
survey of sex education in Maine, Dr. Sandra L.
Caron, a professor at the University of Maine at
Orono, suggested that sex education in Maine be
brought in line with what such groups as SIECUS,
refer to as "comprehensive family life education."
This harmless-sounding comprehensive family life
education would extend beyond prevention of
pregnancy and avoidance of disease, which Dr.
Caron calls "sex-negative" topics to include
discussions of homosexuality and abortion and
such "sex-positive" topics such as "Sex for
Pleasure" "Gay/Lesbian/Bisexual Issues" "Sex for
Procreation," and …. [deleted.] Dr. Caron's entire
article can be seen by clicking on the link below.

Click Here to See Dr. Caron's Shocking
Recommendations for Liberalizing the Sex
Education Curriculum in Maine

**Susan, How Could You?**

It's something of an understatement to say that
stalwart Republicans reacted with dismay at the
compromise reached in the Senate late Monday
night to ward off a vote to end the filibustering of
judicial nominees. The compromise was reached
among fourteen U.S. Senators, who are being
portrayed in the media as "moderates." Among the
fourteen were John McCain, John Warner, Lincoln
Chafee, Robert Byrd, Joe Liebermann, and our
own two senators from Maine, Olympia Snowe and
Susan Collins.



Many analysts are commenting that the driving
force behind the compromise was the simple desire
for publicity and self-aggrandizement on the part of
the Republican and Democratic senators. Both
sides seemed eager to compromise their principles.
In the deal that was worked out, two of the current
judicial nominees, Priscilla Owen and Janice
Brown, will be approved by the Senate, and the
Democrats have promised not to use the filibuster
against any other nominees except in
"extraordinary circumstances" – which means, of
course, the next time they encounter a judicial
nominee who is a true social conservative.

The heated reaction to the news of the compromise
- some Republican activists stormed into the
headquarters of their local party organization and
loudly announced their resignation – was caused
by the fact that the recent Republican successes in
the presidential, congressional, and gubernatorial
elections were caused by the participation of social
conservatives, who now feel betrayed at the
eleventh hour by their two Republican senators,
Collins and Snow. The compromise reached late
on Monday virtually ensures that no pro-life social
conservatives will be appointed to the Supreme
Court. Many feel that years of effort have now gone
down the drain, and their reaction is one of intense
frustration.

But then again, this should have been expected. The positions of Collins and Snowe on a number of issues are virtually interchangeable with those of the Democrats. We wonder how much the people of Maine will have to suffer – base closings, a ruined economy, the shipping of our industry overseas – before they finally get the picture. If events continue on their current course, the only thing left to the people of Maine will be the dubious distinction of being an "elightened" and "progressive place" with regard to liberal social causes, foremost among them gay marriage.

### The Original Band of Brothers

150 years before our generation's "Band of Brothers" fought Nazi oppression an inspired and beloved British naval Admiral said, "I had the happiness to command a Band of Brothers." Lord Horatio Nelson remained mindful of this sentiment from his successful Battle of the Nile as he led nearly thirty ships of the line against Napoleon's larger combined fleet at Trafalgar in 1805.



As Nelson's ship "Victory" boldly sailed under light morning winds toward the impressive center of the French and Spanish line of battle he penned a famous Christian prayer, "May the Great God whom I worship, grant to my Country and for the benefit of Europe in general an great and glorious victory." He wrote on his knees in his spacious quarters overlooking, through the stern wall of glass, his own battleships lined up behind the "Victory." As they anxiously anticipated the coming calamity the Christian Admiral continued writing, "and may no misconduct in anyone tarnish it; and may humanity after victory be the predominant feature of the British Fleet. For myself individually I commit my life to Him who made me and may his blessing alight upon my endeavors for serving my Country faithfully. To Him I resign myself and the just cause which is entrusted to me to defend. Amen, Amen, Amen."

Just a couple hours later Nelson breathed his last as a French sharpshooter's bullet pierced his chest

and lodged in his backbone. While the great Christian lost his life, his strategy carried the day and led to British dominance of all the earth's oceans for over a century.

Learn more about Lord Horatio Nelson

The Christian Civic League of Maine
70 Sewall Street
Augusta, ME 04330
V-207-622-7634
F-207-621-0035
www.cclmaine.org
The RECORD is published every weekday at 6 a.m. and archived at www.cclmaine.org/forum
Forward this email to your Christian friends and family. Encourage them to sign up and stay informed and praying about current issues. Please email your suggestions for segments to mike@cclmaine.org. Click here for a map to our headquarters building

Close Window

Home

# The Christian Civic League of Maine

70 Sewall Street
Augusta, Maine 04330
v- 207-622-7634
f- 207-621-0035
email@cclmaine.org

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )      No.  1:06CV00614
            Plaintiff,             )
                                   )      EXHIBIT I
            v.                     )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
            Defendant.             )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT I SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

AU.org - Americans United for Separation of Church and State

# Primary Source

*Transcript of remarks to the Family Research Council's Washington Briefing by Senate Majority Leader Bill Frist and House Majority Leader Tom DeLay.*

*Skip to Rep. DeLay's remarks below.*

March 17, 2005

# Frist to Family Research Council

Washington, D.C.

