**United States District Court**
**District of Columbia**

| | |
|---|---|
| **The Christian Civic League of Maine, Inc.**<br>70 Sewall Street<br>Augusta, ME 04330**,**<br><br>                              *Plaintiff,*<br><br>                *v.*<br><br>**Federal Election Commission,**<br>999 E Street, NW<br>Washington, DC 20463**,**<br><br>                              *Defendant.* | **Cause No.** 1:06CV00614 (JWR, LFO, CKK)<br><br><br>THREE-JUDGE COURT |

# Plaintiff's Reply in Support of Its Motion for Preliminary Injunction[1]

———————

M. Miller Baker, D.C. Bar # 444736
MCDERMOTT WILL & EMERY LLP
600 Thirteenth Street, NW
Washington, D.C. 20005-3096
202/756-8000 telephone
202/756-8087 facsimile
*Local Counsel for Plaintiff*

James Bopp, Jr.
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN  47807-3510
812/232-2434 telephone
812/234-3685 facsimile
*Lead Counsel for Plaintiff*

———————

[1]Because Intervenors Opposition was not filed on April 17 but instead on the 20th, CCL did not have time to read or reply to it.

**Reply Supporting**
**Motion for Preliminary**
**Injunction**

## Supplemental Facts

Christian Civic League of Maine, Inc. ("CCL"), was founded in 1897. (Heath Deposition 14:13, April 13, 2006.) CCL has been associated with Focus on the Family ("Focus") for approximately 15 years. (Heath Declaration ¶ 3.) The defense of traditional marriage as the union of one man and one woman is a high priority for both organizations, which believe that traditional marriage is the foundation of society and the best environment in which to raise children. (Heath Decl. ¶ 4.) Court cases like those in Vermont and Massachusetts which forced civil unions and homosexual marriage on their citizens without benefit of the democratic process have highlighted for CCL the need for a Federal Marriage Amendment. (Heath Decl. ¶ 5.) The importance of this issue to CCL has been demonstrated through its involvement, via its two state political action committees, with state referenda regarding homosexual rights and its own previous efforts, including a radio campaign, with regard to the 2004 Federal Marriage Amendment. (Heath Decl. ¶¶ 6, 8; Pl.'s Resp. to Def.'s Req. Prod. Docs, 2, 3 and 4.)

Focus often corresponds with CCL regarding policy issues of mutual interest, including the Federal Marriage Amendment. (Heath Decl. ¶ 7). In the past, CCL has engaged in grass roots lobbying for the Federal Marriage Amendment through phone calls, e-mail, the internet, and our printed newsletter the Record. (Heath Decl. ¶ 16.) CCL also ran a grass roots lobbying radio campaign in July 2004 encouraging people to contact Senators Snowe and Collins and ask them to support traditional marriage. (Heath Decl. ¶ 18; Pl.'s Resp. to Def.'s Req. Prod. Docs, 2, 3 and 4.[2]).

---

[2]Mr. Heath did not remember this ad during his deposition but the text had been previously provided to opposing counsel in response to their request for production of documents. (Heath Decl. ¶ 16.)

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                    2

So far this year, Tim Russell, the lobbyist for CCL, has participated in multiple conference calls, e-mail exchanges and discussions with legislators, grass roots activists, media, and national level pro family groups regarding the Federal Marriage Amendment. (Heath Decl. ¶9.) However, during the first part of the year grass roots lobbying efforts were tepid because the Senate had chosen not to debate the issue. (Heath Decl. ¶ 10) In March 2006, Focus sent an e-mail to its affiliated organizations that included a message from Jim Bopp, counsel for both Focus CCL, which explained how the 2002 McCain-Feingold law could effect grass roots lobbying via broadcast advertising and offered to represent "any group whose *planned* broadcast falls within the blackout period." (Heath Decl. ¶10, emphasis added). Mr. Bopp's straight-forward legal advice about McCain-Feingold's limits on grass roots lobbying was eye-opening for CCL and came at about the same time as information that the Senate was planning to hold a vote in early June on the Federal Marriage Amendment. (Heath Decl. ¶ 10) After ascertaining that the blackout period in Maine would begin on May 14, 2006, Mr. Heath told Mr. Bopp that the Christian Civic League would run an ad in that period mentioning Olympia Snowe because such an ad would be a natural outgrowth of our continuing campaign to support the passage of the Federal Marriage Amendment which sources say will be voted on in early June of 2006. (Heath Decl. ¶ 10)

The decision regarding when to run ads like the "Crossroads" ad is necessarily tied to legislative decisions about debate and votes on the Federal Marriage Amendment. (Heath Decl. ¶12.) Whether CCL will need to run such ads during the blackout period prior to the November election depends on whether the Federal Marriage Amendment (or other important legislative issues) is pending before the legislature and where it is in the process. In other words, CCL will

run such ads when there is an imminent vote or other deadline that requires immediate action by citizens voicing their opinion to their legislator so that the legislator can adequately represent the desires of his or her constituents. (Heath Decl. ¶12.)  Because the timing of grass roots lobbying campaigns is inherently dependent on legislative whims, it is difficult to plan specific campaigns in advance and they are often created and executed within very short time frames.  (Heath Decl. ¶12.)  Such is the case with the "Crossroads" ad, which was developed because the Senate had finally decided to hold a vote on the Federal Marriage Amendment in early June.  (Heath Decl. ¶12.)

