1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF COLUMBIA

3

4   CHRISTIAN CIVIC LEAGUE      )
    OF MAINE, INC.,          )  Docket No. 1:06CV00614
5                         )
          Plaintiff,      )
6                         )
            v.            )
7                         )
    FEDERAL ELECTION COMMISSION,)
8                         )
          Defendant.       )
9

10

11

12          DEPOSITION of MICHAEL HEATH, taken pursuant to

13   notice dated April 5, 2006, at the Sheraton Hotel, 363 Maine

14   Mall Road, South Portland, Maine, on April 13, 2006,

15   commencing at 9:55 a.m., before Cindy Packard, Registered

16   Merit Reporter, a Notary Public in and for the State of

17   Maine.

18

19   APPEARANCES:

20   For the Plaintiff:        James Bopp, Jr., Esq.

21   For the Defendant:        Harry J. Summers, Esq.
                         Colleen T. Sealander, Esq.

22

23

24

25

2

1                    INDEX

2    Deponent:  MICHAEL HEATH

3    Examination by:                    Page

4        Mr. Summers                3
         Mr. Bopp                    121
5

6

7

8                    EXHIBITS

9            (Retained by Counsel.)

10    Exhibit 1          bylaws              9
      Exhibit 2      notice of deposition        9
11    Exhibit 3        voter's guide          17
      Exhibit 4          article         36
12    Exhibit 5          article         37
      Exhibit 6        advertisement           39
13    Exhibit 7          complaint           44
      Exhibit 8          article         84
14    Exhibit 9        registration         90
      Exhibit 10    interrogatory responses       92
15    Exhibit 11        registration         95
      Exhibit 12          article         97
16    Exhibit 13          invoices        109
      Exhibit 14        form 990          119
17

18

19

20

21

22

23

24

25

3

1                  - - - - - - -

2        MICHAEL HEATH, having been duly sworn by the Notary

3    Public, was examined and deposed as follows:

4            MR. SUMMERS:  My name is Harry Summers, I'm

5    an attorney with the Federal Election Commission.  With

6    me today is Colleen Sealander, also an attorney with

7    the Commission.

8        Would other counsel please identify himself?

9            MR. BOPP:  James Bopp, Jr.

10            MR. SUMMERS:  This deposition is being taken

11    in connection with Christian Civic League of Maine v.

12    Federal Election Commission, Civil Action Number

13    06-0614 in the District -- U.S. District Court for the

14    District of Columbia.

15                    EXAMINATION

16    BY MR. SUMMERS:

17  Q    Please state your name, sir?

18  A    Michael Heath.

19  Q    And what is your home address?

20  A    28 Mayflower Lane, South China, Maine.

21  Q    And your professional address or your work address?

22   A   70 Sewall Street, Augusta, Maine.

23   Q   And that's the -- also the address of the Christian

24       Civic League of Maine?

25   A   Yes.

4

1   Q   Are you represented by a lawyer today, by counsel

2       today?

3   A   I am.

4   Q   And who is that counsel?

5   A   James Bopp.

6   Q   Okay.  Have you been deposed before, sir?

7   A   No, sir.

8   Q   Do you understand that if I ask questions, the court

9       reporter takes down the questions and the answers, so

10      it's important to answer orally?

11  A   Yes.

12  Q   Do you understand you're under oath today and required

13      to testify truthfully to the best of your ability?

14  A   I do.

15  Q   If you don't understand a question, will you let me

16      know?

17  A   Yes.

18  Q   We'll take breaks, but if you need one at any

19      particular time, just let me know.  Is there anything

20      such as medication that could affect your ability to

21      testify accurately today?

22   A   No.

23   Q   Okay.  Did you do anything to prepare for this

24       deposition?

25   A   Yes.

5

1    Q    What did you do?

2    A    I spoke with counsel.  I instructed my staff to

3         cooperate with counsel in the preparation of documents

4         related to this deposition.  I reviewed those

5         documents.  And that's about it.

6    Q    Did you discuss the deposition itself with anyone other

7         than counsel?

8    A    My wife.

9    Q    Anyone else?

10   A    Besides staff?

11   Q    Including staff?

12   A    I discussed it with the president of our board of

13        directors.

14   Q    And what is his name?

15   A    Dallas Henry.

16   Q    Anyone else?

17   A    No.

18   Q    Okay.  Did your counsel give you anything to review in

19        preparing for today's deposition?

20   A    He gave me the documents that you have.

21   Q    The documents that were produced to the Commission

22    earlier this week?

23    A   Correct.

24    Q   By Christian -- I'm sorry, Christian Civic League, I'm

25    sorry, those documents?

6

1   A   Yes.

2   Q   Just to save time, in the papers that counsel has

3       filed, he's used the abbreviation CCL for your

4       employer.  Is that okay with you if I use that as well,

5       or is there one you prefer, just to make it shorter?

6   A   That's fine.

7   Q   That's fine, okay.  Any other materials that --

8   A   Related to -- any other materials related to --

9   Q   To the deposition that you were given by counsel before

10      the deposition?

11  A   Okay.  Related to this meeting?

12  Q   Yes.

13  A   To the deposition?

14     (Mr. Bopp confers with the witness.)

15        THE WITNESS:  Can you repeat the question?

16  Q   (By Mr. Summers)  Did counsel give you any other

17      materials other than what you've described in

18      preparation for this meeting, this deposition?

19  A   I'm pausing to reflect on what I described in the

20      previous questions.  No.

21  Q   Okay.  Could you state your job, please?

22   A   I'm the executive director of the Christian Civic

23       League of Maine.

24   Q   Do you hold any other work positions?

25   A   I'm the executive director of the Christian Education

7

1    League.  And I also have responsibilities related to

2    our political action committees.

3  Q    And what are those?  What are your positions with those

4    committees?

5  A    Executive director.

6  Q    Of?

7  A    Christian Action League.  The Coalition for Marriage,

8    which is a -- doing business as PAC, related to the

9    Coalition -- I mean, to the Christian Action League.

10    And the -- recently -- we're in process of working with

11    a PAC called the No Slots for Maine.

12  Q    And what's your position with No Slots for Maine?

13  A    Still being determined because the board of No Slots

14    for Maine is transitioning, and we are working with

15    them to --

16  Q    I see.

17  A    -- develop a petition effort related to gambling.

18  Q    So that's an existing PAC?

19  A    It is.  State.

20  Q    State PAC, yes.  Is it okay if for -- if I use these

21    abbreviations as well, for the Christian Action League,

22      CAL, and for the Coalition for Marriage, CFM?

23   A   Yes.

24   Q   Okay.  Thank you.  How long have you held a position

25      with CCL?

8

1  A   As executive --

2  Q   Let's start when you first started and maybe work your

3      way through the different job titles until now, if you

4      would?

5  A   I started in 1988, I believe, around there, as the

6      administrative assistant.  And sometime in the early

7      1990s, became associate director.  And in 1994, became

8      executive director of CCL.  I've held that post since

9      that time.

10 Q   Can you describe your duties as executive director of

11     CCL, please?

12 A   My duties.  I am responsible for the day to day

13     operations of CCL.  And my duty is to the board.  I'm

14     responsible to the board of directors.

15 Q   What do you actually do as executive director in a more

16     concrete way?

17 A   I manage the staff.  I sign the checks.  I speak for

18     the organization publicly, am responsive to the media.

19         I implement the broad policy directives of the

20     board with respect to our operations, our day to day

21     operations, which sometimes include petitioning

22     campaigns, and other times include lobbying efforts in

23     the State House.

24  Q    Would you say that you direct the policy and activities

25     of CCL on a day to day basis?

9

1    A    Yes.

2    Q    Okay.

3         MR. SUMMERS:  I'd like to have the court

4    reporter mark an exhibit.

5    (Heath Deposition Exhibit Number 1 was marked for

6    identification.)

7         MR. BOPP:  Before we do 1, I was expecting

8    you to go to the notice of deposition, and of course --

9    do you have a copy of the notice of deposition?

10        MR. SUMMERS:  I do.  I have no objection to

11   having that marked, if you --

12        MR. BOPP:  Could we mark that now?  Do you

13   have a copy?

14        MR. SUMMERS:  I do.  Is it okay if that's

15   marked as Exhibit 2?

16        MR. BOPP:  Yes, sure.

17   (Heath Deposition Exhibit Number 2 was marked for

18   identification.)

19        MR. BOPP:  Mr. Heath of course has been

20   produced pursuant to the notice of deposition, which is

21   Exhibit Number 2, pursuant to Rule 30(b)(6), as the

22    representative of CCL.  And in that regard, the notice

23    of deposition has subject matters as required that he

24    is to familiarize himself with and be prepared to

25    testify about in this deposition.

10

1     Now we have to both the interrogatories and to the

2     document request, we have interposed objections and

3     have answered subject to those objections.  And that

4     would be our intention here.

5     We have the same substantive objections to the

6     subject matters that you are asking this witness to be

7     prepared to answer on as we do to the interrogatories

8     and to the depositions -- or the document request.

9     Specifically, it is our -- we object to any

10    questions that go beyond the facts verified in the

11    complaint, that go beyond the content of the ad or

12    relevant contextual factors that go to whether or not

13    the particular ad in question is an electioneering

14    communication.

15    And specifically, we object to questions about

16    other lobbying efforts that have been engaged in by the

17    organization, by -- with respect to their subjective

18    intent in conducting this broadcast advertising

19    campaign, to their projected belief on whether or not

20    there will be any effect on any election by their

21    advertising campaign.

22          We object to any questions about practical

23     difficulties that they would encounter in creating a

24     PAC.

25          And so as a result, we object to subject matters

11

1    listed in the notice of deposition, Numbers 1, 3, 4, 5,

2    7, and 9.

3        We do not object to questions specifically related

4    to the ad in question in Number 2, which we believe is

5    encompassed in Number 2.

6        We do not object to the extent to which Number 6

7    is involved in -- in questions related to contributions

8    or expenditures for the ad in question.

9        We do object to questions beyond that, including

10    the identity of any donors.

11        And we do not object to questions related to 8, as

12    long as they're not asking for legal conclusions of the

13    witness, they're asking for factual matters that would

14    relate to that criteria, we do not object to that.

15        And I would ask -- and we of course had this

16    discussion prior to the deposition that we stipulate

17    that these objections are, you know, ongoing so we do

18    not have to interpose them to each question.

19        And we intend to have the witness to answer those

20    questions even though we believe they're objectionable.

21    And if we have any specific question -- objections go

22    beyond this, of course, we would make those at that

23    time.

24        So if that is agreeable to you, then that's the

25    way we'd proceed.

12

1          MR. SUMMERS:  That is agreeable.  We'll

2      stipulate to that, and we appreciate that.

3   Q   (By Mr. Summers)  Mr. Heath, if I could direct your

4      attention to what's been marked as Exhibit 1.  And if

5      you could turn to Section 9 of that exhibit.  Is this

6      exhibit the current bylaws of CCL?

7   A   Yes.

8   Q   And is Paragraph 9 an accurate description of your

9      duties as executive director today?

10  A   Yes.

11  Q   Mr. Heath, you were a Republican nominee for the Maine

12      House of Representatives in 1992; is that correct?

13  A   Yes.

14  Q   Have you made any other bids for government office?

15  A   No.

16  Q   Okay.  Have you worked on any other electoral campaigns

17      since then, either paid or volunteer?

18  A   No.

19  Q   Have you held any position in a political party since

20      then?

21  A   No.

22  Q   Okay.  You made reference earlier to the documents

23      produced to the Commission earlier this week.  Is it

24      part of your job to maintain the documents that CCL

25      produced to the Commission earlier this week?

13

1  A   I have a staff member who I delegate that

2      responsibility to.

3  Q   I see.  Were those documents true and correct copies of

4      documents kept in the course of CCL's regular business?

5  A   Yes.

6  Q   Were they made by persons with knowledge of the matters

7      they discuss?

8  A   Yes.

9  Q   And was it the regular practice of CCL to make those

10     documents?

11         MR. BOPP:  I'll be glad to stipulate, they're

12     business records that are admissible.

13         MR. SUMMERS:  Thank you.

14  Q   (By Mr. Summers)  Please answer, anyway, if you would?

15  A   Could you repeat the question?

16  Q   Yes.  Was it the regular practice of CCL to make those

17     documents?

18  A   No.

19  Q   In what way was it not?

20  A   Well, to make those specific documents, we maintain

21     some of those electronically, we produced those in that

22      sequence for this purpose.

23   Q    Maybe I should explain.  To -- was it the regular

24      practice of CCL to create documents like those in

25      whatever medium they were -- they are normally created

14

1    or maintained, whether in a digital version or in a

2    printed version?

3    A    Yes, but not in the -- not in the sequence or --

4    Q    I understand.

5    A    -- organization that was given -- that was provided.

6    Q    I understand.  But in some organization that you may

7    have in the organization itself?

8    A    Yes.

9    Q    Thank you.  Okay.

10    (Mr. Bopp and the witness confer.)

11    Q    (By Mr. Summers)  What is CCL?

12    A    The Christian Civic League is a ministry that was

13    formed in 1897 and which has been active in the state

14    of Maine since that time bringing Christian individuals

15    and churches together to accomplish three purposes.

16    One, to elect honest and competent public

17    officials.

18    Second, to encourage all the people of Maine in

19    good citizenship.

20    And third, to enact good laws and provide for

21    their impartial enforcement.

22   Q   Let me direct your attention once again to what's been

23        marked as Exhibit 1, Section 2.  Section 2 describes

24        the purpose of CCL; correct?

25   A   Uh-huh.

15

1    Q    And I see four purposes there, are those four purposes

2          all still the current purposes of CCL?

3    A    Yes.

4    Q    How does CCL work to elect honest and competent

5          officials?

6    A    The -- that has been a subject of discussion among

7          staff and board for years as a result of the, in part,

8          IRS designations and rules.  Also rules related to

9          electioneering, some of which -- some of which are

10         beyond my -- I don't know them all.  I don't work hard

11         to try to understand what presents itself as an issue.

12              So in recent decades, the Christian Civic League

13         of Maine, which is the name of the founding -- which

14         was the founding name in 1897, has seen that purpose of

15         electing honest and competent public officials become

16         less active in its actions, in its daily actions.

17              That's changing, and we are becoming more active

18         in our efforts related to candidates.  In doing so, we

19         are familiarizing ourselves with contemporary rules and

20         regulations related to that sort of activity.

21              Some of the, from what I've been able to determine

22    in travelling around the state and speaking with our

23    supporters, reason for the election of honest and

24    competent public officials fading into the background

25    is the 501(c)(3) rules that churches operate

16

1    under related to the Internal Revenue Service.

2        And because the Civic League was founded to work

3    with churches, in part, that is a reality within our

4    organization, their concerns related to candidate --

5    related to any statements they might make or actions

6    they might take related to candidate politics.

7        So we are in process regarding that purpose,

8    discussing it.

9    Q    CCL --

10        MR. BOPP:  Just a second.

11        (Mr. Bopp and the witness confer.)

12    Q    (By Mr. Summers)  CCL is a 501(c)(4) organization under

13        the IRS rules; correct?

14    A    Repeat the question.

15    Q    CCL is a 501(c)(4) organization under the IRS law; is

16        that correct?

