## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

THE CHRISTIAN CIVIC LEAGUE )
OF MAINE, INC. )
     **Plaintiff,** )
            ) **Civil Action No. 06-0614 (LFO)**
 **v.** ) **(Three-Judge Court Requested)**
            )
FEDERAL ELECTION COMMISSION, )
            )
     **Defendant.** )
            )
_____)

**MEMORANDUM OF APPLICANT-INTERVENORS SENATOR JOHN MCCAIN, SENATOR RUSS FEINGOLD,  REPRESENTATIVE CHRISTOPHER SHAYS, REPRESENTATIVE MARTIN MEEHAN, AND REPRESENTATIVE TOM ALLEN IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Roger M. Witten (D.C. Bar No. 163261)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800


Trevor Potter (D.C. Bar No.413778)
J. Gerald Hebert (D.C. Bar No. 447676)
Paul S. Ryan
CAMPAIGN LEGAL CENTER
1640 Rhode Island Avenue, N.W.
Suite 650
Washington, DC  20036
(202) 736-2200


(Additional counsel listed on next page)

Seth P. Waxman (D.C. Bar No. 257337)
 *Counsel of Record*
Randolph D. Moss (D.C. Bar No. 417749)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2445 M Street, N.W.
Washington, DC  20037
(202) 663-6000


Daniel R. Ortiz
UNIVERSITY OF VIRGINIA SCHOOL OF LAW[*]
580 Massie Road
Charlottesville, VA  22903
(434) 924-3127

* For identification purposes only

Donald J. Simon (D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY, LLC
1425 K Street, N.W.
Suite 600
Washington, DC  20005
(202) 682-0240

Charles G. Curtis, Jr.
David Anstaett
HELLER EHRMAN WHITE &
    MCAULIFFE LLP
One East Main Street
Suite 201
Madison, WI  53703
(608) 663-7460

Fred Wertheimer (D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, DC  20006
(202) 429-2008

Bradley S. Phillips
Grant A. Davis-Denny
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA  90071
(213) 683-9100

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................................................. iv

Introduction ..................................................................................................................1

Argument ......................................................................................................................2

I.    CCL's Motion for a Preliminary Injunction Should be Denied......................................2

    A.  CCL Cannot Demonstrate a Substantial Likelihood of Success on the Merits ........................................................................................................3

    B.  CCL Cannot Demonstrate That It Would Suffer Irreparable Harm Without Injunctive Relief.......................................................................................10

        1.  CCL Can Fund Its Proposed Ads Without Alteration By Using a PAC.........................................................................................11

        2.  CCL Can Disseminate Its Message Without Triggering BCRA's Electioneering Communications Provisions ...........................................13

    C.  Granting CCL's Preliminary Injunction Would Injure Other Interested Parties and Harm the Public Interest.......................................................15

        1.  Enjoining an Act of Congress Constitutes Irreparable Harm .................15

        2.  Granting an Injunction Would Impair the Compelling Interests Underlying BCRA's Electioneering Communications Provisions .........16

II.   If This Court Believes a Preliminary Injunction is Appropriate, It Should Limit It to Exempting "Crossroads," CCL's Only Specified Ad, For Only a Brief Period.....................................................................................................18

Conclusion ....................................................................................................................19

# TABLE OF AUTHORITIES

## *Cases*

*Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652 (1990) ..........................11, 16, 17

*Burroughs v. United States,* 290 U.S. 534 (1934) .......................................................................16

*CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738 (D.C.Cir.1995)...........................2

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ....................................................................2, 14

*FEC v. Beaumont*, 539 U.S. 146 (2003) ............................................................1, 2, 11, 12, 16, 17

*FEC v. Massachusetts Citizens For Life, Inc.*, 479 U.S. 238 (1986)................................................9

*FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197 (1982) .........................................................1, 2

*McConnell v. FEC*, 540 U.S. 93 (2003)................................................................................ *passim*

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) (Rehnquist, J., in chambers)......................................................................................................................15

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir.1998)......................................................2

*Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323 (1984) (Rehnquist, J., in chambers)......................................................................................................................15

## *Statutes, Rules, and Constitutional Provisions*

Bipartisan Campaign Reform Act of 2002, 116 Stat. 81 ................................................................1

2 U.S.C. § 431........................................................................................................................1

2 U.S.C. § 434(f)(3)(A)(i).........................................................................................................1

2 U.S.C. § 441b(b)(2) ...............................................................................................................11

2 U.S.C. § 441b(c)(1)................................................................................................................11

26 U.S.C. § 527(e)(2)..................................................................................................................5

11 C.F.R. § 100.29...................................................................................................................1

26 C.F.R. § 56.4911-2(b)(2)(i)-(ii) ...............................................................................5

Fed. R. Civ. P. 65(a) ....................................................................................................3

