## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CHRISTIAN CIVIC LEAGUE OF MAINE, INC., <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL ELECTION COMMISSION, <br><br> Defendant, <br><br> and <br><br> JOHN MCCAIN, RUSSELL FEINGOLD, CHRISTOPHER SHAYS, MARTIN MEEHAN, AND TOM ALLEN, <br><br> Intervenor-Defendants. | Civil Action No. 06-0614 (JWR, LFO, CKK) <br> (Three-Judge Court) |

## <u>MEMORANDUM OPINION</u>

Plaintiff, the Christian Civic League of Maine, Inc. (the "League"), is a self-styled "nonprofit, nonstock . . . ideological" corporation that engages in some business activity. Verified Complaint ¶¶ 20, 22. It strongly supports the proposed Marriage Protection Amendment (S.J. Res. 1), now pending in the United States Senate. Anticipating that the Senate will discuss and vote on this Amendment in early June 2006, the League plans to use its general corporate funds to broadcast in Maine, between May 10 and early June 2006, the following radio advertisement:

> Our country stands at the crossroads – at the intersection of how marriage will be defined for future generations.

Marriage between a man and a woman has been challenged across this country and could be declared unconstitutional at any time by rogue judges. We must safeguard the traditional definition of marriage by putting it beyond the reach of all judges – by writing it into the U.S. Constitution. Unfortunately, your senators voted against the Marriage Protection Amendment two years ago. Please call Sens. Snowe and Collins immediately and urge them to support the Marriage Protection Amendment when it comes to a vote in early June. Call the Capitol switchboard at 202-224-3121 and ask for your senators. Again, that's 202-224-3121.

Thank you for making your voice heard.

*Id.*, Ex. A. A single, individual donor has committed to a donation to the League to cover the cost of funding the broadcast.

However, the Federal Election Communications Act – as amended by the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, and codified at 2 U.S.C. § 431 *et seq*. (the "Act") – prohibits corporations from using general corporate funds for "electioneering communication[s]," 2 U.S.C. § 441b(a), (b)(2), defined as any "broadcast, cable, or satellite" communication, issued within thirty days of a federal primary election or sixty days of a general federal election (the "blackout period"), that "clearly identifie[s]" a candidate in that election and "target[s]" the relevant electorate, 2 U.S.C. § 434(f)(3)(A)(i). Because Senator Snowe is a candidate in a primary election scheduled for June 13, 2006, the League's proposed advertisement falls within the definition of the "electioneering communications" barred by the Act.

Defendant Federal Election Commission is charged by the Act with the responsibility to enforce it. Seeking to bar the Commission from enforcing the Act with regard to its proposed advertisement, the League has filed a complaint against the Commission along with a motion for

a preliminary injunction.[1]   The League contends that, although the Act by its terms bars its proposed broadcasts of the advertisement, the First Amendment[2] protects the League's right to run it because it addresses an issue expected to come to a vote in the Senate during the relevant time (i.e., because it constitutes, in the League's terms, "grass roots lobbying").  Senators John McCain and Russell Feingold and Congressmen Christopher Shays, Martin Meehan, and Tom Allen have intervened as additional defendants.  On April 24, 2006, we held an expedited hearing on the League's motion for a preliminary injunction.  *See* 28 U.S.C. § 2284.

The League concedes that it could publish its proposed advertisement, during the desired time period, without running afoul of the Act (and thus without implicating the First Amendment and/or any occasion for a preliminary injunction) if it:

> (1)    funded the advertisement through a political action committee rather than via general corporate funds;

> (2)    published the advertisement in a medium other than "broadcast, cable, or satellite" (e.g., newspapers, leaflets, e-mails, telephone banks); or

> (3)    altered the script of the advertisement to refrain from "clearly identif[ying]" Senator

---

[1]   The League also seeks a preliminary injunction, unlimited time-wise, that would encompass "any electioneering communications by [the League] that constitute grass-roots lobbying."  Verified Complaint, Prayer for Relief.  The League, however, fails to define "grass-roots lobbying" (other than as including its proposed advertisement) or to identify any necessity for the application of such a broader injunction.  Accordingly, its request for the broader preliminary injunction is unwarranted.  The balance of this memorandum opinion addresses the League's motion only insofar as it seeks an injunction barring the Commission from enforcing the Act against the League's proposed advertisement in the thirty days before Maine's June 13, 2006 primary election.

