UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTIAN CIVIC LEAGUE OF MAINE, INC., | ) ) | |
| | ) | Civil Action No. 06-0614 (JWR, LFO, CKK) |
| Plaintiff, | ) | (Three-Judge District Court) |
| | ) | |
| v. | ) | |
| | ) | Joint Report |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN McCAIN, RUSSELL FEINGOLD, CHRISTOPHER SHAYS, MARTIN MEEHAN, and TOM ALLEN, | ) ) ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**JOINT REPORT OF THE PARTIES PURSUANT TO
ORDER OF MAY 9, 2006**

Pursuant to the Court's Order of May 9, 2006, the parties hereby file their "joint plan for the further administration of this case."

After this Court denied the motion of plaintiff Christian Civic League of Maine, Inc. ("CCL") for a preliminary injunction, CCL appealed that decision to the United States Supreme Court and filed a Jurisdictional Statement on May 12, 2006. CCL also filed a motion to expedite the appeal, which was denied by the Supreme Court on May 15, 2006. The responses of the Federal Election Commission ("FEC") and the Intervenors to the Jurisdictional Statement are due on June 12, 2006.

1.      **FEC's position:**

Counsel for CCL did not make a good faith attempt to confer and prepare this report.  As explained below, CCL's "position" herein is essentially a surprise brief, submitted this afternoon to opposing counsel.  The contents of this "position" should have been presented to the Court as a memorandum in support of a motion to stay this case and to limit the scope of discovery.  The FEC respectfully requests the time normally allotted to respond to a motion to prepare an appropriate response to CCL's "position" herein.

Counsel for the Commission attempted to arrange a telephone conference among counsel by contacting opposing counsel by email last Tuesday, May 16.  See Attachment 1 hereto (exchange of emails cited and quoted below concerning this report).  In response, counsel for CCL responded the same day (May 16) by email and wrote:

> Because the case has been appealed, any action in the district court should be stayed until the Supreme Court resolves the appeal. The parties could then submit to the district court a plan for the further administration of the case in the district court within ten days of the resolution of the appeal.

The following day (May 17), counsel for CCL elaborated:

> This is intended to fulfill the requirement to confer pursuant to the May 9 Order of the D.C. District Court.
>
> The Plaintiff's position on the further administration of this case in the district court is, as you know, that any action in that court should be stayed until the Supreme Court resolves the appeal. The parties could then submit to the district court a plan for the further administration of the case in the district court within ten days of the resolution of the appeal.
>
> If Defendants and/or Intervenors have (a) different position(s), and wish to submit them to the court, please circulate them as necessary and please include the above position as Plaintiff's in the plan to be submitted.

Later, that day (Wednesday, May 17), counsel for the Commission provided CCL with the positions of both the FEC and the intervenors as set forth below.  Two days later (Friday,

May 19), counsel for CCL wrote to explain that they were "drafting an extensive explanation of CCL's positions regarding further administration of this case…"  In response, counsel for the Commission wrote:

> We look forward to receiving your additions to the report on Monday.  Since we have not had a chance to confer by telephone to discuss your position, we would appreciate receiving your written additions by noon on Monday.  We may need to modify our section in light of what we receive from you.  Thanks for your cooperation.

At 2:13 p.m. today (Monday, May 22), counsel for the Commission and the intervenors received 19 pages of briefing from CCL.  It is included at the end of this report under the heading "Plaintiff's Position."

The defendants had no warning that CCL would be addressing in this report any issues beyond its contention that this case should be stayed pending the appeal in the Supreme Court. In response to that position, the FEC states the following (the text of which was provided to CCL on Wednesday, May 17):

With respect to CCL's proposal to stay the proceedings, the FEC notes that this Court unquestionably retains jurisdiction to decide the merits while the appeal of the denial of the preliminary injunction is before the Supreme Court, that section 403 of the Bipartisan Campaign Reform Act calls for expedition of this case, and that CCL itself had previously demanded expedition and moved to consolidate the hearing on the preliminary injunction with the merits. If CCL wants to avoid further proceedings, it is free to seek a voluntary dismissal of its action.

Any stay of the proceedings before this Court, moreover, should not be construed as a concession of any kind by the FEC regarding whether CCL's appeal to the Supreme Court of the denial of a preliminary injunction continues to be justiciable.  In its Motion to Expedite filed with the Supreme Court on May 12, 2006, CCL explained that it believes the Senate will vote on

the Marriage Protection Amendment on June 5, 2006, and that the "League only wants to run the ad until the vote occurs and not thereafter." When the FEC opposed the Motion to Expedite, the Commission explained that CCL's appeal is therefore likely to become moot by the time the Supreme Court acts on CCL's jurisdictional statement. The FEC noted that CCL "may still seek further relief before the district court, perhaps following further factual development or proceedings" and that in light of the statutory expedition mandate "there is no reason to suppose that the process of record development will be protracted." This continues to be the FEC's view.

