United States District Court
District of Columbia

| | |
|---|---|
| **The Christian Civic League of Maine, Inc.**<br>*Plaintiff,*<br><br>v.<br><br>**Federal Election Commission,**<br>*Defendant,*<br><br>and<br><br>**John McCain et al.,**<br>*Intervenor-Defendants.* | Cause No. **1:06CV00614** (JWR, LFO, CKK)<br><br>THREE-JUDGE COURT |

# Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant FEC's Motion to Dismiss "Plaintiff's Claims Regarding Hypothetical 'Grass Roots Lobbying'" and Motion of Intervenor-Defendants for Partial Judgment on the Pleadings

The Christian Civic League of Maine, Inc. ("League") opposes Defendant FEC's Motion to Dismiss [docket # 37] and Intervenor-Defendants' Motion for Partial Judgment on the Pleadings [docket # 39] for the following reasons:[1]

**I.    Correctly Stated, the Requirements for Article III Standing Are Fully Met Here.**

While characterizing the League's claims regarding future ads as unripe, speculative or hypothetical, Defendant Federal Election Commission's Memorandum in Support of Its Motion to Dismiss Plaintiff's Claims Regarding Hypothetical "Grass Roots Lobbying" ("Defs.' Mem.") 1, the Defendants cite generally applicable principles of Article III standing but fail to address or

---

[1]Because intervenor-defendants filed no separate brief in support of their motion for partial judgment and instead relied upon the reasons given by Defendant FEC, the League answers in opposition to both motions in this response, but files copies in response to each motion.

**Plaintiff's Opposition
to Motions to Dismiss**

counter the weight of applicable precedents finding standing and ripeness where, as here, future conduct is alleged in a preenforcement challenge of a law that arguably abridges First Amendment rights.[2]

    A.    **The League's Claims Are Ripe.**

As Defendants note, in a pre-enforcement challenge[3] such as this, ripeness is a particularly relevant component of justiciability. Defs' Mem. 4 (quoting *Navegar Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997)). But in addition to reiterating general propositions about standing and ripeness, in *Navegar* the District of Columbia Court of Appeals explained that

---

[2]That this Court limited discussion of broadcast ads in its Opinion on the League's motion for preliminary injunction to the one attached to the League's Verified Complaint is of little import in addressing the League's request for declaratory and permanent injunctive relief with regard to other, future ads. *See* Defs' Mem. 3. Of course, this Court is the final authority on the meaning of its Opinion, but Plaintiff submits that the section cited by Defendants means only that, having disposed of the request for a preliminary injunction for any future ads, the Court would no longer address those ads in the remainder of its opinion. More important, that result had nothing to do with ripeness or standing and everything to do with the narrow scope Fed. R. Civ. P. 65 requires of a preliminary injunction.

    A preliminary injunction requires a precise scope because it is considered extraordinary relief. *See* Memorandum Opinion (May 9, 2006) at 4; Fed. R. Civ. P. 65(d) ("Every order granting an injunction and every restraining order shall . . . be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . ."). This Court found that, under Rule 65's demanding standard, the scope of any future ads to which the injunction would apply was not sufficiently delineated. Memorandum Opinion at 3 n.1. A request for a declaratory judgment and permanent injunction on cross motions for summary judgment bears no comparable burden because, by definition, the material facts justifying injunctive relief are authoritatively established, the scope of any necessary injunctive relief is clearly delineated, and the legal necessity of the remedy has been established.

    Thus, it would be perfectly consistent for this Court to deny preliminary injunction on the basis that the ads to which it would apply were not narrowly described and to then declare, on cross motions for summary judgment, that the law is, in fact unconstitutionally overbroad as to those same ads, and permanently enjoin the law's application to them.

[3]"It is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

**Plaintiff's Opposition
to Motions to Dismiss**                        2

where, as here, a pre-enforcement challenge is raised against a law that threatens prosecution for First Amendment-protected activities, a party claiming relief has standing and the action is ripe for adjudication if there is a credible threat of the law's enforcement.

