United States District Court
District of Columbia

| | |
|---|---|
| **The Christian Civic League of Maine, Inc.**<br>70 Sewall Street<br>Augusta, ME 04330**,**<br>                                              *Plaintiff*,<br><br>v.<br><br>**Federal Election Commission,**<br>999 E Street, NW<br>Washington, DC 20463**,**<br>                                              *Defendant***.** | **Cause No.** 1:06CV00614 (JWR, LFO, CKK)<br><br>THREE-JUDGE COURT |

## Plaintiff's Response to Intervenor-Defendants' Allegations

Plaintiff the Christian Civic League ("the League") offers the following in response to this Court's July 18, 2006 order and in response to Intervenor-Defendants' allegations in their July 7 Memorandum ("Intervenors' Mem."). The League has also addressed similar contentions in its Reply in Support of Its Motion for Preliminary Injunction, Docket # 26, to which this Court's attention is directed and the relevant parts of which the League incorporates here by reference.

Intervenors' statements ignore key material facts in the record and offer a misleading, conclusory view based on a tiny slice of the record. Their statements suggest that they would withhold constitutional protection from small grassroots lobbying and issue advocacy

**Response to Intervenor-Defendants'**
**Allegations**                                                                 1

organizations, and ignore the Constitution's broad protection of the exercise of First Amendment rights of speech, association and petition.

I.      **The Intervenor-Defendants' Allegations Are Unsupported by the Record.**

   A.   **Focus on the Family, Not Counsel, Contacted the League About Running a Grassroots Lobbying Ad Supporting the Federal Marriage Amendment.**

Counsel did not contact the League, through Focus on the Family or otherwise, in order to "trump up" litigation. *Cf.* Intervenor-Defendants' Mem. at 7. Focus on the Family ("Focus"), not counsel, sent an email regarding the Federal Marriage Amendment ("FMA") to the League and other, similarly affiliated, organizations.[1] Heath Deposition. (Docket # 26-4) ("Heath Dep.") 45:13-46:6 (April 13, 2006); *see also id.* at 55:10-24. Focus, not counsel, suggested that radio ads targeting the Maine Senators' constituents and urging them to contact their Senators would be an appropriate and effective way to affecting the Senate vote on the FMA, and the League agreed and began planning to run an ad. Heath Dep. 45:13-23, 46:12-14, 56:13-18.

Moreover, there was nothing unusual about Focus sending such a suggestion to the League. The Federal Marriage Amendment was an issue of concern to and discussion between Focus and the Family Policy Councils, including the League, long before this litigation ensued. Focus and the League have worked together and corresponded for approximately 15 years

---

[1] The League is the Family Policy Council ("FPC") for Maine. *See State FPC Family Policy Councils*, http://www.family.org/cforum/fpc/. Family Policy Councils are independent state-level organizations formed by business and community leaders that conduct policy analysis, promote responsible and informed citizenship, facilitate strategic leadership involvement, and influence public opinion. While they have no corporate or financial relationship to each other or to Focus on the Family, they nonetheless work with Focus and each other to further "a uniform purpose serving as a voice for the family and assisting advocates for family ideals who aim to recapture the moral and intellectual high ground in the public arena." *Id.*

**Response to Intervenor-Defendants'**
**Allegations**                                    2

regarding policy issues of mutual interest, including the FMA. Heath Declaration (Docket # 26-2) ("Heath Decl.") ¶¶ 3, 4, 7 (April 21, 2006). This, in turn, is not surprising, as the issue at the center of the Federal Marriage Amendment debate, preserving traditional marriage, is a high priority for both organizations, which believe it to be a foundation of society and the best environment in which to raise children. Heath Decl. ¶ 4.[2] As Focus was undoubtedly aware, in 2004 the League had engaged in grassroots lobbying for a previous permutation of the Federal Marriage Amendment. Heath Dep.34:3-35:16 (listing methods of communication used in 2004 grassroots lobbying in favor of the FMA). The League had, in fact, mounted a radio campaign in support of the 2004 Federal Marriage Amendment in July 2004 encouraging people to contact Senators Snowe and Collins and ask them to support traditional marriage. Heath Decl. ¶¶ 6, 8; Pl.'s Resp. to Def.'s Req. Prod. 2, 3 and 4 (Docket #s 26-7, 26-8, 26-9, 26-10, 26-11, 26-12).[3] Again, in 2006, Tim Russell, the lobbyist for the League, participated in multiple conference calls, e-mail exchanges and discussions with legislators, grass roots activists, media, and national level pro family groups regarding the Federal Marriage Amendment. Heath Decl. ¶9. Focus, not counsel, sent the email to the League to which Intervenor-Defendants refer and it was merely one in a series of communications between the two organizations over 15 years that addressed this