CONNIE MACKEY (VP-GOVERNMENT AFFAIRS, FAMILY RESEARCH COUNCIL): Let's see, Senator, can you hear us? Senator?

U.S. SEN. BILL FRIST (R-TENN.) - BY TELEPHONE: Yes!

MACKEY: Well, you're here!

FRIST: Yes, indeed! Good to be with you.

MACKEY: Good. We know that you wanted to be here personally because the last time you joined us, I think you ran six blocks through some sort of a hold-up that was going on, and you made it into the room then, and I know you want to be in the room with us now, but if it has to be on the phone we appreciate that too.

FRIST: Thank you so much. It is great to be with you. Can you hear me ok?

AUDIENCE: Yes.

MACKEY: We can, sir.

FRIST: Good. Well, let me apologize. We are voting every ten minutes in what's called a vote-a-thon as we work toward passing the budget for the United States of America here in the Senate, so literally we're voting every ten minutes. We started at about 1:30, and we'll be going to about ten o'clock tonight. In between votes, I am spending nine minutes working on a case that addresses the culture of life, the dignity of life, and it's a case that all of you are familiar with and you may have talked about today. It's the Terri Schaivo case. I had the opportunity when I was in Florida last week to talk to the neurologist who has been taking care of her in the past. I have talked to the state senator who is in charge of the judiciary committee there, and it's clear to me that we in the United States Senate, in order to prevent her from being starved to death, are going to have to act. Florida is dealing with the case now, but it's unclear whether they will be able to, so I can promise you that I will not leave tonight or tomorrow until we do everything we can and ultimately save the life by preventing the starvation of Terri Schiavo.

[applause]

Let me just step back for a minute and say that you stand up for our children, you stand up for our families, you never back down. That's why we are winning these larger battles today. As Ronald Reagan said nearly thirty years ago, he said, "I refuse to believe the good Lord divided this world into Republicans who defend basic values and Democrats who win elections." I say those words because, together, we are leading our nation forward. We have a president, we have a House of Representatives, we have a Senate that shares our values, and the American people are on our side. In this Congress, we're going to continue to work on issues that are important to you, to me, above all to America's future. That includes good judges, the sanctity of marriage, and, I just mentioned, the culture of life, as well as protection for the unborn. One of the first tests we will have is this whole confirmation of judges. This is at the top of the challenges that we must overcome in this Congress. We all know that activist judges in the past have recently cited international law written by U.N. bureaucrats, they directly undermined marriage being between a man and a woman, they struck down our partial-birth abortion bans, and these activist judges are not interpreting the Constitution, they're re-writing it, and that's wrong, and it's something that I know you're committed to and I'm committed to. I'm also committed to overcoming the minority's filibuster and restoring this 220 years or more of Senate tradition and history --

[applause]

-- we're going to have to make sure that every judge who comes out of the committee gets the up or down vote he or she deserves. The minority broke the tradition, they violated the founders' intent, and we will bring the President's nominees up for a vote, and we will confirm them.

[applause]

The second issue that I'll briefly mention is what our government has got to do, and that is defend the institutions our society rests on, and especially, especially, the marriage between a man and a woman. Monday's terrible decision in California reminded us of the stakes. We've got activist trial-court judges and their allies on the left who will not stop until they have imposed their vision of marriage on every state in the union. And let me just say that we have got to, we will, take action to preserve, and protect, and defend the sanctity of marriage between a man and a woman.

[applause]

As we all know, the American people stand with us, everywhere they voted on a state constitutional amendment to protect marriage it passed. We will, once again, bring an amendment to the floor when the time is right. I and others will be discussing with you when the appropriate time is. Last year we had to be sure it was an issue on which Americans could express their minds at the polls. We brought it to the floor, we accomplished that, we know we're right, and we want to win. We want to protect marriage from activist judges once and for all, and we will do it.

[applause]

Let me just comment on a couple of other things, and then we're in the middle of a vote so I have to run, but third, and certainly not last, we've got to move forward on protecting the sanctity of every human life. I will do it on the floor, with the strong support of my Senators, in a bill that will save Terri Schiavo life today, and I think hopefully that speaks directly to the fact that this Congress under this leadership focuses on the dignity of life, the sanctity of life, in a very direct way. When Congress returns after our recess, we'll consider the Child Custody Protection Act. I don't know exactly what day that will be, but as you know this law makes it illegal to transport a child across state lines to get around parental notification laws on abortion. We all heard about the story of the fourteen-year-old Pennsylvania girl where her boyfriend's family forced her into having an abortion without her parents' knowledge. It's wrong on so many levels, it's hard to even know where to begin. But I do know that we must pass this law so that sort of thing will never happen again. Our laws need to, must, recognize that unborn children are real people, people able to feel pain, and that's why we will also pass a bill called the Unborn Child Pain Awareness Act, a bill that many of you have participated in and have discussed. I truly believe with this leadership working with the President, that in this Congress we can pass these measures, and this Congress will become the most pro-family Congress in our nation's history.