The scarcity of resources at CCL this year has necessitated that they work even more closely with groups such as Focus to coordinate efforts to pass the Federal Marriage Amendment. (Heath Decl. ¶ 13.)  CCL is currently working with Focus to encourage people to send post cards to their Senators asking them to vote for the Federal Marriage Amendment.  (Heath Decl. ¶13.)  Focus has also assisted CCL with the "Crossroads" campaign by drafting the text and recording the "Crossroads" ad.  (Heath Decl. ¶14.)  At the time Mr. Heath's deposition was taken, the "Crossroads" campaign had been planned, but was still in the process of being executed. (Heath Decl. ¶15.) Since that deposition was taken, the ad has been recorded and is ready to air. (Heath Decl. ¶15.)  Mr. Heath has also confirmed a plan to run the "Crossroads" ad 22 times per week at a cost of  $998 per week on WGAN-AM, Portland & Lewiston; WVOM-FM, Bangor; WLOB-FM, Lewiston & Augusta; and WLOB-AM, Portland & Lewiston. (Heath Decl. ¶15.) CCL plans to run the ads beginning on May 10, 2006, and continuing weekly through the date of the vote at the beginning of June or for approximately four weeks for a total cost of $3,992. (Heath Decl. ¶15 and Exh. A.)

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                    4

Further, although CCL's resources are scarce this year and have caused some cut-backs, the passage of the Federal Marriage Amendment is of such import to CCL and its members that it is raising funds specifically for the "Crossroads" project. (Heath Decl. ¶ 16.)  One donor has committed to paying the entire $3,992 cost of the radio buy so that the ads may be run as scheduled. (Heath Decl. ¶ 16.)

While Mr. Heath believes that non-broadcast communication is effective with regard to those who receive it, such communication is necessarily limited by the number of CCL's subscribers to those communications and broadcast ads, particularly radio ads, are more effective because they consistently reach more persons per dollar spent. (Heath Decl. ¶ 18.)  Moreover, CCL has found that renting phone lists and hiring a phone bank for a telephone campaign is costly and not as effective as broadcast ads. (Heath Decl. ¶ 19.)  In Mr. Heath's experience, people are more receptive to ads which are invited into their homes because they are listening to a certain radio station or watching a program they like on television than to ads which are brought to them by the intrusive ring of unsolicited telephone calls which seem to come at inopportune moments. (Heath Decl. ¶ 19)  Therefore, when Focus brought up the idea of radio ads urging the passage of the Federal Marriage Amendment, which are similar not only to the ones run by CCL's political action committees in support of state homosexual rights referenda but also to the radio campaign that CCL ran in July 2004, CCL thought it would be a way to reach a broader audience than its. (Heath Decl. ¶ 20.)

Further, creating a federal political action committee would be more burdensome for CCL than the state PACs that are currently affiliated with it because the State PACs were formed to support/oppose referenda there were no limits on contributions to those entities. (Heath Decl. ¶

21.)   In contrast, because federal PACs are presumed to be formed for the purpose of supporting/opposing candidates that contribution limits apply. (Heath Decl. ¶ 21.)   In addition, since federal corporate PAC are limited to fundraising from their own members, the pool of contributors is necessarily limited to CCL's approximately 300 members and would not encompass its nearly 2,500 donors.  (Heath Decl. ¶ 21.)   The limited pool of donors would make it much more difficult to raise the funds needed to engage in a broadcast advertising campaign such as the one CCL is currently endeavoring to undertake in support of the Federal Marriage Amendment.  (Heath Decl. ¶ 21.)

In addition, some of our members have theological objections to contributing to political action committees. (Heath Decl. ¶ 22.)  Some Christians are reluctant to link the church and the state too closely. (Heath Decl. ¶ 22.)  This reluctance, often related to Paul the Apostle's teaching in the book of Romans regarding church and state, leads them to tread carefully when involving the institution of the church in the selection of candidates. (Heath Decl. ¶ 22.)  The idea of giving money to candidate campaigns, which political action committees do, is especially onerous to some Christians, carrying with it, as it does, the risk of becoming involved inappropriately in the process of governing, or wielding the sword.  (Heath Decl. ¶ 22.)   Because some of CCL's members subscribe to this belief, it would increase its difficulties in raising money for a federal political action committee. (Heath Decl. ¶ 22.)

Finally, employing alternative text for CCL's grass roots lobbying ads would not be as effective because the point of the grass roots lobbying effort is to ask the citizens of Maine to call their Senators and tell them how they would like them to vote on the Federal Marriage Amendment.  (Heath Decl. ¶ 23.)  Giving the names of the Senators helps the potential callers to

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                6

be more comfortable making the requested call because they can simply ask for him or her by name rather than dealing with the awkwardness of saying "I'm from Maine, I don't know the name of my senator but can you connect me to him." (Heath Decl. ¶ 23.) Regardless, simply saying "call your Senator," as the FEC suggests, would still violate the electioneering communication prohibition because the FEC's rule specifically says that an electioneering communication refers to a clearly identified candidate when it uses an "unambiguous reference" to the identity of the candidate and lists "your Congressman" as an example. (Heath Decl. ¶ 23.)