17    A    Yes.

18    Q    What does CCL -- I understand your prior answer about

19        the CCL's activities with regard to electing officials,

20        my question was directed at what CCL has actually done

21        in the past to -- and say in the last few years, to

22    pursue that goal?

23  A   What goal?

24  Q   The goal of electing honest and competent officials?

25  A   Nothing.

17

1  Q   Nothing.  You've --

2  A   Let me clarify, if what you mean by that is endorsement

3      of candidates or direct organized opposition of a

4      candidate, it hasn't done anything.

5  Q   What has it done?

6  A   It produces a voter guide, which can be viewed online,

7      which involves a questionnaire and a ranking of

8      candidates.

9  Q   And what years has it produced voter guides?

10  A   We began producing them in 2000 -- I don't remember

11      exactly when, but I --

12  Q   If it would help --

13  A   We've been producing them since the date that you

14      requested documents, January 1, 2004.

15  Q   Did you produce one in 2002?

16  A   We may have.

17          MR. SUMMERS:  I'd like to mark another

18      exhibit.

19      (Heath Deposition Exhibit Number 3 was marked for

20      identification.)

21  Q   (By Mr. Summers)  I'll show you what's been marked as

22     Exhibit 3, a document dated 2002 and entitled voter's

23     guide.  Do you recognize this?

24  A   Yes.

25  Q   As the CCL's 2002 voter's guide?

18

1   A   Yes.

2   Q   What's the purpose of the voter's guide?

3   A   To inform our -- well, to inform the public.

4   Q   I'll direct your attention to Page Number 5 of the

5       voter's guide.  At the top of Page 5, there is a

6       listing of several federal candidates; correct?

7   A   Uh-huh.

8   Q   And then over -- and that includes Senator Susan

9       Collins; correct?

10  A   Yes.

11  Q   Then over on the right side of the page, there are

12      what's described as CCL ratings; correct?

13  A   Yes.

14  Q   Can you explain those?

15  A   Page 4, halfway down the page, how we rated the

16      candidates.  Christian Civic League board of directors

17      rated candidates according to their comments and

18      answers to the questionnaire.  Our policy statement was

19      used as a standard to grade the stands of each

20      candidate.  Each candidate running in the November

21      election was sent a questionnaire, and every effort was

22    made to assure the candidates received questionnaires

23    and had ample opportunity to respond.  Followup

24    telephone calls were made when possible.  And the

25    rating of A through F is shown here.

19

1  Q   So what's on Page 4 is an accurate description of how

2     the rating process works in the voter guides for CCL?

3  A   Uh-huh.

4  Q   And is that also how it worked in -- for the -- well,

5     strike that.  Did you also create a voter guide in

6     2004?

7  A   Yes.

8  Q   Was the same rating system used in 2004?

9  A   Yes.

10  Q   Did you also create a voter guide in 2000?

11  A   2000, I don't remember.

12  Q   Do you remember any prior years, whether a guide was

13     created in years prior to 2000?

14  A   None were -- none were created.

15  Q   You're sure that none were created prior to 2000?

16  A   Not during my -- not while I was executive director.

17  Q   Was there a printed version of the 2004 voter's guide?

18  A   I don't remember.

19  Q   Is the 2004 voter's guide available on your web site?

20  A   Yes.

21  Q   Were any federal candidates rated in the 2004 voter's

22    guide?

23  A   I don't remember.

24  Q   Okay.

25        MR. SUMMERS:  We would request a copy of the

20

1      2004 voter's guide if one can be created in hard copy.

2           MR. BOPP:  If you -- the way we need to

3      handle this is not to ask it during the deposition, but

4      if you just make a list, give us a list in writing, and

5      we will do -- we will produce those as promptly as we

6      can, assuming they're not objectionable.

7           MS. SEALANDER:  Is it all right if we make a

8      list on a piece of paper here today and hand it to you

9      on your way out the door?

10          MR. BOPP:  Anything that's in writing, I'll

11     be happy to respond to.

12          MS. SEALANDER:  Handwriting, however -- all

13     right.

14          MR. BOPP:  I trust I can read your writing, I

15     don't know about Harry's, but --

16          MS. SEALANDER:  I will make the list.

17          MR. SUMMERS:  Maybe you've been able to see

18     some of my writing here.

19   Q   (By Mr. Summers)  Was the 2002 voter -- strike that.

20       Where was the 2002 voter's guide distributed?

21   A   Online.  And beyond that, I don't remember.

22   Q   Was there a hard copy version of the 2004 voter's

23       guide?

24   A   I don't remember.

25   Q   Did CCL do anything beyond putting the 2002 voter's

21

1     guide on its web site to transmit the 2002 voter's

2     guide to persons outside of CCL?

3  A   No.

4  Q   Did CCL do anything beyond what you've described to

5     make persons outside of CCL aware that 2002 voter's

6     guide was available on the web site?

7  A   We mentioned it in publications.

8  Q   Which publications?

9  A   The email which was then called the issues summary

10    would have mentioned it.

11  Q   How often does that -- how often did that email -- how

12    often was that email sent?

13  A   Daily.

14  Q   So roughly how many emails mentioned the 2002 voter's

15    guide?

16  A   I don't know.

17  Q   Were the emails mentioning it sent prior to the --

18    prior to the November, 2002, elections?

19  A   Yes.

20  Q   Is there any other way in which the availability of the

21    2002 voter's guide was made known to those outside CCL,

22      other than the emails you've described?

23   A   We may have sent a press release to the media

24      indicating that we produced a voter's guide.

25   Q   Did you -- did CCL mention that the 2002 voter's guide

22

1      existed in any print publications?

2   A   We probably mentioned it in a item -- in a printed

3      publication called The Record.

4   Q   Please describe The Record?

5   A   It's a four page newsletter that is sent to our

6      supporters.

7   Q   How often was that sent in 2002?

8   A   It was -- it changed over the years in frequency, it

9      was either monthly at that time or every other month.

10   Q   Can you think of any other ways in which CCL made those

11      outside of CCL aware of the 2002 voter's guide?

12   A   No.

13   Q   Did CCL use the same methods you've described for the

14      2002 voter's guide in making people aware of the 2004

15      voter's guide being available on CCL's web site?

16   A   Yes.

17   Q   In 2002, did CCL encourage people outside of CCL to

18      print and distribute the voter's guide from the web

19      site?

20   A   Yes.

21   Q   And did that occur in 2004 also?

22   A   Yes.

23   Q   Did CCL encourage people to print and distribute the

24        voter guides through the same methods that it made

25        persons outside CCL aware that they existed through the

23

1    same media?

2    A    Repeat the question.

3    Q    Did CCL encourage people to print and distribute the

4    2002 and 2004 voter's guides through the same media

5    that you've said it used to make people aware that the

6    voter's guides existed on its web site?

7    A    Yes.

8    Q    Can you think of any other ways in which CCL made

9    people outside of CCL aware of the existence of the

10    voter's guides in 2002 and 2004?

11    A    No.

12    Q    Okay.  You've mentioned -- you've described how CCL is

13    considering becoming more active in working to elect

14    good candidates; correct?

15    A    Yes.

16    Q    Does it plan to endorse candidates in the future?

17    A    No.

18    Q    How does it plan to become more active in working to

19    elect good candidates?

20    A    The CCL?

21    Q    Yes.

22   A   It doesn't, if what you mean by the question is

23      endorsement.

24   Q   How does CCL plan to become more active in working to

25      elect good candidates other than endorsement?

24

1   A   Repeat the question.

2   Q   How does CCL plan to become more active in pursuing its

3       purpose of working to elect good candidates other than

4       endorsement?

5   A   It doesn't have any other plans.

6   Q   What is it considering doing in order to become more

7       active in that area?

8   A   Nothing beyond what I've indicated with respect to the

9       voter's guide.

10  Q   You described earlier that CCL was, and correct me if

11      I'm not getting it right, CCL was reviewing the current

12      requirements for organizations engaged in political

13      activity.  Can you explain a little more what the

14      purpose of that -- of that review is if you are not

15      considering becoming more active in pursuing the goal

16      of electing good candidates?

17  A   Can you repeat or rephrase the question?  I'm not sure

18      I understand it.

19  Q   What is the purpose of CCL's review of current

20      requirements about political activity that you've

21      described?

22    A    To practice good citizenship and maintain its

23         operations within the parameters of the law and

24         regulations related to our activities.

25    Q    Has CCL ever stated that it is considering endorsing

25

1    state and local candidates in the future?

2    A    We may have indicated such a thing in relationship to

3        the formation of the political action committee of the

4        Christian Civic League, which is the Christian Action

5        League.

6    Q    Has CCL ever stated that it is considering endorsing

7        federal candidates including in connection with the

8        political action committee that you mentioned?

9    A    No.

10   Q    And I take it there are no plans to endorse federal

11       candidates by CCL?

12   A    None, no.

13   Q    CCL has a worldwide web site; correct?

14   A    Yes.

15   Q    And is the address www.cclmaine.org?

16   A    It is.

17   Q    And the statements on that site are statements of CCL;

18       right?

19   A    Yes.

20   Q    Please describe generally what activities CCL does to

21       achieve its purposes?

22   A   Repeat the question.

23   Q   Please describe generally what activities CCL does to

24       achieve its purposes?

25       (Mr. Bopp and the witness confer.)

26

1              THE WITNESS:  Repeat it.

2    Q    (By Mr. Summers)  What does CCL do, day to day, what

3         does CCL do?

4    A    CCL exists to enact good laws and provide for their

5         impartial enforcement.

6    Q    I understand the purposes of CCL, you've described, but

7         what does it actually do, what does the staff of CCL do

8         day to day in order to pursue those purposes?

9    A    They come to work.  They review daily newspapers.  They

10        receive and track contributions.  They write opinion

11        and commentary.  The staff is responsive to my leading

12        which is responsive to the board's direction.

13   Q    Anything else?

14   A    No.

15   Q    How does CCL communicate with the public?

16   A    Through its web site.  Through its newspaper.  Through

17        media interviews.

18   Q    Does it also communicate through email?

19   A    Yes.

20   Q    How often does it -- please describe how it does that?

21   A    It has an online email -- it has an email that it

22     produces three times a week called The Record.

23  Q   Is that the same Record as is also created as a print

24     publication?

25  A   Different -- same name, different publication.

27

1  Q   Is there any content in common?

2  A   Yes.

3  Q   How much is in common?

4  A   We started the newspaper three months ago.  What was

5     the -- percentage, is that what you said?

6  Q   Yes.

7  A   Less than 20 percent.

8  Q   How often is the print version distributed?

9  A   Monthly.

10  Q   How many people is it currently distributed to, the

11     print version?

12  A   5,000.

13  Q   And how many -- how many recipients are there of the

14     email version of The Record?

15  A   3,000.

16  Q   Does CCL have a radio program?

17  A   No.

18  Q   Does CCL prepare any audio commentary for distribution?

19  A   No.

20  Q   Do you prepare any audio commentary for distribution?

21  A   Yes.

22   Q   Please describe that?

23   A   I produce a daily two minute commentary program called

24       Faith Matters in Maine for the CEL, Christian Education

25       League.

28

1   Q    And what -- what is the basic content of that

2        commentary?

3   A    It addresses political, cultural, moral issues and

4        occasionally discusses candidates or politicians,

5        elected officials and their positions on issues.

6   Q    I believe you mentioned that CCL speaks with media;

7        correct?

8   A    Yes.

9   Q    Does CCL appear in press articles?

10  A    Yes.

11  Q    Are you quoted in press articles?

12  A    Yes.

13  Q    Does that happen often?

14  A    Yes.

15  Q    Have you published columns in newspapers?

16  A    Yes.

17  Q    How many columns have you published in newspapers since

18       the beginning of 2004?

19  A    A dozen.

20  Q    Has CCL run radio or TV ads?

21  A    Has -- I can't speak for all the way back to the

22     beginning of radio and television, but in my tenure,

23     yes.

24   Q   Please describe those in your tenure?

25   A   We've advertised on Christian radio stations for

29

1    events, banquets that we have annually.

2        We've not done any television advertising.

3    Q   Have there been any other radio ads other than the ones

4        you've described by CCL?

5    A   Right.  Not that I remember.

6    Q   Has the Christian Education League placed any radio or

7        TV ads during your tenure?

8    A   No.

9    Q   Okay.  Has CCL published advertisements in newspapers

10       other than its own newspaper?

11   A   I -- print advertisements.

12   Q   When I say advertisement, I include things that discuss

13       policy or political matters -- same question.

14   A   Oh, so --

15   Q   So the question is has CCL placed any advertisements in

16       newspapers other than its own newspaper?

17   A   No.

18   Q   Has it placed any advertisements on web sites other

19       than its own web site?

20   A   I don't -- I don't think so.

21   Q   Who would know?

22    A    The question again was has it placed -- repeat the

23        question.

24    Q    Has it placed any advertisements on web sites other

25        than its own web site?

30

1   A   No.

2   Q   Has it distributed written materials other than The

3       Record that you've described?

4   A   Yes.

5   Q   Please describe those?

6   A   Books on various subjects related to the mission of the

7       League.  Fliers.  Publications related to various

8       events and issues.

9   Q   In what physical form -- what physical form have those

10      materials taken, brochures?

11  A   Brochures, books, magazines.

12  Q   Any others?

13  A   Well, electronic -- electronic media, emails, pdf

14      documents that people can download off the web site.

15  Q   Anything else?

16  A   No.

17  Q   Has CCL used phone banks in your tenure?

18  A   No.

19  Q   Has it used billboards in your tenure?

20  A   Well, that would get me in jail since they're illegal

21      in Maine.  No.

22   Q   Have CCL representatives appeared on television or

23       radio shows?

24   A   Who?

25   Q   Have representatives of CCL appeared on television or

31

1    radio shows?

2  A  Yes.

3  Q  Please describe those appearances?

4  A  We have a lobbyist who is interviewed regularly.  I'm

5    interviewed regularly by radio and television stations

6    on issues.

7  Q  What is the lobbyist's name?

8  A  Tim Russell.

9  Q  How often do you appear on television or radio shows?

10  A  How often, I've done hundreds of media interviews of

11    various kinds.

12  Q  And Mr. Russell?

13  A  He's been with us two years, he has done -- probably

14    he's done hundreds, I've done thousands by this time.

15  Q  Is that -- have you appeared on national television and

16    radio shows?

17  A  Yes.

18  Q  And also on local television radio shows?

19  A  Yes.

20  Q  Has Mr. Russell appeared on national television or

21    radio shows?

22  A   Yes.

23  Q   And he's appeared on local television radio shows I

24      take it?

25  A   Yes.

32

1   Q   Has any other representative of CCL appeared on

2       television or radio shows in your tenure?

3   A   Yes.

4   Q   Who is that?

5   A   The president of our board, Dallas Henry.

6   Q   Anyone else?

7   A   No.

8   Q   CCL does create advertisements as I've described to

9       communicate its policy views to the public; correct?

10  A   Clarify what you mean by advertisements.

11  Q   CCL creates public communications to tell the public

12      what it thinks about policy issues; correct?