***Other Authorities***

http://cclmaine.org/INformation/league_is_committed_to_these_6_e.htm ...................................4

Br. For Appellants/Cross-Appellees Senator Mitch McConnell app. at 1a-15a, 540 U.S. 93 (2003)...............................................................................................................................5

**Introduction**

Applicant-Intervenors oppose the Christian Civic League of Maine, Inc.'s ("CCL")

motion for a preliminary injunction in its as-applied constitutional challenge to the

"electioneering communications" provisions of the Federal Election Campaign Act ("FECA" or

the "Act"), 2 U.S.C. § 431 *et seq.*  These provisions prohibit corporations and labor unions from

using their general treasury funds to pay for any "broadcast, cable, or satellite communication

which … refers to a clearly identified candidate for Federal office [and] is made within … 60

days before a general … election for the office sought by the candidate; or … 30 days before a

primary … election  … for the office sought by the candidate; and is targeted to the relevant

electorate."  *Id.* § 434(f)(3)(A)(i).  *See also* 11 C.F.R. § 100.29 (defining "electioneering

communication").  In upholding these provisions added by the Bipartisan Campaign Reform Act

of 2002 ("BCRA"), 116 Stat. 81, against facial constitutional challenge, the Supreme Court

recognized both that the First Amendment reflects "respect for the legislative judgment that the

special characteristics of the corporate structure require particularly careful regulation" and that

compelling governmental interests support prohibiting corporations and labor unions from

financing electioneering communications out of their general treasury funds.  *McConnell v. FEC*,

540 U.S. 93, 205 (2003) (quoting *FEC v. Beaumont*, 539 U.S. 146, 155 (2003) (quoting *FEC v.

Nat'l Right to Work Comm.*, 459 U.S. 197, 209-210 (1982))) (internal quotation marks omitted).

So great are the potential dangers posed by direct corporate political involvement, in fact, that

the Supreme Court has "concluded that the congressional judgment to regulate corporate political

involvement warrants considerable deference and [that completely banning corporate

contributions to candidates] reflects a permissible assessment of the dangers posed by

1

[corporations] to the electoral process." *Beaumont*, 539 U.S. at 156-57 (quoting *Nat'l Right to Work Comm.*, 459 U.S. at 207-11) (internal quotation marks omitted).

CCL asks this Court to overthrow all the careful congressional judgments on which BCRA's electioneering communications provisions rest. The reasoning underlying CCL's motion for a preliminary injunction is so broad that it would potentially permit all corporations, including business corporations, to run broadcast advertisements that refer to clearly identified federal candidates in the electorates of those candidates shortly before their elections. Although ostensibly concerning pending legislative matters, such ads could be "intended to influence the voters' decisions [in the candidate elections] and have that effect." *McConnell*, 540 U.S. at 206. Such ads, the Supreme Court held, were "the functional equivalent of express advocacy," *id.*, which Congress clearly "has a compelling interest in regulating," *id.* at 205. CCL's proposed injunction, if granted, would in the name of protecting "grass roots lobbying" allow corporations virtually free rein to run ads having exactly the intent and effect that the Supreme Court has found most warrant appropriate regulation.

**Argument**

**I.  CCL's Motion for a Preliminary Injunction Should be Denied.**

"A preliminary injunction is an extraordinary remedy." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). A party seeking one must "by a clear showin[g] carr[y] the burden of persuasion" on four separate elements. *Id.* It must, in particular, "demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without injunctive relief, (3) that an injunction would not substantially harm other interested parties, and (4) that issuance of the injunction is in the public interest." *Id.* (citing *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C. Cir. 1998)*; CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d

2

738, 746 (D.C.Cir.1995); and Fed. R. Civ. P. 65(a)).  In its extreme and vaguely defined reach, CCL's requested preliminary injunction fails all four of these necessary factors.  Indeed, with respect to the final three, CCL's "showing" amounts—in total—to less than two pages of conclusory assertions.  Mem. in Supp. of Prelim. Inj. Mot. ("CCL's PI Memo") at 25-27.  That falls far short of a "clear showin[g] carrying the burden of persuasion" on these three necessary elements.