[2]   The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

Snowe.

Given this concession, *inter alia*, we conclude that the League has established neither a substantial likelihood of success on the merits nor that it will be irreparably injured in the absence of the "extraordinary remedy" of a preliminary injunction. *See Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004); *accord Wis. Right to Life, Inc. v. Fed. Election Comm'n*, 542 U.S. 1305, 1306 (2004) (Rehnquist, J., in chambers). We therefore also conclude that the requested preliminary injunction would substantially injure the Commission and not serve the public interest. Accordingly, as more fully explained below, an accompanying Order denies the League's motion for a preliminary injunction.

## I.  BACKGROUND

In *McConnell v. Federal Election Commission*, 540 U.S. 93, 189-94, 203-11 (2003), the Supreme Court upheld the Act's electioneering communications provision from a facial attack on its constitutionality under the First Amendment. The Court did so in full realization that the electioneering communications provision encompasses some "issue advertis[ements]." *McConnell*, 540 U.S. at 126-32, 189-94, 203-05. Indeed, the Court carefully catalogued the past use of such advertisements to influence elections improperly. *See id.* at 126-32. The Court cited examples, including the infamous "Bob Yellowtail" advertisement. It excoriated candidate Yellowtail for "t[aking] a swing at his wife," being "a convicted felon," and "fail[ing] to make his own child support payments" yet closed as if a mere issue advertisement: "Call Bob Yellowtail. Tell him to support family values." *Id.* at 193 n.78. The Court observed: "Little difference exist[s] . . . between an ad that urge[s] viewers to 'vote against Jane Doe' and one that condemn[s] Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe

and tell her what you think.'" *Id.* at 126-27.  Given these realities, the Court concluded that the

Act's electioneering communications provision was tailored sufficiently narrowly to meet a

compelling governmental interest and to survive constitutional scrutiny.  *See id.* at 193, 204-06.

As the Court pointedly noted: "[C]orporations and unions may finance genuine issue ads during

th[e blackout] time frames by simply avoiding any specific reference to federal candidates, or in

doubtful cases by paying for the ad from a segregated fund."  *Id.* at 206.

Subsequently, a Wisconsin corporation – on facts markedly similar to those before us

here – brought an as-applied challenge to the electioneering communications provision, seeking

to run an "issue" advertisement in the run-up to a primary election.  *See Wis. Right to Life, Inc. v.

Fed. Election Comm'n*, slip op., No. 04-1260 (D.D.C. Aug. 17, 2004); slip op., No. 04-1260

(D.D.C. May 9, 2005).  Holding that the Supreme Court's decision in *McConnell* necessarily

foreclosed as-applied challenges to the electioneering communications provision, a three-judge

district court denied that corporation's motion for a preliminary injunction and subsequently

dismissed the case.  The Supreme Court, however, reversed and remanded, clarifying that its

decision in *McConnell* did not pose an absolute bar to as-applied challenges to the electioneering

communications provision of the Act because the Constitution might require that a particular

advertisement be exempted from the Act's definition of an electioneering communication.  *See

Wis. Right to Life, Inc. v. Fed. Election Comm'n*, 126 S. Ct. 1016, 1018 (2006).  The League

argues that this is such a case.

## II.  ANALYSIS

The League's pending motion for a preliminary injunction presents two issues: (1)

whether the League has standing, and (2) if it does, whether it is entitled to a preliminary

injunction.  As explained below, we conclude that the League has standing but that a preliminary injunction is not warranted.