If the Court declines to stay this proceeding, the FEC proposes that it will file its Answer and/or appropriate motion under Fed. R. Civ. P. 12 within ten days of the Court's ruling. Because a Rule 12 motion would likely narrow the scope of this litigation, the FEC further proposes that within ten days of the Court's ruling on any such motion, the parties submit a joint report under Rule 16 concerning, inter alia, the scope of discovery and a schedule for briefing on the merits. If the scope of the litigation is not narrowed through a preliminary motion, the FEC would seek approximately three months to conduct discovery.

### 2.    Intervenors' position:

The Intervenors agree with the FEC's recitation as to the background to this filing, and with the request that the FEC and the Intervenors be provided with the opportunity to respond to the lengthy arguments submitted this afternoon by the Plaintiff as to discovery in this case.

As to the issue of whether the case should be stayed pending appeal of the denial of the plaintiff's motion for a preliminary injunction, Intervenors state the following (the text of which was provided to CCL on Wednesday, May 17):

The Intervenors oppose the stay as unwarranted. BCRA plainly directs this Court to proceed with this case on an expedited basis, § 403, Pub. L. No. 107-155, and Plaintiff has

shown no good cause to delay these proceedings in contravention of the statutory mandate.

Indeed, Plaintiff has itself previously urged this Court to expedite these proceedings. <u>See</u>

Plaintiff's Motion to Expedite (filed April 3, 2006). This Court retains jurisdiction to proceed,

notwithstanding Plaintiff's appeal of this Court's Order denying a preliminary injunction. 16 Fed.

Prac. & Proc. Jurisd. 2d. § 3921.2. It is unclear whether or when the Supreme Court may review

this Court's decision denying a preliminary injunction or what the result of such review might

be. It is clear, however, that whatever the Supreme Court may do, this Court will need to resolve

the case beyond the question of a preliminary injunction. In doing so, this Court will need and

should have the benefit of a full factual record. The parties can and should use the time now

available to build that record so that this case is ready for a final decision at the earliest feasible

time. The Intervenors agree with the FEC that approximately three months to conduct discovery

is appropriate.

       **3.**     **Agreement of all parties:**

     If the Court stays this case as proposed by CCL, the parties agree that any such stay

includes a stay of the impending obligation of the Federal Election Commission to file its

Answer, currently due on June 2, 2006. The parties have further agreed to stipulate that the FEC

need not file its Answer until ten days after the Court issues a decision about whether to stay this

case.

       **4.**     **Plaintiff's Position:**

     Because this case has been appealed, any action in the district court should be

stayed until the Supreme Court resolves the appeal. The parties could then submit to this

Court a plan for the further administration of the case in the district court within ten days

of the resolution of the appeal. A stay would preserve judicial resources and allow the

Court to either resolve the underlying legal questions or at least point this Court in the right direction so that it may do so. If the Court does not stay action in this matter, it should not allow Defendants further discovery into factors irrelevant to the resolution of the core issue of this case.

> ### A.    The Appeal May Resolve this Matter and Waiting For the Court's Disposition Will Conserve Judicial Resources.

The resolution of the appeal in this case could well prove dispositive of this matter. If the Supreme Court agrees with either Plaintiff's claim of probable success on the merits or that the district court's denial of preliminary injunction is a final judgment because Plaintiff has forever lost its opportunity to speak before the June 5 Senate vote, it will likely reach the merits of this case and its holding will then resolve the questions at the core of this matter, i.e, whether the electioneering communication prohibition is narrowly tailored to a compelling government interest as applied to the specific ad at issue here and/or as applied to genuine grassroots lobbying. This will obviate the need for protracted proceedings in this Court. At the very least, this Court will have the benefit of the Supreme Court's pronunciation of its basis for resolving CCL's appeal. It will therefore preserve judicial resources to await the disposition of CCL's appeal.

On the other hand, while the resolution of this case will likely come from the Supreme Court, the Defendants' proposal to instead "develop" the "full factual record" it has proposed earlier in this case will expend party and nonparty resources but will not facilitate this or any court's resolution of the case. Defendants here have previously proposed extensive and intrusive discovery. In addition to the expedited discovery to which CCL has already submitted, the FEC will apparently seek to

> compile a record addressing a narrow range of topics
> concerning the purpose and likely effect of CCL's planned
> advertisement . . . . seek expert testimony as to the likely effect of
> CCL's advertisement in Maine's electoral climate, CCL's alleged
> need to identify office holders in its grassroots lobbying
> advertisements, and the effect that a grassroots lobbying exemption
> like the one CCL now seeks would likely have in future electoral
> contests, including whether it would enable political consultants to
> craft electioneering ads that would circumvent regulation during
> the "electioneering communication" periods of the Act.