### 1. The Credible Threat of Enforcement Here Establishes Standing and Makes Adjudication of This Case Ripe.

"[W]hen the criminal statute that a litigant challenges has not yet been enforced against her, (i.e. in a preenforcement challenge), the challenger's claim may be *justiciable* if the challenger can demonstrate that she faces a threat of prosecution under the statute which is credible and immediate, and not merely abstract or speculative." *Navegar*, 103 F.3d at 998 (emphasis added). A dispute is *justiciable* only when the plaintiff has standing *and* the controversy is ripe. *Id.* (noting that standing and ripeness are both "components" of Article III justiciability); *Renne v. Geary*, 501 U.S. 312, 320 (1991) ("Justiciability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention.").

As the court in *Navegar* then made explicit, taken together, these points mean that demonstrating a credible threat of prosecution establishes both standing and ripeness: "such threats of enforcement can simultaneously ripen[4] a preenforcement challenge and give the

---

[4]The mechanics of this result are straightforward. Ripeness analysis overlaps substantially with standing considerations:

> In deciding whether a case is ripe for adjudication, federal courts generally consider the hardship to the parties of withholding court resolution (a factor that overlaps with the "injury in fact" facet of standing doctrine), and the fitness of the issues for judicial decision (a factor that resembles the prudential concerns applied in the standing context). [citation omitted].

103 F.3d at 998. Thus, questions of ripeness are answered when standing is considered, and since in the First Amendment preenforcement context, a credible threat of enforcement is an injury in

**Plaintiff's Opposition
to Motions to Dismiss**                                         3

threatened party standing." 103 F.3d at 998 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-99 (1979); *American Library Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C. Cir. 1992); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3532.5 (1984)). *See also California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093-94 (9th Cir. 2003) (holding that where a similar association's intended communication was arguably subject to California reporting and disclosure requirements, it was a cognizable injury establishing standing to challenge the definition making the requirements applicable, and that because it suffered an injury as a result of an allegedly unconstitutional statute, that the association's claim was necessarily ripe for review); *Arizona Right to Life PAC v. Bayless*, 320 F.3d at 1007 n. 6 (noting in a similar context that finding that the plaintiff has suffered a harm "dispenses with any ripeness concerns"). In a preenforcement challenge of a law that arguably violates the First Amendment, unless the threat of enforcement is not credible, the plaintiff has standing and the controversy is ripe.

Defendants cannot claim that the threat of enforcement of the electioneering communication prohibition against past or future broadcasts of the League's ads is not credible: the prohibition is plainly applicable to the Crossroads ad and any "targeted" broadcast ad aired during the blackout periods. The FEC has not provided any exception to the electioneering communication prohibition for anything even purporting to be grassroots lobbying, despite requests to do so. *See*, *e.g.*, FEC Notice 2006-4 "Rulemaking Petition: Exception for Certain 'Grassroots Lobbying' Communications From the Definition of 'Electioneering Communica-

---

fact and "provides the foundation for justiciability as a constitutional and prudential matter," *Navegar*, 103 F.3d at 998, ripeness is likewise established by the credible threat of enforcement. *Id.* at 998-99.

**Plaintiff's Opposition
to Motions to Dismiss**                                    4

tion."71 Fed. Reg. 13557. The prohibition firmly remains the "the purported legal norm that binds the class regulated by the statute," and hence there is a credible threat of enforcement. *Chamber of Commerce v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995). Moreover, as was pointed out in *Chamber of Commerce*, enforcement of FECA provisions can be initiated by complaint by a private party and any FEC refusal to enforce challenged by a private party under 2 U.S.C. § 437g(a)(8). 69 F.3d at 603. "Therefore, even without a Commission enforcement decision, [the League is] subject to litigation challenging the legality of their actions if contrary to the Commission's rule."*Id.*

  B.  **This Matter is Ripe Under *Renne v. Geary.***

The sparse record evidence noted by the Court in *Renne v. Geary* is not analogous to the record here and, in any event, the Court did not make such factors decisive in a ripeness analysis. The Court found the lack of a credible threat of enforcement to be an important factor in deciding that the controversy was not ripe:

> The record also contains no evidence of a credible threat that [the law] will be enforced, other than against candidates in the context of voter pamphlets. The only instances disclosed by the record in which parties endorsed specific candidates did not, so far as we can tell, result in petitioners taking any enforcement action. While the record indicates that the Democratic committee feared prosecution of its members if it endorsed a candidate, we find no explanation of what criminal provision that conduct might be held to violate. Petitioners' counsel indicated at oral argument that [the law] carries no criminal penalties, and may only be enforced by injunction. Nothing in the record suggests that petitioners have threatened to seek an injunction against county committees or their members if they violate [the law].