---

[2]The League's concern with such issues is not limited to the federal context. The Coalition For Families, an affiliated Maine-registered political action committee, has been active and vocal in leading a "peoples' veto" of the Maine legislature's making sexual orientation subject to the Maine Human Rights Act.

[3]Mr. Heath did not remember this ad during his deposition but the text had been previously provided to opposing counsel in response to their request for production of documents. Heath Decl. ¶ 16.

**Response to Intervenor-Defendants'**
**Allegations**                                        3

and related issues. The League has and is active in the public debate of these issues. The email sent by Focus is therefore hardly indicative of any "special" plan.

      Nor was the inclusion of legal advice in the email unusual or untoward. Counsel for the League in this action has been counsel for Focus and provided similar legal advice to Focus and FPCs[4] for two years. The email Focus sent shared accurate and timely information provided to Focus for its own use and the use of FPCs regarding the legal ramifications of grassroots lobbying in advance of the upcoming vote on the FMA. Neither Focus nor counsel ever represented to the League that the suggested ads were for the purpose of a law suit. Heath Dep. 57:10- 24; Heath Decl. ¶ 10 (answering this specific question). Nor did the League interpret the email as saying so. When asked in deposition by the FEC about "any discussion of the electioneering communication regulation and federal law," and its application to the ads he planned to run, Mr Heath answered:

> That it's – that this is prohibited speech or prior – within a certain window before an election, and Maine's primary is in June, early June. And so our desire to run the ad consistent – in – to run the ad at a time that makes sense in order to influence Senators Snowe and Collins with respect to a pending vote scheduled for July is interfered with by the – by the blockout (sic) period 30 days prior to June. So that was – *that was presented by Focus in good faith indicating that this is the way it is.*

Heath Dep. 48:21- 49:5 (emphasis added). Mr. Heath considered the information on the electioneering communication prohibition as coming from Focus, a trusted associate, and a matter of relevant fact, not as an invitation by counsel to sue. *See also* Heath Dep. 49:6-11 (Q. So Focus brought you the idea, and in bringing you the idea, they also mentioned there was this legal

---

    [4]*See infra*, n. 1.

**Response to Intervenor-Defendants'**
**Allegations**                              4

issue as well? A. Yes. Q. So that's something that came from them? A Yes.).

Mr. Heath thus learned that federal law could prohibit grassroots lobbying efforts in Maine, and learned this at about the same time as he learned that the Senate was planning to hold a vote in early June on the Federal Marriage Amendment. Heath Decl. ¶ 10. The timing of the electioneering communication prohibition's blackout period meant that it directly interfered with the what the League and Focus considered an appropriate and effective grassroots lobbying effort:

> Q Can you explain what you mean by appropriate grass roots lobbying effort?
> A Well, the federal marriage amendment is due to be voted in July, and – in Congress. And it is appropriate to, given the stand of Senators Snowe and Collins, for citizens to be advised of that fact, and to be urged to contact Senators Snowe and Collins, and urge them to vote in the affirmative for the federal marriage amendment. And that should happen – that should start happening soon and continue into July or toward July or toward the vote.
> Q Why does it have to start soon?
> A Well, because these things take – campaigns take time to work their way through the grass roots networks, and so it's good to get people thinking about, talking about, and contacting political figures like Senators Snowe and Collins as they're moving toward the vote.
> Q So when you say appropriate, what does that – what does that include?
> A Can you –
> Q What is the ad trying to do?
> A It is encouraging the listener to contact their senator.
> Q Does it have any other purpose?
> A No.

Heath Dep. 46:24-47:25. In the opinion of two organizations experienced in issue advocacy and grassroots lobbying on this very issue, the ad needed to run during a period that fell within the black out period and it should encourage the listeners to contact the Senators, one of whom happened to be up for reelection. The League was thus faced with a dilemma: in order to run appropriate and effective ads, it would be violating the electioneering communication

**Response to Intervenor-Defendants'
Allegations**                                    5

prohibition.