[applause]

Let me just close, and I apologize for coming right in the middle of your program, and I appreciate your understanding, but let me just say thank you from the bottom of my heart. The work that you do makes our country a beacon of liberty, a beacon of freedom for the world. I've had the opportunity to travel in many places around the world as a medical mission person in delivering health care to people in really underserved areas on many continents; I go to Africa every summer to provide health care to people who are pretty far away from any type of electricity or health facility. I always take with me - even out in the bush of Africa, a thousand miles south of Khartoum, and five hundred miles west of the Nile River, where there's no electricity, there are no automobiles, there are no generators even, I take a little picture of the Capitol of the United States of America, where I'm blessed to work every day, where I'm sitting right now. And it's amazing, even out in the bush, when I pull that picture out, in whatever dialect they happen to speak, they say "America," and then right after that, they say, "freedom." This nation's symbols are just that, it's freedom and democracy in the world, and we speak to the world by liberty, by democracy, by freedom, and that's reflected in the work that you do, and what we do on the floor of the Senate. These symbols are bright symbols; they touch the souls of people who live in the darkness of poverty, the darkness of war, and the darkness of tyranny around the world. Our symbols provide that hope and I will continue to rely on your help, and your support, your guidance, and your prayers as we move forward in this cause of freedom. Thank you for what you do, and I look forward to seeing you, and I apologize for not being with you there today. Thank you; God bless you all.

[applause]

MACKEY: Thank you, Senator.

---

March 18, 2005

## To Family Research Council

Washington, D.C.

U.S. REP. TOM DELAY (R-TEXAS): ...we were within an hour of finishing our work and urged us to stay in session. I told them it would be very difficult to do that, and it got to the point that we had nothing else to do and we had to adjourn. They waited until after we adjourned to pass their bill, because the Democrats who wanted to vote for this bill for political cover knew that once we adjourned we would not be in session to pick up this bill so they could vote for it knowing it was going to die. That is the real situation we find ourselves in. Yesterday we spent all day trying to figure - to work on our bill in the Senate. We obviously saw the gridlock that we were coming to, so we were grasping at straws at

anything we could find to put off pulling the feeding tube out in an hour or less. And we came up with the idea of getting Tom Davis, chairman of the Government Reform Committee, to subpoena Terri as a witness and her equipment, so it has to be frozen in place. We issued that subpoena this morning. The last we had checked, I don't know what it is, but we have a lot of confidence that they will not pull the feeding tube because of this subpoena. We also came up with the idea, and gave it to the Senate, and the Senate sent a letter of inquiry, which under the law - we found this little obscure law that says if a Senate committee sends a letter of inquiry you have to freeze everything in place for ten days until the answer to the question of inquiry. So we're on dual tracks: we have the letter of inquiry, we have the subpoena, and the reason we did that is to spend the weekend trying to pass the House bill in the Senate. We cannot go back in session today, tomorrow; we can't go back, by Constitution we cannot go back in session until Monday. The Senate is still in session; they have not passed the concurrent resolution of adjournment. So this notion that all we have to do is come back Monday and pick up the Senate bill, that the House can do that, is not where we are at. We want the Senate to go back into session - that they can do - today, tomorrow, Sunday, I don't care, at least give us a chance to pass the House bill, which is the superior bill. Now we'll be fighting this fight all weekend, hopefully as events occur today we will have stayed pulling the feeding tube to give us an opportunity to fight this fight. But the point is, whatever happens come Monday, we're going to solve this issue, one way or another. My admonition to you is, if you can help us. I'm going to a press conference in just a minute, and name Senator Ron Wyden, Senator Carl Levin, and Senator Barbara Boxer are stopping us from saving Terri Schiavo life by not passing the House bill.

[applause]

And we need to put as much pressure on the Senate - not the House, the House is in fine shape - to do the right thing. Whatever Senators' contact you have, please contact them. I know what they're going to tell you, "Well, if the House would just take our bill up, it'd be law." Well, I feel if the Senate would just take up our bill, it'd be law. Now, one of these two bills is going to be law in the next few days. But if we have to choose, the one that's most superior, and helps Terri more, is to get this case out of that state court and into another court. The Senate bill does not do that. And we can settle this once and for all, you won't have a whole bunch of court cases and all this kind of stuff, although they'll probably challenge the Constitutionality of our law, we're still, we think we're standing on very solid Constitutional grounds because all we did was amend an already-existing statute and have it applied to Terri. This is critically important, and I know you know that. It's more than just Terri Schiavo. It is a critical issue for people in this position, and it is also a critical issue to fight the fight for life, whether it be euthanasia or abortion. And I tell you, ladies and gentlemen, one thing that God has brought to us is Terri Schiavo, to elevate the visibility of what's going on in America that Americans would be so barbaric as to pull a feeding tube out of a person that is lucid and starve them to death for two weeks. I mean, in America, that's going to happen if we don't win that fight. So it's bigger than any one of us, and we have to do everything that is in our power to save Terri Schiavo and anybody else that may be in this kind of position.