## Argument

**I. CCL Has Standing**.

        **A.    The CCL is Ready, Willing, and Able to Broadcast the Ad and Standing Requirements are Relaxed in Challenges Based on the First Amendment**.

The FEC overstates the hurdle standing represents in this First Amendment challenge to § 203 of the BCRA, and, at the same time, ignores important facts. For example, the FEC has had in its possession since April 14, 2006, as a result of supplemental discovery requests, information on CCL's planned "ad buy" containing a weekly schedule of spots that demonstrates that the ad is "targeted to the relevant electorate." 2 U.S.C. § 434(f)(3)(A)(i)(III); 2 C.F.R. § 100.29(a)(3). *Cf. Mem. Opp.* at 4. The ad has been recorded. *Heath Decl.* at ¶ 12. The schedule for a broadcast buy has been confirmed, and the total cost of the buy have either been contributed or are pledged. *Id.* at ¶ 14.

More important, the FEC overstates the demands for standing in matters such as this. Courts have routinely recognized that traditional concerns surrounding standing are relaxed when plaintiffs raise challenges based upon the First Amendment. "Particularly in the First

Amendment-protected speech context, the Supreme Court has dispensed with rigid standing

requirements." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003)

("*CPLC*"). So long as a plaintiff faces a "'genuine threat of imminent prosecution'" under a

proscriptive statute, Article III standing is satisfied. *Id.* (quoting *Thomas v. Anchorage Equal

Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). *See also Babbitt v. United Farm Workers

Nat'l Union*, 442 U.S. 289, 298 (1979).

    A previous case involving the FEC addressed similar circumstances as here. *Virginia

Society for Human Life v. FEC*, 263 F.3d 379, 389-90 (4th Cir. 2001) ("*VSHL*") (collecting

cases), applied the correct standards on standing and ripeness in a case challenging FEC

regulations. "As the 2000 federal elections were approaching, VSHL was interested in spending

money on communications it regarded as 'issue advocacy' ["voter guides"], and "VSHL also

planned to produce radio advertisements that would air one week before the elections." *Id.* at

381. As here, the FEC argued that the allegations were "too speculative" for standing and that the

case was not ripe. The court held that both standing and ripeness existed because, "for a

preenforcement challenge to a regulation, it is enough to 'allege[] an intention to engage in a

course of conduct arguably affected with a constitutional interest, but proscribed by a

[regulation].' *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 [] (1979). VSHL

has alleged an intention to engage in constitutionally protected activities that would fall within

the reach of the regulation." *VSHL*, 263 F.3d at 389. The court noted that VSHL's injury – its

fear of prosecution – was imminent and immediate because it needed "to plan the substance and

placement of its advertisements" to be heard before the approaching election. *Id.* Likewise here,

the vote the ad addresses is barely more than six weeks away and ongoing plans are chilled by the

fear of prosecution. Certainly, the FEC's response offers no reason to expect that the law would not be enforced against CCL and such assurances would not be sufficiently binding in any event.[3]

**B.    CCL is Not a Qualified Nonprofit Corporation.**

The FEC's claim that CCL has offered no evidence that it does not qualify as a "qualified nonprofit corporation" (QNC) under 11 CFR 114.10 is without merit. In its answers to FEC discovery, CCL has explained that it does not have characteristic 11 C.F.R. § 114.10(c)(2), which by itself precludes QNC status. CCL *can* engage in business activities, and has produced for the FEC its Bylaws, which confirm this. No written or unwritten bylaw, rule, or policy to which CCL is subject provides that it cannot engage in business activity, as the relevant regulation requires. *See* 11 C.F.R. § 114.10(c)(2) ("[i]t *cannot* engage in business activities") (emphasis added)). Moreover, CCL, in fact *does* engage in business activities.[4] In addition to the activities the FEC only claims *may* not be business activities, CCL has advertising income from the print version of its newspaper, *The Record*, as shown by records produced in document requests. Finally, as CCL explained in response to an FEC interrogatory, it may be found to have indirectly received

_____

[3]Moreover, this case, as in *VSHL*, is ripe because it presents a "purely legal issue," "[CCL] will face a significant impediment if we delay," "the regulation requires [CCL] to adjust [its] conduct immediately," and "these types of 'substantive rules are ripe for review at once." *Id.* at 389-90 (collecting Supreme Court authorities) (interior quotation marks and citations omitted).

[4]The FEC claims that there is "no precedent to establish that the Commission would necessarily consider income from a fundraising banquet, or the provision of materials supporting an organization's policy goals . . . as business activities." *Mem. Opp.* at 15. But the definition of business activity is quite straightforward: "provided goods and services that results in income to the corporation."11 C.F.R. § 114.10(b)(3)(i)(A). Moreover, the FEC's approach would ask CCL to risk prosecution based on how the FEC *might* interpret a regulation, in spite of its apparent threat. Such a demand is sufficient to *confer* standing for a preenforcement challenge, but not *deny* it.