13  A   Yes.

14  Q   Who creates those advertisements?

15  A   I do.  And I have staff who work on those --

16  Q   Which staff?

17  A   -- items.

18  Q   Sorry.

19  A   That's it.

20  Q   Which staff work on those now?

21  A   I have a gentleman named Fritz Spencer on my staff who

22    does writing.  I have a young lady named Leslie Gower

23    who works on graphics.  And occasionally, we work with

24    a firm outside of the Christian Civic League on various

25    things.

33

1  Q  What's the name of that firm?

2  A  Design 4 Marketing.

3  Q  Where are they located?

4  A  Florida.

5  Q  Which city in Florida?

6  A  Tampa.

7  Q  And could you spell the surnames of the two people

8    you've named for the court reporter?

9  A  The surname, you mean --

10  Q  The last name?  Fritz and --

11  A  Fritz Spencer and Leslie Gower, G-O-W-E-R.

12  Q  And is that Spencer with a C or an S?

13  A  C.

14  Q  Does anyone else work on CCL's ads?

15  A  No.

16  Q  When did CCL become aware that a federal constitutional

17    amendment about marriage was under consideration in

18    Congress?

19  A  Years ago.

20  Q  Do you recall which year?

21  A  No.

22  Q   Could it have been in 2004?

23  A   Congress, yes.

24  Q   Could it have been later than 2004?

25  A   No.

34

1    Q    Could it have been earlier than 2004?

2    A    I don't know.

3    Q    CCL has spoken publicly about such a proposed

4        amendment; correct?

5    A    Yes.

6    Q    Did it do so in 2004?

7    A    Yes.

8    Q    Okay.  In those public communications -- strike that.

9        Would you describe those public communications in 2004

10        as grass roots lobbying?

11    A    Yes.

12    Q    Who at CCL made the decision to do that activity in

13        2004?

14    A    Me.

15    Q    All right.  I'd like to explore some of the ways in

16        which CCL has communicated on that issue since 2004.

17        Has CCL used the internet to communicate about that

18        issue since 2004?

19    A    Yes.

20    Q    Can you briefly describe those efforts using the

21        internet?

22   A   We've written about the federal marriage amendment in

23       The Record that I mentioned before.  And I believe --

24       and in 2004, there was an effort to influence our

25       senators on this -- on the federal marriage amendment.

35

1    Q    Can you describe that effort in more detail?

2    A    We designed a church bulletin insert, and we had a

3        young lady make phone calls and encourage citizens to

4        contact our senators and urge them to support the

5        federal marriage amendment.

6    Q    The -- how was the church insert distributed?

7    A    We mailed copies if they were requested, and we made

8        them available as printouts off of our web site.

9    Q    How many were distributed by CCL?

10   A    Yeah, I -- I have no idea.  I don't know.

11   Q    How many calls did the young lady you've described make

12       in 2004?

13   A    I don't know.

14   Q    Can you think of any other ways in which CCL

15       communicated its view in 2004 on that issue?

16   A    No.

17   Q    Did CCL organize public protests about the issue, by

18       which I mean encouraging people to gather together

19       physically to express a view about the federal marriage

20       amendment?

21   A    I don't remember.

22   Q   Did CCL distribute brochures other than the church

23       inserts that you've mentioned in 2004 about the issue?

24   A   Not that I recall.

25   Q   Okay.

36

1          MR. SUMMERS:  I'd like to mark another

2     exhibit.  Off the record.

3     (Recess at 10:56 a.m., to 11:03 a.m., after which the

4     following proceedings transpired.)

5          MR. SUMMERS:  I'd like to have another

6     exhibit marked.

7     (Heath Deposition Exhibit Number 4 was marked for

8     identification.)

9   Q    (By Mr. Summers)  Show you what's been marked as

10     Exhibit 4, which appears to be a copy of a March 1,

11     2004, column called Coalition for Marriage, which says

12     it was published in the Portland Press Herald on that

13     date.  Do you recognize this column?

14   A   Yes.

15   Q   Is that a column that you wrote?

16   A   Yes.

17   Q   Was it published in that newspaper on that date?

18   A   Yes.

19   Q   Do you think that this column was effective in

20     conveying CCL's message about the issue of gay

21     marriage?

22   A   Yes.

23   Q   Can you recall any other columns that you -- that CCL

24       published in the print press in 2004 about the gay

25       marriage issue?

37

1   A   No.

2   Q   Were any CCL personnel quoted in news pieces in 2004 on

3        the gay marriage issue?

4   A   Yes.

5   Q   Can you describe that?

6   A   I'm sure that I was quoted and probably Tim Russell was

7        quoted.

8   Q   How many press pieces would you say you and Tim Russell

9        were quoted in in 2004 on that issue?

10  A   I have -- I don't know.

11  Q   Was it more than 10?

12  A   Yes.

13  Q   More than 50?

14  A   I don't know.

15  Q   Okay.

16          MR. SUMMERS:  I'd like to mark another

17       exhibit.

18       (Heath Deposition Exhibit Number 5 was marked for

19       identification.)

20  Q   (By Mr. Summers)  Please review what's been marked as

21       Exhibit Number 5, which is a reprint of an article

22      dated July 13, 2004, from the Portland Press Herald.

23          Please turn to the second page and find the

24      paragraph which begins executive director Michael

25      Heath, which is in the bottom half.  And please review

38

1    that paragraph and the following two paragraphs.

2        Are those three paragraphs an accurate account of

3    what CCL and its members were doing at that time with

4    regard to the federal marriage -- excuse me, federal

5    marriage amendment?

6    A   Yes.

7    Q   Did you speak with the reporter of -- who wrote this

8    article --

9    A   Yes.

10   Q   -- on this issue?  In the article, you're quoted as

11   saying that your members have been calling and emailing

12   their senators; correct?

13   A   Yes.

14   Q   How did CCL get its members to do that?

15   A   We assigned a full-time staffer to make phone calls and

16   provide bulletin -- church bulletin inserts to churches

17   that were responsive.

18   Q   So it used the methods that you described earlier?

19   A   Yes.

20   Q   Did it use any other methods to encourage supporters to

21   contact the senators?

22   A   No.

23   Q   Were those effective ways of achieving your goals?

24   A   Yes.

25   Q   The article also says that you wrote a column that

39

1       appeared in this same paper the preceding week which

2       would have still been in July; correct?

3    A   Yeah.  Yes.

4    Q   Is it correct that that column was published the

5       preceding week before this article, or is it the one

6       from March that I believe we've marked as Exhibit 4?

7    A   I don't remember.

8    Q   It's possible there was more than one column?

9    A   It's possible.

10   Q   Okay.  Did any CCL representative appear on any radio

11      or TV shows in 2004 on this issue?

12   A   I don't remember.

13   Q   Did CCL place any print advertisements or

14      communications on this issue in 2004?

15   A   No.

16          MR. SUMMERS:  I'd like to mark another

17      exhibit.

18      (Heath Deposition Exhibit Number 6 was marked for

19      identification.)

20   Q   (By Mr. Summers)  Please review what's been marked as

21      Exhibit 6, which is an undated one page document with

22      the heading, A Politician Fears Man?

23   A   Yes.  We published this, and I had forgotten about it.

24   Q   Where was this published?

25   A   I believe it was published in the Kennebec Journal,

40

1    which is a daily newspaper in Augusta.

2    Q    Anywhere else that you can recall?

3    A    No.

4    Q    When was it published?

5    A    I don't remember.

6    Q    Do you think it was in 2004?

7    A    I do.

8    Q    What was the purpose of the advertisement?

9    A    To support marriage and to point people to our online

10    voter's guide.

11    Q    And what's the link between supporting marriage and

12    pointing them to the online voter's guide?

13    A    In general, it's -- it was political.  The ad was

14    political, and the ad must -- I don't know exactly when

15    it ran, but it must have run prior to the election, and

16    so we decided to include mention of our voter's guide.

17    Q    In 2004?  The election in 2004?

18    A    As I said, I think so, but I can't remember.

19    Q    Okay.  Is it that you wanted voters to bear in mind

20    your position on this issue when they were voting?

21    A    Yes.

22  Q   And part of that would have been the information listed

23      in the voter's guide about different candidates and

24      their positions on this issue?

25  A   Yes.

41

1   Q   Who created this ad?

2   A   This ad was created by Design 4.

3   Q   And that's the firm in Florida that you mentioned

4       earlier?

5   A   Yes.

6   Q   Do you think this ad was effective in conveying CCL's

7       position on this issue?

8   A   Yes.

9   Q   Did CCL use direct mail in 2004 other than the church

10      inserts that you've described on this issue?

11  A   We may have mailed our membership -- mailed our

12      supporters and our membership.

13  Q   Roughly what was the size of your membership in 2004?

14  A   2,500.

15  Q   And what roughly is the size of your membership today?

16  A   Same.

17  Q   And was it the same in 2005?

18  A   And I'm -- we -- membership -- we define membership so

19      that actual membership is 300.  Around 300,

20      approximately, 300 members of CCL.

21  Q   You say you've designed it, can you explain what that

22     means?

23   A   Well, a member.  We have approximately 300 members.

24   Q   And the other people --

25   A   Are supporters.

42

1    Q    Supporters.  How do you define a member for CCL?

2    A    A member pays annual dues and signs a form that we

3         provide to them.  We maintain the form in our files.

4         They only have to sign it once.  And then they have to

5         pay their dues annually.

6    Q    Just generally, what does the form involve?

7    A    It's a doctrinal statement, a religious doctrinal

8         statement.

9    Q    And how are the supporters -- the supporters don't sign

10        that form?

11   A    That is correct.

12   Q    That is, the people who are not members?  But they are

13        people who have given money to the organization?

14   A    Maybe.  Some have, some haven't.

15   Q    Okay.  Are some of the members -- strike that.  What

16        types of entities are your members, individuals,

17        churches?

18   A    Individuals and churches.

19   Q    Any other types?

20   A    Not that we identify, not that we keep track of.

21   Q    So it's possible there's another type?

22   A   Well, it's not possible there's another type that we

23       keep track of.

24   Q   But if you're not sure -- if you're not sure that it's

25       only individuals and churches, isn't it possible

43

1      there's some other type of member such as another

2      501(c)(4) organization?

3   A   Yes, but we wouldn't recognize them in membership as

4      another (c)(4) organization, we would recognize -- they

5      would come in as an individual member or a family

6      member or a church member.  There's no business member.

7      There's no 501(c)(4) member.

8   Q   How does someone get on your list of supporters, the

9      larger list?

10   A   Variety of ways.  They have involved themselves in a

11      campaign perhaps.  They have indicated to me personally

12      that they would like to be on our mailing list.

13         They have indicated such to a board member.  They

14      have been on the list for -- two -- I think it's two

15      years.

16         Actually, let me correct that.  The number I gave

17      you, which is 2,500, references only those who have

18      given any money in the last two years and have made a

19      donation in the last two years.  We have a much larger

20      list that we don't use that we never mail to, but we

21      maintain those names and addresses.

22   Q   What do you do with the larger list?

23   A   Nothing.  It sits there.

24   Q   Do you have a sense of how large that list is?

25   A   8,000, approximately.

44

1  Q   And to get on that list, what are the likely ways other

2      than the ones you've described?

3  A   Well, they indicated some interest in our mission or

4      were entered for the reasons I've mentioned.  And then

5      they become part of the group, the inactive group above

6      2,500 by not contributing, by not making a contribution

7      for two years.

8  Q   But it's only the medium size list of roughly 2,500

9      that receives the mailings; correct?

10 A   Yes.

11 Q   So why do you maintain the larger list?

12 A   We may decide to use it at some point.  We may decide

13     to communicate with that list.

14 Q   Has CCL run any radio or TV ads about the federal

15     marriage amendment from 2004 until today?

16 A   Not that I recall.

17 Q   Okay.  Can you think of any other ways that CCL has

18     spoken publicly about the federal marriage amendment

19     from 2004 until today other than what we've discussed?

20 A   No.

21 Q   Okay.

22          MR. SUMMERS:  I'd like to mark another

23     exhibit.

24     (Heath Deposition Exhibit Number 7 was marked for

25     identification.)

45

1   Q    (By Mr. Summers)  I'll show you what's been marked as

2       Exhibit 7, which is the complaint in this lawsuit,

3       which it says was verified by you on March 28, 2006.

4           And you -- if you'd turn to Paragraph 11, please,

5       which I believe is on Page 3.  That paragraph says that

6       CCL plans to run the radio ad that's attached as

7       Exhibit A to the complaint; is that correct?

8   A   Yes.

9   Q    And that ad is called Crossroads; correct?

10  A   Yes.

11  Q    Is it still CCL's plan today to run that radio ad?

12  A   Yes.

13  Q    When did CCL decide to run a broadcast ad about the

14      federal marriage amendment this year?

15  A   We decided to run the ad a couple of weeks ago.

16  Q    Who first had the idea for CCL to run such an ad?

17  A   We were contacted by the organization that we associate

18      with called Focus on the Family, Colorado Springs,

19      Colorado.

20          And the -- it was suggested that this would be an

21      appropriate grass roots lobbying, appropriate and

22     effective grass roots lobbying effort.  I agreed.  And

23     I communicated my agreement with them.

24  Q   Who at Focus on the Family did you communicate with

25     about it?

46

1    A    I believe it was John Paulton.

2    Q    Could you spell that last name?

3    A    P-A-U-L-T-O-N.

4    Q    Did you talk to anybody else at Focus on the Family

5         about it?

6    A    No.

7    Q    So Focus on the Family sent the text of the ad to CCL a

8         couple weeks ago?

9    A    No.  The Focus on the Family developed the text of the

10        ad after learning of my agreement or learning of my --

11        after I responded to them.

12    Q    So when they first contacted you, what did they

13         communicate?

14    A    They communicated that this would be an appropriate

15        grass roots lobbying activity.

16    Q    And then you indicated your agreement, and then at some

17        later point, they sent back the ad text, proposed ad

18        text?

19    A    Yes.

20    Q    I see.  Do you know who drafted that text?

21    A    I don't.

22   Q   Okay.  Do you know who was involved in drafting it?

23   A   I don't.

24   Q   Can you explain what you mean by appropriate grass

25       roots lobbying effort?

47

1    A    Well, the federal marriage amendment is due to be voted

2         in July, and -- in Congress.  And it is appropriate to,

3         given the stand of Senators Snowe and Collins, for

4         citizens to be advised of that fact, and to be urged to

5         contact Senators Snowe and Collins, and urge them to

6         vote in the affirmative for the federal marriage

7         amendment.  And that should happen -- that should start

8         happening soon and continue into July or toward July or

9         toward the vote.

10   Q    Why does it have to start soon?

11   A    Well, because these things take -- campaigns take time

12        to work their way through the grass roots networks, and

13        so it's good to get people thinking about, talking

14        about, and contacting political figures like Senators

15        Snowe and Collins as they're moving toward the vote.

16   Q    So when you say appropriate, what does that -- what

17        does that include?

18   A    Can you --

19   Q    What is the ad trying to do?

20   A    It is encouraging the listener to contact their

21        senator.

22   Q   Does it have any other purpose?

23   A   No.

24   Q   Do you know where Focus on the Family got the idea for

25        these ads?

48

1    A    No.

2    Q    Do you know if they're sending them to other states for

3        use in other states?

4    A    I don't know.

5    Q    Do you know if they've sent them for use by other

6        groups in Maine?