### A.    CCL Cannot Demonstrate a Substantial Likelihood of Success on the Merits.

CCL asks this Court for a breathtakingly broad preliminary injunction.  CCL suggests that many special features of the specific ad "Crossroads," Plaintiff's Verified Complaint for Declaratory and Injunctive Relief ("Complaint") Ex. A, and of the Maine primary election, particularly the fact that Senator Snowe, the clearly identified federal candidate, is running unopposed in the Republican primary, weigh in favor of its as-applied challenge.  But its requested preliminary injunction would sweep much more broadly than that.  As its complaint makes clear, CCL asks for a preliminary injunction that would allow it "to run both ["Crossroads"] and materially similar ads in the future."  *Id.* ¶ 15.  Its request covers ads not before this Court and covers an election for which Senator Snowe will certainly have opposition. In fact, as CCL describes its plans,

> Regardless of the outcome of the expected Senate cloture vote on S.J. Res 1 in early June, CCL intends to run materially similar grass-roots lobbying ads falling within the electioneering communications prohibition periods before future primary and general elections in Maine when there are pending matters in the legislative or executive branch that similarly require referencing a clearly identified candidate for federal office in broadcast communications to the citizens of Maine.

*Id.* ¶ 16.

CCL never limits the type of "pending matters in the legislative or executive branch" it could be interested in.  In fact, its complaint describes its field of interests in terms broad enough to include the major part of federal legislative and executive activity.  In addition to "laws protecting traditional marriage," "partial birth abortion, permissive abortion, abortion clinic registration, parental control of their children's education, regulation of sexual predators, legislation normalizing same sex relations, gambling," and "freedom to advance its issues in the public forum," CCL claims an interest in "limiting the government's power to raise taxes," *id*., a concern which could implicate nearly any governmental decision requiring spending.

CCL's publicly available web site describes its interests more broadly still.  It lists three capacious "Founding Purposes established in 1897," which guide its activities:

- To encourage all the people of Maine in good citizenship

- To elect honest and competent public officials

- To enact good laws and provide for their impartial enforcement

*See* http://cclmaine.org/INformation/league_is_committed_to_these_6_e.htm (viewed April 15, 2006).  There appears to be little the federal government does that CCL could not claim an interest in, including the election of particular federal officials.  CCL, in other words, can point to long-held interests, as justifying in the name of "grass roots lobbying," broadcast ads clearly identifying candidates for federal office on virtually any issue and right before virtually any election.

CCL's complaint, moreover, does not identify with any kind of specificity what kinds of ads any preliminary injunction would apply to.  As CCL describes it, the preliminary injunction it seeks would "permi[t] CCL to run both the current grass-roots lobbying advertisement ["Crossroads"] and *materially similar ads* in the future."  Complaint ¶ 15 (emphasis added); *see*

*also id*. ¶ 16.  The Complaint never makes clear, however, in what particular ways these ads will be "materially similar."  Indeed, its motion asks for a preliminary injunction that covers any electioneering communication deemed to be "grassroots lobbying," Prelim. Inj. Mot. at 2, a category of advertising that CCL never specifically defines (although it does gesture at several definitions, including the one that the IRS uses in a quite different context, CCL's PI Memo at 13-15, and ones proposed by participants in various FEC rulemaking proceedings, *id*. at 14 n. 7; *id*. at 16-17 n. 8).  The IRS definition shows why CCL never offers a concrete definition—it would allow easy circumvention of the electioneering communications provisions upheld by the Supreme Court in *McConnell* by many of the ads before the Court in *McConnell* itself.

The IRS definition provides that a "Grass roots lobbying communication" is "any attempt to influence any legislation through an attempt to affect the opinions of the general public or any segment thereof" and has three "required elements:" it (1) "refers to specific legislation" (2) "reflects a view on such legislation," and (3) "encourages the recipient of the communication to take some action with respect to such legislation."  26 C.F.R. § 56.4911-2(b)(2)(i)-(ii).  Although this definition may be appropriate for the specific uses the IRS makes of it, particularly when it is applied along with other contrasting definitions, *see* 26 U.S.C. § 527(e)(2) (defining "exempt function"), when applied to BCRA, it would exempt from coverage many electioneering communications that are "the functional equivalent of express advocacy," the very category of expression the Supreme Court found Congress had compelling interests in regulating. *McConnell*, 540 U.S. at 205-06.  Nearly all the ads Senator McConnell cited as protected issue advocacy in his leading brief, for example, would clearly meet the IRS test of "grass roots lobbying" with only minor changes.  *See* Br. For Appellants/Cross-Appellees Senator Mitch McConnell app. at 1a-15a, 540 U.S. 93 (2003).  The only change necessary would be for the ads

to reference particular pieces of legislation dealing with topics like estate taxes, cutting taxes, nursing home funding, international trade, setting Social Security benefits, tort reform, criminal gangs, partial birth abortion, and term limits—all of which, except perhaps term limits, are often pending before one house of Congress or one of its committees.