A.      **Standing.**

The Commission first argues that the League lacks standing under Article III of the Constitution because it has failed to allege facts to demonstrate that it is injured by the statutory provision it challenges.  *See* Commission Opp'n Br. at 14; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  Specifically, the Commission argues that the League lacks the funds it would need to run the advertisement, has not taken any steps to plan for its broadcast, and thus cannot demonstrate that it would be injured if it were unable to broadcast the advertisement provided to it by others.  *See* Commission Opp'n Br. at 14.  However, a declaration of the League's Executive Director, Michael Heath, affirms under penalty of perjury that it now has caused its proposed advertisement to be recorded and has a donor "committed to paying the entire $3,992 cost of the radio buy."  Pl.'s Reply in Supp. of Mot. for P.I., Ex. A (Apr. 21, 2006 decl. of Michael Heath) ¶¶ 14-16.  Mr. Heath also affirms that the advertisement addresses an issue of high priority for the League.  *See id.* ¶¶ 4, 8.  This evidence suffices to establish, for purposes of this preliminary injunction application, that – absent the requested injunction – the League would suffer injury in fact, since it is now ready, willing, and able to broadcast the proposed advertisement.

The Commission also argues that the League lacks standing because it *may* qualify as an "*MCFL* organization," rendering it exempt from the Act's electioneering communications provision.  *See Fed. Election Comm'n v. Mass. Citizens for Life, Inc.* 479 U.S. 238, 262 (1986)

-6-

(holding certain non-profit advocacy corporations – now known as *MCFL* organizations –

exempt from an earlier version of the Act's limits on corporate expenditures); *McConnell*, 540

U.S. at 209-11 (holding that the current Act's electioneering communications provision contains

the same exemption); *see also* 11 C.F.R. § 114.10.  To qualify as an *MCFL* organization, a

corporation must not "engage in business activities"; on the other hand, it may obtain donations,

at least under some circumstances, through "garage sales, bake sales, dances, raffles, and

picnics." *Mass. Citizens*, 479 U.S. at 255, 264.  The League, however, has submitted invoices

that evidence its receipt of revenue from the sale of advertising space in its newsletter, *The

Recorder*.  We conclude that the League has submitted evidence sufficient, on the present record

and under the present time constraints, to demonstrate that it will suffer injury in fact.[3]

*See Lujan*, 504 U.S. at 560.

The Commission does not challenge the League's standing on other grounds, and we hold

that the League has standing because it also meets the causation and redressibility prongs of the

standing test.  *See id.*

**B.      Preliminary Injunction.**

It is well-settled that, in order to obtain a preliminary injunction, the movant bears the

burden of demonstrating:

(1)      "a substantial likelihood of success on the merits," *CityFed Fin. Corp. v. Office of

Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995);

---

[3]  The Commission argues that, in order to establish its standing, the League must seek an
advisory opinion from the Commission on whether it nonetheless qualifies as an *MCFL*
organization, thereby obviating any occasion for the Commission to become involved.  At oral
argument, however, the Commission could offer no assurance that it could provide such an
opinion before May 14 when the relevant blackout period begins.

(2)    "that it would suffer irreparable injury if the injunction is not granted," *CityFed Fin.*, 58 F.3d at 746;

(3)    "that an injunction would not substantially injure other interested parties," *id.*; and

(4)    "that the public interest would be furthered by the injunction," *id.*

In the present case, each of the four preliminary injunction factors counsels against the grant of the requested injunction.

### 1.    Substantial Likelihood of Success on the Merits.

The League has not demonstrated a "substantial likelihood of success on the merits." *CityFed Fin.*, 58 F.3d at 746.  On the one hand, enforcement of the electioneering communications provision to bar the League's proposed advertisement appears problematic under the First Amendment.  The First Amendment protects corporate speech, at least where that speech pertains to "[a] matter[] of public concern."  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776-78, 790-96 & n.31 (1978) (quotation marks omitted).  The League, the relevant corporation here, is a non-profit civic organization.  Its proposed advertisement would address a legislative issue at a time when that issue is likely to be under consideration in the Senate.  And the advertisement does not mention Senator Snowe's candidacy, which is unopposed.