Def. FEC's Mem. Opp. Consolidation 7 (Docket # 15). It is well-established that the

constitution requires that a would-be speaker must know, *based on the meaning of the*

*words he is using*, whether or not his communication is regulable; a regulation of speech

that instead relies on surmising the intent or effect suffers a constitutional defect. *Thomas*

*v. Collins*, 323 U.S. 516 (1945); *see also Buckley v. Valeo*, 424 U.S. 1, 43 (1976),

*McConnell v. FEC*, 540 U.S. 93, 192 (2003). Subjective intent is not properly a part of

any other similar test in the First Amendment area. Accordingly, the Parties do not need

to amass nor does the Supreme Court or this Court need to pore over a "record" exploring

the intent or effect of CCL's ad and certainly not a record beyond that which the FEC has

already submitted.[1] The First Amendment protects those who simply wish to exercise

their constitutional rights of speech, association, and petition to the fullest extent without

risking prosecution or being forced to mount a pre-enforcement lawsuit and then prove its

motives "pure" because some critic supposes a nefarious purpose or intent behind the

communication.

The possibility that the Supreme Court's resolution of the appeal will reach the

merits and resolve the issues in this case without further action by the district court and

the likelihood that it will provide guidance as to the proper resolution even it is

eventually remanded far outweighs any benefit that could be had from expending

substantial resources to amass a more extensive record that is cumulative and will contain only information and/or opinions that are not relevant to the ultimate resolution of the issues this case presents.

**B.    The Need for an Expedited Resolution has Dissipated.**

The need for expedition in cases such as this focuses on would-be speakers such as CCL who face the threat of prosecution when attempting to make time-sensitive communications and must therefore have their claims expeditiously decided. That need expedition is now reduced in this case.

As was noted in CCL's Motion to Consolidate, the primary objective in bringing this suit was to broadcast an ad during the blackout period in order to influence the vote of Senators Snowe and Collins on the Marriage Protection Amendment, S.J. Res. 1, scheduled for early June. Pl's Motion to Consolidate 10 (citing VC ¶¶ 9-11). As was explained there and as has since developed, because the FEC was not enjoined from enforcing the electioneering communication prohibition against the broadcast of the ad, it was not run starting on May 14, and the need for resolution by this Court of the questions presented by that situation is no longer as pressing.

CCL presently has no concrete plans to run ads beyond what it began on May 10; but, of course, grass roots lobbying campaigns are often created and executed within very short time frames because they are inherently dependent on legislative whims. *See* Heath Aff. ¶ 12 ("Whether the Christian Civic League will need to run such ads during the blackout period prior to the November election depends on whether the Federal Marriage Amendment (or other important legislative issues) is pending before the legislature and where it is in the process."). Accordingly, there is no longer any pressing need that

justifies maintaining two tracks of litigation when the appeal here is likely to resolve the issues on the merits.

Finally, as a practical matter, awaiting resolution of the appeal will likely take no more time than the plan Defendants propose. Their schedule includes three months of discovery before any dispositive motion would be lodged, let alone briefed and argued.

### C.    There is No Logical Reason For the Defendants to Press For Discovery in This Case Yet Seek Dismissal in *Wisconsin Right to Life v. FEC*.

The FEC and Intervenor-Defendants[2] hold contradictory positions on the appropriate judicial consideration of the issues of this case. They have just this month (May 1) argued before the district court that *Wisconsin Right to Life v. FEC*, No. 04-1260 (D.D.C.) ("*WRTL*"),which considers essentially the same issues, should be dismissed as moot as to the ads that WRTL wanted to run in 2004 and not ripe as to any future ads. *See WRTL*, Memorandum of Law in Response to Scheduling Order (Docket #72), Defendant Federal Election Commission's Memorandum Addressing Questions Posed in the Court's April 17, 2006, Scheduling Order (Docket #73). In *WRTL*, the same Defendants want to end consideration of the same issues this case presents even after the Supreme Court remanded for consideration "in the first instance," yet here they oppose a stay, where the ongoing appeal may well resolve all the issues entirely. In *WRTL*, they argue that the case should be dismissed after the time for the ad had passed, but here they wish the case to continue unabated after time for the ad has passed.

### D.    In the Alternative, Should This Court not Stay Action Until Resolution of CCL's Appeal, It Should Not Allow Defendant's to Impose Unnecessary and Intrusive Discovery.

The discovery proposed here, having to do with the intent and effect of CCL's advertisements, is at best unnecessary and at worst illegitimate because it contradicts established First Amendment jurisprudence and amounts to relitigating *McConnell v. FEC*, 540 U.S. 93 (2003), and/or seeking evidence of considerations made irrelevant by *McConnell* and *Wisconsin Right to Life, Inc. v. FEC*, 126 S.Ct. 1016 (2006) ("*WRTL II*").

Whether CCL's advertisements "fit the very type of activity that *McConnell* found Congress had a compelling interest in regulating," *WRTL II* at 1018, does not require examining more than the facts already established in this matter, because the legal effect of such facts has already been established. After considering the same factors proposed for discovery by the FEC here with respect to electioneering communications and considering expert testimony very similar to that which the FEC has proposed here, the Court in *McConnell* found that the electioneering communication prohibition's reach was not so wide as to be facially invalid. The timing of the advertisements' broadcast near elections, the need to name officeholders in ads, and the effect of the ads on "the electoral climate" were considerations by the district court in *McConnell* and are necessarily encompassed in the Supreme Court's holding. There is no need to spend resources covering the same ground again.