501 U.S. 312, 322 (1991). As just explained, no doubts about the FEC's enforcement posture with regard to the challenged law are justified here. But even if resolving the question of whether the League's foregoing broadcast of future ads is ripe for review requires a record similar to the "concrete factual record" that Defendants argue the Court required in *Renne*, Defs' Mem. at 5,

**Plaintiff's Opposition
to Motions to Dismiss**       5

such a record has already been established here and any remaining ambiguities are not at all comparable to the situation in *Renne*.[5]

In its Verified Complaint, the League alleged that it

> intends to run materially similar grass-roots lobbying ads falling within the electioneering communication prohibition period before the next general election and within the electioneering communication prohibition periods before future primary and general elections in Maine when there are pending matters in the legislative or executive branch that similarly require referencing a clearly identified candidate for federal office in broadcast communications to the citizens of Maine. CCL is concerned about a range of issues in addition to laws protecting traditional marriage – such as partial birth abortion, permissive abortion, abortion clinic regulations, parental control of their children's education, regulation of sexual predators, legislation normalizing same sex relations, gambling, limiting the government's power to raise taxes and the freedom to advance its issues in the public forum –

Verified Complaint (VC) at ¶ 16. First, the ads will be "materially similar" to the ad withdrawn from broadcast in May, 2006. "Materially" in this sense means "[h]aving some logical connection with the consequential facts . . . . [o]f such a nature that knowledge of the item would affect a person's decision-making process; significant; essential . . . ." *Black's Law Dictionary* 991 (17th ed. 1999). Essential and consequential facts are those that would make the ad subject to the electioneering communication prohibition and those forming the basis of the constitutional claim regarding those ads. Thus, "what the text of such ads might be . . . [and] where or when the ads might run," Defs' Mem. at 5, are not genuine questions since the League alleges the intent to broadcast grass-roots lobbying ads "materially similar" to the Crossroads ad, and materially

---

[5] The League maintains that the fact that it was forced to withdraw the ad attached to its Verified Complaint from broadcast in June 2006 suffices to establish and maintain standing through final adjudication on the merits because the injury inflicted is capable of repetition yet evading review, which doctrine inherently includes the future ads Defendants wish to extricate from this case in this motion. *See* Plaintiff's Response to the Court's Suggestion of Mootness (filed concurrently with this response).

**Plaintiff's Opposition
to Motions to Dismiss**                               6

similar, by definition, means that the ads' text, placement and timing would put them in contravention of the electioneering communication prohibition, just as the text, placement, and timing of the Crossroads ad put it in contravention of the electioneering communication prohibition.

But in any event, the League has explicitly alleged facts that unequivocally put to rest any questions, valid or not, of the concreteness of the ads the League intends to run in the future. It has alleged sufficient details about the form, timing and placement of the future ads that fully meet the ripeness concerns expressed in *Renne*: the communication will "referenc[e] a clearly identified candidate," will be run "within the electioneering communication prohibition period before the next general election and . . . before future primary and general elections in Maine when there are pending matters in the legislative or executive branch," VC ¶ 16, and would likely be publicized by radio or television broadcast. *Heath Decl.* ¶¶ 18-19. *Cf. Renne*, 501 U.S. 322 (plaintiffs failed to specify what form offending "support or opposition would take" or "the nature of the endorsement" that would place them in the path of the challenged law and a credible threat of enforcement). In other words, even if, as the FEC contends, the League must allege "what candidate(s) it may wish to identify," "what the text . . . might be," "what legislative issues they might discuss," and "where or when the ads might run," in order for its claim to be a ripe for adjudication, those questions are answered by allegations in the first sentence of paragraph 16 of League's Verified Complaint.