> Q So they suggested that you run the ad even though there was this legal issue?
> A Yes. No. I mean they didn't encourage us to do something illegal, they advised–
> they advised us of the law. And they said that the – and they suggested that the
> grass roots advertising would be helpful in influencing senators.

Heath Dep. 49:12-18. The League could either violate the law or, as the information that counsel provided to Focus correctly stated, an FPC could file suit, seeking an expedited hearing in hopes of securing an injunction allowing the running of the ads during the blackout period. As part of the legal advice and as a service to Focus and the FPCs, counsel offered to represent "any group whose *planned* broadcast falls within the blackout period" *Email from John Paulton* (*Focus on the Family*) *to Michael Heath* (*Christian Civic League*), *et al.* (March 24, 2006) (Docket # 17, Exhibit B) (emphasis added).[5] Faced with such a choice, the League chose to file suit.

    **B.**    **Even A Cursory Review of the Record Reveals That the Intervenor-Defendants' Allegations That Counsel Supplied the League With the Text of the Ad Before the League Planned to Engage in Grassroots Lobbying is Demonstrably False.**

The record also shows Intervenors' allegation that the League planned to run the ad only after "counsel supplied [the League] with the text of the 'Crossroads' ad . . ." to be patently false:

> Q So Focus on the Family sent the text of the ad to CCL a couple weeks ago?
> A No. *The Focus on the Family developed the text of the ad after learning of my agreement or learning of my – after I responded to them.*
> Q So when they first contacted you, what did they communicate?
> A They communicated that this would be an appropriate grass roots lobbying activity.
> Q And *then you indicated your agreement, and then at some later point, they sent back the ad text, proposed ad text*?

---

[5]And the record establishes that the League planned to run the ad before Focus had **a)** offered any assistance in drafting the text of the ad, *see infra*, Heath Dep. 46:9-11; **b)** researched the media buy, *id.* 51:1-19; or **c)** the League had contact with counsel. *Id.* 49:22-25.

**Response to Intervenor-Defendants'**
**Allegations**                        6

> A *Yes*.

Heath Dep. 46:7-19 (emphasis added). The source of the text for the ad was explored and established at least once more at Mr. Heath's deposition:

> Q But at some point a text of the Crossroads ad arrived at CCL?
> A Uh-huh.
> Q Do you remember when that was?
> A I don't remember exactly.
> Q Do you remember from whom that text came?
> A I don't know.
> Q *But it was someone at Focus on the Family*?
> A *Yes*.

Heath Dep. 59:4-12 (emphasis added). Hence, "[a]s made plain by the record," Intervenors' Mem. at 7, Focus supplied the text of the "Crossroads" ad, not Counsel. And the text of the ad was created and supplied only *after* the League expressed its desire to run a grassroots lobbying ad in Maine, not before, as Intervenor-Defendants allege.

### C. Because the FMA Was a Critical Issue for the League But Resources and Time Were Tight, It Relied on Help From Focus in Drafting Text for the Ad and Researching the Media Buy.

The League considered grassroots lobbying for the FMA a critical project, even though its resources and the time needed to draft, produce and place an ad were very limited at the time it decided to run the ad. Accordingly, the League worked closely with Focus in producing the ads, Heath Decl. ¶ 13, and planned special efforts to raise funds for the ad. Heath Decl. ¶ 16. Focus has in-house expertise crafting such ads, saving the League from committing resources to that aspect of the ad, and could produce the text within the time constraints that the pending vote on the FMA militated. Providing the text of the ad assisted the League in this regard, Heath Decl. ¶¶ 13-14, Heath Dep. 50:8, as did Focus' researching the "buy" of the ad. *Id.* 51:1-3.

**Response to Intervenor-Defendants'**
**Allegations**                          7

>   D. **Small Issue Advocacy Organizations That Must Raise Funds For Their Advocacy Have the Same First Amendment Rights As Do Large, Well-Funded Ones and Funding for The Ads At Issue Here Was In Place Well Before The Ads Started.**

Intervenor-Defendants imply that organizations such as the League should not have access to the courts to litigate First Amendment rights because they do not have substantial resources reserved for their activities. *See* Intervenor-Defendants' Mem. at 7 (the League's complaint is "trumped up" because it "had neither intent nor funds to engage in any advertising . . . [and] did not even raise the money to run the ad until after the complaint had been filed."). This idea directly contradicts the view that "[t]he First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion." *Buckley v. Valeo*, 424 U.S. 1, 49 (1976). The protection afforded speech and the right to petition on issues of public import by the First Amendment does not have an entry fee and it does not brook placing a financial condition on the exercise of those rights.