And let me just finish with this. This is exactly the issue that's going on in America, of attacks against the conservative movement, against me and against many others. The point is, the other side has figured out how to win and defeat the conservative movement, and that is to go after people personally, charge them with frivolous charges, link that up with all these do-gooder organizations funded by George Soros, and then get the national media on their side. That whole syndicate that they have going on right now is for one purpose and one purpose only, and that's to destroy the conservative movement. It's to destroy conservative leaders, not just in elected office but leading. I mean, Ed Feulner of the Heritage Foundation was under attack in the National Journal. This is a huge, nationwide, concerted effort to destroy everything we believe in. You need to look at this, at what's going on, and participate in fighting back. One way they stopped churches from getting into politics was Lyndon Johnson, who passed a law that said you couldn't get into politics or you were going to lose your tax-exempt status because they were all opposed to him when he was running for President. That law we're trying to repeal; it's very difficult to do that. But the point is, when they knock out a leader, then no other leader will step forward for a while, because they don't want to go through the same thing. If they go after and get a pastor, then other pastors shrink from what they should be doing. It forces Christians back into the church, and that's what's going on in America: "The world is too bad, I'm going to go get inside this building and I'm not going to play in the world." That's not what Christ asked us to do. And so they understand that, it is a political maneuver, and they are going to try to destroy the conservative movement, and we have to fight back.

So, please, this afternoon, each and every one of you, if you know a Senator, give him a call, tell him - they'll say, "Our bill can pass in the House." Tell him, "That's fine, your bill is ok, but the House bill is better, and I want the House bill." Particularly, you know, Democrats. Don't let them get off the hook by hiding behind "one house or the other is adjourned." We can do anything we need to do to pass any bill we need to pass. So I appreciate what you're doing. God bless you, and thank you for the Family Research Council.

[applause]

TONY PERKINS, PRESIDENT, FAMILY RESEARCH COUNCIL: He has to leave for the press conference. You can just say "Terri's Law," "carry the bill for Terri Schaivo" and they'll know exactly who that is. I have been, for the eighteen months I've been here, and prior to that, back when I was even in the legislature in Louisiana, I came up with pastors, and met with congressman DeLay in his office many times. And I want you to know what he has told me consistently, and not just me but other leaders: top on his agenda, one of the reasons he's worked to build a conservative majority, is that he wants to see abortion outlawed in America. He wants George Bush--

[applause]

You see the bulls-eye that that has created on him, as a result of saying that? He is number one enemy to the liberal syndicate on the left, that wants to take him out. So I challenge you to pray for him, to talk to your Republican members of Congress, who are part of the Republican team, to support their leader. I know the work this man is doing. I vouch for his work, I vouch for his character, and I urge you to stand with him and support him in the work that he's doing for families, for life, for the unborn, here in our nation's capital.

[applause]

© Americans United for Separation of Church and State, 518 C Street NE, Washington, DC 20002
Telephone (202) 466-3234; Facsimile (202) 466-2587; E-mail: **americansunited@au.org**
**Privacy Policy | Security Policy**

AU.org - Americans United for Separation of Church and State

## Special Report

## Americans United Exposes Congressional Leaders' Plan To Push Religious Right's Controversial Political Agenda

The Family Research Council, a Washington-based Religious Right group, held a closed-door "Washington Briefing" March 17-19, 2005. During the event, House Majority Leader Tom DeLay (R-Texas) and Senate Majority Leader Bill Frist (R-Tenn.) addressed attendees and pledged that Republican leaders in Congress would work to implement the Religious Right's controversial political agenda.

Americans United obtained a recording of DeLay's and Frist's comments. Americans United believes this recording underscores the growing power and influence of ultra-conservative fundamentalist organizations on our political system. AU released it to the media and public because the organization does not believe that powerful groups with controversial and narrow fundamentalist agendas that they seek to impose on all Americans should be permitted to plot and scheme in secret.

### The Recording

The people speaking on this recording, in order of appearance, are:

- *Thursday, March 17*
    - Connie Mackey, vice president for government affairs, Family Research Council
    - U.S. Sen. Bill First (R-Tenn.) [speaking via telephone]

- *Friday, March 18*
    - U.S. Rep. Tom DeLay (R-Texas) [speaking in person]
    - Tony Perkins, president, Family Research Council


(requires Real player)


(20mb)



Both speeches took place during the Family Research Council's "Washington Briefing" at the Willard Hotel, Washington, D.C., March 17-19, 2005.

---

### More On This Issue

#### Press Release

Top congressional leaders have promised to push the Religious Right agenda on judicial nominations, church politicking, abortion, marriage and the Terri Schiavo case, according to Americans United for Separation of Church and State. Read more...

#### Stand With AU

We depend on your support to continue our work.

Become a member today, *or if you are already a member*, please make a special contribution.

© Americans United for Separation of Church and State, 518 C Street NE, Washington, DC 20002
Telephone (202) 466-3234; Facsimile (202) 466-2587; E-mail: americansunited@au.org
Privacy Policy | Security Policy

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) ) ) | No. 1:06CV00614 |
| Plaintiff, | ) ) | EXHIBIT J |
| v. | ) ) | |
| FEDERAL ELECTION COMMISSION | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT J SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**News**Room

Citation                        Search Result     Rank(R) 8 of 28        Database
2/11/06 APDATASTREAM 00:51:5                                             ALLNEWSPLUS

2/11/06 AP DataStream 00:51:58

AP DataStream
Copyright 2006 The Associated Press. All rights reserved. This material may not
be published, broadcast, rewritten or redistributed.