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                    9

corporate donations, which also, by itself, denies QNC status under 11 CFR 114.10 (c)(4)(ii).[5]

Demanding that CCL seek an advisory opinion to establish whether it is a QNC, *Mem. Opp.* at 15-16, begs a puzzling question and overlooks the law. What would the FEC advise regarding CCL's status that is different from its position here? They haven't offered that CCL is a QNC, even as a litigation position (the assurances of which to would be of limited value to CCL). More important, CCL need not seek an advisory opinion before seeking relief in court.

The advisory opinion is an optional or permissive device, and "without an express requirement of exhaustion by Congress, it is within the court's sound discretion whether to require prior resort to administrative remedies." *Maine Right to Life Comm., Inc. v. FEC*, 914 F.Supp. 8, 9 (D.Me. 1996) ("*MRTL*"). Prior resort should not be required here. "It is true that in *Faucher v. FEC*, 708 F.Supp. 9 (D.Me. 1989), Judge Cyr required the MRLC to seek an advisory opinion, but in that case there was a particular newsletter in question that could be submitted to the FEC *and there was a substantial period of time until publication of the next issue*." *Id.* at 9-10 (emphasis added). Here, as in *MRTL*, "time does not permit an advisory opinion in sufficient time . . ." *Id.* at 10. A detour through an advisory opinion process only invites similar delays in future cases where a would-be corporate speaker wishes to broadcast its grassroots lobbying when time is of the essence.

C.    **This Litigation is Itself Petitioning the Government for Redress of**

---

[5]CCL may have received contributions from non-profit corporations who may have received contributions from business corporations. CCL also shares and allocates expenses with an associated entity, the Christian Education League, that does receive donations from business corporations. Because such sharing and allocation may be construed to result in the conclusion that CCL "indirectly accept[s] donations . . . from business corporations," CCL is also not able to certify, in accordance with 11 C.F.R. § 114.10(e)(1)(ii)(B), that it has the characteristic 11 C.F.R. § 114.10(c)(4)(ii).

**Grievances.**

As general advocacy of positions in matters of public import, the action for which CCL has filed suit, grassroots lobbying, is protected under the First Amendment as part of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). But grassroots lobbying is also a quintessential exercise of the right to petition. *Eastern R.R. President Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-138 (1961); *Liberty Lobby, Inc. v. Pearson*, 390 F. 2d 489, 491 (D.C. Cir. 1968). The right to petition is "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'" *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quoting *United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967)).

Bringing a lawsuit is itself an exercise of the right to petition. "In the context of [CCL] objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives" of exercising the right to expression during certain periods before elections and of freely petitioning the legislature. *N.A.A.C.P. v. Button*, 371 U.S. 415, 429 (1963).

> It is thus a form of political expression. Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts. . . . And under the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances.

*Id.* at 429-30.[6] Even in the antitrust and labor relations contexts, where no separate First

---

[6]Protection for the right to petition for conventional lobbying developed under the *Noerr-Pennington* doctrine. *Noerr* and *Pennington* established that the right to petition trumps otherwise applicable antitrust law. The principle protection it afforded, that of immunity from prosecution when petitioning government, was also extended to "situations where groups use . . .

Amendment speech concerns attach, the rights and immunities attached to the exercise of the right to petition generally apply unless the attempt to petition is a sham. In *Professional Real Estate Investors v. Columbia Pictures Industries*, the Court held that whether litigation asserted to be an exercise of the right to petition was "sham" must be determined by a two-part test:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. [footnote omitted] Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere *directly* with the business relationship of a competitor" through the "use [of] the governmental process — as opposed to the *outcome* of that process — as an anticompetitive weapon."

508 U.S. 49, 60-61 (1993) (citations omitted; emphasis in original); *accord*, *BE &K*, 536 U.S. at 526.

A petition, whether offered by lobbying or litigation, is *subjectively* a sham if, for example, in the antitrust context, the intent is to interfere directly with the business relationships of a competitor, *Noerr*, 365 U.S. at 144, or, in the labor relations context, to penalize or retaliate against a protected labor activity, *Bill Johnson's*, 461 U.S. at 743. However, an improper subjective intent, while necessary, is not sufficient to make a petition a sham because there is a threshold requirement.

The rights and immunities of the exercise of the right to petition still exist where there is

---

courts to advocate their causes and points of view" in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972). The Court later applied the *Noerr-Pennington* doctrine in the context of labor relations law in *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 737, 743 (1983). It was applied to a situation where groups used the court to advocate in the context of labor relations law in *BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002).

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                    12

"'a concerted effort to influence public officials *regardless of intent or purpose.*'" *BE & K*, 536

U.S. at 525 (quoting *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965)) (emphasis added).

"For a suit to [be excepted from petitioners' rights and immunities], then, it must be a sham *both*

objectively and subjectively." *Id.* at 526 (citing *Professional Real Estate Investors*, 508 U.S. at

60-61) (emphasis in original). The Supreme Court has accordingly held that unless no reasonable

litigant could expect success on the merits, even if a labor law litigator intended by his litigation

"to retaliate against the defendant for exercising rights protected by the [NLRA]," *Bill Johnson's*,

461 U.S. at 743, the petition effort was not sham and the protection demanded by the federal

constitution for the right to petition prevented application of the NRLA. *BE & K*, 536 U.S. at

526.