7    A    I don't know.

8    Q    In your discussion with Focus on the Family about this

9        ad, did you discuss the -- did you discuss campaign

10        finance regulation?

11    A    Can you rephrase the question?

12    Q    In your discussion with Focus on the Family about this

13        ad, was there any discussion of campaign finance

14        regulation?

15    A    Can you be more specific about campaign finance

16        regulation?

17    Q    Yes.  Was there any discussion of the electioneering

18        communication regulation and federal law?

19    A    Yes.

20    Q    Can you describe that?

21    A    That it's -- that this is prohibited speech or prior --

22    within a certain window before an election, and Maine's

23    primary is in June, early June.  And so our desire to

24    run the ad consistent -- in -- to run the ad at a time

25    that makes sense in order to influence Senators Snowe

49

1     and Collins with respect to a pending vote scheduled

2     for July is interfered with by the -- by the blockout

3     period 30 days prior to June.  So that was -- that was

4     presented by Focus in good faith indicating that this

5     is the way it is.

6   Q   So Focus brought you the idea, and in bringing you the

7     idea, they also mentioned there was this legal issue as

8     well?

9   A   Yes.

10   Q   So that's something that came from them?

11   A   Yes.

12   Q   So they suggested that you run the ad even though there

13     was this legal issue?

14   A   Yes.  No.  I mean they didn't encourage us to do

15     something illegal, they advised -- they advised us of

16     the law.  And they said that the -- and they suggested

17     that the grass roots advertising would be helpful in

18     influencing senators.

19   Q   Did they suggest any way that you could run the ad

20     during the period you've described and not face a legal

21     problem?

22   A   They -- they said that we should contact them if we

23        want to run the ad.  And then we were -- we were put in

24        touch with counsel who is counsel for Focus on the

25        Family and for us.  And here we are.

50

1  Q   Can you think of anything else that Focus on the Family

2       told you during those discussions about running the ad?

3  A   No.

4  Q   Just to finish up this topic, did they -- did Focus on

5       the Family offer you any funding to assist with running

6       the ad?

7  A   No.

8  Q   Did they offer you any other kind of assistance other

9       than supplying a text for the ad?

10  A   No.

11  Q   You mentioned that they offered to put you in touch

12       with counsel?

13  A   Uh-huh.

14  Q   Correct?

15  A   Uh-huh.

16  Q   Can you think of any other -- were there any other

17       names they gave you of persons who might be of

18       assistance in connection with running the ad?

19  A   Can you rephrase the question?

20  Q   Did they offer to put you in touch with anyone else

21       other than counsel with regard to the ad?

22    A    No.

23    Q    Did they offer you a list of potential funders of the

24        ad?

25    A    No.

51

1   Q   Did they offer you any assistance in producing the ad?

2   A   They researched the buy, the schedule.

3   Q   The buy here in Maine?

4   A   Yes.

5   Q   And what -- can you describe more about that research?

6   A   I have not seen the detail.  The buy is planned for

7       radio stations in Portland and Augusta.  And we

8       don't -- we haven't decided on a final cost for the

9       buy, but they have produced some -- they've produced

10       some information related to overall costs, but I have

11       not had an opportunity to review it.

12   Q   But you have that information?

13   A   I don't have it here.

14   Q   I understand.  But CCL has that information?

15   A   I don't know if we have it in our offices yet.  I don't

16       know.

17   Q   But Focus on the Family has indicated that they will

18       provide it?

19   A   Yes.

20   Q   But the money to run the ad is planned to come solely

21       from CCL?

22  A   Yes.

23  Q   Has the actual recording of the ad been created?

24  A   No.

25  Q   Do you have specific plans to create it?

52

1  A   We have not gotten to the point of making those plans.

2  Q   How much money has CCL spent so far on the ad?

3  A   Nothing.

4  Q   Nothing.  The complaint in Paragraph 11 describes a

5      specific period that CCL plans to run the Crossroads

6      ad, and I believe it indicates that CCL plans to start

7      running the ad on May 10; is that correct?

8  A   Uh-huh.

9  Q   Why start running the ad on May 10, if the vote may not

10      be until you said July?

11  A   Uh-huh.

12  Q   Why start running the ad on May 10?

13  A   Well, it's an appropriate time to start introducing the

14      upcoming vote and to encourage our members and the

15      public to contact Senators Snowe and Collins and take a

16      position.

17  Q   Do you know how often the ad is planned to run on the

18      two -- in the two markets that you described?

19  A   I don't.

20  Q   Do you know how many stations the ad is planned to run

21      on in those two markets?

22    A    I don't.

23    Q    Are those decisions that you will make at a later time?

24    A    Yes.

25    Q    Will anyone else be involved in making those decisions?

53

1   A   I'll be responsible for the decision, but I will

2       consult with the board president perhaps.  Well,

3       definitely, and -- at least him.

4   Q   Will you consult Focus on the Family?

5   A   I don't know.

6   Q   Will you consult anyone else?

7   A   No.

8   Q   So you haven't spoken -- CCL has not spoken with any

9       radio stations yet about running the ad?

10  A   No.

11  Q   But the information about where the ad will run is

12      coming from Focus on the Family?

13  A   The proposal is coming -- is coming from them.

14  Q   I understand.  Will CCL stop running the ad once the

15      vote that is -- that may occur in Congress on the

16      marriage amendment happens?

17  A   Yes.  But Congress does all kinds of things.  So you

18      say the vote, the vote on what, so --

19  Q   The vote referenced in the Crossroads ad?

20  A   Yes.

21  Q   If the vote is postponed, will CCL postpone running the

22      ad?

23    A   I don't know.

24    Q   We're almost ready to break for lunch, so just one or

25      two things.

54

1          Do you know how much CCL plans to spend to

2      broadcast Crossroads?

3  A   No.

4  Q   Does CCL currently have the funds to do it?

5  A   No.  But we have -- I have one donor who has committed

6      the funds if -- they've committed the funds, but I

7      haven't decided whether I will go to that donor to

8      fulfill that commitment or not.

9  Q   The donor has pledged to cover whatever the cost is, or

10      is there a specific number?

11  A   Donor was unclear, but my interpretation of it is that

12      they would cover the entire buy, if necessary.

13  Q   Okay.

14  A   They may.

15  Q   Okay.

16          MR. SUMMERS:  I think that's all I have for

17      now, we can go to lunch.  Thank you.

18      (Recess at 11:40 a.m., to 1:30 p.m., after which the

19      following proceedings transpired.)

20  Q   (By Mr. Summers)  Mr. Heath, when we broke for lunch,

21      we were talking about the interactions that CCL has had

22     with Focus on the Family about the Crossroads ad.

23         Before we leave that topic, I want to make sure

24     I've heard everything about those interactions.  Maybe

25     the best way to do that is to start with the first

55

1     contact that you had with Mr. Paulton?

2   A    Uh-huh.

3   Q    And ask you to describe everything that was said in

4        that contact?

5   A    Uh-huh.  First let me say that I got something wrong in

6        the morning, and that was the expected time when the

7        Congress will take up the -- will vote on the -- I said

8        July.  And it's June.  And that was just a -- I just --

9        I wasn't thinking right.

10        So it's John -- it was -- came to me in the form

11       of an email that was a broadcast email to myself and

12       all my colleagues in the country who work at the state

13       level in organizations called Family Policy Councils.

14       And I was -- I responded to that email with an email

15       and said that I was -- said that I was interested.

16   Q    What did the initial email say?

17   A    Nothing different from what I indicated in the morning.

18       It discussed the upcoming vote and the suggestion that

19       advertising would be appropriate to encourage grass

20       roots activism, appropriate and helpful, but

21       nevertheless, barred during this window.  It mentioned

22     that as well.  And sought a response from Family Policy

23     Councils that were interested in doing such

24     advertising.

25   Q   How many recipients were there for that email?

56

1   A   I don't know exactly, but in excess of 30.

2   Q   And in various states?

3   A   Yes.

4   Q   Do you know if there are any others in Maine?

5   A   There are not.

6   Q   There are not.  And can you think of anything else that

7       that email said?

8   A   I can't.

9   Q   And in your response, you said your response indicated

10      an interest, what else did you say in your response?

11   A   It was very short, I said I'm interested.

12   Q   What happened next?

13   A   We were -- we were in contact with John, and then

14      counsel became involved because of the aspect of the

15      email having to do with the blackout period.  And then

16      we proceeded toward the development of script and

17      research regarding the buy and began our plan, began

18      our planning.

19   Q   Did you then have a number of interactions with

20      Mr. Paulton?

21   A   No.

22   Q   How many would you say?

23   A   Just that original email, a response to that email, and

24       then I have a staff, and my -- they were involved.  And

25       we consulted with counsel, and we consulted with Focus,

57

1    and leading up to.

2    Q    Who else on your staff was involved in any dealing with

3        Mr. Paulton?

4    A    Nobody.

5    Q    How were they involved in the process then?

6    A    They got involved later as it -- as it became clear

7        that we were going to have to -- as this process began

8        related to the blackout period, producing documents,

9        preparing documents, getting that material together.

10    Q    What else did Mr. Paulton tell you about the

11        electioneering communications period that you've

12        described?

13    A    Nothing.

14    Q    All he said was this is a problem?

15    A    I never spoke with him orally.  I -- just email.

16    Q    Right.  What did he tell you in any form about --

17    A    Just the email, just that original email.

18    Q    Did he mention that there might be a court case about

19        it?

20    A    I don't remember if that was contained in the email or

21        not.

22    Q    Did he say that at any point?  Did he tell you that at

23        any point?

24    A    No.

25    Q    By email or otherwise?

58

1    A    I don't know.

2    Q    So you only had communications with Mr. Paulton on this

3         issue by email?

4    A    In the initial phase, yes.

5    Q    Well, when did the initial phase end and a later phase

6         begin?

7    A    We received the email.  I responded to the email in the

8         affirmative.  I don't remember how many days lapsed,

9         but then I spoke with counsel in reference to the

10        blackout aspect of the original email.

11            And then script development was ongoing at Focus.

12        This of course happened in the last two weeks, I

13        believe.  And that -- and shortly after that staff

14        became involved.

15   Q    So in that later phase, did you speak orally with

16        Mr. Paulton?

17   A    No.

18   Q    Still only by email?

19   A    I had no further need for correspondence with

20        Mr. Paulton.

21   Q    So after -- after you replied by email expressing

22     interest?

23  A   Uh-huh.

24  Q   You're saying you had no further correspondence with

25     Mr. Paulton?

59

1  A   Correct.

2  Q   Did Mr. Paulton communicate with anyone else at CCL?

3  A   I don't know.

4  Q   But at some point a text of the Crossroads ad arrived

5       at CCL?

6  A   Uh-huh.

7  Q   Do you remember when that was?

8  A   I don't remember exactly.

9  Q   Do you remember from whom that text came?

10  A   I don't know.

11  Q   But it was someone at Focus on the Family?

12  A   Yes.

13  Q   And someone at CCL received it?

14  A   My operations director, Natalie Torgeson, was involved

15      at that point.

16  Q   Did anything come with the text of the ad at that

17      point?

18  A   I don't know.

19  Q   Were there any other communications from Focus on the

20      Family about the ad after that?

21  A   I don't know because those communications may or may

22    not have happened between my operations director and

23    Focus.

24  Q   And what is her full name?

25  A   Natalie Torgeson.

60

1  Q    Torgeson, can you spell the last name?

2  A    T-O-R-G-E-S-O-N.

3  Q    Thank you.  Has -- have there been any communications

4        with Focus on the Family between the time the ad was --

5        arrived at CCL and today?

6  A    No.

7  Q    Is it possible there were communications between

8        someone else at CCL and Focus on the Family during that

9        time?

10  A    No.

11  Q    Are you aware of any other versions of the Crossroads

12        ad that CCL has received?

13  A    No.

14  Q    Did anyone at CCL express a view about the text of the

15        Crossroads ad after it was received to Focus on the

16        Family?

17  A    No.

18  Q    Did anyone at CCL express a view on the ad to anyone

19        else other than counsel?

20  A    Repeat the question.

21  Q    Did anyone at CCL say anything else about the ad to

22      someone other than Focus on the Family or counsel?

23   A   I don't know.

24   Q   Did you discuss the text of the ad with anyone else

25      outside CCL or counsel?

61

1  A   No.

2  Q   Did Focus on the Family offer to help with the

3      recording of the ad?

4  A   No.

5  Q   I want to talk briefly about the timing to make sure I

6      have that correct.

7          I believe you've -- you've said that CCL believes

8      May 10 is an appropriate time to begin running the ad;

9      correct?

10  A   Yes.

11  Q   Would April 10th also be an appropriate time to begin

12     running the ad?

13  A   No.

14  Q   Why not?

15  A   It's too soon.

16  Q   Too soon for what?

17  A   Well, given the fact that the vote is coming in June,

18     it's most appropriate to run it beginning in May.

19  Q   And so I believe you've indicated that Focus on the

20     Family told you that May 10 would be an appropriate

21     date?  Did I have that correct?

22    A    I don't recall saying that.  They may have recommended

23         that.  I'm not certain.

24    Q    You're not sure who came up with the May 10th date?

25    A    People discussed the email that was sent by Focus on

62

1    the Family, made a suggestion in reference to the

2    June -- the upcoming June vote on the FMA, and

3    discussions ensued about what would be an appropriate

4    date to begin.  And May 10 was settled on.

5  Q    So would June 15th be an appropriate date?

6  A    June 15th?

7  Q    15th to run the ad?

8  A    Not if the vote is June 1st.

9  Q    But if the vote were to be postponed until July,

10    when -- let's say the vote was postponed until

11    July 15th, when do you think would be an appropriate

12    day to start running the ad?

13  A    I would have to consider the circumstances.

14  Q    And if the vote is postponed until July 15th, do you

15    have any plan to run the ad on a different start date,

16    different than May 10th?

17  A    No.

18  Q    If the vote were to be held on the last day of July,

19    would you -- do you have any plan to start the ad on a

20    different date?

21  A    No, I don't -- I don't have such a plan at this time.

22   Q    Would that be appropriate to make later the start date

23        if the vote -- if you knew the vote were to occur on

24        the last day in July?

25   A    Maybe.

63

1  Q    What factors would go into that decision?

2  A    Not -- realities in Washington, D.C., decisions that

3       may or may not be made that I can't predict at this

4       time.  Or we're basing our time table now on a decision

5       to hold a vote that was made by a high ranking official

6       who has authority in the matter of setting the date.

7            And what that individual may choose to do or not

8       do, I can't predict.  And for what reasons he would

9       choose to do those things, I can't predict.  And so

10      what we might choose to do with respect to grass roots

11      lobbying related to Senators Snowe and Collins and

12      timing, I can't predict.

13 Q    The current plan is to start running the ad less than a

14      month before the scheduled vote; correct?

15 A  Uh-huh.

16 Q    You've indicated that starting in advance of that --

17 A  Uh-huh.

18 Q    -- would not be effective in your view?

19 A  Uh-huh.

20 Q    Correct?  So if the vote were to be moved to the end of

21      July, wouldn't it be appropriate to start running the

22      ad at the beginning of July?

23   A    Repeat the question.

24   Q    If the vote were to be moved until the end of July,

25      wouldn't it be appropriate to start running the ad at

64

1    the beginning of July?