Still more troubling, the one ad the Supreme Court cited in *McConnell* as a clear example of sham issue advocacy would—with one minor emendation—also pass the IRS definition.  In *McConnell*, the Supreme Court noted that although many ads avoiding express words of advocacy "do not urge the viewer to vote for or against a candidate in so many words, they are no less clearly intended to influence the election."  540 U.S. at 193.  In a footnote, it then gave a powerful example:

> One striking example is an ad that a group called "Citizens for Reform" sponsored during the 1996 Montana congressional race, in which Bill Yellowtail was a candidate.  The ad stated:
>
>> "Who is Bill Yellowtail?  He preaches family values but took a swing at his wife.  And Yellowtail's response?  He only slapped her.  But 'her nose was not broken.'  He talks law and order … but is himself a convicted felon.  And though he talks about protecting children, Yellowtail failed to make his own child support payments—then voted against child support enforcement.  Call Bill Yellowtail.  Tell him to support family values."
>
> The notion that this advertisement was designed purely to discuss the issue of family values strains credulity.

*Id*. at 193-94 n. 78 (internal citations omitted).  Even though the notion that this ad discusses mere issues "strains credulity," the ad itself would be protected as "grassroots lobbying" under the IRS's definition if only its final two words, "family values," were changed to refer to specific legislation.  In that case, it would meet all three parts of the IRS test.  It would (1) "refe[r] to specific legislation", (2) "reflec[t] a view on such legislation," and (3) "encourag[e] the recipient

of the communication to take some action with respect to such legislation." The IRS definition, in other words, would exempt even the most egregious ads in *McConnell* as "grassroots lobbying."

By its own terms, moreover, CCL's requested preliminary injunction would run far beyond the Maine senatorial primary election, the special circumstances of which, CCL urges, mitigate any danger that "Crossroads" and other "similarly material ads" will affect voters' decisions. CCL's motion does not limit the term of the preliminary injunction to the 30 days before Maine's Republican primary, which run from May 14 to June 13, 2006. Its supporting memorandum, in fact, suggests that it might be planning on running "Crossroads" before the general election as well. CCL's PI Memo at 4-5. The reach of the preliminary injunction into this fall's general election is critical because it shows that the preliminary injunction will outrun one of the central justifications CCL musters for it.

CCL argues that broadcast ads mentioning Senator Snowe cannot have any impact on voters' decisions because she is running unopposed in the Maine Republican primary. *E.g., id*. at 26 ("Sen. Snowe is unopposed in the Maine Republican primary: what interest does the government have in curtailing calls to lobby a Senator during a period when she is not even challenged?"). This is wrong for several reasons. First, such ads can affect the size of the vote Senator Snowe receives in the primary, which in turn can affect her fundraising and ultimate prospects in the general election. Congress could have made the electioneering communications provisions inapplicable to any election where a candidate is running unopposed but chose not to do so—leaving the clear implication that the provisions are meant to deal with the impact of such ads on an election even if the election has only one candidate. Second, even though Senator Snowe may be running unopposed in the primary, advertising directed at her during this period

may have a direct impact on voters' choices in the general election.  In fact, since many voters will be particularly interested in and focused on the candidates generally in this pre-primary period, advertisements appearing then could be expected to have even more impact than ones appearing after the primary but before the 60-day period preceding the general election.  Indeed, BCRA's structure of focusing regulation only on periods of heightened voter interest reflects this understanding.  Third, whatever the validity of CCL's argument with respect to the primary election, it is clearly invalid with respect to the general election, which CCL's proposed injunction would also cover.  At that point Senator Snowe will almost certainly have a challenger.  By extending so far into the future, then, CCL's proposed preliminary injunction would permit ads that could clearly influence voters' choices for or against Senator Snowe.

CCL's proposed injunction overreaches in still another way.  Given the breadth of the IRS definition of "grass roots lobbying," which CCL suggests this Court adopt, the proposed preliminary injunction would exempt electioneering communications referencing Members of the House of Representatives, even though no marriage protection amendment will be coming up for action there during the pre-primary period.  Ads directed at House members during this time can be understood *only* as attempts to influence the choices of voters, not to influence the votes of House members themselves.

For this same reason, this Court should reject CCL's request to consolidate the hearing on the preliminary injunction with the hearing on the merits.  The discovery on the preliminary injunction, which is being expedited at CCL's request, focuses by necessity primarily on the single "Crossroads" ad within the context of Maine's primary election.  Since the final determination on the merits concerns the possibility of other, as yet undesigned, ads which will appear within the context of a very different election in which Senator Snowe will be running

8

against opposition and at a time when different issues will be pending before Congress, this Court should not base any final determination upon a record developed under time pressure for a much more limited and specific purpose. Indeed, the likelihood that any injunction would affect other races on different issues among other federal candidates argues for extremely careful development of a full factual record.