Nevertheless, the electioneering communications provision, even in its application to the proposed advertisement, appears narrowly tailored to serve a compelling governmental interest. Particularly after *McConnell*, there can be no question that the governmental interest in maintaining the integrity of the electoral process is compelling.  The Court recognized: "'[T]o say that Congress is without power to pass appropriate legislation to safeguard an election from the improper use of money to influence the result is to deny to the nation in a vital particular the

power of self protection.'"  540 U.S. at 223-24 (quoting *Burroughs v. United States*, 290 U.S. 534, 545 (1934)).  It held: "The latter question – whether the state interest is compelling – is easily answered by our prior decisions regarding campaign finance regulation, which represent respect for the legislative judgment that the special characteristics of the corporate structure require particularly careful regulation."  *Id.* at 205 (quotation marks omitted).[4]  The League's status as a nonprofit, ideological corporation does not blunt this interest.  *See Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 152-63 (2003).

The Act appears narrowly tailored as well with respect to the League proposal to pay for the broadcast of its advertisement from its corporate funds.  Again in the words of the *McConnell* Court: "Because corporations can still fund electioneering communications with [political action committee] money, it is simply wrong to view the [electioneering communications] provision as a complete ban on expression rather than a regulation."  540 U.S. at 204 (quotation marks omitted).  Rather, the "ability to form and administer separate segregated funds . . . has provided corporations . . . with a constitutionally sufficient opportunity to engage in express advocacy." *Id.* at 203.  Here, the Act does not bar the proposed advertisement; it only requires that the League fund it through a political action committee.  Alternatively, the League may publish the advertisement with its own general corporate funds (i.e., without the use of a political action committee) so long as it uses a medium other than "broadcast, cable, or satellite," e.g., newspapers, leaflets, e-mails, telephone banks.  2 U.S.C. § 434(f)(3)(A)(i).  Or the League could publish the advertisement, as a "broadcast, cable, or satellite" communication and using its

---

[4]  For over a quarter of a century, Congress has legislated to restrict political expenditures by corporations – restrictions that do not and probably could not apply to individuals.  *See, e.g.*, *McConnell*, 540 U.S. at 115-33.

general corporate funds, if it refrained from "clearly identif[ying]" Senator Snowe. *Id.* As the
*McConnell* Court concluded: "[C]orporations and unions may finance genuine issue ads during
th[e blackout] time frames by simply avoiding any specific reference to federal candidates, or in
doubtful cases by paying for the ad from a segregated fund." 540 U.S. at 206.

Additionally, the advertisement that the League seeks to broadcast appears to be
functionally equivalent to the sham issue advertisements identified in *McConnell*. *See* 540 U.S.
at 94, 126-27. The Supreme Court has explicitly acknowledged that "issue advertisements" that
do not directly exhort citizens to vote for or against a particular candidate may have that effect.
*See id.* at 126-29, 189-94, 203-11. Indeed, the League's advertisement – which characterizes
Senator Snowe's past stance on the Marriage Protection Amendment as "[u]nfortunate[]" – is the
sort of veiled attack that the Supreme Court has warned may improperly influence an election.
*See id.* at 126-27. Here, the advertisement might have the effect of encouraging a new candidate
to oppose Senator Snowe, reducing the number of votes cast for her in the primary, weakening
her support in the general election, or otherwise undermining her efforts to gather such support,
including by raising funds for her reelection. *See* Oral Arg. Tr. at 41-42. The League's own
newsletter has already sounded an enthusiastic note regarding a potential challenger to Senator
Snowe:

> Representative Duprey is the courageous third-term legislator who is the State
> House's most faithful defender of traditional marriage. Here, Representative Duprey
> announces for the first time that he is willing to run against Senator Olympia Snowe
> in next year's Republican primary. The Record is proud to be the first publication
> in Maine to provide you with this information.

Commission Opp'n Br., Ex. A (Apr. 5, 2006 dep. of the League) at Ex. 8 (excerpt from Feb. 23,
2005 League newsletter).