The upshot of *McConnell* is that sham issue ads are problematic, *see*, *e.g.*, 540 U.S. at 193 n.78, while genuine grassroots lobbying ads are not. *Id.* at 207 n.88; *WRTL II*, 126 S.Ct. at 1018 (implicitly but necessarily rejecting the assertion that the logic of BCRA's electioneering communication prohibition meant that no line could be drawn between "genuine" and "sham" issue ads and seeking this Court's initial guidance in establishing such a line). And this Court has already made an enormous effort to

The discovery proposed here, having to do with the intent and effect of CCL's advertisements, is at best unnecessary and at worst illegitimate because it contradicts established First Amendment jurisprudence and amounts to relitigating *McConnell v. FEC*, 540 U.S. 93 (2003), and/or seeking evidence of considerations made irrelevant by *McConnell* and *Wisconsin Right to Life, Inc. v. FEC*, 126 S.Ct. 1016 (2006) ("*WRTL II*").

Whether CCL's advertisements "fit the very type of activity that *McConnell* found Congress had a compelling interest in regulating," *WRTL II* at 1018, does not require examining more than the facts already established in this matter, because the legal effect of such facts has already been established. After considering the same factors proposed for discovery by the FEC here with respect to electioneering communications and considering expert testimony very similar to that which the FEC has proposed here, the Court in *McConnell* found that the electioneering communication prohibition's reach was not so wide as to be facially invalid. The timing of the advertisements' broadcast near elections, the need to name officeholders in ads, and the effect of the ads on "the electoral climate" were considerations by the district court in *McConnell* and are necessarily encompassed in the Supreme Court's holding. There is no need to spend resources covering the same ground again.

The upshot of *McConnell* is that sham issue ads are problematic, *see*, *e.g.*, 540 U.S. at 193 n.78, while genuine grassroots lobbying ads are not. *Id.* at 207 n.88; *WRTL II*, 126 S.Ct. at 1018 (implicitly but necessarily rejecting the assertion that the logic of BCRA's electioneering communication prohibition meant that no line could be drawn between "genuine" and "sham" issue ads and seeking this Court's initial guidance in establishing such a line). And this Court has already made an enormous effort to

distinguish between the two, forming the basis of the Supreme Court's holding that

"sham" issue ads were regulable as the functional equivalent of express advocacy, and its

later holding, in *WRTL II*, that a line must be drawn between sham issue ads and

grassroots lobbying ads.

> **1.     The Supreme Court's Remand
> Decision in *WRTL II* Makes Irrelevant Discovery
> Regarding Such Things as Proximity to an
> Election, Possibility of an Effect on Elections,
> Choice of Broadcast Media, or Burden of PAC
> Use.**

The Supreme Court's remand opinion in *WRTL II* makes irrelevant some matters

into which the Defendants have indicated an interest in conducting discovery, such as

why CCL wanted to run its ads during the electioneering communication blackout period

and why CCL chose the broadcast medium. The same is true of any proposed expert

testimony on the fact that ads run near elections might have some effect on elections.

Defendants are really trying to relitigate the first issue of *WRTL II*, which they

lost by unanimous decision in the Supreme Court. Defendants argued to the Supreme

Court that there could be no as-applied challenges to the electioneering communication

prohibition because in *McConnell* that Court had noted that ads in proximity to elections

that named candidates might influence elections and might even be intended to do so,

which findings were sufficient to sustain the prohibition against a facial attack. But

despite *McConnell*'s findings and Defendants' arguments, the Supreme Court decided

that as-applied challenges must be permitted and remanded the case to this Court for

assistance, in the first instance, in crafting a rule that would distinguish what *McConnell*

called "genuine issue ads," 540 U.S. at 206 n.88, from what it elsewhere called "sham

issue ads." *WRTL II*, 126 S.Ct. at 1018.

Several guiding principles for the scope of discovery are implicit in the Supreme Court's *WRTL II* decision. First, it doesn't matter that grassroots lobbying ads would be run within 30- and 60-day periods before primary and general elections. If that mattered, the Supreme Court would not have permitted as-applied challenges regarding communications that necessarily fall within the prohibition periods. Instead, the Supreme Court would have held what Defendants asked it to hold, i.e., that under the logic of *McConnell* there could be no as-applied challenges because by definition any exception to the electioneering prohibition must necessarily apply within the prohibition periods. So any effort by Defendants to put on evidence and to argue that genuine grassroots lobbying must be prohibited because it happens in proximity to elections must be rejected. That is a given fact in the very nature of an as-applied challenge to the prohibition and so is irrelevant. The Supreme Court has already decided that issue.