Other information Defendants consider crucial to ripeness is superfluous. Under 2 U.S.C. § 434(f)(3)(A)(i) (the definition of "electioneering communication"), the prohibition on the use of corporate funds, 2 U.S.C. § 441b(b)(2), applies regardless of what candidate the League may wish to identify. Defendants' concerns about "what candidate(s) CCL may wish to identify" are

therefore unwarranted. Defs' Mem. at 5. "[T]he nature of the electoral environment in which the ads might air," *id.*, has no corollary in what the Court found lacking in the record in *Renne*, and therefore is not obviously essential for ripeness here, even under Defendants' theory.[6]

Any remaining genuine ambiguity about when the future ads might run is inherent to the legislative process itself:

> The decision regarding when to run ads like the "Crossroads" ad is necessarily tied to legislative decisions about debate and votes on the Federal Marriage Amendment. Whether the Christian Civic League will need to run such ads during the blackout period prior to the November election depends on whether the Federal Marriage Amendment (or other important legislative issues) is pending before the legislature and where it is in the process. In other words, the Christian Civic League will run such ads when there is an imminent vote or other deadline that requires immediate action by citizens voicing their opinion to their legislator so that the legislator can adequately represent the desires of his or her constituents. Because the timing of grass roots lobbying campaigns is inherently dependent on legislative whims, it is difficult to plan specific campaigns in advance and

---

[6]And if the phrase refers to questions of the intent or effect of the ads, subjective intent is not properly a part of any other similar analysis in the First Amendment area. It is well-established that the constitution requires that a would-be speaker must know, *based on the meaning of the words he is using*, whether or not his communication is regulable; a regulation of speech that instead relies on surmising the intent or effect suffers a constitutional defect. *Thomas v. Collins*, 323 U.S. 516 (1945); *see also Buckley v. Valeo*, 424 U.S. 1, 43 (1976), *McConnell v. FEC*, 540 U.S. 93, 192 (2003).

Moreover, when, as here, the right to petition is at issue, a fortiori where the First Amendment is also squarely at issue, questions of intent or motive are irrelevant. Under the *Noer-Pennington* doctrine, unless the League's grassroots lobbying ads themselves are objectively without merit as exercising the right to petition, then any finding of a subjective intent to influence elections would not be enough to deny the ads immunity from the electioneering communication prohibition.

Nor would such information be practically applicable to the workable standard needed to dispose of this case. Both parties agreed in briefing before the Supreme Court in *Wisconsin Right to Life, Inc. v. FEC*, 126 S. Ct. 1016 (2006) that an intent-based test for a grassroots lobbying exception to the electioneering communication prohibition would be unworkable. *Brief for the Appellee* 39 (The FEC said: "A constitutional standard that turned on the subjective sincerity of a speaker's message would likely be incapable as a workable application; at a minimum, it would invite costly, fact-dependent litigation."); *Reply Brief for Appellant* 16-17 ("WRTL has never proposed an *intent* test and rejects such a test as truly unworkable; it would lead to the 'fact-intensive' litigation that the FEC claims to despise.").

**Plaintiff's Opposition
to Motions to Dismiss**                                       8

>they are often created and executed within very short time frames. Such is the case with the "Crossroads" ad, which was developed because the Senate had finally decided to hold a vote on the Federal Marriage Amendment in early June.

Heath Decl. ¶ 12. The uncertainty of when the future ads will run is not related to whether the League's stopping the broadcast of future ads during blackout periods is "truly motivated by a well-founded fear," *Navagar*, 103 F.3d at 999, nor, therefore, is it relevant to whether the League's claims with respect to the future ads are ripe.

Likewise, any genuine ambiguity about the issues addressed in future ads is irrelevant because the application of the law to the ads does not depend on it addressing any particular legislative issue. And, in any event, the list of issues the League is demonstrably interested in publicly addressing, *see* VC ¶ 16, provides sufficient notice of the subject matter of future ads, and the abundance of these issues exponentially increases the likelihood that the League will again be forced to withdraw an ad that it would otherwise broadcast.

C.   **The League's Claims of Injury Are Not Speculative.**

Defendants repeatedly describe the League's claims regarding future ads as speculative while failing to provide authority for that specific proposition. There are two types of speculative claims: when the threat of prosecution is speculative and when the claim of injury is speculative. The Court in *Babbitt* noted that there is no standing for resolution of a claim in a federal court when the fear of prosecution is speculative, that is, when a plaintiff does not claim that they have been threatened with prosecution, that a prosecution is likely, or that prosecution is even remotely possible. 442 U.S. at 298-99. As noted above, Defendants have not claimed, nor could they claim, that the threat of enforcement is speculative here. The Defendants' criticism of the League's claims regarding future ads as "so speculative and hypothetical that they amount to a request for an advisory opinion," Defs.' Mem. at 5, instead amounts to a claim that the League's

**Plaintiff's Opposition
to Motions to Dismiss**                                      9

claims of *injury* are speculative. *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("[A] litigant must first clearly demonstrate that he has suffered an 'injury in fact.' That injury . . . must be concrete in both a qualitative and temporal sense."). But such an argument is unfounded here.