Moreover, raising funds for the ad after planning to run it was indicative of nothing. Funding activities after they are planned is unremarkable for organizations such as the League, which do not have large endowments or grants from foundations or trusts. And as Mr. Heath, who has more than 11 years of experience with such activities has testified, raising money for already planned activities does not present scheduling problems. Heath Dep. 70:2-5 (Q ". . . In order to start running the ad on May 10, when would CCL need to have the funding?" A "The -- a few days before the start date."). The record shows that Heath's answer was accurate and that there was little reason to doubt that the resources would be available to the League in time to

**Response to Intervenor-Defendants'**
**Allegations**                                                8

fund the project.

The League filed its Complaint on April 3, and by April 13, the time of Mr. Heath's deposition under the expedited discovery schedule agreed to by the parties, a commitment for funding of the ad had already been made: Q "Does CCL currently have the funds to do it?" A "No. But we have -- I have one donor who has committed the funds if -- they've committed the funds, but I haven't decided whether I will go to that donor to fulfill that commitment or not." Heath Dep. 54:4-8. Not only were the necessary funds obtainable within ten days, but their availability did not depend on a particular donor; there were other potential donors to fund the ads at issue here. Heath Dep. 69:6-24 (approximately 1500 potential regular donors and "at least a half dozen" large donors were possible sources for funding the ad.). As is common practice with small issue advocacy organizations, the League relied on being able to secure funding for the ad after committing to run it and before it should be actually aired, and the record validates that reliance.

## II. The Actions Leading to This Case Fall Under the Broad Protection of the Exercise of First Amendment Rights of Speech, Association and Petition.

As demonstrated above, the events leading to this case were not as portrayed by Intervenor-Defendants. But even if the scenario were as they allege, that counsel here *had* directly contacted the League and *urged* that it file suit, such facts would not obviate the League's claims. Intervenor-Defendants view is that their version of the events leading to this litigation would make it "unseemly" to find it justiciable. Intervenors' Mem. 7. But had counsel directly contacted the League and urged it to file suit, when, as here, such actions were necessary to secure or expand constitutionally guaranteed rights, those actions would themselves be a

**Response to Intervenor-Defendants'**
**Allegations**                                          9

protected exercise of the First Amendment. *N.A.A.C.P. v. Button*, 371 U.S. 415, 428-29 (1963) (We hold that the activities of the NAACP, its affiliates and legal staff shown on this record[6] are modes of expression and association protected by the First and Fourteenth Amendments). Even a naked attempt to secure a suitable plaintiff to establish an exception to the electioneering communication prohibition for grassroots lobbying would itself be an act protected by the First and Fourteenth Amendments, not "indicia of [the suit's] having been trumped up." Intervenors' Mem. at 7.

Accordingly, prohibiting or punishing such an attempt would itself subject to strict scrutiny. In *In re Primus*, 436 U.S. 412, 431(1978), the Court held that soliciting[7] a prospective client for an ACLU-sponsored suit for damages for violating her civil rights "c[a]me[ ] within the generous zone of First Amendment protection reserved for associational freedoms," and attempting to prohibit it was, accordingly, subject to the "'exacting scrutiny applicable to limitations on core First Amendment rights . . . .'" *Id.* at 432 (quoting *Buckley*, 424 U.S. at 44-45). Likewise, the litigation at issue here is "a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *Id.* And

---

[6] The First Amendment-protected activities at issue in *Button* included the NAACP legal staff explaining the legal steps necessary to achieve desegregation to a meeting of possible plaintiffs. *Id.* at 421. The meetings were sometimes prompted by the state organization distributing letters and bulletins "urging active steps to fight segregation," distribution of petitions to local branches to be signed and filed with school boards, and advice to local NAACP officials "to obtain, as petitioners, persons willing to 'go all the way' in any possible litigation that may ensue." *Id.* at 422.