February 11, 2006

Republican chief outlines strategy to portray Democrats as weak, bypass
mainstream media

WASHINGTON_Republican national chairman Ken Mehlman on Friday outlined a
political strategy for 2006 to portray Democrats as too weak to protect the
country and to bypass the mainstream media to spread the GOP message.

Speaking at the Conservative Political Action Conference, Mehlman roused the
crowd at a Washington hotel to cheers as he told them President Bush had finally
responded to decades of terrorist attacks.

"For a generation, terrorists learned they could make war on free nations
without fear of war in return," Mehlman said, adding that Bush understood how to
respond. "On Sept. 12, the terrorists got war in return."

Bush's stance on fighting terror is very popular with participants in this
annual meeting of hard-line conservatives from around the country and so are his
federal court appointments.

But many at this national conference question the Bush administration's
spending, deficits, immigration policies, prescription drug plan and increased
use of federal power.

The GOP chief said such questioning and grumbling is healthy for the Republican
party and the conservative movement.

The fight against terrorism is centered in Iraq, Mehlman said, and the only way
to prevent terrorists from taking charge there is to stick it out and win.

He quoted Democratic chairman Howard Dean saying that the idea the United States
can win in Iraq is wrong and reminded that Sen. John Kerry, D-Mass., accused
American soldiers of "terrorizing women and children."

"Democratic leaders always seem to blame America first," Mehlman said,
"especially when a Republican is in the White House."

Mehlman said the loss in popularity of the mainstream media _ both the evening
network news and daily newspapers _ is an opportunity for conservatives. He
pointed to the growing popularity of talk radio and blogging.

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2/11/06 APDATASTREAM 00:51:5

Senate Majority Leader Bill Frist told the group he plans to push for a Senate vote in May on the inheritance tax, called the "death tax" by conservatives. And he said he would push for a vote June 5 on "the marriage protection amendment" that seeks to amend the Constitution to define marriage as a union between a man and a woman.

⎯⎯

On the Net:

Conservative Political Action Conference _ http://www.cpac.org

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Government (1GO80); Public Affairs (1PU31))

REGION:  (Middle East (1MI23); USA (1US73); Gulf States (1GU47); Americas (1AM92); Iraq (1IR87); North America (1NO39); Arab States (1AR46))

Language:  EN

OTHER INDEXING:  (CONSERVATIVE POLITICAL ACTION CONFERENCE; CONSTITUTION; DEMOCRATS; GOP; SENATE; WHITE HOUSE)  (Bill Frist; Bush; Democratic; Howard Dean; John Kerry; Ken Mehlman; Mehlman)

KEYWORDS:  (w)

Word Count: 443
2/11/06 APDATASTREAM 00:51:58

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF | ) | |
| MAINE, INC., | ) | |
| | ) | No.  1:06CV00614 |
| Plaintiff, | ) | |
| | ) | EXHIBIT K |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT K SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

AUG 17 2004

Cierk, U.S. District Court
District of Columbia

)
WISCONSIN RIGHT TO LIFE, INC.,    )
)
Plaintiff,    )    Civil No. 04-1260 (DBS, RWR, RJL)
)
v.    )    THREE-JUDGE COURT
)
)
FEDERAL ELECTION COMMISSION, )
)
Defendant.    )
)

## MEMORANDUM OPINION AND ORDER

This matter coming before the court on plaintiff's motion for a preliminary injunction,

and the court having considered the affidavits and representations of counsel, solely for the

purposes of the motion for a preliminary injunction, the court makes the following findings of

fact:

1. Plaintiff Wisconsin Right to Life, Inc. (WRTL) is a nonprofit, nonstock, Wisconsin,

ideological advocacy corporation recognized by the Internal Revenue Service as tax-exempt

under § 501(c)(4) of the Internal Revenue Code.

2. Defendant Federal Election Commission (FEC) is the government agency charged

with enforcing the relevant provisions of the Federal Election Campaign Act, as amended by the

Bipartisan Campaign Reform Act of 2002 (BCRA).

3. WRTL admits that it does not qualify for any exception permitting it to pay for

1



electioneering communications from corporate funds because (a) it is not a "qualified nonprofit corporation" (QNC) within the definition of 11 C.F.R. § 114.10 so as to qualify for the exception found at 11 C.F.R. § 114.2(b)(2) to the electioneering communication prohibition and (b) its advertisements are "targeted" so that it does not fit the exception for § 501(c)(4) organizations as described in 2 U.S.C. § 441b(c)(2).  2 U.S.C. § 441b(c)(6)(A).

4.  U.S. Senator Russell Feingold of Wisconsin is running for reelection this year.

5.  As early as September, 2003, candidates opposing Senator Feingold made Senator Feingold's support of Senate filibusters against judicial nominees a campaign issue. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. (Def.'s Opp'n) Exh. 10-14.

6.  WRTL maintains a political action committee (PAC).

7.  In March 2004, WRTL's PAC endorsed three candidates opposing Senator Feingold and announced that the defeat of Senator Feingold was a priority.  Def.'s Opp'n Ex. 4, 5, 6, 7.

8.  In a news release on July 14, 2004, WRTL criticized Senator Feingold's record on Senate filibusters against judicial nominees.  Def.'s Opp'n Exh. 16.