 The transferable concept to the present application of the right to petition is that unless

CCL's litigation is objectively without merit as exercising the right to petition, then the

subjective intent of the litigants is irrelevant. As the Supreme Court said in *Professional Real*

*Estate Investors*, "only if challenged litigation is objectively meritless may a court [even]

*examine* the litigant's subjective motivation." 508 U.S. at 60 (emphasis in original). The

threshold objective test must be overcome before inquiry may be made into subjective intent.

 But this litigation is not objectively meritless. Even a cursory examination of the law in

this area belies such an idea. In vacating the unreported district court opinion dismissing

*Wisconsin Right to Life*, *Inc. v. FEC*, Civil No. 04-1260 ("*WRTL*), the United States Supreme

Court held that an as-applied challenge to the electioneering communication prohibition could be

brought and necessarily implied that an exception to the prohibition for grassroots lobbying may

be required. Accordingly, as the Court held in *Professional Real Estate Investors*, questions of

possible underlying "motivations in bringing the suit" are not even properly discoverable, let alone cause for denying standing, because such questions "were rendered irrelevant by the objective legal reasonableness of the litigation."508 U.S. at 65-66.

**II. This Case Fully Meets the Requirements For Issuing a Preliminary Injunction**.

Where a declaration of unconstitutionality is sought, especially when, as here, the Supreme Court has remanded a case addressing the same statute, *Wisconsin Right to Life, Inc. v. FEC*, 126 S.Ct. 1016 (2006),[7] (*"WRTL II"*) to determine whether it is constitutional as applied to grassroots lobbying such as CCL's the "status quo" the FEC wishes to preserve is no longer authoritative.

>     **A.**   **CCL is Likely to Succeed on The Merits.**

>     **1.**   ***McConnell* Did Not Sweep Grassroots Lobbying Ads Into the Electioneering Communication Prohibition.**

In arguing that *McConnell* considered the sorts of advertisements at issue here, *Mem. Opp.* at 17-20, the FEC overlooks some key points. First, as explained fully in Plaintiff's *Memorandum in Support of Preliminary Injunction*, (*"Mem. Supp."*), the ads considered in *McConnell* and found to be "sham" were not the kind of ads that CCL would like to run. In short, as a factual matter, grassroots lobbying such as CCL's does not condemn a candidate's record but gives information about her record on the issue and asks hearers to call her and "urge [her] to support [legislation] when it comes to a vote [in the near future]." *Crossroads* Ad, Exhibit A to V.C. Grassroots lobbying ads like CCL's do not include information about the candidate other

---

[7]The vacate and remand also deflates the FEC's argument that the *facial* upholding of the BCRA adds weight to the presumption of constitutionality ordinarily afforded Acts of Congress. Quite apparently, the constitutionality of its provisions *as applied* is not assured.

than to perhaps mention his position on the issue coming to a vote.

      **2.**    ***McConnell* Was a Facial Challenge and the Court Applied Classic *Broadrick* Analysis.**

Second, the FEC, while finally forced to abandon the argument that *McConnell* precluded as-applied challenges, still ignores the implication of the Court's remand in *WRTL II*. If, as the FEC argues, the Court had considered ads like CCL's in *McConnell* in holding that the electioneering communication prohibition's "minimal impact on issue advertising was constitutionally acceptable because corporations and unions could comply with the law" during the blackout periods by avoiding reference to federal candidates or paying for the ad from a PAC, *Mem. Opp.* at 19,  then why did the Court unanimously remand a challenge to that law that had been justified on substantially the same basis?

The answer is that *McConnell* was a *facial* challenge and thus, the Court applied a *Broadrick* substantial overbreadth analysis to facially uphold the prohibition in that case. *McConnell v. FEC*, 540 U.S. 93, 205-07 (2003); *WRTL II*, 126 S.Ct. at 1018 ("we found BCRA's primary definition of 'electioneering communication' facially valid when used with regard to BCRA's disclosure and funding requirements."). The Supreme Court in *McConnell* facially upheld the prohibition because the overbreadth of the prohibition, reaching beyond functional equivalents of express advocacy to genuine issue ads, was not "substantial." *Id.* at 207. The Court found that "the vast majority of ads" fitting the definition of electioneering communications were the "functional equivalent of express advocacy," *id.* at 206, and, as a result, the definition was not substantially overbroad. *Id.* at 207. The Court's statements about alternative modes of broadcast, *id.* at 206, demonstrated that the admitted overbreadth was not substantial, not, as the FEC

argues, that the prohibition's burden was constitutionally acceptable because they were avoidable. *Mem. Opp.* at 18-19.

Likewise, the FEC stubbornly clings to the idea that "upholding stringent restrictions on *all* election-time advertising that refers to a candidate because such advertising will *often* convey a message of support or opposition," *id.* at 239, means that the Court was deciding once and for all that grassroots lobbying was encompassed in its holding that the electioneering communication prohibition was facially valid. But the language the FEC cites, *Mem. Opp.* at 20, was the Court parenthetically describing the Court's facial upholding of the electioneering communication prohibition in its Title V analysis. From its mistaken reading of *McConnell*, the FEC attempts to create an entirely new mode of constitutional analysis.[8]

### 3.    Forcing a Corporation to use PAC or SSF Funds For Political Speech is a Constitutionally Cognizable Burden Subject to Strict Scrutiny.