2    A   Maybe.

3    Q   Is there any reason the analysis would be different if

4        that one month period were the month of July versus the

5        current one month period of May 10 through June 5?

6    A   Sure.

7    Q   What's different?

8    A   I don't know what could develop related to the timing.

9    Q   So you can't think of any reason why it would be

10       different today?

11   A   Rephrase the question.

12   Q   You can't think of any reason why the analysis about

13       when to run the ad would be different; correct?

14   A   I still don't --

15   Q   We've put -- we've proposed two periods, right, one is

16       the current period in let's say the month before the

17       scheduled vote in June; correct?

18   A   Uh-huh.

19   Q   I'm proposing another period, if the vote were to be

20       postponed until the end of July?

21   A   Uh-huh.

22   Q   And my question is, why wouldn't it be appropriate,

23      just as appropriate for you to start running the

24      Crossroads ad at the beginning of July because that

25      would be about the same distance before the

65

1    beginning -- before the vote?

2  A   Well, it may or may not be appropriate to do that.

3  Q   So you have no plans to change the start date for the

4     ad running based on a postponement of the vote if that

5     were to occur?

6  A   None.  I have no plans to change the date.

7  Q   Is it possible that you would change the date?

8  A   Yes.

9  Q   Okay.  Can you think -- strike that.  Did anyone at

10    Focus on the Family give you any other information that

11    we haven't discussed about the Crossroads ad from the

12    initial contact until today?

13  A   No.

14  Q   Did they give you any other information about the

15    timing of the Crossroads ad, the timing that it would

16    be run that we haven't discussed?

17  A   No.

18  Q   Did they give you any other information about how the

19    ad would be created that we haven't discussed?

20  A   No.

21  Q   You've mentioned a potential donor to get CCL the funds

22      to run the ad, how did that donor learn about the ad?

23   A  I told him about it.

24   Q  When were those discussions?

25   A  I told him about it this morning.

66

1  Q   Did you discuss it with this potential donor before

2      today?

3  A   No.

4  Q   Please describe those discussions?

5  A   It was over breakfast, and we were discussing the case.

6      And the donor offered to -- made a not a detailed

7      commitment with respect to an amount, but made a

8      commitment to be helpful.

9  Q   Did the donor say anything else about being helpful?

10 A   I --

11 Q   Did the donor say any specific way in which the donor

12     might be helpful in running the ad?

13 A   No.

14 Q   Did you ask the donor to do anything specifically?

15 A   No, I didn't even ask for a donation.

16 Q   You didn't mention a specific amount?

17 A   We discussed -- we discussed what such a campaign might

18     cost because I don't have -- I haven't -- I don't have

19     detailed information regarding that information.  But

20     that was -- that was what we discussed.

21 Q   Did you discuss the purpose of running the ad?

22   A   Yes.

23   Q   What did you tell the donor the purpose of running the

24       ad was?

25   A   To influence Senator Snowe and Senator Collins to vote

67

1    yes for the -- to support the federal marriage

2    amendment.

3  Q   Did you mention any other reasons for running the ad?

4  A   We discussed this case, and the fact that it's

5    happening and shared with them what this case is about.

6  Q   Did you -- what was the donor's reaction to that?

7  A   They were interested.

8  Q   Interested in what way?

9  A   Interested in the case, interested in the grass roots

10    lobbying, interested in the federal marriage amendment,

11    interested in the Christian Civic League.

12  Q   So if I understand, you did discuss a specific amount

13    of money that might be needed to run the ad?

14  A   No.

15  Q   Did you discuss a range of figures?

16  A   Yes.

17  Q   What was that range of figures?

18  A   We've since learned because we have more detailed

19    information that we were inaccurate maybe, but five to

20    $10,000.

21  Q   You've referred to earlier information, where did that

22    information come from?

23    A    Focus on the Family research regarding the buy.

24    Q    Okay.

25    A    Which --

68

1   Q   And how much did that research indicate that the buy

2       would cost?

3   A   $3,500.

4   Q   I see.  And did the new research come from Focus on the

5       Family also?

6   A   Yes.

7   Q   And when did that new research come?

8   A   I found out about it this morning.

9   Q   Okay.

10  A   I got that particular detail this morning, of $3,500.

11  Q   Okay.  Who was at the -- this meeting this morning with

12      you and the donor?

13  A   Counsel.

14  Q   Counsel.  Anyone else?

15  A   No.

16  Q   Has this donor ever given money to CCL in the past?

17  A   Yes.

18  Q   Please describe those donations in terms of time and

19      amount?

20  A   I -- they've donated to the League a number of times.

21      And I don't know the exact times or amounts.  They're

22      in writing, but I don't have them committed to memory.

23    Q    Did it start more than five years ago, their donations?

24    A    Yes.

25    Q    Okay.  Did you and the donor discuss a time frame for

69

1    determining whether the donor will support the running

2    of the ad?

3  A   No.

4  Q   Do you plan to be in touch about the ad in the future?

5  A   I haven't decided.

6  Q   Do you have other potential donors --

7  A   Yes.

8  Q   -- to support the ad?

9  A   Yes.

10  Q   How many?

11  A   Probably possibilities, 1,500.

12  Q   1,500 donors?

13  A   Possibilities, if I decide to direct mail and tell them

14    about the possibility, invite them to donate.

15  Q   Would that be direct mail to people on your supporters

16    list that you've described?

17  A   Yes.

18  Q   Is there any other -- do you have any other donor in

19    mind who would be a large donor similar to the donor

20    you met with today?

21  A   Yes.

22  Q    And how many -- how many other large donors do you have

23       in mind who might support the ad?

24  A    At least a half dozen.

25  Q    Have you had any discussions with any of those --

70

1    A    No.

2    Q    -- persons?  Just a few more on this area.  In order to

3         start running the ad on May 10, when would CCL need to

4         have the funding?

5    A    The -- a few days before the start date.

6    Q    Would that include the funding for recording the ad?

7    A    No.

8    Q    Is the recording of the ad included within the figure

9         you gave earlier of the range?

10   A    No.  No, it isn't.

11   Q    Do you have an estimate for how much it would cost to

12        record the ad, to create the recording of the ad?

13   A    No.

14   Q    Did you discuss with your potential donor this morning

15        assisting with that production of the ad cost?

16   A    No.

17   Q    Have you discussed the funding of the recording and

18        production of the ad with anyone?

19   A    No.

20   Q    How do you plan to run the ad -- strike that.  What

21        plans do you have to have the ad recorded?

22   A   At this point, none.

23   Q   Do you know when the ad would have to be recorded in

24        order to be run on May 10?

25   A   No.

71

1  Q   Who was the donor from this morning?

2        MR. BOPP:  I object and instruct the witness

3     not to answer the identity of the donor, potential

4     donor -- well, both a donor and a potential donor in

5     this case.

6  Q   (By Mr. Summers)  Was the -- is that potential donor

7     from this morning an individual or not an individual?

8     An individual person or -- sorry, strike that.  I was

9     caught between two forces.  Let me --

10       MR. BOPP:  Your mind and her mind.

11       MR. SUMMERS:  Let me rephrase that.

12  Q   (By Mr. Summers)  Would the potential donation that you

13     have described from your meeting, your meeting this

14     morning, be a donation of individual funds or funds

15     from an organization?

16  A   I don't know.

17  Q   Was the individual you met with this morning

18     representing an organization in that meeting?

19  A   No.

20  Q   Okay.  Have that individual's donations in the past

21     been donations of personal funds or donations of funds

22      from an organization?

23   A   I don't know.

24   Q   Is an organization's name listed in your records along

25      with the donations that have been given in the past?

72

1    A    I don't know.

2    Q    So it may be that only the individual's name is listed

3        in your records of donations from the past by -- from

4        that donor?

5    A    It may be.

6    Q    Okay.  Is that donor -- is that potential donor a

7        resident of Maine?

8    A    Yes.

9    Q    What are the names of the other I believe you said six

10        potential major donors?

11            MR. BOPP:  And we object to identification of

12        any donors and instruct the witness not to answer.

13    Q    (By Mr. Summers)  Are those other six potential major

14        donors persons who have donated funds to CCL in the

15        past?

16    A    Yes.

17    Q    And were their donations in the past donations of

18        personal funds or organizational funds?

19    A    Both.

20    Q    For the donors who gave organizational funds, were they

21        corporate funds?

22   A   I don't know.

23   Q   Who would know?

24   A   They would.

25   Q   Anyone else?

73

1   A   I don't know.

2   Q   Are you saying no one at CCL knows?

3   A   Right.

4   Q   Okay.  You've mentioned that CCL doesn't have right now

5       the funds to run this ad, has CCL had a shortage of

6       operating funds in 2006?

7   A   Yes.

8   Q   Has CCL curtailed any of its normal activities in 2006?

9   A   Yes.

10   Q   Generally speaking, what has it done to curtail

11       activities?

12   A   I've been forced to cut the hours of some staff members

13       and make changes in benefit plans.

14   Q   Anything else?

15   A   No.

16   Q   Can you describe in some more detail the shortage of

17       funds in 2006?

18   A   Donations are not being made at the level that we

19       anticipated.  I do not know the reason.

20   Q   Have you made other efforts to make up for the

21       shortfall?

22   A   Can you rephrase the question?

23   Q   Have you tried to raise more funds to compensate for

24       the lack of funds in 2006?

25   A   Yes.

74

1    Q    What have you done to do that?

2    A    Notified our supporters in writing of our challenge

3        through both email and written, printed letters.

4    Q    And when did you do that?

5    A    A couple of months ago.  Ongoing.

6    Q    Do you think running the Crossroads ad on the radio

7        will affect the election of Senator Snowe, primary

8        election?

9    A    No.  She doesn't have an opponent that I know of.

10    Q    Do you think it might affect her election in a way

11        other than the ultimate outcome?

12    A    I have no idea.  I don't know.

13    Q    Is it a concern of yours that it might affect the

14        election in some way other than the ultimate outcome?

15    A    Rephrase the question.

16    Q    Do you have a view about whether it will affect the

17        election of Senator Snowe in some way other than what

18        if she loses?

19    A    No.

20    Q    All right.  Do you have any current plans to run ads on

21        radio or TV about the federal marriage amendment other

22     than the Crossroads ad?

23   A   No.

24   Q   Do you have any plans to run ads on radio or TV about

25     anything other than the Crossroads ad?

75

1  A   No.

2  Q   Do you have any plans to communicate about the federal

3      marriage amendment through nonbroadcast media during

4      the same period that you plan to run the Crossroads ad?

5  A   Maybe.  Strike that.  Yes.  We will write about it in

6      our house organs, the email and the print newspaper.

7  Q   The Record newspaper?

8  A   The Record newspaper, yes.

9  Q   Will you communicate in any other way about it during

10     that period?

11  A   We will do interviews with reporters.

12  Q   Do you have plans to place any print ads about the

13     issue during that period?

14  A   No.

15  Q   Do you have plans to send communications to your

16     supporters about it during that period?

17  A   Yes.

18  Q   Please describe those plans?

19  A   The email and the monthly Record which goes to our

20     supporters.

21  Q   Okay.  Can you think of any other plans to communicate

22    about the marriage amendment during that period other

23    than what you've discussed?

24  A   No.

25  Q   All right.  Do you have plans to communicate about the

76

1    issue through nonbroadcast media after the period you

2    plan to run the Crossroads ad?

3  A   No.

4  Q   No plans?

5  A   Oh, you said nonbroadcast?

6  Q   Right, nonbroadcast?

7  A   Yes.

8  Q   Please describe those plans?

9  A   Information for our supporters following the progress

10    of the federal marriage amendment.

11  Q   And would it be the same types of media that you just

12    described?

13  A   Yes.

14  Q   Other than broadcast?

15  A   Yes.

16  Q   Has CCL run any ads in the past in any media that have

17    identified a federal candidate other than the ones

18    we've discussed today?

19  A   Repeat the first part of the question.

20  Q   Has CCL run any ads in the past in any media that have

21    identified a federal candidate other than what we've

22     discussed today?

23   A   I don't know.

24   Q   Well, maybe it will help to break it down by media.

25     Has CCL in the past ever run any radio or TV ads that

77

1    have identified a federal candidate?

2  A  I don't know.  I don't know.

3  Q  Has it ever placed a print ad that has identified a

4    federal candidate before now?

5  A  Well, we have already seen one.

6  Q  Anything else beside the one we've seen?

7  A  Not that I recall.

8       MS. SEALANDER:  Let's go off the record.

9    (Discussion had off the record, after which the

10    following proceedings transpired.)

11      MR. BOPP:  Back on the record.  That is not

12    proper for you to challenge the witness on the record

13    or off the record.  So we're back on the record, let's

14    just -- and Harry is the deponent -- or he's doing the

15    deposition.

16      MS. SEALANDER:  Jim, we're getting an awful

17    lot of I don't know to questions that were outlined in

18    30(b(6), and you designated this man.  He's been

19    designated as the person to answer.

20      MR. BOPP:  There isn't corporate records that

21    go back to 1886.

22          MS. SEALANDER:  This morning he had no

23     trouble saying during my tenure, the answer is such and

24     such, that's a reasonable qualifier to put on.  What's

25     happening right now is we're getting a whole bunch of I

78

1    don't knows because I think he's interpreting the

2    question in a way that Harry doesn't intend it, and

3    we're not going to get through this any time --

4         MR. BOPP:  Then Harry is to ask the question.

5    And when -- and it's a perfectly appropriate answer for

6    him to say that he doesn't know.  And there are no

7    records that would ever indicate that since 1886, they

8    have run radio ads.  So that is a perfectly appropriate

9    answer.

10        And you are not to challenge this witness on -- go

11    off the record and raise your voice and challenge this

12    witness.  That's improper.  Honestly.  So we're back on

13    the record --

14        MS. SEALANDER:  I wanted to make sure that he

15    was testifying truthfully because I know --

16        MR. BOPP:  He is testifying truthfully.

17        MS. SEALANDER:  I know he's trying to, and I

18    wanted to make sure that we -- that he was

19    understanding the questions that Harry was asking and

20    that everybody was understanding everybody because it

21    sounded to me as if we were getting awfully

22     inconsistent answers.  So that is why I raised this

23     point.

24          MR. BOPP:  Okay.  Colleen --

25          MS. SEALANDER:  I have no problem doing it on

79

1    the record.

2        MR. BOPP:  Colleen, that is simply improper

3    for you to challenge the witness on whether or not he

4    is answering truthfully or not.  So let's resume.

5   Q   (By Mr. Summers)  Let me direct your attention to

6    what's been marked as Exhibit 7, which is the

7    complaint, if you have a copy.  Do you see it?  I think

8    it's that one.

9   A   Yes.

10   Q   And Paragraph 16.  Please review Paragraph 16 just

11    briefly.

12        MR. BOPP:  By the way, in light of that

13    colloquy, let me make clear that the time period of

14    this deposition is since January 1, 2004.  It is not

15    for the history of the world.

16        And that all questions -- I object to any question

17    that is directed at time period prior to January 1,

18    2004, because it's not part of the notice for the

19    period of time in which he is to be prepared to answer

20    questions.

21        If we can make that a continuing objection, then I

22     won't object to whenever he says, has CCL ever run a

23     radio ad.  Can we stipulate to that, or do you want me

24     to object?