CCL makes no demonstration of a substantial likelihood of success on the merits with respect to any of the broad applications its requested preliminary injunction would entail. The purpose of BCRA's electioneering communications provision was to prevent corporations— except those subject to the narrow and specific exemption carved out by *FEC v. Massachusetts Citizens For Life, Inc.*, 479 U.S. 238, 263-64 (1986)—from spending their general treasury funds to influence federal elections. And in *McConnell* the Supreme Court upheld Congress's carefully crafted provisions to accomplish this purpose against facial constitutional challenge. Yet, many ads within the scope of CCL's proposed preliminary injunction would use corporate treasury funds to influence federal elections. Not only would CCL's single identified broadcast ad, "Crossroads," target the electorate of a clearly identified candidate for federal office within 30 days before the primary election and 60 days before the general election, CCL's PI Memo at 5, but its requested injunction would exempt many possible ads that not only meet BCRA's statutory definition but also have both the intent and effect of affecting voters' choices in federal candidate elections. Whether or not every ad covered by BCRA's statutory definition can withstand an as-applied challenge, many covered by CCL's loose and ill-defined concept of "grass roots lobbying" clearly can. If only for this reason, Plaintiff's motion for a preliminary injunction should be denied.

CCL's arguments, though, are weaker still. It has failed to make a clear showing that it is substantially likely to succeed on the merits even with respect to the single broadcast ad it identifies. The injunction CCL seeks would exempt the ad after any vote on the Marriage Protection Amendment (S.J. Res. 1) occurs, but before the primary election, which undercuts any claim that its aim is solely limited to influencing how Maine's two senators vote. Additionally, the ad takes pains to inform its listeners of the two senators' past political position on the marriage amendment issue and characterizes that position as "[u]nfortunate[e]." Complaint Ex. A. By plainly criticizing Senator Snowe's position on the issue, the ad goes beyond legislative advocacy. It does not simply seek to affect Senator Snowe's future vote, but amounts to a criticism of Senator Snowe's past vote that would be broadcast in the immediate pre-election period in which she is a candidate. This undercuts further the claim that the ad neither has the intent nor will have the effect of influencing voters. As discussed in the next section, moreover, the availability of other constitutionally sufficient means for CCL to get out its grass roots lobbying message, not to mention CCL's ability to disseminate its message without even triggering BCRA, further undercuts its likelihood of success on the merits.

**B.     CCL Cannot Demonstrate That It Would Suffer Irreparable Harm Without Injunctive Relief.**

CCL argues that it will suffer irreparable injury because it

> is currently barred by BCRA from engaging in grassroots lobbying communications that refer to Senator Snowe from May 14, until June 13 2006 and again from September 8 until November 7, 2006, which is precisely the time when CCL needs to run an ad encouraging support of the federal Marriage Protection Amendment. Without injunctive and declaratory relief, CCL's ability to make these communications will be irreparable lost.

*Id.* at 25. This is demonstrably untrue. As the Supreme Court made clear in *McConnell*, BCRA imposes no "bar" whatsoever on CCL's ability to effectively engage in grassroots lobbying.

Rather, it provides CCL several alternative ways of disseminating its grassroots lobbying advertisements to Maine citizens, and the Supreme Court determined in *McConnell* that those avenues fully protect the First Amendment interests of corporations like CCL.

**1.    CCL Can Fund Its Proposed Ads Without Alteration By Using a PAC.**

CCL can broadcast its proposed advertisement, without any alteration at all, on any radio or television outlet, at any time, simply by using a PAC to fund the ads. *See* 2 U.S.C. §§ 441b(b)(2), 441b(c)(1). In BCRA, Congress did not prohibit any spending or any speech, but only required corporations and labor unions to channel certain spending through their PACs. Given that BCRA provides this "PAC option," the Supreme Court has flatly rejected characterizations that BCRA "bars" speech. To the contrary, "[b]ecause corporations can still fund electioneering communications with PAC money, it is 'simply wrong' to view [section 203 of BCRA] as a 'complete ban' on expression rather than a regulation." *McConnell*, 540 U.S. at 204 (quoting *Beaumont*, 539 U.S. at 162).

CCL's ability to fund its proposed advertisements through a PAC, moreover, precludes the as-applied challenge it now asserts. The Supreme Court has repeatedly held that the opportunity to use a PAC for election-related activity fully safeguards corporate and union First Amendment rights. *See, e.g., Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652, 668-69 (1990) (upholding rule that corporations must fund express advocacy with PACs); *Beaumont*, 539 U.S. at 163 (upholding rule that corporations must fund campaign contributions with PACs).[1] The Supreme Court in *McConnell* explained that requiring corporations and

---

[1]    The Supreme Court has held that a certain narrow class of nonprofit advocacy corporations is entitled to an exception from the rule requiring corporations to fund campaign

unions to fund election-related spending with their PACs appropriately allows corporations and

unions to participate in the political process while ensuring that they do not distort it:

> The PAC option allows corporate political participation without the
> temptation to use corporate funds for political influence, quite possibly at odds
> with the sentiments of some shareholders or members, and it lets the government
> regulate campaign activity through registration and disclosure, see [2 U.S.C.] §§
> 432-434, without jeopardizing the associational rights of advocacy organizations'
> members.