Moreover, the League's proposed "grass roots lobbying" exception would seriously impair the government's compelling interest in protecting the integrity of the electoral process. For example, candidates or their allies could easily schedule an issue for "legislative consideration" during the run-up to an election as a pretext for broadcasting a particular subliminal electoral advocacy advertisement. In such a scenario, a scheduled hearing on "family values" might re-authorize even the Bob Yellowtail advertisement. Given these considerations, the League has not established a substantial likelihood of success on the merits.

    **2.**    **Irreparable Injury From Denial of the Injunction.**

The League has also failed to establish that "it would suffer irreparable injury if the injunction is not granted." *CityFed Fin.*, 58 F.3d at 746. It retains ready options for communicating its message regarding the Marriage Protection Amendment, consistently with the Act.

The facts as presently developed strongly suggest that the League will not suffer irreparable, or even significant, harm in the absence of the requested injunction:

(1)    The League can broadcast the same advertisement by funding it through a political action committee. *See* 2 U.S.C. § 441b(b)(2). The League would enroll its individual donor in the political action committee and have him or her direct the donation through that committee rather than into its general corporate funds.

(2)    The League could publish the text of the advertisement in a medium other than "broadcast, cable, or satellite," such as newspapers, leaflets, e-mails, telephone banks. 2 U.S.C. § 434(f)(3)(A)(i).

(3)    The League could refrain from "clearly identif[ying]" Senator Snowe in the

advertisement.  *Id.*

As the three-judge district court concluded in the factually analogous *Wisconsin Right to Life v. Federal Election Commission*, No. 04-1260, slip op. at 7 (D.D.C. Aug. 17, 2004): "[T]he actual limitation on plaintiff's freedom of expression, as protected by the First Amendment, is not nearly so great as plaintiff argues."

Nor can the League benefit from the presumption that injury from a First Amendment violation is irreparable.  In *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the Supreme Court stated: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  At this point, however, the League has established neither a First Amendment violation nor even the substantial likelihood of such a violation.  Irreparable injury does not follow from "merely *alleg[ing]* the violation of First Amendment rights."  *Wagner v. Taylor*, 836 F.2d 566, 576 n.76 (D.C. Cir. 1987) (emphasis in original).

### 3.    Substantial Injury From Grant of the Injunction.

The League's requested preliminary injunction would "substantially injure other interested parties."  *CityFed Fin.*, 58 F.3d at 746.  Specifically, it would injure the Commission and the public.  "The presumption of constitutionality which attaches to every Act of Congress is . . . an equity to be considered . . . in balancing hardships."  *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers); *see also New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").  As the *Wisconsin Right to Life* district court concluded:

The harm to the opposing party, the Federal Election Commission, is evident.

> Everyone agrees that it is the statutory duty of the defendant to enforce the [Bipartisan Campaign Reform Act of 2002]. . . .  We hold that an injunction against the performance of its statutory duty constitutes a substantial injury to the Commission . . . .

No. 04-1260, slip op. at 8 (D.D.C. Aug. 17, 2004).

### 4. Furtherance of the Public Interest.

Finally, the League has failed to establish that "the public interest would be furthered by the injunction." *CityFed Fin.*, 58 F.3d at 746.  In the words again of the three-judge district court in *Wisconsin Right to Life*:

> [W]e do hold that the plaintiff has not established that the public interest would be furthered by the injunction.  The Supreme Court has already determined that the provisions of the [Bipartisan Campaign Reform Act of 2002] serve compelling government interests.  *See McConnell*, 125 S. Ct. at 695-96.  To the extent that the injunction of the proposed application of those provisions interferes with the execution of the statute upheld by the Supreme Court in *McConnell*, the public interest is already established by the Court's holding and by Congress's enactment, and the interference therewith is inherent in the injunction.

No. 04-1260, slip op. at 8-9 (D.D.C. Aug. 17, 2004).

## III. CONCLUSION

For the foregoing reasons, an accompanying Order denies the League's motion for a preliminary injunction.

/s/

Judith W. Rogers
UNITED STATES CIRCUIT JUDGE

/s/

Louis F. Oberdorfer
UNITED STATES DISTRICT JUDGE

/s/

Colleen Kollar-Kotelly
UNITED STATES DISTRICT JUDGE

DATED:        May 9, 2006