Second, the mere fact that genuine grassroots lobbying might have some possible effect on elections was also implicitly rejected in *WRTL II*. Defendants argued to that Court that *McConnell* had found that ads run near elections that mentioned candidates might have some effect on elections so there could be no as-applied challenges. Defendants lost. *WRTL II* says that there may be as-applied challenges in the face of such evidence, i.e., it is not enough that some expert believes that genuine grassroots lobbying might have some effect on an election. *McConnell* required more than that, namely that the ads must be the "functional equivalent of express advocacy," 540 U.S. at 206, not merely that they have some possible effect on elections. So evidence of a mere possibility of an effect on elections is already assumed in *WRTL II* and is irrelevant for this case on remand.

Third, the fact that, and reasons why, CCL chose the broadcast medium for its ads are also irrelevant because by the very definition of electioneering communication there would be no case if they were not broadcast ads. Any exception to the prohibition will necessarily be a broadcast ad. There were no findings in McConnell indicating that choosing to use broadcast ads, as opposed to print ads, was somehow any indication of wrongdoing. The simple fact is that Congress extended the prohibition to broadcast ads only (quite obviously because of the medium's effectiveness for communication), so an exception to the prohibition must necessarily be applicable to broadcast ads, and there is no relevant issue as to the use of, or reasons for choosing, any other type. The necessary implication of the *WRTL II* remand is that there may be "genuine issue ads" that are broadcast ads within prohibition periods. So there is no relevance to the fact that CCL wanted to do broadcast ads. The necessary implication of the *WRTL II* remand opinion is that there may be an as-applied exception precisely where the communicator did not choose the other media.[3]

Fourth, the same principle applies to questions about why CCL did not use a PAC or what burdens were entailed in using funds from the PAC. The short answers are that CCL doesn't have a federal PAC, and CCL does not believe that it is constitutionally required to use PAC funds to exercise its right to petition by grassroots lobbying. But as to discovery, any information about the burden of using a PAC is necessarily irrelevant both because (1) as a matter of law both *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*") and *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658 (1990), held that requiring expenditures to be made through a PAC is a constitutionally cognizable burden in and of itself and (2) the *WRTL* remand opinion implicitly assumes

that there will be "genuine issue ads" that are not run with PAC funds. Again, there would be no issue on remand in *WRTL* if WRTL could have been made to use PAC funds, and if the Supreme Court had intended that non-use of PAC funds was the deciding factor, then it would have said there could be no as-applied challenge because WRTL would have been limited to use of PAC funds.

In sum, the Supreme Court in unanimously holding that WRTL could bring an as-applied challenge to the electioneering communication prohibition — on the basis of its choice to use broadcast grassroots lobbying ads within the prohibition period and without funding them with PAC funds — already took into account both the evidence in *McConnell* and the language of the Court's own opinion in *McConnell* (including the fact that broadcast ads not using PAC funds that are run close to elections might have some effect on elections) and nonetheless said that there could be "genuine issue ads" requiring constitutional protection specifically in the context of the grassroots lobbying protected by the First Amendment right to petition. Defendants should not be permitted to burden CCL and this Court with an effort to relitigate both *McConnell* and *WRTL*.

### 2.    The Legitimacy of a Discoverable Issue Here Is Limited by CCL's Right to Petition.

Any application of the electioneering communication prohibition must respect the limits imposed by the fundamental constitutional right to petition. The FEC seeks to discover CCL's intent in running the advertisements giving rise to this suit, ostensibly on the theory that the electioneering communication prohibition rightly applies if the requisite intent or motive should be shown. But when the right to petition is at issue, in

whatever context it arises, questions of intent or motive are irrelevant in situations such as the present one, as discussed next.

The right to petition is "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'" *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quoting *United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967)). Grassroots lobbying is a quintessential exercise of the right to petition. *Eastern R.R. President Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-138 (1961); *Liberty Lobby, Inc. v. Pearson*, 390 F. 2d 489, 491 (D.C. Cir. 1968). In addition, as general advocacy of positions in matters of public import, grassroots lobbying is protected under the First Amendment as part of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Even in the context of federal antitrust and labor relations law[4], where no additional First Amendment rights attach, the government cannot prohibit activities that would otherwise violate antitrust or labor law when those actions are "'an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.'" *BE & K*, 536 U.S. at 525 (quoting *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961)). The right to petition trumps the provisions of such laws, even where the petitioners seek to affect the debate over how those very laws do or should apply.

The *Noerr-Pennington* doctrine allows prosecution only when the right to petition is not genuinely at issue because the efforts to petition are "sham." See *Noerr*, 365 U.S. at 144 (in the antitrust context, immunity does not extend to lobbying "ostensibly directed

15

toward influencing governmental action [that] is a mere sham to cover what is actually . . . an attempt to interfere directly with the business relationships of a competitor.").  The FEC seeks to discover CCL's intent in running the advertisements at issue here, ostensibly on the theory that information it gleans will establish that the electioneering communication prohibition rightly applies to CCL's grassroots lobbying, despite the First Amendment's protection of the right to petition. In short, the FEC seeks here to establish an exception to the right-to-petition immunity in the context of the electioneering communication prohibition, and it can do that only if CCL's grassroots lobbying is "sham petitioning."