The Supreme Court explained in *Whitmore* that a speculative theory of injury is one that depends on unlikely contingencies placing the would-be plaintiff in the path or shadow of the law. For example, it is speculative to surmise that a death row inmate will be granted habeas corpus relief and a new trial, be convicted, sentenced to death, have that sentence reviewed by a state supreme court employing comparative review and reaching the legal conclusion that the absence in the comparative review "database" of another death sentence case will "skew" the comparison afforded the inmate asserting the injury. *Whitmore*, 495 U.S. at 156-58. Here, the chain of events putting the League in the path of the challenged statute, via future ads, is only one action away. And, in addition to explicitly alleging the intention to run ads that would place it at odds with law it challenges, doing so would be the very type of activity in which the League normally engages. Indeed, in addition to activities similar to but not comprising electioneering communications and the Crossroads ad, the League also ran a grass roots lobbying radio campaign in July 2004 encouraging people to contact Senators Snowe and Collins and ask them to support traditional marriage. Heath Decl. at ¶ 8.

The Court in *Whitmore* advised that an injury is also speculative if it depends on surmising that "'if [the plaintiffs] proceed to violate an unchallenged law and if they are charged, held to answer, and tried in any proceedings before [defendants], they will be subjected to the discriminatory practices that [plaintiffs] are alleged to have followed.'" *Id.* at 158 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)). The threat of injury in such a claim is insufficiently concrete because the plaintiffs "anticipate[d] violating lawful criminal statutes and being

**Plaintiff's Opposition
to Motions to Dismiss**                                   10

tried for their offenses," *O'Shea*, 414 U.S. at 496, while "[i]t was to be assumed that '[plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners.'" *Lyons*, 461 U.S. at 103 (quoting *O'Shea*, 414 U.S. at 497). In other words, a claimed injury was too speculative when it depended on deliberate lawbreaking to put the would-be plaintiff in the path of the challenged law. Here, on the other hand, the League's claim with respect to the Crossroads ad and future ads is a preenforcement challenge to protect First Amendment activities, by way of which it seeks to *avoid* breaking the law while challenging its constitutionality and, further, the challenged law unequivocally applies to the ads it has already broadcast and wishes to broadcast again.

Likewise, a claim of injury "contingent on a plaintiff having an encounter with police wherein police would administer an allegedly illegal 'chockenhol[d],'" *Whitmore*, 495 U.S. 149 (quoting *Lyons*, 461 U.S. at 105) is speculative, as is one that depends "on the prospective future candidacy of a former Congressman" who has since accepted a fourteen year term as a judge. *Id.* (referring to *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)).

A speculative claim of injury is one in which the injury is contingent on a series of events unlikely because of temporal delay and/or rational unlikelihood. But here, there is ample evidence in the record that the League intends to run ads in the future that will put them squarely at odds with the electioneering communication prohibition. To claim that the League's injury is speculative or hypothetical with regard to the future ads against the backdrop of the specific allegations regarding those ads and the demonstrated threat of enforcement against such ads "flies in the face of considerable precedent that a federal court may decide not only claims involving actual present injury, but also those involving a threat of injury which is sufficiently

**Plaintiff's Opposition
to Motions to Dismiss**             11

direct and immediate to constitute more than a string of contingencies or speculative characterizations." *Branch v. FCC*, 824 F.2d 37, 41 (D.C. Cir. 1987).

II.   **There is No Reason to Withhold Declaratory Judgment in this Matter.**

Defendants urge the Court to withhold a declaratory judgment regarding the League's future ads. Defs.' Mem. 7. While they couch this argument as an appeal to the Court's discretion under the Declaratory Judgment Act, the factors recommending discretionary withholding of a declaratory judgment in the cases they cite, *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) and *Jackson v. Culinary School of Washington, Ltd.*, 59 F.3d 254 (D.C. Cir. 1995), are not present here. Hence, the argument eventually relapses into the ripeness argument.

In *Wilton*, the Supreme Court expressly distinguished the situation there, where the lower court stayed a declaratory judgment action brought in federal court "in favor of parallel state litigation," 515 U.S. at 281, from that here, where the claim rests on a question of federal law.