[7] The letter read, in part, "[t]he American Civil Liberties Union would like to file a lawsuit on your behalf for money against the doctor who performed the operation." *In re Primus*, 436 U.S. 412, 417 (1978).

**Response to Intervenor-Defendants'**
**Allegations**                                    10

> [a]s *Button* indicates . . . the efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants. "Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas v. Collins*, 323 U.S. 516, 537 (1945). The First and Fourteenth Amendments require a measure of protection for "advocating lawful means of vindicating legal rights," *Button*, 371 U.S., at 437, including "[advising] another that his legal rights have been infringed and [referring] him to a particular attorney or group of attorneys . . . for assistance," *id.*, at 434.

*Id.* at 431-32. Again, even were counsel's communication with the League and the circumstances of its filing suit as Intervenor-Defendants claim, it would be a protected exercise of the First Amendment, not a cloud on justiciability.

Moreover, here, unlike in *Button* or *In re Primus*, the civil liberty at issue, grassroots lobbying, is both general advocacy of a position in a matter of public import and the right to petition government. Accordingly, the civil liberties the litigation addresses are protected under the First Amendment both as part of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), *and* as a quintessential exercise of the right to petition. *Eastern R.R. President Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-138 (1961); *Liberty Lobby, Inc. v. Pearson*, 390 F. 2d 489, 491 (D.C. Cir. 1968). The right to petition is "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'" *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (quoting *United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967)).

And, unlike as in *Button* and *In re Primus*, the League's bringing suit is not in tension with a similar countervailing government interest "of considerable moment to the legal

**Response to Intervenor-Defendants'
Allegations**                                                  11

profession and to society." *In re Primus*, 436 U.S. at 421. If, as the Court provided in *Button*, "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights," 371 U.S. at 439, *a fortiori*, the constitutional right to litigate on behalf of the rights of speech, association and petition should not be impinged where no such subordinating government interest is even at stake.

**Conclusion**

Intervenors' allegations are, at best, a colorful take on the record. The allegation that counsel supplied the League with the text of the ad is demonstrably false. The League and Focus, who did supply the text of the ad, have a 15 year relationship centered on common interests in issues of public import including the FMA, so their suggestion of running the ad at issue here was not remarkable.

Counsel here for the League, which is the Family Policy Council for Maine, has been counsel for Focus for two years and in that capacity has offered advice to Focus and the FPCs on complying with and the effect of campaign finance and election laws that abridge First Amendment rights, including the electioneering communication prohibition. Neither Focus nor counsel ever represented to the League that the suggested ads were for the purpose of a law suit and the League never interpreted the information that Focus provided in that way. The League planned to run the ad before Focus had offered any assistance in drafting the text of the ad, researched the media buy, or the League had contact with counsel.

Requiring small issue advocacy organizations to demonstrate substantial financial reserves before a pre-enforcement suit could be deemed justiciable would have the intolerable

effect of placing a financial condition on the exercise of First Amendment rights. It is common practice among small, grassroots organizations to raise money for projects after planning and committing to them. And the record here validates the League's similar reliance on gathering the necessary funds after it planned to run the ad.

Even if the events leading to the filing of this suit were as Intervenor-Defendants allege, the constitutional right to litigation is a form of speech, association, and petition and an attempt to prohibit or punish it is subject to strict scrutiny. And no compelling government interest supports quashing this suit even if counsel had directly contacted the League and urged it to file a complaint. The League's claims are justiciable because the injuries they allege are capable of repetition yet evade review, and the Intervenor-Defendants' allegations, albeit unfounded, do nothing to counter this.

Dated July 24, 2006                                                  Respectfully submitted,

| | |
|---|---|
| _____ | /s/ James Bopp, Jr.<br>_____ |
| M. Miller Baker, D.C. Bar # 444736 | James Bopp, Jr., D.C. Bar #CO0041 |
| Michael S. Nadel, D.C. Bar # 470144 | BOPP, COLESON & BOSTROM |
| MCDERMOTT WILL & EMERY LLP | 1 South Sixth Street |
| 600 Thirteenth Street, NW | Terre Haute, IN  47807 |
| Washington, D.C. 20005-3096 | 812/232-2434 telephone |
| 202/756-8000 telephone | 812/234-3685 facsimile |
| 202/756-8087 facsimile | *Lead Counsel for Plaintiff* |
| *Local Counsel for Plaintiff* | |