9.  WRTL had used a variety of non-broadcast communications to convey its criticism of Senate filibusters against judicial nominees in the months leading up to August 2004.

10.  WRTL is now paying to broadcast on television and radio a series of advertisements inclusive of those depicted in Exhibits A, B, and C to the complaint and attached as Exhibits A, B, and C hereto, all of which refer to and will continue to refer to and clearly identify Senator Russell Feingold.

11.  The Wisconsin primary for the office for which Senator Feingold is a candidate will occur thirty days after August 15, 2004.  The general election will occur November 2, 2004.

2

12.  WRTL anticipates that its ongoing advertisements will be considered electioneering communications for purposes of federal statutory and regulatory definitions under 2 U.S.C. § 434(f)(3) and 11 C.F.R. § 100.29 during the period between August 15, 2004, and November 2, 2004.

## LEGAL CONCLUSIONS AND ANALYSIS

Plaintiff Wisconsin Right to Life seeks a judgment declaring portions of the BCRA unconstitutional as applied to it under the facts set forth in its complaint, and it seeks preliminary injunctive relief preventing FEC enforcement of those portions of BCRA against it.

The focus of the litigation is 2 U.S.C. § 441b, which regulates the extent to which such corporations as WRTL may finance and produce "applicable electioneering communications," which are defined at 2 U.S.C. § 434(f)(3) as being "any broadcast, cable, or satellite communication which (I) refers to a clearly identified candidate for Federal office; (II) is made within (aa) 60 days before a general . . . election . . .; or (bb) 30 days before a primary . . . election; and (III) . . . is targeted to the relevant electorate."

In this case, WRTL cites three specific ads, first aired July 26, which contain references to Sen. Russell Feingold, currently the sole Democrat contender for the Senate seat.  Complaint 5.  As the primary election occurs on September 14 and the general election occurs on November 2, BCRA's (in this case, overlapping) "blackout" periods prohibit the airing of the advertisements from August 15 until November 2.  *Id.* at 6.

WRTL's prayer for relief is sweeping, seeking both declaratory and injunctive relief

declaring 2 U.S.C. § 441b unconstitutional as applied to "electioneering communications . . . that

constitute grass-roots lobbying," and specifically as applied to the three advertisements

incorporated in its complaint. Complaint 13. However, the motion before us today concerns

only its motion for a preliminary injunction. The standards for the granting of a preliminary

injunction are familiar. To prevail, a plaintiff seeking such relief must demonstrate: (1) a

substantial likelihood of success on the merits; (2) that it would suffer irreparable harm if an

injunction is not granted; (3) that an injunction would not cause substantial injury to other

parties; and (4) that the public interest would be furthered by the injunction. *See, e.g.*, *CityFed*

*Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). Plaintiff's showing

in the present litigation cannot survive this standard.

First, WRTL has not established that it has a substantial likelihood of success on the

merits. Just last year, in *McConnell v. Federal Election Commission*, 124 S. Ct. 619 (2003), the

Supreme Court upheld the electioneering communication provisions of the BCRA in their

entirety. *Id.* at 686-700. WRTL is correct that in *McConnell* the Court was considering a facial

challenge while the current challenge subjects the statute to constitutional analysis in the context

of its specific application, but the reasoning of the *McConnell* Court leaves no room for the kind

of "as applied" challenge WRTL propounds before us. More specifically, the Court noted that

the statute included a "back up" definition of electioneering communications, 2 U.S.C. §

434(f)(3)(A)(I), to take effect only if the primary definition were held to be "constitutionally

insufficient." The Court expressly stated that it need not rule on the constitutionality of that back

up provision because "*we uphold all applications of the primary definition* and accordingly have

no occasion to discuss the backup definition." 124 S.Ct. at 687 n.73 (emphasis added). The

4

Court's deliberate declaration of its ruling as encompassing "*all applications* of the primary definition" suggests little likelihood of success for an "as applied" challenge to some applications of that definition, such as the one plaintiff brings before us.

Furthermore, the Court's deliberate upholding of "all applications" stands in informative contrast to its explicit acknowledgment that other parts of the statute which it upheld against facial challenge might be subject to "as applied" challenges in the future. For example, the Court upheld a Title I provision of BCRA restricting state parties from spending "soft money for federal election activities." 2 U.S.C. § 441i(b). But the Court stated that "as-applied challenges remain available" if some future state party could show that the restriction had become "'so radical in effect as to . . . drive the sound of [the recipient's] voice below the level of notice.'" *Id.* at 677 (brackets in the original) (quoting *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 397 (2000)). Similarly, in upholding the ban on soft money fundraising by national party committees, 2 U.S.C. § 441i(a), the Court noted that "'a nascent or struggling minor party can bring an as-applied challenge" should the ban prevent it from "amassing the resources necessary for effective advocacy.'" *Id.* at 669 (quoting *Buckley v. Valeo*, 424 U.S. 1, 21 (1976)).

Again, in upholding the Title V recordkeeping requirement on broadcasters, the Court noted that the regulated entities "remain free to challenge the provisions, as interpreted by the FCC in regulations, or as otherwise applied." *Id.* at 717. And finally, the Court noted that its ruling upholding against facial challenge the § 201 disclosure provisions of Title II "does not foreclose possible future challenges to particular applications" of that statutory requirement. *Id.* at 692.