Perhaps recognizing that it cannot prevail under strict scrutiny, the FEC attempts to shift the burden to an as-applied corporate challenger to prove that avoiding reference to federal candidates or paying for the ad from a PAC are unconstitutional burdens. *Mem. Opp.* at 19; 23-26. But requiring a corporation to use only PAC money to fund grassroots lobbying is a constitutionally cognizable burden that is subject to strict scrutiny, which places the burden on the FEC to demonstrate that as applied to CCL's ad, the electioneering communication prohibition is narrowly tailored to a compelling government interest. In *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658 (1990), the Supreme Court held that making a

---

[8]The FEC also commits a classic logical fallacy when it attempts to make the opposite of Justice Kennedy's dissent into a majority holding. *Mem. Opp.* 19-20. There could be any number of reasons the majority did not address his points, and the FEC must discount all of them to prove that it intended to hold the conclusion to which Justice Kennedy objected.

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                16

corporation use funds from its PAC or separate segregated fund ("SSF") for political speech "burdens the exercise of expression because 'the corporation is *not* free to use its general funds for campaign advocacy purposes.'" *Id.* (quoting *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 252; 266 (1986)). "Although these requirements do not stifle corporate speech entirely, they do burden expressive activity." *Id.* (after listing "requirements similar to those in the federal statute" at issue in *MCFL*). The Court concluded that, as applied to the Chamber, prohibiting corporations from using its treasury funds for political speech except from a SSF "is narrowly tailored to serve a compelling state interest," in other words, that it survived strict scrutiny. *Austin*, 494 U.S. at 655.

Thus, the Court in *Austin* held both that a corporation's being forced to use PAC or SSF funds for political speech is, by itself, as a matter of law, a constitutionally cognizable burden, and that such a burden must survive strict scrutiny.

The Court did not apply strict scrutiny to the electioneering communication prohibition in *McConnell* only because it was persuaded that that case was a facial challenge, and accordingly, applied classic *Broadrick* analysis. But where, as here, a challenge to the requirement to use PAC funds is not facial, strict scrutiny applies, and the government has the burden to prove that forcing a corporation to fund grassroots lobbying through a PAC or SSF "is (1) narrowly tailored, to serve (2) a compelling state interest. [And] [i]n order for [the government] to show that [such a regulation] is narrowly tailored, they must demonstrate that it does not unnecessarily circumscrib[e] protected expression." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775 (2002) (internal quotations and citations omitted).

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                    17

**4.    The Electioneering Communication Prohibition, as Applied to CCL's Advertisement, is Not Narrowly Tailored to a Compelling Interest.**

The FEC argues that "even if Congress *lacks a substantial independent interest* in regulating corporate issue advocacy," *Mem. Opp.* 21 (emphasis added), or in other words, even though there is no corporate corruption interest in prohibiting them, that such genuine issue ads still must be prohibited, because the restrictions that BCRA imposes on them "are simply the unavoidable, incidental byproduct of Congress's efforts to prevent corporate treasury funds from being used to influence federal elections." *Mem. Opp.* 20; *see also id.* at 21 ("the marginal and incidental impact of BCRA § 203 on [issue advocacy] does not require the Court to find that an exemption for CCL's advertisements is constitutionally required"). But, as has been shown, the burden is not incidental but, as a matter of law, of constitutional import, and that burden must be shown by the government to be narrowly tailored to a compelling government interest. Instead, the FEC admits that it lacks even a substantial interest in regulating genuine issue advocacy in the form of grassroots lobbying, and claims only that it is justified by what it characterizes as minimal burdens that the prohibition requires. Without even a substantial interest in regulating CCL's speech, the prohibition cannot be constitutionally applied to its ad.

**5.    *McConnell* Does Not Require CCL to Use Alternative Content, Funding, or Media for its Ads.**

Much of FEC's defense is comprised of arguing that *McConnell* doesn't require an exception to the prohibition for grassroots lobbying. But this is an answer to an argument that CCL does not make. It is the *constitution* that requires it, and *McConnell* did not hold otherwise. The FEC is in this predicament because it ignores the obvious; that *McConnell* decided a facial challenge to the electioneering communication prohibition under a *Broadrick* facial analysis, and

Reply Supporting
Motion for Preliminary
Injunction                    18

an as-applied challenge of the statute is subject to conventional analysis of cognizable burdens on protected speech, i.e. strict scrutiny. Ignoring the import of *Austin* and *MCFL* has led to its insistence, *see*, *e.g.*, *Mem. Opp.* 23-26, that CCL must prove that alternatives to its ad or its funding are unconstitutionally burdensome. Yet even some of the alternatives it proposes as constitutionally sufficient options are debatable on other grounds.

Allowing CCL to tell listeners to call the Senate switchboard and ask for their Senator but not identifying the Senator for them is of dubious value in insulating the Senator-candidate from citizens' electoral criticism. But in any event, the need to name the senators in grassroots lobbying and its likely effect on listeners, *Mem. Opp.* at 24, was a matter of some analysis in *McConnell*.