25            MS. SEALANDER:  I think that's an excellent

80

1    example about why I -- I just wanted to make sure that

2    the witness understood the questions that I thought

3    Harry was asking and was understanding them in the way

4    that Harry meant them.

5        MR. BOPP:  Do we agree to the time period,

6    January 1, 2004, or do I have to object?

7        MR. SUMMERS:  You're asking do we agree that

8    you can have a standing objection?

9        MS. SEALANDER:  I think you're right the

10    deposition notice specifies 2004.  Nobody has any

11    problem with that.  There are occasions when

12    understand -- the answers to questions regarding the

13    time period from then forward is helpful to go back a

14    few years.  I don't think that in the course of this

15    deposition, Harry has pushed that envelope too much.

16        If I -- I think you should -- I mean, I think he

17    can endeavor to continue to try, to the extent that you

18    think that he's not done that, he can try harder.

19        I think you ought to say something if you have a

20    problem, say something about it, but I think there's

21    times when going beyond before 2004 is entirely

22     appropriate in a contextual manner.  I think you would

23     think so if you were sitting in Harry's chair, too.

24          MR. SUMMERS:  In general, I'm not, or maybe

25     never, I'm not talking about 1900, I'm talking about

81

1    during the witness's tenure at CCL.  Obviously, if you

2    have --

3         THE WITNESS:  That was not clear to me.  And

4    that's why I said I don't know because what I heard you

5    asking was has the CCL Maine ever, that's what I heard.

6    And so in my mind, I was thinking I don't know.

7    Q    (By Mr. Summers)  I understand.  But would your answer

8    change if it had been specified during your tenure,

9    because --

10   A    Yes.

11   Q    It would?

12   A    Yes.

13        MS. SEALANDER:  Perhaps we ought to go back

14   and do some questions, I wouldn't want to go back to

15   the beginning.

16   Q    (By Mr. Summers)  I would interpret ever to include

17   your tenure plus more.  So if you didn't recall

18   anything ever, that would mean you didn't recall

19   anything during your tenure because your tenure is a

20   small --

21        MR. BOPP:  We're not going to argue about

22     these questions.  Let's just go back in the proper

23     order here and with that clarification.

24   Q   (By Mr. Summers)  Okay.  During your tenure at CCL, has

25     CCL run any radio or TV ads that identified federal

82

1    candidates?

2    A   None that I recall in addition to the print

3       advertisement that has already been discussed.

4    Q   And that's my next question is whether CCL during your

5       tenure has run any other print advertisements

6       identifying federal candidates?

7    A   None that I recall.

8    Q   Okay.  Now directing your attention to what's been

9       marked as Exhibit 7, a complaint, Paragraph 16.  Have

10      you had a chance to look at Paragraph 16?

11   A   Yes.

12   Q   Paragraph 16 says that CCL plans to run materially

13      similar ads after mid June on a range of other issues;

14      correct?

15   A   Uh-huh.  Uh-huh.

16   Q   Is that a correct statement of CCL's plans today?

17   A   Yes.

18   Q   Can you describe those plans?

19   A   No.

20   Q   Why not?

21   A   Because it's not beyond a simple plan or intention to

22    do that.

23  Q    Does -- is Paragraph 16 a complete statement of CCL's

24    current plans to do that, in other words, is there

25    anything more than what's in Paragraph 16?

83

1   A    Can you rephrase the question?

2   Q    Is there any specific issue you can tell me that CCL

3        plans to run a radio or TV ad on in the future other

4        than the Crossroads ad?

5   A    No.  We have no other script written.  We have no other

6        issues selected for future campaigns.

7   Q    Does CCL have plans to run such ads in any other media

8        other than radio or TV in the future?

9   A    Such as?

10  Q    Such as what media?

11  A    Yes.

12  Q    Newspapers?

13  A    No.

14  Q    Okay.  CCL has spoken publicly about Senator Snowe in

15       the past; correct?

16  A    Yes.

17  Q    Please describe generally what CCL has discussed about

18       Senator Snowe?

19  A    We've been critical of the senator's position on

20       marriage.  We've been critical of the senator's

21       position on partial birth abortion.  That's all that I

22      can recall.

23   Q   I'm talking about during your tenure of course?

24   A   Right.

25   Q   You can't recall any other issues that you've discussed

84

1    Senator Snowe?

2  A   I can't.

3  Q   You can't.  During your tenure, has CCL ever expressed

4      a view about Senator Snowe's candidacy for any office?

5  A   No.

6  Q   Okay.

7          MR. SUMMERS:  I'm going to mark another

8      document.

9      (Heath Deposition Exhibit Number 8 was marked for

10     identification.)

11 Q   (By Mr. Summers)  I'll show you what's been marked as

12     Exhibit 8, a document headed The Record, and dated

13     February 23, 2005.  Do you recognize this document?

14 A   I do.

15 Q   What is it?

16 A   It's an article that appeared in our -- on our web

17     site.  And I think it's still there.

18 Q   Did it appear on or about the date that's listed,

19     February 23, 2005?

20 A   Uh-huh.

21 Q   I'd like to direct you to the -- really the first

22     paragraph which is the introductory material on the

23     first page.  And if you would, I'd like to ask you to

24     read aloud the last three sentences of that paragraph,

25     the sentence starting Representative Duprey is?

85

1  A    Representative Duprey is the courageous third term

2      legislator who is the State House's most faithful

3      defender of traditional marriage.  Here, Representative

4      Duprey announces for the first time that he is willing

5      to run against Senator Olympia Snowe in next year's

6      Republican primary.  The Record is proud to be the

7      first publication in Maine to provide you with this

8      information.

9  Q    This basically says CCL's proud to tell the public that

10      Representative Duprey was quote, willing, unquote, to

11      run against Senator Snowe in the 2006 Republican

12      primary; right?

13  A    Uh-huh.

14  Q    Okay.  So I take it from this that CCL would rather see

15      a Republican senate candidate whose positions were

16      closer to its own than Senator Snowe's are; is that

17      correct?

18  A    Yes.

19  Q    Has CCL spoken publicly on any other occasions about

20      potential primary challengers to Senator Snowe, other

21      than this?

22  A    Not that I recall.

23  Q    CCL has no federal separate segregated fund or PAC;

24       correct?

25  A    Yes.

86

1   Q    And CCL has currently two Maine state political action

2        committees; correct?

3   A    Technically, one, depending on how you define that

4        because we register two PACs with the Ethics

5        Commission, but they're incorporated under one

6        incorporation.

7   Q    And what are the names of those for the record?

8   A    Christian Action League and Coalition for Marriage.

9   Q    And you say they're incorporated as one, can you

10       explain what that means?

11  A    Well, the way my lawyer explained it is that Coalition

12       for Marriage is a d/b/a for the Christian Action

13       League.

14  Q    And why is there a separate registered PAC entity?

15  A    To comply with state ethics rules regarding a petition

16       drive that we ran last year.

17  Q    And so I take it CFM was created in order to pursue

18       that project?

19  A    Correct.  Yes.

20  Q    All right.  What's involved in setting up and running a

21       state PAC in Maine?

22    A    Registration with the State Ethics Commission which

23         includes the filing of a form, which requires certain

24         information, all of which I can't -- I would have to

25         see the form to familiarize myself with the detail that

87

1    they request.

2        And then the filing of reports on a regular basis

3    with the Ethics Commission indicating what the PAC's

4    activities have been, expenditures and income.

5  Q   Are there requirements about maintaining records?

6  A   I'm not sure.  I know that there's a requirement about

7    presenting information.  I do not know about

8    requirements regarding the maintenance of records.

9  Q   And by presenting information, you mean reporting the

10    financial information to the state?

11  A   Yes.

12  Q   And is that information about contributions received

13    and expenditures made?

14  A   Yes.

15  Q   Any other information?

16  A   No.

17  Q   Is there anything else that from your perspective is

18    involved in running these PACs?

19  A   Can you rephrase the question?

20  Q   I'm looking for your sense of what work is required to

21    run and maintain the state PACs, what does CCL have to

22     do?

23   A   A lot in the case of the Coalition for Marriage.

24   Q   How so?

25   A   People's veto drive.

88

1  Q   Right.

2  A   Well, I mean, the PAC is the entity that does the work,

3     so let me rephrase my answer.  The PAC does -- did the

4     work on the petition drive last year, the Coalition for

5     Marriage work.  The Christian Civic League of Maine did

6     not do that work.

7  Q   Okay.  And in general, what work was that that was done

8     that CFM did?

9  A   It was the gathering of signatures, the fund raising

10     related to supporting the field team that made that

11     happen.  The coordination of 2,000 volunteers --

12  Q   Okay.

13  A    -- statewide.  All of the operational matters related

14     to fielding and leading and managing such a campaign.

15  Q   Okay.  In running -- in running the PACs, one thing you

16     have to do is to disclose the identities of your

17     donors; correct?

18  A   Yes.

19  Q   And you've done that at least in the case of CFM;

20     correct?

21  A   Yes.

22   Q   Have you also done that with CAL?

23   A   Yes.

24   Q   All right.  And those disclosures are public records in

25       Maine; correct?

89

1    A    Yes.

2    Q    Have you or any of your donors ever faced any kind of

3          harassment as a result of those disclosures to the

4          state?

5    A    I don't know.

6    Q    You're not aware of any harassment that you or the

7          donors have faced as a result of those disclosures?

8    A    I cannot prove that harassment or vandalism has taken

9          place as a result of those disclosures.  However,

10          harassment and destruction of property has taken

11          place --

12    Q    Has taken place?

13    A    -- at times related to our work on these issues.

14    Q    Okay.  Is CAL a corporation?

15    A    Yes.

16    Q    It's a Maine corporation?

17    A    Yes.

18    Q    And CFM is not a separate --

19    A    I'm sorry, you said CAL?

20    Q    Yes.

21    A    I was thinking -- yes, CAL, Christian Action League,

22      yes.

23   Q   Yes.  It's a corporation?

24   A   Yes.

25   Q   And it's distinct from CCL?

90

1  A  Yes.

2  Q  Is CAL a Maine corporation?

3  A  Yes.

4  Q  Is it tax exempt?

5  A  I don't know.

6  Q  Do you know what kind of corporation is it?

7  A  I don't know.

8  Q  Okay.  When was it founded?

9  A  I'm not sure of the exact year, but I believe just a

10    few years ago.  Since 2000.

11  Q  All right.

12      MR. SUMMERS:  I'm going to mark an exhibit.

13    (Heath Deposition Exhibit Number 9 was marked for

14    identification.)

15  Q  (By Mr. Summers)  I'll show you what's been marked as

16    Exhibit 9, which says that it's a registration for

17    political action committees for Christian Action

18    League, do you recognize this?

19  A  Yes.  I recognize the form.

20  Q  And what is it?

21  A  It's the registration for the Christian Action League

22     with the Ethics Commission of the state of Maine.

23   Q   Directing your attention to the second page, Section 5,

24     Part B, it lists a date of origin/incorporation of

25     April, 1999.  Is that correct for the beginning of CAL

91

1    as far as you know?

2  A  Yes.

3  Q  Okay.  You were executive director at the time CAL was

4    set up; correct?

5  A  Yes.

6  Q  Why did CCL decide to set up CAL?

7  A  To get involved with in a -- politics, potentially

8    endorsements or direct opposition of candidates during

9    elections.

10  Q  So the statement in Section 6 of this document, which

11    is entitled statement of support or opposition, is that

12    a correct statement of the purpose of CAL?

13  A  It's incomplete, should be amended.

14  Q  What else does CAL do?

15  A  Well, right now, it is -- it is not doing much, but we

16    are discussing supporting or opposing candidates for

17    state.

18  Q  State candidates, also --

19  A  Legislature.

20  Q  -- federal candidates?

21  A  No.

22  Q   There's no plan to endorse or oppose federal candidates

23      by CAL?

24  A   No.

25  Q   Do you direct CAL's activities?

92

1   A   Yes.

2   Q   What have CAL's activities been between 1999 and today

3       generally speaking?

4   A   The most activity came last year -- strike that.  The

5       Christian Action League was very active in 2000 on a

6       state matter related to gay rights.  And then again in

7       2004 on a state matter involving the same issue.

8           In 2004, the Christian Action League was involved

9       through its d/b/a, the Coalition for Marriage.  Same

10      corporation both times, same issue both times.

11  Q   Okay.

12  A   D/b/a in 2004.

13  Q   Is there anything else that CAL has done since 1999

14      other than what you've described?

15  A   No.

16          MR. SUMMERS:  I want to mark another exhibit.

17      (Heath Deposition Exhibit Number 10 was marked for

18      identification.)

19  Q   (By Mr. Summers)  I'll show you what's been marked as

20      Exhibit 10, which is the responses of CCL to the FEC's

21      interrogatories served earlier this week, and I direct

22     your attention to the second page, Interrogatory 1, the

23     answer at the bottom.

24          I take it -- let me ask, is this a correct

25     statement of the activities of CCL -- CAL?

93

1    A    Yes.

2    Q    Did CAL do anything prior to 2004?

3    A    Did CAL?

4    Q    Yes.

5    A    In 2000 --

6    Q    Prior, between 1999 and the end of 2003?

7    A    Yeah.  We worked in 2000 on a state ballot issue

8        related to gay rights through the PAC.

9    Q    Briefly, what was that issue?

10   A    The legislature put gay rights on the ballot, and we

11       led the opposition.

12   Q    Has CCL -- PAC -- strike that.  Has CAL done anything

13       other than what you've described?

14   A    Not that I recall.

15   Q    Has it ever supported or opposed candidates from 1999

16       until today?

17   A    No.

18           MR. BOPP:  By the way, now that we're on the

19       interrogatories, I want to advise you all that with

20       respect to Interrogatory Number 9, which has an Exhibit

21       B attached, that Exhibit B is attached in error.

22     Exhibit B is not responsive to Interrogatory Number 9.

23     And that was a mistake made in our office.

24          MR. SUMMERS:  Okay.  While we're on that,

25     there's no other answer listed for Interrogatory 9, so

94

1    obviously we're interested in an answer of

2    Interrogatory 9.

3         MR. BOPP:  There's the guy that can answer it

4    right here.

5         MR. SUMMERS:  We'd still like an answer to

6    the interrogatory itself.

7         MR. BOPP:  But given the expedition, I

8    thought rather than amend, you know, the interrogatory

9    answers, I would tell you right now, and you can ask

10    whatever you want to ask.

11         MR. SUMMERS:  We will get to that.

12    Q    (By Mr. Summers)  Generally speaking, how has CAL

13    communicated with the public?

14    A    Can you be more specific?

15    Q    What media has CAL used to --

16    A    The internet, in the form of a web site.  Email.  I'm

17    assuming in answering your question since you mentioned

18    CAL and since CFM is a d/b/a, you're referring to both?

19    Q    We'll actually get to CFM in a minute.

20    A    You're referring only to CAL?

21    Q    Yes, just CAL?

22   A   Ask the question again.

23   Q   What methods has CAL used to communicate with the

24       public?

25   A   I can't think of any except -- except for 2000, when

95

1    we -- when we were engaged in leading the opposition to

2    that particular ballot initiative.  In that case, we

3    employed internet, print media.  Since I wasn't charged

4    with preparing for 2000 in the --

5  Q   I understand.

6  A   I don't remember the specific ways that the CAL

7    communicated.