540 U.S. at 204 (quoting *Beaumont*, 539 U.S. at 163).

In *McConnell*, the Supreme Court adopted this reasoning to find that BCRA lawfully

requires corporations and unions to fund all electioneering communications with their PACs.

The Court first confirmed the "firmly embedded" principle that "[t]he ability to form and

administer [PACs] has provided corporations and unions with a constitutionally sufficient

opportunity to engage in express advocacy."  540 U.S. at 203.  The Court then extended that

principle from express advocacy to electioneering communications, noting that under BCRA,

corporations and unions "may not use their general treasury funds to finance electioneering

communications, but they remain free to organize and administer separate segregated funds, or

PACs, for that purpose."  *Id*. at 204.

The Court then upheld BCRA's electioneering communications provision as against a

claim of overbreadth precisely because of the availability of this "PAC option."  It concluded

that the "vast majority" of electioneering communications are the "functional equivalent" of

express advocacy but recognized that there might be rare instances in which "genuine issue ads"

fell within the electioneering communications definition.  *Id*. at 206.  But the Court found no

constitutional infirmity in requiring corporations and unions to pay for such ads from their PACs:

expenditures through their PACs.  *See FEC v. MCFL*, 479 U.S. at 264.  CCL does not currently
qualify, *see* Complaint ¶ 22.

"[I]n the future corporations and unions may finance genuine issue ads during those timeframes by simply avoiding any specific references to federal candidates, or in doubtful cases by paying for the ad from a segregated fund." *Id.* (footnote omitted).

Notwithstanding the Court's finding that a PAC option is "constitutionally sufficient," *id.* at 203, CCL argues that "there is no justification for imposing the PAC requirement on corporations making grass-roots lobbying broadcasts." Complaint ¶ 55. In essence, it believes that grass-roots lobbying can never implicate the concerns the Supreme Court believe justified reasonable regulation of electioneering communications. That is not the case, as the extreme breadth of CCL's proposed preliminary injunction shows. Many ads it would characterize as "grass-roots lobbying" could easily affect voter choices in federal candidate elections. In short, under CCL's vague definitions, an ad could easily be both grass-roots lobbying and the "functional equivalent" of express advocacy. Contrary to CCL's apparent belief, the two are not mutually exclusive categories.[2]

## 2.    CCL Can Disseminate Its Message Without Triggering BCRA's Electioneering Communications Provisions.

---

[2]    CCL also makes a backup as-applied argument. It urges that if this Court does not authorize it to pay for its ads from its general treasury funds it be allowed to fund those advertisements from a "segregated bank account" consisting solely of donations from individuals. CCL's PI Motion at 23. Such donations, unlike contributions to a PAC, which are limited to $5,000 per year from an individual, 2 U.S.C. § 441a(a)(1)(C), would not be subject to any contribution limit. Such segregation, however, would not only rewrite the statute in a way Congress specifically rejected for section 501(c)(4) nonprofit corporations, like CCL, *see McConnell*, 540 U.S. at 209-10 n.90, but would also open avenues for for-profit corporations to evade BCRA's electioneering communications regulation. If segregated bank accounts were all that were required, corporations could contribute money to a nonprofit's general treasury on the informal understanding that such money would replace individual contributions that would ordinarily be deposited there but that could now be placed in the segregated bank account and used for these "grass roots" electioneering communications. Such segregated bank accounts do not account for the fungibility of money.

CCL retains other options for publishing its views without triggering BCRA's electioneering communications provisions—and it can use its general treasury funds to exercise these options.  First, CCL can disseminate its message at any time, in any outlet, and with any funds, as the Supreme Court noted in *McConnell*, "by simply avoiding any specific reference to federal candidates."  540 U.S. at 206.  CCL could, for instance, inform the public about the Marriage Protection Amendment by broadcasting its proposed ad exactly as drafted but simply deleting specific mention of Senator Snowe by name.  Second, CCL could also use its general treasury funds to disseminate its advertisements identifying a federal candidate at any time, including close to an election, by publishing those ads in non-broadcast media such as newspapers or billboards.  This ability to disseminate its message through non-broadcast alternatives provides the opportunity to reach a mass audience without triggering the electioneering communications requirements.  Third, CCL could use its general treasury funds to broadcast ads that refer to Senator Snowe by name outside the statutory pre-election windows.  Such ads are not electioneering communications under BCRA and can thus be funded from a nonprofit's general treasury funds even when outside business corporations have made contributions to them.  CCL's only response is a conclusory allegation in its complaint that "[b]roadcast advertisements are the most effective form of communication for the present grass-roots lobbying campaign, and non-broadcast communications would not provide CCL with sufficient ability to reach the people of Maine with CCL's message."  Complaint ¶ 46.  Needless to say, such unsupported and speculative allegations cannot "carr[y] the burden of persuasion," let alone "by a clear showin[g]," that CCL would suffer irreparable harm without injunctive relief.  *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (internal citations omitted).