But the exception to *Noerr-Pennington* petitioner immunity has two elements, including a key threshold inquiry. Even in the antitrust and labor relations contexts, where no separate First Amendment speech concerns attach, petitioners' immunity generally applies regardless of the petitioners' subjective intent or purpose. *In Professional Real Estate Investors v. Columbia Pictures Industries*, the Court held that whether litigation asserted to be an exercise of the right to petition was "sham" must be determined by a two-part test:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. [footnote omitted] Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationship of a competitor" through the "use [of] the governmental process — as opposed to the outcome of that process — as an anticompetitive weapon."

16

508 U.S. 49, 60-61 (1993) (citations omitted; emphasis in original); *accord*, *BE & K*, 536 U.S. at 526.

A petition, whether by lobbying or litigation, is subjectively a sham if, for example, the intent is to interfere directly with the business relationships of a competitor, *Noerr*, 365 U.S. at 144, or to penalize or retaliate against a protected labor activity, *Bill Johnson's*, 461 U.S. at 743. However, an improper subjective intent, while necessary, is not sufficient to make a petition a sham and trigger the exception to petitioner immunity because there is a threshold requirement.

Protection of the exercise of the right to petition still exists where there is "'a concerted effort to influence public officials regardless of intent or purpose.'" *BE & K*, 536 U.S. at 525 (2002) (quoting *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965)) (emphasis added). "For a suit to [be excepted from petitioners' immunity], then, it must be a sham both objectively and subjectively." *Id.* at 526 (citing *Professional Real Estate Investors*, 508 U.S. at 60-61) (emphasis in original). The Supreme Court has accordingly held that unless no reasonable litigant could expect success on the merits, even if a labor law litigator intended by his litigation "to retaliate against the defendant for exercising rights protected by the [NLRA]," *Bill Johnson's*, 461 U.S. at 743, the petition effort was not sham and the protection demanded by the federal constitution for the right to petition prevented application of the NRLA. *BE & K*, 536 U.S. at 526.

The transferable concept to the present application of the right to petition is that unless CCL's grassroots lobbying ads themselves are objectively without merit as exercising the right to petition, then any finding of a subjective intent to influence elections would not be enough to deny the ads immunity from the electioneering

communication prohibition. As the Supreme Court said in *Professional Real Estate Investors*, "only if challenged litigation is objectively meritless may a court [even] examine the litigant's subjective motivation." 508 U.S. at 60 (emphasis in original). The Court held there that discovery as to possible underlying "motivations in bringing the suit" was properly denied because they "were rendered irrelevant by the objective legal reasonableness of the litigation." *Id.* at 65-66.

Likewise here, CCL's legal position is objectively reasonable. It is objectively a genuine exercise of the right to petition by the plain terms of the communication.[5] Accordingly, as the Court held in *Professional Real Estate Investors*, discovery as to possible underlying "motivations in bringing the suit" should be denied because such questions are irrelevant.

> **3.     The Resolution of This Case Requires a Standard That Will Distinguish Genuine Grassroots Lobbying From Otherwise Regulable Ads and That Standard Will Not Depend on the Intent or Effect of the Ad. Therefore, Discovery of Subjects or Objects that Explore the Intent or Effect of CCL's Ad Are Irrelevant.**

What sort of standard would best distinguish genuine grassroots lobbying from the sort of "sham" issue ads identified as the problem in *McConnell*, 540 U.S. at 193, n.78 (example of "sham" ad). First, the standard must be faithful to the First Amendment's guarantees of free expression, association, and petition (so that it must be narrowly tailored to compelling governmental interests, promote robust public debate, and leave breathing room) and the Fourteenth Amendment's protection against vagueness. Second, while constitutional mandates clearly outweigh FEC convenience[6] or judicial manageability, a proper standard must give sufficient guidance to the regulated

community so that the FEC does not embroil citizen groups in intensive discovery to determine their true 'intent' and this Court is not inundated with eve-of- election litigation. This is best accomplished by an objective legal test that focuses on the activity at issue instead of extraneous activity and eliminates irrelevant discovery.

The needs described above require a standard that is sufficiently bright to protect the communicator's rights and that is based on readily-identified, objective criteria and on the content of the communication itself. The two most relevant examples of how this sort of standard is done in the election law context are the standards for determining whether a communication is an "independent expenditure" or an "electioneering communication." The determinations are made on the basis of the communications themselves, not the subjective intent of the speaker.

An independent expenditure is determined by looking to the communication itself, not the speaker's intent. "'Independent expenditure' means an [uncoordinated] expenditure by a person . . . expressly advocating the election or defeat of a clearly identified candidate . . . ." 2 U.S.C. § 431(17). "'Clearly identified' means that—(A) the name of the candidate involved appears; (B) a photograph or drawing of the candidate appears; or (C) the identity of the candidate is apparent by unambiguous reference." 2 U.S.C. § 431(18). So whether a communication constitutes an independent expenditure turns solely on whether the communication itself contains explicit words expressly advocating a clearly identified candidate's election or defeat. Intent is not a factor, nor is what an organization's PAC said, what the organization's press releases said, and whether some candidate cares about the same issue so as to make it a campaign issue are not part of the analysis. There is express advocacy, or there is not, based on the

communication itself. *Buckley v. Valeo*, 424 U.S. 1, 43 (1976) (express advocacy "limited to communications that include explicit words of advocacy . . . .").