> We not attempt at this time to delineate the outer boundaries of that discretion in other cases, for example, cases raising issues of federal law or cases in which there are no parallel state proceedings. . . . we conclude only that the District Court acted within its bounds in staying this action for declaratory relief where parallel proceedings, presenting opportunity for ventilation of the same state law issues, were underway in state court.

*Id.* at 290. Likewise, in *Jackson*, on remand from the Supreme Court for consideration in light of *Wilton*,[7] the Court of Appeals for the District of Columbia advised that, where a declaratory judgment would require interpretation of state law on matters of first impression, and it was unclear whether even the state law for which declaratory judgment was sought would apply to the

---

[7] In light of its intervening opinion in *Wilton*, in which it held that such decisions are considered only for abuse of discretion, the Supreme Court asked the Court of Appeals to reconsider its earlier holding that the district court's decision to grant declaratory judgment in the dispute was subject to *de novo* review.

**Plaintiff's Opposition
to Motions to Dismiss**                              12

dispute, the federal district court might well use the discretion afforded it and decline to issue a declaratory judgment. 59 F.3d at 255-56. The appeals court felt confident, however, after carefully reviewing the Supreme Court's holding in *Wilton*, that its "initial decision addressing the merits of appellants' claimed *federal* defense [was] unaffected." *Id.* at 255. The factors at issue in *Wilton* and *Jackson* advising the withholding of a declaratory judgment are not present here, where the claims seeking a declaratory judgment are based on a federal constitutional question about federal statutory law.

*Penthouse Int'l, Ltd. v. Meese*, insofar as it addresses declaratory judgment, holds, unremarkably, that "Article III case or controversy requirements apply as forcefully, of course, to relief sought under the Declaratory Judgment Act as to any other form of relief." 939 F.2d 1011, 1018 (D.C. Cir. 1991). *See also Branch*, 824 F.2d at 40 (standards for standing "remain applicable where the relief sought is merely a declaratory ruling"). Limited to its relevant holding, that justiciability requirements are the same for declaratory judgment actions as for other relief, *Penthouse Int'l, Ltd.* provides no guidance for when a federal court should discretionarily withhold declaratory judgment, and raises no questions with regard to justiciability that are insufficiently addressed *supra*.[8]

**Conclusion**

Where, as here, future conduct is alleged in a preenforcement challenge of a law that arguably abridges First Amendment rights, standing and ripeness are established if there is a credible threat of the law's enforcement. *Navegar*, 103 F.3d at 998. The threat of enforcement of

---

[8] The Court in *Penthouse Int'l, Ltd.* determined that the Plaintiff's claims were not justiciable because it did not suffer an actual injury because there was no credible threat of prosecution, 939 F.3d at 1016, and the plaintiff had no "constitutional right to be free of government criticism that would discourage the distribution of its magazine," 1016-18.

**Plaintiff's Opposition
to Motions to Dismiss**                            13

the electioneering communication prohibition against past or future broadcasts of the League's ads is credible. Whether framed an issue of ripeness or the concreteness of the League's claims, the record here is more than adequate to answer any relevant questions regarding the future ads the League would like to run and it is reasonable to conclude that the League will again find itself at odds with the electioneering communication prohibition. Finally, declaratory judgment should not be discretionarily withheld because this matter arises from a question of federal law and there is no parallel state court litigation or questions about the applicability of state law.

    For these reasons, the Court should deny Defendant FEC's Motion to Dismiss "Plaintiff's Claims Regarding Hypothetical 'Grass Roots Lobbying'" and Intervenor-Defendants' Motion of for Partial Judgment on the Pleadings.

Dated June 30, 2006

Respectfully submitted,

/s/ James Bopp, Jr.

| | |
|---|---|
| M. Miller Baker, D.C. Bar # 444736 | James Bopp, Jr., D.C. Bar #CO0041 |
| Michael S. Nadel, D.C. Bar # 470144 | BOPP, COLESON & BOSTROM |
| MCDERMOTT WILL & EMERY LLP | 1 South Sixth Street |
| 600 Thirteenth Street, NW | Terre Haute, IN 47807 |
| Washington, D.C. 20005-3096 | 812/232-2434 telephone |
| 202/756-8000 telephone | 812/234-3685 facsimile |
| 202/756-8087 facsimile | *Lead Counsel for Plaintiff* |
| *Local Counsel for Plaintiff* | |