While these dicta concerning the possible future facial challenges to other provisions do

5

not preclude the possibility that the Supreme Court might uphold an as-applied challenge to the provisions before us, in the face of the strength of the Court's holding with specific reference to these provisions, we cannot possibly conclude that plaintiff has made out a substantial likelihood of success on the merits.

Our reading of *McConnell* that as-applied challenges to § 441b are foreclosed is but one reason we find little likelihood of success on the merits. The facts suggest that WRTL's advertisements may fit the very type of activity *McConnell* found Congress had a compelling interest in regulating. *Id.* at 695. In *McConnell*, the Court voiced the suspicion of corporate funding of broadcast advertisements just before an election blackout season because such broadcast advertisements "will *often* convey [a] message of support or opposition" regarding candidates. *Id.* at 651, 697, 715. Here, WRTL and WRTL's PAC used other print and electronic media to publicize its filibuster message – a campaign issue – during the months prior to the electioneering blackout period, and only as the blackout period approached did WRTL switch to broadcast media. (See Def.'s Opp. Exh. 4, 16, 18.) This followed the PAC endorsing opponents seeking to unseat a candidate whom WRTL names in its broadcast advertisement (Def.'s Opp. Exh. 10-14), and the PAC announcing as a priority "sending Feingold packing." (Def.'s Opp'n Exh. 4.)

As to the second part of the preliminary injunction standard, we hold that plaintiff has not demonstrated that it will suffer irreparable harm in the absence of a preliminary injunction. Plaintiff relies on the general statement that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Unquestionably, as a general proposition of law, that statement is true.

6

However, in adjudicating entitlement of a plaintiff to a preliminary injunction, we must apply the whole four-part test, which requires us to determine whether the "balance of harms favor[s] plaintiffs." *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1137 (D.C. Cir. 1988). That said, the actual limitation on plaintiff's freedom of expression, as protected by the First Amendment, is not nearly so great as plaintiff argues. At least for purposes of a preliminary injunction, the present showing appears to be that plaintiff is not precluded from forwarding its message, or even from exposing the public to the particular advertisements at issue. As we understand it, the BCRA does not prohibit the sort of speech plaintiff would undertake, but only requires that corporations and unions engaging in such speech must channel their spending through political action committees (PACs).[1] In *McConnell*, the Supreme Court noted that though "corporations . . . may not use their general treasury funds to finance electioneering communications, . . . they remain free to organize and administer segregated funds, or PACs, for that purpose." *Id.* at 695. The Court went on to reason that "'the PAC option allows corporate political participation without the temptation to use corporate funds for political influence . . . .'" *Id.* (quoting *Federal Election Commission v. Beaumont*, 123 S. Ct. 2200, 2211 (2003)).

The *Beaumont* decision quoted by the Supreme Court in *McConnell*, while not directly on point as it did not deal with the current statute, is instructive. That case involved a challenge to the regulation of a corporation's political contributions while the present involves regulation of electioneering communications. Nonetheless, the analogy is obvious. In *Beaumont*, the Supreme

---

[1] WRTL also has alternative methods available to communicate its message in addition to using PAC funding for broadcast ads, namely, using print media, such as newspaper or magazine advertisements, press releases, pamphlets, informational mailings, and billboards; using electronic communications, such as e-mailing and internet posting; and placing telephone calls.

7

Court endorsed the constitutional adequacy of "the PAC option." That holding by the Supreme Court not only weighs against the likelihood of success on the merits, but it also suggests that plaintiff has not advanced a strong case of irreparable harm in the absence of a preliminary injunction. Certainly, it suggests that the harm established by plaintiff will not weigh much in the balance against potential harm to others under the third step of the test or against the public interest under the fourth. Therefore, WRTL has failed the second as well as the first step of the four-part test.

Given the absence of merit in plaintiff's case on the first element of the preliminary injunction test and the near-total absence of irreparable harm to the plaintiff under the second, we need not linger long over the third and fourth elements. The harm to the opposing party, the Federal Election Commission, is evident. Everyone agrees that it is the statutory duty of the defendant to enforce the BCRA. If we enter the preliminary injunction, then, to the extent of that injunction, the Commission cannot perform its duty. We hold that an injunction against the performance of its statutory duty constitutes a substantial injury to the Commission, although given plaintiff's failure on the first two elements, we do not consider that showing essential to our denial of the preliminary injunction.

Similarly, since plaintiff has not established any entitlement to a preliminary injunction, it is not essential that we determine that the grant of such an injunction would fail to further the public interest, but for the sake of completion of record for the purposes of any review that might be sought, we do hold that plaintiff has not established that the public interest would be furthered by the injunction. The Supreme Court has already determined that the provisions of the BCRA serve compelling government interests. *See McConnell*, 124 S.Ct. at 695-96. To the extent that

8

the injunction of the proposed application of those provisions interferes with the execution of the statute upheld by the Supreme Court in *McConnell*, the public interest is already established by the Court's holding and by Congress's enactment, and the interference therewith is inherent in the injunction.

In short, plaintiff's case falls far short of the four-part test for the grant of a preliminary injunction. Therefore, we have denied plaintiff's motion. In light of this disposition, we further order that the parties hereto file supplemental memoranda within ten days of the date of this memorandum and order addressing the question whether this matter should be dismissed.