Judge Leon in the district court in *McConnell* singled out grassroots lobbying as being of special concern, providing a rationale from the record as to why it is necessary to *name* a legislator in such situations. *McConnell v. FEC*, 251 F. Supp. 2d 176, 794 (2003). No other Judge disputed this finding and it was necessarily encompassed in the Supreme Court's holding. When the Court then held in *WRTL II* that as-applied challenges to the very provisions at issue here were not precluded by its holding in *McConnell*, the necessary implication is that none of the factors discussed in *McConnell per se* made advertisements sharing them "the very type of activity that *McConnell* found Congress had a compelling interest in regulating" *WRTL II*, 126 S.Ct at 1018. An ad cannot rise or fall on whether it names a legislator who is a candidate.

Alternatives to funding from the corporate treasury and the attendant burdens of doing so are moot questions, as *Austin* and *MCFL* establish that, as a matter of law, forcing a corporation to form and use a PAC to fund political speech is constitutionally cognizable burden subject to

strict scrutiny. CCL's inability to describe those difficulties at a deposition, *Mem. Opp.* at 24-25, are irrelevant, but are now set forth in Heath's Affidavit at ¶ 20, 21.

Claims that CCL could use alternative, non-broadcast media for its ad is just restating the FEC's objection to any exception to the grassroots lobbying exception. As far as the constitution is concerned, however, "[i]t is not the role of government to tell citizens how best to communicate: "The First Amendment protects [CCL's] right not only to advocate [it's] cause but also to select what [it] believe[s] to be the most effective means for doing so." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

> **6.    CCL's Ad is Like Those At Issue in *WRTL*, Not the Sham Issue Ads in *McConnell*.**

Because the content of CCL's ad is obviously different from those found to be "sham issue ads" in *McConnell*, *Mem. Supp.* at 19-21, the FEC is left trying to whip CCL's supposed motives, intent, and other activities into some sort of "master plan" that makes the ad the paradigm of a prohibited multi-message communication. Even the fact that Senator Snowe is unopposed in the primary is made to be an opportunity for stealth electioneering by CCL.

In truth, the only difference between CCL's ad and the ones at issue in *WRTL* is that the *Crossroads* ad mentions the Senators' stance on the Amendment in an earlier permutation, but this is a reference to their position on an issue, not their suitability for office. All the other details, including telling the hearer to call and ask the Senators to support the Amendment, what the FEC misleadingly describes as "call and tell," were at issue in *WRTL* and by necessary implication, therefore, were not dispositive of an ad's status as a "functional equivalent."

### 7.   Desire for a Bright Line Does Not Trump the Need of Narrow Tailoring.

Bright lines are extolled by the FEC, arguing that the Court had supposedly agreed that a broad, bright-line test was necessary. The FEC argues that CCL's lack of a legal standard to determine entitlement to a grassroots lobbying exception will "reintroduce indeterminacy," *Mem. Opp.* at 31, require "unstructured *ad hoc* inquiry," *id.* at 32, and "multiply litigation." *Id.* at 33. Bright-line tests are important, of course, to protect free expression under the First Amendment, but they are to protect speakers from vague laws, not to protect enforcement officials or to enhance the reach of speech prohibitions beyond their justifiable bounds. They do not justify abandoning the fact-sensitive scrutiny required in narrow tailoring.

In *MCFL*, this Court expressly rejected a similar call by the FEC to uphold the bright-line prohibition of electioneering by all corporations,[9] found in § 441b. Instead, the Court held that the bright-line prohibition on all corporations could not be constitutionally applied to MCFL-corporations, which exhibited certain characteristics, 479 U.S. at 263-64,[10] since "government must curtail speech only to the degree necessary to meet the particular problem at hand, and must

---

[9]*MCFL* was not the first as-applied challenge to § 441b this Court has upheld. In *United States v. CIO*, 335 U.S. 106, 123-24 (1948), this Court held that the ban on corporate and union expenditures did not apply to the CIO News, which was distributed to union members and subscribers. The FEC rule on this membership communication exemption hardly qualifies as bright line. *See* 11 C.F.R. § 100.134.

[10]The FEC now calls this exception a "bright line," after arguing against it in *MCFL* on bright-line grounds. But it does so for the same reasons, to enhance the reach of government's speech prohibition. Defending the corporate prohibition meant that all corporations' speech would be banned, including *MCFL*-corporations where the prohibition was not justified. And by defending a narrow and wooden definition of the characteristics that exempted *MCFL*-corporations from the ban, *see* 11 C.F.R. § 114.10(c), fewer non-profit corporations would benefit from the prohibition's exemption.

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                     21

avoid infringing on speech that does not pose the danger that has prompted regulation." *Id.* at

265. Further, in *McConnell*, the Court recognized the first as-applied exemption to the

"electioneering communication" prohibition itself by holding that it could not be constitutionally

applied to MCFL-corporations. *McConnell*, 540 U.S. at 211.

In *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996), the

presumption that all political party expenditures were always coordinated with their candidates,

coupled with a strict spending limit on such expenditures, created a very bright line, but the

Court rejected that bright line as inconsistent with free expression guarantees. Instead, it found

the FEC's coordination presumption invalid and held that the "Party Expenditure Provision" was

unconstitutional as applied to independent expenditures. *Id.* at 623-24. That coordination must be

proven, not presumed, is consistent with First Amendment narrow-tailoring protections, but it is

certainly not a bright line. Rather, it is a multi-factor, somewhat vague, test.[11]

Throughout the *McConnell* litigation, those supporting the electioneering communication

definition argued that they could prove that the substantial portion of the speech captured was in

fact election-related, not a prophylaxis. Examining the evidence, the Court agreed that they had

done so. That leaves the acknowledged capture of speech that has nothing to do with elections.