8  Q   CAL has a presence on the web site of CCL; correct?

9  A   Limited, I believe.  It's mentioned, I'm sure.

10  Q   Can you think of any other ways that CAL has

11    communicated?

12  A   No.

13  Q   It hasn't sent its own emails except for --

14  A   No.

15  Q   It hasn't placed -- has it placed ads in newspapers?

16  A   No.

17  Q   Has it run broadcast ads during your tenure?

18  A   It may have in 2000 related to that specific ballot

19    measure.

20  Q   All right.  Let's talk about CFM.

21        MR. SUMMERS:  Let me mark another exhibit,

22    actually.

23    (Heath Deposition Exhibit Number 11 was marked for

24    identification.)

25  Q   (By Mr. Summers)  Show you what's been marked as

96

1    Exhibit 11, do you recognize -- I should say, it's a

2    registration for a political action committees for

3    Coalition for Marriage, dated February 27, 2006, as

4    received by the Commission on Governmental and Election

5    Practices.  Do you recognize this document?

6  A   Uh-huh.  Yes.

7  Q   What is this?

8  A   It's a registration for a political action committee

9    with the Commission on Governmental Ethics and Election

10    Practices.

11  Q   And this is for the Coalition for Marriage that we've

12    discussed; correct?

13  A   Yes.

14  Q   Do you direct CFM's activities?

15  A   Yes.

16  Q   What have those activities been?

17  A   The Coalition for Marriage was formed in the spring of

18    2005 in response to the decision of our legislature to

19    add sexual orientation to the Human Rights Act.  And

20    the Coalition for Marriage led a people's veto of that

21    law, which -- the result of which was an election in

22     November of 2005, and that we lost -- that we lost.

23   Q   You say an election, do you mean a measure that was on

24     the ballot for people to vote on?

25   A   Yes.

97

1   Q   Okay.  I take it CFM communicated with the public quite

2       a bit during 2005?

3   A   Yes.

4   Q   Did it have a web site?

5   A   Yes.

6   Q   Was that www.coalitionformarriage.net?

7   A   Yes.

8   Q   Did CFM send emails during 2005 about the ballot

9       measure and the petition drive?

10  A   Yes.

11  Q   Was the internet an important method of building

12      support for that campaign in 2005?

13  A   Yes.

14  Q   Did CFM run radio and TV ads during 2005 for that

15      campaign?

16  A   Yes.

17  Q   Okay.

18          MR. SUMMERS:  I'll mark another exhibit.

19      (Heath Deposition Exhibit Number 12 was marked for

20      identification.)

21  Q   (By Mr. Summers)  I'll show you what's been marked as

22      Exhibit 12, which is a reprint of an article from the

23      Morning Sentinel dated April 27, 2005, with the

24      headline, Civic League Head Expects Large Turnout for

25      Anti Gay Rights Rally.

98

1       Please look at the second page at the top, the

2    first paragraph?

3  A  Uh-huh.

4  Q  Is that paragraph a correct statement of some of --

5    well, strike that.  That paragraph says that CCL was

6    running radio ads; correct?

7  A  Uh-huh.

8  Q  Were those -- were those ads actually being run by CFM

9    in April, 2005?

10  A  I think they were.

11  Q  It's correct that those radio ads were being run?

12  A  I believe -- I believe they were.

13  Q  Can you describe those ads?

14  A  A lobsterman named Dan Riley recorded a spot, and they

15    were aired as -- I believe the story is accurate with

16    regard to the number of times they were aired, seven to

17    800 times.

18       And they -- I don't recall the script, exactly

19    what the -- what it asked for.  I remember the general

20    subject matter being as described here.

21  Q  Did it name -- did the script name any candidates?

22   A   No.

23   Q   And you ran TV ads as well; correct?

24   A   Later, I believe.

25   Q   Do you know when those ran?

99

1  A    In the fall of 2005.

2  Q    Just prior to the November ballot vote?

3  A    Yes.

4  Q    What did those ads say?

5  A    They were an appeal to the public to vote yes on that

6     ballot measure.

7  Q    Did those ads name any candidates?

8  A    No.  No.

9  Q    What other ways has CFM communicated with the public

10     other than what we've discussed?

11  A    None that I can think of.

12  Q    Has CFM placed any newspaper ads?

13  A    Yes.

14  Q    Can you describe those?

15  A    We ran many large ads at about the same time this radio

16     advertising campaign was running in the spring of 2005

17     mentioning the rally and encouraging people to commit

18     to gather signatures for the petition drive.

19  Q    Can you think of any other -- anything else about the

20     newspaper ads that you ran, what -- sorry.  Strike

21     that.  What newspapers did they run in?

22   A   I don't know all the papers they ran in, but I know

23       they ran in the Portland Press Herald, the Kennebec

24       Journal, I think in the Bangor Daily News.  And they

25       may have run in the Waterville Sentinel also.

100

1    Q    Did --

2    A    No, go ahead.

3    Q    Did you speak often with the press about the ballot

4         initiative?

5    A    Yes.

6    Q    And were your comments published in the press?

7    A    Yes.

8    Q    And did you speak with the broadcast media about the

9         ballot issue?

10   A    Yes.

11   Q    And were those comments broadcast?

12   A    Yes.

13   Q    Did that include the national media?

14   A    Yes.

15   Q    The CFM web site even today contains a number of

16        documents that appear to be newspaper ads?

17   A    Uh-huh.

18   Q    Were those in fact newspaper ads?

19   A    Yes.

20   Q    That were -- and those were placed in the newspapers as

21        you've described?

22   A   Yes.  I was describing a different set of -- a

23       different print advertising campaign that ran in the

24       spring.  The ads that you're referencing were developed

25       for the fall campaign.  And those were placed on the

101

1    web site as pdf -- as downloadable files that people

2    were encouraged to place in their own local weekly and

3    daily newspapers.  I have no way of knowing how many of

4    those were run, could have been none, could have

5    been -- I have no way of knowing.

6  Q   What other methods did -- strike that.  You mentioned a

7    rally?

8  A   Uh-huh.

9  Q   Can you describe the rallies that CFM put together for

10    this effort in 2005?

11  A   We organized a rally for the State House steps in I

12    think it was -- it's mentioned there, March, I guess,

13    that attracted over 500 people and addressed the recent

14    passage of the gay rights law and responded to that by

15    encouraging citizens to sign up to become petition

16    circulators.  And 2,000 of them did that.

17  Q   What other rallies did you hold as part of the CFM

18    effort in 2005?

19  A   Well, rallies.

20  Q   Or any public gathering of that nature?

21  A   None.

22  Q   What methods did CFM use to persuade people to come to

23      the rally?

24  A   The full page ads.  The radio advertisements mentioned

25      the rally, I think.  Email mention on the web site.

102

1    Direct mail.  Phoning, but not phone banking, just

2    informal grass roots voluntary phoning.

3  Q   Was that by the woman you mentioned earlier or --

4  A  No.

5  Q   Who was -- please describe the phoning?

6  A   We worked with a group called the Maine Grass Roots

7    Coalition, and they did phoning.  And they made direct

8    contact, personal appeals to people.

9  Q   Was it a shared effort between CFM and Maine Grass

10    Roots Coalition to do that phoning?

11  A   They did most of the work.  We provided funding to them

12    to do that and to coordinate and organize the signature

13    gathering.

14  Q   And you mentioned direct mail, can you describe what

15    you did in direct mail with CFM?

16  A   There were a number of mailings that went out to donors

17    and potential donors inviting them to participate.  I

18    cannot remember -- I cannot remember any of them

19    specifically.

20      We had a group of people numbering around 20 to 30

21    who were in my orbit, and beyond them, there were many

22    more as you can imagine with 2,000 people active.  And

23    there was a number of -- there was mailing and phoning

24    and solicitation ongoing at a number of levels in a

25    number of different ways.

103

1   Q   Are there any other ways in which CFM communicated its

2       views on the ballot initiative in 2005?

3   A   None that I can think of.

4   Q   CFM reported the contributions it received in 2005 to

5       the state of Maine; correct?

6   A   Uh-huh.

7   Q   And I take it those reports are accurate as far as you

8       know?

9   A   Yes.

10  Q   Did CFM receive any money from business corporations in

11      2005?

12  A   I don't know.

13  Q   Okay.

14          MR. SUMMERS:  This might be a good place for

15      a break.  Does that sound good?

16      (Recess at 2:56 p.m., to 3:06 p.m., after which the

17      following proceedings transpired.)

18  Q   (By Mr. Summers)  Mr. Heath, has CCL considered during

19      your tenure setting up a federal PAC?

20  A   No.

21  Q   Why not?

22   A   We're -- I'm taking it slow.

23   Q   Can you explain?

24   A   Getting involved with candidate politics in the form of

25       express endorsements or in the form of endorsements or

104

1     direct opposition is -- has appeared to me to be

2     complicated, not just with respect to regulations, but

3     with respect to the theological perspectives of our

4     supporters.  So I'm taking my time.

5   Q   Do you have concerns about the -- those issues with the

6     state PACs that you have?

7   A   Yes.  Some -- some of the same issues on the

8     theological side, yes.  But with respect to regulations

9     and rules and funding on the federal side with federal

10     candidates and PACs and activity, I don't have enough

11     information yet.

12   Q   Have you talked about possibly setting up a federal PAC

13     during your tenure with anyone else?

14   A   No.

15   Q   What are the sources of CCL's funding?

16   A   CCL.  Churches and individual contributors.

17   Q   Anything else?

18   A   The -- we just started accepting advertising for our

19     print Record so we do have advertising income now.

20   Q   Is that -- strike that.  The complaint in this case

21     that you verified says that CCL does not qualify for

22      the exception for qualified nonprofit corporations

23      under the federal law.  Do you recall verifying that as

24      a factual --

25              MR. BOPP:  That is not a fact.  That is a

105

1    legal -- I object to the question.

2         MR. SUMMERS:  We'll bring him to the

3    complaint then.

4  Q    (By Mr. Summers)  I'll ask you to take a look at the

5    complaint which is Exhibit 7, and please turn to

6    Paragraph 22?

7  A    Okay.

8  Q    Okay.  Please read Paragraph 22.  I'm asking for the

9    factual basis for the statements in Paragraph 22 as to

10    why CCL does not qualify for the exception for

11    qualified nonprofit corporations?

12         MR. BOPP:  Well, I'd object because that

13    would be based upon the legal requirements.  So he

14    cannot be expected to know the legal requirements that,

15    you know, are encompassed within that determination.

16  Q    (By Mr. Summers)  Let me direct you to the

17    interrogatory responses, which are Exhibit 10.  Exhibit

18    10 which are the interrogatory responses CCL served

19    earlier this week, and Interrogatory 4, response is on

20    Page 5.  Okay.  The first full paragraph on Page 5, do

21    you see that?

22   A   Uh-huh.

23   Q   Is it correct that CCL has offered books and materials

24        in exchange for a suggested donation?

25   A   Yes.

106

1  Q   Please describe how that -- how that works?

2  A   Well, we were in receipt of over 400 books entitled How

3      Now Shall We Live some years ago, I don't know if it's

4      been since 2004, but it may have been.  And --

5  Q   Who wrote that?

6  A   Charles Colson.

7  Q   Go on.

8  A   And those books -- I'm hesitating because that

9      particular campaign may have been a Christian Education

10     League activity, CEL, instead of CCLM.  The CCLM has a

11     literature table when I speak, and we provide books to

12     people who sign up to become members or supporters, we

13     provide them for the donation or for the -- for their

14     first donation or their dues, whatever, depends.  It

15     may be dues or it may be just a donation for support,

16     and we would provide books.

17  Q   So does CCL or possibly the Education League say if you

18     make a donation of a certain amount, we will give you a

19     copy of this book or this material?

20  A   Yes.

21  Q   Is there any other -- any other materials that are

22      offered in exchange for donations by CCL?

23   A   Occasionally.

24   Q   What are those?

25   A   We're working on a project now that would involve a DVD

107

1    for -- we will probably make those available not for

2    donation, but for sale.  People would give us a certain

3    amount, and we would provide the product.

4  Q   When you -- what you've described, offering the books

5    and other materials at your meetings, is that a CCL

6    activity?

7  A   Yes.

8  Q   And so what CEL activity might involve this kind of

9    transaction?

10  A   I mentioned one, that book project that we provided to

11    churches.

12  Q   All right.  Anything else?

13  A   Nothing that I can think of.

14  Q   All right.  Now coming back to CCL activities, other

15    than the books and materials offered in exchange for

16    the suggested donations at the meetings, are there any

17    other ways in which CCL provides books and materials to

18    supporters that generates income to or that generates

19    funds for CCL?

20  A   No.

21  Q   In the same paragraph on Page 5 of the interrogatory

22    responses, there's a reference to events such as

23    banquets which are likewise providing goods and

24    services or are advertising or promotional activity.

25        Can you describe -- is that any different from

108

1      what we just talked about, or is that the same thing by

2      CCL?

3   A   The banquets are different from my speaking

4      engagements.  We hold an annual banquet, and we invite

5      people to sponsor tables.  Occasionally we will provide

6      a book or CD or some goods related to their

7      contribution.

8   Q   Is that sentence describing anything other than that?

9   A   No.

10  Q   At the end of the paragraph, there's a reference to

11     advertising revenue from The Record; correct?

12  A   Yes.

13  Q   Is that the revenue that you mentioned earlier that you

14     had just recently started to --

15  A   Yes.

16  Q   -- create?  When did The Record begin receiving

17     advertising revenue?

18  A   Three months ago.

19  Q   Before that period, before 2006, had The Record ever

20     received such advertising revenue?

21  A   Yes.

22   Q    Please describe that during your tenure?

23   A    None during my tenure.

24   Q    So during your tenure, The Record has not received?

25       Have you -- has CCL during your tenure received any

109

1    other advertising revenue aside from what The Record

2    decided to do three months ago?

3    A    No.

4        MR. SUMMERS:  I'm going to mark another

5    exhibit.

6    (Heath Deposition Exhibit Number 13 was marked for

7    identification.)

8    Q    (By Mr. Summers)  Please review what's been marked as

9    Exhibit 13 which is a series of invoices produced by

10    CCL to the Commission earlier this week with dates

11    ranging from late January, 2006, to March, 2006?

12    A    Uh-huh.

13    Q    Do you recognize these?

14    A    Yes.

15    Q    Are those invoices for The Record's advertising?

16    A    Uh-huh.

17    Q    And this is the advertising that you just discussed?

18    A    Uh-huh.

19    Q    Correct?  Can you tell me which of these invoices

20    reflect money from business corporations?

21    A    I don't know which are business corporations and which

22     aren't.

23  Q   I take it that zero invoices do not generate any income

24     for CCL?

25  A   Zero invoices may or may not be related to donations.

110

1  Q   So please explain what that means?

2  A   Some ads that have zero invoices are thank yous that we

3      just might give to a potential -- an advertiser, a

4      church, an individual or a business.  Some are zeros

5      that are part -- that are part of an advertising series

6      where we don't invoice this month, but we're going to

7      invoice next month or the month after because they've

8      made a commitment over a period of months.