**C.    Granting CCL's Preliminary Injunction Would Injure Other Interested Parties and Harm the Public Interest.**

CCL's motion should not be granted for the additional reason that enjoining BCRA's electioneering communications provisions as-applied would manifestly injure other parties as well as the broader public interest.

**1.    Enjoining an Act of Congress Constitutes Irreparable Harm.**

After seven years of careful legislative consideration, BCRA was enacted by Congress and upheld by the Supreme Court "to confine the ill effects of aggregated wealth on our political system." *McConnell*, 540 U.S. at 224. The "presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered … in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). Here, BCRA enjoys not just a "presumption," but a definitive *judgment*, of constitutionality, having been so recently upheld by the Supreme Court.

Setting aside a duly enacted Act of Congress—even for a short period of time—irreparably injures both the government and the public, the beneficiary of that law. Thus, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). Similarly, when a lower court enjoins enforcement of an Act of Congress, the harm to the public is immediate; and if that judgment is later reversed on appeal, the harm incurred is irreparable. *Cf. Nat'l Ass'n of Radiation Survivors*, 468 U.S. at 1324 (Rehnquist, J., in chambers). These injuries are particularly great in this case. As the Supreme Court has noted, "to say that Congress is without power to pass appropriate legislation to safeguard … an election from the improper use of money to influence the result is

to deny to the nation in a vital particular the power of self protection." *McConnell*, 540 U.S. at 223-24 (quoting *Burroughs v. United States,* 290 U.S. 534, 545 (1934)).

2.        **Granting an Injunction Would Impair the Compelling Interests Underlying BCRA's Electioneering Communications Provisions.**

The Supreme Court in *McConnell* upheld BCRA's electioneering communications provisions because it found "easily answered" the question whether the provisions served compelling governmental interests: "We have repeatedly sustained legislation aimed at 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.'" 540 U.S. at 205 (quoting *Austin*, 494 U.S. at 660) (internal quotation marks omitted). The broad "as applied" exemption that CCL seeks here would directly undermine this compelling interest and re-open the door for corporations and unions to fill the airwaves with broadcast ads funded from their general treasuries that refer to specific federal candidates in the immediate pre-election period. Such ads, even if mentioning pending legislation, can aim to influence voters' decisions in the primary and general elections. They can, in short, be the "functional equivalent" of advocacy expressly calling for the election or defeat of particular federal candidates.

It is no answer here to say that CCL, as a non-profit corporation, fails to pose the same threat as for-profit corporations. The Supreme Court has made clear that the purposes behind section 441b's ban on electoral spending from corporate treasury funds, as amended by BCRA's electioneering communications provisions, are served by regulation of nonprofit as well as for-profit corporations. In *FEC v. Beaumont*, 539 U.S. 146 (2003), for example, the Court explicitly rejected the argument that section 441b's ban on corporate contributions should not apply to a non-profit. Even though non-profit corporations "may not have accumulated significant amounts

of wealth," the Court said, "they receive from the State the special benefits conferred by the

corporate structure and present the potential for distorting the political process."  539 U.S. at 158

(quoting *Austin*, 494 U.S. at 661).  "[C]oncern about the corrupting potential underlying the

corporate ban," the Court held,

> may indeed be implicated by [nonprofit] advocacy corporations.  They, like their
> for-profit counterparts, benefit from significant state-created advantages and may
> well be able to amass substantial political war chests.  Not all corporations that
> qualify for favorable tax treatment under § 501(c)(4) of the Internal Revenue
> Code lack substantial resources, and the category covers some of the Nation's
> most politically powerful organizations, including the AARP, the National Rifle
> Association, and the Sierra Club.  Nonprofit advocacy corporations are, moreover,
> no less susceptible than traditional business companies to misuse as conduits for
> circumventing the contribution limits imposed on individuals.

*Id*. at 159-60 (citations, internal quotation marks, and footnotes omitted).

Congress rejected a proposal to exclude nonprofit corporations from BCRA's

electioneering communications provisions.[3]  Because nonprofit corporations like CCL can

themselves pose a threat of aggregated wealth or can serve as conduits for other incorporated

entities that do, they are properly subject to BCRA's electioneering communications provisions.