As to electioneering communications, the law again requires examination of the communication itself, not the subjective intent of the speaker. "Electioneering communication" is defined as a "communication" meeting certain criteria. 2 U.S.C. § 434(f)(3); 11 C.F.R. § 100.29. Nowhere in the definition is there any instruction to see what the organization's intent was, or whether the organization's PAC said anything, or what the organization's press releases said. In fact, *McConnell* upheld the definition because it introduced none of the vagueness posed by the statute at issue in *Buckley*. *McConnell*, 540 U.S. at 192, 194. The problem identified in *Buckley* was how to separate electioneering from participatory democracy. *Buckley* noted that "[c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." 424 U.S. at 42. The Court pointed out the standard in the First Amendment context, namely, that there could not be a test that depended on intent or the hearers' subjective judgment:

> (W)hether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation. . . . Such a distinction offers no security for free discussion. In these conditions it blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.

*Id.* at 43 (internal quotation marks and citation omitted).

As to the relevance of CCL's other activity, the very statutory prohibition at issue in this case, expressly excludes any consideration of PAC activity in determining whether

a corporation has made an independent expenditure or an electioneering communication. 2 U.S.C. § 441b(b)(2)(C) ("shall not include . . . the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes" (emphasis added)). The courts have never held that what a citizen group says through other entities is attributable to its connected corporation is a factor in determining whether a communication made with general treasury funds constitutes express advocacy, or its functional equivalent.[7] If what an associated entity says is attributable to a connected corporation itself, then every PAC's independent expenditure and electioneering communication would constitute a violation by the corporation of the prohibition on corporate independent expenditures and electioneering communications at 2 U.S.C. § 441b. The PAC is legally and logically separate from the corporation.[8] It's actions are not attributable to its connected corporation. Likewise, the activities of CCL's state PAC or any other of its internal segregated funds are not attributable to its corporation and thus are irrelevant as subjects of discovery.

*Buckley* and *McConnell* both stand for the proposition that express advocacy and its functional equivalent must be determined by a bright-line test to protect the speaker's fundamental freedoms and involvement in the core functions of participatory democracy. There can be no vagueness, and introducing subjective criteria, such as the speaker's subjective intent or things said in an unrelated prior press release, reintroduces vagueness.

First Amendment protections in the libel context also provide guidance for a proper standard. If a speaker allegedly libeled an incumbent politician who was running for office, the Supreme Court has held that the First Amendment requires that the politician prove that the statement was false, that it referred to the politician, and that it

was made with "actual malice," which it defined as scienter, not as some actual 'intent'

(i.e., ill will, hatefulness):

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*New York Times v. Sullivan*, 376 U.S. 254, 280-81 (1964). The Supreme

Court approvingly quoted a Kansas Supreme Court opinion showing the

scope of the speaker's "privilege":

> In such a case the occasion gives rise to a privilege, qualified to this extent: any one claiming to be defamed by the communication must show actual malice or go remediless. This privilege extends to a great variety of subjects, and includes matters of public concern, public men, and candidates for office.

*Id.* at 281-82 (quotation marks and citation omitted). If a candidate cannot delve into a

speaker's subjective intent in making an allegedly libelous statement, neither the

candidate nor the FEC ought to be able to delve into the speaker's subjective intent for

other claims operating in the realm of First Amendment protection.

And as mentioned above, the *Noerr-Pennington* line of cases provide further

support for the notion that genuine grassroots lobbying and litigation are protected,

despite possible effects that might otherwise be regulable, by an objective, legal

examination of the activity itself, not extraneous activity of the entity involved. These

examples all demonstrate the problems with, and the need to avoid creating, any standard

that would examine a communicator's subjective intent, or depend on the hearer's

subjective evaluation of what has been said, or on contextual criteria beyond the

communication.

      Accordingly, the resolution of this case, whether it comes from the Supreme

Court or this Court, will not depend on the intent or effect or the context of CCL's ad

beyond the communication itself and discovery into areas that address these factors can

only yield

[1]By submitting to the expedited discovery conducted in this case, CCL in no wise concedes that it was necessary to the disposition of its claim. *See* Pl's Motion to Consolidate the Hearing on the Motion for Preliminary Injunction with a Hearing on the Merits of the Verified Complaint (Docket #12) at 2 n.1. However, and in any event, the record compiled by that discovery is more than sufficient to dispose of the questions presented here. *Id.* at 1-2, 4-5.

[2]The Intervenor-Defendants are the same in both cases with the exception that in addition to the sponsors of the BCRA, Senators John McCain and Russ Feingold, Representatives Christopher Shays and Martin Meehan, also intervening in this case was Representative Tom Allen from Maine while in *WRTL*, Representative Tammy Baldwin from Wisconsin intervened.