This the 17th day of August, 2004.


_____
United States Circuit Judge


_____
United States District Judge


_____
United States District Judge


9

# *Radio Script*

Client: Wisconsin Right to Life
Title:  "Wedding" :60
Job#:  WRL-8136
Date: July 15, 2004

| AUDIO | TALENT |
|---|---|
| *We hear church bells up and under...* | PASTOR: And who gives this woman to be married to this man? |
| | BRIDE'S FATHER (rambling): Well, as father of the bride, I certainly could. But instead, I'd like to share a few tips on how to properly install drywall. Now you put the drywall up... |
| | VO: Sometimes it's just not fair to delay an important decision. |
| | But in Washington it's happening. A group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple "yes" or "no" vote. So qualified candidates don't get a chance to serve. |
| | Yes, it's politics at work, causing gridlock and backing up some of our courts to a state of emergency. |
| | BRIDE'S FATHER (rambling): Then you get your joint compound and your joint tape and put the tape up over... |
| | Contact Senators Feingold and Kohl and tell them to oppose the filibuster. |
| | Visit: BeFair.org. That's BeFair.org |
| | Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this advertising and not authorized by any candidate or candidate's committee. |

Exhibit



# *Radio Script*

Client: Wisconsin Right to Life
Title:  "Loan" :60
Job#:  WRL-8136
Date: July 14, 2004

| AUDIO | TALENT |
|---|---|
| | **LOAN OFFICER:** Welcome Mr. and Mrs. Shulman. We've reviewed your loan application, along with your credit report, the appraisal on the house, the inspections, and, well... |
| | **COUPLE:** Yes, yes... we're listening. |
| | **OFFICER:** Well, it all reminds me of a time I went fishing with my father. We were on the Wolf River in Waupaca... |
| | **VO:** Sometimes it's just not fair to delay an important decision. |
| | But in Washington it's happening. A group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple "yes" or "no" vote. So qualified candidates aren't getting a chance to serve. |
| | It's politics at work, causing gridlock and backing up some of our courts to a state of emergency. |
| | Contact Senators Feingold and Kohl and tell them to oppose the filibuster. |
| | Visit: BeFair.org |
| | Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this advertising and not authorized by any candidate or candidate's committee. |

Exhibit



# *TV Script*

Client: Wisconsin Right to Life
Title:  "Waiting" :30
Job#:  WRL-8136
Date: July 14, 2004

---

| VIDEO | AUDIO |
|---|---|
| We see vignettes of a middle-aged man being as productive as possible while his professional life is in limbo: | |
| He reads the morning paper<br>He polishes his shoes<br>He checks for mail, which hasn't arrived<br>He scans through his Rolodex<br>He reads his Palm Pilot manual<br>He pays bills | VO:<br>There are a lot of judicial nominees out there who can't go to work.<br><br>Their careers are put on hold because a group of U.S. Senators is filibustering—blocking qualified nominees from a simple "yes" or "no" vote.<br><br>It's politics at work and it's causing gridlock.<br><br>Contact Senators Feingold and Kohl and tell them to oppose the filibuster. |
| SUPER:<br>www.BeFair.org | Visit: BeFair.org |
| *4-SECOND DISCLAIMER (4% or 20 scan lines):*<br>Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this advertising, not authorized by any candidate or candidate's committee. | WRL REPRESENTATIVE VO:<br>Wisconsin Right to Life is responsible for the content of this advertising. |

Exhibit

C

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

CHRISTIAN CIVIC LEAGUE OF          )
MAINE, INC.,                       )
                                   )        No.  1:06CV00614
                Plaintiff,         )
                                   )        EXHIBIT L
            v.                     )
                                   )
FEDERAL ELECTION COMMISSION        )
                                   )
                Defendant.         )
                                   )

**DEFENDANT FEDERAL ELECTION COMMISSION'S
EXHIBIT L SUBMITTED IN SUPPORT OF ITS OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## SUPREME COURT OF THE UNITED STATES
### OFFICE OF THE CLERK
### WASHINGTON, DC 20543–0001

WILLIAM K. SUTER
CLERK OF THE COURT

May 23, 2003

James Bopp, Jr., Esquire
James Madison Center for Free Speech
Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807

> Re:    02A989
>        02A990
>        Club for Growth, et al.
>        v. FEC, et al.

Dear Mr. Bopp:

The above-entitled applications were presented to The Chief Justice, who on May 23, 2003, noted thereon the following:

> "Applicants have filed an application to vacate the stay entered by the District Court. After consulting with other members of the Court, I shall deny the application to vacate the stay entered by the District Court. An act of Congress is presumed to be constitutional, see *Bowen* v. *Kendrick*, 483 U. S. 1304 (1987), and the Bipartisan Campaign Reform Act should remain in effect until the disposition of this case by the Supreme Court. The application to vacate the stay is denied, and the application for an injunction pending appeal, which was contingent on my vacating the District Court's stay, is thereby rendered moot."

Sincerely,
WILLIAM K. SUTER, Clerk

By

Christopher W. Vasil
Chief Deputy Clerk

cc:    All counsel