Under strict scrutiny, as-applied challenges such as this are required to sort out the

misapplications of the bright-line rule because there is no prophylaxis in narrow tailoring.

### 8.    Using a Segregated Account Satisfies the Government's Interests.

CCL's offer to make disbursements for electioneering communications only out of a

---

[11]*See* 11 C.F.R. §§ 109.20, 109.21; FEC Notice of Proposed Rulemaking, Coordinated
Communications, 70 Fed. Reg. 73946 (Dec. 14, 2005).

**Reply Supporting
Motion for Preliminary
Injunction**                    22

segregated bank account meeting the requirements of 11 C.F.R. § 104.20(c)(7) eliminates all concerns about use of corporate or labor union funds. Disclosure will be done at the level Congress has asserted an interest in for electioneering communications, which is the same level at which individuals and MCFL corporations disclose. If CCL is allowed to make these electioneering communications, it would not become a PAC and so PAC-level disclosure is inappropriate.

The FEC just insists that CCL "has no constitutional right" to use a segregated bank account. This simply restates its objection to any grassroots lobbying exception. It ignores that *McConnell* found the statute *facially* valid and that *WRTL II* said that there could be as-applied exceptions. And that it is the FEC's strict-scrutiny burden to show why a compelling interest an narrow tailoring survive when such a fund is used.

**B.    CCL Will Be Irreparably Harmed Without an Injunction.**

CCL's claim of irreparable harm does not rest on the assumption that an allegation of First Amendment harm, but on practical realities. It wants to exercise First Amendment rights to speak and petition its government when it matters. If injunction is not granted, CCL will not run the ads after May 14, when their effectiveness would be greatest, and the opportunity and its commensurate First Amendment rights will be forever lost.

And the PAC alternative for CCL is effectively a complete ban. *Cf. Mem. Opp.* at 39-40. There is inadequate time to recruit members, expressly acknowledge their acceptance as members, and then solicit them for contributions for a PAC (usually multiple efforts are required). Moreover, as the Court found in *Austin*, even when a PAC is up and running and successful at fundraising, 494 U.S. at 658, the burdens of organizing and  maintaining the PAC

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                23

and the source restrictions on contributions make a PAC-only funding requirement a burden on corporate speech that is constitutionally cognizable. *Id.*

### C.    A Preliminary Injunction Furthers the Public Interest.

There are clear public interests in citizens being able to associate in citizen groups, expressing themselves on imminently pending legislative matters and calling on other citizens to petition government officials. It is in the public interest for citizens to know about the issue of the federal Marriage Protection Amendment and the ongoing conflict over it. This is not outweighed here by a government interest in enforcing a law that properly furthers government interests, as the district court in *WRTL* explained. *Mem. Opp.* at 44. That opinion assumed that *McConnell* had found compelling interests supporting the BCRA for all cases.

But the Supreme Court said in *WRTL II* said that *McConnell* was a facial challenge, that there can be exceptions to the electioneering communication prohibition, so *McConnell* did not settle establish a compelling government issue supporting the application of the BCRA to this ad. The FEC has so far been unable to meet their strict-scrutiny burden in showing that as-applied to grassroots lobbying ads such as CCL's, the electioneering communication prohibition is narrowly tailored to a compelling government interest. Accordingly, there is no compelling government or public interests established as outweighing the public interests noted above.

There is, to be sure, a presumption of constitutionality that attached to the BCRA and that presumption is considered in balancing hardships. But *WRTL II* eliminates that presumption with regard to an exception to grassroots lobbying. And there remains a countervailing presumption that when a regulation burdens First Amendment rights, as does the electioneering communication prohibition, it is presumed *un*constitutional. *Am. Library Ass'n v. Reno*, 308 U.S.

App. D.C. 233 (D.C. Cir. 1994) ("'Content-based regulations are presumptively invalid.'"

(quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992))).

## Conclusion

The electioneering communication prohibition is unconstitutional as-applied to CCL's

grassroots lobbying activities and as-applied to CCL's broadcast ad found in Exhibit A of its

Verified Complaint. All the required elements for preliminary injunctive relief are met. This

Court should expeditiously grant the requested injunctive relief, assuring it is in place prior to

May 14.

Dated: April 21, 2006

                                        Respectfully submitted,


/s/ M. Miller Baker                     /s/ James Bopp, Jr.
M. Miller Baker, D.C. Bar # 444736      James Bopp, Jr.
MCDERMOTT WILL & EMERY LLP              Bopp, Coleson & Bostrom
600 Thirteenth Street, NW               1 South Sixth Street
Washington, D.C. 20005-3096             Terre Haute, IN  47807-3510
202/756-8000 telephone                  812/232-2434 telephone
202/756-8087 facsimile                  812/234-3685 facsimile
*Local Counsel for Plaintiff*           *Lead Counsel for Plaintiff*

**Reply Supporting**
**Motion for Preliminary**
**Injunction**                 25