9  Q   So the thank yous you've described to an individual,

10      what would that look like as far as the ad text?

11  A   Whatever they want it to look like.

12  Q   Can you give me an example of what people typically --

13  A   Look through here.

14  Q   -- create?

15  A   Well, there's one ad here which is listed as a zero,

16      it's invoice number 171, which would be invoice number

17      171, top right, which has a zero value.  The newspaper

18      ad itself has a retail value of $56, but we didn't

19      charge anything as a thank you to this particular

20      individual for donation.

21  Q   And what did that ad text actually say?

22   A   Well, this individual chose to advertise a particular

23       ministry of which he was fond -- that he was fond of.

24       And so we put an ad in for him advertising that

25       particular -- it happened to be a retreat center.

111

1   Q    Is it really whatever the donor would like to put in

2       there?

3   A    As long as it's consistent with our mission values.

4   Q    Do donors sometimes create ads that thanks CCL for its

5       work?

6   A    Well, not yet, but I hope so.

7   Q    Do donors sometimes create ads that are in the nature

8       of tributes to people they admire?

9   A    That's another good idea.

10   Q    Can you describe any other -- any other -- please

11       describe other types of things that people put in their

12       ads?

13   A    Well, one -- this top one here, he advertises his car

14       dealership.

15   Q    What does that ad say?

16   A    Buy a car from me, his company, full page, basically.

17       I mean that's not exactly what it says, but that's what

18       it -- that's what it tries to get people to do.

19   Q    Is it possible that none of the -- that none of these

20       ads are for business corporations?

21   A    Is it possible, yes.  Is it likely, no, because this

22    particular ad for the car company, I'm not a lawyer, so

23    when you say business corporation, I can't -- I don't

24    know whether he has a business corporation.  I know

25    it's a business.  But I don't know what his corporate

112

1    status is or anything like that.

2   Q   I mean a for profit corporation?

3   A   I would assume, but it's an assumption on my part, that

4    this particular ad for the Linnehan family business is

5    such an ad, but it's an assumption on my part because

6    we don't keep track of that.

7   Q   Does The Record have any policy about offering the

8    courtesy advertisements?

9   A   Can you elaborate on the question?

10   Q   Who is entitled to a courtesy advertisement?

11   A   We developed some broad guidelines, but I have

12    authorized my advertising director to use her

13    discretion in those decisions.

14   Q   How much revenue has advertising in The Record created

15    for CCL in 2006?

16   A   It would be an estimate, but pretty close, I would say,

17    not in excess of $3,000.

18   Q   How much of that came from individual human beings?

19   A   Probably at least two-thirds of it, I'm guessing.  But

20    I don't know because I'd have to review the -- all the

21    ads and the income that came in from those ads.

22   Q   Did some of it come from churches?

23   A   Yes.

24   Q   How much came from churches?

25   A   I don't know.  I don't know.

113

1   Q   Did some come from other nonprofit groups that are not

2       churches like CCL itself?

3   A   Not that I -- not that I recall.

4   Q   Does CCL do anything else other than what we've

5       discussed that you regard as business activity?

6   A   No.

7   Q   Okay.  I'd like to direct your attention back to the

8       interrogatory responses, which I believe were marked as

9       Exhibit 10.  And that same Page 5, now the last

10      paragraph on Page 5, a statement about halfway down in

11      that paragraph, the sentence beginning, however, 11

12      CFR, and the statement, the second half of that

13      sentence which states, CCL may have received

14      contributions from nonprofit corporations who may have

15      received contributions from business corporations.

16          Do you see that?

17  A   Yes.

18  Q   Can you please explain the factual basis for that?

19  A   Well, we don't keep track of the corporate status of

20      donors.  So it's accurate for us to say we may have

21      received contributions.  We receive somewhere between

22    10 and 20,000 contributions a year.

23        And so we may have received contributions for

24    business corporations, may have received -- so that's

25    the factual basis.

114

1  Q   Can you think of any examples of a donation from a

2      nonprofit that you suspect may have received money from

3      a business corporation?

4  A   There's -- in the Exhibit B, which has been mentioned

5      as not responsive to interrogatory whatever, I don't

6      remember the question, there's the International Reform

7      Federation is listed there.

8          And I -- they may be a nonprofit corporation, says

9      they are in our notation here.  And they may have

10      received contributions from a business corporation.  I

11      can't say they did or didn't.

12  Q   In the next sentence of the same paragraph of the

13      interrogatories, there's a statement that the Christian

14      Education League does receive donations from business

15      corporations.  Is that correct?

16  A   Yes.

17  Q   How much in donations from business corporations has

18      the Education League received in 2006?

19  A   I don't know.

20  Q   How would you find out?

21  A   I would have to review each individual contribution,

22     and if I saw a name that looked like a business, I

23     would then have to confirm or deny that it is -- was

24     actually a business by I assume contacting the

25     business.  And that would be how it would have to be

115

1     done.

2   Q   Is that the same answer for 2005?

3   A   Are you referencing something here?

4   Q   Has the Education League -- did the Education League

5       receive donations from business corporations in 2005?

6   A   Yes.

7   Q   And how much did it receive in 2005?

8   A   I don't know.

9   Q   Would you have to go through the same process you've

10      just described for 2005?

11  A   Yes.

12  Q   And in 2004, did the Education League receive donations

13      from business corporations?

14  A   Yes.

15  Q   How much?

16  A   I don't know.

17  Q   And would you have to go through the same process to

18      find out?

19  A   Yes.

20  Q   Okay.  Is it possible because you've said that you --

21      if I understand -- if I understand you, that you aren't

22    sure exactly what the Education League has received in

23    2006 from business corporations, is it possible that it

24    has not actually received any money from business

25    corporations in 2006?

116

1   A   Business corporations.  Is it possible, I don't know.

2       I would have to review the contributor list for 2006 to

3       give an answer.

4   Q   So if you -- then if you don't know as you sit here

5       right now, then it's possible; correct?

6   A   It's possible that we did not, possible, yes.

7   Q   The same sentence in the response to Interrogatory

8       Number 4 that talks about the Education League also

9       mentions the sharing and allocating of expenses between

10      CCL and the Education League?

11  A   Uh-huh.

12  Q   Please explain generally how that works?

13  A   The CEL is bound by (c)(3), 501(c)(3) rules to only

14      fund certain activity.  And that activity, some of its

15      funds are provided to the Christian Civic League of

16      Maine in the form of grants that fund appropriate

17      (c)(3) activity.  That's -- and then some of the funds

18      in the CEL are directly expended by the CEL by that

19      corporation.

20  Q   Okay.  The CEL and the CCL share staff; correct?

21  A   The CCL is the only entity that has staff.  And the

22     staff of the CCL is -- keeps track of hours and related

23     to projects that the grants from the CEL are funding.

24     And that's how -- that's one way that that relationship

25     works.

117

1      The CCL also provides the staff for CEL activities

2     directly, and the CEL pays for that.

3  Q  So does the -- I'm trying to understand.  Does the CEL

4     finance activities of the CCL?

5  A  It funds only activities that it -- that its board,

6     which is a separate entity, determines are appropriate

7     (c)(3) activities.  And the CCL submits paperwork

8     consistent that indicate that detail -- that detail

9     that activity.

10  Q  And that's sometimes activity of CCL that is funded

11     that way?

12  A  Yes.

13  Q  All right.  Okay.  I'd like to direct your attention to

14     the response to Interrogatory Number 7, same exhibit,

15     and Exhibit A to the responses.  The Exhibit A lists

16     donations over $1,000 to CCL in the time period 2004

17     through March of 2006; correct?

18  A  Yes.

19  Q  And are these donations by individual human beings?

20  A  Some are, some aren't.

21  Q  What else -- what other kinds of entities are they

22     from?

23   A   Churches.  Perhaps some nonprofit corporations, perhaps

24     some -- what you're calling -- perhaps some businesses.

25   Q   Do you know for certain that any are businesses?

118

1   A   I don't.

2   Q   Do you know for certain that any are individual human

3      beings?

4   A   Yes.

5   Q   How many are individual human beings?

6   A   I don't know.

7   Q   The third column is headed fund code; correct?

8   A   Uh-huh.

9   Q   Can you explain the meaning of the entries under fund

10     code?

11  A    Well, this is a code that's produced by our operations

12     director and is used I assume by her in her work with

13     our accounting firm that does the -- that does the --

14     not audit, but the review of our finances every year.

15  Q    Can you explain what the entries mean, though?  For

16     instance, what does SPLG mean?

17  A    I believe that means special gift.  I think wills,

18     probably self-explanatory.  Miscellaneous.  CHBD would

19     be I assume again church budget.  I would need to

20     confirm that.  AP204, I don't know.  EOYG, I don't

21     know.

22   Q   RCPT?

23   A   I don't know.

24   Q   SPDS?

25   A   Don't know.

119

1  Q   All right.  Since January 1, 2004, CCL has received

2      donations from other nonprofit corporations; correct?

3  A   Yes.

4  Q   And since that time, it's received donations from

5      churches; correct?

6  A   Yes.

7  Q   Has it received donations from other 501(c)(4)

8      organizations since that time?

9  A   I don't know.

10  Q   What other types of organizations do you know that CCL

11      has gotten donations from during that time?

12  A   Rephrase the question.

13  Q   Do you know that CCL has received donations from any

14      other type of organization since January, 2004?

15  A   I don't know.

16          MR. SUMMERS:  I'm going to mark one exhibit.

17      I believe it may be the last exhibit.  Is that

18      encouraging?

19      (Heath Deposition Exhibit Number 14 was marked for

20      identification.)

21  Q   (By Mr. Summers)  I'll show you what's been marked as

22      Exhibit 14, which is a Form 990 of the Internal Revenue

23      Service which states that it's for fiscal year 2004 for

24      Christian Civic League of Maine, Inc.  Do you recognize

25      this?

120

1   A   Uh-huh.

2   Q   Please turn to Page 6.  What is this document?

3   A   Form 990.

4   Q   Is it a Form 990 that CCL filed for fiscal year 2004?

5   A   Yes.

6   Q   On Page 6, there are entries for Line 93A and 103A, do

7       you see those?

8   A   Uh-huh.

9   Q   The entry for 93A on Page 6 says program service

10      revenue along with other income; correct?

11  A   Uh-huh.

12  Q   What is that?

13  A   I believe that that would be income that came from a

14      convention we had that year, our banquet.  It's

15      referenced as a banquet in other documents.

16  Q   And what income related to the banquet, what was that?

17  A   Could have been donations.  It could have been what

18      people paid us to get in.

19  Q   Ticket prices?

20  A   Ticket type of thing.  But I don't recall exactly what

21      it was that year.

22   Q    Is there anything else it could have been?

23   A    Not that I can think of.

24   Q    For 103A, the description is, provide the League with

25        the capital necessary to fund its operations.  What was

121

1      that?

2    A   I don't know.

3    Q   You were the person who signed this form on behalf of

4        CCL; correct?

5    A   Yes.

6    Q   All right.  Turning back once again to the

7        interrogatories, which you should have in front of you,

8        which are Exhibit 10.  And please look at Exhibit 9 --

9        I'm sorry, Interrogatory 9, and Exhibit B, which has

10       been deleted from the response to Interrogatory 9.  Do

11       you see Interrogatory 9?

12   A   Uh-huh.

13   Q   What is the answer to Interrogatory 9?

14   A   Zero.

15   Q   Please explain.

16   A   No individual has pledged to contribute in excess of

17       $1,000 to CCL to pay for CCL's campaign for passage of

18       the federal Marriage Protection Amendment Act, not one.

19   Q   I understand.

20       MR. SUMMERS:  I think that's all I have.

21       Jim, do you have any questions you'd like to ask?

22          MR. BOPP:  Yes.

23                    EXAMINATION

24       BY MR. BOPP:

25   Q    Turn to Page 5, please, again.

122

1         MR. SUMMERS:  Page 5 of?

2    Q    (By Mr. Bopp)  The interrogatory answers.  You were

3         asked about banquets?

4    A    Uh-huh.

5    Q    And with respect to people buying tables, you mentioned

6         that they might be provided goods and services like

7         books or other premiums?

8    A    Uh-huh.

9    Q    Okay.  Aren't they also provided meals?

10   A    Yes.

11   Q    Okay.  And meals would be a good or service that

12        resulted in income to the corporation?

13   A    Yes.

14   Q    Okay.

15        MR. BOPP:  No further questions.

16        MS. SEALANDER:  We had talked earlier about a

17        list.

18        MR. BOPP:  Are we done?

19        MS. SEALANDER:  But I want to do this on the

20        record because I'm giving you the only copy of this.  I

21        want to just read to you the things that we've listed.

22          MR. BOPP:  Okay, sure.

23          MS. SEALANDER:  So the first thing is the

24     2004 voter's guide.

25          And second thing is the radio buy information that

123

1      Focus on the Family produced which I believe he

2      indicated that he may have, but in any event, I believe

3      they have, and at this point they're sort of acting as

4      the agent.

5          Number three, email from Focus on the Family, the

6      initial email that was sent to you from Focus on the

7      Family asking whether you wanted to do an advertising

8      campaign on the amendment.  You described it as being

9      sent to the Family Policy Councils.

10         Number four, you indicated that you responded by

11     email.  So we would like that email response.

12         Number 5, you indicated there have been

13     communications between Natalie Torgeson and Focus on

14     the Family regarding the script.  We'd like any

15     documents related to that.

16         Number 6.  There's only two more.  Number 6 is

17     copies of the print version of The Record for the last

18     three months that contain paid advertising.

19         And Number 7 is all invoices that weren't produced

20     earlier that relate to paid advertising in The Record.

21     You indicated at deposition that you thought there were

22    about $3,000 worth.  My quick math said we didn't have

23    that much here.  If there's others, we'd like those.

24    If there's not, there's not.

25        MR. BOPP:  All right.  We'll do this as

124

1    quickly as possible subject to --

2         MS. SEALANDER:  Maybe we can get this

3    tomorrow?

4         MR. BOPP:  We'll try, subject to any

5    objections, if we have any.  I don't know that we do,

6    but we will --

7         MS. SEALANDER:  Can you read all of that?

8         MR. BOPP:  Yes, thank you.  Yes.  I think I

9    know what you're saying.  And we'll do that as quickly

10    as possible, hopefully tomorrow, but we will see.

11         MS. SEALANDER:  We're all done.

12    (At 3:52 p.m., the foregoing proceedings were

13    concluded.)

14              - - - - -

15

16

17

18

19

20

21

22

23

24

25

125

1              CERTIFICATE

2              I, Cindy Packard, a Notary Public in and for

3       the State of Maine, hereby certify that the

4       within-named deponent was sworn to testify the truth,

5       the whole truth, and nothing but the truth in the

6       aforementioned cause of action.

7              I further certify that this deposition was

8       stenographically reported by me and later reduced to

9       print through Computer-Aided Transcription, and the

10       foregoing is a full and true record of the testimony

11       given by the deponent.

12              I further certify that I am a disinterested

13       person in the event or outcome of the above-named cause

14       of action.

15              IN WITNESS WHEREOF I subscribe my hand

16       this _____of _____, 2006.

17       Dated at Falmouth, Maine.

18

19

20

21

22        _____

23                    Notary Public

24      My Commission Expires
        November 9, 2008
25