This "as applied" effort to exempt certain of their electioneering communications from coverage

of those provisions would undermine the efficacy of the law and impair the public interest served

by the law.

---

[3]    In 2 U.S.C. § 441b(c)(6), Congress functionally overrode 2 U.S.C. § 441b(c)(2), a
provision of BCRA that had exempted section 501(c)(4) corporations from the ban on spending
their treasury funds for electioneering communications, subject to certain conditions.  *See
McConnell*, 540 U.S. at 209-10 n.90.

**II.    If This Court Believes a Preliminary Injunction is Appropriate, It
Should Limit It to Exempting "Crossroads," CCL's Only Specified Ad, For
Only a Brief Period.**

Notwithstanding the arguments above, this Court may view this particular ad and the

unique facts surrounding the Maine primary election and conclude that some limited form of

preliminary injunctive relief is appropriate.  If it does, it should limit the scope of any injunction

and craft its terms on the narrowest possible grounds.  Only in this way will the Court be able to

respect Congress's well-considered judgment that electioneering communications pose

substantial harms to the electoral process.

In particular, the Court should limit the injunction in two ways.  First, the injunction should

apply only to "Crossroads," the one specific ad CCL has submitted to the Court.  As previously

described, CCL's proposed injunction sweeps much broader.  It would exempt all "grass roots

lobbying," a term it nowhere specifically defines, and other, undescribed ads that are "materially

similar" to "Crossroads" in some vaguely specified respects.  This Court should not grant a

preliminary injunction that covers ads not before it, and whose content the Court has not had an

opportunity to review.  The scope of CCL's proposed injunction is quite broad and would work

severe mischief—allowing any corporation, including business corporations, to run ads having

the intent and effect of influencing voter choices in federal candidate elections.  Without a

workable constitutional test to apply in "as applied" challenges, which CCL's briefing does not

begin adequately to address, this Court is ill-equipped to venture beyond the single ad before it. S

Second, this Court should not exempt "Crossroads" itself for any period beyond the

primary, or if a vote on the Marriage Protection Amendment occurs prior to the date of the

primary, then the exemption should not extend beyond the date of that vote.  In particular, this

Court should exempt "Crossroads" neither during the 60-day period before the general election, as CCL asks, nor for any period prior to the primary after an actual vote on the amendment.

## Conclusion

For the above reasons, Applicant-Intervenors respectfully request that this Court deny CCL's motion for a preliminary injunction or, in the alternative, frame it in the narrowest possible terms so as to respect Congress's compelling interests in appropriately regulating electioneering communications, the "functional equivalents" of express advocacy.

Respectfully submitted,

/s/ J. Gerald Hebert

Roger M. Witten (D.C. Bar No. 163261)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

Seth P. Waxman (D.C. Bar No. 257337)
   *Counsel of Record*
Randolph D. Moss (D.C. Bar No. 417749)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2445 M Street, N.W.
Washington, DC  20037
(202) 663-6000

Trevor Potter (D.C. Bar No.413778)
J. Gerald Hebert (D.C. Bar No. 447676)
Paul S. Ryan
CAMPAIGN LEGAL CENTER
1640 Rhode Island Avenue, N.W.
Suite 650
Washington, DC  20036
(202) 736-2200

Daniel R. Ortiz
UNIVERSITY OF VIRGINIA SCHOOL OF LAW[*]
580 Massie Road
Charlottesville, VA  22903
(434) 924-3127

* For identification purposes only

Donald J. Simon (D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
   ENDRESON & PERRY, LLC
1425 K Street, N.W.
Suite 600
Washington, DC  20005
(202) 682-0240

Fred Wertheimer (D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, DC  20006
(202) 429-2008

Charles G. Curtis, Jr.
David Anstaett
HELLER EHRMAN WHITE &
   MCAULIFFE LLP
One East Main Street
Suite 201
Madison, WI  53703
(608) 663-7460

Bradley S. Phillips
Grant A. Davis-Denny
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA  90071
(213) 683-9100

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2006, I served a copy of the foregoing Motion to Intervene, Memorandum in Support of Motion to Intervene, Proposed Answer and Affirmative Defenses, Proposed Order, and Declarations of Intervenors McCain, Feingold, Shays, Meehan and Allen,  and the Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction, on the following counsel by filing these documents in the Court's Electronic Case Filing System:

> David Kolker
> Assistant General Counsel
> FEDERAL ELECTION COMMISSION
> 999 E Street, N.W.
> Washington, D.C. 20463
>
> James M. Bopp, Jr.
> BOPP, COLESON & BOSTROM
> 1 South Sixth Street
> Terre Haute, IN 47807

> /s/ J. Gerald Hebert
> J. Gerald Hebert