[3]It is not the role of government to tell citizens how best to communicate: "The First Amendment protects [CCL's] right not only to advocate [it's] cause but also to select what [it] believe[s] to be the most effective means for doing so." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

[4]The *Noerr-Pennington* line of cases demonstrates that, in whatever context the right to petition is affected, it enjoys powerful constitutional protection. *Noer* and *Penninton* established that the right to petition trumps otherwise applicable antitrust law. The principle of immunity from prosecution when petitioning government was extended to "situations where groups use . . . courts to advocate their causes and points of view" in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972). The Court later applied the *Noer-Pennington* doctrine in the context of labor relations law in *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 737, 743 (1983). It was applied it to a situation where groups used courts to advocate in the context of labor relations law in *BE & K*, 536 U.S. 516.

[5]Moreover, it also objectively looks nothing like the "sham issue ads" identified as being the "functional equivalent" of express advocacy in *McConnell*.

[6]The Supreme Court has held that where constitutional justification is absent, the FEC's "desire for a bright-line rule. . . . hardly constitutes the compelling state interest necessary to justify any infringement on First Amendment freedom." *MCFL*, 479 U.S. at 263.

[7]In *MCFL*, MCFL had a PAC, 479 U.S. at 255 n.8, but the Supreme Court never asked what the PAC had said or done in its analysis of whether MCFL's communication contained express advocacy. *Id.* at 249. MCFL had engaged in various legislation-oriented activities, including grassroots lobbying. *Id.* at 242. But the Court never considered any such activity in determining whether there was an independent expenditure. Instead the Court noted that the "Special Edition" of MCFL's newsletter said to vote prolife and then identified which candidates were prolife. *Id.* at 249. So the Court said that if A=B and B=C, then A=C. But the sole focus was on the particular communication in the newsletter and what its words said, not MCFL's other activities.

[8]Corporations and their PACs are independent entities as a legal matter. *California Medical Association v. FEC*, 453 U.S. 182, 196 (1981) ("[The] claim that [a PAC] is merely the mouthpiece of [the sponsoring organization] is untenable. [The PAC] instead is a separate legal entity that receives funds from multiple sources and that engages in independent political advocacy.").

Respectfully submitted,

FOR THE PLAINTIFF:                              FOR THE DEFENDANT:


                                                _____/s/_____
James Bopp, Jr.                                 Lawrence H. Norton
Richard E. Coleson                              General Counsel
Jeffrey P. Gallant
BOPP, COLESON & BOSTROM
1 South Sixth Street                            _____/s/_____
Terre Haute, IN 47807-3510                      Richard B. Bader
812/232-2434 telephone                          Associate General Counsel
812/234-3685 facsimile                          (D.C. Bar # 911073)
*Lead Counsel for Plaintiff*


                                                _____/s/_____
                                                David Kolker
                                                Assistant General Counsel
                                                (D.C. Bar # 394558)


 _/s/  Michael S. Nadel_____          _____/s/_____
M. Miller Baker, D.C. Bar #444736               Harry Summers
Michael S. Nadel, D.C. Bar #470144              Kevin Deeley
MCDERMOTT WILL & EMERY LLP                       Steve N. Hajjar
600 Thirteenth Street, NW                       Attorneys


Washington, D.C. 20005-3096                     FEDERAL ELECTION COMMISSION
202/756-8000 telephone                          999 E Street, N.W.
202/756-8087 facsimile                          Washington, D.C. 20463
*Local Counsel for Plaintiff*                   (202) 694-1650

FOR THE INTERVENOR-DEFENDANTS:


/s/ _____

Roger M. Witten (D.C. Bar No. 163261)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

Seth P. Waxman (D.C. Bar No. 257337)
   *Counsel of Record*
Randolph D. Moss (D.C. Bar No. 417749)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006
(202) 663-6000


Donald J. Simon (D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
   ENDRESON & PERRY, LLC
1425 K Street, N.W.
Suite 600
Washington, DC  20005
(202) 682-0240

Fred Wertheimer (D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, DC  20006
(202) 429-2008


Trevor Potter
J. Gerald Hebert (D.C. Bar No. 447676)
Paul S. Ryan
CAMPAIGN LEGAL CENTER
1640 Rhode Island Avenue, N.W.
Suite 650
Washington, DC  20036
(202) 736-2200

Daniel R. Ortiz
UNIVERSITY OF VIRGINIA SCHOOL OF LAW*
580 Massie Road
Charlottesville, VA  22903
(434)924-3127

*For identification purposes only


Charles G. Curtis, Jr.
David Anstaett
HELLER EHRMAN WHITE &
  MCAULIFEE LLP
One East Main Street
Suite 201
Madison, WI  53703
(608)663-7460

Bradley S. Phillips
Grant A. Davis-Denny
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
35th Floor
Los Angeles, CA  90071
(213)683-9100

May 22, 2006